C:\Case Files\Lee\Motions\2255 motion 06-26-2006.wpd

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


UNITED STATES OF AMERICA                        PLAINTIFF/ RESPONDENT

vs.                              NO: 4:97-CR-00243(02) GTE

DANIEL LEWIS LEE                                    DEFENDANT/MOVANT


MOTION PURSUANT TO 28 U.S.C. § 2255
TO VACATE CONVICTION AND SENTENCE[1]

COMES NOW Daniel Lewis Lee ("Movant"), by his undersigned counsel, and moves

this Court, pursuant to 28 U.S.C. § 2255, to vacate, set aside, and/or correct his convictions

and sentences of death, on the ground that his conviction and sentences were imposed in

violation of the United States Constitution or the laws of the United States.  Movant seeks

a hearing on all disputed issues of fact and reserves the right to amend this petition in

accordance with law.  Movant is presently confined on death row within the United States

Penitentiary, at Terre Haute, Indiana.

---

[1]This motion substantially adheres to the format of the standard form appended to the
Rules Governing Section 2255 Proceedings for the United States District Courts.  *See* Rule
2(c).  The standard form directs that a 2255 motion should be limited to a statement of the
"specific facts which support [a] claim" and that a 2255 motion should "not argue or cite
law."  While it became sometimes necessary in this motion to cite cases and law in order to
set out the factual premise of a claim, Movant's counsel have kept legal argument to a
minimum.  Movant's counsel request that the Court set a status conference in order to discuss
issues of briefing and scheduling.

1

In support of this motion, Movant states the following:

1.      The judgments of conviction and sentences that are the subjects of this challenge were entered in the United States District Court for the Eastern District of Arkansas, in Little Rock.  The case was docketed as *United States v. Daniel Lewis Lee*, LR-CR-97-243(2)-GTE.

2.      Judgment was entered on May 13, 2002.

3.      Movant was sentenced to death.

4.      Movant and his co-defendants, Kirby Kehoe and Chevie Kehoe (father and son, respectively), were charged in a seven-count superseding indictment.  Not all defendants were charged in all counts.  Count one charged all three defendants with racketeering in violation of 18 U.S.C. § 1962(c).  There were ten racketeering acts alleged under Count one. Movant was named in Acts four through seven, which alleged Movant's participation in the bombing of the city hall in Spokane, Washington and three acts of murder.   Count two charged all three defendants with a racketeering conspiracy in violation of 18 U.S.C. § 1962(d).  Counts three, four and five charged Movant and co-defendant Chevie Kehoe with the murders of William Mueller, Nancy Mueller and Sarah Powell ("the Muellers') in aid of racketeering in violation of 18 U.S.C. § 1959.  Counts six and seven of the indictment were dismissed by the Government prior to trial.  The Government sought the death penalty as to Movant and Chevie Kehoe.

5.      Movant pleaded not guilty and, with co-defendant Chevie Kehoe, proceeded to trial.  Co-defendant Kirby Kehoe pleaded guilty to count two of the indictment.

6.      Movant was tried by a single jury which hear both the guilt- and penalty-phases of his trial.

7.      Movant testified at a pre-trial hearing concerning the departure of one of his attorneys to take a position as an Assistant United States Attorney in the same office that was prosecuting Movant and seeking a sentence of death.  He also testified at a suppression hearing prior to the commencement of the penalty-phase.  Movant did not testify before the jury at either the guilt- or penalty-phase of his trial.

8.      Movant appealed his conviction and sentences of death to the United States Court of Appeals for the Eighth Circuit.

9.       On July 8, 2004, the Eighth Circuit, under Docket No. 02-2389, affirmed Movant's convictions and sentences.  *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004).  The following grounds were raised:[2]  (1) Movant's Sixth Amendment confrontation rights were violated by the admission of hearsay statements made by non-testifying co-defendant Chevie Kehoe to Gloria and Cheyne Kehoe;  (2) this Court abused its discretion by failing to give an accomplice instruction requiring the jury to consider whether the testimony of Gloria and Cheyne Kehoe was sufficiently corroborated;  (3) this Court abused its discretion by denying Movant's motion to sever his trial from Chevie Kehoe's;  (4) there was insufficient evidence to prove that Movant was involved either in the charged criminal enterprise or in the conspiracy;  (5) Movant presented a challenge to the federal death penalty statute;  (6) this

---

[2]The briefing filed on Movant's behalf in the Eighth Circuit speaks for itself and the following summary is not intended to substitute for the specific contents of those briefs.

Court erred when it recognized a potential juror's bias yet failed to strike that juror; (7) Movant's confrontation rights were violated when this Court allowed Movant's counsel to stipulate to the receipt of evidence at his penalty phase which the jury had already heard and seen during Chevie Kehoe's penalty phase; (8) this Court erred in failing to dismiss the indictment on the basis that it did not allege every element of a capital offense by including the aggravating factors necessary to impose a death sentence; (9) this Court violated Movant's due process rights and 18 U.S.C. § 3432 by holding a hearing without his counsel having received notice of it or being present and by ruling that the prosecution did not have to provide defense counsel the names of witnesses three days before trial; (10) Movant's discovery rights were violated when this Court improperly excused the government from complying with § 3432 by not requiring the government to disclose the names of witnesses before trial; (11) Movant's death sentence was arbitrarily imposed because Chevie Kehoe, the more culpable defendant, did not receive the death penalty; and (12), Movant's Sixth Amendment right to the assistance of counsel was violated by conflicts of interest.

Movant also sought review in the Supreme Court of the United States by petitioning for a writ of *certiorari*. The case was docketed in the Supreme Court as No. 04-8773. On June 27, 2005, *certiorari* was denied. *Lee v. United States*, 125 S.Ct 2962 (2005). The following grounds were presented to the Supreme Court: (1) whether a capital defendant's Sixth Amendment right to the effective assistance of counsel is violated when his counsel are prohibited from showing any government discovery to him and from disclosing to him the names of any government civilian witnesses, all in the absence of any specific factual

findings by the district court that would support such a restriction on attorney-client communication; (2) whether, in a capital trial, the actions of the defendant's lead counsel give rise to an actual conflict of interest in violation of the Sixth Amendment right to counsel when counsel testifies against his client's interests and stated position during a pretrial hearing at which counsel also represents that client; (3) whether the Confrontation Clause of the Sixth Amendment or the rules of evidence preclude the government in a federal criminal case from introducing hearsay statements given by a non testifying co-defendant to relatives who later testify after becoming paid government informants, where the out of court statements are not otherwise admissible under a firmly rooted hearsay exception and are not subjected to cross-examination; and (4), do the Fifth and Eighth Amendments and 18 U.S.C. §3595(c)(1) require courts of appeal to conduct "intra-crime" proportionality review of federal death sentences involving multiple co-defendants and, if so, does the constitution and federal law prohibit the execution of a federal capital defendant where an equally or more culpable co-defendant receives a life sentence from the same jury?

10.    Movant has filed no petitions or applications outside of litigation directly associated with this criminal case. The United States has twice appealed orders entered by this Court to the Eighth Circuit. *See*, *In re United States*, 197 F.3d 310 (8th Cir. 1999) (Writ of mandamus issued quashing subpoenas issued by the trial court); *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001) (Reversing order granting Movant a new penalty-phase hearing).

GROUNDS FOR RELIEF

INTRODUCTION – A CASE FOR ACTUAL INNOCENCE

11.     This is a case that should leave any observer uneasy as to whether or not the criminal justice system worked.  There are many aspects of this case that are disturbing and strongly suggest that Movant Daniel Lewis Lee is, as he has always claimed to be, an innocent man convicted and sentenced to death for crimes he did not commit.  Our judicial system's worst nightmare is, or should be, the execution of the innocent; our penultimate nightmare is, or should be, this case, *i.e.*, an innocent man unjustly convicted and then unjustly sentenced to death.  Everything about this case is disturbing; every corner turned raises new questions. Among those issues are the following:

- The narrow time-frame within which the crimes had to have occurred for Movant to have been in Spokane, Washington when he was;

- The inherent improbability that a man in Movant's physical condition, having recently lost an eye, would be the chosen accomplice to the robbery of heavily-armed well-trained victims and then serve as the  half-blind co-driver on a 37-hour drive from Arkansas to Spokane;

- The quality of the key witnesses, all of whom had axes of various sizes and shapes to grind;

- The minimal probative value of the forensic evidence: "similar" hair; "similar" paint chips; Movant's fingerprints on items to which Movant was known to have access;

- The robust testimony of a series of reputable, reliable, and disinterested honest citizens who credibly, independently and consistently reported one or more sightings or encounters with one or more of the victims long after their supposed deaths and disappearance on January 11, 1996, sightings that placed one or more of the victims with known violent people who were themselves early suspects in the crime;

- The documented willingness of investigators to feed witnesses details of the crime and the prosecution's theory of how and why the murders were accomplished;

- The undeniable reality that the abhorrent nature of both defendants' white supremacist beliefs, coupled with Movant Lee's physical appearance (Nazi tattoos – a swastika and "SS" lightning bolts – on his neck; a missing left eye) had to have repulsed the jury;

- The unexplored and unexplained role of Christian Identity and White Supremacist fringe groups in the case;

- A defense attorney who defected to the prosecution shortly before trial;

- The series of witnesses who reported Cheyne Kehoe's confessions to the murders;

- The jury's rejection of numerous racketeering acts and other allegations;

- Newly-discovered evidence that further undercuts the Government's key time-line;

- Newly-discovered evidence concerning the very existence of the "APR," the RICO enterprise which conferred federal jurisdiction;

- Newly-discovered evidence, or evidence withheld in violation of the government's *Brady* obligations, that others carried out the murders of the Mueller family.[3]

---

[3]With regard to the Government's constitutional *Brady* obligations, Movant's counsel requests that the Government review its files and the files of its investigating agencies for any information favorable to the defense bearing on guilt or punishment, including – but not limited to – any evidence that other members of white supremacist or Christian Identity groups, or other like groups, were responsible for the murders of the Mueller family or otherwise played a role in the crimes charged in, or related to, this case. *See*, *Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitney*, 514 U.S. 419, 438 (1995) (Prosecutors are obligated "to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." Should additional *Brady* evidence be discovered, Movant will amend the petition and seek relief appropriate to the nature of the material newly-disclosed or uncovered.

FACTUAL BACKGROUND

12.    The bodies of William Mueller, Nancy Mueller, and Sarah Powell were recovered from the Illinois Bayou on Lake Dardanelle near Russellville, Arkansas, in late-June 1996. It was critical to the Government's case to establish that the Mueller family had been murdered on or extremely close to January 11, 1996.  However, the exposure to water and climate had caused significant decomposition.  A state medical examiner, William Sturner, could neither determine a cause of death or when death occurred, beyond a range of four to six months.

13.    The Government's evidence of Movant's involvement in the Mueller murders rested entirely upon bargained-for testimony and an impossibly tight time frame.

14.    The only witnesses providing direct evidence against Movant were: Gloria Kehoe, Cheyne Kehoe, James Wanker and Davine Wanker.  Gloria Kehoe bargained for, and received, dismissal of pending federal charges, immunity from prosecution for any offenses related to the murders and the RICO enterprise counts, and substantial cash payments ($2,500 per month) for her testimony. Cheyne Kehoe, despite attempting to kill two Ohio police officers in a shoot-out, received a grant of immunity, sentencing concessions in Ohio, and placement in the Federal Witness Protection Program for his testimony.  At the time of trial, the defense was led to believe – apparently erroneously – that the Wankers had received no consideration for their testimony.  Each provided evidence of a causal admission by Movant that, if actually made, may have been calculated more to impress than inform.

15.    With the exception of the bargained-for testimony, the Government, on the

basis of circumstantial evidence alone, theorized the Muellers were murdered at some point between January 11-13, 1996. However, a series of reputable, reliable and disinterested witnesses provided direct evidence to the contrary. A summary of their testimony follows:

a.      Ester Anderson, a resident of Tilly, knew the Muellers and saw their Jeep and attached trailer at their residence on January 17th, 1996. The trailer had been backed up to the lower level of the Mueller residence.

b.      Mary Reid had known the Muellers for eleven years. On January 18, 1996, Ms. Reid saw Nancy Mueller who called "hello" to Ms. Reid from a beige-colored car as Reid left a Russellville bank. Ms. Reid conversed with Mrs. Mueller, who was seated in the front of the car with an unknown man. Ms. Reid also observed William Mueller sitting in the back of the car with two other unknown men. The date was corroborated by bank video surveillance records. Ms. Reid indicated that she was "a hundred percent positive" that a vehicle owned by Paul Humphrey, an early suspect in the killings, was the car in which she saw both Muellers. Ms. Reid also identified photos of Mr. Humphrey, David Mason, and Timothy Coombs, as the men in the vehicle with the Muellers.

c.      Sue Weaver, a Wal-Mart employee, testified that Mr. Mueller bought a large quantity of bottled water in January or February of 1996. She recalled asking Mr. Mueller what he was going to do with so much water, and he responded that "he was taking it to the mountains." Wal-Mart records corroborated a large water purchase on January 21, 1996. There were no other similar purchases in that time-frame.

d.      Janis Rowlands, a schoolteacher who knew the Muellers, testified that she saw

them at the same Wal-Mart on February 2nd or 3rd, 1996.

e.        Lucy Carr, an employee of Leonard's Hardware in Russellville where William Mueller did business, testified that she saw him at the store after the date he purportedly disappeared.

f.        Sue Sullivan, another employee of Leonard's Hardware, testified that she saw him at the store well after the date he purportedly disappeared.

g.        Finally, Ted Edwards, yet another employee of Leonard's Hardware, testified that he also saw Mr. Mueller at the store well after the date he purportedly disappeared.

16.        The Government's time-line was also problematical, as the following summary of testimony illustrates:

a.        Vada Campbell testified that Movant was in Spokane, Washington on January 13, 1996.  She testified that she saw Movant at around 8:00 p.m. on January 13th while she was picking up her son-in-law at the Shadows Motel.  The date was memorable to her because her daughter entered the hospital on January 14 and gave birth the following day.

b.        Telephone records show that Movant placed a telephone call from Spokane to his mother in Oklahoma on January 14, 1996, at approximately 5:09 p.m.

c.        Jeff Brown, the former manager of the Shadows Motel, informed a defense investigator that Chevie Kehoe arrived at the Shadows Motel late in the day on January 12, 1996 or in the immediate post-midnight early-morning hours of January 13, 1996.  This evidence, which was available to defense counsel at trial, but not effectively developed, destroys the Government's critical time-line.

10

17.     A series of witnesses testified that Cheyne Kehoe admitted his involvement in the murders:

a.     Inmate Deono Gierdedis testified that Cheyne talked about the murder of a little girl and her mother, and how things got out of hand. Cheyne said he was the one that put the bags over their heads, and that he committed the crime for money. He said things got out of hand because the man fought him. Cheyne stated that he had falsely implicated his brother Chevie because he believed Chevie was having sex with Cheyne's wife.

b.     Inmate James Harrison testified that Cheyne told him that he was lying to the authorities and that he himself was actually involved in the murders. Cheyne said he was using his knowledge of the crimes to implicate Chevie. Cheyne described the murders and how the bodies were dumped in the river with rocks taped to them.

c.     Inmate Robert Taylor testified that Cheyne admitted his presence at the Mueller murders. Cheyne described to Taylor that the home invasion "went bad," and that bags were put over the victims' heads.

18.   GROUND ONE FOR RELIEF

MOVANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE GUILT-PHASE OF THE TRIAL, A RIGHT GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE LAWS OF THE UNITED STATES, BECAUSE IN EACH AND EVERY INSTANCE CITED BELOW, THE PERFORMANCE OF MOVANT'S DEFENSE COUNSEL, INDIVIDUALLY AND/OR COLLECTIVELY, FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS UNDER PREVAILING PROFESSIONAL NORMS, AND THERE IS A REASONABLE PROBABILITY THAT, BUT FOR COUNSELS' UNPROFESSIONAL ERRORS, THE RESULT OF THE PROCEEDING WOULD HAVE BEEN DIFFERENT.

In support of this ground, Movant states as follows:

**A.   Trial counsel were ineffective for failing to locate, interview, effectively examine, or present witnesses, described below, who would have provided important exculpatory evidence for the defense.**

1.   Kirby Kehoe

Mr. Kehoe entered a guilty plea under circumstances that required him to testify for the government if called upon to do so. He was not called by the government. He was not called by either defendant's counsel, despite his availability as a witness. If called to testify, Kirby Kehoe would have provided exculpatory evidence as to Movant Daniel Lee. An examination of Mr. Kehoe would have cast doubt on his Arizona alibi, the roles played by his sons, Chevie and Cheyne, in the murders, and his role in and knowledge of the insurance fraud perpetrated by the Muellers with regard to a faked burglary of their residence.

12

2.    Gloria Kehoe

Although Gloria Kehoe testified on direct examination, she was not re-called as a witness in the defense case despite permission from the Court to do so. Had she been called as a witness on the defense case, Ms. Kehoe was subject to examination regarding her complicity in a plan – hatched by Kirby Kehoe – to have one of her sons kill another of her sons.

Counsel were also ineffective in failing to cross-examine Ms. Kehoe on a prior statement she had made to the effect that Movant and his co-defendant had remained in Arkansas for a period of days after the Muellers were murdered, an assertion that cannot be harmonized with the fact that Movant and his co-defendant were undeniably in Spokane no later than January 14, and likely earlier.

3.    George Eaton

George Eaton was interviewed by the press subsequent to the discovery of the bodies of the Mueller family. *See, e.g.*, Michael Whitley, "Police Come Up Empty as They Dive Into Mueller Mystery," ARKANSAS DEMOCRAT GAZETTE, July 8, 1996. Mr. Eaton informed reporters that William Mueller had expressed fear for his life two months before he had vanished. Mueller also reported a connection between Bill Mueller and a man named Andy Strassmeir who was, in turn, connected to Timothy McVeigh and the Christian Identity community at Elohim City, near Muldrow, Oklahoma.[4]

---

[4]As noted *infra*, a witness called by the defense, publisher and journalist Eugene Wirges, had interviewed Bill Mueller in November 1995. During that interview, Mr. Mueller expressed fear for his life and particularly named Strassmeir and Michael Brescia. *See*, Gene

4.      Peter Langan

Peter Langan was a member of the so-called Aryan Republican Army ("ARA") which committed a series of bank robberies throughout the mid-west in the early- to mid-1990's, with the proceeds allegedly going to finance the aims of the ARA, which included overthrowing the government of the United States.  Mr. Langan was prosecuted for his role in the bombings and is presently serving a life sentence in federal prison.  *See*, *United States v. Langan*, 96-cr-015 (S.D. Ohio).  Based on readily-available public information, efforts should have been made to locate and interview Mr. Langan who was, throughout most of the period leading up to this trial, incarcerated on federal charges.

5.      Michael Brescia

Michael Brescia was another member of the ARA involved in the mid-west bank robberies.  He was also prosecuted and convicted and has since been released from prison. His connection to William Mueller was outlined in a newspaper article published in July 1996, well in advance of the trial, in the publication COMMON SENSE AMERICAN.  The article, as noted in the footnote below, was authored by a witness, Eugene Wirges, who appeared and testified as a defense witness.  Based on readily-available public information, efforts should have been made to locate and interview Mr. Brescia who was, throughout most of the period leading up to this trial, incarcerated on federal charges.

---

Wirges, "Triple Murders a Mystery," COMMON SENSE AMERICAN, JULY 12, 1996.  Mr. Wirges was not questioned bout his interview of William Mueller, an omission that constitutes an independent act of ineffective assistance.

6.    David Hill

One of the theories explored by the defense was that Paul Humphrey was involved in the Muellers' killing.  If called as a witness, David Hill could have testified that he saw Humphrey and another man throw something off the bridge at the Illinois Bayou at about 8:15 a.m. during the second week of January 1996.

7.    Glen Hinson

If called as a witness, Glen Hinson would have presented evidence that after Paul Humphrey obtained the titles to the Mueller vehicle he was nervous and scared, and that Nancy Mueller had told him that she was frightened of Humphrey.

8.    Eldon King

If called as a witness, Eldon King would have testified that Humphrey began acting strangely after the Mueller's disappeared.

9.    Maria Ahrens

If called as a witness, Maria Ahrens would have testified that she had seen the Muellers at her husband's auto shop the Thursday after they were supposed to be missing.

10.    Vernon Ahrens

Vernon Ahrens is Maria Arens' husband. If called as a witness, he would have confirmed the Muellers presence at his auto shop the Thursday after they were supposed to be missing.

11.    Pam Wrappe

Pam Wrappe, an additional Wal-mart employee, participated in discussions regarding

the Muellers being in the Wal-mart. If called as a witness, she would have further corroborated the trial testimony of Susan Weaver and Betty Gray.

12.   David Hollabaugh and Denise Hollabaugh, M.D.

The Hollabaugh's clinic treated Nancy Mueller for stomach problems in early January. If called as a witness, each would have testified that Nancy Mueller told them that her family was planning on leaving town.

13.   Earlene Branch

If called as a witness, Earlene Branch would have testified that she saw her daughter Nancy Mueller at Wal-mart in early January a few times and described her as nervous, upset and not very talkative. She also could have testified that she was at the home of Sylvia and David Mason in February 1996 and believed she heard William Mueller's distinctive cough.

14.   Kelly Kramer

Although actually called as a witness, Kelly Kramer, Chevie Kehoe's "second wife," would have testified, if asked, that not once in all the time she spent with Chevie did he talk of setting up anything like the "Aryan People's Republic," "Aryan People's Resistance" or "Aryan People's Revolution," or, for that matter, any organization with the initials "APR."

15.   Faron Lovelace

If called as a witness, Faron Lovelace would have testified that he had never heard of the "Aryan People's Republic," "Aryan People's Resistance" or "Aryan People's Revolution," or, for that matter, any organization with the initials "APR." Mr. Lovelace also claimed at the time of Movant's trial to be in possession of additional exculpatory evidence.

16.    Norda Lewis

If called as a witness, Norda Lewis, Faron Lovelace's wife, would have testified that she never heard of the "Aryan People's Republic," "Aryan People's Resistance" or "Aryan People's Revolution," or, for that matter, any organization with the initials "APR."

17.    Jeff Brown

Although he was called as a government witness, Mr. Brown, if asked, would have testified that he had never heard of the "Aryan People's Republic," "Aryan People's Resistance" or "Aryan People's Revolution," or, for that matter, any organization with the initials "APR."  Mr. Brown also would have testified that he believed Chevie Kehoe had arrived back at the Shadows Motel in Spokane late in the day on January 12, 1996 or shortly after midnight in the early-morning hours of January 13, 1996.  He was not questioned effectively on these topics.

18.    Angela Holderman

If called as a witness, Angela Holderman would have testified that she called the Mueller residence at 8:00 a.m. on January 11, 1996 and that a man identifying himself only as "Darryl" answered the phone, tending to establish that there was an unknown individual, and potentially others, in the Mueller household immediately before (according to the government's theory) the Muellers were killed.

19.    Jack Price

Although he was called as a government witness, defense counsel failed to elicit from Mr. Price an accurate recounting of his criminal history.  Mr. Price testified, "all my offenses

consisted of fraud, bad checks, and theft of property, sir." This was far from accurate since the witness also had prior convictions for armed robbery and assault with a firearm. Defense counsel failed to cross-examine Mr. Price regarding these prior convictions or his self-serving false testimony regarding the nature of his criminal history. The government did nothing to correct Mr. Price's false testimony.

**B.     Defense counsel failed to cross-examine the Wankers on the fact that they had received compensation from the government.**

It was a theme of the defense that the government's important witnesses had been bought and paid for and, therefore, their credibility was suspect. In his rebuttal summation, A.U.S.A. Stripling emphasized to the jury that the Wankers had not received any compensation for their part in the case. In fact, the Wankers did receive an unknown amount of money so that they could move out of the area for their testimony. Defense counsel did not cross the Wankers on this issue, thus missing the opportunity to set up the argument that every key witness against Movant had received some type of consideration for their testimony. Defense counsel were further ineffective for failing to cross-examine the Wankers regarding their media interviews.

**C.     Defense counsel were ineffective for failing to object to the government's pre-trial motion to bar Movant from access to discovery.**

Prior to trial, the government moved to bar Movant from access to discovery. Movant's counsel, although offered an opportunity to object, did not do so. This failure resulted in the claim being reviewed under a stringent plain-error standard on appeal instead of the more relaxed standard applied to errors that have been preserved. Under the more

relaxed appellate standard, Movant's conviction would have been vacated.

**D.     Trial counsel failed to object to the Court's order exempting the government from compliance with the statute requiring a list of all witnesses at least three entire days before trial; trial counsel also failed to object to the testimony of witnesses for whom prior notice had not been provided when they were called at trial.**

Without objection from the defense, this Court entered an order that the government was not required to comply with 18 U.S.C. § 3432 regarding the provision of a witness list. This failure-to-object, in and of itself ineffective assistance of counsel, resulted in the claim being reviewed under a stringent plain-error standard on appeal instead of the more relaxed appellate standard applied to errors that have been preserved. Under the more relaxed appellate standard, Movant's conviction would have been vacated.

**E.     Defense counsel were ineffective for failing to conduct DNA testing of the hair identified as "similar" to Movant's hair.**

At Movant's trial, expert evidence was introduced that a hair found on an FBI "raid cap" found in a vehicle operated by Cheyne and Chevie Kehoe at the time of their shoot-out with police in Ohio, was microscopically similar to Movant's hair. The cap was itself tied to the murder of the Mueller family through the testimony of Gloria Kehoe and Cheyne Kehoe who testified that the crimes were carried out by the defendants masquerading as federal agents. Despite the availability of Mitochondrial DNA ("mtDNA") analysis at the time of his trial, Movant's counsel did not seek authorization for the funding needed to conduct such analysis. Mitochondrial DNA analysis, while not as discriminating in declaring a match as DNA analysis that looks at the nuclear portion of the human cell, can (and could

19

at the time) provide an absolute, science-based, exclusion.  An exclusion of Mr. Lee as the source of the hair would have undercut a key aspect of the government's proof.

This Court has recently approved a request by Movant's present counsel to fund mtDNA testing and arrangements are being made with the government, which retains custody of the evidence, to have mtDNA testing accomplished.  Such testing will exclude Movant as the source of the hair.

**F.      Defense counsel were ineffective in adopting a jury-selection strategy that emphasized seating as many African-Americans as possible.**

Both Movant and his co-defendants held offensive and abhorrent white-supremacist views that were likely to be particularly offensive to non-white people since they were the targets of race-based hatred.  Those views were an inevitable part of  the trial evidence. Movant has, and had at the time of the trial, plainly visible Nazi-related tattoos on both sides of his neck.  Indeed the nature of Movant's tattoo's, including those not visible to the jury, were the subject of testimony and physical evidence presented to the jury in the form of photographs of those tattoos.  Under these circumstances, a strategy that emphasized the selection of African-American jurors was unreasonable and prejudicial, since the final jury was made up of a majority of African-Americans.

G.    **Movant's defense counsel Jack T. Lassiter was ineffective, and breeched his duty of loyalty to his client, when he vouched for the integrity of Karen Coleman at the pre-trial hearing convened to consider the ramifications of Ms. Coleman's decision to accept employment with the United States Attorney that was prosecuting Movant and seeking his execution and when he failed to advise Movant that Ms. Coleman would be joining the United States Attorney's office.**

The trial of this case began on March 1, 1999. In early December 1998, most likely on December 7, Movant learned, just prior to a court appearance, that one of the attorneys on his defense team, Karen Coleman,[5] was leaving the defense and had accepted employment with the same United States Attorney that was prosecuting Movant and seeking his execution. Movant had had significant contact with Ms. Coleman and continued to have such contact after Ms. Coleman had accepted employment with Movant's prosecutors. Although Ms. Coleman's employer, Jack Lassiter, Esquire, had known for some time that Ms. Coleman was seeking employment with the United States Attorney, he did not so advise Movant and did not so advise his co-counsel, Cathleen Compton, Esquire. Moreover, Ms. Coleman was permitted to continue working on Movant's case as the employment process moved along. As revealed in the course of two hearings conducted in December 1998, Ms. Coleman had been offered the position, and had accepted it, four or five weeks earlier, and was awaiting only a routine background check in order to commence her new position.

Counsel to co-defendant Chevie Kehoe, upon learning of the situation on December

---

[5]Although Ms. Coleman is now known as Karen Whatley, she will be referred to throughout as Karen Coleman for the sake of not confusing the record. No disrespect is intended.

7, moved to disqualify the United States Attorney's Office for the Eastern District of Arkansas from further participation in the case. Although it was of an obvious strategic advantage to Movant and his co-defendant to have a disqualification order entered, since replacement prosecutors were unlikely to be as knowledgeable about the case as the then current prosecution team, Mr. Lassiter testified in a manner adverse to that interest by supporting the integrity of Ms. Coleman. Eventually the motion to disqualify was denied.

Mr. Lassiter's actions, in choosing to support his associate over the contrary interests of his client, constitute ineffective assistance of counsel, as was his failure to advise Movant (or to instruct Ms. Coleman to advise Movant) of her imminent departure.

**H.    Counsel were ineffective for failing to move for the disqualification of the United States Attorney's office prosecuting the case when Ms. Coleman accepted employment with that office; alternatively, counsel were ineffective for failing to join the disqualification motion filed on behalf of Chevie Kehoe.**

As noted above, the news that Ms. Coleman was joining the same office that was prosecuting this case prompted Chevie Kehoe's attorneys to move for the disqualification of that office. Movant's counsel failed to join the motion. Additionally, one of Movant's counsel testified in a manner that was adverse to Movant's interests. The failure to move for disqualification constituted ineffective assistance of counsel.

**I.      A hearing will be necessary to determine whether Ms. Coleman, purposely or not, disclosed privileged and confidential information and/or work-product to the prosecution team and whether the Office of the United States Attorney set up adequate procedures to guard against the deliberate or inadvertent disclosure of such information.**

The factual background of this issue is set forth in the preceding paragraphs under sub-headings G and H.  It is not known at this point what procedures were put into place (if any) to prevent Ms. Coleman from disclosing, purposely or not, protected attorney-client information and/or work-product.  If such information was disclosed, Movant is entitled to relief.  An affidavit submitted by Movant to the Eighth Circuit on this issue is filed herewith as Attachment One and is incorporated herein by reference.

**J.      Counsel were ineffective for failure to capitalize on inconsistent testimony regarding the search of the Old Town, Idaho storage unit.**

Movant recalls conflicting testimony regarding the search of a storage unit located on Old Town, Idaho.  Specifically, Movant recalls testimony from a federal agent, and an accompanying video-tape, that documented an initial search of the Old Town unit that disclosed no incriminating evidence and a second search, conducted a few days later, where significant incriminating evidence was uncovered.  At trial, Movant's counsel advised Movant that, despite what he recalled, no such evidence had been presented.  If such evidence had been presented, the failure to capitalize on it in summation constituted ineffective assistance of counsel.

**K.      Counsel were ineffective for failing to object to improper closing argument.**

In closing argument at the first stage of the trial, the government engaged in

significant misconduct by mischaracterizing the evidence and arguing legally impermissible inferences.  Counsel failed to object to and preserve those errors.[6]  The improper remarks were as follows:

1.    It was argued that Cheyne Kehoe had faced death threats from an inmate who was associated with the Aryan Brotherhood or other Aryan-related prison gang.  This argument improperly bolstered Cheyne Kehoe's and placed in front of the jury a prejudicial incident (if it did in fact really occur) that was never connected to Movant.

2.    The government argued that Movant's involvement in the plot to kill the Muellers was the cause of Kirby Kehoe's decision not to participate.  Because Kirby Kehoe did not testify, this was speculation premised only upon inadmissible hearsay from Gloria Kehoe.

3.    In its closing argument the government engaged in improper and unprofessional name-calling that simultaneously de-valued Movant's status as a human being, by referring to Movant as Chevie Kehoe's "faithful dog."

4.    The government argued facts that were not in evidence, by stating that Movant had referred to Nancy Mueller as a "dumb bitch."

5.    The government improperly referred to Kirby Kehoe's guilty plea as proof of the existence of the RICO enterprise.

STAGE TWO – A CASE FOR LIFE

There are, as is true of the first stage of this case, numerous disturbing aspects of the process leading to a sentence condemning Movant to death.  First, and most glaring, is the disparity between the punishment visited upon Movant versus the punishment received by his co-defendant.  However the government now wants to view this case, it was obvious to the government, and all concerned at the time, that when the jury spared Chevie Kehoe's life,

_____

[6]It is alleged *infra* that the failure to raise this issue on direct appeal was ineffective assistance of appellate counsel.

justice would be ill-served by a death verdict for Movant. Kehoe was clearly the leader of the enterprise who had engaged in a series of violent and dangerous actions, including a shoot-out with police officers. The grand jury had charged him with additional murders. The only evidence available on the issue of Sarah Powell's murder was that Chevie Kehoe had carried it out because Movant refused to do so.[7] Responsible steps were taken by the former United States Attorney for this district to take death off the table as to Movant. Catherine Compton, who was primarily responsible for the presentation of Movant's case for life, is of the sincere belief that she had reached an agreement with the United States Attorney that would in fact take death off the table as part of a post-verdict plea agreement. In light of this history, it remains to be seen whether a United States Attorney's office that once believed death was not a just result as to Movant will now fight to bring about his execution.

---

[7]At Movant's penalty phase, the jury rejected arguments that Movant had engaged in substantial planning and premeditation to take lives. The jury also rejected arguments that Movant had deliberately taken the life of Sarah Powell.

19.  GROUND TWO

MOVANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE PENALTY-PHASE OF THE TRIAL, A RIGHT GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE LAWS OF THE UNITED STATES, BECAUSE IN EACH AND EVERY INSTANCE CITED BELOW, THE PERFORMANCE OF MOVANT'S DEFENSE COUNSEL, INDIVIDUALLY AND/OR COLLECTIVELY, FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS UNDER PREVAILING PROFESSIONAL NORMS, AND THERE IS A REASONABLE PROBABILITY THAT, BUT FOR COUNSELS' UNPROFESSIONAL ERRORS, THE RESULT OF THE PROCEEDING WOULD HAVE BEEN DIFFERENT, SINCE AT LEAST ONE JUROR WOULD HAVE ALTERED HIS VOTE OR, AS A MATTER OF LAW, DEATH COULD NOT HAVE BEEN IMPOSED.

**A.      Defense counsel failed to recognize that the multiple-murder aggravating factor had not been enacted at the time of the murders.**

The verdict sheet at the penalty-phase of this case reflects that with regard to the murders of William Mueller and Nancy Mueller, the jury found the existence of two statutory aggravating factors, multiple-murder, 18 U.S.C. § 3592(c)(4), and pecuniary gain, 18 U.S.C. § 3592(c)(8).[8] It was the government's theory that the Muellers were killed, within an extremely tight time-frame, on January 11, 1996. The multiple-murder aggravating factor, however, did not become part of the Federal Death Penalty Act until April 24, 1996. Accordingly, the multiple-murder factor should not have been submitted to the jury as an aggravating factor. Trial counsels' failure to recognize the inapplicability of this factor to

---

[8]With regard to the murder of Sarah Powell, the jury also found the statutory aggravating factor of vulnerable-victim.  18 U.S.C. § 3592(c)(11).

26

this case, and counsels' failure to move to strike the factor, constitute ineffective assistance of counsel.[9]  As noted in the ensuing paragraph, the only other statutory aggravating factor as to the Muellers, pecuniary gain, as a mater of law should not have been submitted to the jury.  Thus, had counsel performed effectively, the jury would have found no statutory aggravating factors as to Movant with regard to the murders of William and Nancy Mueller.  While there may have been record support for the jury's finding of a single statutory aggravating factor as to Sarah Powell, *but see* discussion *infra*, Movant was unfairly prejudiced by his counsels' errors in the submission of two invalid statutory factors.

**B.      Defense counsel failed to bring authority to the Court's attention concerning the inapplicability of the pecuniary gain factor to the factual circumstances of this prosecution.[10]**

As noted above, the multiple-murder statutory aggravating factor should not have been submitted to the jury in Movant's case.  With regard to the pecuniary gain factor, at the time this case was tried, any reasonably competent attorney engaged in capital litigation would have known that courts around the nation had limited the applicability of this factor to

---

[9]It is alleged *infra* that the failure to raise this issue on direct appeal was ineffective assistance of appellate counsel.

[10]In a letter to the Court dated April 22, 1999, Movant's counsel objected to submission of the pecuniary gain factor, noting counsel's "belief that this aggravator was meant to be used in cases of murder for hire."  Counsel went on to state that she had "no law to support this theory – only the committee comments to the Eighth Circuit Model Death Penalty Instructions, and *dicta* in *United States v. Davis*, 904 F.Supp. 554, 558 (E.D. La. 1995)."  In fact, a decision right on point, and favorable to the defense position, had been rendered in a federal death penalty case in the Southern District of New York six weeks before Movant's counsel wrote her letter to the Court.  *See, United States v. Cuff*, 38 F.Supp.2d 282, 288 (S.D.N.Y. 1999), decided March 8, 1999.

situations where the murder was the direct and indispensable key to the pecuniary gain, such as a killing done for hire, or a killing done to gain an inheritance or insurance proceeds. Many courts around the country, as of the time this case was tried, had held that the factor was not applicable to the situation here presented, *i.e.*, a robbery of valuable items where the victims are killed. Movant's trial counsel were ineffective for failing to bring that body of law to this Court's attention and by failing to move to strike the factor.[11] Had counsel performed effectively, the jury would have found no statutory aggravating factors as to Movant with regard to the murders of William and Nancy Mueller. While there may have been record support for the jury's finding of a single statutory aggravating factor as to Sarah Powell, Movant was unfairly prejudiced by his counsels' errors in the submission of two invalid statutory factors with regard to her.

**C.      Defense counsel were ineffective for failing to file appropriate pre-trial motions challenging the constitutionality of the federal death penalty.**

Defense counsel failed to bring to the Court's attention meritorious legal arguments respecting the application and constitutionality of the federal death penalty. In particular, among other failings, defense counsel did not argue to the Court the irrationality of the federal death penalty because of its "white-victim-effect," *i.e.*, an argument that the federal death penalty is irrational because juries tend to return death sentences at a greater rate when the victim or victims of the offense are white. Defense counsel also failed to present an argument to the Court that the federal death penalty operates, and operated at the time, in a

_____

[11]It is alleged *infra* that the failure to raise this issue on direct appeal was ineffective assistance of appellate counsel.

28

fundamentally arbitrary and capricious manner, invidiously targeting minority defendants and irrationally sought on the basis of the region of the country where the crimes occurred. Properly-presented arguments would have caused this Court to strike the death penalty.

> **D.  Defense counsel failed to note or object to this Court's erroneous penalty-phase instructions regarding the range of punishments for the capital counts.**

Movant was sentenced to death for three violations of 18 U.S.C. § 1959, Violent Crimes in aid of Racketeering Activity ("VICAR"). The VICAR statute was most recently-amended on September 13, 1994 as part of the enactment of the Federal Death Penalty Act of 1994. The amendment added death as a potential punishment for racketeering-related murder. As amended, and as in effect in this case, the statute reads in pertinent part:

> Whoever, . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . shall be punished –
> **(1)** for murder, by death or life imprisonment, . . . .

18 U.S.C. § 1959. The statute does not specify a sentence of "up to life imprisonment," or "a term of years up to life imprisonment" or anything other than life.[12] In other words, the alternative punishments available in a case where the government seeks the death penalty in a VICAR murder are (1) the death penalty or (2) mandatory life imprisonment. Despite this

---

[12]Many federal statutes carrying the death penalty do provide for sentences of less-than-life if a sentence of death is not returned. *See, e.g.*, 18 U.S.C. § 2119(3) (for causing a death in a carjacking, the death penalty or "any number of years up to life"); 18 U.S.C. § 924(j) (for causing a death by the illegal use of a firearm, the death penalty "or by imprisonment for any term of years or for life;"), 21 U.S.C. § 848(e) (for a causing a death while engaged in a continuing criminal drug enterprise or a drug conspiracy punishable under 21 U.S.C. § 841(b)(1)(A), a minimum term of 20 years, the death penalty, or "any term of imprisonment, which may be up to life imprisonment . . . .").

clear statutory language, this Court, with no objection from the defense, mis-instructed the jury on the issue of potential punishment.

In particular, the Court instructed the jury that, once it had made its necessary preliminary findings on aggravation and mitigation (and assuming the necessary findings of a "gateway" factor, at least one statutory factor, and that Movant was over 18 at the time of the offense), it should proceed as follows:

> Based upon this weighing process, you must determine whether a sentence of death is justified. If you cannot unanimously agree upon a sentence of death, you must then decide whether to return a sentence of life in prison without the possibility of release. Again, your finding with respect to a sentence of life in prison without the possibility of release must be unanimous.

(Tr. 7995-96.) The second portion of the instruction quoted above is wrong as a matter of law. If the jury was unable to reach unanimous agreement on a sentence of death, its deliberations were concluded and, as a matter of law, because of the mandatory life sentence required by the VICAR statute itself, the Court would be required to impose a life sentence. The instruction continued:

> If you unanimously agree upon a sentence of death or a sentence of life in prison without the possibility of release, the Court is required to impose that sentence. If you cannot unanimously agree upon either a sentence of death or a sentence of life in prison without the possibility of release, the Court will impose the sentence required by law.

(Tr. 7996.) This latter instruction was also wrong as a matter of law. Assuming a lack of agreement on death, the Court had no authority to impose any sentence other than lifetime

imprisonment.

The dynamic such an erroneous instruction sets up – especially where the jury is left to speculate on what the Court means by "the sentence required by law" is that jurors may reasonably conclude that if they cannot agree on death and cannot agree on life, then it's up to the Court to impose some lesser sentence. Jurors in a minority, therefore, could find themselves convinced to vote for a death sentence in the face of arguments from jurors favoring a death sentence that if all jurors don't agree on something, Movant would be back on the streets someday.

The Court should have instructed the jury, simply, that a failure to agree on a death sentence would mean that the Court would impose a sentence of lifetime imprisonment. The failure of Movant's trial counsel to object to this instruction constituted ineffective assistance of counsel.[13]

E.  **Trial counsel failed to challenge the indictment for its lack of specific elements of *mens rea* and aggravating factors necessary to impose a death sentence.**

The motion to challenge a federal capital indictment on the above-described basis was standard procedure among attorneys handling federal capital cases at the time this case was tried. The argument that certain classes of *mens rea* and aggravating factors function as elements of the offense of capital murder was eventually vindicated by the supreme Court in *Ring v. Arizona*, 536 U.S. 584 (2002). By failing to bring this motion, the claim was

---

[13]It is alleged *infra* that the failure to raise this issue on direct appeal constituted ineffective assistance of appellate counsel.

reviewed on appeal under a stringent plain-error standard instead of the more relaxed appellate standard applied to errors that have been preserved.  Under the more relaxed appellate standard, the sentence of death would have been vacated.

F.    **Counsel failed to conduct a complete and adequate investigation of the circumstances of Movant's true role in the Wavra murder.**

One of the government's primary jury arguments for sentencing Movant to death, and for distinguishing his case from co-defendant Chevie Kehoe's where the jury had rejected the death penalty, was the role played by Movant in a murder in Oklahoma City at a time when Movant was a juvenile, 17-years old.  Despite the serious nature of the charges initially brought against Movant, the case was resolved by a charge that Movant had either taken keys from the victim or had taken his bicycle by force.  In a misguided effort to help the true perpetrator of the murder, Movant's cousin David Patton, Movant made statements that ascribed to himself a greater role in the crime than was actually true.  A properly-conducted investigation of the circumstances of the Wavra murder would have revealed Movant's true role and would have placed the true nature of Movant's role in that offense in an entirely different light.  The additional evidence would have lead to a different result in that at least one or more jurors, if not all, would have voted for a life sentence as opposed to a sentence of death.

G.    **Trial counsel were ineffective for stipulating to the receipt of evidence presented at Chevie Kehoe's penalty phase without a waiver from Movant of his confrontation rights.**

Counsel's stipulation of the Kehoe penalty evidence improperly compromised

Movant's Sixth Amendment right to confront witnesses.  Moreover, by stipulating to this evidence, the claim was reviewed on appeal under a stringent plain-error standard instead of the more relaxed appellate standard applied to errors that have been preserved.  Under the more relaxed appellate standard, the sentence of death would have been vacated.

**H**.     **Trial counsel were ineffective in failing to object during the cross-examination of Dr. Cunningham when the Government improperly exceeded direct examination and premised questions of Movant's future dangerousness upon the Hare Psychopathy Checklist.**

The government expended a substantial amount of energy cross-examining psychologist Mark D. Cunningham, Ph.D., on future dangerousness.  In doing so, the government exceeded the proper scope of cross examination and made Dr. Cunningham their own expert witness on the issue of Movant's future dangerousness.  However, Dr. Cunningham never performed a risk assessment and Movant's requests for access to relevant materials in the possession of the Department of Justice ("DOJ") on that issue were denied. Defense counsel failed to fully and continuously object during the government's improper cross-examination.  Further, defense counsel failed to immediately move and renew their request for access to the DOJ materials in order to rehabilitate Dr. Cunningham and present what could have been compelling mitigating information to rebut the government's claim.

**I.     Trial counsel were ineffective in utilizing Dr. Cunningham as a family and social history witness.**

Movant's defense counsel did not present Dr. Cunningham as an expert providing a mental-health diagnosis.  Instead, defense counsel used Dr. Cunningham as a reporter of Movant's life and family history.  Defense counsel ineffectively failed to present such

testimony through the appropriate lay witnesses.  The failure to do so caused substantial

prejudice to Movant.  First, it allowed the government to open the door to cross examination

on the inflammatory issue of "psychopathy."  (One can imagine few things that are as

damaging to a defendant on trial for his life as being characterized, "scientifically," as a

"psychopath.") Second, the government ably argued to the jury that Dr. Cunningham's

testimony could not be considered because it was all hearsay and had not been corroborated.

Defense counsel were ineffective in their presentation since the defense mitigation specialist,

Glori Shettles, and lay witnesses, could have established this history without a risk of

subjecting that testimony to the risk-assessment cross-examination and the ensuing

presentation of psychologist Thomas Ryan, Ph.D., as a rebuttal witness.

> **J.     Trial counsel were ineffective in failing to object to Dr. Ryan's testimony and report.**

The government presented the testimony of Dr. Ryan and his report as rebuttal

testimony at Movant's mitigation phase.  Defense counsel failed to object to Dr. Ryan's

testimony as improper rebuttal given that Dr. Cunningham never offered a diagnosis.

Further, defense counsel failed to object to the submission of Dr. Ryan's report especially

since it included a risk assessment, something that Dr. Cunningham had not included in his

testimony.[14]

---

[14]At a hearing, Movant's counsel are prepared to offer evidence that Dr. Ryan, in sworn testimony and affidavits filed after his testimony in this case, has stated that the Hare Psychopathy Checklist is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants and that he no longer stands by such testimony or analysis.

**K.    Trial counsel failed to present available mitigation evidence.**

Defense counsel failed to investigate and present available mitigating evidence. First, defense counsel failed to place before the jury information that the government had on more than one occasion offered Movant a sentence less than death and, in fact, had tried to have the death-penalty removed as an option following the life verdict in Chevie Kehoe's case. The defense failed to call Marty Barker as a witness to solidify the fact that Chevie Kehoe killed Sarah Powell, not Movant. There was additional readily available mitigating evidence that defense counsel failed to discover or present.

**L.    Counsel were ineffective for failing to object to improper closing argument the penalty phase.**

In closing argument at the first stage of the trial, the government engaged in significant misconduct by mischaracterizing the evidence and arguing legally impermissible inferences. The same was true at penalty. The improper remarks were as follows:

1.    The government presented numerous arguments related to psychopathy and Movant's alleged propensity for violence that had been improperly introduced through the cross-examination of Dr. Cunningham and the direct examination of Dr. Ryan.

2.    The government improperly characterized defense counsel's arguments for life as "smoke and mirrors;" or "that's like the kid who killed his parents who walked into court, said, 'Take mercy on me. I'm an orphan'"; or that displaying photographs of Movant was an act of "manipulation" by defense counsel.

3.    The government improperly argued that there had to be a nexus between the mitigation evidence presented and the commission of the crime.

4.    The government improperly characterized evidence of Movant's family background and development as an effort to "figuratively" blame others for the

murders.

5.      The government resorted to inflammatory and unfairly prejudicial emotional pleas by arguing that "we" have the right to be safe in our homes – "our sanctuary."  "Doesn't an eight year-old girl, damn it, have that right?"

6.      The government improperly denigrated the protections afforded a criminal defendant on trial for his life by arguing that it was somehow relevant to the jury's sentencing decision that Movant received more due process than the Muellers received.

7.      The government improperly argued that the difference between Movant's case and Chevie Kehoe's was that, as argued by Kehoe's counsel during his penalty-phase, that Kehoe could receive "grace."  The government then argued that it was privy to defense counsel's state of mind and that the Ms. Compton "realized that she couldn't sell grace to you" because Movant had already had a shot at "grace," a reference to the Oklahoma murder case.  It was also improper to denigrate counsel's efforts to bring appropriate mitigating circumstances to the jury's attention as an attempt by defense counsel to "sell" the jury something.

8.      The government improperly argued to the jury that Movant should be sentenced to death on the basis of Chevie Kehoe's actions.

Movant's counsel failed to object to any of the above-described remarks and therefore

did not preserve these errors for appellate review.[15]

### M.      Counsel were ineffective for failing to ascertain whether  a hold-out juror (or jurors) were coerced to reach a death verdict.

Trial counsel were ineffective when they failed to ascertain or request a voir dire as

to whether one or more "hold-out" jurors was coerced into returning a death verdict after the

jury received a supplemental charge.  Movant's death verdict was returned approximately

---

[15]It is alleged *infra* that the failure to raise this issue on direct appeal was ineffective assistance of appellate counsel.

one hour thereafter.

## 20.  GROUND THREE

MOVANT DID NOT RECEIVE THE EFFECTIVE
ASSISTANCE OF APPELLATE COUNSEL AND BUT FOR
THIS FAILING, MOVANT'S CONVICTIONS AND/OR
SENTENCE OF DEATH WOULD HAVE BEEN VACATED.

**A.    Appellate counsel failed to recognize and raise several aspects of the government's improper closing arguments in both phases of the trial.**

The factual basis for this argument is set forth under sub-heading K  of Ground One and sub-heading L of Ground Two above.  Had this issue been raised before the Eighth Circuit, Movant's conviction and, therefore his sentence of death as well, would have been vacated.  Failure to raise the issue constituted ineffective assistance of appellate counsel.

**B.    Appellate counsel failed to recognize and raise the issue of the inapplicability of the multiple-murder factor.**

The factual basis for this argument is set forth under sub-heading A of Ground Two above.  Had this issue been raised before the Eighth Circuit, Movant's sentence of death would have been vacated.  Failure to raise the issue constituted ineffective assistance of appellate counsel.

**C.    Appellate counsel failed to recognize and raise the issue of the inapplicability of the pecuniary-gain factor.**

The factual basis for this argument is set forth under sub-heading B of Ground Two above.  Had this issue been raised before the Eighth Circuit, Movant's sentence of death would have been vacated.  Movant's direct appeal was argued on April 15, 2004. On February 2, 2004 there was a favorable Eighth Circuit opinion on this very issue.  *United*

*States v. Allen*, 357 F.3d 745, 750-51 (8th Cir. 2004), *vacated on other grounds*, 406 F.3d 940 (8th cir. 2005) (*en banc*).  Failure to raise this issue constituted ineffective assistance of appellate counsel.

**D.      Appellate counsel failed to recognize the error in the court's penalty-phase instructions regarding the permissible range of punishments and the jury's role in choosing among them.**

The factual basis for this argument is set forth under sub-heading D of Ground Two above.  Had this issue been raised before the Eighth Circuit, Movant's sentence of death would have been vacated.  Failure to raise this issue constituted ineffective assistance of appellate counsel.

**E.      Appellate counsel failed to recognize and raise, as plain error if necessary, the issue regarding the irrational, arbitrary and capricious operation of the federal death penalty.**

The factual basis for this argument is set forth under sub-heading C of Ground Two above.  Had this issue been raised before the Eighth Circuit, Movant's sentence of death would have been vacated.  Failure to raise this issue constituted ineffective assistance of appellate counsel.

**F.      Appellate counsel failed to present a challenge to the sentence of death imposed as to the murder of Sarah Powell since the jury did not find that Movant had committed deliberate murder.**

The only evidence on the issue of Movant's role in the death of Sarah Powell is that he would not kill the child and, therefore, Chevie Kehoe had to kill her.  The jury found that Movant had not deliberately taken the child's life.  Nonetheless, a sentence of death was

imposed. Movant's degree of participation in the acts that ultimately led to Sarah Powell's death – according to the government he could and would not do it – presents a substantial Eighth Amendment challenge not raised by appellate counsel.

## 21. GROUND FOUR

> AFTER 18 YEARS OF EXPERIENCE WITH THE FEDERAL DEATH PENALTY IT NOW APPEARS INDISPUTABLE THAT THE PENALTY IS SOUGHT AND IMPOSED IN AN ARBITRARY AND CAPRICIOUS MANNER AND, THEREFORE, MUST BE STRUCK DOWN AS VIOLATIVE OF THE EIGHTH AMENDMENT'S GUARANTEE AGAINST THE INFLICTION OF CRUEL AND UNUSUAL PUNISHMENTS OR AS OTHERWISE ILLEGAL.

At a hearing, Movant's counsel are prepared to present evidence that the federal death penalty is sought and imposed in an arbitrary and capricious manner and that it operates in a manner so that the race of the victim, the defendant, and the area of the country where the crime was committed, all operate in an invidious and irrational manner. If Movant succeeds in so persuading this Court, then the sentence of death imposed in this case is illegal and must be set aside.

## 22. GROUND FIVE

> BASED ON THE RATIONALE OF THE SUPREME COURT'S DECISION IN *ROPER V. SIMMONS*, 543 U.S. 551 (2005), IT WAS ERROR TO ADMIT MOVANT'S CONVICTION AS A JUVENILE FOR AN OFFENSE RELATED TO THE WAVRA MURDER.

In *Roper*, the United States Supreme Court struck down the death-penalty as applied to people under the age of 18. Applying the underlying rationale of *Roper* to this case, it was

error capable of correction by this motion to allow evidence of Movant's role in the Wavra

murder since, at the time, Movant was 17-years old.

### 23.  GROUND SIX

MOVANT'S COUNSEL DID NOT MEET THE STATUTORY DEFINITION OF COUNSEL "LEARNED IN THE LAW APPLICABLE TO CAPITAL CASES," AND, THEREFORE, HIS SENTENCE OF DEATH WAS RETURNED IN VIOLATION OF THE LAWS OF THE UNITED STATES.

A defendant in a federal capital case has special statutory rights regarding counsel that

go beyond the guarantees of the Sixth Amendment.  The relevant statute provides, in relevant

part, as follows:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . . .

18 U.S.C. § 3005.

At a hearing, Movant is prepared to establish that neither of Movant's trial counsel,

despite some experience in capital cases, were qualified to serve as counsel "learned in the

law applicable to capital cases."  Without the assistance of "learned counsel," Movant's

sentence of death was returned in violation of the laws of the United States and must be set

aside.

24.  GROUND SEVEN

THERE IS NEWLY-DISCOVERED EVIDENCE BEARING
ON KIRBY KEHOE'S ROLE IN THIS OFFENSE.

Movant adopts by reference, and joins the arguments presented in ¶¶ A.1 - A11 of

Chevie Kehoe's amended motion for relief pursuant to 28 U.S.C. § 2255.  Those arguments

outline newly-discovered evidence of Kirby Kehoe's whereabouts during times relevant to

this case.  *See*, Amended Motion to Vacate, filed July 1, 2005, at docket entry 1067; see *also*

the supplemental motion, with attachments, filed by counsel to Chevie Kehoe on July 7,

2005, at docket entries 1068 and 1069.

.                              <u>REQUEST FOR RELIEF</u>

WHEREFORE Movant asks this Court for the following relief:

1.      Issue a writ of habeas corpus that Movant be brought before the court to be
        discharged of his unconstitutional and illegal confinement and relieved of his
        unconstitutional and illegal conviction and/or sentence of death; alternatively,

2.      Order the Respondent to answer this petition;

3.      Grant Petitioner, who is indigent, sufficient funds to secure expert testimony
        to prove the facts as alleged in this petition;

4.      Grant Petitioner, upon his request, the authority to obtain subpoenas for
        witnesses and documents necessary for an evidentiary hearing;

5.      Order such hearings as may be necessary; and

6.      Set a status conference at which time a briefing, discovery and hearing
        schedule can be established.

                                        Respectfully submitted,


                                        <u>/s/ David A. Ruhnke</u>
                                        Ruhnke & Barrett
                                        47 Park Street
                                        Montclair, New Jersey 07042
                                        (973)744-1000
                                        (973)746-1490 (fax)
                                        davidruhnke@ruhnkeandbarrett.com


                                        <u>/s/ Laurence E. Komp</u>
                                        Laurence E. Komp
                                        Attorney at Law
                                        423 Madrina
                                        Ballwin, MO 63021
                                        (636) 207–7330
                                        (636) 207–7351 (fax)
                                        lekomp@swbell.net


                        CO-COUNSEL FOR MOVANT,   DANIEL LEWIS LEE

VERIFICATION

Movant, Daniel Lewis Lee, states, pursuant to penalties of perjury, 28 U.S.C. § 1746, that the foregoing is true and correct.

/s/ Daniel Lewis Lee

CERTIFICATE OF SERVICE

Although service of a motion brought pursuant to 28 U.S.C. § 2255 is not required until the Court has made a preliminary ruling that the files and records of the case do not conclusively bar relief, Movant's counsel, in anticipation of such a ruling, have filed this motion on today's date via ECF, thereby serving the United States and all parties.

/s/ David A. Ruhnke
COUNSEL FOR MOVANT

Dated:    Montclair, New Jersey
          Baldwin, Missouri
          June 26, 2006