## AFFIDAVIT OF DANIEL LOUIS LEE

STATE OF INDIANA
COUNTY OF VIGO

I, Daniel Louis Lee, being of sound mind and lawful age to testify, hereby state as follows:

1. In 1999, I was convicted in the United States District Court for the Eastern District of Arkansas of various "RICO" offenses, including conspiracy and three counts of murder allegedly committed in furtherance of a RICO enterprise. *United States v. Lee*, Case No. LR-CR-97-243.

2. Since the beginning, I have maintained my innocence of these offenses.

3. Following the guilt and penalty phases of my trial, the district court sentenced me to death. I am currently incarcerated at the United States Penitentiary in Terre Haute, Indiana, where I reside on death row.

4. Several weeks before my trial, an issue arose which caused me great concern and which affected my relations with my two lead trial attorneys for the remainder of their representation. This issue involved a conflict of interest, which occurred when a younger attorney assigned to my defense team, Karen Coleman, left the defense and went to work for the same United States Attorney's Office that was prosecuting me and seeking to have me put to death.

5. I am now represented by new counsel, who were appointed to represent me in my direct appeal. They are not in any way involved with the conflict of interest that occurred with my trial lawyers.

6. When I was charged with the RICO offenses, the district court appointed two counsel to represent me, Jack Lassiter and Cathleen Compton. Because I was going to be on trial for my life, I was very concerned about the abilities and loyalties of the attorneys who would be defending me. Both Mr. Lassiter and Ms. Compton assured me of their qualifications and their desire to serve as my advocates.

1

7. Mr. Lassiter and Ms. Compton worked at separate law firms. A younger lawyer, Karen Coleman, worked at Mr. Lassiter's firm. Mr. Lassiter assigned Ms. Coleman to work on my case several months before trial.

8. From my conversations with Mr. Lassiter and Ms. Compton, I learned that the government's investigation in my case had been extensive and that literally thousands of pages of documents needed to be examined before trial. As a result, Mr. Lassiter and Ms. Compton needed Karen Coleman to assist them in investigating the facts of the case and preparing for trial. Mr. Lassiter and Ms. Compton also planned for Ms. Coleman to assist them at trial.

9. During the many months before trial, Karen Coleman functioned as a full member of my defense team. She reviewed hundreds of documents, interviewed defense witnesses, attended defense team meetings and met with me in person and spoke with me on the telephone on many occasions.

10. One of Karen Coleman's primary tasks was to gather facts relating to my alibi defense. Developing this defense required Ms. Coleman to meet with me numerous times so that she could develop a time line and establish where I was and who I was with at various times.

11. I had many confidential and privileged conversations with Karen Coleman when she was a member of my defense team. At the urging of Mr. Lassiter and Ms. Compton, I spoke candidly with Karen Coleman and tried to answer her many questions about my whereabouts around the time of the Mueller family murders as well as other matters. Based on my conversations with Mr. Lassiter and Ms. Compton, I strongly believed that Karen Coleman was sincere in her efforts to help me and that she was a loyal member of the defense team. I was also persuaded by the fact that Ms. Coleman repeatedly assured me that, if I was convicted, she would be very involved in my appeal. I thought she was committed to me and my case for the "long haul."

Attachment 1 to Lee 2255
2

12. Although I was pleased with Karen Coleman's close attention to my case, I remember being concerned on several occasions that she seemed to be constantly pressing me for information about people, places and groups that were not relevant to my defense. Although Karen Coleman was supposed to be focusing on developing a time line to show my alibi, she continually probed and questioned me about topics of interest to the prosecution – namely, my supposed contact with or knowledge of certain white supremacist groups and my alleged association with their members. I found Karen Coleman's obsession with such topics strange. Instead of focusing on my alibi, she would go through lists of names and organizations with me, trying to find out if I was familiar with them. Most of the time, I was not. Karen Coleman expressed particular interest in any knowledge I might have of Tim McVeigh or of Elohim City, a reputed center of white supremacist activity. When I questioned Karen Coleman about her ongoing interest in facts that had nothing to do with my alibi, she reassured me that the questions were a necessary "background check" so that she could prepare a proper defense.

13. Because Mr. Lassiter and Ms. Compton frequently were busy when I attempted to reach them by telephone (I was detained in jail prior to trial), I frequently resorted to asking for Karen Coleman when I called Mr. Lassiter's office. In fact, during much of the pretrial period, she was my primary contact with the defense team.

14. After being reassured many times of Karen Coleman's commitment to my case, I received one of the shocks of my life when I called Mr. Lassiter's office one Monday morning a few weeks before my trial. When I asked for Ms. Coleman, I was told that she had taken a job with the United States Attorney's Office. The secretary who gave this information told me that Karen Coleman had "cleaned out her desk" and was gone.

15. When I learned that Karen Coleman would be working with the attorneys who were seeking to convict me, I felt completely betrayed. My trial was only a few weeks away, and Ms. Coleman's sudden departure would leave a gaping hole in my trial team. Worse yet, I recalled how I had spent hours talking with Ms. Coleman on the telephone and in person, providing her with confidential information that was vital to my defense. During our conversations at the jail, Karen Coleman constantly took notes which filled several legal pads. I wondered where those pads would go now that Ms. Coleman was going to the prosecutor's office.

16. As I thought further about the situation, I became even more upset. I recalled the many times Karen Coleman had pressed me hard for information about certain white supremacist organizations. Frequently, I would know nothing about the names and groups she quizzed me about. On those occasions when I could provide no information, it seemed that Karen Coleman would get quite frustrated.

17. During several of my conversations with Karen Coleman, it appeared that she was trying to find out if there was some kind of connection between me and Tim McVeigh or between me and the so-called "midwest bank robbers." There was no such connection, but that did not stop Ms. Coleman from repeatedly returning to these topics or from also questioning me about Elohim City. In fact, the subject areas in which Ms. Coleman showed the most interest were areas that had nothing to do with my defense. Now that I knew she was going to the United States Attorney's Office, I became suspicious of her motives.

18. Once I knew Ms. Coleman was leaving and I looked back over the previous weeks, I realized that my conversations with Ms. Coleman had grown especially lengthy and intense during the period when she was preparing to leave Mr. Lassiter's firm and become a prosecutor. It was during this time that Ms. Coleman had really pressed me for information about Tim McVeigh and certain white supremacist organizations.

19. Once Ms. Coleman announced she was leaving to go work for the prosecutor's office, my co-defendants and their counsel picked up on this issue and started talking about a conflict of interest. The same day that I learned of Ms. Coleman's planned departure, we had a court hearing which had previously been scheduled to address pretrial motions. That hearing was held on December 7, 1998. Counsel for the co-defendants raised the conflict issue at that hearing. During testimony that day and at a later hearing, I learned that Karen Coleman had known for weeks that she would be going to the United States Attorney's Office. It appeared that in October or November of 1998, Ms. Coleman had been offered the prosecutor's job and accepted it. She was only waiting to have the FBI background check completed.

20. Once I learned that Karen Coleman had spent the past several weeks awaiting only her FBI clearance and had spent a good portion of those weeks conversing with and quizzing me, I became even more concerned. I suspected that

4

her motives for asking me all of those irrelevant questions had everything to do with her new position with the prosecutor's office and had nothing to do with her role as my defense attorney.

21. During the many weeks Karen Coleman operated in this dual role – as a soon-to-be prosecutor and as a member of my defense team –she did not give me a hint that she was considering any change in employment. I later found out that she had shared the fact of her job offer and acceptance with Mr. Lassiter a few weeks before this news became public. However, Mr. Lassiter never shared this information with me either.

22. During pretrial hearings, Karen Coleman, Paula Casey (the head United States Attorney) and Jack Lassiter all testified. There were statements about a "Chinese wall" being built in the prosecutor's office so that any information that Karen Coleman obtained while she was a defense attorney would not be shared with the lawyers who were prosecuting me. I had never heard of this type of "Chinese wall" before and it did not provide me with any reassurance. I felt deeply betrayed by Karen Coleman's defection to the other side.

23. I felt equally disturbed by other testimony at the hearings. Karen Coleman and Paula Casey gave conflicting accounts of some of the circumstances surrounding Ms. Coleman's application and move to the prosecutor's office. The conflict in their stories caused me further distrust and worry. My concern grew deeper when my lead attorney, Jack Lassiter, testified in court that he believed in Karen Coleman's honesty and integrity and did not believe she would disclose confidential information to the prosecution. I did not share Mr. Lassiter's confidence in Ms. Coleman, as I recalled all of those conversations in which she had probed me for information yet never disclosed to me that she was planning to go to work for the prosecutor's office.

24. I was especially concerned that my lead lawyer, Mr. Lassiter, was testifying to opinions of Ms. Coleman that I did not share. Basically, it seemed that Mr. Lassiter was testifying against me.

25. When the news of Ms. Coleman's departure became public, I tried to address my concerns with my attorneys. Instead of showing concern, they seemed to be trying to "sweep the issue under the rug." Although Cathleen Compton

5

expressed some concern about the conflict of interest, Mr. Lassiter continually assured me that the issue was not a big deal. Overall, it appeared that he was more loyal to and interested in protecting Karen Coleman than me.

26. After others had testified, I was permitted to take the stand so that my lawyers could "make a record" on the conflict issue. Before I testified, Lassiter and Compton instructed me to keep my testimony short and simple and not to deviate from the areas they instructed me on. They told me that the prosecutors would not be asking me any questions.

27. My testimony was indeed brief. I was put on the stand for perhaps just a few minutes. I was supposed to simply say I was "concerned" about the situation. However, in response to one of Ms. Compton's questions, I stated that I felt shocked and betrayed. I pointed out that during the same time period when Ms. Coleman knew she was going to join the prosecutor's office she had been intensively questioning me on a regular basis. I stated that she had been "really tilling over the soil and examining every detail there was possible and making returns trips to the jail, asking several questions about this, following up on other leads. . . ." When Cathleen Compton asked me about whether the situation bothered me in any way, I stated that I felt like Ms. Coleman had played me "like a fool." A copy of my testimony is attached as Exhibit A to this affidavit.

28. After I explained how upset I was about the situation, Ms. Compton introduced her next question by saying "Let me ask you this, Mr. Lee, before you step down. . . ." I interpreted that question as my cue to bring my testimony to an end. Ms. Compton then asked me whether I had any problem with regard to Mr. Lassiter. When Ms. Compton asked me this question, I responded that I had "full confidence" in Mr. Lassiter and in his desire to help me. At that time, I certainly wanted to have confidence in Mr. Lassiter. Unfortunately, this answer, which was rehearsed with my lawyers ahead of time, was simply wishful thinking. After the Coleman situation arose, I never fully trusted my attorneys again. In fact, I became quite guarded in what I said to them. I felt that I had learned an important lesson – namely, that you cannot trust your attorneys' reassurances that they have only your best interests at heart.

29. With regard to my attorneys' efforts to "make a record" on the Coleman issue, I felt they were doing little more than "going through the motions." They

6

were not interested in protecting my interests. The remaining confidence I had in Mr. Lassiter evaporated when I saw the Coleman issue was treated as nothing more than a routine procedural matter.

30. As I approached my trial date, I felt scared and isolated. I felt that everything that I had shared with my defense team could become – or already had become – common knowledge in the prosecutor's office. Because of the Coleman situation, I felt I could not freely discuss the facts of the case or trial strategy with my attorneys. In fact, there were facts that I was aware of that would have been very helpful to my defense that I was afraid to tell my lawyers because of the fear I had that the government would learn those facts before they could ever be used for my defense at trial. At times, I was afraid that there was a direct pipeline from my defense to the prosecutor's office.

31. One of the other things that upset me was a court ruling that occurred around the same time the Coleman issue arose. According to this court ruling, I could no longer be given copies of any discovery documents. I was told that the court had made this ruling because I had sent a letter to a friend that included a copy of a report on a witness. My attorneys had simply agreed with the prosecutors' proposal to prohibit thereafter my access to documents, including any documents that included the names of witnesses. No one ever discussed with me why I sent the letter or whether there was another method or procedure that could have been used that would have satisfied security concerns while allowing me to assist my attorneys in trial preparation. I was particularly upset because no one had ever told me that I could not share the documents with others; in fact, I believed that the documents were a matter of "public record."

32. I later learned that the court's ruling barring me from access to the documents had been issued at a hearing in November 1998 that I did not attend and of which I had no knowledge. I further learned that I had been represented at this secret hearing by only Karen Coleman; my other attorneys were unavailable and did not attend. This hearing occurred during the time period when Karen Coleman knew she would be going to United States Attorneys office and was only awaiting her FBI clearance. At the hearing, I later learned, Ms. Coleman had voiced no objection to the government's proposal to bar my access to all discovery documents.

7

33. I feel strongly that my defense was prejudiced by my inability to review vital documents. Although my attorneys were allowed to discuss some of the contents of documents with me, that were not permitted to mention witness names and did not in fact do so. Adding to the problem was the fact that the discovery file was enormous. There was no way that an attorney could "go over" everything with me during attorney-client meetings. I felt that my effort to assist my attorneys in preparing a defense was greatly impaired by the court's ruling. If Karen Coleman had properly represented my interests at this hearing, I believe that there is a great possibility the court's ruling would have provided a less intrusive procedure for protecting the documents and would have continued to permit me necessary access to vital information.

34. When I was appointed new counsel to represent me in my direct appeal, I learned for the first time about the secret hearing and that the fact that Ms. Coleman had represented me during that hearing. At that time, Ms. Coleman was awaiting only her FBI clearance before making her official entry into the prosecutor's office. I also learned for the first time in recent weeks that Ms. Coleman had voiced no objection at this hearing to the prosecutor's proposal to bar my access to discovery.

35. I believe that my legal representation at the trial level was fatally compromised by Karen Coleman's conflict of interest and by Mr. Lassiter's and Ms. Compton's unwillingness to press this issue and argue that my defense had been harmed by Coleman's representation of me during a time period when she was also a *de facto* prosecutor. At the hearing on this issue, I was represented by counsel who themselves labored under a conflict of interest. As Ms. Coleman's employer, Mr. Lassiter appeared primarily concerned about declaring Coleman's honesty and integrity and in not making any waves over this serious breach in the defense team.

36. After the Karen Coleman incident, I felt I could no longer trust my lawyers, and my legal representation suffered from my inability to freely communicate with counsel.

8

FURTHER AFFIANT SAITH NOT.

_Daniel Lee_
Daniel Lee

I swear under penalty of perjury, the foregoing statements are true and correct to the best of my memory.

_Daniel Lee_
Daniel Lee

5-5-03

9