IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA                    PLAINTIFF/RESPONDENT

NO. 4:97-CR-00243(02) GTE

DANIEL LEWIS LEE                             DEFENDANT/MOVANT

**RESPONSE OF UNITED STATES OF AMERICA, PLAINTIFF/RESPONDENT, TO DEFENDANT/MOVANT DANIEL LEE'S MOTION PURSUANT TO 28 U.S.C. §2255 TO VACATE CONVICTION AND SENTENCE**

The United States by Bud Cummins, United States Attorney, and Dan Stripling, Assistant United States Attorney, and Gwynn X Kinsey, Jr., United States Department of Justice, Criminal Division, for its Response to Daniel Lewis Lee's Motion pursuant to 28 U.S.C. § 2255 to vacate conviction and sentence, states:

**STATEMENT OF THE CASE**

On July 7, 1998, Movant Daniel Lewis Lee, Chevie Kehoe, and Kirby Kehoe were charged in a seven-count Superseding Indictment.[1]  Count 1 charged all three defendants with racketeering in violation of 18 U.S.C. § 1962(c).  Count 2 charged all three defendants with a racketeering conspiracy in violation of 18 U.S.C. § 1962(d).  Counts 3, 4, and 5 of the indictment charged Chevie Kehoe and Lee with murder in aid of racketeering in violation of 18 U.S.C. § 1959 alleging that they murdered William Mueller, Nancy Mueller and Nancy Mueller's eight-year-old daughter, Sarah Powell.  Count 6 of the indictment charged all three defendants with a

---

[1]  The Court is well aware of the procedural history and facts of this case.  The Government nevertheless includes a statement of the case and statement of facts similar to those contained in its brief on direct appeal, because these sections are germane to and referenced in some of the specific portions of the Government's Argument, *infra*.

robbery conspiracy in violation of 18 U.S.C. § 1951(a) for the robbery of the Muellers associated with their murders.  Count 7 charged Chevie Kehoe and Lee with use of a firearm in the Mueller robbery and murder in violation of 18 U.S.C. § 924(c).  Count 1 alleged ten racketeering acts including the 1995 Mueller burglary, a Washington State robbery and kidnaping, two Idaho murders, the 1996 Mueller family murders, the bombing of Spokane City Hall, and the attempted murder of two Wilmington, Ohio, police officers.  Lee was charged in racketeering acts 4, 5, 6, and 7 of Count 1, the Mueller family murders/robbery and the Spokane City Hall bombing.  Prior to trial Kirby Kehoe entered into an agreement with the government and pled guilty to Count 2 of the indictment.  Also prior to trial, Counts 6 and 7 were dismissed on motion of the government. The government sought the death penalty for both Chevie Kehoe and Lee.  Trial commenced March 1, 1999.  The guilt phase of the trial concluded May 4, 1999.  Both Chevie Kehoe and Lee were convicted on all five counts.  As to Count 1, Lee was found to have committed three of the racketeering acts, those associated with the Mueller family murders.  He was found not to have committed the racketeering act associated with the Spokane City Hall bombing.  In the first of two separate sentencing phases, Chevie Kehoe was sentenced to life.[2]  The jury then returned a death penalty verdict against Lee.

Lee moved to set aside the death penalty and sought to obtain evidence from Attorney General Reno and Deputy Attorney General Holder.  The government moved to quash the subpoenas issued to General Reno and Deputy Holder.  This Court denied the motion.  The government appealed and the Eighth Circuit issued a writ of mandamus directing that the

---

[2] The Eighth Circuit affirmed Chevie Kehoe's convictions and life sentence in *United States v. Kehoe*, 310 F.3d 579 (8th Cir. 2002), *cert. denied*, 538 U.S. 1048 (2003).  Kehoe subsequently filed a motion for relief under Section 2255, which is pending before this Court.

subpoenas be quashed. *In re United States*, 197 F.3d 310 (8th Cir. 1999). This Court then entered an order setting aside the death penalty. *United States v. Lee*, 89 F. Supp. 2d 1017 (E.D. Ark. 2000). The court of appeals reversed and reinstated Lee's death sentence. *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001), *cert. denied*, 537 U.S. 1000 (2002). Judgment was then entered on the jury verdict.

Lee appealed from the final order of judgment and conviction. The court of appeals affirmed. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004). Lee's convictions and death sentences became final on direct review on June 27, 2005, the date on which the Supreme Court denied Lee's certiorari petition. 125 S. Ct. 2962 (2005) (order).

On June 26, 2006, Lee filed his present motion for Section 2255 relief from his convictions and death sentence.

## STATEMENT OF FACTS

*The Aryan Peoples' Republic*

The RICO "enterprise" charged in the Indictment was an association in fact whose members included Lee; Chevie Kehoe; Chevie Kehoe's father, Kirby Kehoe; Chevie Kehoe's brother, Cheyne Kehoe; and Faron Lovelace. The group called itself the Aryan Peoples' Republic, the Aryan Peoples' Resistance, and the Aryan Peoples' Revolution. The purpose of the group was to establish an independent country to be populated by whites only within the existing boundaries of the United States. Membership in the enterprise and citizenship in the new nation would be increased by recruitment of like minded persons and the practice of polygamy. It was part of the goal of the organization to engage in armed conflict and terroristic acts against the United States, to finance the necessary operations by various criminal means, and

to take all action necessary, including murder, to secure the future of the enterprise and its members.

The indictment charged that Chevie Kehoe was the leader of the enterprise and that Lee, Cheyne Kehoe, Kirby Kehoe, and Faron Lovelace were principal assistants.

The principal inspiration for the Aryan Peoples' Republic came from Chevie Kehoe. Kehoe's concept was based on the precepts of Robert Matthews' group, The Order.[3]  (Tr. 1317-18).  Kehoe wanted to lead a group that engaged in acts that would lead to the establishment of a new government for a portion of the United States.  (Tr. 1314).  Kehoe's group would not become greedy as Matthews' group had, and would avoid the mistakes that the Matthews' group had made.  (Tr. 1319, 1311).  The Aryan Homeland, free of mongrel races, would be established in the northwest United States.  (Tr. 1319-20).  Whites were a chosen people.  (Tr. 1433).  Jews were the devil's children and should die.  (Tr. 1433-34).  The Bible justified violence.  (Tr. 1435).  Kehoe reviewed books on explosives, always carried weapons, and tested armaments. (Tr. 1435).  As Kehoe envisioned, the white men could take control in the chaos that followed the simultaneous killing of large numbers of judges and law enforcement officials.  (Tr. 1320, 1321).

Lee and Chevie Kehoe were tried on five counts.  Count One charged racketeering in

---

[3]  Matthews' activities are described in *The Silent Brotherhood*, a book Kehoe had earlier given to John Shults.  (Tr. 1310).  Kehoe later gave a copy of the book to Danny Lee.  (Tr. 4964). The Silent Brotherhood tells the story of Robert Matthews deepening hatred of the government. This hatred manifested itself in Matthews formation of a group, The Order, which intended to ferment revolution.  The Order engaged in criminal activity, including armored car robberies, to support itself. The Order committed the murder of liberal Jewish talk show host Alan Berg. Order members also killed one of their own members whom they believed to be untrustworthy. Matthews was killed after being cornered by FBI agents.

violation of 18 U.S.C. § 1962(c).  Count Two charged a racketeering conspiracy in violation of 18 U.S.C. § 1962(d).  Counts Three, Four and Five charged murder in aid of racketeering in violation of 18 U.S.C. § 1959.  The RICO charge included charges of conducting and participating in the affairs of the enterprise through the commission of ten racketeering acts (hereinafter RA), several of which had multiple parts.  The acts included the 1995 theft of property from the Muellers and the transportation of that property from Arkansas to Washington (RA 1); the kidnaping and robbery of Malcolm and Jill Friedman in Colville, Washington (RA 2); the 1996 robbery and murder of William Mueller, his wife Nancy, and his eight-year old stepdaughter Sarah Powell (RA 4-6 and Counts 3-5); the bombing of Spokane City Hall (RA 7); and the 1997 attempted murder of Ohio police officers (RA 9).  The jury found both Lee and Chevie Kehoe guilty of all five counts.  As to Count 1, racketeering, the jury found Lee committed racketeering acts 4, 5, and 6 (Mueller family murders).  The jury did not find Lee had committed racketeering act 7 (Spokane City Hall bombing), the other racketeering act with which Lee was charged.

*1995 Mueller Burglary (RA 1)*

In February 1995 Chevie Kehoe stole a trailer near Harrison, Arkansas.  (Tr. 1760).  He pulled the trailer to his parents' house near Kingston, Arkansas.  (Tr. 4951).  On February 12, 1995 Kehoe and his father Kirby Kehoe burglarized the Mueller home in Tilley, Arkansas.  (Tr. 4954).  Chevie Kehoe took control of most of the property taken.  A dispute with his father developed because Chevie did not pay Kirby as much as Kirby thought was his.  (Tr. 4956).

*Friedman Kidnaping and Robbery (RA 2)*

In June 1995, Faron Lovelace, aided by Chevie and Kirby Kehoe, kidnaped and robbed

5

Malcolm and Jill Friedman.  Friedman was the former owner of a Colville grocery store where Chevie Kehoe had worked as a youth.  Kehoe had also worked at the Friedman home.  (Tr. 4137).  Kehoe had not liked working for the Friedmans because of their supposed ethnicity, or as Kehoe expressed it – they were "kikes."  (Tr. 5284).  Lovelace gave the money taken from the Friedmans, $15,000, to Chevie who took $13,000 and gave Lovelace $2,000.  (Tr. 5300-02). Later Chevie Kehoe gave Kirby Kehoe $4,000 of the money.  (Tr. 4962).  Chevie Kehoe used part of the money to purchase real property near Priest River, Idaho (Tr. 4188-94).  Later members of the organization, including Lee, congregated on this property.  (Tr. 4353-55; 4967).

During 1995 Kehoe met Lee.  (Tr. 2896).  Kehoe also met Sean Haines, a friend of Lee. Kehoe recruited Lee, and Lee moved in with him.  (Tr. 2773).  Kehoe attempted to recruit Haines.  Kehoe and Lee went together to Haines apartment and, after Lee awakened Haines, Kehoe told Haines, "that he was having trouble sleeping at night with his conscience.  His conscience wouldn't let him sleep because of the situation the white race was facing and that people inside the movement had to start to begin acting more seriously or in more serious types of actions.  I think he brought up that similar types of actions similar to the white supremacist organization called The Order."  (Tr. 2800).

*The Mueller family murders (RA 4-6, Counts 3-5)*

On January 11, 1996 Bill Mueller, his wife, Nancy and Nancy's daughter, Sarah Powell returned to their home in rural Searcy County, Arkansas.  The family was overpowered by Chevie Kehoe and Lee who were waiting for them.  The Muellers were handcuffed, separated, and ultimately killed.  Each of their heads was wrapped in a plastic bag which was then wrapped tightly with duct tape.  Before killing Sarah Powell, Kehoe and Lee questioned her and obtained

the location of approximately $50,000 Mueller had hidden.  Property belonging to the Muellers, including coins, cash, display cases, and a large supply of firearms and firearm parts, was taken.[4] After killing the Muellers, Kehoe and Lee taped rocks to their bodies, transported them to Pope County, and threw them into the Illinois Bayou.  Following disposition of the bodies, Kehoe and Lee returned to Spokane, Washington with the stolen Mueller property.  (Tr. 4971-74; 5325-29).

The bodies were not discovered until June 28, 1996.  On that day, a woman was fishing just north of Russellville on the westerly of two bridges on Pleasant View Road.  The bridges cross the Illinois Bayou.  (Tr. 3074-5).  She snagged two tennis shoes tied together with "something that was flapping around extending out from it." (Tr. 3075).  A dragging operation found portions of the bodies of Bill Mueller, Nancy Mueller and Sarah Powell.  The adult bodies had handcuffs or flex cuffs attached to ankles and wrists.  The three bodies had plastic bags duct taped to their heads.  Some plastic bags were blue Wal-Mart sacks.  (Tr. 3105).  Some were black trash bags.  (Tr. 3097-3121).  The bodies had large rocks duct taped to them.  (Tr. 3104; 3118).

Evidence of Lee's involvement in the Mueller family murders included: (1) Lee's detailed confession to Gloria Kehoe, mother of Chevie Kehoe; (2) Lee's confession, containing details of the murders, to James Wanker a man with no involvement with the organization or with members of the organization; (3) Lee's general statement regarding having taken care of persons down south made to Ms. Wanker, a person with no involvement in the organization or with members of the organization; (4) detailed confessions Chevie Kehoe gave his mother, Gloria Kehoe and his brother, Cheyne Kehoe, telling of Lee's involvement in the murders; (5) physical evidence connecting Chevie Kehoe's vehicle to the crime scene; (6) circumstantial evidence of

---

[4]  Mueller was a gun show vendor.

Chevie Kehoe's and Lee's presence in Arkansas at the time of the murders; (7) evidence connecting the stolen Mueller property to Chevie Kehoe and Lee, including evidence of Kehoe's and Lee's immediate possession of property following the murders; (8) evidence connecting Chevie Kehoe and Lee to police raid clothing worn at the time of the murders; (9) evidence of the sudden affluence of Chevie Kehoe immediately after the murders; (10) Lee's fingerprint found on Mueller property which had been stored with other organization property; and (11) a hair similar to Lee's found in a raid cap which Chevie Kehoe told Cheyne Kehoe was used in the Mueller family murders which was found at the time of the Ohio shootings.

Prior to the Mueller family murders/robbery, Chevie Kehoe and Lee left Washington State telling friends that they were going to build a barn in Idaho. (Tr. 2778-79; 2898). Instead, Kehoe and Lee traveled to Arizona where they met Kirby and Gloria Kehoe. After a short stay in Arizona, Kehoe and Lee drove to Lee's mother's home in Oklahoma. Lee's mother gave them $40.00 because they lacked funds to return to Washington, (Tr. 2619-20), and the next day, January 10, 1996, Kehoe and Lee left Oklahoma. (Tr. 2633).

Kehoe and Lee resurfaced in Spokane, Washington on or about January 14, 1996, in possession of stolen Mueller property. On January 14, 1996 at 5:59 p.m., Lee called his mother from Spokane. (Tr. 2610; 2620-22).

When Chevie Kehoe arrived at the Shadows Motel in Spokane, Washington, he had a great quantity of guns, gun parts, and cash. (Tr. 2896; 2916). Kehoe claimed that he had taken delivery of guns and gun parts from a dealer on consignment. (Tr. 2897-98). Items which he possessed included display cases and Black Hills ammunition later traced to Bill Mueller. (Tr. 2915; 2900).

In January 1996 Chevie Kehoe visited Cheyne Kehoe in Colville, Washington.  Chevie Kehoe was driving the blue two-tone 1984 GMC diesel Suburban which Kehoe and Lee had used to travel to Arizona and Oklahoma prior to the Mueller family murders.  (Tr. 2620; 4812-13; 5308-09).  In late June or July 1996 Kehoe caused the Suburban he had driven to Oklahoma to be painted white.  (Tr. 3044-56).  He then traded this vehicle to his father.  (Tr. 5356).

In early February, Gloria Kehoe left Kirby Kehoe in Arizona.  She arrived at the Shadows Motel on February 4, 1996.  (Tr. 5603, 5138, 4969, 4970).  She saw the mound of merchandise her son possessed.  (Tr. 4971).  Kehoe told his mother he now had the funds to take pilot lessons.  (Tr. 4971).  Gloria Kehoe questioned her son and he confessed to the Mueller family murders in detail, implicating Lee in his statement.  (Tr. 4972-74).  Later Lee also confessed the murders to Gloria Kehoe.  (Tr. 4975).

On February 11, 1996 Chevie Kehoe and his father sold a Mueller gun to Travis Brake, a heroin addict, at a gun show in Seattle.  (Tr. 3178-83).  The sale of the gun to Brake ultimately provided a connection between Kehoe and the Mueller family murders.  On July 9, 1996 a search of property which had been stored by the Muellers' landlord after the Mueller's disappearance located a .45 caliber Colt box.  (Tr. 3165).  The gun's serial number was placed in NCIC.  The gun had been found on Travis Brake in Seattle following his arrest in February 1996.  (Tr. 3179-83).  This information lead investigators to the gun show where Brake had purchased the gun and then to the Kehoes and the Shadows Motel.

Jeff Brown was the manager of the Shadows Motel.  Jeff Brown described property in Kehoe's possession after both the 1995 Mueller burglary and 1996 Mueller disappearance.  Black Hills ammunition boxes were found at the Shadows.  The serial numbers on these boxes matched

9

the serial numbers on boxes of ammunition earlier purchased by Bill Mueller.  (Tr. 3523-31).

Handwriting analysis of papers recovered at the Shadows traced recovered items to the Muellers.

(Tr. 3731-66).  ATF agents in Spokane began sporadic surveillance of both Chevie Kehoe and

Kirby Kehoe.

It was the sale of another Mueller weapon to Sean Haines that propelled  Lee and Chevie

Kehoe to flee the Northwest.  On December 10, 1996 Sean Haines was arrested in South Dakota.

(Tr. 2794).  At the time of Haines' arrest, Haines called Lee and told Lee that police were

questioning him about a rifle Haines had obtained from Kehoe.  (Tr. 2799).  Lee rushed to

Kehoe's motor home which was then parked in Spokane.  Lee told Kehoe of Haines arrest with

the Mueller rifle.  Lee left for Oklahoma.  (Tr. 4980).  Kehoe left Spokane the day after Haines

was arrested.  (Tr. 4469-72).

Kehoe traveled to his parents who now lived in Yaak, Montana.  Kehoe's brother,

Cheyne, and his wife and child, were then living on the parents' remote property.  Chevie Kehoe,

his wife Karena and their three children, Cheyne Kehoe, his wife Tanna and their baby, left Yaak

two days later.  (Tr. 5318-20).  Chevie and Cheyne Kehoe and their families traveled first to

Arizona looking for work.  In Tucson Chevie Kehoe and Cheyne Kehoe attended a gun show.  As

they prepared to leave the motor home to attend the gun show, Chevie Kehoe told Cheyne Kehoe

that he must get rid of a particular firearm because it was a Mueller gun.  (Tr. 5323).

The Kehoes found no work and traveled to Galveston, Texas.  Chevie Kehoe continued to

sell at gun shows.  In Galveston, Chevie Kehoe told Cheyne Kehoe that he and Lee had killed the

Mueller family.  He provided particular information to Cheyne Kehoe telling him that Lee had

been unable to kill the little girl and he, Chevie, had to kill her.  Chevie Kehoe showed his

brother the federal officer raid gear in which he and Lee had dressed.  Chevie Kehoe told his brother that when he and Lee bound the Muellers' heads in bags with duct tape they had run out of bags which had been brought for the purpose and had to use bags found in the Mueller residence.  Chevie Kehoe stated that he gave Lee $3,000 or $4,000 and a pistol from the property taken from the Muellers and that he, Chevie, kept $50,000 in cash and gold, and guns and gun parts worth $30,000.  (Tr. 5326-30).  Several times Chevie Kehoe told his brother that he continued to be in contact with Lee.  (Tr. 5331).

After traveling through the Southeastern United States, the Kehoes turned north into West Virginia and then west.  They arrived in Ohio in early 1997.  They parked the motor home at a park in Chillicothe, Ohio.  Chevie Kehoe arranged to meet Lee in Greensboro, Kentucky, but Lee failed to show.  (Tr. 5342).

*Ohio Shootings (RA 9)*

On February 15, 1997, Chevie Kehoe and Cheyne Kehoe were involved in two shooting incidents with law enforcement in Wilmington, Ohio.  A state trooper stopped the truck which Chevie Kehoe was driving and in which Cheyne Kehoe was a passenger.  Chevie Kehoe exited the truck and then had a long discussion with the trooper.  He refused to provide his drivers license.  Cheyne Kehoe remained in the truck.  Chevie Kehoe ran from the trooper while Cheyne Kehoe exited the truck and exchanged gunfire with a Clinton County, Ohio deputy sheriff who had stopped at the scene.  (Tr. 5344-48).

Chevie Kehoe jumped into the truck and drove from the scene of this shooting.  Cheyne Kehoe fled from the scene on foot.  Shortly after the initial shooting, a Wilmington city policeman located the truck.  As the policeman exited his vehicle, Chevie Kehoe fired

approximately thirty-three rounds at him and a fellow officer.  (Tr. 4612).  A bystander was shot in the arm.  Chevie Kehoe escaped on foot.

A search of the truck found much Mueller property and federal officer raid jackets and caps.  In one of the caps was a hair microscopically similar to the hair of Lee.  (Tr. 4722).

*The Escape and Hiding*

Both Kehoes escaped.  Cheyne Kehoe made his way to the park where the motor home in which they were traveling was located.  He drove the two families west, ultimately making contact with Kirby Kehoe who transported Cheyne Kehoe and the two families to western Washington.  Chevie Kehoe stole a van, made his way to Indianapolis, then took a bus to South Dakota where his mother, Gloria, met him and took him to western Washington.

The Chevie Kehoe and Cheyne Kehoe families decided to flee.  Kirby Kehoe returned the now white 1984 GM Suburban to Chevie Kehoe.  The Kehoes traveled south, ultimately arriving at the Leavitt ranch in Beryl Junction, Utah.  At the ranch Chevie Kehoe continued to discuss with Cheyne Kehoe his plans to conduct armored car robberies to finance his revolutionary group, the APR.[5]  Chevie Kehoe, Cheyne Kehoe and Lee were to be the basis of the group.  (Tr. 5370-71).  The group was to be modeled on Matthews group.  (Tr. 5371).  Kehoe had prepared a symbol for the group based upon the 14 words.[6]  Targets of the APR would include government officials, law enforcement personnel and judges.  (Tr. 5373).

In Utah, Chevie Kehoe told his brother of his involvement in two other murders,

---

[5]  At times in conversations and writings Kehoe stated the APR was the Aryan Peoples' Revolution. At other times the APR was the Aryan Peoples' Resistance.

[6]  "We, the White Aryan people, must secure and provide a future for our children."

including his murder of Jon Cox.  Chevie Kehoe stated that he killed Cox because he was

revealing information about plans for armored car robberies.  (Tr. 5365-66).

*The Surrender of Cheyne Kehoe*

Cheyne Kehoe determined to leave Chevie Kehoe and turn himself into authorities.  In

June 1997 Cheyne Kehoe took the Suburban and fled with his wife and child.  On June 16, 1997,

after a stop at his parents in Yaak, Cheyne Kehoe turned himself in to local authorities in

Colville.  Cheyne Kehoe began cooperating with authorities.  On June 17, 1997 Chevie Kehoe

was arrested in Cedar City, Idaho.

In Colville the GMC Suburban was searched.  Paint samples were taken from the

repainted vehicle.  Later additional samples were taken.  An FBI forensic chemist conducted a

microscopic examination of the paint from the truck and paint from the duct tape on the

Muellers.  The chemist also performed four analytical tests.  The chemist found "based on the

comparison examinations I performed in this case, the metallic blues from the three victims, was

consistent, very similar, to that from the known blue paints." The chemist went on to find that the

specimens removed from Nancy and William Mueller had an intact layer of black which was

similar to the known blue and black from the scrapings of the truck.  It was the conclusion of the

chemist that the paints from the victims could have originated from the truck.  (Tr. 3678-84).

*Gloria Kehoe's Cooperation*

Kirby Kehoe was charged with gun violations in the Eastern District of Washington.  He

was placed under supervision pending trial.  Gloria Kehoe became concerned that Kirby Kehoe

would kill her because "she knew too much."  (Tr. 4980).  In early March 1998 Gloria Kehoe

called ATF agents in Spokane and began cooperating with authorities.  (Tr. 4980).  Based upon

information provided by Gloria Kehoe, authorities conducted searches of rental storage units located in Thompson Falls, Montana and Old Town, Idaho.

The Thompson Falls search was conducted on March 6 and 7, 1998.[7] The unit had been rented by Kirby Kehoe. (Tr. 3378-79). A cache of guns and ammunition were found. Among the guns was a Maddi AK-47 owned by Nancy Mueller. Also found was a quantity of Black Hills ammunition with serial numbers matching serial numbers of ammunition sold to Bill Mueller. (Tr. 3380-3403). Among the weapons and ammunition found were hand grenades, grenade parts, a machine gun, assault weapons, and over 30,000 rounds of ammunition of various calibers including armor piercing ammunition. Also found were written materials associated with the White Separatists movement and with Survivalist. (Tr. 3380-3403).

Authorities also searched the storage unit at Old Town, Idaho. A first search was conducted on April 16, 1998 and the second search on April 21, 1998. (Tr. 3479). A key taken in the search of Chevie Kehoe's trailer at Beryl Junction matched the key on the lock at Old Town. (Tr. 3626). Kirby Kehoe also had a key that matched the lock. (Tr. 3628). Among the items found in the search were two display cases similar to those used by Bill Mueller. The cases had fibers in them similar to the carpet in the Mueller house. (Tr. 3650). One of the cases had a hair similar to Bill Mueller's in it. (Tr. 3652). One of the display cases had Lee's fingerprint and a Chevie Kehoe fingerprint on it. (Tr. 3710). Also found in the search were table display units similar to the ones Mueller used, Rubbermaid containers containing Mueller property, and white supremacists and Survivalist literature. (Tr. 3479; 3610-28).

*The Indictment and Trial*

---

[7] Authorities returned on April 1, 1998 and conducted an additional search.

Lee, Chevie Kehoe and Faron Loveless were initially indicted on December 12, 1997.  On July 7, 1998, Lee, Chevie Kehoe, and Kirby Kehoe were charged in a seven-count Superseding Indictment.  Count 1 charged all three defendants with racketeering in violation of 18 U.S.C. § 1962(c).  Count 2 charged all three defendants with a racketeering conspiracy in violation of 18 U.S.C. § 1962(d).  Counts 3, 4 and 5 of the indictment charged Chevie Kehoe and Danny Lee with murder in aid of racketeering in violation of 18 U.S.C. § 1959 alleging that they murdered William Mueller, Nancy Mueller and Nancy Mueller's daughter, Sarah Powell.  Count 6 of the indictment charged all three defendants with a robbery conspiracy in violation of 18 U.S.C. § 1951(a) for the robbery of the Muellers associated with their murders.  Count 7 charged Chevie Kehoe and Danny Lee with use of a firearm in the Mueller robbery and murder in violation of 18 U.S.C. § 924(c).

Count 1 alleged ten racketeering acts including the 1995 Mueller burglary, a Washington State robbery and kidnaping, two Idaho murders, the 1996 Mueller family murders, the bombing of Spokane City Hall and the attempted murder of two Wilmington, Ohio police officers.  Danny Lee was charged in racketeering acts 4, 5, 6, and 7 of Count 1, the Mueller family murders/robbery and the Spokane City Hall bombing.

Prior to trial Kirby Kehoe entered into an agreement with the government and pled guilty to Count 2 of the indictment.  Also prior to trial, Counts 6 and 7 were dismissed on motion of the government.

The government sought the death penalty for both Chevie Kehoe and Danny Lee.  The notice of intention to seek the death penalty against Danny Lee, as amended, identified the following aggravating factors that the government intended to prove in support of death

sentences on each of the three capital murder counts: that Lee committed the murder in expectation of the receipt of something of pecuniary value, 18 U.S.C. § 3592(c)(8), that Lee committed the murder after substantial planning and premeditation to cause the death of the victim, § 3592(c)(9), that Lee intentionally killed more than one person in a single criminal episode, § 3592(c)(16), and, as a nonstatutory aggravating factor, that Lee posed a risk of future dangerousness. *Lee*, 374 F.3d at 642. With regard to Count Five only, the Government additionally alleged the Section 3592(c)(11) factor that the victim under that count, Sarah Powell, was particularly vulnerable in that she was eight years old when murdered. *Id*.

Lee was incarcerated in the Pope County, Arkansas jail.[8] Lee obtained a jailhouse tattoo from a fellow inmate. The tattoo was of a "wolf's hook" which Lee told the inmate was the emblem of the Aryan Peoples' Republic or Aryan People's Resistance. (Tr. 4115-16).

Jack Lassiter and Cathi Compton, attorneys experienced in capital cases, were appointed to represent Lee. Jack Lassiter employed Karen Coleman (now Whatley), a young attorney, who also worked on Lee's case.

In November, 1998, the United States Attorney for the Eastern District of Arkansas offered Ms. Coleman a position as an AUSA, subject to the completion of an FBI background investigation.

The government began providing discovery materials, mostly *Jencks* material, almost a year before trial was scheduled to begin. Lee was then incarcerated in the Pulaski County Detention Center. The government discovered that Lee was sending witness statements from the

---

[8] Lee had been arrested on state murder charges in September 1997. These charges were later dismissed in favor of the federal charges.

Detention Center to others.  The government contended Lee was doing so in an effort to harm or intimidate witnesses.  On November 19, 1998, a hearing was held on the government's Motion to limit Lee's access to these materials.  Because both Mr. Lassiter and Ms. Compton were out of town, Karen Coleman appeared for Lee who was not at the hearing.  The Court entered an Order permitting Lee's attorneys to continue receiving discovery material but requiring that Lee's attorneys retrieve discovery materials left with him, and not leave materials with him in the future.  While the Order stated that Lee's attorneys could discuss any of the discovery materials with Lee, his attorneys were prohibited from identifying civilian witnesses in their discussions with Lee.

In early December, 1998, Ms. Coleman's background investigation was completed and she was hired.  On December 4, 1998, attorneys for co-defendants Chevie Kehoe and Kirby Kehoe learned of the hiring and moved to disqualify the U.S.  Attorney's Office for the Eastern District of Arkansas.  Lee did not file any motion regarding the hiring of Ms. Coleman.  On December 7, 1998, the District Court conducted a hearing on the issue.  At that hearing the Court questioned Mr. Lassiter and later attorneys for Chevie Kehoe and Kirby Kehoe called Mr. Lassiter to testify.  Mr. Lassiter stated that he was not concerned about the hiring because he had complete faith in Ms. Coleman's integrity, knowing she would not reveal client confidences. (12/7/98 Tr. 16-17; 48-55).  On December 8, 1998, Lee testified that he was very upset with Ms. Coleman but retained full confidence in Mr. Lassiter.  (12/8/98 Tr. 220-222).  The District Court denied co-defendants Chevie Kehoe and Kirby Kehoe's motions to disqualify the U.S. Attorney's Office.

Prior to trial, Lee twice moved to sever his trial from his co-defendants.  Among the

reasons Lee sought severance was his contention that the greater evidence against Chevie Kehoe would prejudice him and statements Chevie Kehoe had made to his mother and brother would inculpate him. The District Court denied both motions finding, among other things, that Chevie Kehoe's statements to his mother were admissible against Lee as non-hearsay under Fed. R. Evid. 801(d)(2)(B), the adoptive statement exception to the definition of hearsay. The Court found further that if Chevie Kehoe's statements to his mother were hearsay, they were nevertheless admissible against Lee as statements against interest under Fed. R. Evid. 804(b)(3).

The District Court found the statements made to Cheyne Kehoe were admissible against Lee for the same reasons as were the statements to Gloria Kehoe. In addition the court found the statements to Cheyne Kehoe were non-hearsay under Fed. R. Evid. 801(d)(2)(E), statements made to another in furtherance of a conspiracy.

Prior to trial, Kirby Kehoe entered into a plea agreement. He pleaded guilty to Count 2, the racketeering conspiracy[9] and cooperated with authorities.

On February 24, 1998, the government provided defendants the witness list required by 18 U.S.C. § 3432. Government attorneys advised defense counsel that eight witnesses' names and some additional information were not being provided because of concerns about witness safety. Government attorneys provided the Court a letter explaining their reasons for believing that providing the names could endanger the witnesses. The Court then sent defense counsel a letter explaining to defense counsel that it was inclined to grant the government's request and

---

[9] Kirby Kehoe was sentenced to 51 months as a result of his guilty plea to the gun counts in the Eastern District of Washington. Kirby Kehoe received a 44 ½ month sentence on his plea in the Eastern District of Arkansas. The sentences were served consecutively, and Kirby Kehoe was released in 2006.

18

would make further inquiry of the government on February 26, the day an extensive hearing was scheduled.  The Court further stated that, if after further inquiry, the Court remained satisfied that witnesses were potentially endangered, it would permit the government to delay identifying these witnesses.  On February 26, after stating he intended to act in accordance with the letter he had previously provided defense counsel, the Court held an ex parte, in camera hearing.  Following this proceeding the Court permitted the government to withhold the names of eight potential witnesses.  Six of these potential witnesses testified at trial without objection.

The guilt phase of the trial lasted from March 1, 1999 to May 4, 1999.  The first witness was called March 9, 1999.  The government called 169 witnesses.[10]  The defense called 41 witnesses.[11]  The government called four rebuttal witnesses.  Over 1200 exhibits were introduced into evidence.[12]

Both defendants were convicted on all five counts of the indictment presented to the jury.

As to Count 1 of the indictment the verdict form required the jury make specific findings as to each of the ten racketeering acts charged.  The jury found Lee had committed racketeering acts 4, 5, and 6 which related to the Mueller family murders.  Conviction on Counts 3, 4, and 5, which charged a violation of 18 U.S.C. § 1959, murder in aid of racketeering, made Lee death

---

[10]  Several witnesses were called more than once.  This count does not include additional appearances by the same witness.

[11]  Some of the witnesses had been previously called by the government.

[12]  Counting exhibits is difficult.  For example, a container would be introduced with dozens of items in the container.  On occasions the containers contents would be assigned separate numbers while on other occasions the container and contents were assigned only one number.  Large numbers of firearms and large amounts of ammunition was introduced.  Sometimes large blocks of ammunition would be introduced using only one number.  On occasions many numbers would be assigned to a quantity of ammunition.

eligible.

Chevie Kehoe's death penalty phase was held May 6 and 7.  On May 10, the jury returned a verdict of life imprisonment.

Lee's penalty phase was held May 11-14.  A principal thrust of the Government's opening statement at the sentencing was that Lee's involvement in a prior murder sufficiently distinguished him from Chevie Kehoe to warrant imposition of a death sentence.  (Tr. 7378-84).  Defense counsel in her opening countered that Lee was undeserving of the death penalty, principally because his involvement in the victims' deaths and his present condition were attributable in significant part to conditions of Lee's childhood over which Lee had no direct control, thus rendering him morally less blameworthy for the murders.  (Tr. 7384-89).

The Government presented the following evidence in its case-in-chief at the sentencing. It introduced testimony concerning a July 1990 Oklahoma incident in which Lee severely beat Joey Wavra.  (Tr. 7389-461).  Lee forced Wavra to descend through a manhole into a storm sewer and then provided a knife to an accomplice, who in turn killed Wavra by repeatedly stabbing him and slitting his throat.  (Tr. 7412-15; 7441-46).  The Government also introduced Lee's testimony at the accomplice's preliminary hearing, (Tr. 7419-56), Lee's certified conviction for robbery of Wavra, an unrelated Florida conviction for carrying a concealed weapon, and Lee's birth certificate (reflecting a birthdate of January 31, 1973).  (Tr. 7469-70). Deputy Sheriff Nancy Cummings testified that shortly before the trial in this case Lee threatened her, that she was "going to die like the others did." (Tr. 7466).  The Government rested after adopting the evidence introduced at Kehoe's sentencing, including the evidence of the particular vulnerability of the child victim, Sarah Powell.  (Tr. 7471).

Lee presented testimony regarding Lee's childhood upbringing through witnesses including Lee's mother, Lea Graham, and Lee's half sister, Carrie Edwards. (Tr. 7473-549; 7553-625). Two other witnesses, Joy Campbell and Danny Bishop, recounted their experiences with Lee in his adulthood. (Tr. 7625-49).

Lee's penultimate witness was Dr. Cunningham, a psychologist whom the court "accepted as an expert in the field of clinical and forensic psychology and permitted to express opinions in [that] area." (Tr. 7665). Dr. Cunningham preliminarily recounted the sources of factual information he consulted in reaching an opinion regarding Lee, (Tr. 7667-71), including a psychological evaluation of Lee by Dr. Ryan (the Government's mental health expert), which Dr. Cunningham characterized as showing "an elevation reflective of paranoid thought processes." (Tr. 7670).

Dr. Cunningham testified that Lee's family background reflected a history "multi-generational family distress," (Tr. 7684), that included (a) alcoholism and substance abuse that Lee witnessed and engaged in himself, (b) neglect, abandonment, and rejection that Lee endured, and (c) physical and sexual abuse that Lee received and witnessed others suffer. (Tr. 7680-81; 7684-706). According to Dr. Cunningham, Lea Graham, as a result physical and sexual abuse she herself had suffered in the course of two failed marriages and problems stemming from her own childhood, was "overwhelmed" in attempting to respond the demands of her family and Lee in particular. (Tr. 7696). Lea Graham "made some very serious errors in the way she handled [Lee's] medical and psychological problems." (Tr. 7685, 7710-11). She failed to provide the structure necessary to deal with Lee's alcohol and substance abuse as an adolescent. (Tr. 7685-86). She began drinking heavily as a means of dealing with physical abuse by her second

husband, and was preoccupied with her own situation.  (Tr. 7686-87, 7704-05).

According to Dr. Cunningham, Lea Graham's second husband, Dennis Graham, inflicted harm not only on Lea, but also on Lee directly.  Dennis Graham rejected Lee, which aggravated the loss Lee suffered as a result of being abandoned by his first father.  (Tr. 7688-91).  Dennis Graham's perverse obsession with sexual gratification with his wife pervaded atmosphere of the household, and Dr. Cunningham suggested that Dennis Graham sexually abused Lee directly.  (Tr. 7673; 7691-92).  Dennis Graham also subjected Lee and other family members to physical abuse.  (Tr. 7696-98; 7703; 7709-10).

Dr. Cunningham also maintained that Lee suffered from multiple neurological problems, which impaired Lee's development and adjustment.  (Tr. 7717-28).  He had a history of seizures as a young child, and according to Dr. Cunningham an electroencephalogram ("EEG") from Lee's childhood suggested that Lee suffered from generalized seizure disorder.  (Tr. 7717-18).  At Dr. Cunningham's recommendation, Lee received a neuropsychological evaluation, EEG, and other tests.  (Tr. 7718-19).  Dr. Cunningham also stated that Lee exhibited symptoms of attention deficit hyperactivity disorder ("ADHD"), as evidenced by school and medical records.  (Tr. 7721-25).

Dr. Cunningham recounted Lee's history of psychiatric diagnoses.  (Tr. 7728- 32).  Following the ADHD diagnosis, Lee was diagnosed with dysthymic disorder (characterized by Dr. Cunningham as a low-grade depression), a possible attachment related personality disorder, intermittent explosive disorder, adjustment disorder, and a conduct disorder (solitary aggressive type).  (Tr. 7728-32).  In summation of his testimony on direct, Dr. Cunningham opined that "Danny Lee experienced many traumatic and adverse life experiences that fundamentally shaped

him.  It shaped him neurologically, psychologically, socially, emotionally and ethically, and that I think contributed to his involvement in this offense." (Tr. 7742).

On cross-examination, the Government questioned Dr. Cunningham about Lee's future dangerousness, and the expert acknowledged that "[i]n some contexts he has been violent." (Tr. 7745-46).  Later cross-examination of Dr. Cunningham focused on a variety of things other than future dangerousness and "psychopathy," including Lee's I.Q.  and the diagnosed learning disability, (Tr. 7765-70), Lee's purported childhood seizure disorder and neuropsychological evaluation, ( Tr. 7770- 76), and the correlation between ADHD and conduct disorders, (Tr. 7785-91).

Clinical neuropsychologist Dr. Kevin Bianchini also testified for the defense.  Dr. Bianchini identified a number of possible indicators of neurological impairment in Lee including his learning disability, seizure disorder, attention deficit disorder, head injuries (one during a football game that caused him to lose consciousness and as many as a hundred blows to his head that didn't result in unconsciousness, all self-reported), history of "huffing" neurotoxic substances, bed wetting, anosmia (inability to smell), and an abnormal EEG.  (Tr. 7848-57).  Dr. Bianchini administered a "pretty long list of tests" and related that "a lot of the scores were within normal range."  (Tr. 7864).  Dr. Bianchini related that Lee had difficulty on attention concentration tests, one of which ("Trails B"), in particular, he identified as important for "discriminating different kind of generic brain damage."  (Tr. 7867).  In the results from the Wechsler Memory Scale III and the California Verbal Learning Test, Dr. Bianchini perceived some impairment to short term memory.  (Tr. 7868).  Dr. Bianchini diagnosed Lee as having a non-psychotic mental disorder following brain damage.  (Tr. 7869).

In rebuttal, the Government presented the testimony of Thomas Ryan, Ph. D., a board certified clinical neuropsychologist. (Tr. 7903). According to Dr. Ryan, a large body of empirical evidence and data established the battery of tests he administered to Lee to be valid and reliable in detecting brain damage. (Tr. 7908). Lee scored within the normal range on every single test. (Tr. 7908). Lee's performance in the low average range on two particular tests dealing with attention and concentration was consistent with his attention deficit disorder. (Tr. 7911).

After reviewing the results of his own testing and that of Dr. Long, Dr. Ryan found "absolutely no evidence" of brain damage or higher cortical impairment. (Tr. 7907-08). Dr. Ryan found that underlying scoring and data used by Dr. Bianchini did not support any suggestion of brain damage. (Tr. 7913). According to Dr. Ryan, an individual with brain damage will not do well on tests of higher level cognitive abilities, tests on which Lee performed at either an average or well above average level. (Tr. 7913-14).

Dr. Ryan was questioned about Dr. Cunningham's testimony that an MMPI test administered by Dr. Ryan indicated elevation on the paranoia scale. (Tr. 7918). According to Dr. Ryan, the score on the paranoia scale may well have reflected the fact that Lee was on trial for capital murder. (Tr. 7918). Dr. Ryan noted that Lee's schizophrenia score was well within normal limits. (Tr. 7918). Dr. Ryan rejected as preposterous Cunningham's suggestion that Lee suffered from paranoid psychotic disorder or paranoid schizophrenia. (Tr. 7919). Dr. Ryan found no suggestion of serious mental illness. (Tr. 7919).

In their closing arguments the parties reiterated themes raised in their opening statements and witness examinations. The defense asserted as mitigating factors, among other factors, that

24

Lee's violence was a product of his environment as a child and predisposing and contextual factors. (Tr. 7978-80; 7984). The Government contrarily argued, among other points, that the jury should not find these mitigating factors because, as indicated by the cross-examination of Dr. Cunningham and the rebuttal testimony of Dr. Ryan, Lee's conduct was the product of his free will, his "love of violence." (Tr. 7957-58; 7960; 7964-75; 7991).

The jury returned death sentences on each of the three capital counts. In its special verdicts the jury found each of the aggravating factors alleged in the Government's death penalty notice, except the jury did not find the 18 U.S.C. § 3592(c)(9) "substantial planning and premeditation" factor as to any of the counts. The jury made findings of the proffered mitigating factors as follows. All of the factors refer to the defendant's condition, and except as noted by citation, all of the factors are of the "non-statutory" (i.e., 18 U.S.C. § 3592(a)(8)) variety:

| Mitigating factor | Jurors finding the factor |
|---|---|
| Impaired capacity (§ 3592(a)(1)) | 0 |
| Duress (§ 3592(a)(2)) | 0 |
| No significant prior record (§ 3592(a)(5)) | 0 |
| Disturbance (§ 3592(a)(6)) | 0 |
| Equally culpable co-defendant (§ 3592(a)(4)) | 3 |
| Victim of abuse and neglect as a child | 6 |
| Untreated neurological impairments as a child | 0 |
| Brain dysfunction impairment | 0 |
| Introduced to drugs and alcohol as a child | 0 |
| Would benefit from a structured prison environment | 1 |
| Was only age 22 at the time of the murders | 0 |
| Was under the influence of Chevie Kehoe | 0 |
| Other persons involved will not be punished | 3 |
| Kirby Kehoe was involved in a related 1996 burglary | 2 |
| Any other factor (§ 3592(a)(8)) | 0 |

Lee's trial counsel filed several post-conviction motions. One of these motions resulted in an order issuing subpoenas to Attorney General Reno and Deputy Attorney General Holder.

An appeal to the Eighth Circuit resulted in reversal of that order. *In re United States*, 197 F.3d 310 (8th Cir. 1999). The district court then entered an order setting aside the jury verdict. *United States v. Lee*, 89 F. Supp.2d 1017 (E.D. Ark. 2000). A second government appeal resulted in reversal. *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001), *cert. denied*, 537 U.S. 1000 (2002), and on Lee's direct appeal, the Eighth Circuit affirmed the convictions and death sentences. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied*, 125 S. Ct. 2962 (2005).

## ARGUMENT

I.     LEE'S "ACTUAL INNOCENCE" ASSERTION DOES NOT STATE A FREE-STANDING BASIS FOR RELIEF AND FALLS FAR SHORT OF THE ESTABLISHED STANDARD FOR EXCUSING DEFAULTS OF HIS PROCEDURALLY-BARRED CLAIMS.

Lee prefaces his claims that his trial counsel (Mr. Lassiter and Ms. Compton) were constitutionally ineffective at the guilt/innocence trial with a brief introduction entitled, "A Case for Actual Innocence." Section 2255 Motion at 6-11.[13] Lee's reliance on "actual innocence," a term of art on collateral review, is mistaken for several reasons. First, insofar as he makes a procedural assertion of innocence as an exception to the procedural default doctrine, his assertion

---

[13] Lee's motion, arguably insufficient on its face, consists of barebones claim allegations without discussion of supporting legal principles or, for that matter, much factual context. Although many counseled collateral review petitions filed in this and other federal courts include relevant legal principles, Lee intends to prolong the litigation by deferring presentation of his legal authority until a round of briefing to be scheduled. As support for this approach, Lee cites only the pro se form Section 2255 motion prescribed in the federal rules, *see* Motion at 1 n.1, a form that Lee himself does not employ. In the interest of minimizing needlessly repetitive cycles of filings, the government has incorporated much of its expected briefing herein, and requests that Lee be directed to provide his supporting legal arguments forthwith. The government reserves the right to supplement its legal and factual arguments in light of Lee's subsequent filings. Except as specifically admitted herein, the Government denies the allegations of Lee's motion.

is unnecessary to secure review of his ineffective assistance claims, which may be raised for the first time on Section 2255 review.  *See United States v. Massaro*, 538 U.S. 500, 509 (2003).  Second, although Lee raises several direct error claims, not involving ineffectiveness assertions, that are procedurally barred, *see* Arguments V, VI, VII, *infra*, those claims involve the capital sentencing hearing exclusively.  Lee fails to satisfy the heightened standard for actual innocence assertions made to secure review of a claim challenging a death sentence only.  Third, insofar as Lee argues actual innocence as a free-standing, substantive basis for collateral relief, his claim is not cognizable and fails to satisfy the extremely high standard that the Supreme Court assumed *arguendo* would apply to such claims.  *See Herrera v. Collins*, 506 U.S. 390, 417 (1993).

Although an actual innocence claim does not generally state a free-standing basis for habeas relief, *Herrera*, 506 U.S. at 417, such a claim may allow review of an otherwise procedurally-barred constitutional habeas claim where the petitioner shows that "a constitutional violation probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see House v. Bell*, 126 S. Ct. 2064, 2076-77 (2006).  Thus, this exception  is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"  *Schlup*, 513 U.S. at 315.

As indicated above, procedural assertions of actual innocence come in two varieties, (a) complete innocence of the guilt/innocence offense, and (b) "innocence of the death penalty."  In *Schlup*, a case involving federal habeas review of a state death penalty case pursuant to 28 U.S.C. 2254, the Supreme Court re-confirmed that the procedural default decision in *Murray v. Carrier*, 477 U.S. 478 (1986), supplied the proper standard for assessing a claim under category (a), in

27

which the petitioner asserted that he was innocent of the crime of which he was convicted:

> The *Carrier* standard requires the habeas petitioner to show that "a constitutional violation probably resulted in the conviction of one who is actually innocent." To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.

*Schlup*, 513 U.S. at 327 (citations omitted); *see House v. Bell*, 126 S. Ct. at 2076-77.

In thus restating the *Carrier*'s comparatively generous standard for claims of "actual innocence of the crime," *Schlup* took pains to contrast the much more restrictive review accorded "a petitioner's claims that his death sentence was inappropriate," i.e., that he is "innocent of the death penalty." 513 U.S. at 323. Referencing the post-*Carrier* decision in *Sawyer v. Whitley*, 505 U.S. 333 (1992), *Schlup* reiterated that a claim of innocence of the death penalty:

> "must focus on those elements which render a defendant eligible for the death penalty." However, in addition to defining what it means to be "innocent" of the death penalty, the Court departed from *Carrier*'s use of "probably" and adopted a more exacting standard of proof to govern these claims: The Court held that a habeas petitioner "must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty."

*Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 347, 336).

It was hardly accidental that "innocence of the death penalty" claims were singled out for a higher review standard than that governing "true" innocence claims. *Sawyer* explained:

> A federal district judge confronted with a claim of actual innocence may with relative ease determine whether a submission, for example, that a killing was not intentional, consists of credible, noncumulative, and admissible evidence negating the element of intent. But it is a far more difficult task to assess how jurors would have reacted to additional showings of mitigating factors, particularly considering the breadth of those factors that a jury under our decisions must be allowed to consider.

*Sawyer*, 505 U.S. at 345-46 (citations and footnote omitted). Thus, "innocence of death

28

penalty" claims focus exclusively on the issue of death penalty eligibility, not mitigating evidence, and must be proven by "clear and convincing" evidence. *Id*. at 350.[14]

Here, Lee can prevail on his procedural innocence assertion only if he satisfies *Sawyer*'s heightened standard for assertions of "innocence of the death penalty." Lee's claims attacking the guilt/innocence convictions are limited to ineffectiveness assertions, to which the procedural default doctrine does not apply in this context. The portions of Lee's motion that are procedurally barred challenge only his death sentences, *see* Arguments V, VI, VII, *infra*, so Lee would have to satisfy the *Sawyer* standard in order to obtain review of the merits of those claims pursuant to the actual innocence exception to procedural default. *Schlup*, 513 U.S. at 323. As discussed in detail below in connection with the particular, procedurally-barred sentencing claims, Lee cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Id.* (quoting *Sawyer*, 505 U.S. at 347, 336).

To the extent that Lee asserts his actual innocence as a free-standing basis for relief, that assertion even more clearly fails. *See Cornell v. Nicks*, 119 F.3d 1329, 1333-35 (8th Cir. 1997). Apart from the "gateway" exceptions to the procedural default doctrine, "actual innocence" does not state a recognized basis for Section 2255 relief. *See Herrera*, 506 U.S. at 400*; United States*

---

[14] Although *Carrier*, *Schlup*, and *Sawyer* all involved federal Section 2254 review of state convictions, the broader procedural default doctrine (and its "actual innocence of the crime" exception) applies equally to Section 2255 review. *See Daniels v. United States*, 532 U.S. 374, 382-83 (2001) (reiterating that "procedural default rules developed in the habeas corpus context apply in § 2255 proceedings," citing *United States v. Frady*, 456 U.S. 152, 167-68 (1982)); *Bousley v. United States*, 523 U.S. 614, 623-24 (1998) (applying the *Carrier/Schlup* actual innocence standard in determining whether Bousley was entitled to pass through that procedural default gateway to obtain review of the merits of his constitutional challenge to his guilty plea).

*v. Quinones*, 313 F.3d 49, 67-69 (2d Cir. 2002). "'[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'" *Quinones*, 313 F.3d at 67 (quoting *Herrera*, 506 U.S. at 400). And, while *Herrera* assumed, without deciding, that a "truly persuasive showing" of a defendant's innocence could render his execution unconstitutional even in the absence of an error in the underlying trial, 506 U.S. at 417, *Herrera* reiterated that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Herrera*, 506 U.S. at 417.

Lee's assertions of innocence do not remotely amount to such an "extraordinarily high" showing, and fall far short of the quantum of evidence required even for an evidentiary hearing or discovery on his claim. The evidence of Lee's guilt was overwhelming, and none of the supposed gaps and inconsistencies identified by Lee casts any new doubts on the convictions. As noted, evidence of that Lee premeditatedly murdered the Muellers for pecuniary gain included: (1) Lee's detailed confession to Gloria Kehoe, mother of Chevie Kehoe; (2) Lee's confession, containing details of the murders, to James Wanker a man with no involvement with the organization or with members of the organization; (3) Lee's general statement regarding having taken care of persons down south made to Ms. Wanker, a person with no involvement in the organization or with members of the organization; (4) detailed confessions Chevie Kehoe gave his mother, Gloria Kehoe and his brother, Cheyne Kehoe, telling of Lee's involvement in the murders; (5) physical evidence connecting Chevie Kehoe's vehicle to the crime scene; (6) circumstantial evidence of Chevie Kehoe's and Lee's presence in Arkansas at the time of the murders; (7) evidence connecting the stolen Mueller property to Chevie Kehoe and Lee,

including evidence of Kehoe's and Lee's immediate possession of property following the murders; (8) evidence connecting Chevie Kehoe and Lee to police raid clothing worn at the time of the murders; (9) evidence of the sudden affluence of Chevie Kehoe immediately after the murders; (10) Lee's fingerprint found on Mueller property which had been stored with other organization property; and (11) a hair similar to Lee's found in a raid cap which Chevie Kehoe told Cheyne Kehoe was used in the Mueller family murders which was found at the time of the Ohio shootings.

In the face of this evidence, Lee presents virtually no new facts to cast any doubt on his guilt, and certainly does not make the "extraordinarily high" showing required by *Herrera*. Lee argues in paragraph 11 of his motion that, "this is case that should leave any observer uneasy as to whether the criminal justice system worked." Virtually without exception, however, all of Lee's present assertions were squarely argued to the jury, which by its verdicts necessarily resolved these issues in the government's favor.

Lee emphasizes that several witnesses received benefits in connection with their cooperation, but this fact was disclosed to trial counsel and fully presented to, or available for presentation to, the jury in assessing each witness's credibility.[15] In paragraph 15 of his motion, Lee argues that the quality of his own evidence establishes his innocence. Far from establishing his innocence, Lee's argument ignores convincing testimony from other disinterested witnesses

---

[15] Throughout the trial the government acknowledged that Gloria Kehoe received substantial payments from the United States and Cheyne Kehoe was granted federal immunity and placed in federal witness protection which resulted in his serving his Ohio Penitentiary sentence in federal prison. As to the Wankers, the government denies that they received any consideration for their testimony. They were paid $50 per day for four days in January 1998 while being relocated because of security concerns. This will be discussed in more detail, *infra*.

and greatly overstates the quality of the testimony of Defendant's witnesses.  The issue of the date of the Muellers' disappearance was hotly contested at trial.  The government presented overwhelming testimony of the Muellers' disappearance on January 11th.

Bill Mueller, a reliable workman, stopped in the middle of a project.  (Tr. 1789, et seq.).  On the Morning of January 11, 1996, Mueller stopped all activity at Leonard's Hardware where he was a regular customer.  (Tr. 1811, et seq.).  All Mueller telephone call activity ended at 8:18 a.m. on January 11.  (Tr. 1830, et seq.).  Except for account entries, there was no banking activity in Nancy Mueller's account after January 11.  (Tr. 1837, et seq., Tr. 1851, et seq.).  On January 18, 1996, Linden Standridge called the Pope County, Arkansas 911 dispatcher that the Mueller vehicle abandoned on his property for "seven or eight days."  (Tr. 1896, et seq.).  A close friend of the Muellers was in the hospital.  Visitation ceased completely and suddenly after the night of January 9.  (Tr. 1830, et seq.).  A friend was scheduled for a C-Section on January 12, 1996.  The Muellers were planning to travel to the hospital for the procedure.  The procedure was postponed and the friend's husband was unable to locate the Muellers on the morning of January 12, 1996 (Tr. 1921, et seq.)

Lee invokes the testimony of Esther Anderson who thought she saw the Mueller Jeep at their residence on January 17, 1996.  However, on cross examination, Mrs. Anderson testified that the date could have been January 11th.  (Tr. 5969).  Lee relies upon the testimony of Mary Reed who was thoroughly discredited during cross examination.  (Tr. 5873, et seq.).  Lee invokes the testimony of Sue Weaver, a Wal-Mart employee, who based her fixing of the date of the Mueller disappearance on a newspaper article which was shown to be the wrong article.  (Tr. 5933).  Wal-Mart records showed that Bill Mueller last did electrical work for Wal-Mart on

January 6th. (Tr. 5823, et seq.). Lee invokes the testimony of Janis Rowland who admitted on cross examination that she was not sure who she had seen at Wal-Mart in February, 1996. (Tr. 5803). Lee invokes the testimony of Lucy Carr who again tied her testimony to the date a newspaper article appeared and then, when shown a blow up of the article that was used to fix the date, stated that the blow up was of the wrong article. Mrs. Carr ultimately testified that she did not remember whether it was "a week or a month" before the article appeared that she last saw the Muellers. (Tr. 5810, et seq.). Ted Edwards, another Leonard's Hardware employee, was sure that he saw the Muellers alive in February. However, Mr. Edwards testified that he knew that on the last day he saw the Muellers, he saw Bill Mueller pay his bill at Leonard's Hardware. The Leonard's Hardware records establish that Bill Mueller made his last payment on January 11th. (Tr. 5810, et seq.).

Lee's argument also ignores the position now obviously taken by his co-defendant. As set forth in the government's response to Chevie Kehoe's 2255 Motion, Mr. Kehoe now asserts that he was on the Arkansas-Oklahoma border on January 10, 1996. The assertion of Lee's co-defendant confirms that the government's timeline is accurate.

The timeline was hotly contested at trial. Had the jury not accepted the government's time line, Lee could not have been convicted. There was overwhelming evidence to establish that the Muellers disappeared on January 11, 1996. The arguments presented in this section of Lee's motion avail him nothing.

Lee invokes the testimony of Vada Campbell, the mother of Lee's friend. The jury was entitled to discount her testimony. Lee invokes telephone records which show Lee called his mother on January 14th, at 5:09 p.m. This was about seventy-two (72) hours after the Muellers

were murdered.  Lee and Chevie Kehoe could easily have driven from Arkansas to Spokane, Washington in this time.

The government has no knowledge of the purported Jeff Brown assertion that Chevie Kehoe arrived at the Shadows Motel on January 12, 1996.  Nothing in the many statements made by Mr. Brown indicates this.  (Exhibit A, ¶ 3).  Given the overwhelming evidence that the government's timeline is correct, and given that Chevie Kehoe has in effect abandoned his challenge of the timeline by asserting a new theory regarding how he and Lee obtained the truckload of Mueller property, the matter is decidedly trivial.

In paragraph 17 of his motion, Lee invokes the testimony of the Ohio prison witnesses, who do not remotely establish Lee's innocence.  The government first notes that Lee does not invoke the testimony of Richard Coburn, the leader of the Ohio inmates.  (Tr. 6367, et seq.).  Mr. Coburn provided testimony similar to the other three inmates.  However his testimony contained specific assertions which prison records showed were wrong.  As a result, Mr. Coburn was charged with and pled guilty to perjury.  See Exhibit B.

The other three inmates were all unquestionably discredited during cross examination. The essence of each inmates' testimony was that Cheyne Kehoe had confessed he had murdered the Muellers.  Cheyne Kehoe's involvement in the Mueller family murders would have been impossible as, in the government's rebuttal case, the government established beyond any possible doubt, by disinterested witnesses and numerous documents, that Cheyne Kehoe was in northern Washington at the time of the murders.  Again, invoking the testimony of the Ohio inmates adds nothing to Lee's motion.

II.     LEE'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL AT THE

34

GUILT/INNOCENCE TRIAL ARE MERITLESS.

Lee raises a number of specific areas in which Mr. Lassiter and Ms. Compton allegedly provided ineffective representation in connection with Lee's guilt/innocence trial.  As explained below, Lee fails as a matter of law to show either constitutionally deficient performance or prejudice resulting therefrom.  Accordingly, he is not entitled to substantive relief or an evidentiary hearing or discovery on his claims.

When a defendant raises a claim of ineffective assistance of counsel, he shoulders a particularly heavy burden as courts "indulge a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance and sound trial strategy."  *Driscoll v. Delo*, 71 F.3d 701, 706 (8th Cir. 1995) (citing *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).  In order to prevail, the defendant must establish that his counsel's performance was constitutionally deficient and that he was prejudiced as a result of the deficient performance.  *United States v. Robinson*, 301 F.3d 923, 925 (8th Cir. 2002).  "Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful."  *Graham v. Dormire*, 212 F.3d 437, 440 (8th Cir. 2000).  Moreover, the Court does not have to analyze the performance prong if it determines that the defendant suffered no prejudice.  *See Whitehead v. Dormire*, 340 F.3d 532, 537 (8th Cir. 2003); *Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir. 1997).

In evaluating counsel's conduct, "judicial scrutiny of a counsel's performance must be highly deferential."  *Strickland*, 466 U.S. at 689.  Indeed, the distorting effects of hindsight must be avoided, and courts "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id*. at 690.  Counsel's conduct is deficient if it falls "outside the wide range of professionally competent assistance."

35

*Graham*, 212 F.3d at 440.  Thus, counsel's performance is objectively unreasonable if "counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would use under like circumstances."  *Battle v. Delo*, 19 F.3d 1547, 1554 (8th Cir. 1994).  As the Eighth Circuit has stated, "We will presume attorneys provide effective assistance and will not second-guess strategic decisions or exploit the benefits of hindsight."  *Henderson* v. *Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997).

In analyzing the prejudice prong, it must be determined whether the defendant has established "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  However, as the Supreme Court stated in *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993), "to set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him."  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.  *United States v. Cronic*, 466 U.S. 648, 658 (1984).  As will be set forth to specific allegations and responses to paragraphs 18-20, pages 12-39 of Lee's motion, neither trial nor appellate counsel were ineffective under these principles.

A.    Response to Lee's Contention that Trial Counsel were Ineffective for Failing to Locate, Interview, Effectively Examine or Present Witnesses Who Would Have Provided Exculpatory Evidence.

Lee contends that trial counsel were ineffective for failing to present, or in some instances for failing to properly present, exculpatory evidence available from 19 individuals listed on pages 12 to 18 of his motion.  Lee's allegation is without basis.  As explained below, counsel's performance was neither deficient nor prejudicial with respect to each of these 19 persons.

(1)  Kirby Kehoe

The Government determined not to call Kirby Kehoe.  Defense counsel was advised of this.  The Court advised Defense counsel that they could call Kirby Kehoe out of order if they chose so that Mr. Kehoe could more immediately be returned to the Bureau of Prisons.  When advised of this, Defense attorneys Mark Hampton and Jack Lassiter conducted an extensive interview of Kirby Kehoe in the presence of Mr. Kehoe's attorney.  Following the interview, Defense attorneys agreed that calling Kirby Kehoe as a defense witness would be more detrimental than favorable to Defendant's case.  *See* Exhibit D, ¶ 1.

Where trial counsel conducts an investigation and determines not to call a witness, trial counsel's conduct does not violate either the performance or prejudice prong of *Strickland*, *Griffin v. Delo*, 33 F.3d 895, 901, 902 (8th Cir. 1994).

(2)  Gloria Kehoe

Lee complains that his counsel fails to present testimony that Gloria Kehoe could have provided.  He first claims that Gloria Kehoe should have been called to testify that Kirby Kehoe had hatched a plan to have one of his sons kill another son.  Lee fails to explain this testimony could possibly have aided his defense.  The government is at a loss to understand how proof that a co-defendant's father engaged in despicable conduct constitutes a defense for Lee.

Lee also complains that Gloria Kehoe was not questioned about a prior statement that Lee and Chevie Kehoe had remained in Arkansas after the Mueller family murders.  There is no such statement.  Lee and Chevie Kehoe told Gloria Kehoe that after the Spokane City Hall bombing Lee and Chevie Kehoe parked on a hill above City Hall, watched the explosion, and were then disappointed because the police did not respond immediately.  Lee is confusing the two incidents.

### (3) George Eaton

Lee complains because his trial counsel failed to pursue George Eaton as a witness. Lee alleges that Mr. Eaton told reporters that William Mueller had expressed fear for his life before he vanished. This evidence, even if available, proves nothing. Lee also claims that Eaton reported a connection between Bill Mueller and Andy Strausmier. Andy Strausmier knew Timothy McVeigh and about the goings on at Elohim City. Lee fails to explain how this evidence could have possibly been relevant to any issue. As the allegations, even accepted as true, prove nothing, Lee is entitled to no relief. *Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1999)

### (4) Peter Langan

Lee complains because the Midwest Bank robbers were not interviewed. Peter Langan was one of their leaders. Lee does not attempt to explain how Peter Langan possessed any information relevant to any issue.

### (5) Michael Brescia

Michael Brescia was another Midwest Bank robber. Again, Lee fails to explain how Mr. Brescia could reasonably be expected to have any evidence relevant to any issue at Lee's trial.

### (6) David Hill

Lee argues that David Hill should have been called as a witness. Trial counsel were aware of Mr. Hill's potential testimony. Defendant Kehoe's counsel and an investigator visited Mr. Hill twice. They determined that Mr. Hill's testimony would not be useful. Lee's trial counsel relied upon the reports of the investigator and co-counsel. Where trial counsel make a reasonable investigation and determine that a witness' testimony is not helpful, Lee has no cause

to complain.  *Griffin, supra.*  (See Exhibit C ¶ 2 and Exhibit D ¶ 2).

(7)  Glen Hinson

Lee claims that Glen Hinson should have been called to testify that after Paul Humphrey obtained titles to the Mueller vehicle, he was nervous and scared and that Nancy Mueller had told Mr. Hinson that she was afraid of Mr. Humphrey.  Lee fails to explain how this testimony could possibly have benefitted him.  The government knows of no benefit and as to the Nancy Mueller alleged statement, no rule that would cause the evidence to be admissible.  Paul Humphrey was called to testify.  (Tr. 6141-214).  Practically all of Mr. Humphrey's extensive testimony was direct examination by the defense.  Given Mr. Humphrey's extensive testimony and the opportunity the jury had to consider the weight to which it should be given, the government is at a loss to understand how Glen Hinson's purported, possible, testimony could have had any effect.

(8)  Eldon King

Lee argues that Eldon King should have been called to testify that Mr. Humphrey began acting strangely after the Muellers disappeared.  It is the government's belief that the evidence would have established that Mr. Humphrey began acting strangely long before the Muellers disappeared.  At any rate, Lee fails to explain how this evidence could possibly have benefitted him.

(9)  Maria Ahrens

(10)  Vernon Ahrens

Lee complains because his attorneys did not call Mr. and Mrs. Ahrens to testify.  Lee alleges that the Ahrens would have testified that the Muellers were at Mr. Ahrens' auto shop after the time the government alleges they disappeared.

As set forth in the affidavit of Glen Jordan, Exh. A, ¶ 2, the co-owners of Vernon's Auto Repair, Don and Vernon Ahrens, were interviewed on three different occasions. A copy of their last interview summary is attached to Agent Jordan's affidavit. Maria Ahren was never interviewed although one of the early interviews makes reference to her being present. As the interview summary attached to Agent Jordan's affidavit makes clear the Ahrenses, when questioned specifically about the last date on which they had seen the Muellers alive with the aid of a calendar, stated unequivocally that it was prior to January 11, 1996.

(11)  Pam Wrappe

Lee complains because trial counsel did not call Pam Wrappe. Lee states that Mrs. Wrappe would have corroborated the trial testimony of Mrs. Weaver and Mrs. Gray. The government is unaware of any testimony available from Mrs. Wrappe. However, the government notes that corroborating the named witnesses would have been futile. Mrs. Weaver was called as a defense witness. (Vol. 29, Tr. 5830-5837). She testified about a large supply of water which Mr. Mueller had purchased. When questioned about the date of the purchase, she testified, "It would have been 95-96." (Tr. 5833). She also testified that the purchase was "within a two month period of time" of the appearance of a newspaper article. (Tr. 5833). Again, as did Lucy Carr, Mrs. Weaver tied the date of the "article" to the flyer which was delivered around Russellville by Nancy Mueller's family shortly after the Mueller family disappeared, not the later newspaper article. (Tr. 5834). Betty Gray testified. (Vol. 29, Tr. 5821-5830). She ran the shoe department. Bill Mueller did electrical work for Wal-Mart. When she was originally interviewed, she told investigator Tom Brown that she had work done by Mr. Mueller in her department on January 17th or 18th, 1996. (Tr. 5823). However, on cross examination, she

40

explained she had not reviewed records at the time she spoke with Trooper Brown. When the government's attorney interviewed her, the government's attorney asked her to review her records when the work was done. She did. The records show that the work was done the week of January 6, 1996, i.e., at some time between the 6th and 12th of January. (Tr. 5826)

It is clear that the testimony of Mrs. Weaver added nothing to the time line issue and that the testimony of Mrs. Gray aided the government's attempt to establish the date of disappearance as January 11th. The government is at a loss to understand how corroborating evidence that ultimately assisted the government in proving its case could possibly be beneficial to Lee.

(12) David Hollabaugh and Denise Hollabaugh, M.D.

Lee argues that trial counsel were ineffective for failing to call Dr. Hallabaugh to testify that Nancy Mueller told them that her family was planning on leaving town. The Muellers "left town" many weekends to attend gun shows. Even were the assertion that Mrs. Mueller asserted her family was leaving town for an extended period, Lee fails to explain how that testimony would have been helpful to his case.

(13) Earline Branch

Again, the government sees no possible benefit that could have accrued to the defense by calling Nancy Mueller's mother to testify that her daughter was nervous, upset, and not very talkative at a casual meeting shortly before her murder. (The government is not aware of any statement by Earline Branch regarding hearing William Mueller's distinctive cough in February, 1996. The government doubts this testimony would have added much to Lee's case as identification by a "distinctive cough" would be easily discredited.)

(14) Kelli Kramer

Lee faults trial counsel for failing to ask Kelli Kramer if, during the time she lived with Chevie Kehoe as his second wife, Chevie Kehoe spoke of the Aryan People's Republic or something similar. Lee opines that Ms. Kramer would have testified "no." The government has no indication that such would have been Ms. Kramer's testimony. Even assuming such testimony would have been given, the matter is trivial.

(15) Faron Loveless

Defense counsel considered calling Mr. Loveless. Defense counsel determined that given the circumstances he should not be called. *See* Exhibit C, ¶ 1 and Exhibit D, ¶ 3. Here defense counsel knew of the witness, considered the possibility of calling the witness and, given the unquestioned instability of Mr. Loveless, made the correct decision regarding calling him as a defense witness.

(16) Norda Lewis

Lee faults trial counsel for not calling Norda Lewis, Faron Loveless's wife, to testify she had never heard of the Aryan People's Republic or similar institutions. Again the government has no indication that this would have been Ms. Lewis's testimony. Given the fact that she was rarely near Chevie Kehoe, even had she given the testimony, the testimony would have been useless.

(17) Jeff Brown

Again, Lee complains because Mr. Brown was not asked if he had heard of the Aryan People's Republic, etc. Again Lee has failed to indicate why Lee believes Mr. Brown would have provided this testimony. Again, the matter is trivial.

Lee also complains that Mr. Brown would have testified that Chevie Kehoe returned to

the Shadows Motel on January 12th or 13th, 1996.  Mr. Brown was extensively interviewed by government agents.  As the Affidavit of Mr. Jordan shows, Exhibit A, ¶ 3, there was nothing in any of the extensive interviews that would indicate Mr. Brown would have given such testimony.

(18)  Angela Holderman

Lee argues that trial counsel erred in failing to obtain testimony from Angela Holderman.  Lee asserts that Mrs. Holderman would have testified that on January 11, 1996, the day the Mueller's were killed, at 8:00 a.m. she called the Mueller house and the phone was answered by "Darryl," whom she did not know.  This evidence, even if available, was useless on its face.

(19)  Jack Price

Lee faults trial counsel and the government for not correcting Jack Price's testimony that "all my offenses consisted of fraud, bad checks, and theft of property, sir."  Lee argues this was not accurate as Mr. Price had prior convictions for armed robbery and assault with a firearm.  As the affidavit of Mr. Jordan provides a review of Mr. Price's extensive criminal history establishes that he was convicted of neither armed robbery nor assault with a firearm.  Exhibit A, ¶ 4.  This allegation is meritless.

B.      Response to Lee's Assertion that his Trial Counsel Failed to Cross Examine the Wankers on the Fact that they had Received Compensation from the Government.

The Wankers received four $50 subsistence payments for four days during the time they moved from one location to another for security reasons.  Lee argues that these payments "bought and paid for" the Wankers' testimony and therefore, their credibility was suspect.  Lee argues that trial counsel's failure was especially egregious as the government's attorney in his closing argument emphasized to the jury that the Wankers had not received any compensation for their

part in the case.

As the affidavit of Glen Jordan explains, the Wankers moved because of security concerns. (Exh. A, ¶ 1). In this context, paying four $50 payments for "meal money" while the Wankers were moving can hardly be considered "compensation." The payments are more akin to witness fees and mileage customarily paid all witnesses. The government submits that its officials should not be faulted for failure to identify these payments as "compensation."

Lee also alleges that trial counsel should have pursued the matter so that the jury could have been informed that the Wankers had given "media" interviews. Had the issue been broached, not only would the Wankers have established that this case was significant in Spokane, emphasizing that fact unnecessarily, but also that they were legitimately concerned for their safety when the fact that they were witnesses became public. The government is at a loss to understand how it could be an advantage to any defendant to point out to the jury that the defendant and his associates are considered so dangerous that witnesses hide for protection.

The government notes that Lee's argument is especially intriguing in light of the fact that in another section of his motion, 18K-1, pp. 23-24, Lee argues that the government improperly bolstered Cheyne Kehoe's testimony by placing before the jury that fact that Cheyne Kehoe was threatened by an Aryan prison gang member while incarcerated. It seems that if Lee is concerned about emphasizing threats to witnesses, Lee should delight in the fact that neither his trial counsel nor government attorneys attempted to place security concerns regarding the Wankers before the jury. For all of these reasons, counsel's performance was neither deficient nor prejudicial.

   C.    Response to Lee's Contention that Defense Counsel were Ineffective for Failing to Object to the Government's Pre-trial Motion to Bar Movant from Access to Discovery

44

Lee asserts that the government moved to bar Lee from access to discovery.  The Eighth Circuit reviewed and rejected this claim under a "plain error" standard.  *Lee*, 374 F.3d at 652.  Lee claims his trial counsel should have objected so that on appeal his claim would not have been subject to plain error review.   Lee's claim completely distorts what occurred at trial, and fails to show deficient performance or prejudice.

The government began systematically providing *Jencks* material[16] months before trial was scheduled to commence.  Lee's trial counsel left copies of some *Jencks* material with Lee.  Lee sent copies of the material to his associates in an effort to have witnesses harmed.  The government discovered what Lee was doing and moved to deny Lee direct access to the materials, i.e., the materials would still be provided to Lee's counsel who could discuss these materials with Lee with some limitations, but Lee was denied access to copies of the material.  The Court's order provided expressly that Lee "will be able to fully discuss the content of all such materials with his attorneys."  Lee now argues that his attorneys should have objected.  This position is without merit.  As practically all the materials were *Jencks* materials, had Lee's trial attorney objected to any limitations on providing Lee copies, the government could have provided *Jencks* material at the time the statute directs, i.e., after the witness completed his direct examination, 18 U.S.C. § 3500(b).  This would have crippled the ability of defense attorneys to timely prepare for trial.  As the Court recognized:

> "I think I should point out that the whole discovery process is really at the grace of the government.  We could have delayed this until right before the trial under the rules that pertain in cases of this type, so I

---

[16]A huge amount of "discovery" materials were provided.  The vast majority of the material were *Jencks* material.  A small amount of the material was Rule 16 discovery and *Brady* material.  The material that was at issue here was exclusively *Jencks* material.

think the government is being forthcoming about discovery, continues to be even in light of this very - - their serious concerns, as expressed in the motion." (11/19/1998 Hrg. Tr. 14)

Here, Lee claims his trial counsel should have objected so that on appeal his claim would not have been subject to plain error review. This position ignores that which was obvious to Lee's trial counsel, if not his appellate or current counsel. Access to the material was at the grace of the government. To object would not have made the issue easier to present on appeal. There would have been no issue on appeal as the government would simply have stopped providing any *Jencks* Act material until at least within a few days of the start of trial so that Lee would have more trouble convincing his associates that they needed to harm the witnesses. There would have been no discussion of the discovery material between trial counsel and Lee since trial counsel would not have seen any *Jencks* material. For all of these reasons, counsel's performance was neither deficient nor prejudicial.

D.      Response to Lee's Allegation that Trial Counsel Failed to Object to the Court's Order Exempting the Government from Compliance with the Statute Requiring a List of All Witnesses at Least Three Entire Days before Trial and Further Contending that Trial Counsel Failed to Object to the Testimony of Witnesses for Whom Prior Notice had not Been Provided When They were Called at Trial.

Lee argues that his conviction would have been vacated on appeal had his trial counsel objected to the Court's Order exempting some witnesses from being identified three days before trial commenced and then failing to object when the witnesses were called to testify. The Eighth Circuit reviewed and rejected the witness list argument under a "plain error" standard. *Lee*, 374 F.3d at 651-52. Lee assumes that had these objections been made, Lee's conviction would have been vacated. Counsel's performance was neither deficient nor prejudicial.

18 U.S.C. § 3432 provides:

46

> A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness, *except that such list of* the veniremen and *witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.*

(Emphasis Supplied).

If the Court correctly found that providing the names of some of the witnesses might jeopardize their life or safety, then an objection at the time that witnesses appeared to testify would rightly have been denied. It follows that the only meaningful point which can be raised by Lee is that trial counsel's failure to object to the order itself was ineffective assistance of counsel.

In his motion Lee assumes that had this objection been made, it would have been denied and that the only result of the failure was application of the plain error standard of review on appeal. Lee then assumes that had a less strict standard been applied on appeal, Lee would have prevailed. This second assumption is entirely unwarranted.

Lee does not identify the standard of review which he feels was applicable had an objection been made. The standard of review on appeal probably would have been abuse of discretion.[17] Had this Court's finding that the witnesses' lives or safety *may* have been jeopardized been presented to the appellate court under an abuse of discretion review the result would have been the same. Lee had a history of attempting to induce associates to harm

---

[17] The government has found no case directly on point. In the *United States v. Collins*, 340 F.3d 672 (8th Cir. 2003), the issue was whether the court had correctly applied the sequestration of witnesses rule. The court found an abuse of discretion standard of review was applicable. If the standard of review was not abuse of discretion, no doubt the standard of review would have been whether the District Court's decision was clearly erroneous. The analysis of this matter is the same under either standard.

witnesses.  The witnesses identified would provide damning evidence against Lee.

While Lee was given the identity of the witnesses after the trial started, the witnesses were identified days before they testified.  Lee cannot possibly establish any prejudice.  Given these basic facts, no appellate court, no matter the standard of review, would find the district court's finding that listing the witnesses "may jeopardize the life or safety of any person." applying any standard of review.

      E.      Government's Response to Lee's Allegation that Defense Counsel were Ineffective for Failing to Conduct DNA Testing of the Hair Identified as Similar to Lee's Hair.

Lee argues that trial counsel was ineffective for failing to obtain a mitochondrial DNA analysis of the hair found in the FBI raid cap when Chevie Kehoe's truck was searched following the Wilmington, Ohio shooting incident.  As the affidavit of Glen Jordan states the government considered mitochondria testing of the hair, but the sample was unsuitable. (Exh. A, ¶ 5). Defense counsel obviously encountered the same difficulty or, because they knew the probable outcome of the examination, determined that obtaining the test would not aid in Lee's defense. Counsel's performance was neither deficient nor prejudicial.

      F.      Government's Response to Lee's Allegation that Defense Counsel were Ineffective in Adopting a Jury Selection Strategy that Emphasized Seating as many African Americans as Possible.

Lee argues that because he held offensive and abhorrent white supremacist views his counsel erred in following a strategy that emphasized selection of black jurors.  Counsel's performance was neither deficient nor prejudicial.

As set forth in the affidavit of Mark Hampton, Exhibit C, ¶ 4, defense counsel obtained the services of a well respected jury consultant.  Defense counsel had sound reasons for their

decision.  Defense counsel and the jury consultant believed that (1) blacks are more likely than whites to discredit government testimony and (2) research indicates blacks are less likely to give the death penalty.  It follows that a strategy that emphasizes obtaining persons with these beliefs will be a strategy that inevitably leads to using few strikes on blacks.

> G.    Government's Response to Lee's Argument that Lee's Defense Counsel was Ineffective and Breached his Duty of Loyalty when he Vouched for the Integrity of Karen Whatley.

Lee argues:

> (1)    Mr. Lassiter was ineffective when he vouched for the integrity of Karen Whatley at a hearing;
>
> (2)    Mr. Lassiter breached his duty of loyalty at that time, and;
>
> (3)    Mr. Lassiter was ineffective and breached his duty of loyalty when he failed to advise Lee that Mrs. Whatley would be joining the U.S. Attorney's Office.

Lee argues that it was of an obvious strategic advantage to Lee to have the U.S. Attorney's Office for the Eastern District of Arkansas disqualified.  Lee then alleges that Mr. Lassiter testified in a manner adverse to that interest, "by supporting the integrity of Mrs. Coleman." Lee laments that, "Eventually the Motion to Disqualify was denied."  By presenting the argument in this manner Lee asserts that it was Mr. Lassiter's testimony which prevented the disqualification of the United States Attorney's Office that ultimately led to Lee's conviction. Lee's allegations are preposterous, and counsel's performance was neither deficient nor prejudicial.

First, no grounds existed to disqualify the U.S.  Attorney's Office for the Eastern District of Arkansas.  The obvious remedy was to wall Mrs. Whatley from the attorneys trying the case.

This was done.  At this point any, "problem" was eliminated.  Lee's co-defendants and their counsel disagreed.  They sought someway to disqualify the United States Attorneys Office.  First, the government notes that this strategy in and of itself is suspect.  Principle trial attorneys for the United States were Dan Striping and Robert De La Cruz.  Mr. De La Cruz was assigned from Washington to assist in the prosecution.  No doubt had the United States Attorneys Office for the Eastern District of Arkansas been disqualified, additional trial counsel from the Department of Justice or another district would have been assigned to work with Mr. De La Cruz to prosecute the case.  Mr. De La Cruz had been working on the case for a year and was intimately familiar with all details.  In effect, Lee argues that Mr. Stripling's appearance on behalf of the government was the deciding factor in his conviction.  Mr. Stripling is deeply flattered.  However, truth be told, the evidence against Lee was so overwhelming that his conviction was likely without regard to the skill of the prosecutor.

Lee's position also assumes Mr. Lassiter's "vouching" for Mrs. Whatley was adverse to Lee's interest because he supported "the integrity of Ms. Coleman."  Mr. Lassiter was called as a defense witness.  He testified under oath.  He was asked why he had not questioned United States Attorney Casey about the formation of a wall to prevent Ms. Whatley from providing information to the attorneys trying the case.  He responded that, "I've worked with Mrs. Coleman three and a half years.  I know her integrity."  (12/22/98 Hrg. Tr. 52).  Was Mr. Lassiter to lie?  Does Lee feel Mr. Lassiter should have found some excuse not to answer the question?  Is Lee upset because his trial counsel were ethical?  Is it their integrity that results in that which is adverse to Lee's interest?  The government is at a loss to understand that which Mr. Lassiter did which could be considered a breach of loyalty to his client.  Lee apparently is of the opinion that

lawyers who honestly answer questions are disqualified from representing a defendant in a capital case.

Lee also complains because he was not told of Mrs. Whatley's hiring by the U.S. Attorney until her background check was completed.  He finds fault because Mr. Lassiter let Mrs. Whatley assist him while the background check was being completed.  The government is at a loss as to how this act could in any way prejudice Lee.  It was clearly to everyone's benefit, Lee and his appointed counsel Mr. Lassiter and Mrs. Compton, for Mrs. Whatley to continue to assist during this time of intensive trial preparation until the background check was complete and her move to the United States Attorney's Office was a certainty.  As the affidavit of Karen Whatley, Exhibit E, establishes, no confidential information was divulged.

> H.      Response to Lee's Argument that Counsel were Ineffective for Failing to Move of Disqualification of the United States Attorney's Office when Mrs.  Whatley Accepted Employment and were Ineffective for Failing to Join the Disqualification Motion filed by Co-Defendant Chevy Kehoe.

This issue is discussed in the response to Lee's paragraph 18-G.

> I.      Response to Lee's Assertion that a Hearing will be necessary to Determine Whether Mrs. Whatley Disclosed Privileged Information.

There is no right to an evidentiary hearing or other factual development in a federal post-conviction proceeding.  Rather, evidentiary hearings are committed to the sound discretion of the district court and are governed in part by Rule 8 of the Rules Governing Section 2255 Proceedings in the United States District Courts.   A post-conviction petitioner is only entitled to an evidentiary hearing if the facts alleged, if true, would entitle him to relief.  *See Payne v. United States*, 78 F.3d 343 (8th Cir. 1996).  Affidavits may be reviewed by the court to determine whether an evidentiary hearing is required.  *United States v. Goodman*, 590 F.2d 705, 712 (8th

Cir. 1979).

Lee has attached an affidavit to his motion.  The affidavit, while long, in no way asserts any facts which would indicate that Mrs. Whatley shared any privileged information.  The essence of the motion is simply that Lee was unhappy because one of his appointed attorney's assistants took a position with the U.S.  Attorney.  Neither Lee nor any other person alleges facts which would make a hearing necessary.  Attached to this response is the Affidavit of Karen Whatley, Exhibit E.  This affidavit establishes that no confidential information could have been provided, even inadvertently.  As the affidavit shows, Ms. Whatley never provided any information to the attorneys prosecuting the case.  From the time Ms. Whatley came to work at the U.S.  Attorney's Office until trial was complete, the attorneys trying the case and the persons working with them moved to offices in the federal building.  All files were moved there.  Research was conducted there.  Separate telephone lines were installed there.  Indeed, given the size and complexity of the prosecution, an entirely separate "prosecutor's" office was created.  Given the creation of a "wall" in this manner, there could have been no inadvertent sharing of information.  Given these uncontested facts, no hearing is required.

J.      Government's Response to Lee's Allegation that Trial Counsel were Ineffective for Failure to Capitalize on Inconsistent Testimony Regarding the Search of the Old Town, Idaho unit.

The government has reviewed the testimony regarding the search of the Old Town, Idaho storage unit.  The government is unable to locate any conflict and, in any event, counsel's performance was neither deficient nor prejudicial.

In March and April of 1998 ATF Agent Sprenger interviewed Gloria Kehoe.  During the course of one of the interviews, Mrs. Kehoe told Mr. Sprenger the general location of a storage

unit.  Based on the information provided, Agent Sprenger conducted a search that resulted in locating the unit in Old Town, Idaho.  Agent Sprenger conducted a search on April 16th.  On April 21st, 1998, Agent Sprenger with Agent Jordan conducted a second search.

At the suppression hearing, December 8, 1998, the government called two witnesses, Arnan McCullough (Tr. 285, 307) and Michael Springer (Tr. 350-385).  At trial on March 25, 1999, Volume 18 of the transcript, four witnesses testified about the Old Town search.  They were George Robbins (Tr. 3447-51), Mr. McCullough (Tr. 3451-54), Agent Springer (Tr. 3479, 3493, 3520-21), and Glen Jordan (Tr. 3591-603).  On March 29, 1999, Volume 19 of the transcript, Agent Jordan continued his testimony.  (Tr. 3610-31, 3641-42).

This testimony was straightforward.  When Gloria Kehoe began cooperating with ATF Agents, she provided information which led to the location of the Old Town storage facility.  The Old Town storage unit had been abandoned.  The owners had cut the lock, placing the old lock in the storage building, and were about to salvage the material inside the unit.  Before that occurred, Agent Sprenger, on April 16, 1998, went to the unit.  At the time he removed several items that were later introduced into evidence.  Agent Sprenger then called Agent Jordan who flew from Little Rock to Spokane, went to the unit, and conducted an additional search on April 21.  At this search, Agent Jordan seized several additional items. The allegation that the first search "disclosed no incriminating evidence" is without merit.  A good portion of Agent Sprenger's testimony was the introduction of incriminating evidence.  Agent Jordan testified regarding the items found at the April 21th search.  Both searches had "significant incriminating evidence."  Agent Spenger seized those items of which he had knowledge of the evidentiary value, i.e., weapons and similar materials and literature.  Agent Jordan seized additional items of which he

had peculiar knowledge as they tied to specific issues with which Agent Sprenger was unfamiliar.

K.    Government's Response to Lee's Contention that Trial Counsel were Ineffective for Failing to Object to Improper Closing Arguments.

Lee argues that trial counsel erred in failing to object to the government's closing argument in that attorneys for the government engaged in "significant misconduct by mischaracterizing the evidence and arguing legally impermissible inferences." Lee cites five alleged improper arguments. A review of the remarks show that Lee's contention is meritless, in that counsel's performance was neither deficient nor prejudicial.

Lee first contends that the government improperly argued that Cheyne Kehoe had faced death threats from an Aryan inmate. Lee argues that this portion of the government's closing argument improperly bolstered Cheyne Kehoe's testimony and placed in front of the jury a prejudicial incident. A review of the argument in the context of the evidence presented shows that the argument is meritless. Chevy Kehoe's trial attorney broached the subject. (Vol. 28 Tr. 5513). The attorney asked Cheyne Kehoe if he had ever been placed in the infirmary while incarcerated in Ohio. Cheyne Kehoe responded affirmatively stating that he was placed into protective custody. (Tr. 5514). Mr. Kehoe's attorney pursued the matter and asked about the investigation that lead to the need for protective custody. Cheyne Kehoe responded that, "There had been a threat sent into the prison that they were going to try and kill me." (Tr. 5515). After questioning Cheyne Kehoe about alleged homosexual conduct, Chevy Kehoe's attorney returned to the issue by asking if there was any other reason Cheyne Kehoe had requested witness protection. Cheyne Kehoe responded, "The dealings that I was going to have with this case and

the threats that had been coming up and so forth related to this." (Tr. 5518). On redirect examination, the attorney for the government clarified Cheyne Kehoe's earlier testimony by asking about the protective custody/infirmary testimony given earlier in the day on cross-examination. The following exchange occurred:

> Q. One other area, and that has to do with what Mr. Hampton asked you this morning about your situation in the penitentiary in Ohio. Is it not a fact that you were moved to the infirmary as a safety precaution because the authorities were concerned that they could not protect you in protective custody?
>
> A. That is correct.
>
> Q. And when you were in the infirmary for safety reasons, was there not an incident in which an inmate got into the infirmary, an Aryan inmate, got into the infirmary and threatened you?
>
> A. That's what I was told, yes. One of the captains told me an outside inmate from the PC unit had actually got inside the unit looking for me.
>
> Q. As a result of that, were you not almost immediately taken into federal custody at that point?
>
> A. Three days later, I was taken into federal custody.
>
> Q. Thank you.

(Tr. 5541).

In his closing argument the government's attorney alluded to this testimony. (Vol. 36 Tr. 6808). The context of the government's argument was that throughout the trial Defense attorneys had argued that the government had made deals with all of its witnesses. One of the alleged deals was placing Cheyne Kehoe in the federal penitentiary system to serve his Ohio penitentiary time. The government's attorney in the course of going through several of the reasons for the alleged favorable treatment of government witnesses, stated:

> "Ladies and Gentlemen, the witnesses in this case were picked by Chevie Kehoe. He picked them. There is no witness store. If there were, the government and the defendant would go there and the only witnesses

that would be hired from this witness store would be church deacons and other people whose reputation and integrity is beyond dispute. So, you have heard that we have put on - - we have made deals with some of these people. We made a deal with Cheyne Kehoe. We moved him out of the state prison to a federal prison. What did you hear about that? That Cheyne Kehoe had been put in protective custody, and that even after being put in protective custody an Aryan inmate came in looking for him and there were death threats on Cheyne's life. Is that a fair deal? That's a question you can answer yourself."

(Vol. 36, Tr. 6808)

This argument was neither a mischaracterization of the evidence nor legally impermissible. The government has every right to explain its deals with witnesses. There was clearly evidence in the record to support the government's argument that removing Cheyne Kehoe to the federal penitentiary was undertaken to protect him, not to give him a better place to serve his time.

Lee next argues that his trial counsel erred by failing to object to the government attorney's reference to the fact that Kirby Kehoe did not want to be involved in the Mueller family murders because Chevie Kehoe had involved Danny Lee in the murders. Lee argues that, "this was speculation premised only upon inadmissible hearsay from Gloria Kehoe." The context of this argument was that the government had to prove that the Defendant had a position in the enterprise. (Vol. 36, Tr. 6820). Here, the government's attorney was arguing that Chevie Kehoe was the leader of the enterprise. The point the government's attorney was making was that Chevie Kehoe and Danny Lee had gone to Arizona on their way to Oklahoma and then Arkansas. Kirby Kehoe was upset because Chevie Kehoe was involving Danny Lee in the Mueller "hit." The government's attorney was arguing that this showed that Chevie Kehoe, not Kirby Kehoe, was the leader of the criminal organization as, despite his father's objection, Chevie Kehoe continued on to Arkansas to complete the criminal activity. The argument was:

The third thing that we have to prove is the defendant had a position in the enterprise. Chevie Kehoe was the leader and the founder of a criminal enterprise. Kirby Kehoe talked about things. Chevie Kehoe did them. Kirby Kehoe talked about polygamy. Chevie Kehoe practiced it. Kirby Kehoe played with bombs here in Arkansas in his back yard. Chevie Kehoe set them off. Kirby Kehoe talking about burglaries. Chevie Kehoe decided when and where to do them. If you will recall the testimony, Chevie Kehoe brought Danny Lee down to Arizona with the plans to do the January, 1996 robbery and murder of the Muellers. And because he brought Danny Lee with him, Kirby Kehoe didn't want to play. He didn't want to go. He didn't want to participate, and he stayed in Arizona.

(Tr. 6820-21).

This argument was premised upon testimony provided by Gloria Kehoe. (Vol. 26, Tr. 5133). Lee and Chevie Kehoe had come to Arizona and visited Kirby, Gloria, and all of their other sons except Cheyne who was in Washington. Chevie had talked to Kirby about his plan to burglarize the Muellers again. Chevie had not told this to his mother. Rather, Chevie told his mother that he and Lee were going to Oklahoma to visit Lee's mother. After Lee and Chevie Kehoe left Oklahoma, Gloria Kehoe talked to Kirby Kehoe. Approximately 24 hours after Lee and Chevie Kehoe left, Kirby told Gloria that Lee and Chevie Kehoe were going to "hit" the Muellers again. (Tr. 5134). Kirby thought that Chevie had "jumped the gun." (Tr. 5134). Kirby told Gloria that he "didn't want to have anyone outside the family do it." Kirby wouldn't go because of Lee. (Tr. 5134). The government first notes that this testimony was given on cross examination of Gloria Kehoe, not the government's examination. The testimony was not presented to prove the matter asserted, i.e., that Kirby Kehoe knew in advance of the Mueller hit, but rather to impeach Gloria Kehoe for not taking any action to protect the Muellers. (Tr. 5135-6). It follows that the testimony was not hearsay. Even if the testimony was hearsay, an

exception to the hearsay rule applies as the statement was clearly against Kirby Kehoe's interest.

There is no violation of the confrontation clause as the hearsay was not obtained in preparation

for trial. *Crawford v. Washington*, 541 U.S. 36 (2004). Under pre-*Crawford* cases, the

testimony was admissible as non-violative of the confrontation clause since it was admissible

under a clearly established hearsay exception. It follows that the premise of Lee's argument, i.e.,

"This was speculation premised only upon inadmissible hearsay testimony from Gloria Kehoe."

is meritless. The argument was in no way speculative as it summarized Gloria Kehoe's trial

testimony.

Remembering that the context of the government's argument at this point was that

Chevie Kehoe was the leader of the criminal organization, Lee's next objection is also shown to

be meritless. Immediately after the argument quoted above, the government's attorney argued:

> "Chevie Kehoe is the leader of this enterprise. Danny Lee, Danny
> Lee is like the faithful dog. If you recall the testimony, he is sleeping out
> on the couch in front of his master's motor home. At one point he is
> sleeping in the shed guarding his master's property. But that's not all he
> does. He goes with him to commit the murders. He goes with Chevie
> Kehoe to do the Spokane bombing. He is with Chevie Kehoe when they
> transport the property in interstate commerce back to Spokane,
> Washington. They had a position. Chevie Kehoe is the leader. Danny
> Lee is the henchman."

(Tr. 6821)

Lee argues that this argument was improper and unprofessional name calling, "that

simultaneously devalued Lee's status as a human being." This argument colorfully shows Lee's

position in the criminal enterprise. Referring to someone's similarity to a faithful dog is neither

name calling nor does it devalue one's status as a human being. Few things are more revered in

our society than a "faithful dog." The image presented by the government correctly captured the

evidence as that evidence established Lee's position in the criminal organization.

As the government's attorney continued his explanation of positions in the criminal

organization, the attorney gave some details as to the specific acts that Lee took incorporating

testimony to make his point.  Immediately after the section quoted above, the government's

attorney argued:

> "But that's not all Danny did.  Danny told Gloria after the murders,
> Gloria Kehoe, "Bill was on tough son of a bitch," talking about that fight
> when Bill fought for his life.  "Bill was one tough son of a bitch." But
> Nancy was a dumb bitch because she pulled that plastic bag over her own
> head.  Take a look at the color of that bag, ladies and gentlemen.
>
> For his participation in this crime, Danny got a thousand dollars
> and a shotgun or a rifle.  This is a re-creation of the shotgun.  This is the
> gun Jim Hester worked on.  This is the gun that Sean Haines saw Danny in
> possession with.  This, as I said, is a duplicate, this type of gun.  This is the
> type of gun that Danny Lee traded for a tattoo.
>
> When Danny Lee talked to the Wankers, James and Dalvine
> Wanker, what did he say? "We went down south" - - I forget the exact
> words.  But it's your recollection which controls.  He talked about
> dumping the bodies in the swamp.
>
> What else did Danny do in this enterprise? He shared the same
> beliefs.  Remember Patricia Young? When Danny started talking about
> how the DNA would be purified though having more white children and
> all of this sort of business and she tried to set him straight by giving Danny
> a biology book, he didn't want to read that.  We are going to talk about the
> purpose, as I said, at the end of this case.  Danny had the same beliefs.
> Danny was fully involved.  Danny willingly embraced his role in this
> enterprise as the henchman."

(Tr. 6821-22).

Lee contends that the attorney's reference to Lee calling Mrs. Mueller a "a dumb bitch"

because she pulled the plastic over her own head was not in evidence.  At trial, Gloria Kehoe

testified as follows:

> Q. What did Mr. Lee tell you about the murders?
>
> A. Just said Bill was one tough son of a bitch because he fought so hard and how dumb Nancy was because she thought it was real and helped put the trash bag on her head because she thought it was real.

(Tr. 4975).

The attorney for the government erred in his recollection of this testimony. Given the testimony, the attorney's recollection error is understandable. The matter is decidedly trivial.

Finally, Lee argues that the government improperly referred to Kirby Kehoe's guilty plea, "as proof of the existence of the RICO enterprise." This is argument completely misstates the point of the government's argument. The attorney for the government was summarizing the various counts. The attorney stated:

> Count 2 is a conspiracy to commit racketeering activity, if you will. We talked a little about that conspiracy being a criminal agreement. It's an agreement to participate in racketeering activity in that the defendants deliberately joined with knowledge of the criminal organization's purpose. Now, Chevie Kehoe didn't join this. He created it. Danny Lee joined it. Faron Lovelace was involved in this enterprise. Kirby Kehoe was involved in this enterprise. Kirby Kehoe is not present today, because you've already been informed that Kirby Kehoe pled guilty to Racketeering Act Count 1 for his role and his participation in this criminal organization. There are others who were named, Cheyne Kehoe. Cheyne Kehoe told you he was up there after the Friedman robbery, and he counted that money out that was stolen from the Friedmans. And later, when they got to Ohio, who is in that blue Chevrolet Suburban? Cheyne Kehoe, along with Chevie Kehoe. The defendants agreed that one of the member of this enterprise would commit at least two of the crimes that we call racketeering acts."

(Tr. 6823-6824). The attorney for the government did not argue that Kirby Kehoe's guilty plea was proof of the existence of the RICO enterprise. The attorney for the government was making the point that several people joined the criminal organization that Chevie Kehoe created. Only in

passing did he refer to Kirby Kehoe's guilty plea.  The matter is decidedly trivial.

III.    LEE'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL AT THE CAPITAL PENALTY HEARING ALSO FAIL.

Lee raises a number of specific areas in which Mr. Lassiter and Ms. Compton allegedly provided ineffective representation in connection with Lee's capital penalty hearing.  As explained below, Lee fails as a matter of law to show either constitutionally deficient performance or prejudice resulting therefrom.  Accordingly, he is not entitled to substantive relief or an evidentiary hearing or discovery on his claims.

A.    Counsel's performance was neither deficient nor prejudicial in failing to challenge the "multiple killings" statutory aggravating factor.

Lee argues that counsel ineffectively failed to move to strike the "multiple killings" statutory aggravating factor under 18 U.S.C. § 3592(c)(16) from the aggravating factors presented to and considered by the jury at the penalty hearing.  Motion at 26-27.  He notes that this aggravating factor was not added to Section 3592 until April 1996, *see United States v. Higgs*, 353 F.3d 281, 300 (4th Cir. 2003), several months after the January 1996 murders of the Mueller family.  Lee extrapolates that had counsel objected to this factor and also the "pecuniary gain" statutory aggravating factor (discussed in the next section *infra*), counsel would have demonstrated Lee's total death-penalty-ineligibility for all of the counts except the murder of Sarah Powell, whom Lee concedes was a "vulnerable victim" within the meaning of the Section 3592(c)(11) statutory aggravating factor.  Motion at 27.  Even with respect to the Powell murder, Lee continues, reversal is required due to the prejudicial impact of the jury's consideration of inapplicable statutory aggravating factors.  *Id*.

Lee fails as a matter of law to show deficient performance by counsel and resulting

prejudice.  Even had counsel moved to strike the multiple killings factor, such action could not, as a legal matter, have affected the jury's deliberations in any way.  The caselaw is quite clear that even where defense counsel timely objects to the trial court's improper submission of the "multiple killings" aggravating factor to the jury, such action is harmless beyond a reasonable doubt provided that the jury properly found at least one other statutory aggravating factor.  *See Brown v. Sanders*, 126 S. Ct. 884, 894 (2006); *Higgs*, 353 F.3d at 319-20.  Thus, Lee's challenge to the death sentence for the Sarah Powell murder, which is supported by the uncontested "vulnerable victim" factor, necessarily fails.  And, the death sentences for the Bill and Nancy Mueller murders were adequately supported by the "pecuniary gain" statutory aggravating factor, which, as discussed in Argument III.B, *infra*, was likewise properly submitted to the jury.

The double murder in *Higgs*, like the murders here, were committed in January 1996, and the district court submitted the "multiple killings" aggravating factor to jury over Higgs's timely objection.  *Higgs*, 353 F.3d at 319-20.  The Fourth Circuit nevertheless concluded that any error was harmless beyond a reasonable doubt.  The court reasoned that Higgs's eligibility for the death penalty was established through one or more statutory aggravating factors independent of "multiple killings," and that the jury could also properly consider the "multiple killings" aspect of the offense, even if not as a statutory aggravating factor.  *Id*.

In *Brown v. Sanders*, the Supreme Court endorsed the same harmless error analysis applied in *Higgs*.  *Sanders*, 126 S. Ct. at 894 (clarifying that an invalid statutory aggravating factor does not affect a death sentence where the jury is able to "give weight to the same facts and circumstances under the rubric of some other, valid sentencing factor").  The Court explained:

> As the California Supreme Court noted . . . "the jury properly considered two special circumstances [eligibility factors] (robbery-murder and witness-killing)." . . . These are sufficient to satisfy *Furman's* narrowing requirement, and alone rendered Sanders eligible for the death penalty. Moreover, the jury's consideration of the invalid eligibility factors in the weighing process did not produce constitutional error because all of the facts and circumstances admissible to establish the "heinous, atrocious, or cruel" and burglary-murder eligibility factors were also properly adduced as aggravating facts bearing upon the "circumstances of the crime" sentencing factor. They were properly considered whether or not they bore upon the invalidated eligibility factors.

*Id*. The Court also made clear that the foregoing analysis applied regardless of whether the death sentence was imposed under a "weighing" or "non-weighing" death penalty statute. *See id.* at 891-92. For all of these reasons, counsel's performance was neither deficient nor prejudicial.

   B.    Counsel's performance was neither deficient nor prejudicial in failing to challenge the "pecuniary gain" statutory aggravating factor.

Lee argues that counsel ineffectively failed to move to strike the "pecuniary gain" statutory aggravating factor, 18 U.S.C. § 3592(c)(8), as factually inapplicable to this case. According to Lee, trial counsel should have argued that the factor applies only to "a killing for hire, or a killing done to gain an inheritance or insurance proceeds," and not to "a robbery of valuable items where the victims are killed." Motion at 27-28.

As explained below, as a matter of law, there was ample evidence to sustain the jury's finding beyond a reasonable doubt that Lee indeed committed the Mueller family murders for pecuniary gain. Lee cannot show that his counsel's performance with regard to this issue was deficient or prejudicial, because any challenge to the pecuniary gain factor would have lacked merit, especially in light of subsequent caselaw construing the factor. *See Lockhart v. Fretwell*, 506 U.S. at 369-70. Further, counsel in fact timely objected on the ground that this factor was

63

limited to cases involving murder for hire and, although her contention was meritless, she cited

the most directly-applicable authorities available.[18]  That counsel failed to cite in addition the

single district court opinion identified by post conviction counsel, *United States v. Cuff*, 38 F.

Supp. 2d 282, 288 (S.D.N.Y.) (*see* Motion at 27 n.10), was hardly deficient or prejudicial,

especially given that *Cuff* was wrongly decided according to all of the federal appellate decisions

discussed *infra*.

Although four federal courts of appeals have now construed the Section 3592(c)(8)

factor, none of them has limited it exclusively to "murders for hire," as Lee contends.[19]  Rather,

the courts have simply held, consistently with the statutory language itself, that the factor applies

where the capital homicide, rather than any related robbery, was committed for pecuniary gain.

*See United States v. Brown*, 441 F.3d 1330, 1369-71 (11th Cir. 2006); *United States v. Barnette*,

211 F.3d 803, 806-07 (4th Cir. 2000), *vacated on other grounds*, 126 S. Ct. 92 (2005); *United

States v. Bernard*, 299 F.3d 467, 482-84 (5th Cir. 2002); *United States v. Chanthadara*, 230 F.3d

1237, 1263 (10th Cir. 2000).[20]  *Brown* explained:

---

[18]  Lee cannot raise a direct claim challenging the pecuniary gain factor because that claim was not raised on direct appeal and thus is barred by the procedural default doctrine. *See* Arguments V, VI, VII, *infra*.

[19]  The statutory text of the factor is as follows:

> (8) Pecuniary gain. – The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

§ 3592(c)(8).

[20]  The sole Eighth Circuit decision construing the pecuniary gain factor, *United States v. Allen*, 357 F.3d 745 (8th Cir. 2004), no longer has any precedential value because it was vacated and replaced by an en banc decision affirming Allen's death sentence, *United States v. Allen*, 406

Quite simply, the "pecuniary gain" aggravating factor may apply in the "murder-for-hire" scenario ( if the defendant committed the murder "as consideration for the receipt of . . . anything of pecuniary value") or in the robbery scenario (if the defendant committed a concomitant murder "in the expectation of the receipt of anything of pecuniary value"). The "consideration" and "expectation" clauses are two separate ways by which the pecuniary gain factor may be satisfied, and they both must have meaning.

441 F.3d at 1370 (citations omitted).

Consistently with this interpretation, both *Brown*, 441 F.3d at 1369-70, and *Barnette*, 211 F.3d at 806-07, affirmed jurors' application of this factor in the robbery-murder context, holding that there was some evidence from which the jurors in those cases could properly have concluded that the murders were committed to effectuate the robberies and, thus, to secure pecuniary gain. Also consistently with *Brown*, the Tenth Circuit in *Chanthadara*, 230 F.3d at 12-63-64, concluded that the district court there erred in instructing the jury that it need only find that the underlying robbery, rather than the murder, was committed for pecuniary gain. *See Brown*, 441 F.3d at 1369. Finally, the Fifth Circuit in *Bernard*, 299 F.3d 483-84, held the factor not to apply where the evidence showed conclusively that the victims were killed solely to eliminate them as witnesses and not for pecuniary gain. This, too, is entirely consistent with *Brown*'s interpretation. *See Brown*, 441 F.3d at 1369-70.

Ultimately, whether the factor applies involves a Rule 29-style evaluation of the sufficiency of the evidence, in which "we are required to draw all reasonable inferences in the government's favor." *Brown*, 441 F.3d at 1371. As set forth above, Lee and Chevie Kehoe took over $50,000 and other property, including firearms, from the Muellers. Lee told Gloria Kehoe

F.3d 940 (8th Cir. 2005) (en banc). In any event, *Allen*'s now-vacated discussion is entirely consistent with the decisions of the other four circuits, for reasons similar to those set forth *infra*. *See Allen*, 357 F.3d at 750-51.

that Chevie Kehoe gave him a thousand dollars and a firearm for his involvement in the Mueller murders. (Tr. 4975).

Pecuniary gain motivated Lee's participation in the murders, not just the robbery. The proof established not only that Chevie Kehoe was insistent on eliminating all of the Mueller family members but also that Chevie Kehoe controlled all the proceeds from the organization's criminal acts. After both the 1995 Mueller burglary and the Friedman kidnaping and robbery, it was Chevie Kehoe who took control of the proceeds and distributed them as he saw fit. (Tr. 4962; 4956; 5300-02). Chevie Kehoe also took control of and distributed the proceeds of the Mueller murders and robbery. He distributed a portion of the organization's income from the robbery to Lee. Finally, even from Chevie Kehoe's perspective, the murders were essential to complete the robbery. As recounted above, Lee told Gloria Kehoe after the murders that Bill Mueller resisted Lee and Chevie Kehoe viciously, (Tr. 4975), leaving the robbers with no doubt that they would have to kill him to succeed with the robbery. In short, overwhelming evidence shows that Lee committed the Mueller family murders for pecuniary gain. *Brown*, 441 F.3d at 1371.

      C.      Counsel's performance was neither deficient nor prejudicial in failing to challenge the challenge the constitutionality of the Federal Death Penalty Act.

Lee argues that trial counsel were ineffective in failing to challenge the constitutionality of the federal death penalty as being applied in an arbitrary, capricious, and discriminatory manner. Motion at 28-29. Lee fails to show that counsel's performance was deficient and prejudicial. As explained in Argument V, *infra*, Lee's direct challenge to the Federal Death Penalty Act (FDPA) on these same constitutional grounds is doomed by existing law, in addition

66

to being barred by the procedural default and non-retroactivity doctrines.  Counsel had no professional duty to anticipate a change in the law, much less a "rule of law that has yet to be articulated by the governing courts."  *United States v. Fields*, 201 F.3d 1025, 1028 (8th Cir. 2000).

> D.    Counsel's performance was neither deficient nor prejudicial in failing to object to the Court's instruction on the jury's sentencing options.

At the capital penalty hearing, the Court correctly instructed the jury on the two available sentence options for racketeering murder under 18 U.S.C. § 1959, death and life imprisonment without the possibility of release.  (Tr. 7996-97).  The Court further instructed the jury, again quite correctly, that a verdict for death or for life without release had to be unanimous, and that if the jury was unable to reach a unanimous verdict, the responsibility for sentencing would then fall to the court, which would "impose the sentence required by law."  (Tr. 7996).  According to Lee, the court should have instructed the jury that unanimity was required only for a death verdict, and not for a verdict of life imprisonment, and that "the Court should have instructed the jury, simply, that a failure to agree on a death sentence would mean that the Court would impose a sentence of lifetime imprisonment."  Motion at 31.  Lee reasons that counsel was ineffective in failing to object on these grounds.

Counsel's performance was neither deficient nor prejudicial for the threshold reason that Lee's proposed instructions are wrong as a matter of law and thus could not properly have been given to the jury.  Under the FDPA, as in other death penalty cases, "the Government has 'a strong interest in having the jury express the conscience of the community on the ultimate question of life or death.'"  *Jones v. United States*, 527 U.S. 373, 382 (1999) (quoting *Lowenfield*

*v. Phelps*, 484 U.S. 231, 238 (1988)).  A failure to agree on life-versus-death under the FDPA is not itself a verdict but rather "a breakdown in the deliberative process."  *Jones*, 527 U.S. at 382. Consistently with this policy, the FDPA expressly requires that the jury's verdict be unanimous one way or the other – whether for death *or* a life term.  18 U.S.C. § 3593(e) ("the jury by unanimous vote  .  .  .  shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence").

An instruction that a life term would result from a failure to agree "has no bearing on the jury's role in the sentencing process" but rather "speaks to what happens in the event that the jury is unable to fulfill its role – when deliberations break down and the jury is unable to produce a unanimous sentencing recommendation."  *Jones*, 527 U.S. at 382.  Instructions on the consequences of a deadlock are improper under the FDPA because they tend to undermine the strong interest in unanimity by presenting an "open invitation to the jury to avoid its responsibility and to disagree."  *Id.* (internal quotation omitted); *see also United States v. Chandler*, 996 F.2d 1073, 1088-89 (11th Cir. 1993) (holding that a consequences of deadlock instruction was not required under the former death penalty provisions of the Anti-Drug Abuse Act of 1988), *cert. denied*, 512 U.S. 1227 (1994).

*Jones* thus forecloses Lee's presently-proposed instruction that a failure to agree is itself a jury verdict in favor of a life sentence.  The Court could not properly have delivered such an instruction, and trial counsel's performance in failing to request the incorrect instruction thus was not deficient or prejudicial.  Even had such an instruction been proper, moreover, Lee cannot show that counsel's failure to object necessarily fell outside the wide range of reasonable representation and "that but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694.

> E.    Counsel's performance was neither deficient nor prejudicial in not challenging the indictment for failure to allege the statutory death penalty eligibility factors.

Lee argues that trial counsel were ineffective in not challenging the indictment for failure to allege the statutory death penalty eligibility factors under 18 U.S.C. §§ 3591(a)(2), 3592(c). Lee recognizes that the primary authority for such a challenge is *Ring v. Arizona*, 536 U.S. 584 (2002), decided years after Lee's 1999 trial and penalty hearing, but he nevertheless maintains that even before *Ring*, motions raising such challenges were "standard practice" and that counsel's failure to follow that course here was deficient and prejudicial. Motion at 31-32. Lee also acknowledges that his appellate counsel unsuccessfully raised the *Ring* issue on direct appeal under a plain error theory. *See Lee*, 374 F.3d at 650-51. He maintains, however, that the Eighth Circuit would have granted relief under the less-demanding review standard for properly preserved claims if trial counsel had raised the *Ring* claim in this Court.

For any of a number of reasons, Lee fails to show that counsel's performance was deficient and prejudicial. At the time of Lee's trial and sentencing, binding precedent made clear that there was no requirement for the indictment to include eligibility factors, such as statutory intent factors and statutory aggravating factors. *See*, *e.g.*, *Jones v. United States*, 526 U.S. 227 (1999); *Walton v. Arizona*, 497 U.S. 639, 648-49 (1990) (aggravating factors are not "separate . . . offenses"); *Lewis v. Jeffers*, 497 U.S. 764, 782 (1990) (aggravating factors are not "'elements' of any offense"); *accord Hildwin v. Florida*, 490 U.S. 638, 640-41 (1989); *Cabana v. Bullock*, 474 U.S. 376, 385 (1986). In *Jones*, a non-capital case decided shortly before Lee's penalty hearing, the Court construed the portion of the federal carjacking statute providing for increased

penalties in the event that the carjacking resulted in a serious bodily injury or in a death, *see* 18

U.S.C. § 2119, as setting forth "elements" of distinct "offenses" rather than "sentencing

considerations," thus requiring that those elements (serious bodily injury or death) be alleged in

the indictment and found by the jury as a prerequisite to the court's imposing an enhanced

penalty. *Jones*, 526 U.S. at 232-52. *Jones* reiterated, however, the correctness of prior law

holding that the Constitution does not require in capital cases that the indictment allege, or the

guilt/innocence jury find, aggravating factors (as in Section 3592(c)) or *Enmund v. Florida*, 458

U.S. 782 (1982), intent factors (as in Section 3591(a)). The *Jones* majority indicated that its

decision was not at odds with the capital decision in *Walton v. Arizona*, because *Walton* dealt

with "finding[s] of aggravating facts falling within the traditional scope of capital sentencing as a

choice between a greater and lesser penalty, not as a process of raising the ceiling of the

sentencing range available." *Jones*, 526 U.S. at 251. Thus, *Jones* confirmed that aggravating

factors are not elements of a capital offense. Further, *Jones* did not at all disturb the *Walton*

holding, see *Walton*, 497 U.S. at 648-49, that *Enmund* findings are not elements of the offense.

*See Jones*, 526 U.S. at 251. As *Walton* recognized, *Enmund* findings need not be made by a jury

at all, and may be made by a reviewing appellate court. *Walton*, 497 U.S. at 648-49.

Especially in light of the binding precedent that would have foreclosed the *Ring* claim,

counsel were under no professional obligation to anticipate a change in the law and file a motion

that, according to existing precedent, lacked any legal merit.[21] *Fields*, 201 F.3d at 1028. Had

---

[21] Indeed, in roughly the same timeframe as Lee's prosecution, his present counsel, Mr. Ruhnke, served as trial counsel for capital defendant David Paul Hammer. *See United States v. Hammer*, 25 F. Supp. 2d 518, 519 (M.D. Pa. 1998). Mr. Ruhnke made no motion in the district court challenging Hammer's indictment for failure to allege death penalty eligibility factors.

counsel nevertheless filed such a motion, the Court would have been obliged to deny it, precisely

as all other district courts in federal capital cases had done.  *See*, *e.g.*, *United States v. Spivey*,

958 F. Supp. 1523, 1527-28 (D.N.M. 1997); *United States v. Nguyen*, 928 F. Supp. 1525, 1545

(D. Kan. 1996).

Finally, assuming counsel filed such a motion and in the extremely unlikely event that

this Court or the Eighth Circuit felt free to ignore binding precedent and held that the indictment

had to allege death penalty eligibility factors, counsel's actions necessarily would not have

altered the outcome, because the indictment in fact alleged the required eligibility factors.[22]  The

capital counts (Counts 3, 4, and 5 of the superseding indictment) charged the defendants with

murder in aid of racketeering under 18 U.S.C. § 1959, and alleged in particular that Lee and

Chevie Kehoe "murdered" William Mueller, Nancy Mueller, and Sarah Powell, respectively.

Count 1 additionally alleged that Lee and Chevie Kehoe committed the murders of William

Mueller, Nancy Mueller, and Sarah Powell "with the purpose of causing the death of" the

victims.  These intent allegations replicated the mental culpability factors in Section

3591(a)(2)(A) & (B).[23]  *See United States v. Paul*, 217 F.3d 989, 996-98 (8th Cir. 2000) (jury's

guilt phase and penalty phase verdicts, which collectively reflected a finding that Paul knew that

his aiding and abetting would kill the victim, satisfied the intent requirements of Section 3591),

*cert. denied*, 534 U.S. 829 (2001); *United States v. Jackson*, 327 F.3d 273, 290 (4th Cir. 2003)

---

[22]  If this Court granted a motion by Lee challenging the indictment, the government simply would have obtained a superseding indictment containing the required death penalty eligibility factors, as it did in all federal capital cases pending trial at the time of *Ring*.

[23]  Section 3591(a)(2)(A) provides the intent factor that the defendant "intentionally killed the victim," and Section 3591(a)(2)(B) provides the intent factor that the defendant "intentionally inflicted serious bodily injury that resulted in the death of the victim."

(Niemeyer, J., concurring) (indictment charging a willful, deliberate, malicious, and premeditated murder, committed during the course of a kidnaping, sufficiently alleged a statutory aggravating factor under Section 3592(c)).

The indictment also sufficiently alleged a statutory aggravating factor under Section 3592(c). The Section 3592(c)(8) "pecuniary gain" factor (that "[t]he defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value") was presented almost verbatim in the grand jury's finding in Counts 3, 4, and 5 that Lee committed the murders of William Mueller, Nancy Mueller, and Sarah Powell "as consideration for the receipt of anything of value from an enterprise engaged in racketeering activity, and to increase or maintain their position in the enterprise, . . . and pursuant to and in furtherance of the conspiracy alleged in Count 2." There is no basis for concluding that the grand jury's "value" finding in Counts 3, 4, and 5 referred to something different from "pecuniary value" as used in the pecuniary gain aggravating factor; indeed, like the Section 3592(c)(8) aggravating factor, the applicable offense statute refers to "pecuniary value." 18 U.S.C. § 1959(a). "Pecuniary value" under Section 1959 is further defined as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958(b)(1).

Given that the indictment thus alleged a statutory intent factor and a valid statutory aggravating factor, this Court would have been constrained to reject any challenge to the indictment. *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005). Thus, counsel's performance was not deficient or prejudicial in failing to raise the claim. Finally, Lee suffered no cognizable prejudice given that he received actual notice of the applicable eligibility factors,

which the petit jury later found beyond a reasonable doubt. *Lee*, 374 F.3d at 651. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. *Lockhart v. Fretwell*, 506 U.S. at 369-70.

> F.    Counsel's performance was neither deficient nor prejudicial in investigating Lee's role in the Joey Wavra murder.

Lee argues that had trial counsel conducted a proper investigation of the circumstances of the Wavra murder, Lee's "true role" would have placed his offense "in an entirely different light." A review of the record shows this argument is meritless, as counsel's investigation was entirely reasonable and caused no prejudice to Lee.

The government was clearly entitled to prove Lee's involvement in the murder of Joey Wavra. Lee's trial attorneys were fully aware of the significance of this testimony. They attempted to suppress the government's proof. On Monday, May 10, 1999, a suppression hearing was commenced. (Vol. 43-C). The suppression hearing was completed the next morning. (Vol. 44, Tr. 7341 - 7367). The basic facts were that when Lee was 17, he assisted his cousin, John David Patton, when Mr. Patton stabbed Joey Wavra about 40 times and slit his throat. Lee beat Mr. Wavra prior to the stabbings, pushed Mr. Wavra into a large storm sewer and handed the knife Patton used to stab Wavra to Patton. These facts were going to be presented. The only question at the suppression hearing was the manner in which they would be presented. Lee, shortly after the murder, confessed his involvement in detail to Oklahoma City detectives. Lee was subpoenaed to a preliminary hearing for John David Patton where he testified, again admitting his involvement in the murder. The issue at the suppression hearing

73

was whether the government could present Lee's testimony from Patton's preliminary hearing.[24]

Had the suppression hearing succeeded, the government would have presented the evidence

through the confession. A review of the suppression hearing shows that Lee's trial counsel was

obviously well versed on all the facts, had considered the issue, and fought hammer and tong to

have the facts presented in the least damaging manner.

Four government witnesses testified concerning the Wavra murder. A transcript of Lee's

testimony in an Oklahoma State proceeding was also read into evidence. Detective Randell

Yarbourough described the circumstances of the investigation, the finding of the body, and

identified the relevant parties. (Tr. 7389 - 7398). Dr. Chai Choi was the forensic pathologist

who examined Mr. Wavra's body. She testified that Mr. Wavra died of a combination of a cut to

the throat and multiple stab wounds. (Tr. 7407). Bryan Compton was at the party where the

occurrences took place which lead to the murder of Mr. Wavra. He described that which

occurred when Mr. Wavra was murdered. (Tr. 7408 - 7418). He described seeing Lee and

Wavra fighting and Lee knocking Wavra to the ground. (Tr. 7411 - 7412). He testified that Lee,

"beat him up and beat him pretty good." (Tr. 7413). He also testified that, "he [referring to Lee]

picked up a stick of wood and hit him a couple of times." (Tr. 7413). He described Wavra being

forced into the storm sewer, a later coin toss to determine whether Wavra would live or die, and

Lee handing a black plastic bag to Patton who was in the storm sewer with Wavra. (Tr. 7413 -

7414).

The evidence which resulted in the suppression hearing was a transcript of testimony

---

[24]The government preferred this method of presenting the testimony as the video of Lee's
confession to police officers was of poor quality.

gave as a part of the proceeding involving the Wavra murder. (Tr. 7419 - 7456). In the transcript, after admitting that everyone at the party, including himself, was high, Lee stated he assaulted Wavra (Tr. 7428 - 7429) because he laughed and urinated on a chair (Tr. 7430), followed him outside and hit him again (Tr. 7431 - 7432), kicked him (Tr. 7432), and had to be pulled off of him by Patton. (Tr. 7433). Lee and Patton took turns beating Wavra. (Tr. 7435). Lee opened a manhole, crawled halfway in, and decided to place Wavra in the storm sewer to sober up. (Tr. 7436 - 7437). Lee and Patton forced Wavra into the sewer. (Tr. 7438). It was Lee's idea to force Wavra into the manhole. (Tr. 7439). Patton entered the storm sewer with Wavra. (Tr. 7440). Lee decided to get a rope so Wavra's hands could be tied and he could be led down the storm sewer and confused. (Tr. 7442). Lee also obtained a plastic bag in which he placed a knife which he passed to Patton. (Tr. 7442 - 7443).

After the transcript was read to the jury, Rochelie Ezzi was called as a government witness. (Tr. 7456). She testified that, long after the Oklahoma prosecution was complete, Lee told her that he was entitled to wear red boot laces because he had murdered someone. (Tr. 7457-58). Ms. Ezzi testified as follows:

> A.      We were on the back porch at my friends house. I don't know how
>          we got into the conversation. He was talking about how him and
>          his cousin years back had beat somebody up real bad and slit his
>          throat, and they weren't sure if the guy died from beating him up or
>          from slashing his throat. And his cousin said, "I'll take the blame.
>          I'm going to have to do life anyway, so I will take the blame for it."
>          Danny wasn't real sure, you know, who exactly did murder this
>          person.

(Tr. 7458, L 12-19)

In light of Ms. Ezzi's testimony, it is difficult to imagine how "a properly conducted

investigation of the circumstances of the Wavra murder "would have revealed Lee's true role" and "would have placed the true nature of Lee's role in that offense and in an entirely different light." The statement to Ms. Ezzi was certainly not made in an effort to assist Patton as Lee now asserts was his reason for testifying as he did at the hearing.

Lee argues that had trial counsel conducted a proper investigation they would have recognized that, "Lee made statements that described a greater role in the crime than was actually true." Lee's statements were Lee's statements. They came in despite the best efforts of trial counsel. There is no viable argument that the Court erred in admitting the statements. The government is at a loss to understand that which Lee now argues his trial counsel should have done. Counsels' performance was neither deficient nor prejudicial.

G.     Counsel's performance was neither deficient nor prejudicial in stipulating to the evidence from Chevie Kehoe's sentencing.

Lee argues that trial counsel ineffectively stipulated to the introduction at Lee's penalty hearing of the testimony that the same jury had received at the just-completed capital sentencing of Chevie Kehoe. Motion at 32-33. On direct appeal, however, the Eighth Circuit rejected Lee's challenge to the stipulation, which the court of appeals held did not violate the Confrontation Clause because Lee himself "was aware of the stipulation prior to the penalty phase and waived his confrontation rights when he did not object to the stipulation in court." *Lee*, 374 F.3d at 650. This holding, predicated on Lee's personal acquiescence in the stipulation, effectively precludes a grant of relief on Lee's derivative ineffectiveness assertion.

Further, Lee's complaint is frivolous in any event. On direct appeal, appellate counsel acknowledged in Lee's opening brief that the stipulation was made for a tactical reason, which

was to avoid subjecting the same jury to a second airing of the graphic and moving victim impact testimony presented at Chevie Kehoe's penalty hearing.  Such tactical judgments, made after a proper investigation, are "virtually unchallengeable" on collateral review.  *Strickland v. Washington*, 466 U.S. at 690.  Indeed, had defense counsel refused to stipulate to this evidence, Lee no doubt would claimed ineffective assistance based on the prejudicial, inflammatory, and unnecessary repetition of powerful victim impact evidence.  *See*, *e.g.*, *Payne v. Tennessee*, 501 U.S. 1277 (1991).

Although foreclosed for the foregoing reasons, Lee's assertion that the Confrontation Clause applies to capital sentencing hearings warrants brief additional discussion.  Whatever the impact *Ring* may have on the evidentiary standards applicable at capital sentencing hearings is necessarily confined to proof of statutory aggravating factors and mental culpability factors that define eligibility for the death penalty.  The rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and extended in *Ring* has, by its plain terms, no relevance to the establishment of the myriad sentencing factors – like non-statutory aggravating factors or mitigating factors – that might affect the selection of an appropriate sentence within the range of the statutory maximum, but do not increase the statutory maximum or define eligibility for the death penalty. *See Harris v. United States*, 536 U.S. 545, 563-66 (2002); *Purkey*, 428 F.3d at 749; *Jackson*, 327 F.3d at 289-90 (Niemeyer, J., concurring).  The Government's evidence at Kehoe's penalty hearing, unlike that at Lee's, was primarily relevant to establish the non-statutory aggravating factor of victim impact.  The testimony from Kehoe's sentencing hearing covered by Lee's stipulation consisted of testimony by three witnesses (Aaron Duvall, Monica Gurel, and Michael Marmaduke) covering a total of fifteen transcript pages.  (Tr. 7185-7200).  The testimony

showed the gruesome impact of Lee's offenses, especially on the helpless child victim. Most of the exhibits Aaron Duvall referenced, moreover, were already in evidence against both Lee and Chevie Kehoe via the guilt/innocence trial. (Tr. 7185-93).

H.      Counsel's performance was neither deficient nor prejudicial in objecting to the government's cross-examination of Dr. Cunningham.

Lee argues that his trial counsel ineffectively failed to object to the government's cross-examination of a defense psychologist, Dr. Cunningham, as exceeding the scope of direct. Motion at 33. In its prior appeal, the government argued that Lee's trial counsel failed to preserve this claim, but the Eighth Circuit rejected this position and considered the merits of Lee's objection as fully preserved for review. *Lee*, 274 F.3d at 493-96. The Court held on the merits that the government's cross-examination was proper and reinstated Lee's death sentences. Lee renewed the same arguments in his opening brief on direct appeal, but the Eighth Circuit affirmed. *Lee*, 374 F.3d at 654.

Lee's assertion that trial counsel performed deficiently fails in light of the Eighth Circuit's conclusion that trial counsel properly preserved his present arguments. The Eight Circuit's holding on the merits that the government's cross-examination did not exceed the scope of direct demonstrates that counsel's performance caused no prejudice to Lee. Lee's assertion that trial counsel should have immediately moved for access to previously-denied materials from the Bureau of Prisons would not have resulted in "compelling mitigating evidence to rebut the government's claim." Motion at 33. The materials in question related to BOP's ability to incapacitate Lee from inflicting future harm, which did not, as Lee argues, constitute a mitigating factor. *See United States v. Johnson*, 223 F.3d 665, 675 (7th Cir. 2000). And, as this Court had

78

already ruled, Lee simply had no right to compel the government to educate Dr. Cunningham as an expert on BOP policies and procedures. This is especially true in the limited time constraints of an ongoing capital penalty hearing, the context on which Lee's claim is predicated. In any event, the record supports an inference that the defense had already made a tactical decision, independent of the BOP access issue, to attempt to limit the government's cross-examination by having Dr. Cunningham focus "'strictly' on mitigation evidence concerning Lee's upbringing and environment." *Lee*, 274 F.3d at 489. For all of these reasons, Lee's ineffective assistance claim fails.

I.  Counsel's performance was neither deficient nor prejudicial in presenting Lee's family and social history through Dr. Cunningham.

Lee also argues that his trial counsel ineffectively presented Lee's family and social history through Dr. Cunningham rather than through the defense-retained mitigation specialist, Gloria Settles, who had investigated Lee's background for the defense. Lee contends that the defense had no reason to present Dr. Cunningham because no medical diagnosis was offered, and presenting this defense psychologist allowed the government to elicit damaging opinion testimony on cross-examination. Further, relying on Dr. Cunningham allowed the government to argue to that the psychologist's account of Lee's history was unreliable hearsay.

Trial counsel's presentation of Dr. Cunningham employed a tactic frequently used in federal capital cases with considerable success. Offering a specific diagnosis under the Diagnostic and Statistical Manual would prove more aggravating than mitigating for Lee. Instead, Dr. Cunningham was able to present not only Lee's family and social history but also his history of prior mental diagnoses, all validated by Dr. Cunningham's credentials as a board-

79

certified forensic psychologist, (Tr. 7653), something Ms. Settles could not remotely replicate.

Further, Dr. Cunningham concluded his direct testimony with the broad opinion, "Danny Lee

experienced many traumatic and adverse life experiences that fundamentally shaped him. It

shaped him neurologically, psychologically, socially, emotionally and ethically, and that I think

contributed to his involvement in this offense." (Tr. 7742). In introducing this medical opinion

not tied to a specific diagnosis, counsel succeeded in introducing more than Lee had a right to

expect. Lee also offered a neuropsychologist, Dr. Bianchini, who offered additional

psychological testimony. (Tr. 7848-69).

In light of the foregoing, counsel's performance was neither deficient nor prejudicial.

Counsel elected to present psychological testimony through two experts and, while this

necessarily exposed the two experts to government cross-examination and rebuttal, the only

alternative would have been to forego presenting any experts and to have relied solely on Ms.

Settles to present Lee's history. Ms. Settles necessarily would have been subject to equal or

greater challenge based on her reliance on third-party hearsay accounts of Lee's history, and her

account would have lacked the interpretive opinions and added credibility that only Dr.

Cunningham could supply. Counsel wisely chose not to rely on Ms. Settles, which would have

subjected the defense to far greater allegations of ineffective assistance. Further, by formulating

a strategy of limiting the scope of the defense experts' testimony, as discussed *supra*, the defense

attempted to control the risk of damaging cross-examination and rebuttal by the government.

J.    Counsel's performance was neither deficient nor prejudicial in objecting to Dr.
Ryan's rebuttal testimony.

Lee argues that his trial counsel ineffectively failed to object to Dr. Ryan's rebuttal

testimony as not responsive to a new matter presented in the defense case.  Motion at 34.  In its prior appeal, the government argued that Lee's trial counsel failed to preserve this claim, but the Eighth Circuit rejected this position and considered the merits of Lee's objection as fully preserved for review.  *Lee*, 274 F.3d at 493-96.  The Court held on the merits that the government's rebuttal testimony was proper and, with respect to one point, harmless error, and reinstated Lee's death sentences.  Lee renewed the same arguments in his opening brief on direct appeal, but the Eighth Circuit affirmed.  *Lee*, 374 F.3d at 654.

Lee's assertion that trial counsel performed deficiently fails in light of the Eighth Circuit's conclusion that trial counsel properly preserved his present arguments.  The Eight Circuit's holding on the merits that the government's rebuttal was proper or harmless error demonstrates that counsel's performance caused no prejudice to Lee.  Lee's assertion that Dr. Ryan no longer vouches for portions of his testimony has no bearing at all on the Eighth Circuit's holding that the testimony was properly admitted.

> K.    Counsel's performance was neither deficient nor prejudicial in failing to present information that was not admissible mitigating evidence.

Lee argues that his trial counsel ineffectively failed to present, as mitigating evidence, the government's repeated offers to forego the death penalty in exchange for Lee's agreement to plead guilty and Marty Barker's testimony indicating that Chevie Kehoe, not Lee, killed Sarah Powell.

That the U.S. Attorney's office had sought the Department's approval to withdraw the death penalty notice against Lee, and also any proposals that Lee enter a guilty plea, were no more admissible against the government than offers by Lee to plead guilty would have been

admissible to prove his death penalty eligibility. Under the constitutional and statutory definitions of relevant mitigating evidence, the information must pertain to the defendant's character or background or the circumstances of the offense and tend to support a sentence of less than death. *See Oregon v. Guzek*, 126 S. Ct. 1226, 1231-32 (2006) (the Constitution does not require states to allow a capital sentencing jury to consider, as a mitigating factor, "residual doubt" concerning a defendant's guilt); *Franklin v. Lynaugh*, 487 U.S. 164, 173 (1988) (plurality opinion) (same); 18 U.S.C. § 3592(a)(8). Any proposal by the government to allow a plea or to withdraw the death penalty notice would not satisfy this standard because such would not have related to Lee's character or background or the circumstances of his offense. Any decision to withdraw the death penalty notice unilaterally, moreover, required the approval of the Attorney General or Deputy Attorney General, who directed the Department continue to seek the death penalty. For all of these reasons, the identified information was inadmissible, so counsel's actions were not deficient or prejudicial in failing to introduce the material.

Lee also argues that trial counsel erred in failing to "discover or present" mitigating evidence available from witness Marty Barker. Mr. Barker was certainly "discovered." Mr. Barker was incarcerated with Chevie Kehoe in the Greene County, Ohio jail. He was brought to Arkansas as a potential government witness. Mr. Barker's potential testimony created both *Bruton* and *Messiah* problems. As a result of these potential problems, a hearing was held outside the presence of the jury. (Tr. 4005 - 4037).

At the hearing, Mr. Barker explained that while he was incarcerated with Chevie Kehoe, Chevie Kehoe admitted to him that "he was the one who murdered the little girl." (Tr. 4007). This obviously is the testimony to which Lee alludes. The *Messiah* problem arose because Mr.

82

Barker was talking to Ohio state officers during the time he was incarcerated with Mr. Kehoe. The *Bruton* problems arose because during these conversations Chevie Kehoe told him that he was, as Mr. Barker remembered it, with a man named Daniels at the time he engaged in the Arkansas activity. (Tr. 4037).

The morning after the hearing was held the district court ruled that he did not have enough information to rule on the *Messiah* issues. (Tr. 4063-4069). The Court's position was that Ohio officials would have to testify before he could rule properly on the issue. (Tr. 4069). As a result of this ruling, the government determined not to call Mr. Barker as a witness. Of course, Lee could have called Mr. Barker as a witness to emphasize that it was Chevie Kehoe, not he, who had killed Sarah Powell. However, given the fact that all parties acknowledge this is the case based upon the testimony of Gloria and Cheyne Kehoe, nothing was to be gained by attempting to "solidify" this point. Clearly there was a lot to lose. The *Bruton* issue was still looming in the case. If Mr. Barker testified that Chevie Kehoe told him that Mr. Daniels was with him when he committed the Arkansas murders, Daniel Lewis Lee had a lot to lose. Given that it would have been Lee's attorneys who would have elicited testimony from Mr. Barker, had this testimony even inadvertently been presented there is an excellent chance the court would have ruled this was invited error thereby vitiating Defendant's *Bruton* protection. Calling a witness to "solidify" an uncontested issue where there is any possibility that such a witness will further inculpate a defendant would have been an unsound trial strategy. For all of the reasons, counsel's performance was neither deficient nor prejudicial.

> L.    Counsel's performance was neither deficient nor prejudicial in failing to object to the government's penalty phase closing argument.

83

Lee argues that his trial counsel ineffectively failed to object to the government's penalty phase closing arguments. The challenged arguments, *see* Motion at 35-36, were consistent with the customary government argument strategy of holding the defendant responsible for his own voluntary, criminal actions and discounting defense attempts to blame others and to shift focus from the defendant's crimes in favor of sympathetic or explaining aspects of the defendant and his background. As such, the arguments were entirely proper, and any objection would have lacked merit. *See*, *e.g.*, *United States v. Allen*, 247 F.3d 741, 775-78 (8ᵗʰ Cir. 2001) (holding that the government's penalty phase argument that Allen was a "murderous dog" was within the proper bounds of closing).[25]   Accordingly, counsel's actions were neither deficient nor prejudicial.

      M.      Counsel's performance was neither deficient nor prejudicial in failing to ascertain whether a hold-out juror was coerced into a death penalty verdict.

Lee argues that his trial counsel ineffectively failed to ascertain whether a hold-out juror was coerced into a death penalty verdict. Motion at 36-37. After the jury retired to consider its verdict in Lee's penalty phase two notes were received by the Court. (Tr. 7998). The first, signed by the foreperson, read, "We have a juror who does not believe in the death penalty – no matter what the crime!" The words "no matter what the crime" were underlined. The second note, signed by another juror, stated, "I think we need more time to discuss it." There followed a discussion between the Court and counsel regarding the appropriate action the Court should take in light of the notes. (Tr. 7998 - 8007). At this point, the jury returned to the Court room where

---

[25]   The Eighth Circuit, sitting en banc, subsequently affirmed Allen's death sentence following a remand by the Supreme Court. *United States v. Allen*, 406 F.3d 940 (8ᵗʰ Cir. 2005) (en banc).

the Court reminded the jury of earlier instructions concerning the duty to deliberate.  (Tr. 8007-10).  The court adjourned at 3:08 p.m.  (Tr. 8015).  At 4:15 p.m., the returned its death sentence verdict.  (Tr. 8015-21).  Defense counsel requested that the jurors be polled, and the jurors individually confirmed their unanimous verdict.  (Tr. 8021-22).

Under these circumstances, defense counsel requested and received all of the inquiry that was proper under the circumstances, and counsel's failure to request more was neither deficient nor prejudicial.  According to the common-law Lord Mansfield's Rule, codified for purposes of guilt/innocence trials in Fed. R. Evid. 606 and also applicable in this context, a high degree of confidentiality attaches to jury deliberations, and even coercion is not a proper subject of inquiry absent evidence that "extraneous prejudicial information was improperly brought to the jury's attention or [that] any outside influence was improperly brought to bear upon any juror."  There never has been any indication of such an outside influence, and even now Lee fails to present any such information.  His claim therefore fails.

IV.     LEE'S CLAIMS OF INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL FAIL.

Lee was represented on direct appeal by a new team of attorneys, Cheryl A. Pilate, Jeremy S. Weis, Kent E. Gipson, and Mark Barrett.  Lee argues that appellate counsel were ineffective in failing to pursue the claims discussed above at arguments, II.K, III.A,, III.B, III.C, and III.D, *supra*.  For the same reasons discussed above, however, counsel's performance was neither deficient nor prejudicial in failing to pursue these claims.  Counsel's failure to pursue these claims also was not deficient or prejudicial for the additional reason that certain claims were not preserved for review, as discussed above.

Lee raises one additional argument not discussed above, that appellate counsel should

have argued Lee's constitutional ineligibility for the death penalty on the Sarah Powell murder count in light of the evidence that Lee may have resisted Chevie Kehoe's insistence that she be killed like the other Mueller family members. Motion at 38-39. Counsel's performance was neither deficient nor prejudicial on this point as well. Trial counsel failed to preserve the argument for appeal, and there was no issue worth preserving. By jointly embarking on a plot to rob and murder the Mueller family, Lee engaged in violent conduct that fully met the constitutional threshold for actions punishable by death, even if he may have had later reservations about killing the young girl. *See Tison v. Arizona*, 481 U.S. 137, 158-59 (1987); 18 U.S.C. § 3591(a)(2)(D).

V.   LEE'S CONSTITUTIONAL CHALLENGES TO THE FEDERAL DEATH PENALTY ACT ARE BARRED BY THE PROCEDURAL DEFAULT AND NON-RETROACTIVITY DOCTRINES AND ARE WITHOUT MERIT IN ANY EVENT.

Lee attacks the constitutionality of the federal death penalty as being applied in an arbitrary, capricious, and discriminatory manner. Motion at 39. His claims are barred by the procedural default and non-retroactivity doctrines and are without merit in any event.

A.   Lee's claims are procedurally barred.

The procedural default doctrine generally bars Section 2255 review of claims that could have been, but were not, presented at an earlier stage of the litigation unless the defendant shows "cause" and "prejudice" to excuse the default. *United States v. Frady*, 456 U.S. 152, 170 (1982). The cause and prejudice standard requires Lee to show not only that some of objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. *Frady*, 456 U.S. at 170; *Coleman v. Thompson*,

501 U.S. 722, 753 (1991). This is a "significantly higher hurdle" than the plain error standard required to overcome the default. *United States v. Olano*, 507 U.S. 725 (1983); *Frady*, 456 U.S. at 166. If Lee cannot show cause and prejudice, Lee cannot have his claim considered unless he can satisfy the actual innocence exception. *Bousley v. United States*, 523 U.S. 614, 623 (1998); *see* Argument I, *supra*.

Here, Lee cannot show that a factor external to the defense prevented trial counsel from raising his present constitutional claims. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 347, 336).

B.      Lee's claims are also barred by *Teague* non-retroactivity.

Lee's claims are also barred by the non-retroactivity doctrine. Under *Teague v. Lane*, 489 U.S. 288 (1989), and its progeny, a defendant may not rely on a "new" rule of "procedure" in seeking to overturn his conviction on collateral review. *See Teague*, 489 U.S. at 310. "The *Teague* inquiry is conducted in three steps." *O'Dell v. Netherland*, 521 U.S. 151, 155 (1977). "First, the date on which the defendant's conviction became final is determined." *Id.* at 156. Where, as here, a defendant does file a petition for certiorari, the conviction becomes final when certiorari is denied. See *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987). In this case that date was June 27, 2005. "Next, the habeas court considers whether a . . . court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the constitution." *O'Dell*, 521 U.S. at 156 (alterations and internal quotations omitted). It is important to emphasize the word "compelled." The Court in *Teague* defined a "new rule" as one that "breaks new ground or

imposes new obligation on the States or the Federal Government." 489 U.S. at 301 (plurality opinion). Put another way, a new rule is one that was not "dictated by precedent existing at the time the defendant's conviction became final." *Id.* (emphasis in original); *see also Graham v. Collins*, 506 U.S. 461, 466-467 (1993). Subsequent decisions have made clear that a rule may be "new" despite the fact that earlier cases supported it, *Sawyer v. Smith*, 497 U.S. 227, 236 (1990), "or even control or govern" it, *Saffle*, 494 U.S. at 491. Unless a legal principle is compelled by existing precedent – i.e., not susceptible to reasonable debate – it will be treated as a "new" rule. *Butler*, 494 U.S. at 415. In almost all cases, if the rule is "new," it is unavailable to the defendant on collateral review. That is the basic doctrine of *Teague*.

The third inquiry concerns the *Teague* exceptions. If the rule is determined to be new, the final step in the *Teague* analysis requires the court to determine whether the rule nonetheless falls within one of the two narrow exceptions to the *Teague* doctrine." *O'Dell*, 521 U.S. at 156-157. The first exception is "for new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Id.* at 157 (alterations and internal quotations omitted). It is important to note that this first exception involves constitutional prohibitions on punishment. The second *Teague* exception, which is "even more circumscribed" than the first, is for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* The example used by the Court to illustrate this second exception is *Gideon v. Wainwright*, 372 U.S. 335 (1963), the decision that gave indigent felony defendants the right to counsel. The exception is reserved for genuine "bedrock" rules that are essential to basic fairness. *O'Dell*, 521 U.S. at 167.

Here, the constitutional rule Lee proposes, declaring the federal death penalty unconstitutional as applied, is clearly not one dictated by precedent existing as of June 27, 2005, and indeed is without support in existing precedent. Further, neither of the two *Teague* exceptions to non-retroactivity applies. Accordingly, Lee's claim is barred for this additional reason.

C.     Lee's constitutional claims are without merit in any event.

Finally, Lee's claims fail on their merits. Lee, whose victims were white, contends that the FDPA is unconstitutional because a defendant's chances of being authorized for a capital prosecution and then actually sentenced to death increase significantly where the victim is white.[26] Lee also argues that the death penalty is unconstitutional because it is disproportionately sought against black defendants in the South. These contentions fail in light of the Supreme Court's decision in *McCleskey v. Kemp*, 481 U.S. 279 (1987). Supreme Court precedent also forecloses Lee's alternative request for an evidentiary hearing.

1. Lee's "white victim effect" claim fails.

a. Decisions to seek the death penalty in the federal system are made pursuant with the so-called "Death Penalty Protocol," which was promulgated by the Department of Justice shortly after enactment of the FDPA and now appears in Title 9 of the U.S. Attorneys' Manual (USAM).[27] Under the Protocol, a U.S. Attorney must initially decide whether to charge a

---

[26] Although Lee fails to articulate his constitutional claims with any specificity, he appears to be raising the same arguments that his counsel, Mr. Ruhnke, is pursuing in the First Circuit in *United States v. Sampson*, No. 04-6001 (1st Cir. argued Oct. 4, 2006). The government reserves the right to supplement its arguments in a reply to Lee's brief, as discussed *supra*.

[27] The Death Penalty Protocol is available online at <http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/10mcrm.htm>.

defendant in his district with a capital-eligible offense.  Once a defendant is charged with such an offense, the U.S. Attorney must make a detailed submission to the Department of Justice that includes a recommendation for or against seeking the death penalty.  *See* USAM § 9-10.040.  The submission is reviewed by the Attorney General's Review Committee on Capital Cases, which makes its own recommendation, but not before providing defense counsel with an opportunity to make a submission and to "present to the Committee the reasons why the death penalty should not be sought."  § 9-10.050.  The Attorney General then makes the final decision whether or not to seek capital punishment, based on standards that track the factors a jury is required to consider under the FDPA.  § 9-10.050, 10.080.  The Protocol provides that "bias for or against an individual based upon characteristics such as race or ethnic origin may play no role in the decision whether to seek the death penalty."  § 9-10.080.

Lee's present counsel has based similar "white victim effect" claims in other defendants' cases primarily on a statistical survey that was performed by the Department of Justice in September 2000 and updated in June 2001.[28]  The 2000 Survey and the 2001 Supplement present a series of statistics regarding the federal death penalty process that are broken down by time period, participants in the decision-making process (U.S. Attorneys, the Review Committee, and the Attorney General), and by the racial or ethnic groups of defendants and victims.  *See* 2000 Survey at 6.  The survey found "no evidence of bias against racial or ethnic minorities" in the process, but its authors made several recommendations aimed at "promot[ing] public confidence in the process's fairness."

---

[28]  The 2000 Survey and 2001 Supplement are also available online at <www.usdoj.gov/dag/pubdoc.html>.

Lee does not suggest that the Department of Justice purposefully targets white victim cases for capital prosecution.  He claims, however, that the DOJ survey establishes that the system is nevertheless unconstitutional in its impact because a defendant accused of killing a white victim is over four times more likely to receive a death sentence than someone accused of murdering a non-white victim.  This assertion fails.

b.  In *McCleskey*, the Supreme Court rejected a minority capital defendant's contention that the Georgia death penalty scheme violated the Equal Protection Clause and the Eighth Amendment based on a statistical analysis (the "Baldus study") indicating that defendants charged with killing white victims were eleven times more likely to receive a death sentence than those charged with murdering non-whites.  *See* 481 U.S. at 286.  The Court held that to prevail on an equal protection claim, the defendant must show both "that the decision-makers in *his* case acted with discriminatory purpose" and that the purposeful discrimination had "'a discriminatory effect' on him."  *Id.* at 292 (citations omitted; emphasis in original).  The *McCleskey* Court defined "discriminatory purpose" as entailing:

> more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.

481 U.S. at 298 (quoting *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)).  "Because discretion is essential to the criminal justice process," the Court stressed that it would "demand exceptionally clear proof before [it] would infer that the discretion has been abused."  *Id.* at 297.  Applying that standard, the Court explained that, in the context of capital sentencing, statistics about the general operation of a death penalty scheme are insufficient to support an inference of discriminatory purpose.  *Id.* at 292-299.

For similar reasons, the Supreme Court also rejected McCleskey's Eighth Amendment challenge.  481 U.S. at 299-313.  The Court explained:

> At most, the Baldus study indicates a discrepancy that appears to correlate with race. Apparent disparities in sentencing are an inevitable part of our criminal justice system. The discrepancy indicated by the Baldus study is "a far cry from the major systemic defects identified in *Furman*[.]"  As this Court has recognized, any mode for determining guilt or punishment "has its weaknesses and the potential for misuse."  Specifically, "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'"  Despite these imperfections, our consistent rule has been that constitutional guarantees are met when "the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible." Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious.  In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants, we hold that the Baldus study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process.

*Id.* at 312-313 (citations and footnotes omitted).

Lee fares no better than McCleskey.  Lee is unclear regarding the legal basis for his "white victim effect" claim, but it appears to have both equal protection and Eighth Amendment components.[29]  Lee cannot establish any error on an equal protection theory.  Lee has no evidence of purposeful discrimination on the basis of victim race in this case or any other.  And *McCleskey* establishes that general statistics like those relied on by Lee are insufficient to establish "that the decision-makers in *his* case acted with discriminatory purpose."  *See* 481 U.S. at 292 (emphasis in original).  In short, Lee has failed to provide the requisite "exceptionally clear proof" of intent to discriminate on the basis of the race of the victim.  *Id.* at 297.

---

[29]  Although the Fifth Amendment does not contain an Equal Protection Clause, "it does contain an equal protection component" that provides "precisely the same" protection as the Equal Protection Clause of the Fourteenth Amendment. *Wayte v. United States*, 470 U.S. 598, 608 n.9 (1985) (citations and quotation marks omitted).

Lee's Eighth Amendment claim also fails.  In *McCleskey*, the Baldus study indicated that, when factors other than race were not controlled for, a defendant accused of killing a white victim was eleven times more likely to be sentenced to death than a person accused of murdering a black victim.  *See* 481 U.S. at 286.

Because the federal capital prosecution and sentencing process has been "surrounded with safeguards to make it as fair as possible," it would be at least as inappropriate here as it was in *McCleskey* for a court to "assume that what is unexplained is invidious."  481 U.S. at 313.  The Department of Justice's Protocol for capital prosecutions prohibits bias based on characteristics such as race or ethnicity, *see* USAM § 9-10.080, and, in most cases, the Department's decision-makers are not aware of the race of the defendant or the victim.[30]  Moreover, the FDPA guided the jury's discretion in this case by requiring it to "consider the circumstances of the crime and criminal before it recommended [a] sentence."  *See Gregg v. Georgia*, 428 U.S. 153, 197 (1976).  Each juror in this case expressly certified in accordance with 18 U.S.C. 3593(f) that he or she was not influenced by the race of the defendant or the victim.  ®. 62-101).  Under these circumstances, the statistics relied on by Lee fall far short of "demonstrat[ing] a constitutionally significant risk of racial bias" affecting the federal sentencing process.  *McCleskey*, 418 U.S. at 312-313.

c. Nor is Lee entitled to a remand for an evidentiary hearing on his "white victim effect"

---

[30]  In some cases involving racially-motivated murders or civil rights violations, the race of the defendant and the victims may be obvious.  Furthermore, in presenting reasons why the death penalty should not be sought, defense counsel sometimes provide DOJ's decision-makers with information about the race or ethnicity of the defendant or the victim.  *See* 2000 Survey at 5-6; *see also* USAM § 9-10.050 (stating that the Department will consider "evidence of racial bias against the defendant or evidence that the Department has engaged in a pattern or practice of racial discrimination in the administration of the Federal death penalty").

claim. Defendants are not entitled to evidentiary hearings on their selective or vindictive

prosecution claims unless they first identify facts tending to demonstrate (I) that the government

refrained from prosecuting others who were "similarly situated," and (ii) that the reasons for any

such discrimination were illegitimate. *United States v. Bass*, 536 U.S. 862, 863 (2002); *United

States v. Armstrong*, 517 U.S. 456, 465 (1996); *United States v. Webster*, 162 F.3d 308, 333-35

(5th Cir. 1998). As demonstrated above, Lee has failed to demonstrate that the death penalty was

not sought or imposed on others similarly situated but accused of killing non-whites. *See Bass*,

536 U.S. at 863-864 (general statistics insufficient to make required showing). Moreover, there

is no reason to believe that the death penalty was sought or imposed in this case was based on

anything other than legitimate factors such as the circumstances of the crimes and the defendant's

background. *See McCleskey*, 481 U.S. at 313 (refusing, in rejecting Eighth Amendment claim,

"to assume that what is unexplained is invidious"). Finally, Lee had ample opportunity to

present his claim and to provide supporting evidence at the time of trial. He is not entitled to a

second bite at the apple, particularly since he provides no basis for concluding that an evidentiary

hearing would help him to overcome *McCleskey*.

> 2. Lee's claim that he was discriminated against based on his race and
> geographical location fails.

Lee, a white male, claims that the FDPA is facially invalid under the Fifth and Eighth

Amendments because black defendants in the South face the death penalty in disproportionately

high numbers. Lee presumably bases this claim primarily on the same Department of Justice

statistical survey that he cites in support of his "white victim effect" claim, as well an analysis of

those surveys by Professor David Baldus. In summary, the survey indicates that, in the

aggregate, "more blacks . . . are selected to face the death penalty than whites." *See United States v. Bin Laden*, 126 F. Supp. 2d 256, 258 (S.D.N.Y. 2000) (rejecting similar claims).  At the same time, however, it reveals that "black . . . defendants who are capital-eligible are actually being approved [by the Attorney General] for the federal death penalty at *lesser* rates than their white counterparts." *Id.* at 259 (emphasis added).  Regarding geography, the survey indicates that "the rates of capital-approval are not uniform across all 94 U.S. Attorneys," with higher authorization rates for defendants in some southern districts.  *Id.* at 260, 263.  Lee's claim fails.

To begin with, Lee cannot overcome the high hurdle he must surmount to prevail on a facial challenge to the FDPA.  A facial challenge is a "claim that [a] law is 'invalid *in toto* – and therefore incapable of any valid application." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982) (quoting *Steffl v. Thompson*, 415 U.S. 452, 474 (1974)).  Because the remedy being sought in a facial challenge is to invalidate the statute in all its applications, it logically follows that a litigant bringing a facial challenge must show that the statute has no valid application.  The Supreme Court most clearly articulated that principle in *United States v. Salerno*, 481 U.S. 739 (1987), in which it stated that "[a] facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Id.* at 745.

Lee cannot demonstrate that the FDPA is incapable of constitutional application; indeed, he cannot even show that the statute is unconstitutional in most or many cases.  The Supreme Court and the other courts of appeals have upheld numerous sentences imposed under the FDPA against various constitutional challenges.  *See, e.g., Jones*, 527 U.S. 373; *Brown*, 441 F.3d 1330;

*United States v. LeCroy*, 441 F.3d 914 (11th Cir. 2006); *Purkey*, 428 F.3d 738; *United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005); *Higgs*, 353 F.3d 281; *Bernard*, 299 F.3d 467; *Webster*, 162 F.3d 308; *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998); *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996).  Although a number of minority defendants have been convicted and sentenced to death under the FDPA, no circuit has stated or even suggested that any such sentence was the product of racial  discrimination.  "The fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid."  *Salerno*, 481 U.S. at 745.

In any event, even if Lee could sidestep the *Salerno* standard, his claim would fail under *McCleskey*.  The equal protection component of Lee's challenge fails because he cannot show "that the decision-makers in *his* case acted with discriminatory purpose" or that the purposeful discrimination had "'a discriminatory effect' on him."  481 U.S. at 292.  Indeed, Lee could not possibly have been targeted for capital prosecution because he is a black offender, as he is a white defendant.  The disparate impact alleged by Lee would actually favor him as a white defendant in a jurisdiction which federal capital prosecutions have rarely been authorized.

The Eighth Amendment component of Lee's claim also fails under *McCleskey*.  The Baldus study at issue in *McCleskey* suggested, among other things, that black defendants accused of killing white victims were substantially more likely to receive a death sentence than white defendants accused of killing black victims.  481 U.S. at 286-287.  In rejecting McCleskey's Eighth Amendment claim based on those statistics, the Court explained that "apparent disparities . . . are an inevitable part of our criminal justice system" and that "where the discretion that is fundamental to our criminal process is involved, [courts should] decline to assume that what is

unexplained is invidious." *Id.* at 312-313.  To assume invidiousness would be particularly inappropriate here.  Although the statistics relied on by Lee indicate that more black defendants than white defendants are authorized for capital prosecution, they do not indicate what percentage of the individuals committing death eligible offenses are minorities.  Similarly, although the statistics suggest a geographic disparity, they fail to provide "the most meaningful information of all" – whether similarly situated offenders have been treated differently in different districts.  *Bin Laden*, 126 F. Supp. 2d at 263.  Finally, as noted above in connection with Lee's "white victim effect" claim, Department of Justice policy prohibits bias based on characteristics such as race or ethnicity, *see* USAM § 9-10.080, and, in most cases, the Department's decision-makers are not aware of the race of the defendant or the victim.  *See* 2000 Survey, at 5-6.  Under the circumstances, Lee's claim would fail under *McCleskey* even if it could survive the *Salerno* standard.

VI.    LEE'S CONSTITUTIONAL CHALLENGE TO THE INTRODUCTION  OF HIS ADULT CONVICTION FOR THE WAVRA ROBBERY IS BARRED BY THE PROCEDURAL DEFAULT AND NON-RETROACTIVITY DOCTRINES AND FAILS ON ITS MERITS IN ANY EVENT.

As noted, the evidence at Lee's penalty hearing included his adult-court conviction for the robbery of Joey Wavra, and also testimony about Lee's aiding and abetting David Patton in the related murder of Wavra.  Lee argues that the Supreme Court's recent decision in *Roper v. Simmons*, 543 U.S. 551 (2005), holding that a defendant may not be sentenced to death for a murder committed while he was under age 18, should be extended to bar the introduction, at a capital defendant's penalty hearing, of evidence of other, non-capital crimes that the defendant committed as a juvenile.  Motion at 39-40.  His claim is barred by the procedural default and

97

non-retroactivity doctrines and is without merit in any event.

As noted, the procedural default doctrine generally bars Section 2255 review of claims that could have been, but were not, presented at an earlier stage of the litigation unless the defendant shows "cause" and "prejudice" to excuse the default. Here, Lee cannot show that trial and direct appeal counsel's failure to pursue his present constitutional claim was due to a factor external to the defense. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 347, 336). The evidence of Lee's participation in the Wavra robbery and murder was relevant solely as a non-statutory aggravating factor, and not to Lee's eligibility for the death penalty.

Lee's claim is also barred by the non-retroactivity doctrine. As of June 27, 2005, when Lee's convictions and death sentences became final (shortly after *Roper*), existing precedent did not dictate a grant of relief on Lee's claim. Both before *Roper* and since, the categorical exclusions of certain classes of capital offenses and offenders from the death penalty have applied to the defendant's participation the capital offense, and not acts relevant as non-statutory aggravation. Non-homicide violent offenses such as rape and robbery, for example, have long been constitutionally excluded from the death penalty, *see*, *e.g.*, *Coker v. Georgia*, 433 U.S. 584, 598-600 (1977) (plurality opinion), yet such offenses have routinely been deemed admissible in aggravation at a capital sentencing hearing. *See*, *e.g.*, *Allen*, 247 F.3d at 789-90. Thus, Lee proposes application of a new rule. Further, neither of the *Teague* exceptions would apply, because Lee's proposal would only bar certain evidence in aggravation, and not exclude certain offenses or offenders from the death penalty, and is not a watershed rule comparable to *Gideon*.

Finally, for reasons similar to those set forth above, Lee's claim is without merit. Lee's adult conviction for the Wavra robbery was properly admitted. *See*, *e.g.*, *Allen*, 247 F.3d at 789-90; *United States v. Davis*, 2003 WL 1873088 (E.D. La. 2003).

VII.    LEE'S CHALLENGE TO THE STATUTORY QUALIFICATION OF HIS TRIAL COUNSEL IS BARRED BY THE PROCEDURAL DEFAULT AND NON-RETROACTIVITY DOCTRINES AND NOT COGNIZABLE ON COLLATERAL REVIEW.

Lee asserts that neither Mr. Lassiter nor Ms. Compton was qualified for appointment as capital counsel under the statute requiring that at least one counsel be "learned in the law applicable to capital cases." 18 U.S.C. § 3005. His claim is barred by the procedural default and non-retroactivity doctrines and is not cognizable in any event.

As noted, the procedural default doctrine generally bars Section 2255 review of claims that could have been, but were not, presented at an earlier stage of the litigation unless the defendant shows "cause" and "prejudice" to excuse the default. Here, Lee cannot show that direct appeal counsel's failure to pursue his present constitutional claim was due to a factor external to the defense. Lee was represented by a separate set of attorneys on direct appeal, whose qualifications Lee does not contest. Further, he self evidently cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 347, 336).

Lee's claim is also barred by the non-retroactivity doctrine, which applies equally to new non-constitutional procedural rules. *See Breard v. Greene*, 523 U.S. 371, 376-77 (1998) (per curiam) (finding treaty-based claim barred by *Teague*). As of June 27, 2005, when Lee's

convictions and death sentences became final, existing precedent did not dictate a grant of relief on Lee's claim.  Indeed, as discussed *infra*, Lee's claim does not present a cognizable basis for collateral relief.  Thus, Lee proposes application of a new rule.  Further, neither of the *Teague* exceptions would apply, because Lee's proposal would not exclude certain offenses or offenders from the death penalty, and is not a watershed rule comparable to *Gideon*.

Finally, Lee does not present a cognizable basis for relief.  Section 2255 applies to non-jurisdictional claims based on a federal statute or rule only if the claim alleges a "fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure."  *Hill v. United States*, 368 U.S. 424, 428 (1962).  Courts have applied this standard to hold that non-constitutional violations of federal law are not cognizable on collateral review.  *See*, *e.g.*, *United States v. Timmreck*, 441 U.S. 780, 783-84 (1979) (claim that district court violated Fed. R. Crim. P. 11 by failing to advise defendant of mandatory parole term before accepting guilty plea); *Hill*, 368 U.S. at 429 (claim that court violated Fed. R. Crim. P. 32 by failing to give defendant opportunity to make a statement before imposing sentence); *United States v. Pollard*, 959 F.2d 1011, 1028 (D.C. Cir. 1992) (claim that government's allocution at sentencing violated terms of plea agreement); *Fiumara v. United States*, 727 F.2d 209, 213 (2d Cir. 1984) (claim that wiretap order did not comply with statutory requirements); *see also Peguero v. United States*, 526 U.S. 23, 29-30 (1999) (district court's failure to advise defendant of right to appeal as required by Fed. R. Crim. P. 32(a)(2) does not entitle defendant to collateral relief "when he had independent knowledge of the right to appeal and so was not prejudiced by the trial judge's omission").

Lee cannot remotely satisfy this standard.  He raises no relevant constitutional challenge,

and he admits, for example, that not just one, but both, of his trial counsel had relevant capital experience.  Further, he makes no assertion that trial counsel lacked the minimum statutory qualifications set forth in 18 U.S.C. § 3599 (formerly 21 U.S.C. § 848(q)).  Lee fails to present the sort of exceptional non-constitutional violation that can serve as a basis for collateral relief.

VIII.    LEE'S CLAIM OF NEWLY DISCOVERED EVIDENCE OF KIRBY KEHOE'S ROLE IN THE OFFENSE DOES NOT PROVIDE A COGNIZABLE BASIS FOR RELIEF.

Lee adopts Chevie Kehoe's Section 2255 assertion that newly discovered evidence placed Kirby Kehoe in Arkansas at the time of the murders.  This assertion is controlled by the "actual innocence" principles discussed in Argument I, *supra*, and applying those standards here, Lee presents no cognizable basis for collateral relief.  To hold otherwise would amount to a new constitutional rule of criminal procedure that cannot be applied retroactively on collateral review, for the reasons also set forth above.

For the reasons stated in the government's response to Chevie Kehoe's amended motion, this argument is meritless in any event.  The government also notes that in an addendum to supplement his amended motion filed with this Court on November 22, 2006, Chevie Kehoe has in essence completely abandoned this argument.  As the addendum makes clear the only pertinent document in those submitted to the court were Kirby Kehoe's V.A. patient data card and V.A. medical center appointment card.  Chevie Kehoe's counsel thought these documents establish that Kirby Kehoe had an appointment at the V.A. hospital in Fayetteville, Arkansas at the time of the Mueller murders.  Chevie Kehoe's counsel retained an investigator who pursued the matter.  As that investigator found Mr. Kehoe was not at the Fayetteville medical center at the time of the Mueller murders. As Chevie Kehoe's counsel forthrightly admits, this evidence is, "of little or no

value."

BUD CUMMINS
UNITED STATES ATTORNEY


*/s/ Dan Stripling*


By _____
DAN STRIPLING
Assistant U.S. Attorney
P.O. Box 1229
Little Rock, AR 72203
(501) 340-2600

/s/ Gwynn X. Kinsey, Jr.
By:_____
Gwynn X. "Charlie" Kinsey, Jr.
U.S. Department of Justice, Criminal Division
1331 F. Street, N.W.
Washington, D.C. 20530
(202) 353-9721


**CERTIFICATE OF SERVICE**

I certify that I have mailed the above on this 6th day of December, 2006, to the following counsel:

David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jewsey 07042

Laurence E. Komp
Attorney at Law
423 Madrina
Ballwin, MO 63021

*/s/ Dan Stripling*

_____
DAN STRIPLING
