IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA                    PLAINTIFF/RESPONDENT

VS.                    NO: 4:97CR00243(01) GTE
                            4:04CV00493 GTE

CHEVIE KEHOE                    DEFENDANT/MOVANT

## AFFIDAVIT

I, Mark F. Hampton, trial attorney for Chevie O'Brien Kehoe state the following on oath:

1.      Trial counsel had numerous extensive interviews with Faron Lovelace. In those interviews Lovelace asserted that he could prove persons other than our client, Chevie Kehoe and co-defendant Danny Lee had committed the murders of the Mueller family. However, Mr. Lovelace refused to state what this testimony would be. Mr. Lovelace also advised Judge Eisele that he could identify the true murders. This resulted in an in camera meeting with Judge Eisele where trial counsel was advised of Mr. Lovelace's assertions. The decision was made not to call Mr. Lovelace as trial counsel had no knowledge regarding what Mr. Lovelace's ultimate testimony would be. It also was obvious that Mr. Lovelace was not mentally stable. Counsel felt that presenting Lovelace as a defense witness would possibly compromise the defenses being permitted. The matter was discussed with defendant Kehoe.

2.      Trial counsel knew of the potential testimony of David Hill. Investigatory Taylor Eubank and I visited Mr. Hill twice. After interviewing Mr. Hill the determination was made that Mr. Hill's testimony would not be helpful to the defense.

3.      John Scholz approached defense counsel asserting that he and Bill Mueller were Ku Klux Klan members. Mr. Scholz asserted that Mr. Mueller had been involved in Ku Klux



GOVERNMENT
EXHIBIT
C

Klan fund-raising efforts but became disillusioned with some of those efforts. As a result of his disagreement with the other members regarding fund-raising methods, other Ku Klux Klan members became concerned that Bill Mueller would talk to authorities. Scholz asserted that he and another Ku Klux Klan member went to Mueller's home with the intention of killing Mueller. Mueller was not home and the murder plan was abandoned. Scholz provided information regarding his son's criminal case. He advised that ATF agent Glen Jordan, one of the most active Kehoe investigators, had prosecuted his (Scholz's) son. Defense counsel feared that development of this evidence on cross examination of Scholz would discredit their case. There were conversations among trial counsel, including trial counsel for defendant Lee. It was ultimately determined that Scholz's story was too incredible to be believed and hence, Scholz should not be called to testify.

4.    Selecting a jury with as many black jurors as possible was a strategic decision made by defense counsel. Jury consultant Bob Berry concurred in the strategy. Defense counsel felt this strategy was reasonable because (1) blacks are more likely than whites to discredit government testimony, (2) research of attitudes indicates that blacks are generally less likely to give the death penalty, and (3) it was felt that blacks were less likely to give the death penalty than whites in this particular case. There were general conversations regarding the strategy with defendant Chevie Kehoe.

5.    Mr. Kehoe's motion refers to two persons who saw the Muellers, alive, with other persons in front of a bank in Russellville after the time the government asserts the Muellers were killed. Defense counsel know only of one such person, Mary Reed. Ms. Reed was interviewed by defense counsel and her assertions were investigated. Ms. Reed was ultimately called as a defense witness at trial.

6.      Defense counsel is now aware that defendant Chevie Kehoe asserts that he met his father, Kirby Kehoe, at a truck stop on the Oklahoma/Arkansas border at the time the government asserts the Mueller family was murdered. Chevie Kehoe asserts that at this time his father, provided him (Chevie) Mueller property to be transported to Washington State. Defense counsel first heard of this assertion in conversations with Chevie Kehoe after the trial, at the time of the Buford McDonald hearings.

7.      In his motion, Mr. Kehoe asserts that trial counsel should have investigated more completely the sources of the $10,000 in cash used to purchase a motor home. During interviews with Mr. Kehoe before trial, Mr. Kehoe asserted that he obtained his income trading in cash at gun shows. Trial counsel knew of no way to trace funds earned in cash sales at gun shows.

8.      Defense counsel conducted an intensive investigation in an effort to locate and interview persons dealing with Bill Mueller at the time of his death. When these persons were interviewed they were, at least generally, questioned about the inheritance Bill Mueller had received shortly before his death. While the exact nature of the questioning varied, throughout the interviews an effort was made to determine all that could be determined about Mueller's use of the inheritance funds after they were received. These discussions often involve specific questions about those who have knowledge of the inheritance and how wide spread that knowledge was in the community.

9.      All statements, including the statements of Cheyne Kehoe, Kirby Kehoe and Gloria Kehoe, given to authorities and provided to trial counsel during the discovery process were reviewed thoroughly in an attempt to identify any statement that could be used to impeach trial testimony. Information from the statements was used extensively in the cross examinations of Cheyne Kehoe and Gloria Kehoe.

10.    Defense counsel personally, as well as investigators retained by defense counsel, exerted great effort to locate any person who could testify that the Muellers were alive after January 11, 1996. Potential witnesses who could provide this testimony were located and interviewed extensively. Numerous such witnesses were called to testify at trial.

11.    Trial counsel has no knowledge of Floyd Cochran. Trial counsel did locate numerous persons associated with the Midwest Bank robbers and activities at Eloim City. Mr. Cochran's name did not come up during the investigation of the Midwest Bank robbers or Eloim City.

12.    Defense counsel and investigators working with defense counsel investigated the issue whether Kirby Kehoe was in Arizona at the time the government asserted the Muellers were murdered. Numerous interviews indicated that there were many people who would assert that Kirby Kehoe was in Arizona at this time, although many of the persons interviewed were inexact when dating the time Kirby Kehoe was in Arizona.

13.    Gloria Kehoe's assertion that Kirby Kehoe had hatched a plot to hit Bill Mueller again was investigated. Gloria Kehoe was cross examined on the issue. Kirby Kehoe was interviewed by defense counsel regarding this issue.

14.    Trial counsel drove to the Mueller house. However it was determined that any effort to examine the house would be futile as the murders had occurred long before defense counsel became involved in the case and numerous persons had lived in the house in the interim from the Muellers' deaths to the time they were appointed to represent Chevie Kehoe.

15.    Defense counsel interviewed witness Tom Brown extensively at Mr. Brown's home in Clinton. Defense counsel also conducted an extensive interview of Mr. Brown in Little Rock.

16.    Defense counsel conducted extensive investigations in an effort to determine whether Cheyne Kehoe was provided information by investigators or prosecutors in an effort to be in a position to undermine Cheyne Kehoe's trial testimony.

17.    Kirby Kehoe's navy records were reviewed prior to trial.

18.    Defense counsel recognized that the whereabouts of Chevie Kehoe and Danny Lee on January 11, 1996 was a key issue in the trial.  An investigator was sent to Oklahoma to locate and interview potential witnesses.  One of Mr. Lee's attorneys also traveled to Oklahoma to interview some potential witnesses.  Information from these investigations was shared by all defense counsel.

19.    The filing of a motion for change of venue was considered by trial counsel.  It was trial counsel's belief that the best opportunity to obtain a favorable jury was in Little Rock rather than other locations in Arkansas.  There also appeared to be no grounds for a change of venue.

20.    Trial counsel knows of no exculpatory evidence withheld by the government.

21.    A mental health review for Chevie Kehoe was obtained after a petition was filed and funds obtained for this purpose.  Defense counsel also caused Mr. Kehoe to be interviewed by a minister/social worker who worked with white supremacists.  After reviewing the information obtained defense counsel determined they could present no mental health proof which would benefit their client at either the guilt/innocense phase or penalty phase of the trial.

FURTHER AFFIANT SAYETH NOT.

Mark R. Hampton

STATE OF ARKANSAS)
COUNTY OF PULASKI)

SUBSCRIBED AND SWORN to before me this 3rd day of ~~January~~ March, 2005.

_____
Notary Public

My Commission Expires: 3-19-2006

