IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA                    PLAINTIFF/ RESPONDENT

vs.                          NO: 4:97-CR-00243(02) GTE

DANIEL LEWIS LEE                                  DEFENDANT/MOVANT

MOVANT'S REPLY IN SUPPORT OF HIS 2255 MOTION
TO VACATE HIS CONVICTION AND SENTENCE OF DEATH

COMES NOW Daniel Lewis Lee ("Movant" or "Mr. Lee"), by his undersigned counsel,

and files this reply to the answer of the government's ("US Reply") opposition to Movant's

motion, brought pursuant to 28 U.S.C. § 2255, to vacate, set aside, and/or correct his convictions

and sentences of death.  Movant's counsel respectfully request that this Court schedule a status

conference in this matter at a mutually convenient time and date consistent with the Court's

schedule at which time the nature and scope of further proceedings, including the nature and

scope of an evidentiary hearing, may be discussed.

## A.    Introduction to the reply

The government's puzzlement regarding Mr. Lee's claims of innocence can be answered

simply and directly – there are enough disturbing elements regarding this prosecution so that no

one can confidently rule out the possibility that an innocent man has been convicted and

sentenced to death for a crime he did not commit.  The failings of counsel at the guilt-phase of

this case, especially as those failings allowed the government to establish the existence of an

enterprise that never existed – the illusive "APR" – went to the heart of the government's case.

Regarding the sentence of death, the United States now fiercely and hypocritically

1

defends that sentence, overlooking and ignoring its earlier position that, in light of co-defendant Chevie Kehoe's life sentence, a death sentence as to Mr. Lee would be a gross injustice.  Mr. Lee's sentence of death was imposed by a jury that weighed and balanced an aggravating factor – multiple murder – which did not exist at the time of the crimes.  The United States, albeit silently, concedes as much.  Neither trial or appellate counsel (and presumably the United States which charged the factor) recognized this fundamental flaw in the proceedings.  The pecuniary gain factor went virtually unchallenged by trial counsel and completely so by appellate counsel. The jury rejected the only remaining aggravating factor – substantial planning and premeditation – with regard to all three murders.

It is the case, therefore, that a properly-instructed jury would have found no statutory aggravating factor as to the murder of the two adults, thus requiring a life verdict, and only one as to the child, her particular vulnerability.  Thus re-structured, the sentencing calculus in this case would, to any reasonable degree of certainty, would have been vastly different.  After all, Mr. Kehoe's life had been spared a few days earlier by a jury that heard evidence that Mr. Kehoe had strangled the little girl because Mr. Lee had refused to.  Indeed, it is impossible to compare the death sentence received by Mr. Lee and the life sentence received by Mr. Kehoe – the leader and organizer of this alleged venture, who attempted the murder of police officers and, the government contends had killed before – with the death sentence received by the "faithful dog," Danny Lee.[1]

---

[1] *See* discussion *infra* of two recent cases applying *Furman v. Georgia* to reach the conclusion that a death sentence as to one defendant was irrational and arbitrary when compared to a life sentence garnered by a far more culpable co-defendant. *United States v. Littrell*, 02-cr-00938(CJC) (CDCA March 22, 2007); *Getsy v. Mitchell*, 456 F.3d 575 (6th Cir. 2006).

As set out in Movant's initial 2255 motion, and as will be further developed in the following pages, Mr. Lee is entitled to have his convictions and/or his sentence of death set aside.

**B.      Where do we go from here?**

The United States chides Movant's counsel for not having briefed his factual arguments to the degree that satisfies the government.  (US Reply at p. 26.)  The format of Movant's initial 2255 motion, however, conforms fully to the rules which govern these proceedings.  *See* Rule 2 (c) of the Rules Governing Section 2255 Proceedings for the United States District Courts. Movant's counsel agree that more extensive briefing is appropriate – either before or after an evidentiary hearing (preferably after so that the evidence adduced at such a hearing may be integrated to the law governing the claims presented) – and are prepared to brief their legal arguments more completely on any reasonable schedule.

**C.      Culpability-phase issues.**

**First Ground for Relief – Ineffective Assistance of Counsel at the Guilt Phase**

Movant has alleged that his trial counsel were ineffective for various acts or omissions at the guilt phase of his trial.  Doc.  1118 pp. 12-24.  In answering Movant's allegations of error, Respondent requests that an overly restrictive standard to be applied.  Respondent's description of the appropriate Sixth Amendment standard is erroneous in two regards.

First, Respondent intimates that this Court should not second guess "strategic decisions or exploit the benefits of hindsight."  US Reply p. 36 *citing to Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1991).  In sum, Respondent suggests that decisions of trial counsel are unchallengeable, and thus, attempts to jettison altogether the "reasonableness" requirement.

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a strategic decision must be "reasonable." In other words, a decision does not become unchallengeable simply because a choice was made, the decision only becomes constitutionally sufficient under *Strickland* after a reasonable investigation to discover available options and a reasonable choice is made from those options. *Strickland*, 466 U.S. at 691 ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations in investigation.") The Supreme Court swept away any confusion as to the above in *Wiggins v. Smith*, 539 U.S. 510, 523 (2003), where the Court noted that it is not that a decision had been made but "rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*." (emphasis in original)(citation omitted); *Skillicorn v. Luebbers*, 475 F.3d 965, 975 (8th Cir. 2007) (court assessed whether the decision was reasonable). *Cagle v. Norris*, 474 F.3d 1090, 1097 (8th Cir. 2007) (same).

Second, Respondent argues *Lockhart v. Fretwell*, 506 U.S. 364 (1993), modified the burden of prejudice imposed upon Movant to establish a *Strickland* violation. In reversing the Fourth Circuit, the United States Supreme Court rejected this precise argument in *Williams v. Taylor*, 529 U.S. 362 (2000). The test suggested by Respondent has been specifically rejected by the United States Supreme Court. This Court should refuse Respondent's invitation to apply the incorrect standard. Rather, this Court should apply the standard announced by the United States Supreme Court.

The United States Supreme Court has made it clear that inadequate assistance of counsel does not satisfy the Sixth Amendment. *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *McMann v.*

*Richardson*, 397 U.S. 759 (1970); *Reece v. Georgia*, 350 U.S. 85 (1955); *Johnson v. Zerbst*, 304 U.S. 458 (1938).  The failure to provide effective assistance is a fundamental constitutional error, which undermines the entire adversary process.  *Strickland*, 466 U.S. 668.

In *Strickland*, at 687, the Court, announced the standard to be applied when determining whether counsel is ineffective.  First, the defendant must show that counsel's performance was deficient.  *Id.* at 694.  In assessing counsel's conduct, this Court must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms."  *Id.* at 688.  The "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides."  *Id.*  In *Wiggins*, and more recently in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005),  the Supreme Court specifically cited the American Bar Association's 1989 "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" as a guide to "'determining what is reasonable.'"  *Wiggins*, 123 S.Ct. at 2537, quoting *Strickland*, 466 U.S. at 688.  The first prong of *Strickland* is met where, in light of all the circumstances of the case, counsel's "acts or omissions were outside the range of professionally competent assistance."  *Id.* at 690.  *See also, Burger v. Kemp*, 483 U.S. 776, 795 (1987).

Second, the defendant must show that "there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  *Id.*  This is not an outcome determinative standard.  *Id.* at 694.  Rather, the reasonable probability showing the defendant must make is a showing of "a probability sufficient to undermine confidence in the outcome" of the proceeding. The United States Supreme Court has stressed that "the adjective ["reasonable"] is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  In *Kyles*, the Court observed as follows:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id*.; *see also Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice").

As explained in *Strickland* itself:

> "[R]easonable probability of a different result" is thus less than a preponderance of the evidence. It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome."

*Strickland*, 466 U.S. at 693 (emphasis added). As noted in *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001),[2] where the court found ineffectiveness in a death penalty rape murder when "we think the chance of an acquittal would still have been significantly less than 50 percent; but it would not have been a negligible chance, and that is enough to require us to conclude that the lawyer's errors of representation were, in the aggregate, prejudicial."

In Movant's circumstances, the best procedure to address whether Movant has satisfied *Strickland* is to conduct a hearing. Counsel must be heard from to determine, as noted in *Strickland*, at 695, "the facts of the particular case, viewed as of the time of counsel's conduct." Otherwise, this Court's determination will more resemble an "post-hoc" assessment. *See Wiggins*, 539 U.S. at 526-27 (cautioning against courts to invoking "strategy" as a "post-hoc rationalization of counsel's conduct, [rather] than an accurate description of their deliberations.")

---

[2] The order to issue the writ was vacated following settlement by the parties. *Miller v. Anderson*, 268 F.3d 485 (7th Cir. 2001).

Alternatively, Respondent has secured an affidavit from two of Movant's previous trial counsel (Mr. Lassiter and Ms. Coleman) and from one of the co-defendant's trial counsel.  Movant requests the opportunity to subject these affidavits to adversarial testing.[3]

Based on the undeveloped record before the Court, the ineffectiveness claims cannot properly be analyzed pursuant to *Massaro v. United States*, 538 U.S. 500 (2003).  As noted in *Massaro*, at 505-506, IAC claims "ordinarily will be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial. The court may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance…In addition, the § 2255 motion often will be ruled upon by the same district judge who presided at trial. The judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial." (citations omitted).  Due to an undeveloped factual record on the IAC claims, this Court should withhold ruling on the IAC claims until conducting a hearing.

    A. *Counsel were ineffective in failing to locate, interview, effectively examine, or present witnesses.*

In order to make reasonable tactical decisions, the Sixth Amendment and contemporary standards place the onus and the impetus upon trial counsel to adequately prepare and put themselves in the position to make a reasoned decision.  In the guilt phase, numerous ABA Standards describe trial counsel's responsibility to investigate and prepare for trial:

GUIDELINE 10.7 – INVESTIGATION

---

[3] Movant notes that the affidavits did not address many of the allegations he raised.  Thus, the presumption from such omissions, if any, should be that trial counsel could not offer a reasoned

> A.    Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL

> A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.

In short, effective counsel must conduct a meaningful investigation to allow an adversarial challenge to the government's case. *See Groseclose v. Bell*, 130 F.3d 1161, 1169 (6th Cir. 1997).

To protect an accused's constitutional rights, defense counsel must conduct a reasonable pretrial investigation. Counsel has a duty to investigate all lines of defense or reasonably decide that a particular investigation is not necessary. *Strickland*, 466 U.S. at 691. Defense counsel "shall conduct a prompt investigation of the circumstances of the case and explore all avenues leading to finding relevant to the merits of the case. . . ." ABA Standards for Criminal Justice 4-4.1(a)(3 ed. 1993). At a minimum, a reasonable pretrial investigation includes interviewing the state's witnesses, as well as identifying and interviewing potential defense witnesses. *Lyons v. Luebbers*, 403 F.3d 585, 594 (8th Cir. 2005) ("Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories.") When defense counsel fails to interview witnesses or fails to conduct a reasonable pretrial investigation, defense counsel's actions constitute negligence, not trial strategy. *Wiggins*, 539 U.S. at 526, 527-28 (failure to investigate based on "inattention, not

---

basis for a decision, if any decision was made at all.

reasoned strategic judgment" is unreasonable, as is abandoning an "investigation at an unreasonable juncture, making a fully informed decision ... impossible.").

Counsel may neither shirk that responsibility nor delegate that responsibility. In Movant's case, his trial counsel failed to present numerous witnesses, or failed to seize upon opportunities of those witnesses that did testify, to raise a reasonable doubt in the mind of the jurors. Movant satisfies the prejudice prong due to the utter lack of evidence implicating him in anything especially the existence of an "enterprise." While the Respondent possessed a plethora of evidence implicating the bad acts of co-defendant Chevie Kehoe,[4] little if any evidence pointed to Movant. The Kehoe family was mutli-generational bad actors; however, just because the Kehoes were evil does not mean Movant should have been found guilty.

In *White v. Roper*, 416 F.3d 728 (8th Cir. 2005),[5] the court found trial counsel ineffective in failing to investigate and present exculpatory testimony of two witnesses in the guilt phase. The defendant was charged, along with two other men, who did not receive a death sentence, in a drug-related murder. While there were witnesses that connected the defendant to the other men,

---

[4] Indeed, Respondent's answer again taps the well that Chevie committed numerous bad acts and was the ringleader, and thus, Movant in large measure was an "after-thought." Tragically, the more egregious actor received the lesser sentence.

[5] *White* is not an a-typical ruling. Courts routinely find ineffective assistance of counsel for failing to investigate and present evidence supporting a defense. *See Grooms v. Solem*, 923 F.2d 88, 90-91 (8th Cir. 1991) (prejudice shown where evidence would have supported alibi defense and raised reasonable doubt about veracity and credibility of state's witness); *Chambers v. Armontrout*, 907 F.2d 825, 832 (8th Cir. 1990) (failure to present disinterested witness who would have supported defendant's claim of self-defense undermined confidence in outcome of trial); *Stewart v. Wolfenbarger*, 468 F.3d 338 (6th Cir. 2006) (Counsel ineffective in murder case, in part, for failing to investigate an exculpatory and potential witness); *Riley v. Payne*, 352 F.3d 1313 (9th Cir. 2003) (Counsel ineffective in an assault with a deadly weapon case for failing to investigate and present a witness supporting a defense theory of self-defense); *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003) (Counsel ineffective in burglary case for failing to interview and present the testimony of an exculpatory eyewitness).

no physical evidence connected the defendant to the crime scene. While the defendant did present evidence that the third man was not the defendant, two available witnesses supporting the defense were never interviewed.  In this instance, trial counsel's conduct was deficient because "counsel's investigation was too superficial." *Id.* at 732. "In other words, the presumption of sound trial strategy founders in this case on the rocks of ignorance, as in *Wiggins*." *Id.*

Similar to *White*, Movant faces a death sentence while the alleged main actor of the enterprise (Chevie Kehoe) faces a lesser sentence, another alleged member of the enterprise (Kirby Kehoe) has cut a deal and is currently a free man, and another alleged member of the enterprise (Faron Lovelace) simply had charges dropped.  Also similar to *White*, Movant's trial counsel did present a defense – just not as full as it should have been –as the below demonstrates.

1.    Kirby Kehoe

Trial counsel failed to present the testimony of Kirby Kehoe.  Trial counsel could have utilized Kirby to question the veracity of the Arizona alibi, emphasize the involvement of Kirby's sons (and not Movant), and bring forward evidence of his previous improper insurance fraud scheme with William Mueller.  The above emphasizes the Kehoe family's involvement and de-emphasizes Movant's role or involvement in any matter regarding the Muellers.

Respondent asserts that trial counsel had a tactical basis not to call Kirby.  The premise of Respondent's assertion is an affidavit from one of Movant's trial counsel that they were given "adequate time" to interview Kirby in the midst of trial and made the determination "it would not be helpful to the defense case." *See* US Reply Ex. 4 par. 1.  However, the affidavit omits

numerous important details, including, but not limited to: 1) when this interview occurred, i.e. when in the government's case were defense counsel required to decide whether to call a witness out of order, and what other trial responsibilities were then on the shoulder of counsel;[6] 2) how much time was actually provided for the interview; and, 3) were limitations placed on the substance of the interview given the presence of Kirby's lawyer.  The omissions and the remaining questions merit an evidentiary hearing for resolution.

Respondent's reliance on *Griffin v. Delo*, 33 F.3d 895 (8th Cir. 1994) fails.  While *Griffin* appears on its face to be somewhat controlling, *Griffin* does not present the same procedural posture or factual record.  In *Griffin*, at 900-901, 902, trial counsel provided sworn deposition testimony and the habeas petitioner had received an evidentiary hearing.  Thus, Griffin's former attorney's strategy decisions were subjected to and withstood the adversarial process in assessing reasonableness pursuant to *Strickland*.  Movant, as of yet, has not had that opportunity.

2.      Gloria Kehoe

Trial counsel failed to subject to recall Gloria Kehoe.  Trial counsel could have utilized Gloria to demonstrate two significant points.

First, provide testimony that Kirby hatched a plan to have a son kill another son. Respondent fails to see how this aides Movant's defense.  Such testimony would have been striking – given Cheyne's and Gloria's testimony that sacrificed one of their own and Movant.  It would have allowed defense counsel to argue the inference that Cheyne and Gloria, as per a previously acceptable family plan, have sacrificed one of their own regardless of his guilt.[7]

---

[6]  This is significant in assessing the reasonableness of the decision.

[7]  Recall, three witnesses testified Cheyne confessed to killing the Muellers. Tr. 6535-36 (Dino Giergedis); 6550 (James Harrison); 6568 (Robert Taylor).

Thus, their self-serving disavowment of knowledge regarding the Muellers and the alleged confessions were unreliable.

Second, Movant is not confused at all regarding Gloria's statement that Chevie and Movant remained in Arkansas after the Muellers' disappearances. This does not fit the government's timeline. Indeed, due to the evidence presented by the Government, such a statement is fatal to the government's case. It undermines Gloria's credibility as a witness – which is especially significant given that she alleged to have heard Chevie and Movant's confessions.

3.     George Eaton; 4.   Peter Langan;   5.   Micheal Brescia

Trial counsel failed to investigate and call the above witnesses. Eaton interviewed Mr. Mueller and noted Mueller's expressed fear of individuals (expressly indicating he feared for his life from Micheal Brescia) in the Christian Identity movement, including individuals from Elohim City, Oklahoma.

A victim's expressed fear is admissible. First, the statement, at the minimum, provides circumstantial evidence of Mr. Mueller's state of mind. Fed R. Evid. 803 (3). Mr. Mueller's state of mind is relevant to Movant's case and is reliable given that it was a contemporaneous recordation of Mr. Mueller's state of mind. *See United States v. Partyka*, 561 F.2d 118, 125 (8th Cir. 1977) (noting difference between immediate statement and a recollection of a past statement). Indeed, state of mind evidence is regularly used as substantive evidence of guilt. *See United States v. Hyles*, 2007 U.S. App. LEXIS 6450 (8th Cir. 2007) (used to establish intent to kill); *United States v. Dolan*, 120 F.3d 856 (8th Cir. 1997) (used to establish intent to plan and motive).

12

6. David Hill.

Trial counsel failed to investigate and call David Hill. Hill would have testified that he saw Paul Humphrey and another man through something off the bridge at the Illinois Bayou in January 1996. Respondent relies on the affidavit of Movant's trial counsel that in turn relied on Chevie Kehoe's attorneys to conclude Hill would not have provided "helpful evidence" to Movant's defense.

Respondent cites no authority for the proposition that Movant's trial counsel can defer their tactical decisions to an attorney representing a co-defendant. Further, the affidavits of trial counsel make no sense due to defense efforts to suggest at Movant's trial that Paul Humphrey was a substantial and alternative guilty party. *See e.g.* Tr. 2263 (Cross-examination of Dr. Charles Turner regarding Humphrey's acquisition of Mueller's jeep); Tr. 2345 (Randy Vincent)(same); Tr. 2727 (John Wright cross-examination regarding a gun transaction with Mueller when Humphrey was present);[8] Tr. 6131 (Glenn Jordan direct found guns and duct tape at Humphrey's place); Tr. 5880, 5882 (Aaron Duvall direct Humphrey did not want to let go of car titles; Mary Reid identified Humphrey as being with Muellers after their alleged disappearance); Tr. (5916-17) (Bobby Hulse direct regarding Humphrey's attempts to secure title to Mueller vehicle);
Indeed, no reasonable explanation exists for failing to present evidence that places the alternative suspect at the scene where the bodies are found when a chosen defense presented and argued to the jury (*see* Tr. 6906-6914) was that individual committed the offense.

Respondent's reliance on *Griffin*, 33 F.3d 895, is inappropriate. *Griffin* did not involve a

---

[8] Interestingly, the direct examination did not query as to who was present.

delegation of tactical decisions to a co-defendant's lawyers. And unlike in *Griffin*, at 900-901, 902, trial counsel testified and an evidentiary hearing was conducted to assess the reasonableness of trial counsel's decisions. Movant, as of yet, has not had the opportunity to subject any suggested tactical decision to an adversarial process.

7. Glen Hinson.

Trial counsel failed to investigate and call Glen Hinson. Hinson could have testified to two significant matters.

First, Hinson observed Paul Humphrey obtain the title of the Mueller's vehicle. Hinson observed a nervous and scared Paul Humphrey. Unquestionably, trial counsel tried to shift blame to Humphrey based upon his actions. This evidence corroborates this defense effort and could have corroborated his actions through the observations of disinterested witnesses. Hinson's testimony would further implicate Humphrey and thus could have impacted the defense rejected by Movant's jury.

Second, Hinson could report Mrs. Mueller's fear of Humphrey. Mrs. Mueller's state of mind regarding Humphrey is clearly admissible. *See* Fed R. Evid. 803 (3); *Partyka*, 561 F.2d 118. Indeed, as previously noted, such evidence routinely leads to the conviction of criminal defendants. *Hyles*, 2007 U.S. App. LEXIS 6450; *Dolan*, 120 F.3d 856. Mrs. Mueller's state of mind, fear of Humphrey, is of benefit to the pursued defense at trial that Humphrey was involved in the Mueller killings.

8. Eldon King.

Trial counsel failed to investigate and call Eldon King. King could have testified as to Humprhey's odd behavior after the Mueller's disappeared. This evidence corroborates the

defense effort to shift blame to Humphrey based upon his actions before and after the crime. While Respondent asserts somewhat flippantly that Humphrey started acting strange long before the Mueller's disappearance,[9] it does not change the observed change in behavior made by King. Again, this benefits Movant in that it supports the pursued defense that Humphrey committed the offense, not Movant.

9.   Maria Ahrens.    10.    Vernon Ahrens

Trial counsel failed to investigate and call both Maria and Vernon Ahrens.  Both could have testified that they had contact with the William Mueller the Thursday after the Mueller's were reported to have disappeared.  Respondent admits Mrs. Ahrens was never interviewed by the government.

Movant's case is similar to that of *Lord v. Wood*, 184 F.3d 1083 (9th Cir. 1999), where the court found counsel ineffective in capital trial for failing to present testimony of three witnesses who stated that they had seen the murder victim the day after the defendant allegedly murdered her.  The basis behind *Lord* at 1094-1095, was that:

> Holden, Huff and Ayers's mutually reinforcing statements were probably the strongest evidence of Lord's innocence that trial counsel could have offered. The case they actually presented consisted solely of attacks on the reliability of the State's physical evidence and the credibility of its witnesses; they presented no contrary physical proof, no satisfactory explanation of the inconsistencies in Lord's statements about his whereabouts on the evening of Tracy's disappearance and, perhaps most importantly, no alibi. Holden, Huff and Ayers, three young men with no ties to Lord and with no reason to lie, could have given Lord a formidable defense: The victim was seen walking around well after the time Lord was supposed to have killed her. Had the jury believed the boys' testimony, Lord's suspicious behavior on the evening of September 16th could have been seen as odd but hardly indicative of murder. Similarly, his efforts to

---

[9]  To the extent Respondent relies on evidence outside the current record, Movant requests access to the same.

> influence testimony might have been dismissed as an innocent man's desperate attempt to concoct an alibi. This would have left Lord's jail-house confessions to witnesses who had been partially impeached and, in any event, were subject to doubt because of their evident self-interest in pleasing the prosecution. Presenting the testimony of the boys would not have entailed significant costs in terms of the defense strategy. Ness and Mandel conceded that the boys' statements dovetailed with their defense and would not have opened the door to any damaging evidence. Nor would the proffer of three witnesses, who were unrelated in any fashion to the defendant or the victim, have tainted Lord's attorneys. The jury might have believed the boys were mistaken, but certainly would not have thought that counsel was presenting manufactured testimony.

Finally, it simply is not a circumstance where a single person viewed the Muellers after their alleged disappearance.  Other witnesses could corroborate the disinterested witnesses, the Ahrens.  *See Montgomery v. Petersen*, 846 F.2d 407, 414 (7th Cir. 1988)(A common sense observation that "independent corroboration by a neutral, disinterested witness would perforce be extremely significant.").  A school teacher, Janis Rowlands, saw them on either February 2 or February 3.  Tr. 5800.[10]  Lucy Carr and Sue Sullivan also saw him in February.  Tr. 5812; 5817-18.  Ron Greer saw Bill Mueller close to the time a February news article appeared.  Tr. 5852-53. Mary Reid, a family friend, saw them the first week of February at a bank.  Tr. 5857.

11. Pam Wrappe.

Trial counsel failed to investigate and call Pam Wrappe.  Wrappe could have corroborated the trial testimony of Susan Weaver and Betty Gray that the Muellers were seen at Walmart after their alleged disappearance.  This again deconstructs the Government's timeline; and, absolutely absolves Movant of guilt.

Respondent's main contention is that Weaver and Gray did not unequivocally affirm their

testimony, and were effectively crossed. As a result, Movant's allegation only supports the government.

Respondent assumes too much. Weaver did indicate she spoke with Mr. Mueller when he made a uniquely large water purchase. Tr. 5832. While she could not recall the exact date (Tr. 5833), a receipt for a large water purchase corroborates Weaver's testimony. Tr. 6364 (receipt dated 1/22/96). She further testified that a flyer about their disappearance could not be true because she had just seen Mr. Mueller. Tr. 5835.

The same holds true for Gray. While Gray did vacillate as to when she saw the Mr. Mueller, she testified that their discussion was **after** work had been done at Walmart. *See* Tr. 5823, 5829. Gray indicated it was possible she saw him after the 12th, but could not provide an exact date. Tr. 5830.

Movant fails to see how an individual's vacillation assists the government in the context of his allegation of error. To the extent the government "scored points" on cross, it became even more important for defense counsel to secure further testimony supporting their point. Such testimony was available in the person of Pam Wrappe. Respondent's ability to cross effectively made it even more important for defense counsel to get corroborating evidence from other disinterested witnesses. Thus, Wrappe could have corroborated Weaver and Gray's testimony. The failure to present Wrappe constituted the ineffective assistance of counsel. *See Lord*, 184 F.3d 1083.

        12. The Hollabuaghs.

---

[10] Ms. Rowlands indicated it was her recollection that it was a snow day. A stipulation corroborated her recollection; school had been canceled on February 2 due to inclement weather. Tr. 6080.

Trial counsel failed to investigate and call David and Dr. Denise Hollabaugh.  They could have reported Mrs. Mueller's statements they were leaving town sometime soon.  This corroborates the defense that the Mueller's were in fear of individuals and intended to "get off the grid."

13. Earlene Branch.

Trial counsel failed to investigate and call Earlene Branch. Mrs. Branch observed her daughter, Nancy Mueller, as nervous, upset and not very talkative before her disappearance. This observation is significant in that it demonstrates her fear and in conjunction with other evidence not presented implicates a known threat (Humphrey and/or potentially others from Oklahoma) as opposed to Movant.  This observation would have had particular weight with a jury because it was a maternal observation.

Further, Mrs. Branch indicated she heard William Mueller's distinctive cough in February 1996, when she was at the home of Sylvia and David Mason.  The fact that the mother of a victim heard her son-in-law approximately three (3) weeks after he is alleged to be dead is not something to be easily discredited.

14. Kelly Kramer.   15.  Faron Lovelace…16.  Norda Lewis…17. Jeff Brown

Trial counsel failed to investigate and call each of the above as to the existence of the "APR."[11]  Each would have testified unequivocally that no such enterprise existed.  Respondent asserts that the matter is "trivial."  Nothing can be further from the truth.

If no enterprise exists, then there is no basis for the federal death penalty.  Indeed, the

---

[11] Three different names are purported to be behind the acronym "APR:" Aryan People's Republic, Aryan People's Resistance, or Aryan People's Revolution.  The fact the government

government would have been unable to inflict a death verdict upon Movant.  Respondent's own response demonstrates the paucity of evidence as to the APR enterprise noting that the alleged ringleader did not even have a consistent name for the alleged enterprise.  US Reply p. 12 n. 5.

Specifically as to Lovelace, Respondent asserts defense counsel made the correct call in not calling him due to his mental instability.  However, defense counsel did not provide any insight as to whether a limited presentation of Lovelace as to the existence of the APR was considered.

Unquestionably, defense counsel argued the lack of existence as to the "APR."  Instead of relying on cross-examination and argument, counsel could have presented affirmative evidence that such an organization did not exist.

17. Jeff Brown

Trial counsel failed to adequately question Jeff Brown.  Brown could have testified regarding Movant and Chevie's arrival at the Shadows Motel in Spokane, WA.  Specifically, Brown would indicate that they arrived either late on January 12, or early morning January 13.  This eviscerates the timeline needed by the government to obtain Movant's conviction.  Further, Brown's potential testimony would corroborate the trial testimony of Vada Campbell that Movant was at the Shadows Motel on January 13.  Tr. 5953-5954.

Respondent counters that none of the interview summaries prepared by the Government contain this information.  Respondent relies on the affidavit of Agent Jordan.[12]  However,

---

could not pin down a name demonstrates the lack of a then existing enterprise at the time of the Muellers' disappearances.

[12] Its unclear from Agent Jordan's affidavit if the government has created a scanable database of all statements which allowed the computer search.  Further, the search, according to Agent Jordan's affidavit, related to Chevie Kehoe's presence not Movant's.

Respondent did not indicate if Brown was asked specifically regarding late on January 12, or early morning January 13. Further, unless the witness interviews are all signed, then it would be improper to rely upon them, especially absent some adversarial process.

18. Angela Holdermann.

Trial counsel failed to investigate and call Angela Holdermann. Holdermann could have testified regarding an individual's presence in the Mueller's home immediately before the Government alleges they disappeared. Respondent alleges this evidence would be "useless on its face." An individual's presence at a home where the residents disappear and later turn up dead is not useless on its face. Rather, it is relevant evidence, particularly when the name provided a witness does not fit the government's theory of the case.

19. Jack Price

Movant stands on his initial pleading with the following exception. While Movant may have mistakenly referred to convictions, the distinction is irrelevant given Price's testimony that all of his "offenses" were of a certain type. This is inaccurate because he had other offenses of armed robbery and assault.

B. *Counsel were ineffective in failing to cross-examine the Wankers on the fact they had received compensation from the government.*

Respondent does not dispute that the Wankers received consideration. Thus, defense counsel were ineffective in failing to cross-examine and impeach the Wankers regarding the consideration received for their testimony. *See Catalan v. Cockrell*, 315 F.3d 491 (5th Cir. 2002) (Counsel ineffective in an aggravated assault case, in part, for he failing to impeach the alleged victim).

Respondent seeks to dampen the effect of the consideration by relying on a 2007

executed affidavit from ATF Agent Glen Jordan explaining why the Wankers were paid (alleged

fear) and attaches the paperwork.  The paperwork is not consistent with the explanation offered

by Agent Jordan.  The paperwork describes the request as "informant subsistence" and in the

"explain/justification" section reads *in toto* "subsistence for CI 134 covering 1/20, 1/21, 1/22,

1/23/98 at $50.00 per day."  Absolutely no mention in the justification of the need for security or

the danger to the informant.  The best record for the basis of the compensation would be the most

contemporaneous request.

During the Wankers testimony, they never characterized themselves as "informants."

Indeed, the government wrongly presented them as disinterested witnesses.  Even at closing

argument, the government seized upon their status as individuals receiving no consideration.

This was not true in two regards.   According to Respondent's own paperwork, the

Wankers were (1) compensated and (2) classified by the government as informants.  Thus, every

government witness that testified as to alleged statements by Movant received some form of

consideration.  Consideration is unquestionably a matter to be considered as impeachment

evidence by a jury.  *See Giglio v. United States*, 405 U.S. 150 (1972).

   C. *Counsel were ineffective for failing to object to the government's pre-trial motion to bar*
      *Movant access to discovery.*

Respondent accuses Movant of "distorting" the record in presenting his allegation of

error.  He does nothing of the kind.  The record establishes the following:

   The government provided discovery prior to trial;

   The government moved to limit Movant's access to the discovery provided;

   Movant's attorney at the hearing, Attorney Coleman, did not lodge a single objection or
   subject the government's request to adversarial testing; and,

21

Attorney Coleman did such outside of the presence of Movant and Movant's other counsel.

This is not a distortion of the record – it simply is the record.

As noted herein, Attorney Coleman labored under an actual conflict where she had pursued and had been offered preliminarily a job with the local USA office. Thus, her failure to object and subject the government's motion to an adversarial testing satisfies the prejudice standard of *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Alternatively, the failure to object impinged upon trial counsel's ability to consult with Movant and prepare for trial.

Finally, Respondent suggests a slippery slope that if trial counsel had objected *Jencks* material would not have been disclosed. In arguing such, Respondent recognizes the reality that "this would have crippled the ability of defense attorneys to timely prepare for trial." US Reply p. 45. Thus, Respondent suggests that if trial counsel had sought to protect their client's rights, the penalty imposed by the government would have been to withhold discovery and cripple any ability to be prepared. This violates the constitutional principles of *United States v. Jackson,* , 390 U.S. 570, 582-83 (1968), wherein the Court prohibited the "needless penaliz[ing of] the assertion of a constitutional right." *See also Dawan v. Lockhart*, 31 F.3d 718, 721 (8th Cir. 1994)(In the context of a *Cuyler* claim noted "A defendant should not have to choose between his right to effective assistance of trial counsel and his right to call a witness in his defense.")

In conclusion, Attorney Coleman did not act as counsel due to her conflict and did not subject the government's motion to an adversarial process. Alternatively, Movant was denied of his right to consult with his attorneys. Finally, this Court should reject respondent's invitation to penalize Movant for pursuing his constitutional rights to have conflict free counsel and consult with his non-conflicted counsel.

22

    *D. Counsel were ineffective in failing to object to the government's exemption from18 U.S.C. § 3432 and failed to object when the witnesses testified.*

Respondent wrongly suggests the standard of review to apply is that of either abuse of discretion and clearly erroneous.  However, the correct test to apply is the deficiency and prejudice test from *Strickland*.  Because Movant had placed this allegation of error under the heading of ineffective assistance of counsel, there can be no doubt this was the test to which he requested the claim be subjected.

Respondent states "Lee had a history of attempting to induce associates to harm witnesses."  Respondent relies again on a motion not challenged by Movant's conflicted attorney now working for the government and a subsequent *ex parte* hearing where the government failed to present sworn testimony.  This statement without citation and never subjected to an adversarial testing simply is not enough to overcome 18 U.S.C. § 3432.

Respondent alleges because Movant received the witnesses days before they testified, he cannot "possibly establish any prejudice."  This cannot be reconciled with the earlier statement that failure to provide discovery prior to trial would "cripple" any defense.  Further, Respondent fails to explain how Movant's counsel could properly prepare for witnesses during a lengthy trial. The best source for this information, of course, is defense counsel, who should be heard from by this Court at an evidentiary hearing.

    *E. Counsel were ineffective in not requesting and conducting MTdna testing.*

Respondent wrongly equates a decision made by an adversary's investigator and imputes that to Movant's counsel.  Setting aside that nothing in the record suggests Movant's trial counsel deferred their decision making process to Agent Jordan, undersigned counsel have contacted the lab and the testing permitted by this Court is ongoing.

F. *Counsel were ineffective in adopting a jury selection strategy that emphasized seating African-American jurors.*

Respondent oversimplifies Movant's arguments describing them simply as Movant possessing "offensive and abhorrent white supremacist views." The omitted portion of Movant's claim are the racially insensitive and inflammatory tattoos visible on a daily basis on Movant's person, as well as the substantial evidence of the racially insensitive and inflammatory tattoos on other parts of Movant's body published to Movant's jury.

Respondent relies on Attorney Hampton's affidavit from Chevie's case regarding his reasoning for the strategy. However, Chevie does not have any tattoos; consequently the same tactical basis did not inform Attorney Hampton's decision. While this may explain the disparity in sentences for the clean-cut defendant, as opposed to the racially insensitive and inflammatory tattooed Movant, it does not explain a reasonable basis for Movant's counsel to pursue such a strategy.

Indeed, in spite of obtaining an affidavit from Attorney Lassiter, Respondent could not obtain an agreement with Attorney Hampton's strategy decision. This omission establishes that no such strategy basis informed Movant's trial counsel's decisions.

In addition, the basis of the strategy decision is inherently racial. It assumes racial proclivities as to beliefs and tendencies, which in turn discriminates against whites. Finally, assuming the correctness in relying on racial stereotyping, it is simply unreasonable to rely on such racial stereotypes when representing an individual that demeans and discounts (in ideology with physical tattoos as a daily reminder) the race the attorneys seek to favorably exploit.

G. *Attorney Lassiter was ineffective and breeched his duty of loyalty to Movant when he testified in opposition to a request to disqualify the United States Attorney and failed to inform Movant that his former attorney was going to work for the United States Attorney.*

24

*H.  Ineffective assistance of counsel for failing to file a separate motion to disqualify the United States Attorney and/or failing to join co-defendant Kehoe's motion to disqualify.*

Movant's allegations are not "preposterous."  Movant's former counsel choose the interests of his former employee over his client's.  Movant's counsel owed a duty of loyalty to Movant and violated that duty in testifying in the interests of his former employee who unquestionably suffered from an actual conflict during her representation of Movant.

Respondent asserts Movant must show that he would not have been convicted.  This simply is not the standard to be employed and demands too much of Movant.  For instance, in *Blankenship v. Johnson*, 118 F.3d 312 (5th Cir. 1997), the court reversed when Appellate counsel had a conflict of interest that adversely affected representation in a discretionary appellate review process. Defendant was convicted of aggravated robbery. On intermediate direct appeal, the conviction was reversed. By the time of the reversal, counsel had been elected as county attorney but did not withdraw or inform the defendant. The state sought discretionary review, which was granted, and the defendant's conviction reinstated without response from counsel, who was aware of the proceedings. Counsel had an actual conflict because he was serving as a prosecutor. The adverse affect was clear because counsel did nothing and did not even inform his client that he was no longer representing him until after the defendant's conviction had been reinstated.

Movant's case exceeds *Blankenship*.  The actual conflict in Movant's case occurred at trial, and therefore the responsibilities of counsel are more pronounced than a discretionary appeal.  Similar to *Blankenship*, Movant's conflicted counsel did nothing at a pretrial conference outside of his presence (after accepting employment with the adversary) which thereafter limited

Movant's right to access to discovery. Thus, Movant can demonstrate an active representation of conflicting interests and that the conflict adversely affected performance. Because Attorney Coleman accepted employment prior to ending her representation of Movant, the first prong is met; the second prong is demonstrated by her inaction at a hearing after accepting employment.

As previously noted, the following facts cannot be disputed.

The government provided discovery prior to trial;

The government moved to limit Movant's access to the discovery provided;

Movant's attorney at the hearing, Attorney Coleman, did not lodge a single objection or subject the government's request to adversarial testing;

Prior to the hearing, Attorney Coleman had accepted an offer of employment from the prosecuting office; and,

Attorney Coleman did such outside of the presence of Movant and Movant's other counsel.

Contrary to Respondent's statement, grounds do exist to disqualify the prosecution team. Further, and setting aside Mr. Stripling's flattery, Mr. De La Cruz would also have been subject to disqualification based upon the above actual conflict.

To be clear, Movant does not suggest Mr. Lassiter should have answered any question under oath in a non-truthful matter. Movant's point is that his attorney should never have placed himself in that position in the first place. It was Attorney Lassiter's failure to be forthcoming with Movant, Attorney Compton and the co-defendants that led to Attorney Lassiter being called as a witness and offering his opinion as to whether Attorney Coleman's future acts would comport with his past knowledge of her character. Respondent omits that the dishonesty involved a failure to disclose an actual conflict to a client – so much so that the same information was withheld from co-counsel. The dishonesty involved allowing a conflicted counsel to

26

conduct a hearing that limited Movant's access to discovery materials when the conflicted co-counsel at the hearing failed to subject the government's request to any adversarial testing.

Movant objects to Respondent's contention that having a conflicted attorney work on his case "was clearly to everyone's benefit." While Movant agrees to the limited extent if Respondent included the government in the definition of "everyone," Movant is aware of no legal authority that holds that a conflicted attorney may work on your case – then leave for the adversary and that the work conducted while under the conflict was to the former client's benefit.

Rather, the Sixth Amendment guarantees defendants effective assistance of counsel. "The Sixth Amendment right to counsel has been interpreted to provide for representation that is 'free from conflicts of interest or divided loyalties.'" *United States v. Reed*, 179 F.3d 622, 624 (8th Cir. 1999) (*quoting United States v. Acty*, 77 F.3d 1054, 1056 (8th Cir. 1996)). This principle was unquestionably violated in Movant's case.

I. *Inadequate safeguards to prevent the deliberate or inadvertent disclosure of privileged or confidential information when Ms. Coleman joined the United States Attorney's Office.*

Movant requests a hearing as to the adequacy of the safeguards. Respondent submitted an affidavit from Ms. Coleman. Ms. Coleman's affidavit contains knowledge as to the whereabouts of the prosecution team. Thus, Ms. Coleman's affidavit on its face demonstrates personal and first-hand knowledge, and thus, no formal "wall" had been constructed and that she was not shielded from all information. Ms. Coleman's affidavit sheds absolutely no light on the actual "wall" put into place. Unlike at the time of trial, undersigned counsel want to subject this self-serving affidavit to an adversarial process, as well as, compel the specifics from the United

27

States Attorney's Office as to how, when, and who set up the "wall," and how that "wall" was maintained, and continues to be maintained.

*J.  Ineffective assistance of counsel regarding the two searches.*

Respondent does not contest the multiple searches at locations which yielded differing results.  Further factual development needs to occur regarding these circumstances that can challenge the reliability of the evidence discovered.

*K.  Counsel were ineffective in failing to object to improper prosecutorial argument.*

"One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review."  (2003 ABA Guideline10.8 (citation omitted)).  There is a "heightened need to fully preserve all issues for later review" in a capital case.  *Id*.  Thus, trial counsel have a responsibility to object to improper arguments made by the prosecutor.

Indeed, trial counsel had an obligation to ensure that Movant received a fair trial. *Strickland*'s duty to advocate and employ "skill and knowledge" includes the necessity for trial counsel to object or otherwise preserve federal issues for review.  *See, e.g., Groseclose v. Bell*, 895 F. Supp. 935, 956 (M.D. Tenn. 1995), *aff'd* 130 F.3d 1161 (1997); *Gravely v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996); *Starr v. Lockhart*, 23 F.3d 1280, 1285 (8th Cir. 1994); *Cf. Freeman v. Lane*, 962 F.2d 1252, 1259 (7th Cir. 1992) (appellate counsel ineffective for abandoning viable federal claim).  Failure to object to these instances of prosecutor misconduct allowed the government to bring improper evidence before the jury and to make improper argument to the jury.  Trial counsel were ineffective in failing to protect Movant's rights by objecting to the alleged instances of misconduct.

Prosecutorial misconduct is reversible error when the prosecutor's remarks are in fact improper and such remarks have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. *United States v. Hernandez*, 779 F.2d 456, 458 (8th Cir. 1985). A new trial is required if that misconduct taken in the context of the entire trial prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial. *See United States v. Grassrope*, 342 F.3d 866, 871 (8th Cir. 2003); *United States v. Cannon*, 88 F.3d 1495, 1502 (8th Cir. 1996); *United States v. Malone*, 49 F.3d 393, 398 (8th Cir. 1995);

There are three factors that the courts usually consider to determine the prejudicial effect of prosecutorial misconduct: (1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the trial court. *See United States v. Singer*, 660 F.2d 1295, 1305 (8th Cir. 1981).

In Movant's case, the government made five (5) improper arguments not objected to by Movant's counsel: 1) arguments regarding Cheyne being threatened by an Aryan; 2) arguments that Kirby not involved because Movant present (premised upon Gloria's hearsay); 3) arguments that Movant is a faithful dog; 4) arguments attributing a statement to Movant that Mrs. Mueller was a "dumb bitch"; and 5) argument referencing Kirby's guilty plea to the enterprise. As to each of the above improper arguments, trial counsel failed to object– thus, the jury's unfettered consideration of the improper arguments worked to Movant's actual and substantial disadvantage. *Cf. Antwine v. Delo*, 54 F.3d 1357, 1363 (8th Cir. 1995) (court should examine what defense counsel did to minimize prejudice from prosecutor's closing argument to determine if trial infected with constitutional error).

As noted in *Burns v. Gammons*, 260 F.3d 892, 896 (8th Cir. 2001), "given the lack of a

29

sufficient objection, the trial court issued no cautionary instruction leaving the jury free to consider this highly improper factor in determining guilt and fixing sentencing." *Id.* at 896 *citing cf. United States v. Wadlington*, 233 F.3d 1067, 1080 (8th Cir. 2000) (defendant not prejudiced by prosecutorial misconduct during trial where district court gave appropriate cautionary instructions). Had counsel objected and prompted a curative instruction from the trial court, the court could have given an appropriate cautionary instruction to the jury.  The Eighth Circuit noted, "At trial, the failure of trial counsel to elicit a cautionary instruction from the judge allowed the jury to consider counsel's argument without riposte. A cautionary instruction would have lessened, if not eliminated, the prejudice to Burns."  *Burns,* at 896 *citing see, e.g., United States v. Emmert*, 9 F.3d 699, 701-02 (8th Cir. 1993) (defendant not prejudiced by improper prosecutorial comment on witness veracity during closing argument where district court gave appropriate cautionary instructions).

While each of the above arguments are improper, Movant starts with the most serious misconduct.  The government mentioned Kirby's guilty plea to the existence of the enterprise in spite of the fact that Kirby never testified.  This is an overwhelming error and improper.  *See United States v. Dougherty*, 810 F.2d 763, 767-768 (8th Cir. 1987).  As noted by the Tenth Circuit:

> A codefendant's guilty plea may not be used as substantive evidence of a defendant's guilt . . . . If the codefendant testifies, however, either the government or the defense may elicit evidence of a guilty plea for the jury to consider in assessing the codefendant's credibility as a witness . . . . Because of the potential for prejudice, cautionary instructions limiting the jury's use of the guilty plea to permissible purposes are critical.

*United States v. Baez*, 703 F.2d 453, 455 (10th Cir. 1983)(citations omitted).  A reference to previous guilty pleas or guilty verdicts concerning codefendants or coconspirators without

cautionary instructions to the jury prejudices the defendant. *United States v. Smith*, 806 F.2d 971 (10th Cir. 1986) (prosecutor); *United States v. Austin*, 786 F.2d 986 (10th Cir. 1986) (prosecutor); *Baez*, 703 F.2d 453 (judge).

Respondent suggests that the mentioning of the plea was trivial and only intended to make the point that "several people joined" the organization. This misses the point and demonstrates the purposefulness of the error. Respondent sought to demonstrate the size of an enterprise via a guilty plea that a reasonable juror would understand established the existence of the organization -- the ultimate question for which the jury was supposed to be seated. Thus, , counsel were ineffective in failing to object.

Further, the express language used by the government belies the benign purpose alleged above. Specifically, the government argued: "Kirby Kehoe was involved in the enterprise. Kirby Kehoe is not present today, because you've already been informed Kirby Kehoe pled guilty to Racketeering Count 1 for his role and his participation **in this criminal organization**." Tr. 6823 (emphasis added). In sum, Kirby pled for his role in an existing enterprise, "this organization" the jury was currently considering. This is particularly egregious when so little evidence pointed to the existence of an enterprise.

For similar reasons, the government's reliance on Kirby's hearsay through Gloria is flawed. The substance of the argument was that Kirby "did not want to play" in this aspect of the enterprise. While it came out on direct for an alleged different purpose (US Reply p. 57 (according to Respondent to impeach Gloria)),[13] the government then utilized that evidence to

---

[13] By no means does Movant concede the admission of Kirby's hearsay, then as argued to the jury as substance evidence, does not violate the principles of *Bruton v. United States*, 391 U.S. 123 (1968) and *Crawford v. Washington*, 541 U.S. 36 (2004).

demonstrate an enterprise and a plan –the source of which was a non-testifying co-defendant that pled guilty to the enterprise.  Once the government manipulated the actual testimony and its purpose into substantive evidence of an enterprise at closing regarding a non-testifying co-defendant, who had pled, counsel should have objected.

Further, it was error for the government to argue as fact to a jury Cheyne's reporting that a guard told him of an alleged attempted attack on him.  It simply is not admissible evidence and should not have been argued as such to the jury.

In addition, it is not trivial to argue to a jury that a defendant referred to a murder victim as a "dumb bitch" when no such statement had been made.  Such a reference, in addition to being a misstatement of fact, is incendiary to the highest level – few things if any can be more prejudicial than falsely accusing a defendant of engaging in name calling of a murder victim.  In the same vein, it is inappropriate to call Movant names as well.  While Respondent appears to sarcastically suggest it is a revered compliment, it is not and it violates the principles of *Darden v. Wainwright*, 477 U.S. 168 (1986).

**D.    Penalty-phase issues**

1.    The factors relating to multiple murder and pecuniary gain

With regard to the murders of the adult victims, the jury was presented with three potential statutory aggravating factors: substantial planning; multiple-murders; and pecuniary gain.  The jury did not find substantial planning.  The government concedes, albeit without ever saying it out loud, that the multiple-murder factor was improperly submitted to the jury since it was not enacted as a statutory aggravating factor until several months after the date on which the

United States claims the murders occurred, January 11, 1996.[14]  The significance of this factual

posture is that if Movant is legally correct, then the sentences of death he received as to William

and Nancy Mueller must be vacated as unsupported by *any* statutory aggravating factor.[15]  The

sole remaining statutory aggravating factor as to the child, Sarah Mueller, would remain, but the

balancing undertaken by the jury is likely to have been skewed substantially by factors not

properly before it with regard to the child.  It must also be remembered that the undisputed

evidence was that Chevie Kehoe, whose life was spared by the same jury that sentenced Movant

to death, killed young Sarah because Movant would not.

In urging this Court to ignore the harm done to Movant's case by the submission of two

invalid statutory aggravating factors, and the evidence which supported each factor, the

government relies on *Brown v. Sanders*, 546 U.S. 212, 126 S.Ct. 884 (2006).[16]  In doing so,

however, the government seriously misstates the holding of that case.  *Brown* does *not* hold that

---

[14]  Trial counsel raised no challenge to the multiple-murder factor and only, at best, a desultory challenge to the factor alleging pecuniary gain.  Appellate counsel challenged neither factor.  Thus, whether this is a case of ineffective assistance of trial counsel, appellate counsel, or some combination of both, the bottom line is that Movant was denied the right to the effective assistance of trial and/or appellate counsel.

[15]  In order for a jury to return a sentence of death, the federal death penalty requires the finding of at least one statutory aggravating factor.  *See* 18 U.S.C. § 3593(d), which states, "If no aggravating factor set forth in section 3592 is found to exist, the court shall impose a sentence other than death authorized by law."

[16]  The government also cites to *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003).  In *Higgs*, the Fourth Circuit found that reliance on the multiple-murder statutory factor violated Appellant's rights under the *Ex Post Facto* Clause.  353 F.3d at 319.  Nevertheless, the submission of the aggravating factor was found harmless.  *Higgs* pre-dates *Brown v. Sanders* and, therefore, its discussion of this issue cannot be viewed as persuasive or even relevant authority.  Indeed, *Higgs* ignored controlling Supreme Court precedent by not citing or discussing *Stringer v. Black*, 503 U.S. 222 (1992), the case overruled in 2006 by *Brown*.

the submission of an improper aggravating factor is harmless error whenever the jury finds the

existence of another aggravating factor.  (US Reply at p. 62.)  Instead, *Brown* stands for the quite

different proposition that where one or more improper aggravating factors are submitted to a

penalty jury for weighing, "[T]he death sentence must be set aside if the jury's consideration of

the invalidated eligibility factor allowed it to hear evidence that would not otherwise have been

before it." *Brown v. Sanders*, 126 S.Ct. at 891.  The most common example of this, in the

Supreme Court's view is where, "[T][he aggravating factors *added* to the eligibility factors a

category (such as an omnibus 'circumstances of the crime' factor which is quite common) that

would allow the very facts and circumstances relevant to the invalidated eligibility factor to be

weighed in aggravation under a different rubric." *Id.* at 890 (emphasis in original text).

There is, of course, no such "omnibus factor" in the federal death penalty.  Neither may it be said

that the evidence of multiple murder was properly before the jury as relevant to any of the

remaining aggravating factors.  Thus, and as noted by Justice Scalia:

> We think it will clarify the analysis, and simplify the sentence-invalidating factors we have hitherto applied to non-weighing States, see *supra*, at ____ - ____, 163 L. Ed. 2d, at 733-734, if we are henceforth guided by the following rule: An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances…If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the rule we apply here.  See *supra*, at ____, 163 L. Ed. 2d, at 732; see also n 6, this page, 163 L. Ed. 2d, at 733.

*Brown*, 546 U.S. at ____, 126 S. Ct. at 893 (footnotes omitted).

Moreover, *Brown* sets out the constitutional boundaries of what takes place where an

invalid aggravating factor or factors is submitted to a jury under a myriad of state court capital

schemes.  *See Rousan v. Roper*, 436 F.3d 951 (8th Cir. 2007) (applying *Brown* retroactively to

habeas proceeding).  Here, this Court is simply interpreting and applying a federal statute and

need not find that the constitution has been violated so long this Court finds that Movant's

sentence of death was returned in violation of the laws of the United States.  Thus, this Court

could reasonably interpret the Federal Death Penalty Act as requiring a re-sentencing whenever

an invalid aggravating factor is submitted to a jury.  Moreover, this Court may also properly take

into account the equities of the situation, since the United States noticed and argued to the jury a

statutory aggravating factor that simply did not exist at the time these murders occurred.

To summarize, *Brown* would permit the jury to consider the factual circumstances of the

multiple murders and pecuniary gain factors as to the murder of Sarah Powell only if that

evidence was relevant to the remaining statutory aggravating factor as to her particular

vulnerability as a child.  Plainly, none of that evidence bore remotely on that issue.  Accordingly,

properly applying *Brown v. Sanders*, "[T]he death sentence must be set aside [since] the jury's

consideration of the invalidated eligibility factor[s] allowed it to hear evidence that would  not

otherwise have been before it."[17]  The same result is true if only the multiple-murder factor is

removed from the equation with pecuniary-gain remaining.  Under those circumstances,

evidence of multiple murder would not bear logically on the remaining factors.

Movant has argued previously that the pecuniary gain factor applies only where the

murder is a necessary condition to the expected pecuniary gain.  Thus, for example, where an

heir kills to gain an inheritance, the pecuniary gain follows only if the murder occurs.  The same

---

[17]  The fact that the jury heard evidence of the multiple murders at the guilt-innocence phase of the trial did not *ipso facto* render that evidence relevant to the penalty trial.

is true where a beneficiary kills for life insurance proceeds or as a contract killer-for-hire.  The

Eighth Circuit had so held in *United States v. Allen*, 357 F.3d 745, 750-51 (8th Cir. 2004) (*Allen*

*I*), *vacated on other grounds*, 406 F.3d 940 (8th Cir. 2005) (*Allen II*) (*en banc*).  In the panel

opinion in *Allen I*, the Court stated:

> We are not persuaded that the indictment, even incorporating
> Count I into Count II, can fairly be read to state the essential facts
> which would constitute the pecuniary gain aggravator. Nothing in
> either count necessarily links the murder of Richard Heflin to the
> receipt of, or expectation of the receipt of, pecuniary gain. The fact
> that Allen and Holder robbed a bank "and in committing such
> offense did kill Richard Heflin," as set forth in Count I, is
> insufficient given that bank robbery is not among the crimes which
> warrant automatic death qualification under 18 U.S.C. §
> 3592(c)(1). We agree with our sister circuits that the "offense
> committed" language in § 3592(c)(8) refers to murder, not the
> underlying felony, so that application of the pecuniary gain
> aggravating factor "is limited to situations where 'pecuniary gain'
> is expected 'to follow as a direct result of the [murder].'" *United*
> *States v. Bernard,* 299 F.3d 467, 483 (5th Cir. 2002) (alteration in
> original, and citation omitted); *United States v. Chanthadara,* 230
> F.3d 1237, 1263 (10th Cir. 2000)  (citing supporting cases, and
> concluding that Congress' exclusion of robbery from § 3592(c)(1)
> "suggests that the pecuniary gain aggravator applies when the
> murder itself was committed as consideration for, or in expectation
> of, anything of pecuniary value"). See also *United States v. Cuff,*
> 38 F. Supp. 2d 282, 288 (S.D.N.Y. 1999) ("[Section 3592(c)(8)]
> appears to be directed at a murder for hire or to collect insurance
> proceeds, or at least the sort of murder in which pecuniary gain can
> be expected to follow as a direct result of the crime. A murder
> from which pecuniary gain does not directly result would not
> appear to be within the reach of the statute."). To hold otherwise
> would convert every felony murder in which the underlying felony
> had a pecuniary object or benefit into a federal capital offense. See
> *Woratzeck v. Stewart,* 97 F.3d 329, 334-35 (9th Cir. 1996)
> (construing Arizona pecuniary gain aggravator, and noting that
> "even if it is true that under many circumstances a person who kills
> in the course of a robbery is motivated to do so for pecuniary
> reasons, that is not necessarily so . . ."). Like the other courts to
> have reviewed this issue, we find nothing in the statute or
> legislative history to suggest that Congress intended such a result.

*Allen I*, 357 F.3d at 850-51.  Noting in the *Allen II en banc* opinion touched this finding.

The failure to raise this issue on direct appeal (as was the failure to raise the inapplicability of the multiple-murder factor) constituted ineffective assistance of appellate counsel even assuming, *arguendo*, that the issue of the pecuniary-gain factor was properly challenged by trial counsel.

2.    Jury instructions regarding the illusory alternative sentence

Movant alleges in his 2255 motion that trial and appellate counsel were ineffective because they failed to note or object to this Court's erroneous penalty-phase instructions regarding the alternative range of punishments for the capital counts.  In answering this point, the government attempts to twist that factual point into an argument that Movant is *not* making – *i.e.* that this Court should have instructed the jury on the consequences of a failure to agree unanimously on a verdict of death.  The point clearly and straightforwardly made by Movant in his 2255 motion is that this Court erroneously viewed the capital charges in this case as carrying a potential punishments of death, life, or some other "sentence required by law." In reality, 18 U.S.C. § 1959 does not allow for any sentences beyond death or life without release.  The statute does not, for example,  specify a sentence of "up to life imprisonment," or "a term of years up to life imprisonment" or anything other than life.[18]  In other words, the alternative punishments

---

[18]  Many federal statutes carrying the death penalty do provide for sentences of less-than-life if a sentence of death is not returned. *See, e.g.*, 18 U.S.C. § 2119(3) (for causing a death in a carjacking, the death penalty or "any number of years up to life"); 18 U.S.C. § 924(j) (for causing a death by the illegal use of a firearm, the death penalty "or by imprisonment for any term of years or for life;"), 21 U.S.C. § 848(e) (for a causing a death while engaged in a continuing criminal drug enterprise or a drug conspiracy punishable under 21 U.S.C. § 841(b)(1)(A), a minimum term of 20 years, the death penalty, or "any term of imprisonment, which may be up to life imprisonment . . . .").

available in a case where the government seeks the death penalty in a VICAR murder are (1) the

death penalty or (2) mandatory life imprisonment.

Despite this clear statutory language, this Court, with no objection from the defense or

the government, mis-instructed the jury on the issue of potential punishment.  In particular, the

Court instructed the jury that, once it had made its necessary preliminary findings on aggravation

and mitigation (and assuming the necessary findings of a "gateway" factor, at least one statutory

factor, and that Movant was over 18 at the time of the offense), it should proceed as follows:

> Based upon this weighing process, you must determine whether a
> sentence of death is justified.  If you cannot unanimously agree
> upon a sentence of death, you must then decide whether to return a
> sentence of life in prison without the possibility of release.  Again,
> your finding with respect to a sentence of life in prison without the
> possibility of release must be unanimous.

(Tr. 7995-96.)  The second portion of the instruction quoted above is wrong as a matter of law.

If the jury was unable to reach unanimous agreement on a sentence of death, its deliberations

were concluded and, as a matter of law, because of the mandatory life sentence required by the

VICAR statute itself, the Court would be required to impose a life sentence.  *Jones v. United

States*, 527 U.S. 373 (1999). The instruction continued:

> If you unanimously agree upon a sentence of death or a sentence of
> life in prison without the possibility of release, the Court is
> required to impose that sentence.  If you cannot unanimously agree
> upon either a sentence of death or a sentence of life in prison
> without the possibility of release, the Court will impose the
> sentence required by law.

(Tr. 7996.)  This latter instruction was also wrong as a matter of law.  Assuming a lack of

agreement on death, the Court had no authority to impose any sentence other than lifetime

imprisonment.   As noted earlier, the option of a potentially lesser sentence, *i.e.*, the "sentence

required by law" would arise only in the context of a federal capital offense that allowed for a range of years "up to life" as an alternative to a death sentence. The VICAR statute, it is reiterated, offers no such alternative.

With regard to a jury unable to agree on penalty, in *Jones v. United States*, *supra*, the Court ruled that in a federal death penalty case such a result requires the trial court to impose a life sentence. While *Jones* also held that the Eighth Amendment does not *require* such an instruction in every case, the Court clearly left the matter to the considerable discretion of the district courts. In practice, the overwhelming majority of judges in federal death penalty cases have exercised that discretion in favor of informing the jury that a failure to agree will result in a life term. In Senior Judge Leonard Sand's treatise on federal jury instructions, the following language is suggested:

> If , after engaging in the balancing process I have described to you, all twelve members of the jury do *not* unanimously find beyond a reasonable doubt, that the Defendant should be sentenced to death (on any of the capital counts), then you may not impose the death penalty (for that count). In that event, Congress has provided that life imprisonment without any possibility of release is the only alternative sentence available. If the jury reaches this result, you should do so by unanimous vote, and indicate your decision in Section ____ of the Special Verdict Form.

1 L. SAND, *et al.*, MODERN FEDERAL JURY INSTRUCTIONS – CRIMINAL, Inst. 9A-20 at p, 9A-82.

Another district court judge, Hon. Mark Wolf, Chief Judge of the District of Massachusetts, expressed his reasoning for exercising his discretion in favor of such an instruction as follows:

> The court told the jury what would occur if it failed to reach a unanimous verdict in favor of the death penalty. In Part Six of the verdict forms, the court gave the jury three options. The first was a unanimous vote that the government had met its burden of proving that death was the appropriate sentence. The second was a unanimous vote that the government had failed to meet its burden

of proving that death was the appropriate sentence. The third was that "after making all reasonable efforts, the jury is unable to reach a unanimous decision on whether the government" met its burden of proof.

The court recognized that the Eighth Amendment does not require that the jury be told the consequences of their failure to agree and that the government has a strong interest in a unanimous verdict-- one way or the other--in a death penalty prosecution. See *Jones v. United States, 527 U.S. 373, 381-82, 144 L. Ed. 2d 370, 119 S. Ct. 2090 (1999)*. However, the Supreme Court in *Jones* did not forbid this sort of instruction. Instead, it held that the constitution does not require it and that the Court would not exercise its supervisory powers to require that it be given in every case.

This court chose to inform the jury of the consequences of deadlock for several reasons. First, viewing this instruction as part of the overall instructions regarding deliberations, the court believed that the government's interest in a unanimous verdict was adequately protected. Second, informing the jurors of the consequences of deadlock emphasized the individual responsibility of each juror. Ensuring that jurors were cognizant of this responsibility was also an important government interest. Third, the instruction also ensured that jurors undertook their deliberations accurately understanding the consequences of their actions. Declining to instruct the jury on the consequences of a deadlock could result in jurors deliberating based on a misunderstanding of the law rooted in speculation and incorrect assumptions. n43

> n43 The court instructed the jury as follows:
>
> If, after making all reasonable efforts, at the conclusion of your deliberations on a particular count, you have not reached unanimous agreement on whether the prosecution has proven that the death penalty is justified, you will not be a hung jury. And in contrast to the conventional criminal case, this case will not have to be tried again because the jury did not reach a unanimous verdict. Rather, if you are unable to reach a unanimous verdict on whether the government has proven the death penalty is justified on a particular count, the law provides that I must sentence Mr. Sampson to

> life in prison without possibility of release on that count, and I will do so.

*United States v. Sampson*, 335 F.Supp.2d 166, 240-41 (D. Mass. 2004).

The failure of either the trial or appellate lawyers to recognize and raise this issue constituted prejudicial ineffective assistance of counsel.

3. <u>Failure to raise and preserve the issue that the indictment did not allege aggravating factors or other necessary elements of capital murder</u>

The government concedes that the current state of the law requires that a federal capital indictment allege, at least, one or more "gateway" or "intent" factors and one or more statutory aggravating factors.  (US Reply at 69-72.)  *See, e.g., Ring v. Arizona*, 536 U.S. 584 (2002); *United States v. Cotton,* 535 U.S. 625  (2002) (in federal prosecutions, any fact increasing the maximum punishment "must also be charged in the indictment").  From there, however, the government's reply obfuscates the relevant inquiry.[19]

The fact of the matter is that in *Jones v. United States*, 526 U.S. 227 (1999) the Court clearly presaged its later *Ring* decision by holding that factual assertions that increase the potential levels of punishment amounted to "elements" of distinct offenses, and were not merely "sentencing factors" and, therefore, had to be alleged by indictment and proved before a jury

---

[19] This obfuscation reaches its height when the government suggests that one of Movant's present counsel did not raise this issue in a roughly contemporaneous federal capital case, the implication being that it was not standard practice at the time to bring challenges of this nature. (US Reply at p. 70.)  That assertion is wrong.  The issue was raised on direct appeal, although that appeal was later dismissed on the defendant's *pro se* application. *United States v. Hammer*, 226 F.3d 229 (3rd Cir. 2000).  A motion contending that the indictment fails to state an offense may be presented "at any time while the case is pending . . . ." F. R. CRIM. P. 12(b)(3)(B).  Whether presenting a challenge of this nature was or was not standard practice among capital defense attorneys at the time will have to await a hearing and, likely, expert evidence.  It is noted that trial courts in *United States v. Nguyen*, 928 F Supp. 1525 (D.Kans. 1996) and *United States v. Spiven,* 958 F. Supp. 1523, 1528 (D.N.M. 1997) had been presented with similar arguments.

beyond a reasonable doubt. This ruling should have prompted trial counsel to move to dismiss the indictment as failing to state an offense. They did not do so at any stage of the proceedings and the issue was not raised until direct appeal, at which time it was treated as plain error. The indictment itself cannot be fairly read to have "cured" this error by a strained reading that the indictment itself contained the elements of federal capital murder.

4.     Failure to bring constitutional challenges to the Federal Death Penalty

Movant stands by his assertion in the 2255 motion that, at a hearing, he will be able to establish that the federal death penalty, at the time this case was being prosecuted, and until today, operates in an arbitrary and capricious manner.

The essence of the Supreme Court's *Furman* decision was captured in Justice Stewart's concurring opinion:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders, . . . many just as reprehensible as these, the petitioners are among a capriciously selected handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Furman v. Georgia*, 408 U.S. 238, 309-10 (1972) (Opinion of Stewart, J., concurring; citations and footnotes omitted). To this may be added Justice White's finding that, "[T]he death penalty is exacted with great infrequency even for the most atrocious crimes, and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.* at 313 (Opinion of White, J., concurring). In fact, the infrequency of death sentences was noted

by each of the five concurring Justices in the *Furman* majority.  *See, Furman*, 408 U.S. at 248 n. 11 (Douglas, J., concurring); *id.* at 291-95 (Brennan, J., concurring);[20] *id.* at 309-10 (Stewart, J., concurring); *id.* at 312 (White, J., concurring); and, *id.* at 354 n. 124 and 362-63 (Marshall, J., concurring).

The argument that the federal death penalty should be struck down because it is so infrequently sought or imposed should not be misunderstood as an argument calling for profligate use of the federal death penalty.  As Justice Brennan stated in *Furman*:

> The States claim, however, that this rarity is evidence not of arbitrariness, but of informed selectivity.Informed selectivity, of course, is a value not to be denigrated.  Yet, presumably the States could make precisely the same claim if there were 10 executions per year, or five, or even if there were but one.  That there may be as many as 50 per year does not strengthen the claim.  When the rate of infliction is at that low level, it is highly implausible that only the worst criminals who commit the worst crimes are selected for this punishment.  No one has yet suggested a rational basis that could differentiate in these terms the few who die from the many who go to prison.  Crimes and criminals simply do not admit of a distinction that can be drawn so finely as to explain, on that ground, the execution of such a tiny sample of those eligible.  Certainly the laws that provide for this punishment do not attempt to draw that distinction; all cases to which the laws apply are necessarily "extreme."

408 U.S. at 293-94 (Brennan, J., concurring).

At the time *Furman* was decided, as the opinion itself reflects, approximately 15-20% of

---

[20]  In 1972, Justice Brennan, positing a nation of 200 million people that carries out 50 executions per year, noted that "when government inflicts a severe punishment no more than 50 times a year, the inference is strong that the punishment is not being regularly and fairly applied,"  408 U.S. at 294, and, "When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily.  Indeed, it smacks of little more than a lottery system."  *Id.*  We are now a nation of 280 million people.  In the 18 years since the return of the federal death penalty, there have been approximately 60 federal death verdicts.  Three federal prisoners have been executed.

convicted murderers and rapists were actually sentenced to death in those jurisdictions where the death penalty was available for such offenses. *Furman*, 408 U.S. at 386 n. 11 (Burger, C.J., dissenting, citing four sources to support the statistic). Justice Powell, also dissenting, cited similar statistics. *Id.* at 435 n. 19. Justice Stewart, however, took Chief Justice Burger's statistical analysis as lending support to Justice Stewart's ultimate conclusion that the death penalty was, indeed, in an Eighth Amendment sense, "unusual."

In *Furman*, arbitrariness and caprice were seen as the inevitable side-effects of a rarely-imposed punishment of death. Recall, also, Justice White's observations, premised his review of hundreds of state and federal death-penalty cases in what was then 10 years on the Court:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring); *see also*, Justice Scalia's concurring observation in *Walton v. Arizona*, 497 U.S. 639, 658 (1990), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002), that the key opinions in *Furman* "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed." In *Gregg*, the plurality reiterated this understanding of *Furman*, noting, "It has been estimated that before *Furman* less than 20% of those convicted of murder were sentenced to death in those States that authorized capital punishment." *Gregg v. Georgia*, 428 U.S. 153, 182 n. 26 (plurality opinion). This understanding was repeated in *Woodson v. North Carolina*, *supra*, 428 U.S. at 295 n. 31.

After 18+ years of experience (1988-2007), it is now apparent that the federal death penalty is sought and imposed far more rarely than in the cases examined by *Furman*. Being

44

sentenced to death in the federal system is truly akin to being struck by lightning; indeed, no meaningful basis may be discerned for distinguishing the cases – even among the most extreme[21] – where death is imposed from cases in which it is not.[22]

At a hearing, if permitted to do so, Movant's counsel will present evidence that the federal death penalty, in addition to the white-victim effect alluded to in the 2255 motion, operates with a racial and regional bias, targeting African-Americans disproportionately and is pursued to a disproportionate degree in the traditional "death belt" states of the deep South and Southwest. This was so at the time Movant's case was tried and continues to be so today. The government spends a lot of time and ink arguing that this claim is barred by the analysis of what is and is not a "new rule" as set out in *Teague v. Lane*, 489 U.S. 288 (1999). (US Reply at pp. 87-89.) There is no need whatsoever to start down that path. Movant simply seeks application of the oldest case in the modern jurisprudence of capital punishment, *Furman v. Georgia*, which for the past 30 years has stood for the proposition that the Eighth Amendment will not tolerate the arbitrary and capricious infliction of capital punishment. Its modern day vitality is confirmed

---

[21] In the District of Colorado, Timothy McVeigh was sentenced to death and executed for utilizing a truck bomb to blow up the Murrah Federal Building in Oklahoma City, killing 168 people and injuring hundreds. In the Southern District of New York, two men associated with Osama bin Laden and al-Qaeda were spared the death penalty after being convicted of simultaneous terrorist attacks, utilizing truck bombs that destroyed two American embassies in East Africa, killing 224 – including 12 Americans – and injuring thousands. Recently Zacharias Moussaoui was spared the death penalty in the Eastern District of Virginia despite a jury verdict that he was responsible for the thousands of deaths that occurred as a result of the September 11, 2001 attacks. Eric Rudolph – the Olympic and abortion-clinic bomber – entered a guilty plea to a life sentence, as did Theodore Kaczynski, the Unabomber.

[22] Movant's counsel will file separately with the Court a CD reflecting the verdict sheets in dozens of federal capital trials. (The data is too large to file in electronic form.) Those verdict sheets, which contain the findings of juries both in aggravation and litigation, speak eloquently to the issue that the federal death penalty is essentially arbitrary and capricious.

45

by cases such as *United States v. Littrell*, 02-cr-00938(CJC) (CDCA) (Docket entry 4712),

decided March 22, 2007,  in the Central District of California, Hon. Cormac J. Carney, U.S.D.J.,

relying explicitly and strictly on *Furman*, struck the death-notice in a pending federal capital

case. The issue in *Littrell*, a 40-defendant case targeting the alleged leadership of the Aryan

Brotherhood prison gang, and described in the opinion as "believed to be the largest capital

murder indictment in American history," was whether targeting Mr. Littrell for capital

punishment was arbitrary and capricious given his comparative culpability with other defendants

who were not facing capital punishment.  Movant raises a different  but related point, *i.e.* that

taking an overall look at the federal death penalty after 18+ years of operation yields, in a macro

sense, what Judge Carney found to exist in a micro sense, namely a penalty that is sought and

imposed in a wholly arbitrary and capricious manner.  As stated succinctly in the introductory

paragraph to the 22-page order granting relief in *Littrell*:

> Defendant Gary Joe Littrell moves to strike the Government's
> notice of intention to continue to seek the death penalty against
> him as unconstitutional;.  Mr. Littrell's motion is GRANTED.  The
> Government violates a defendant's right to due process under the
> Fifth Amendment to the United States Constitution when its
> decision to seek the death penalty is arbitrary and capricious.

*Littrell*, *supra*, at 1.  In *Getsy v. Mitchell*, 456 F.3d 575 (6th Cir. 2006). the Sixth Circuit, relied

on *Furman* to vacate a sentence of death in an Ohio case, finding the sentence to be arbitrary and

disproportionate to the life sentence received by a more culpable co-defendant in the same

case.[23]  In doing so, the *Getsy* Court recognized the continuing vitality of *Furman*, noting that

---

[23]  This decision lends further support to Movant's argument that there must be a principled way of distinguishing those federal cases where the death penalty is sought and imposed from those where it is not sought or, if sought, not imposed.  *Getsy* has particular resonance in this case given the sentencing disparity between Movant and co-defendant Chevie Kehoe.

46

the case "prohibits random, disproportionate capital sentences . . . ."  456 F.3d at 577.  The Court

correctly read *Furman* as having "established that the Eighth and Fourteenth Amendments

cannot tolerate the imposition of a sentence of death under legal systems that permit this penalty

to be arbitrarily and capriciously imposed."  *Id* at 582.  The Court also noted *Furman's* focus on

death-sentences that are "inconsistent or random" and the structuring of laws that "failed to

generate acceptably consistent outcomes."  *See*, D. Baldus, "Arbitrariness and Discrimination in

the Administration of the Death Penalty: A Legal and Empirical Analysis of the Nebraska

Experience (1973-1999)," 81 NEB. L. REV. 486 (2002).  After extensive analysis of the Supreme

Court's continuing concern regarding the arbitrary infliction of death sentences, and writing in

the context of a claim of intra-case arbitrariness, the Court ruled that the sentence of death could

not stand:

> The death-is-different principle can only be observed here by
> holding that the inconsistent and disproportionate sentences in the
> same case violates the clearly-established *Furman* arbitrariness
> principle and hence the Eighth Amendment.

*Id*. at 584.

With specific regard to the race and region issue, Movant is prepared to prove at an

evidentiary hearing that from the early days of the post-1988 "modern" federal death penalty up

to today, the United States has targeted minority defendants for the federal death penalty at a rate

of 70% or more.  *See, e.g., United States v. Bradley*, 880 F. Supp. 271 (M.D.Pa. 1994).  Thirteen

years ago, when obvious racial disparities began to show up in the "early days" of the modern

prosecution of federal death penalty cases, the House Subcommittee on Civil and Constitutional

Rights investigated and concluded as follows:

> Race continues to plague the application of the death penalty in the

> United States.  On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims.  On the federal level, cases selected have almost exclusively involved minority defendants.

"Racial Disparities in Federal Death Penalty Prosecutions 1988-1994," Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd Congress, 2nd Session, March 1994.  That report noted that as of 1994 there had been 37 defendants targeted for capital punishment under the § 848(e) scheme, of whom 33 (87%) were black or Hispanic.  Earlier evidence of the race-effect of the death penalty was also provided by the General Accounting Office in 1990.  In 1988, at the time Congress enacted the 1988 death-penalty, the GAO was directed to undertake a study of the potential influence of race on the death penalty. 21 U.S.C. § 848(o)(2).  The GAO in fact undertook that study and concluded as follows:

> Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision.
>
> In 82 percent of the studies, race-of-victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks.  This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques.  The finding held for high, medium, and law quality studies.

"Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities" (GAO/GGD-90-57, Feb. 1990) at p. 5.

With regard to region, the federal death penalty, in terms of authorized cases, reflects a strong bias in favor of southern jurisdictions.  Historically, the death penalty has been a largely Southern phenomena; that remains the case today.  As of April 2, 2007, there had been 1,069

post-*Furman* executions carried out in the United States.  Of these, 877 the overwhelming majority – 82% – have taken place in Southern states.  Two states alone, Texas and Virginia, have accounted for nearly half (44%) of all post-*Gregg* executions.[24] With this historical perspective in mind, it is no surprise that those federal jurisdictions in states with an established "culture of death" reflect that culture, consciously or not, in decisions to pursue the death penalty. Neither is it surprising that federal juries accustomed to seeing death sentences routinely returned in their own communities would do the same.  Regional bias, however, is inimical to a supposedly national penalty that is, theoretically at least, sought and imposed using consistent national standards.

The disingenuous "ideal" of a national standard aside notwithstanding, the federal death penalty in continues to be a Southern phenomena and federal districts from the South predictably "lead the charge" in seeking and receiving authorization to take  cases capital and in convincing juries to return death verdicts.  At a hearing, Movant is prepared to demonstrate this regional bias – the very essence of arbitrariness – by establishing that more than 70% of the federal death verdicts returned since 1988 have come from Southern states.  Those figures were roughly the same in 1999 when this case was tried.

The failure to bring the constitutional challenges specified in the 2255 motion was ineffective assistance of counsel.

5.      Did Movant's counsel posses the background and experience required of "learned counsel" in a federal capital case?

One aspect of a 2255 motion focuses on whether the conviction or sentence was secured

---

[24] Source: DEATH PENALTY INFORMATION CENTER, "Facts About the Death Penalty," data available on line http//:www.deathpeanltyinfo.org/FactSheet.pdf.  (Last visited April 5, 2007.)

"in violation of . . . the laws of the United States." One such law, 18 U.S.C. § 3005, requires that in capital cases a defendant is entitled to two lawyers, one of whom "shall be learned in the law applicable to capital cases." When the Judicial Conference of the United States studied the quality of representation in federal capital cases in 1998, the importance of counsel experienced in *capital* cases was emphasized. In its final report, the committee noted:

> Federal death penalty cases require knowledge of the extensive and complex body of law governing capital punishment *and* the intricacies of federal criminal practice and procedure. Neither one alone is sufficient to assure high quality representation. Lawyers and judges recounted cases in which seasoned federal criminal lawyers who lacked death penalty experience missed important issues.

FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE PREPARATION (Administrative Office of the United States Courts May 1998) ("The Spencer Committee Report")[25] at p. 10 (emphasis in original text). The Spencer Committee's recommendation regarding the criteria for the selection of "learned counsel" is as follows:[26]

> Ordinarily, "learned counsel" should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation.

Spencer Committee Report at p. 14 (emphasis in original text). *See also*, *United States v. Morrison*, 2006 U.S. Dist. Lexis 92820 (E.D.N.Y. 2006); *United States v. Miranda*, 148

---

[25] The report is available online at http//:uscourts.gov/dpenalty/1COVER.htm and is usually referred to as "the Spencer Committee Report" after its chair, Hon. James R. Spencer, U.S.D.J..

[26] The report's recommendations were adopted by the Judicial Conference of the United States on September 15, 1998.

F.Supp.2d 292 (S.D.N.Y. 2001).

At a hearing, Movant is prepared to show that neither of Movant's trial counsel met the standard of "learned counsel." Thus, Movant's sentence of death – even if sustainable when applying the Sixth Amendment's guarantee, a point Movant does not concede – may not be sustainable under the laws of the United States.

### 5.    Other challenges to the sentence of death

Without reiterating or discussing in further detail his remaining challenges, Movant stands by the averments contained in the 2255 motion. It is clear that the issue has been joined on all issues and that many (if not all) of the issues presented will have to be resolved via a hearing.

Section 2255 provides for a hearing, "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255; *accord*, *Koskela v. United States*, 235 F.3d 1148 , 1149 (8th Cir. 2001) (cause remanded for an evidentiary claim that counsel rendered ineffective assistance in failing to call certain witnesses); *Donahue v. United States*, 2000 U.S. App. LEXIS 18 (8th Cir. 2000) (Evidentiary hearing was required to resolve a post-conviction claim of ineffective assistance of counsel where the government presented only the affidavit of defendant's trial counsel as evidence to rebut the claim.); *Smith v. United States*, 182 F.3d 1023 (8th Cir. 1999) (Judgment dismissing prisoner's motion to set aside a criminal conviction was overturned, where the district court failed to hold an evidentiary hearing regarding prisoner's ineffective assistance of counsel

claim.); *Rose v. United States*, 513 F.2d 1251 (8th Cir. 1975) (A defendant was entitled to a hearing on his post-conviction motion to set aside his sentence based on his alleged incompetence at the time of his guilty plea, when there had never been a previous federal hearing on the issue.) After a full hearing on these issues, Movant will seek an order vacating his sentence of death.

<u>REQUEST FOR RELIEF</u>

WHEREFORE, Movant asks this Court for the following relief:

1.    Issue a writ of habeas corpus that Movant be brought before the court to be discharged of his unconstitutional and illegal confinement and relieved of his unconstitutional and illegal conviction and/or sentence of death; alternatively,

2.    Grant Petitioner, who is indigent, sufficient funds to secure expert testimony to prove the facts as alleged in this petition;

3.    Grant Petitioner, upon his request, the authority to obtain subpoenas for witnesses and documents necessary for an evidentiary hearing;

4.    Order such hearings as may be necessary; and

5.    Set a status conference at which time a briefing, discovery and hearing schedule can be established.

Respectfully submitted,

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490 (fax)
davidruhnke@ruhnkeandbarrett.com

-and-

/s/ Laurence E. Komp
Laurence E. Komp
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
(636) 207–7330
(636) 207–7351 (fax)
lekomp@swbell.net

COUNSEL FOR MOVANT

<u>CERTIFICATE OF SERVICE</u>

Movant's counsel have filed this reply on today's date via ECF, thereby serving the United States and all parties.

/s/ Laurence E. Komp
COUNSEL FOR MOVANT

<u>Electronically</u> Little Rock, Arkansas
<u>filed</u>:            April 9, 2007