IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA                           PLAINTIFF/ RESPONDENT

vs.                                   NO: 4:97-CR-00243(02) GTE

DANIEL LEWIS LEE                                    DEFENDANT/MOVANT

MOVANT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF HIS
28 U.S.C. 2255 MOTION REGARDING THE DNA EXCLUSION

COMES NOW Daniel Lewis Lee ("Movant""), by his undersigned counsel, and

files this memorandum in support of his 28 U.S.C. § 2255 motion to vacate, set aside,

and/or correct his convictions and sentences of death, specifically related to his First

Ground, Subsection (E).  Movant previously filed his reply prior to obtaining the results

of Mitochondrial DNA testing("mtDNA") conducted on Govt. Exs. 1037 and 4722.

When Movant received the results, he immediately filed the results with the

Court.  (ECF Doc. 1138 Exhibit 1).  Significantly, the mtDNA testing excludes Movant

as the source of the hair, Govt. Ex. 1037, taken from the raid cap, Govt. Ex. 582.

The exclusion of Movant as the source of the hair is significant and material

evidence, given the Government's theory that the raid cap with Movant's hair was used

in the fake FBI raid involving the Mueller's.  This theory, establishing Movant's guilt

because it was his hair, was hit on throughout the Government's case, beginning in

opening statement through closing.  The Government overwhelming proved their case –

so much so the Eighth Circuit agreed and endorsed the theory of the staged raid.  *See*

*United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004) ("In January 1996, Lee and

Kehoe left the state of Washington and traveled to Arkansas where they dressed in police

1

raid clothing and went to the home of William Mueller...").  The Eighth Circuit

repeatedly referred to and relied upon the raid clothing and/or the hair found in the raid

cap.  *Id.* at 643, 644, 645.

In its opening, almost immediately after mentioning Movant and Chevie Kehoe

together, the Government first referenced the raid caps.  (Tr. 1253 ("Chevie Kehoe and

Danny Lee had in the truck that they were driving raid gear.")).  The Government

referenced the raid caps and/or the hair twice more during opening argument to

devastating effect.  (*See* Tr. 1254, 1272).  In specifically describing how the Mueller's

were kidnapped and murdered the Government argued: "On January 11th, Chevie Kehoe

and Danny Lee entered into the Muellers' house. They wore the raid gear that I told you

about earlier.  They wore masks over their heads."  (Tr. 1254).  The Government related

"also in the Suburban was a raid cap. The ones that I have talked about – one of the ones

I talked about this morning. Inside the raid cap was a hair similar to the hair of Danny

Lee."  (Tr. 1272).

Numerous witnesses referenced the raid cap and/or the hair.  Ohio State Highway

Patrol Officer Richard Slater seized the hats and raid jackets from the Suburban.  (Tr.

4638, 4639-40).  Immediately thereafter, the Government again presented the testimony

of Chantelle Bequette of the Arkansas State Crime Laboratory.  (*See* Tr. 4720-25).

Bequette found a hair in the cap and compared it to known samples from Movant.  (Tr.

4721-22).  Bequette testified that the hair found on a FBI raid cap seized from the

Suburban involved in the Ohio shoot-out (Govt. Ex. 1037) was microscopically similar to

Movant's known sample (Govt. Ex. 535).  (Tr. 4722). [1]  Bequette indicated there were a range of similarities underlying her expert opinion.  (Tr. 4723).

Bequette had previously testified regarding her training and the significance of a declared comparison.  (*See* Tr. 3646-3675).  The jury heard Bequette's apparent overwhelming qualifications to make hair comparisons.  (Tr. 3644-45).  With no voir dire by defense counsel and no objection, the Court recognized Bequette as qualified to render an opinion.  (Tr. 3646).  In exhaustive detail, Bequette described how she conducted the comparison – analogizing a hair to a pencil to make her discussion even clearer for the jury.  (Tr. 3652).  Bequette honestly noted that she could not say any hair came from a specific person to the exclusion of all others.  (Tr. 3653).  In response to questioning by the Court, Bequette did say an exclusion is more definite.  (Tr. 3654).  On cross, Bequette reiterated that she could only testify that hairs were similar; but could not say unequivocally any hair came from a certain person.  (Tr. 3665, 3674).  However, Bequette and the Government effectively overcame this limitation by suggesting the only reason she could not make an exact match is because there was no database to allow her to compare it to every hair in the world.  (Tr. 3653).

The Government switched from the alleged science (now known to have wrongly tied Movant to the murders), to the alleged confessions to propagate guilt.  The two most significant fact witnesses were members of Chevie's family who purported to hear confessions from Chevie and, in one circumstance, Movant.  The Government hit the raid caps in the testimony of Gloria Kehoe.  (Tr. 4972 (wore raid caps, staged a fake raid)).  Again in the testimony of Cheyne Kehoe, the Government presented Chevie's alleged statement that they were making it look like a raid. (Tr. 5327).

---

[1] The hair was never compared to a known sample from Kirby Kehoe.  (*See*  Tr. 4723).

In rebuttal closing, the Government relied in large measure on "Danny Lee's hair." Tr. 7000. While the Government initially paid lip-service to the limited "similarity" scope of Bequette's testimony, the Government then went much further. Specifically, the Government argued "We recognize that [there might be out there somewhere another hair that could match], but here, I submit to you, the evidence establishes that was Danny Lee's hair." Tr. 7000-01. Thereafter, the Government again referred to it as "Danny Lee's hair." Tr. 7005. The Government's argument placed the hair within a fabric of evidence that relied and bolstered each individual piece to establish guilt. The problem now with that argument to the jury is that it is premised upon an absolute inaccuracy – the hair is not Movant's. The fabric of the Government's case unravels and counsel were ineffective in failing to request testing that would have eviscerated the Government's theory as to how this crime occurred.

The familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs this Court's analysis of Movant's claim. The first prong requires Movant to prove that his trial counsel's representation was deficient in that it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The second prong requires Movant to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is well-established that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-*

4

*Ortega*, 528 U.S. 470, 481 (2000). A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991).

The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland*, 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *See Bryant v. Scott*, 28 F.3d 1411, 1419 (5th Cir. 1994) (citing *Henderson v. Sargent*, 926 F.2d 706, 711 (8th Cir. 1991)).

To protect an accused's constitutional rights, defense counsel must conduct a reasonable pretrial investigation. *Sims vs. Livesay*, 970 F.2d 1575, 1580 (6th Cir. 1992). At a minimum, a reasonable pretrial investigation includes considering reasonable experts to challenge the Government's case. Courts routinely reverse based on the failure to obtain experts:

- *Dugas v. Coplan*, 428 F.3d 317, 329-30 (1st Cir. 2005) - Found counsel's performance to be deficient when he failed to consult with an expert on such investigations when arson is the "cornerstone of the state's case."

- *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005) - Counsel ineffective for failing to retain a ballistics expert. The "state's core theory" that the victim had been shot from only about 10 steps away and a ballistics expert testified that the bullet recovered from the body had not ricocheted before striking the victim. Counsel's conduct was deficient because counsel was aware that the State's argument of intent to kill and for death was based on the witnesses' testimony about the distance of the shot and the ballistics evidence. Prejudice found because a defense expert could have presented a strong case that the fatal bullet struck the pavement in front of the victim and was fired at a much greater distance than the witness' testimony reflected.

- *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) – Court affirmed the district court's grant of a federal habeas petition premised upon ineffective assistance

based on defense counsel's failure to "consult or call an expert on the psychology of child sexual abuse, or to educate himself sufficiently on the scientific issues."

- *Soffar v. Dretke*, 368 F.3d 441 amended, 391 F.3d 703 (5th Cir. 2004 ) -  Counsel also ineffective for failing to retain a ballistics expert "when there were such readily apparent discrepancies between the ballistics evidence and the State's theory of the case," and counsel could have established that the crime scene was consistent with the surviving victim's statements and inconsistent with the defendant's "confession."

- *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001) - Counsel ineffective in rape and murder capital case where the two co-defendants entered a deal to avoid death penalty and testified that the defendant was involved and planned the crimes. The state corroborated the testimony with evidence from a state expert who said a pubic hair on the victim's thigh was "almost certainly" the defendant's.  Expert testimony now contradicted the state's hair testimony, and in addition, counsel failed to prepare and present DNA, tire-tread, and shoe-print evidence that was exculpatory. While cross-examination may be sufficient in some cases to challenge the state's case, "[i]n these circumstances, it was irresponsible of the lawyer not to consult experts."

- *Baylor v. Estelle*, 94 F.3d 1321 (9th Cir. 1996) -  Counsel ineffective in rape case for failing to follow up on criminalist's report which excluded defendant as source of semen in spite of alleged detailed confession.

- *Dees v. Caspiri*, 904 F.2d 452, 455 (8th Cir. 1990) – "Counsel had a duty to garner the expertise necessary to cross examine [the State's expert].".

- *Foster v. Lockhart*, 811 F. Supp. 1363 (E.D. Ark.), appeal dismissed, 995 F.2d 226 (8th Cir. 1992) - Trial counsel ineffective in rape case for failing to secure and present expert that that the defendant is organically impotent.

Counsel also must comply with their responsibilities under the ABA Standards.

Defense counsel "shall conduct a prompt investigation of the circumstances of the case and explore all avenues leading to finding relevant to the merits of the case. . . ."  ABA Standards for Defense Function 4-4.1(a).  As noted by Standards for Defense Function 4-1.2(c) "Since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused. Defense counsel should comply with the

6

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty

Cases."

Turning to the 2003 Death Penalty Standards, 10.7.1(A) provides "Counsel at

every stage have an obligation to conduct thorough and independent investigations

relating to the issues of both guilt and penalty." 1989 ABA Guidline 11.4.1 (A) provided

"Counsel should conduct independent investigations relating to the guilt/innocence phase

and to the penalty phase of a capital trial. Both investigations should begin immediately

upon counsel's entry into the case and should be pursued expeditiously." 11.4.1 (7)(D)

relates to expert assistance and provides:

> Counsel should secure the assistance of experts where it is necessary or
> appropriate for:
> A. preparation of the defense;
> B. adequate understanding of the prosecution's case;
> C. rebuttal of any portion of the prosecution's case at the guilt/innocence
> phase or the sentencing phase of the trial;
> D. presentation of mitigation.

The United States Supreme Court has acknowledged that the ABA Standards constitute

the longstanding prevailing standards or norms of practice. *Wiggins v. Smith*, 539 U.S.

510, 524 (2003).

Movant's counsel failed to comply with the Sixth Amendment requirements as

reflected by their failure to comply with the ABA norms. In failing to request and secure

favorable excluding mtDNA evidence – trial counsel lost the ability to challenge the

"core theory" of the Government's case. A theory announced in opening, presented via

witnesses and reiterated in closing argument via the numerous statements that it was

"Danny Lee's hair." The mtDNA not only eviscerates the Government's theory but

undermines the purported confessions to Gloria and Cheyne Kehoe. A component of the

7

alleged confessions was the fake raid and raid caps – which again became overwhelming evidence of guilt because it was, as the Government described "Danny Lee's hair."

The Government's problem, now that its known its **NOT** "Danny Lee's hair," is that the jury's verdicts and sentences rest upon a false premise.  A false premise that also undermines the alleged confessions, which included the fake raid, raid cap, and thus, the hair.  In these circumstances, counsel were ineffective to Movant's prejudice in not moving for and securing the mtDNA testing of the unknown sample taken from the raid cap with a known sample from Movant.

Respectfully submitted,

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490 (fax)
davidruhnke@ruhnkeandbarrett.com

-and-

/s/ Laurence E. Komp
Laurence E. Komp
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
(636) 207–7330
(636) 207–7351 (fax)
lekomp@swbell.net

COUNSEL FOR MOVANT

<u>CERTIFICATE OF SERVICE</u>

Movant's counsel have filed this Supplemental Memorandum on today's date via ECF, thereby serving the United States and all parties.

/s/ <u>Laurence E. Komp</u>
COUNSEL FOR MOVANT

<u>Electronically</u> Little Rock, Arkansas
<u>filed</u>:                    July 18, 2007

9