IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | PLAINTIFF |
| | ) | |
| VS. | ) | Case No. 4:97-CR-00243(01)(2) GTE |
| | ) | |
| CHEVIE KEHOE & | ) | |
| DANIEL LEWIS LEE | ) | DEFENDANTS |

**REPLY TO PETITIONER'S RESPONSE TO THE COURT'S
ORDER OF MAY 15, 2008 (DOC. 1154)**

The United States by Jane W. Duke, United States Attorney, and Dan Stripling, Assistant

United States Attorney, for its Reply to Petitioner's Response to the Court's Order of May 15, 2008.

states:

On May 15, 2008 this court ordered petitioners to identify the document supporting their

assertion that Gloria Kehoe stated they "waited around a few days after the murders" for immediate

reaction prior to returning to Spokane. Those responses (docs. 1157, 1158, 1159) identified a portion

of Gloria Kehoe's March 31, 1998 statement to Aaron Duvall and ATF agent Glen Jordan.[1] The

transcript of the relevant portion of the Kehoe transcript (document 1157-2), beginning at page 105

---

[1]ATF agents Springer and Gunderson were also present. The interview was conducted by
Duvall and Jordan in a hotel room in Libby, Montana. Springer and Gunderson "babysat" Ms.
Kehoe's children in an adjoining room. There are two transcripts of the tape of the interview
before the court. Document 1157-2 is a 122 page transcript obviously typed directly from the
recording of the interview. This transcript shows agent Jordan conducting the interview. In fact
the interview was conducted by Deputy Sheriff Duvall with agent Jordan occasionally asking a
question. The interview tape was originally transcribed by the Pope County Sheriff's Office. This
transcript is before the court as documents 1158-2 and 1159-4. There is no significant difference
in the substance of the transcripts except it should be noted that the relevant questioning was
conducted by Deputy Sheriff Duvall, not agent Jordan. In document 1159 Kehoe's counsel refers
to pages 71-74 of the Sheriff's Office transcript of the interview. The government does not
believe these pages have any relevance to the issue before the court.

1

reads:

"Mr. Jordan:    Did he tell you how long they were in close to the Muellers' house before they actually took them down? Were they there for a day or two?

Ms. Kehoe:    No.

Mr. Jordan:    Did they scope things out?

Ms. Kehoe:    No. From what I understood, he said that the job was done and they took them. And then they rode around in the Wagoneer for the - - to see what came in the paper, see if the Muellers would come up missing or - - in other words, how the media would handle it.

Mr. Jordan:    They rode around in the Wagoneer?

Ms. Kehoe:    That's what I'm - - that's what I'm believing he said.

Mr. Jordan:    So they stayed in that area for a while?

Ms. Kehoe:    I'm not sure if it was that area or the outside of that area. I can't be quoted on that.

Mr. Jordan:    Did he tell you where he and Danny went right after they disposed of the bodies, where did they go?

Ms. Kehoe:    You know, I was in shock by then. I'll be very honest with you.

I believe they just headed straight back to Spokane. I just remember him saying that they hung around for a few days. That could have been at Danny's mother's house. And then they came back to Spokane.

The relevant portion of the transcript of the recorded interview is found beginning at page 66 of the Sheriff's Office transcript (page 67 of documents 1158-2 and 1159-4) reads:

2

AD:      Did he tell you how long they were in, uh, close to the MUELLERS house before they actually took 'em down? Were they there for a day or two? Did they scope things out?

GK:      No. No, from what I understood he said that uh, the job was done and they took 'em and then they rode around in the Wagoneer to, for the, to see what came in the paper. See if the MUELLERS would come up missing or ... In other words how the media would handle it.

AD:      They rode around in the Wagoneer?

GK:      That's why I'm, that's what I believing he said.

AD:      So they stayed in that area for a while?

GK:      I'm not sure if it was that area or the outside of that area. I can't be quoted on that.

AD:      Did he tell you where he and DANNY went right after they disposed of the bodies? Where did they go?

GK:      You know, I was in shock by then.

AD:      Mm mh (affirmative).

GK:      I'll be very honest with you. I believe they just headed straight back to Spokane. I just remember him saying that they hung around for a few days. That could have been at DANNY'S mother's house and then they came back to Spokane.

Ms. Kehoe's reference to riding around in the Wagoneer to see what came in the paper is confusing. Trial testimony established that in fact Kehoe and Lee took the Mueller vehicle a

significant distance from the Mueller house where it was abandoned. At trial there was testimony that following the Spokane City Hall bombing Kehoe and Lee were curious about whether the bombing would be reported in the morning paper. Apparently Ms. Kehoe was momentarily confused about the two incidents. The follow-up questions establish that she was aware of this confusion. Deputy Sheriff Duvall asked "So they stayed in that area for a while?". In response to this question, Ms. Kehoe made it clear that she was unsure about her son's remarks regarding staying in the area after the murders. She ultimately stated "I believe they just headed back straight to Spokane."

A review of the statement in light of the trial testimony shows that the statement gave petitioners' trial counsel no opening to impeach Gloria Kehoe's testimony. First Gloria Kehoe made it clear that she was not sure. After that she stated unequivocally that she believed petitioners had "just headed straight back to Spokane." She was confused about the timing of Kehoe's statement that he and Lee hung around for a few days. She clarified by saying "that could have been at Danny's mother's house." The trial testimony established that this is indeed what occurred. However, "the hanging around at Danny's mother's house" occurred prior to the Muellers' murders, not after. Gloria Kehoe's earlier statement makes it clear that she is not sure whether it was before or after, and her "I believe they just headed straight back to Spokane" clearly refers to the time immediately following the murders. Had trial counsel questioned her regarding this statement, Ms. Kehoe would have been easily rehabilitated when the government's counsel referred to that portion of the statement.

Respectfully submitted,

JANE W. DUKE
UNITED STATES ATTORNEY


By:     */s/ Dan Stripling*
        DAN STRIPLING, AR BAR #74142
        Assistant U. S. Attorney
        P. O. Box 1229
        Little Rock,  AR  72203
        (501) 340-2600


## CERTIFICATE OF SERVICE

I certify that a copy was mailed on this 9th day of June, 2008, to:

T. Clifton Harviel
50 N. Front Street, Suite 850
Memphis, TN 38103

David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042

Laurence E. Komp
Attorney at Law
Post Office Box 1785
Manchester, MO 63011


                        */s/ Dan Stripling*
                        Dan Stripling