IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


UNITED STATES OF AMERICA                    PLAINTIFF/ RESPONDENT

vs.                              NO: 4:97-CR-00243(02) GTE

DANIEL LEWIS LEE                             DEFENDANT/MOVANT

MOVANT'S SECOND SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF HIS 28 U.S.C. 2255 MOTION PURSUANT TO THE
COURT'S MAY 22, 2008 ORDER

COMES NOW Daniel Lewis Lee ("Movant"), by his undersigned counsel, and

files this second supplemental memorandum in support of his 28 U.S.C. § 2255

motion to vacate, set aside, and/or correct his convictions and sentences of death

("2255 motion").  Movant files this second supplement pursuant to this Court's May

22, 2008 order.  ECF Doc. 1156.

   I.    Procedural History

      On June 26, 2006, Movant filed his 2255 motion.  ECF Doc. 1118.  In his 2255

motion, Movant noted that he did not include full briefing or a legal memorandum in

support, but requested a status conference or a scheduling order.  *See Id.* at p. 1 n.1.

Movant raised seven grounds for relief.  *Id.*[1]  On December 6, 2006, the Government

filed its response.  ECF Doc. 1126. Thereafter, on April 9, 2007, Movant filed his

---

[1] The First Ground relates to ineffective assistance of counsel at the guilt phase and
has numerous subparagraphs: (A)(1)- (19) through (K).  The Second Ground relates to
ineffective assistance of counsel at the penalty phase and has numerous
subparagraphs: (A) through (M).  The Third Ground relates to ineffective assistance
of appellate counsel and has numerous subparagraphs: Subsection (A) through (F).

1

Reply in Support of his 2255 Motion which included extensive citation to legal authority and analysis.  ECF Doc. 1134.

Movant had also filed a request for expert funds related to mtDNA, which this Court granted.  Movant then filed the exculpatory mtDNA result (ECF Doc. 1138 Exhibit 1) and a memorandum regarding the same.  ECF Doc. 1139.  The Government responded not only to the mtDNA but to other claims raised by Movant.  ECF Doc. 1145.  Movant filed a reply.  ECF Doc. 1151.

While this Court accurately noted Movant's initial statement that matters were not fully briefed, the subsequent briefing with requests for factual development of the relevant issues has remedied that earlier statement.  Therefore, Movant does not intend to rehash his previous arguments but respectfully incorporates them by reference.  Movant however offers the below briefing to summarize the more pertinent issues facing the Court and to address any additional authority that may have issued relevant to the allegations of error.

II.    Argument

A.    Introductory Statement -

There is not overwhelming evidence of Movant's guilt.  If anything, the evidence pushes the pendulum in the other direction, that Movant is not guilty of the crimes charged and that there never was an "APR" whatever that may mean given the numerous definitions for the acronym offered by the Government.  The Government's case hinges upon an incredibly tight time-line for when Movant could have committed

this offense; rests almost completely upon the testimony of bargained for testimony; and a dearth of physical or scientific evidence pointing to Movant.

The time-line simply does not work.  A school teacher, Janis Rowlands, saw the Muellers on either February 2 or February 3.  Tr. 5800.[2]  Lucy Carr and Sue Sullivan also saw him in February.  Tr. 5812; 5817-18.  Ron Greer saw Bill Mueller close to the time a February news article appeared.  Tr. 5852-53. Mary Reid, a family friend, saw them the first week of February at a bank.  Tr. 5857.

Weaver did indicate she spoke with Mr. Mueller when he made a uniquely large water purchase.  Tr. 5832.  While she could not recall the exact date (Tr. 5833), a receipt for a large water purchase corroborates Weaver's testimony.  Tr. 6364 (receipt dated 1/22/96).  She further testified that a flyer about their disappearance could not be true because she had just seen Mr. Mueller.  Tr. 5835.  Trial counsel could have been bolstered the above with testimony from even more disinterested witnesses (Maria Ahrens, Vernon Ahrens, Pam Wrappe and Earlene Branch) that viewed or heard the Muellers after their purported deaths.  *See* Allegations I(A)(9-11)(13).

Further, trial counsel could have punctured the time-line as it relates to Movant's arrival in Washington.  Jeff Brown could have testified regarding Movant and Chevie's arrival at the Shadows Motel in Spokane.  Specifically, Brown would indicate that they arrived either late on January 12, or early morning January 13.  This

---

[2] Ms. Rowlands indicated it was her recollection that it was a snow day.  A stipulation corroborated her recollection; school had been canceled on February 2 due to inclement weather.  Tr. 6080.

eviscerates the time-line needed by the government to obtain Movant's conviction. Further, Brown's potential testimony would corroborate the trial testimony of Vada Campbell that Movant was at the Shadows Motel on January 13.  Tr. 5953-5954. Because it takes a significant period of time to drive from Arkansas to Spokane, the Government cannot have Movant's arrival time in Washington before the evening of the 14th, as it attempted to prove arrival time through a phone record.

Trial counsel utterly failed to attack the weakest component of the Government's case; the existence of a criminal enterprise, the alleged "APR." Indeed, the Government could not even consistently name the organization, instead relying on three different alleged names: "Aryan People's Republic", "Aryan People's Resistance," or "Aryan People's Revolution."  The fact the government could not pin down a name demonstrates the lack of a then existing enterprise at the time of the Muellers' disappearances.  Movant could have presented numerous witnesses (Kelly Kramer, Faron Lovelace, Norda Lewis and Jeff Brown) each of whom could have testified unequivocally that no such enterprise existed at all.  *See* Allegations I(A)(14-17).

Finally and while Movant does not have to establish who was an alternative actor, three witnesses testified Cheyne confessed to killing the Muellers. Tr. 6535-36 (Dino Giergedis); 6550 (James Harrison); 6568 (Robert Taylor).

At the penalty phase, Movant faced the identical jury as his co-defendant.  The same jury inexplicably gave a life sentence to the more culpable actor, Mr. Kehoe. According to the Government's best case, Mr. Kehoe spear-headed, conceived of,

orchestrated the crimes at issue, and was unquestionably the hands on killer of Sarah

Powell.[3]

The problem with the death sentences are that they rest on improperly

considered aggravators.  Movant's death sentences rest upon an improper mass

murder aggravator, which was not a part of the death penalty statute when the offense

occurred, and an inapplicable pecuniary gain factor in the circumstances of Movant's

case.  As a consequence, a properly-instructed jury would have found no statutory

aggravating factor as to the murder of the two adults, thus requiring a life verdict,

with only one remaining as to the child, her particular vulnerability.  This substantial

re-structuring of the sentencing calculus undermines each of the death sentences.

There is no comparison between the life sentence received by Mr. Kehoe as to the

little girl– the leader and organizer of this alleged venture, who attempted the murder

of police officers and, the government contends had killed before, and was the hands

on killer of the little girl because Movant refused, according to the Government's

witnesses – with the death sentence received by the "faithful dog," Movant.

B.     Habeas Grounds -

**First Ground for Relief – Ineffective Assistance of Counsel at the Guilt Phase**

Again Movant will not rehash his previous briefing, but simply offers the

following briefing based on recent authority per this Court's direction to "limited to

---

[3] In Movant's circumstance, his jury did not find that any act occurred with premeditation or substantial planning.  *See* Movant's Sarah Powell Verdict form p. 4, Movant's William Mueller Verdict form p. 5, Movant's Nancy Mueller Verdict form p. 4.

providing additional legal authority and analysis for claims previously presented." ECF Doc. 1156 p. 2.  Movant has alleged that his trial counsel were ineffective for various acts or omissions at the guilt phase of his trial.  ECF Doc.  1118 pp. 12-24.  Movant has fully briefed the applicable Supreme Court standards.  ECF Doc. 1134 pp. 3-9.  In sum, trial counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made.  *See Chambers v. Armontrout,* 907 F.2d 825, 828 (8th Cir. 1990) (*en banc*) ("The decision to interview a potential witness is not a decision related to trial strategy. Rather, it is a decision related to adequate preparation for trial.").

Counsel may neither shirk that investigative responsibility nor delegate that responsibility.  In Movant's case, his trial counsel failed to present numerous witnesses, or failed to seize upon opportunities of those witnesses that did testify, to raise a reasonable doubt in the mind of the jurors.  Movant satisfies the prejudice prong due to the utter lack of evidence implicating him in anything especially the existence of an "enterprise."  While the Respondent possessed a plethora of evidence implicating the bad acts of co-defendant Chevie Kehoe, little if any evidence pointed to Movant.

In Ground I(E), Movant alleges his attorneys were ineffective in failing to request and conduct mtDNA testing.  From opening through its closing, the Government asserted that a hair from a raid cap came from Movant.  *See* Tr. 1253, 1254, 1272, 7000-01, 7005.  According to the Government, "I submit to you, the

6

evidence establishes that was Danny Lee's hair." Tr. 7001.  This is significant in that the Government's theory was that these raid caps were worn to stage a raid when the Muellers were abducted and murdered.

In argument to the jury, the Government exaggerated and overstated the significance of the hair similarity.  In rebuttal closing, the Government relied in large measure on "Danny Lee's hair."  Tr. 7000, 7005.  Specifically, the Government argued "We recognize that [there might be out there somewhere another hair that could match], but here, I submit to you, the evidence establishes that was Danny Lee's hair."  Tr. 7000-01.  Thereafter, the Government again referred to it as "Danny Lee's hair."  Tr. 7005.  This seized upon Bequette's previous testimony that the only reason she could not make an exact match is because there was no database to allow her to compare it to every hair in the world.  (Tr. 3653).  The Government erroneously argued to the jury that only shortcomings in technology limited the declaration of a conclusive match, inadequate database.  In reality, existing technology could conclusively establish the incorrectness of the Government's testimony and arguments, and that the hair in the raid cap did not belong to Movant.  In this circumstance and contrary to the Government's position, counsel are ineffective when they allow the Government to argue for a conviction and death sentence based upon an inaccuracy, when technology exists[4] that would allow the inaccuracy to be revealed.

---

[4] While protocols required an "approximate" length of 2cm for mtDNA testing, the affidavits established the technology did exist to allow the testing Movant argues his

7

In *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007), the Sixth Circuit confronted an ineffectiveness claim related to a trial counsel's failure to secure expert services. The court noted:

> "A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance." *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006) (*quoting Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999)). Here, Richey's counsel appeared unconcerned about the State's scientific evidence from the very beginning. Although he was aware of the State's arson theory in July, Kluge did not contact DuBois until September and did not authorize him to begin work on the case until mid-November, just two months before the start of the trial. By the time DuBois advised Kluge in December that he agreed entirely with the State, Kluge might have been prevented by the imminence of trial from obtaining another expert, even had he formed misgivings about DuBois. Even more importantly, it is inconceivable that a reasonably competent attorney would have failed to know what his expert was doing to test the State's arson conclusion, *see* JA 2926 (Kluge testifying that he did not learn "until well after the trial" that DuBois had not performed his own independent testing), would have failed to work with the expert to understand the basics of the science involved, at least for purposes of cross-examining the State's experts, and would have failed to inquire about why his expert agreed with the State. A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the

---

attorneys should have requested. As noted by the Government in the affidavit from Meghan Clement of LabCorp, "if mtDNA analysis were requested on a hair less that 2cm in length, LabCorp would attempt the analysis only after obtaining permission from the submitting agency to consume the entire sample." ECF Doc. 1145 Ex. E. This is confirmed by the declaration of Brian Wraxall, Chief Forensic Serologist of Serological Research Institute. Unquestionably the technology existed to test a sample less than 2cm, however, the testing would consume the sample. ECF Doc. 1151 Exhibit A pars. 4 and 8. Thus, the technology existed at the time of Movant's trial – the protocols did not reflect a limitation on the technology but a safeguard to protect the sample from being exhausted.

basis for the expert's opinion is. Even DuBois expressed astonishment at Kluge's ready acquiescence to his conclusion that the State was right. DuBois testified that Kluge "was surprisingly nonargumentative with me or didn't challenge me on what I thought or why I thought what I did or anything. I was surprised at how unbiased he was about that, and I still am today." (JA 6361.)

The point is not that Kluge had a duty to shop around for another expert who would refute the conclusions of DuBois and the State's experts. The point is that Kluge had a duty to know enough to make a reasoned determination about whether he should abandon a possible defense based on his expert's opinion. *See Rompilla v. Beard*, 545 U.S. 374, 387, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.") (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)). Having simply been served up with DuBois's flat agreement with the State, and not having known either what DuBois did to arrive at his conclusion or why he came out where he did, Kluge was in no position to make this determination. *See id.* at 374 (holding that trial counsel performed deficiently when they failed to investigate a court file containing mitigating evidence even though they pursued other avenues of unearthing mitigating information, including interviewing the defendant and his family members and consulting mental-health professionals); *Wiggins*, 539 U.S. at 527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (stating that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision"); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) (holding that even where defense counsel elicited a concession from the state's expert that whether a particular blood type was on a knife was entirely speculative, defense counsel was defective for having failed to take measures "to understand the laboratory tests performed and the inferences that one could logically draw from the results"); *Dugas v. Coplan*, 428 F.3d 317, 328 (1st Cir. 2005) (holding that where defense counsel visually inspected the fire scene himself, talked with the state's experts, did some limited reading, and talked with other defense attorneys, he nonetheless failed to adequately investigate an available "no arson" defense).

*Richey*, 498 F.3d at 363. The significance of *Richey* is three-fold.

9

First, *Richey* found ineffectiveness under the more restrictive AEDPA review. Second, *Richey* involved a deference to a state expert – the same invitation made by the Government in its response to supplemental mtDNA memorandum when it suggested that there can be no ineffectiveness because a Government agent indicated it would not help.  *See* ECF Doc. 1126-2 par. 5 (Affidavit of Glen Jordan).  *Richey* makes clear that deferring to the government does not satisfy the Sixth Amendment – trial counsel still must make a reasonable investigation.  Third, *Richey* found ineffectiveness even though Mr. Richey's counsel obtained an expert.  Movant's counsel did even less than that: they did not request an expert or even consider requesting the same.

In Ground I(K), Movant alleges his attorneys were ineffective in failing to object to improper closing arguments by the Government.  A specific allegation related to the Government's reliance and argument concerning Kirby Kehoe's conviction.  Specifically, the Government argued the government argued: "Kirby Kehoe was involved in the enterprise.  Kirby Kehoe is not present today, because you've already been informed Kirby Kehoe pled guilty to Racketeering Count 1 for his role and his participation **in this criminal organization**."  Tr.  6823 (emphasis added).  In sum, Kirby pled for his role in an existing enterprise, "this criminal organization" the jury was currently considering.

Movant previously presented authority regarding the impropriety of this argument in that a co-defendant's guilty plea may not be used as a basis to establish another's guilt.  *See* ECF Doc. 1134 pp. 30-31.  In *United States v. Ramos-Cardenas*,

524 F.3d 600, 610-611 (5th Cir. 2008), the court recently found reference by a trial judge's instruction regarding a non-testifying co-conspirator to be "troubling" but concluding under the circumstances of the case to be harmless.

**Second Ground for Relief – Ineffective Assistance of Counsel at the Guilt Phase**

In *Brown v. Sanders*, 546 U.S. 212, 220 (2006), the Court held that "[a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances."

Movant faces a death sentence while the alleged main actor of the enterprise (Chevie Kehoe) faces a lesser sentence, another alleged member of the enterprise (Kirby Kehoe) has cut a deal and is currently a free man, and another alleged member of the enterprise (Faron Lovelace) simply had charges dropped. Movant faces a death sentence when the two aggravators (mass murder and pecuniary gain) as to the two adult victims were improperly considered. *See* Second Ground (A) and (B).

C.    Allegations Require Hearing and/or Discovery.

As noted in *Massaro v. United States*, 538 U.S. 500, 505-06 (2003), IAC claims "ordinarily will be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial. The court may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the

deficient performance…In addition, the § 2255 motion often will be ruled upon by the same district judge who presided at trial. The judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial." (citations omitted). Due to an undeveloped factual record on the IAC claims, this Court should withhold ruling on the IAC claims until conducting a hearing.

When Congress amended the 2254 procedures, no similar limitations were placed upon 2255 proceedings. *See Stead v. United States*, 67 F. Supp. 2d 1064, 1074 n.5 (D.S.D. 1999) ("Although the AEDPA modified, to some extent, the Townsend standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the Townsend standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases.")

Movant is entitled to an evidentiary hearing on his 2255 motion unless "the motion and the files and the records of the case conclusively show that [he] is entitled to no relief." 28 U.S.C. § 2255.  No hearing is required where the claim "is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994).  Where Movant's allegations, if true, amount to ineffective assistance of counsel, a hearing must be held unless the record "affirmatively refutes the factual assertions upon which [the claim] is based." *Shaw*, 24 F.3d at 1043.  A movant's burden to secure a hearing is

"relatively light." *Smith v. United States*, 348 F.2d 545, 551 (6th Cir. 2003); *see also*

*United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003) (same).

No evidence in the trial record contradicts Movant's assertion that he received

the ineffective assistance of trial counsel and appellate counsel.  While this Court is

not required to credit or even find credible Movant's assertions, this Court is required

to hold a hearing before making factual determinations about Movant's assertions. *See*

*Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001).  Movant's claims

relate to investigation and decision making occurring in pretrial and during trial – but

not in the  court room.  Thus, as noted in *Machibroda v. United States*, 368 U.S. 487,

494-95 (1962), a hearing is appropriate where Movant's allegations relate to

"purported occurrences outside the courtroom and upon which the record could,

therefore, cast no real light."

Movant recognizes that Respondent has secured an affidavit from two of

Movant's previous trial counsel (Mr. Lassiter and Ms. Coleman) and from one of the

co-defendant's trial counsel, as well as presenting other materials.  Movant requests

the opportunity to subject these affidavits and materials to an adversarial testing.  *See*

*United States v. Levy*, 377 F.3d 259, 265 (2nd Cir. 2004) (attorney affidavits are not

"completely unbiased" because counsel accused of IAC have a strong interest in not

being found ineffective).  This Court should not assess the credibility of these affiants

without the benefit of an adversarial process where Movant receives the opportunity

to confront the witnesses against him.  Further, again other than broad generalities, the

Government still has not established the contours of any "Chinese Wall" in place before Ms. Coleman arrived at the United States Attorney's Office.

As to the mtDNA, there appear to be contested factual issues. When there are contested factual issues in a § 2255 case, the 2255 may not be resolved through affidavits alone. *Koskela*, 235 F.3d at 1149 ("sharply conflicting evidence" made hearing mandatory).

While a hearing is required, this Court may avail itself of discovery prior to a hearing. The policies of *Blackledge v. Allison*, 431 U.S. 63, 81 (1977), envision that discovery serves as both an issue-clarifying process prior to an evidentiary hearings and as a potential substitute for a hearing.

REQUEST FOR RELIEF

WHEREFORE, Movant asks this Court for the following relief:

1. Issue a writ of habeas corpus that Movant be brought before the court to be discharged of his unconstitutional and illegal confinement and relieved of his unconstitutional and illegal conviction and/or sentence of death; alternatively,

2. Grant Petitioner, upon his request, the authority to obtain subpoenas for witnesses and documents necessary for an evidentiary hearing or discovery; and,

3. Order such hearings or discovery as may be necessary; and

4. Set a status conference or oral argument if necessary to assist the Court in considering Movant's arguments.

14

Respectfully submitted,

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490 (fax)
davidruhnke@ruhnkeandbarrett.com

-and-

/s/ Laurence E. Komp
Laurence E. Komp
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
(636) 207–7330
(636) 207–7351 (fax)
lekomp@swbell.net

COUNSEL FOR MOVANT

CERTIFICATE OF SERVICE

Movant's counsel have filed this Second Supplemental Memorandum on today's date via ECF, thereby serving the United States and all parties.

/s/ Laurence E. Komp
COUNSEL FOR MOVANT

Electronically         Little Rock, Arkansas
filed:                 June 20, 2008