IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA                    PLAINTIFF/ RESPONDENT

vs.                          Case No: 4:06-CV-1608 GTE
                             (Criminal Case No. 4:97-CR-00243-(2) GTE)

**ORAL ARGUMENT REQUESTED**

DANIEL LEWIS LEE                            DEFENDANT/MOVANT

**MOVANT'S MOTION TO ALTER AND AMEND JUDGMENT
PURSUANT TO FED. R. CIV. P. 59(E)**

COMES NOW Daniel Lewis Lee ("Mr. Lee"), by his undersigned counsel, and hereby moves the Court, pursuant to Fed. R. Civ. P. 59(e), to alter or amend its Judgment issued September 4, 2008, denying Mr. Lee's motion for post-conviction relief pursuant to 28 U.S.C. § 2255. In support of this motion, Mr. Lee states the following grounds:

**PROCEDURAL HISTORY**

Mr. Lee filed his motion for post-conviction relief pursuant to 28 U.S.C. § 2255 on June 26, 2006. ECF Doc. 1118. After briefing by both parties, but without taking any evidence, this Court issued an opinion denying Mr. Lee's 2255 motion on August 28, 2008. ECF Doc. 1163 (hereinafter, "Order"). On September 4, 2008, this Court issued its judgment entry. ECF Doc. 3 (Case No: 4:06-CV-1608 GTE).[1] Petitioner now timely files his motion to alter and amend pursuant to Fed. R. Civ. P. 59(e).[2]

---

[1] Unless otherwise noted, all ECF cites relate to filings in Case No. 4:97-CR-00243-(2) GTE.

[2] The ten-day period contemplated by Rule 59 does not does not begin to run until after entry of a valid judgment entry. *Taylor v Teletype Corp.*, 550 F Supp 781 (E.D. Ark. 1982) (Motion to amend memorandum and order issued in employment discrimination action is timely

1

**POLICY BEHIND FED. R. CIV. P. 59(E) AND APPLICABLE STANDARDS**

The Supreme Court has noted that Fed. R. Civ. P. 59(e) ("Rule 59") was adopted "to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment." *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982) (internal quotations omitted); *see also Ray E. Friedman & Co. v. Jenkins*, 824 F.2d 657, 660 (8th Cir. 1987). This Court has broad discretion in deciding whether to grant a motion under Rule 59(e). *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998).

A Rule 59 is appropriate in cases where court has based its order on a factual error. *Norman v Arkansas Dep't of Educ*. 79 F3d 748 (8th Cir. 1996); see *also Innovative Home*, 141 F3d at 1286. A Rule 59 also lies when a manifest error of law has occurred. *Innovative*, 141 F.3d at 1286. Finally, Rule 59 relief is appropriate to consider evidence that was not available to the court when it issued its decision or to prevent manifest injustice. *See, e.g., Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999); *see also Firestone v Firestone*, 76 F.3d 1205 (D.C. Cir. 1996) (same); *Global View Ltd. Venture Capital v Great Cent. Basin Exploration, L.L.C.*, 288 F Supp 2d 482 (S.D. NY 2003) (same).

**BASIS FOR RULE 59**

Petitioner is not re-presenting each and every allegation of error, although all claims in his 2255 motion are meritorious. Petitioner only asserts those allegations of error that demonstrate a manifest error of law and fact, or present a manifest injustice. Mr. Lee's decision not to address any particular claim in this motion constitutes neither a waiver nor a withdrawal of a claim

---

even though not brought within 10 days of date or order where there has been no entry of judgment from which 10-day amendment period would commence).

2

**THE COURT COMMITTED LEGAL ERROR IN DENYING THE § 2255 MOTION WITHOUT THE BENEFIT OF AN EVIDENTIARY HEARING**

Despite Mr. Lee having requested an evidentiary hearing on various claims alleged in his § 2255 motion, this Court denied the motion without the benefit of an evidentiary hearing.  This Court's denial of a hearing constituted a manifest error of law.  Not only did this Court's ruling not comport with the applicable statutory standard for when such a hearing must be granted, but the Court also committed legal error in at least two other respects: (1) the Court erroneously grafted an "affidavit requirement" onto the standard that governs evidentiary hearings in § 2255 proceedings; and (2) the Court made credibility determinations on the basis of government proffered affidavits alone.  These are manifest errors of law, and Mr. Lee respectfully requests that this Court reconsider its ruling denying an evidentiary hearing on his § 2255 claims.

A.    **The Standard Governing Evidentiary Hearings in § 2255 Proceedings is a Liberal One, Under Which There is a Presumption in Favor of Holding a Hearing Whenever Disputed Issues of Fact Are Alleged.**

The standard for granting an evidentiary hearing in a § 2255 case is set out in 28 U.S.C. § 2255, which states: "Unless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C. § 2255, ¶ 2.  As the plain text of the statute makes clear, there is a presumption in favor of holding an evidentiary hearing in a § 2255 proceeding: "*Unless* the motion and the files and the records of the case *conclusively* show that the prisoner is entitled to no relief, the court *shall . . . grant a prompt hearing thereon . . .*"  (emphasis added).

Indeed, Congress intended that the standard for obtaining an evidentiary hearing in a § 2255 proceeding be a liberal one, a fact which is borne out by the legislative history of this

statute. Prior to the passage of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the standard governing the granting of evidentiary hearings in federal court for both §§ 2254 and 2255 proceedings[3] was set out by *Townsend v. Sain*, 372 U.S. 293, 312 (1963): "Where the facts are in dispute, the federal court in habeas corpus *must* hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." (Emphasis added).[4] When Congress passed AEDPA, it made revisions to both § 2255 and § 2254, but those revisions differed as to the evidentiary hearing provisions of the respective statutes. With respect to § 2254 proceedings, Congress legislatively modified the *Townsend* standard and severely limited a federal district court's discretion to even grant an evidentiary hearing on a § 2254 petition. *See* 28 U.S.C. 2254(e). The stated rationale for this change was that in a § 2254 proceeding, a petitioner has purportedly already had the opportunity for an evidentiary hearing as part of the state court post-conviction proceedings, so principles of comity and federalism required deference to findings of fact made by the state courts.

---

[3] 28 U.S.C. § 2254 governs post-conviction motions filed in federal court arising out of *state* convictions, whereas 28 U.S.C. § 2255 governs post-conviction motions filed in federal court arising out of *federal* convictions.

[4] The *Townsend* court further identified six circumstances under which a federal court must grant an evidentiary hearing:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

372 U.S. at 313. These factors are obviously not relevant to a § 2255 proceeding, as there is no prior state hearing in a case attacking a federal conviction. Thus, even pre-AEDPA, there were still significant differences between §§ 2254 and 2254 proceedings regarding the showing necessary to obtain an evidentiary hearing in federal court, due to concerns of comity and deference to state-court fact-finding.

Congress however, placed no such similar limitations on the standard for granting an evidentiary hearing in § 2255 proceedings, as is evident by comparing the text of § 2254(e) with § 2255. *See Stead v. United States*, 67 F. Supp. 2d 1064, 1074 n.5 (D.S.D. 1999) ("Although the AEDPA modified, to some extent, the *Townsend* standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the *Townsend* standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases.")  As a result, Mr. Lee's request for an evidentiary hearing is governed by the more liberal pre-AEDPA standard articulated in *Townsend*, which states that an evidentiary hearing *must* be granted if there are disputed issues of fact in the proceeding.[5]

Indeed, as the Supreme Court has recognized, the need for a hearing in § 2255 proceedings will frequently be necessary on account of the fact that the claim most often litigated in such proceedings is that trial counsel rendered ineffective assistance – in other words, a claim which ordinarily cannot be resolved on the extant record because the allegation involves events and occurrences that took place outside the courtroom.  As the Court explained in *Massaro v. United States*, 538 U.S. 500, 504-506 (2003):

> In light of the way our system has developed, in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance. When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose.  Under *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.  The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis.  If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it.  The appellate court may have no way of knowing whether a seemingly unusual or misguided

---

[5] The specific disputed issues of fact that warrant a hearing here are discussed below.

action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse.  *See Guinan, supra*, at 473 (Easterbrook, J., concurring) ("No matter how odd or deficient trial counsel's performance may seem, that lawyer may have had a reason for acting as he did. . . . Or it may turn out that counsel's overall performance was sufficient despite a glaring omission . . ."). The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them.  And evidence of alleged conflicts of interest might be found only in attorney-client correspondence or other documents that, in the typical  criminal trial, are not introduced. *See, e.g., Billy-Eko*, 8 F.3d at 114. Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial.

 Under the rule we adopt today, ineffective-assistance claims ordinarily will be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial. The court may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance.  *See, e.g., Griffin, supra*, at 1109 (In a § 2255 proceeding, the defendant "has a full opportunity to prove facts establishing ineffectiveness of counsel, the government has a full opportunity to present evidence to the contrary, the district court hears spoken words we can see only in print and sees expressions we will never see, and a factual record bearing precisely on the issue is created"); *Beaulieu v. United States*, 930 F.2d 805 (CA10 1991) (partially rev'd on other grounds *United States v. Galloway, supra*). In addition, the § 2255 motion often will be ruled upon by the same district judge who presided at trial. The judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial.

*See also Machibroda v. United States*, 368 U.S. 487, 494-495 (1962) (holding that movant was entitled to evidentiary hearing where § 2255 claim "related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light. Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.").

Despite the statutory presumption in favor of granting an evidentiary hearing in a § 2255 proceeding when there are disputed issues of fact, and the demonstrable need for further factual development of the claims alleged in Mr. Lee's § 2255 motion, this Court denied Mr. Lee's request for an evidentiary hearing.  This Court's denial of that request constituted legal error.

6

**B.      This Court Erroneously Grafted an "Affidavit Requirement" onto the Statutory Standard Governing Evidentiary Hearings in § 2255 Proceedings.**

In denying Mr. Lee's request for an evidentiary hearing, this Court relied on the fact that Mr. Lee did not submit affidavits in support of his claims in his § 2255 motion. Indeed, throughout the Order, this Court repeatedly asserts that submitting affidavits is a *necessary requirement* of the legal standard for obtaining an evidentiary hearing in a § 2255 proceeding. *See* Order at 18 (citing the "absence of the *necessary* offers of proof" and "fail[ure] to include supporting affidavits" as the basis for denying an evidentiary hearing) (emphasis added); *id.* at 21 ("a petitioner *must* present independent evidence, by affidavit or otherwise, as to what the witness would have said if he or she had been interviewed or called to testify") (emphasis added); *id.* at 22 ("Petitioner has provided no affidavits from the myriad of witnesses whom he claims should have been interviewed or called to testify. Such omission is arguably *fatal* to any finding of prejudice.") (emphasis added). However, there is no such "affidavit requirement" present in the relevant statutory and legal authority governing the standard for granting evidentiary hearings in § 2255 proceedings, and the Court's grafting of such a requirement onto the applicable standard is a manifest error of law.

As noted earlier, the standard governing evidentiary hearings in § 2255 proceedings is set out by 28 U.S.C. § 2255. Nowhere in that statutory standard is there a requirement that a movant must provide supporting affidavits in order to obtain an evidentiary hearing. The statute merely requires that: (1) the movant allege facts that, if true, would entitle him to relief; and (2) there exist disputed issues of fact on the movant's claim that cannot *conclusively* be resolved on the extant record alone. Indeed, as the Eleventh Circuit has succinctly explained, the § 2255 motion need only allege the relevant legal and factual bases for relief in order to obtain a hearing; any proof in support of those claims need not be submitted until the time of the hearing:

> The law is clear that, in order to be entitled to an evidentiary hearing, a petitioner need only *allege* – not prove – reasonably specific, nonconclusory facts that, if true, would entitle him to relief. If the allegations are not *affirmatively contradicted* by the record and the claims are not patently frivolous, the district court is *required* to hold an evidentiary hearing. *It is in such a hearing that the petitioner must offer proof.*

*Aaron v. United States*, 291 F.3d 78, 715 n.6 (11th Cir. 2002) (emphasis in original and emphasis added). This Court's assertion that under § 2255 a movant *must* provide supporting affidavits in order to obtain a hearing improperly grafts a requirement onto the statute and is a manifest error of the law.

Indeed, it is not the "absence" of affidavits regarding Mr. Lee's claims but whether the "the record *affirmatively* refutes the factual assertions upon which it is based." *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994) (reversing and remanding § 2255 motion for an evidentiary hearing regarding the reasons why counsel failed to offer certain evidence in defense of his client at trial) (emphasis added). *See also Estes v. United States*, 883 F.2d 645, 649 (8th Cir. 1989)(same). Contrary to this Court's construction of the statute, every inference alleged in a § 2255 motion must be drawn in the movant's favor, particularly where, as here, Mr. Lee has pled facts that if true would entitle him to relief, and yet, the Court has not granted an evidentiary hearing. *See* 28 U.S.C. § 2255 ¶ 2; *Townsend*, 372 U.S. at 312-13 (requiring a hearing in federal habeas proceedings where the petitioner has alleged facts which, if proven, would entitle him to relief and where the district court has not resolved the merits of the factual dispute in a full and fair hearing); *Fontaine v. United States*, 411 U.S. 213, 215 (1973).[6]

---

[6] *See also Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994) (remanding to the district court for evidentiary hearing on ineffective assistance of counsel claims); *Lawrence v. Armontrout*, 900 F.2d 127 (8th Cir. 1990); *Simmons v. Lockhart*, 856 F.2d 1144 (8th Cir. 1988); *Grigsby v. Mabry*, 637 F.2d 525 (8th Cir. 1980) (citing *Townsend*).

The Court's reliance on *Kafo v. United States*, 467 F.3d 1063 (7th Cir. 2006) and *Porcaro v. United States*, 832 F.2d 208 (1st Cir. 1987) is inapposite. *See* Order at 18 n.112. In *Kafo*, 467 F.3d at 1071, the Seventh Circuit reversed the district court for denying a § 2255 motion without a hearing because the movant allegedly failed to properly "verify" his § 2255 motion. At issue in *Kafo* was Rule 2(b)(5) of the Rules Governing § 2255 Proceedings for the United States District Courts (hereafter "§ 2255 Rules"), which requires that the motion "be signed under penalty of perjury by the movant or by a person authorized to sign it for the movant," and Local Rule for the Northern District of Illinois 81.3(a), which requires that the movant file an accompanying sworn supporting affidavit attesting to the proof relied upon in support of the motion. The movant in *Kafo* failed to sign the 2255 motion under penalty of perjury, and failed to file such an affidavit pursuant to the Local Rule. Despite these technical deficiencies, however, the Seventh Circuit held that the motion provided a sufficient statement of his factual claims to permit further evaluation, and therefore remanded the case to the district court to permit the movant an adequate opportunity to submit a verified version of the amended complaint or a supplemental affidavit.

The facts of *Kafo* are significant in a number of respects. First, *Kafo* highlights that the "affidavit requirement" discussed in that case was not derived from either § 2255 or the § 2255 Rules, but rather from Local Rules for the Northern District of Illinois. The Local Rules for the Eastern District of Arkansas, however, do *not* require the filing of an affidavit in support of a § 2255 motion. *See* Local Rules for the Eastern District of Arkansas, http://www.are.uscourts.gov/default.cfm?content=LocalRules (last visited September 16, 2008). Unlike the movant in *Kafo*, Mr. Lee's § 2255 motion was in compliance with both the § 2255 Rules and the applicable Local Rules. This Court cannot, on its own, impose an affidavit

9

requirement on Mr. Lee which is not required by statute or rule. The Court's imposition of such a requirement is manifestly erroneous.

Additionally, it should be noted that in *Kafo*, despite the fact that the movant there did not supply the requisite affidavit, the Seventh Circuit did *not* affirm the denial of his motion without a hearing. Rather, the Seventh Circuit reversed the district court's denial and ordered the district court to allow the movant an adequate opportunity to submit a verified version of the § 2255 motion or a supplemental affidavit, because the motion "provide[d] a sufficient statement of his allegation to permit further evaluation." 467 F.3d at 1071. In other words, the *Kafo* court recognized that the touchstone of analysis with respect to whether a hearing is warranted is not whether there is an accompanying affidavit swearing to the proof in support of the motion, but whether the claims, as alleged in the motion itself, permit an inference that there is a sufficient disputed issue of fact to warrant a hearing.

In *Porcaro*, 832 F.2d at 210-211, the movant obtained a remand from an appellate court in his § 2255 proceeding and faced a scheduling order requiring the submission of affidavits. In those circumstances (not surprisingly), the appellate court held that the failure to comply was fatally defective to his motion. Unlike *Porcaro*, this Court never put Mr. Lee on notice that affidavits or other alternative measures would be considered, or imposed any scheduling order requiring that affidavits be submitted to the Court by a certain date.[7] *Porcaro*, therefore, is

---

[7] Mr. Lee made numerous requests for a status conference or presentation to the Court regarding how the parties should proceed, or specific arguments that the allegations needed to be factually developed or tested. *See* ECF Doc. 1181 pp. 1, 42; ECF Doc. 1134 pp. 1, 3, 7, 10-11, 14, 19-20, 23, 27-28, 45, 47, 51-52, 53; ECF Doc. 1151 pp. 6-8. Indeed, the undersigned filed a motion suggesting a status conference to schedule matters and proceedings for the remainder of the case (ECF Doc. 1152), but this Court denied that request. ECF Doc. 1153. In denying this request this Court noted: "Petitioner Daniel Lewis Lee has requested 'a status conference to discuss the need for a hearing, scheduling, and any other pertinent issues.' The Court concludes that there is no reason for a status conference at this time. This Court does not conduct status

10

distinguishable on its facts, and does not provide a basis for denying Mr. Lee's § 2255 motion without a hearing.

This Court's Order also cited to *Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989), for the proposition that there is an affidavit requirement in § 2255 cases. The Court's reliance on *Trickey* is misplaced. The Order incorrectly describes *Trickey* as the denial of a § 2255 motion because the movant failed to support the alleged ineffective assistance claim with a detailed affidavit from a proposed witness. *See* Order at 21 n.3. *Trickey*, however, is *not* a § 2255 case. *See Trickey*, at 206 ("Robert Sanders (appellant), a Missouri state prisoner, appeals from a judgment entered July 28, 1988 in the Eastern District of Missouri, Eastern Division, Clyde S. Cahill, District Judge, which adopted the report and recommendation of Magistrate William S. Bahn and denied appellant's petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254 (1982)."). In *Trickey*, the petitioner had already received a "full and fair" evidentiary hearing as part of his state court proceedings, at which findings of fact were made, and to which the federal district court owed a presumption of correctness. 875 F.2d at 207-208, 211 n.9. Indeed, the petitioner did not even allege that he was entitled to a hearing in federal court, but merely proceeded on the basis of the record developed in state court. As the district court correctly noted, the petitioner could not demonstrate any prejudice due to trial counsel's failure to have called the proposed witness because the petitioner "produced no affidavit or testimony" from the proposed witness *at the state court hearing* regarding what the witness would have

---

conferences. Rather, this Court's practice is to schedule hearings only when there is an issue before the Court requiring additional input from the parties, legal argument, or the presentation of evidence. There is no such issue at this time. When the Court considers Mr. Lee's § 2255 motion, it will schedule a hearing if it concludes that a hearing will be helpful in the resolution of the motion." ECF Doc. 1153. The Order gave the undersigned absolutely no notice that the Court expected counsel to provide affidavits to the Court in support of the motion, nor could have undersigned counsel have even anticipated such a thing in light of the lack of such an affidavit requirement under the Local Rules of the Court.

testified to at trial. *Id*. at 210.  In other words, the Eighth Circuit's ruling stands for the relatively uncontroversial proposition that a petitioner who is given a hearing on a habeas claim must present evidence at that hearing to support his claim.  Here, however, Mr. Lee was not even given the opportunity to present his evidence because the Court did not grant a hearing.  This Court's reliance on *Trickey* in denying Mr. Lee a hearing is therefore erroneous, as it imposes no "affidavit requirement" on § 2255 litigants before a hearing may be granted.

As is obvious, Mr. Lee has supported his Rule 59 motion with affidavits and other evidence as permitted by Rule 59(c).  By doing so, Mr. Lee is not conceding that affidavits are a necessary component under § 2255 and *Townsend*.  Mr. Lee offers such as an example, albeit a small part, of the nature of the evidence that would be presented at a hearing or developed in discovery, and in an effort to address the Court's concerns expressed in the Order.  The attached exhibits merely reinforce the specific factual allegations from Mr. Lee's verified motion, which are neither conclusively rebutted by the record nor the evidentiary materials filed by the government, and thus factual development was required under § 2255 and *Townsend*.

**C.**     **This Court Erroneously Made Credibility Determinations on the Basis of Affidavits Alone Filed By The Government.**

The United States Supreme Court addressed the standard for granting an evidentiary hearing in a § 2255 proceeding in *Machibroda v. United States*, 368 U.S. 487 (1962).[8]  There,

---

[8] It should be noted that *Machibroda* is cited in Rule 5 of the Rules Governing Section 2255 Proceedings, which concerns the government's answer and the movant's traverse.  As the Advisory Committee Notes state:

> Numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held. *Machibroda v. United States*, 368 U.S. 487, 494, 495 (1962); *United States v. Salerno*, 290 F.2d 105, 106 (2d Cir.1961); *Romero v. United States*, 327 F.2d 711, 712 (5th Cir.1964); *Scott v. United States*, 349 F.2d 641, 642, 643 (6th Cir.1965); *Schiebelhut v. United States*, 357 F.2d 743, 745 (6th Cir.1966); and *Del Piano v. United States*, 362 F.2d 931, 932, 933 (3d Cir.1966).

the Court remanded for an evidentiary hearing to determine whether the movant's plea was involuntary because it was allegedly induced by promises made by the prosecuting attorney as to the length of the sentences that would be imposed. The movant and the prosecutor filed conflicting affidavits on the factual matter of whether such promises were made. The district judge decided, without a hearing, that the movant's allegations were false and denied the § 2255 motion. The Supreme Court held that the district court did not act in conformity with the provisions of section 2255. As it noted:

> This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the "files and records" in the trial court. *The factual allegations contained in the petitioner's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light.* Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

368 U.S. at 494-495 (emphasis added). As the Court further noted:

> *Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge.* The Government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence. On this record it is his right to be heard.

368 U.S. at 495 (emphasis added) (citation and quotation marks omitted). *See also United States v. Unger*, 665 F.2d 251, 254 (8th Cir. 1981) (explicitly adopting the *Machibroda* standard and holding that "an evidentiary hearing should be held where . . . the factual allegations contained in the petitioner's motion and affidavit relate primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light and where the circumstances alleged are not of a kind that the District Judge could completely resolve by

---

Advisory Committee Notes to Rule 5, Rules Governing Section 2255 Cases.

drawing upon his own personal knowledge or recollection") (citations and internal quotation marks omitted).

As *Machibroda* makes clear, an evidentiary hearing must be conducted when there are material facts in dispute and those facts relate to events that occurred outside the courtroom and, therefore, are not memorialized in the trial record. These are precisely the kinds of material facts which are in dispute here – namely, the actions that trial counsel did and did not take in investigating and preparing for Mr. Lee's capital trial. The facts regarding counsel's conduct, actions and decision-making in preparing and litigating the case are not contained in the trial record, and to the extent that some of those facts have been adduced in the § 2255 proceedings, in the form of affidavits and sworn declarations submitted by the government, these statements have not been tested in an adversarial setting, and are disputed by Mr. Lee. As in *Machibroda*, the only way these factual disputes can be resolved is through an evidentiary hearing, at which witnesses can be called and questioned, and specific factual findings regarding counsel's conduct and performance can be made.

Throughout its Order, however, the Court routinely relied on untested affidavits laden with hearsay in denying Mr. Lee's § 2255 claims. Order pp. 28, 39-40, 40, 41. In some circumstances, this Court relied upon the affidavit of a co-defendant's counsel to deny a claim - an affidavit also premised upon hearsay. Order pp. 25, 32, 50-51. Similarly, this Court relied on the affidavit of Mr. Lee's previous counsel, again based on uncorroborated hearsay. Order pp. 23, 25, 33, 50-51, 56-57, 59. Finally, when no evidence existed that rebutted Mr. Lee's allegations or there was an absence in the government's self-serving attorney affidavits, the

Court simply presumed that there must have been a strategy reason or imported a strategy reason from another affidavit.  Order pp. 36, 51-52.[9]

In doing so, this Court acted contrary to clear precedent which states that a district court cannot make credibility determinations based on the pleadings and affidavits alone.  *See*, *e.g.*, *Koskela v. United States*, 235 F.3d 1148 (8th Cir. 2001) (district court abused its discretion in finding a hearing unnecessary and making credibility determinations about the witnesses based solely on competing affidavits); *Watson v. United States*, 493 F.3d 960, 964 (8th Cir. 2007) ("Although the district court was not required to credit [the movant's] assertion, it was required to hold a hearing before making factual determinations about [the movant's] credibility."); *Latorre v. United States*, 193 F.3d 1035, 1039 (8th Cir. 1999) (government's proffer of testimony by trial counsel and other witnesses to refute movant's allegations was an insufficient basis to deny an evidentiary hearing; "[T]hese witnesses were not heard at the § 2255 hearing in the District Court.  Assertions by counsel cannot foreclose an evidentiary hearing, at which such testimony can be taken and subject to cross-examination."); *Smith v. United States*, 182 F.3d 1023, 1026 (8th Cir. 1999) (where movant and trial counsel filed conflicting affidavits regarding their out-of-court discussions, a hearing was necessary to resolve the facts that were in dispute). *See also Daniels v. United States*, 54 F.3d 290, 295 (7th Cir. 1995) ("The only evidence before the district court . . . consisted of the conflicting, sworn affidavits of [trial counsel] and [movant]. The district court attempted to judge the credibility of [movant's] claim based on the affidavits alone, and we are compelled to conclude that this approach was in error. A determination of credibility cannot be made on the basis of an affidavit."); *Castillo v. United States*, 34 F.3d 443,

---

[9] In this respect, this Court's determination resembles the "post-hoc" assessment found constitutionally wanting in *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003) (cautioning against courts invoking "strategy" as a "post-hoc rationalization of counsel's conduct, [rather] than an accurate description of their deliberations.")

445-46 (7th Cir. 1994) ("a determination of credibility cannot be made on the basis of an affidavit. That is, a judge cannot take two affidavits which swear to opposite things and say, 'I find one of the affidavits more credible than the other, and therefore I shall accept it as true.' The purpose of inviting affidavits . . . is to determine whether there is a dispute over a material issue of fact, rather than to enable the judge to resolve the dispute by picking one affidavit over another that contradicts it, as the judge did here. . . . [T]he judge did with the probation officer's affidavit what he was not permitted to do, and determined that the affidavit, though contradicted by another affidavit, was true").

Here, the Court relied on affidavits without allowing Mr. Lee the opportunity to confront and examine the affiants.  This Court committed manifest legal error in resolving factual questions and making credibility findings with respect to the assertions made in the government's affidavits in the absence of a hearing, where these witnesses could be called and their conflicting statements could be questioned under oath.  The case of *Brown v. Johnson*, 224 F.3d 461, 467 (5th Cir. 2000), is instructive on this point.  There, the Fifth Circuit remanded a pre-AEDPA, non-capital Texas murder case for an evidentiary hearing after criticizing the district court for relying solely on an unsolicited affidavit submitted by the state to deny petitioner's claim, despite the fact that no evidentiary hearing had ever been held in state or federal court. The Fifth Circuit explained:

> If a district court decides to forgo a full-blown hearing with plenary presentation of evidence, . . . it must "seek as a minimum to obtain affidavits from all persons likely to have firsthand knowledge" of the facts relevant to the claim under consideration. [footnote omitted] In other words, a district court must at a minimum make an independent determination concerning what evidence is required to resolve the defendant's claim, and must solicit the best evidence, short of live testimony of witnesses, that each of the parties is capable of producing.  In the instant case, the district court made no independent determination concerning what evidence it required to resolve [petitioner]'s . . . federal claim. The court's fortuitous and unsolicited receipt of evidence pertaining to that claim in the form

of [trial counsel]'s expansive affidavit does not constitute an adequate substitute for the balanced-evidence hearing to which [petitioner] is constitutionally entitled. Even if the district court had specifically requested that the state submit evidence regarding the claim, the court's failure to solicit any evidence whatsoever from [petitioner] before ruling on it satisfactorily demonstrates that the procedures employed by the court were inadequate to satisfy the dictates of *Townsend*.

*Brown*, 224 F.3d 461 at 467.

In conclusion, it is respectfully submitted, that consistent with all the aforementioned statutory authority and legal precedent, this Court must vacate its denial of the § 2255 motion and grant an evidentiary hearing or alternative means of factual development in order that a factual record can be made as to Mr. Lee's claims. Of particular importance, Mr. Lee points to the specific claims asserted below and the attendant need for factual development.

### *INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD*

Prior to examining the specific allegations of Mr. Lee's ineffective assistance of counsel claims, the *Strickland v. Washington*, 466 U.S. 668 (1984) standard must be revisited. In short, a movant needs to demonstrate both that his attorneys were deficient and that the movant was prejudiced. As to both prongs, this Court committed a manifest error of law.

Regarding the deficiency prong, the Court committed a manifest error of law by declaring actions "tactical,"[10] but never assessing the reasonableness of the alleged tactical decision. It is not enough for there to be a tactical decision – it must be a reasonable tactical decision. It is well-established that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "The relevant question is not whether counsel's choices were strategic, but whether they were

---

[10] As previously noted, *Wiggins* requires a basis in the record for a decision to be declared "tactical. It must not be a "post-hoc" rationalization. Again, Mr. Lee has had no factual development, thus there is no record upon which this Court can rely in complying with its responsibility under *Massaro*.

17

reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). In *Wiggins v. Smith*, 539 U.S. 510, 523 (2003), the Supreme Court reaffirmed that it is not that a decision had been made, "rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*." (emphasis in original)(citation omitted); *Skillicorn v. Luebbers*, 475 F.3d 965, 975 (8th Cir. 2007) (court assessed whether the decision was reasonable). *Cagle v. Norris*, 474 F.3d 1090, 1097 (8th Cir. 2007) (same).

As to the prejudice prong, this Court also committed a manifest error of law in imposing the unconstitutionally strict prejudice standard invited by the government. The government had argued that *Lockhart v. Fretwell*, 506 U.S. 364 (1993)(requiring an additional fairness or reliability of the trial requirement), modified the burden of prejudice imposed upon Mr. Lee to establish a *Strickland* violation. *See* ECF Doc. 1126 pp. 36, 73 ("Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. *Lockhart v. Fretwell*, 506 U.S. at 369-70.")

In reversing the Fourth Circuit, the United States Supreme Court rejected this precise argument in *Williams v. Taylor*, 529 U.S. 362 (2000); *see also Strickland*, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice"). This Court committed manifest error in accepting the government's invitation to apply the incorrect standard, and in assessing each of Mr. Lee's claims "with this standard in mind." *See* Order p. 20.

The correct standard of prejudice only requires that Mr. Lee's allegations undermine confidence in the integrity of the verdicts by proving by a preponderance of the evidence that one juror may have been persuaded differently. In *Wiggins*, 539 U.S. 510, the Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system, confidence in the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." *Id.* at 536. The Supreme Court has stressed that "the adjective ["reasonable"] is important" and equated it with "a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). As explained in *Strickland* itself:

> "[R]easonable probability of a different result" is thus *less than a preponderance of the evidence*. It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome."

*Strickland*, 466 U.S. at 693 (emphasis added).

In summary, this Court's analysis of the ineffectiveness claims is layered with two manifest errors of law. One, in considering *Strickland's* first prong, deficient performance, the Court never assessed the reasonableness of the alleged tactical basis for counsel's presumed tactical actions. Two, in considering *Strickland's* second prong, prejudice, the Court applied the *Lockhart* standard rejected by the United States Supreme Court.

### *GROUNDS FOR RELIEF*

#### *Claim II(H) & (J) – Ineffectiveness related to psychopathy evidence.*

In the modern era of the death penalty, three men have been sentenced to death in federal capital trials in which expert witnesses purported to scientifically "prove" the defendants were psychopaths who would always be dangerous even in prison. One was Aquilia Barnette.[11] The Fourth Circuit set aside his death sentence, finding that the expert testimony was *"*as damning as

---

[11] *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000).

it could be."[12]    Another was Richard Stitt.  He, too, has had his death sentence set aside. Although granting relief on different grounds, the district court there found that the expert, Dr. Thomas Ryan, had recanted his prior testimony as scientifically invalid, and that it was "clear that jury might have reached a different verdict," but for Dr. Ryan's expert testimony.[13]  The only remaining person on federal death row whose death sentence was predicated upon psychopathy evidence is Daniel Lee.  The dehumanizing and deeply prejudicial impact of such evidence, recognized by numerous courts, and deemed clearly unethical by psychologists who are experts in the field, has also been demonstrated by social science research to be profoundly affecting to sentencing juries.  *See infra*.

Despite evidence available at the time of Mr. Lee's trial which would have allowed trial counsel to object to the introduction of such psychopathy evidence, either through argument or examination, as scientifically invalid and non-probative of the issue of future dangerousness, trial counsel failed to present this argument to the district court as part of a full and adequate objection to the psychopathy evidence.[14]  The resulting unfair prejudice to Mr. Lee was

---

[12] *Barnette*, 211 F.3d at 825.

[13] *Stitt v. United States*, 369 F. Supp. 2d 679, 699-700  (E.D. Va. 2005), *affirmed by, remanded by United v. Stitt*, 441 F.3d 297 (4th Cir.), *recalled by, vacated by, appeal dismissed by United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006).

[14] As is explained in more detail below, this is *not* the same claim as was previously decided by the Eighth Circuit in *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001).  There, the Eighth Circuit was ruling on an *evidentiary* issue regarding whether the district court erred in admitting psychopathy evidence at Mr. Lee's trial.  The Eighth Circuit's resolution of that issue turned on its assessment that the psychopathy evidence was probative of Mr. Lee's alleged future dangerousness.  274 F. 3d at 495.  The present claim, however, is different: that trial counsel were ineffective in failing to fully and adequately object to the psychopathy evidence precisely because such evidence was *not* probative of the issue of future dangerousness.  The Eighth Circuit has not previously addressed the issue of counsel's ineffectiveness in this regard, nor has it previously been presented with the evidence underlying this ineffective assistance claim – that predictions of future dangerousness based on the PCL-R and psychopathy are scientifically

demonstrable.  Indeed, the government's central argument to the jury for why it should sentence Mr. Lee to death was that the facts and circumstances of Mr. Lee's life showed that he was a psychopath who was predisposed to commit acts of violence, and who would continue to be a future danger if sentenced to life without parole.  This was an argument that the government made explicitly to the jury in both its opening statement and closing argument, and for which it elicited evidence during its cross-examination of defense expert Dr. Mark Cunningham.  In the course of its cross-examination of Dr. Cunningham, the government elicited, in the presence of the jury, that the government's expert, Dr. Thomas Ryan, evaluated Mr. Lee prior to the trial using an instrument known as the Hare Psychopathy Checklist-Revised ("PCL-R"), and that Dr. Ryan had concluded that Mr. Lee was a psychopath based on his PCL-R score.  The government also elicited evidence that the underlying theory behind the PCL-R is that an individual who attains a certain score on that instrument can be diagnosed as a "psychopath," and, consequently, evidence of such psychopathy can be used as a predictor of the individual's future dangerousness.  As the special verdict form plainly demonstrates, the jury unanimously found the aggravating factor of future dangerousness – a factor which it rejected in co-defendant Chevie Kehoe's case, who was indisputably the more culpable offender, but who received a life sentence – and sentenced Mr. Lee to death.

Subsequent to Mr. Lee's trial and death sentence, Dr. Ryan – formerly one of the leading proponents of the use of the PCL-R in capital sentencing proceedings and a frequently retained government expert in capital cases – disavowed the use of the PCL-R in capital cases, and has

---

invalid, and that Dr. Ryan has disavowed the use of the PCL-R for this purpose.  Mr. Lee respectfully requests the opportunity to develop the factual record at this time in the form of an evidentiary hearing in order to compile a full record on his ineffective assistance claims and introduce evidence which was not previously before this Court or the Eighth Circuit in prior proceedings.

acknowledged that the underlying science behind the claim that psychopathy is a valid predictor of future dangerousness for incarcerated individuals is simply non-existent. Moreover, Dr. Ryan has admitted that the basis for challenging the use of psychopathy evidence as a valid predictor for future dangerousness existed at least as early as September of 1998 – that is, prior to Mr. Lee's trial.

The undersigned moved for an evidentiary hearing in support of Mr. Lee's present claims that trial counsel were ineffective for failing to object fully and adequately to the government's cross-examination of Dr. Cunningham regarding psychopathy, and for failing to object adequately to Dr. Ryan's testimony and report. The undersigned were prepared to present at such a hearing evidence regarding Dr. Ryan's disavowal of the use of the PCL-R and psychopathy at capital sentencing proceedings, as well the evidence available to trial counsel at the time of Mr. Lee's trial to fully object to the psychopathy evidence. This Court, however, denied an evidentiary hearing on all of Mr. Lee's § 2255 claims. In light of information which indisputably demonstrates that the psychopathy evidence which the jury in Mr. Lee's case heard was not probative of his future dangerousness, Mr. Lee respectfully requests that this Court alter and amend its judgment, and reconsider its ruling denying an evidentiary hearing, especially in light of the attached materials demonstrating conclusively that the psychopathy evidence and arguments made to and credited by the jury are invalid.

1.      **The Government Introduced Substantial Evidence Regarding Mr. Lee's Alleged Psychopathy During Its Cross-Examination of Dr. Cunningham and in its Examination of Dr. Ryan.**

The government succeeded in introducing substantial evidence regarding Mr. Lee's alleged psychopathy during its cross-examination of Dr. Cunningham. As is explained in more detail below, the government elicited from Dr. Cunningham a definition of the psychological

concept of "psychopathy," as well as a detailed description of the PCL-R and how it is utilized by some mental health professionals in diagnosing individuals as psychopaths, as well as in predicting that individual's future dangerousness.  Although Dr. Cunningham himself did not necessarily subscribe to the use of the PCL-R for making predictions regarding an individual's likelihood to commit future violence in a prison setting, the government was nevertheless able to elicit sufficient information regarding the PCL-R that it was able to make the argument – both in its cross-examination of Dr. Cunningham as well as in its direct remarks to the jury – that the facts and circumstances of Mr. Lee's life and "psychological profile" were consistent with a diagnosis of psychopathy, and that this meant that Mr. Lee would be a future danger if sentenced to life without parole.  Moreover, the government elicited through Dr. Cunningham the fact that Dr. Ryan had evaluated Mr. Lee using the PCL-R and had on that basis concluded that Mr. Lee was a psychopath.

Early on in its cross-examination, the government pressed Dr. Cunningham to offer an opinion regarding whether Mr. Lee was "a dangerous person, a violent person."  Tr. 7745.  In an effort to focus Dr. Cunningham, as well as the jury, on the scope and meaning of that question, the government specifically asked Dr. Cunningham whether he was present during the government's opening statement the day before, and to answer whether the government's representations in that statement regarding Mr. Lee's violent nature were true.  Tr. 7745-46.  The government's reference to its own opening statement carried particular significance – in those remarks, the government told the jury that "what the evidence that will be presented will establish is that *Mr. Lee is a psychopath.  I don't mean that in a common term.  I do mean that in the medical use*,"  Tr. 7381 (emphasis added), and that "Mr. Lee, *because of his psychological profile*, who he is and who he will be for years to come, is dangerous and will continue to be

dangerous." Tr. 7383 (emphasis added). By referring back to its opening statement, the government was unmistakably signaling to the jury that it was about to deliver on its promise to provide evidence that Mr. Lee was a psychopath.

And, indeed, in the course of its cross-examination, the government was able to elicit from Dr. Cunningham almost precisely the kind of evidence that it would have put on through Dr. Ryan. The government elicited from Dr. Cunningham that the term "psychopath" is a psychological term that is recognized within forensic psychology, and that psychopathy is "measured by a structured interview called the psychopathy checklist revised that is developed by Dr. Hare and has been increasingly widely researched within the field of forensic psychology." Tr. 7754. *See also* Tr. 7795 (eliciting testimony from Dr. Cunningham that an individual "can be diagnosed as meeting criteria for psychopathy or being psychopaths as measured by this Hare psychopathy check list revised"); Tr. 7811 (eliciting agreement from Dr. Cunningham that "the psychopathy check list has emerged to be the standard for the assessment of criminal psychopathy in North America"). The government further elicited from Dr. Cunningham a detailed description of how the PCL-R is administered and scored in order to arrive at a diagnosis of psychopathy. Tr. 7796. As Dr. Cunningham explained, the individual is given a score of zero, one or two to assess the presence of 20 different domains that may or may not be descriptive of the individual, such as whether the individual is "glib and superficial." Id. As the government further elicited: "on the most simple level you might say if the person scores over 30 then they would meet criteria to be called a psychopath." Id. The government additionally elicited information identifying for the jury some of the particular domains that are scored as part of the PCL-R, such as lack of remorse, impulsivity, and poor behavior control. Tr. 7804-6. The jury was thus given a fairly comprehensive picture of what the PCL-R is and how it

24

is administered and scored to arrive at a diagnosis that the individual being tested is a psychopath.

As it had previewed in its opening statement, the government frequently questioned Dr. Cunningham about various alleged acts and incidents in Mr. Lee's life and background that purportedly corresponded to the descriptive domains of the PCL-R, such as his impulsivity, poor behavioral control, instances of violence, threats to others, and lack of remorse. *See, e.g.,* Tr. 7750-53; 7763; 7777-83;7788-90; 7809-10. In the event that the jury had any trouble understanding that what the government was attempting to demonstrate was that these various incidents in Mr. Lee's life, including his alleged participation in the Wavra murder, demonstrated that Mr. Lee was a psychopath per the criteria of the PCL-R, the government made the argument explicitly near the conclusion of its cross-examination. Specifically, the government elicited through Dr. Cunningham the fact that Dr. Ryan had diagnosed Mr. Lee as being a psychopath using the PCL-R:

Q.    You know Dr. Ryan is a neuropsychologist?

A.    That's correct.

Q.    You know Dr. Ryan is sitting in this courtroom?

A.    Yes, I do.

Q.    In preparation for this case, you had an opportunity to see a report prepared by him?

A.    Yes, I did.

Q.    And in fact, when you testified yesterday, you made reference to that report?

A.    Yes, I did.

. . .

Q. But what you didn't do is you didn't tell this jury that he made a diagnosis that Mr. Lee was a psychopath, did you?

A. I don't recall that there was that report doesn't sayd (sic) diagnosis colon, but he does identify Mr. Lee as scoring in that range on the psychopathy check list and I think does make a reference to him - - I can get it specifically. Again, the only discrepancy is whether he said he had a diagnosis of. *He clearly identified him by his scoring of the PCL-R as falling into the psychopathy range based on a single standard error of measurement.*

Tr. 7825-7 (emphasis added).[15]  Thus, without ever having to formally examine Dr. Ryan regarding his risk assessment of Mr. Lee, the government managed through its cross-examination of Dr. Cunningham to achieve the same result and inform the jury that Mr. Lee was administered the PCL-R by a trained neuropsychologist and received a score that was sufficient to designate him as being a psychopath.[16]

The government also managed to elicit through Dr. Cunningham that there were members of the forensic psychology community that considered that individuals who scored high enough on the PCL-R to be designated as psychopaths were substantially likelier to commit future acts of violence than the general population – i.e., that the PCL-R was an accurate predictor of future dangerousness. Tr. 7806-7811. Indeed, the government managed to elicit from Dr. Cunningham, in the presence of the jury, that he was aware of a scholarly study which "found that psychopaths were five times more likely to engage in violent recidivism in the community," Tr. 7809, and that individuals who achieve a high score above 30 on the PCL-R

[15] The government also made a point of eliciting that Dr. Cunningham did not use the PCL-R with Mr. Lee or perform a risk assessment. Tr. 7827-28. As is explained in more detail *infra*, the government repeatedly made this point in closing argument, effectively reminding the jury that Dr. Cunninghman's counterpart *had* scored Mr. Lee as a psychopath using the PCL-R, without ever having to explicitly say so.

[16] Indeed, as this Court stated to counsel at the conclusion of Dr. Cunningham's testimony: "I am convinced that I probably permitted the government to go much farther than is proper." Tr. 7836.

"do not appear amenable to treatment." Tr. 7819. Although the jury was not told the exact score that Mr. Lee received on the PCL-R, they were informed that his score fell "into the psychopathy range." Tr. 7827. Thus, it is reasonable to infer that the jury was able to complete the syllogism and conclude that Mr. Lee was therefore five times more likely to commit future acts of violence, and that his psychopathic nature was not treatable. In other words, the jury was given all the evidence it needed to (erroneously) conclude that Mr. Lee would be a future danger in prison if sentenced to life without parole, and that the only way to guarantee that he would not harm anyone again would be to sentence him to death. Indeed, the verdict form reflects that the jury unanimously found that Mr. Lee would be a future danger, a factor which it unanimously rejected in co-defendant Kehoe's case, whose life the jury spared.

In its rebuttal, the government called Dr. Ryan, and once again, engaged in a line of questioning intended to highlight Mr. Lee's alleged "violent nature." *See* Tr. 7917-20; 7925. And although not referring to it by name, the government also questioned Dr. Ryan about the validity of how he scored Mr. Lee's PCL-R results, in order to rebut a criticism made by Dr. Cunningham on cross-examination. Specifically, Dr. Cunningham testified that in his opinion, in order for one to have 95% confidence that the individual was a psychopath, the cutoff score should actually be two standard errors of measurement above 30 – that is, a score of 37. Tr. 7797-98. In rebuttal, the government used Dr. Ryan to characterize Dr. Cunningham's view in this regard as being outside the mainstream of the forensic psychology community. Tr. 7949-50. Dr. Ryan also vouched for the validity of his own approach, stating: "For example, in my clinical practice, I don't use two standard deviations to make diagnoses on neurological conditions. It doesn't have to be two standard deviations in order for me to say there's something clinically wrong with the patient." Tr. 7949. The government therefore not only put on additional

27

evidence regarding the PCL-R, but it was able to do so in a way that strengthened the perceived accuracy of Dr. Ryan's conclusion that Mr. Lee was a psychopath.

> **2.      Dr. Ryan Has Rejected the Use of the Hare Psychopathy Checklist as an Appropriate Instrument for Predicting the Future Dangerousness of Capital Defendants.**

For a period of time between 1997 and 2000, the most lethal weapon in the government's death penalty arsenal was expert testimony and evidence about psychopathy and future dangerousness.  The government had three experts whom it used in cases across the country, of which Dr. Ryan was one.[17]  Dr. Ryan has had an extensive professional relationship with the government, having been retained in a number of federal capital cases to perform risk assessments of defendants using the PCL-R.  Indeed, the government retained Dr. Ryan for that purpose in Mr. Lee's case, and it is reasonable to infer that the government's ability to effectively present such psychopathy evidence to the jury was based on the report he prepared for the government, as well as on its consultations with Dr. Ryan prior to and during the trial. However, as Mr. Lee alleged in his § 2255 Motion, Dr. Ryan has since disavowed the use of the PCL-R  in capital sentencing proceedings, and has specifically stated that the use of the PCL-R and the concept of psychopathy as a predictor of future dangerousness in prisons is inappropriate, as there is no scientific evidence to support such claims.  Dr. Ryan's reversal of his prior views on this matter came to light as part of the proceedings in another federal capital case, *United States v. Willis Haynes*, No. PJM-98-0520 (D. Md.), which was tried in the District of Maryland in May of 2000.  Undersigned counsel wish to briefly recount Dr. Ryan's involvement in that case, as it is pertinent to Mr. Lee's claim here.

---

[17] The other two were Dr. Scott Duncan, whose expert testimony was the subject of the reversal in *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), and Dr. Daniel A. Martell.

In *Haynes*, Dr. Ryan was retained by the government to perform a risk assessment of the capital defendant (Willis Haynes) using the PCL-R and give expert testimony regarding his potential psychopathy and future dangerousness.  In May of 2000, after the written report of his evaluation was submitted to counsel, the defense filed a motion seeking to exclude Dr. Ryan's expert testimony regarding the PCL-R and the diagnosis of psychopathy.  The basis for the motion was that such evidence was unscientific and not probative of future dangerousness, and the motion was supported by five affidavits from prominent clinical and forensic psychologists who variously attested that there was no scientific basis for claiming that a high PCL-R score supported a future dangerousness determination.[18]  After reviewing these affidavits, Dr. Ryan re-evaluated his position on this issue and voluntarily withdrew his expert report in the *Haynes* case.  Nor did he testify regarding the PCL-R or psychopathy at the trial.  As Dr. Ryan himself later explained:[19]

> The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of *United States v. Willis Haynes*.  In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy.  The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score that would support a future dangerousness determination.  I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists.  I then determined that I would withdraw my report.

---

[18] Those affidavits are attached as Exhibit 6.

[19] The following is excerpted from Dr. Ryan's sworn declaration filed in the capital § 2255 proceedings in *United States v. Richard Thomas Stitt*, No. 2:98-CR-47 (E. D. Va.).  As will be explained in more detail *infra*, Dr. Ryan provided expert testimony at the *Stitt* trial  in 1998 regarding the capital defendant's psychopathy and future dangerousness, but subsequently repudiated that testimony for the same reasons that he withdrew his testimony in the *Haynes* case.  Dr. Ryan's recantation of his prior views on the PCL-R, psychopathy and future dangerousness has not changed since he signed this affidavit on May 12, 2003, and the Court should hear from Dr. Ryan himself regarding Mr. Lee's case at an evidentiary hearing.

As a result, no testimony about psychopathy or the PCL-R was introduced at that trial.

5/12/03 Declaration of Thomas V. Ryan, Ph.D, ABPP at ¶5 (hereafter "Ryan Declaration," attached as Exhibit 3).

Subsequent to the *Haynes* case, Dr. Ryan was contacted by Dr. Stephen David Hart and Dr. Donald D. Bersoff, both of whom had filed affidavits in *Haynes*. *See* Exhibit 6**.** Dr. Hart had worked with Dr. Hare on the development and validation of the PCL-R, and in his expert opinion, he attested that there was "no direct scientific evidence that the PCL-R . . . [is] predictive of institutional violence in correctional offenders in the United States," and that the PCL-R is "not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in correctional offenders in the United States." 5/19/00 Affidavit of Dr. Stephen David Hart at ¶ 18 (hereafter "Hart Affidavit") (Exhibit 6 at p. 4). Dr. Bersoff is an elected fellow of the American Psychological Association (APA) and an expert in the standards and ethics of testifying as a psychological expert witness in legal proceedings. He attested that Dr. Ryan had "acted below the professional standards of those holding themselves out as forensic psychologists" in rendering the conclusion that the defendant was a "relatively high risk of engaging in violence recidivism," because there was a "dearth of data generally accepted in the relevant psychological community to support this opinion" and Dr. Ryan had made "misleading use of the extant studies" regarding the PCL-R in order to render his opinion. 5/24/00 Affidavit of Dr. Donald D. Bersoff at ¶ 21 (hereafter "Bersoff Affidavit") (Exhibit 6 at p. 25).[20]

---

[20] An ethical complaint was eventually filed against Dr. Ryan with the APA based on his misleading expert reports and/or testimony in three capital cases, including *Haynes*, on the issue of psychopathy and future dangerousness. *See* attached Exhibit 4. Additionally, a description of Dr. Ryan's conduct with respect to psychopathy and future dangerousness testimony in *Haynes*

Dr. Hart and Dr. Bersoff contacted Dr. Ryan because they were aware that he had rendered a similarly unscientific and misleading expert opinion regarding psychopathy and future dangerousness in another federal capital case that was tried prior to *Haynes* – *United States v. Richard Thomas Stitt*, No. 2:98-CR-47 (E. D. Va.), a federal capital trial which was tried in the Eastern District of Virginia in September and October of 1998.  There, Dr. Ryan performed a risk assessment on the defendant (Richard Stitt) using the PCL-R and testified that based on the defendant's score on that instrument, the defendant presented a high risk of future violence even in the context of a maximum security federal prison, and that the defendant's psychopathy meant that he was not amenable to rehabilitation and would continue to be a future danger if sentenced to life without parole.  The defendant was ultimately sentenced to death.  Dr. Hart and Dr. Bersoff strongly encouraged Dr. Ryan to review his testimony in that case and write a letter to the court indicating that his testimony was inaccurate.[21]

Dr. Ryan ultimately provided a sworn declaration, which was filed with the court as part of the *Stitt* § 2255 proceedings.  In that declaration, Dr. Ryan recanted his prior expert testimony made at trial and disavowed the notion that a capital defendant's potential psychopathy, as measured by the PCL-R, is predictive of his future dangerousness in prison:

> Based upon my current understanding of the literature and the obvious controversy about forensic clinicians' use of the PCL-R, I would choose not to use this instrument.  Although I did not recognize it at the time, I am aware now that the PCL-R is not, and was not, appropriately relied upon to assess an individual's future dangerousness in federal prison.  As an ethical and responsible clinician, I am informing all concerned that the statements about the defendant's

was published in a peer-reviewed journal for psychologists and described as "not only incompetent and factually misleading, but also highly unethical."  Edens, J.F., *Misuses of the Hare Psychopathy Checklist-Revised in Court, Two Case Examples*, 16 Journal of Interpersonal Violence 1082-93 (2001).

[21] *See* Testimony of Thomas V. Ryan, Ph. D., 7/15/04 Transcript of § 2255 Proceedings in *United States v. Stitt*, No. 2:98cr47 (E.D. Va.) at 59.

> future dangerousness that I made at trial were not grounded in current scientific literature and I do not stand by them now.
>
> . . .
>
> It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

Ryan Declaration (Exhibit 3). *See also id.* at ¶ 10 ("Since withdrawing my report in the [*United States v. Willis*] *Haynes* case [in the Spring of 2000], I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial. In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies. Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since *Haynes*.")

As Dr. Ryan explained in his declaration in the *Stitt* case, a comprehensive review of the scientific literature demonstrated that "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated is untenable[.]" Ryan Declaration at ¶ 9 (internal citation omitted). Of particular significance is Dr. Ryan's acknowledgment that "the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial[.]" Ryan Declaration at ¶ 6. In other words, the basis for challenging such psychopathy evidence was available at least as early as September of 1998, when the *Stitt* case was tried, and was therefore also available nearly eight months later when the government made use of such psychopathy evidence at Mr. Lee's penalty phase proceedings in May of 1999.

At the evidentiary hearing in the *Stitt* §2255 proceedings, Dr. Ryan was called as a witness and testified further regarding his current views on the PCL-R and psychopathy. His

32

testimony made unmistakably clear that predictions about future dangerousness in prison based on a defendant's PCL-R score and alleged psychopathy are not valid. *See* Testimony of Thomas V. Ryan, Ph. D., 7/15/04 Transcript of § 2255 Proceedings in *United States v. Stitt*, No. 2:98cr47 (E.D. Va.) at 63 ("the Hare Psychopathy Checklist Revised is just not appropriate to be used in making predictive statements about adjustment within the prison system"). Dr. Ryan also made clear that as far back as the time of the *Stitt* trial in 1998, there was no scientific research supporting the use of the PCL-R to make risk assessments about an individual's future dangerousness in prison. Id. at 78 ("Q. Was there any study at the time you testified that established that [the PCL-R] was predictive of future dangerousness in prison? A. No.").

Additionally, it should be noted that the district court in *Stitt*, although granting relief on different grounds, did find that Dr. Ryan's testimony at trial was based on unsupported scientific assumptions and erroneous:

> the Court is reasonably satisfied that Dr. Ryan's testimony was erroneous. Dr. Ryan's material testimony predicted Petitioner's future dangerousness based upon a scientific instrument that Dr. Ryan now believes he inaccurately applied. At the time of Petitioner's trial, Dr. Ryan did not realize that the PCL-R was not an accurate predictor of prison violence, as opposed to future dangerousness in the community at large. (Decl. Dr. Ryan PP3, 5, 8.) Dr. Ryan indicates that the scientific literature has come to reflect the view that the PCL-R is not a reliable predictor of future dangerousness of individuals confined in a federal prison, and the Government has not provided any evidence to refute this claim. (Id. at PP9-10.) The Court has not found any precedent providing guidance in a situation where an expert witness has discovered that the scientific basis for a test used to support a material fact was incorrect. However, if a DNA test indicated that an individual was guilty of a crime, and the Government's DNA expert later discovered that a change in DNA science indicated that the old test was inherently flawed, the Court cannot conceive that this would not be sufficient basis for the Court to at least consider such a petitioner's collateral attack. Therefore, the Court finds that Dr. Ryan's testimony was erroneous and has been recanted.

*Stitt v. United States*, 369 F. Supp. 2d 679, 699 (E.D. Va. 2005), *affirmed by, remanded by United v. Stitt*, 441 F.3d 297 (4th Cir.), *recalled by, vacated by, appeal dismissed by United*

33

*States v. Stitt*, 459 F.3d 483 (4th Cir. 2006).[22]  In short, there is absolutely no question that Dr. Ryan has rejected the use of the PCL-R as an appropriate instrument for predicting the future dangerousness of capital defendants.

> **3.      Mr. Lee was Unfairly Prejudiced by the Use of Psychopathy Evidence.**

The Court states in its Order that "it is difficult to see how any additional objection that Petitioner's counsel could have made to Dr. Cunningham's or Dr. Ryan's testimony could have altered the outcome [of the sentencing proceedings]"[23] given the Eighth Circuit's prior decision in *United States v. Lee,* 274 F.3d 485 (8th Cir. 2001), that Mr. Lee was not unfairly prejudiced by the psychopathy evidence.  *See* Order at 95-96.  In *Lee*, the Eighth Circuit stated that Mr. Lee was not "unfairly" prejudiced by the psychopathy evidence because Mr. Lee's "potential psychopathy was probative of his future dangerousness," 274 F.3d at 495.  The Eighth Circuit's

---

[22] After hearing argument, the Fourth Circuit initially published an opinion affirming the district court's judgment in all respects and remanding the case for resentencing.  *See United v. Stitt*, 441 F.3d 297 (4th Cir. 2006).  However, prior to issuance of the mandate, the Fourth Circuit  discovered that, since the defendant had not yet been resentenced, it lacked jurisdiction over the appeal.  *See United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006).  In particular, the Circuit Court noted that under United States Supreme Court precedent, an order reversing a death  in a § 2255 case sentence did not become final until resentencing had occurred.  Additionally, the Circuit Court noted that it lacked jurisdiction over the district court's order denying the defendant relief as to his guilt phase claims, which also did not become final until resentencing.  Accordingly, the Fourth Circuit vacated its previously issued decision, dismissed the appeal for lack of jurisdiction, and remanded the case for resentencing.

[23] The "additional objection that Petitioner's counsel could have made to Dr. Cunningham's or Dr. Ryan's testimony" was that there was no scientific support for the use of the PCL-R and psychopathy evidence as a predictor of future dangerousness in prison.  As the events in *Haynes* and *Stitt* case demonstrate, had trial counsel marshaled the existing research regarding the PCL-R and psychopathy and filed an appropriate motion, there is a reasonable probability that Dr. Ryan would have withdrawn the findings in his report on those matters, and there would have been no occasion  – either on direct- or on cross-examination – for any inquiry into psychopathy or the PCL-R.  Moreover, had that occurred, the government would then have been precluded from making the extensive arguments to the jury in both its opening statement and closing argument regarding psychopathy and future dangerousness.

prior ruling on this matter, however, does not foreclose the present claim of ineffective assistance of counsel, as this is a distinct claim from the issue which the Eighth Circuit previously decided.

The claim before the Eighth Circuit on direct appeal was an *evidentiary* issue, i.e., whether the admission of the psychopathy evidence was unfairly prejudicial. The Court's resolution of that claim turned on its determination that to the extent that the admission of such evidence was prejudicial, it was not *unfairly* prejudicial because the psychopathy evidence was probative of an aggravating factor for which the government had given prior notice, i.e., Mr. Lee's alleged future dangerousness. 274 F. 3d at 495. The present claim regarding trial counsel's ineffectiveness, however, is not only legally distinct, but also rests on a set of facts which were previously not available to this Court or the Eighth Circuit in prior proceedings due to trial counsel's ineffectiveness. Indeed, the issue here is whether trial counsel were ineffective for failing to fully and adequately object to the psychopathy evidence precisely because it was *not* probative of the issue of future dangerousness. The evidence underlying this claim – that predictions of future dangerousness based on the PCL-R and psychopathy are scientifically invalid, and that Dr. Ryan has disavowed the use of the PCL-R for this purpose – was not before the Eighth Circuit previously. Nor has the Eighth Circuit previously addressed the issue of whether counsel's performance with respect to the psychopathy issue was ineffective in light of the available evidence to challenge the PCL-R and psychopathy evidence at trial. Indeed, evidence regarding trial counsel's ineffectiveness could not have been previously presented to the Eighth Circuit, as even the Supreme Court has recognized that such claims are appropriately brought in § 2255 proceedings, and not on direct appeal, as habeas proceedings afford an opportunity for a full record to be developed regarding trial counsel's performance that is otherwise not a part of the existing record. *See Massaro v. United States*, 538 U.S. 500, 504-506

(2003).  It is therefore respectfully submitted that Mr. Lee must be given the opportunity for further factual development of this matter in the form of an evidentiary hearing, as the relevant facts upon which this claim relies are not part of the extant record, nor were they before the Eighth Circuit at the time that it issued its prior decision.

As Dr. Ryan's sworn declaration and testimony in *Stitt* – as well as the other affidavits attached to this motion – demonstrate, a diagnosis of psychopathy, as measured by the PCL-R, is not – and never has been – probative of, or a valid predictor of, an individual's future dangerousness in prison.[24]  This is a position that is fully supported by the forensic psychology community.  In support of that claim, the undersigned respectfully submit the affidavit of Dr. John F. Edens, a licensed forensic clinical psychologist with extensive forensic, clinical and research experience in the area of psychopathy and the PCL-R.[25]  As Dr. Edens states, there is simply no scientific basis for the claim that a high PCL-R score is predictive of an individual's future dangerousness:

> [T]he PCL-R has not been demonstrated to be a valid and reliable indicator of increased violence risk for all people in all circumstances.  As such, blanket statements that persons who are more psychopathic are 'more dangerous' than non-psychopathic offenders are significant oversimplifications of what is known about the relationship between psychopathy and violence across various contexts.

---

[24] Indeed, as is explained more fully *infra*, not only is such evidence of psychopathy irrelevant to the issue of future dangerousness, but its injection into capital sentencing trials is unfairly prejudicial because the label "psychopath" has an extremely powerful impact on jurors' perceptions of the defendant, improperly skewing deliberations in favor of a death sentence based on a perceived likelihood that the defendant will continue to commit violence unless he is executed.

[25] This affidavit was also submitted in the *Stitt* case.  The statements made by Dr. Edens in this affidavit are not specific to the facts in *Stitt*, but rather address the PCL-R and its inapplicability to future dangerousness assessments in prison settings.  Dr. Edens' affidavit provides a fair summary of the research regarding the PCL-R, and its uses and misuses in performing risk assessments.

> I am aware of four published studies (two of which were co-authored by me) and one unpublished doctoral dissertation that specifically have examined the relationship between psychopathy scores and violent behavior in male U.S. prison inmates. Although these studies have found some significant correlations between PCL-R scores and various measures of institutional adjustment (e.g., non-compliance, hostility), *not one* has reported a statistically significant relationship between psychopathy and acts of physical violence. Moreover, it is important to note that one of these research projects (Walters, Duncan, & Geyer, 2003) specifically studied a large sample of prison inmates in the U.S. Federal Bureau of Prisons and failed to find a significant relationship between psychopathy and acts of physical aggression. Thus, the claim that a high PCL-R score indicates a high risk of future violence in a federal prison runs counter to existing evidence that does not support such an assertion. I do not believe that could ethically and responsibly make such an assertion in the face of the available research in this area.

11/24/03 Affidavit of John F. Edens, Ph.D, at ¶¶ 5-6 (hereafter "Edens Affidavit," attached as Exhibit 5). As Dr. Eden notes, concerns about the scientific propriety of using the PCL-R to identify individuals as likely to commit act of violence in prison are not new, and date at least as far back as 1998 – in other words, prior to Mr. Lee's trial. *See* Edens Affidavit at ¶ 7.

### a. The improper psychopathy and future dangerousness evidence was central to the government's case for death.

There is no question that Mr. Lee was unfairly prejudiced by the introduction of psychopathy evidence at his capital sentencing proceedings. First, the record is clear that the PCL-R and psychopathy evidence were a central part of the government's case. The government's penalty phase presentation to the jury was explicitly premised on the argument that Mr. Lee had the psychological profile of a "psychopath," and that as such, violence was intrinsic to his profile, and only a death sentence could keep him from hurting other people. The government began this line of argument in its opening statement to the jury, where it stated that the jury would learn an aspect of Mr. Lee's "psychological profile that in the end will convince you that as he sits here today and will be in the future, Mr. Lee is a dangerous man. *That, ladies and gentlemen, is a lot of what this trial will be about*." Tr. 3739 (emphasis added). The

government's use of the term "psychological profile" was not merely colloquial. As the government argued moments later to the jury: "In the end, what the evidence that will be presented will establish is that *Mr. Lee is a psychopath. I don't mean that in a common term. I do mean that in the medical use*." Tr. 7381 (emphasis added). The government repeated this theme once more when it stated: "We will prove in this case to you that Mr. Lee, *because of his psychological profile*, who he is and who he will be for years to come, is dangerous and will continue to be dangerous." Tr. 7383 (emphasis added).[26]

The government explicitly stated that the evidence it planned to present regarding Mr. Lee's alleged prior bad acts which it would present was not merely of historical significance, but rather it established that Mr. Lee was a psychopath who "thrived" on violence, and who would continue to be a danger if allowed to live: "The evidence that will be presented in this trial is going to help you understand that Mr. Lee, this man who sits right here in this courtroom, is a violent and dangerous man. *He thrives on this stuff. That is part of his profile. Even if you sent him to prison for the rest of his life, he will be a threat for a long, long time*." Tr. 7381 (emphasis added). Indeed, the government's opening statement specifically highlighted Mr. Lee's alleged participation in the Wavra murder in the context of its remarks that Mr. Lee was a psychopath in the medical sense of the term. Tr. 7381-2. In other words, from the very outset of the penalty phase, the government rhetorically linked all the evidence it would present with the theme of psychopathy, thus insuring that the each piece of prior bad act evidence would be viewed by the jury through that lens.

---

[26] *See also* Tr. 7379 ("And during this trial then we balance his life, those he has hurt or will hurt in the future"); Tr. 7381 ("even if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards. He continues to be dangerous."); Tr. 7382 ("Mr. Lee was then, as he is today, angry, suspicious, hostile, broody, a dangerous person.").

After presenting evidence of Mr. Lee's alleged prior bad acts in its case in chief, and then referring to those same acts in its cross-examination of Dr. Cunningham to establish that Mr. Lee was a psychopath, the government returned again and again to this theme in its closing argument to the jury.  It repeatedly characterized Mr. Lee as a "dangerous man" with a "love of violence." Tr. 7956, 7957.  *See also* Tr. 7960 ("Danny Lee, this man who stands before you, is a violent and dangerous man."); id. ("this is a man who is dedicated to violence"); Tr. 7961 ("In looking through this characterization, these qualities that I noticed with Mr. Lee, trying to prepare myself to communicate to you the love of violence, the absolutely no sense of conscience, the volatility, the hair trigger . . .").[27]  Indeed, the government explicitly analogized Mr. Lee to an object that was inherently violent by its nature: "Danny Lee, you know those awful guns that you saw, really ugly guns that you saw?  Danny Lee is like one of those guns, those deadly lethal weapons, loaded, cocked."  Tr. 7970.

Although the government did not reference the PCL-R in its closing, the essence of that message – that Mr. Lee was a medically diagnosable psychopath – was still communicated to the jury in barely coded language:  "This is a man with a track record of harm against others documented for the last 10 years.  And they are saying his criminal record is insignificant?  His arsons, his burglaries, the robbery of Joey Wavra, the concealed weapon, this is insignificant?  Can't we all, with the benefit of hindsight, look at this and see, My God, look at what the *diagnosis* was."  Tr. 7968 (emphasis added).  Moreover, throughout its closing, the government repeated the fact that Dr. Cunningham had refused to provide a psychological risk assessment of

---

[27] *See also* Tr. 7970 (argument regarding "that most disturbing issue about this free-flowing hostility and volatility"); Tr. 7959 ("If you believe he is a dangerous and violent man, then I suggest you have a responsibility to consider that in determining his penalty.  I would suggest that you have a responsibility to ask yourself the question is he dangerous, is he violent, will he be violent in the future?").

Mr. Lee's future dangerousness, which operated as an unspoken but effective reminder that Dr. Ryan *had* performed such a risk assessment and concluded that Mr. Lee was a psychopath:

> Do you remember Wednesday afternoon, I had my first opportunity to question Dr. Cunningham. It was about 4:45 to 5:00 o'clock, only 15 minutes. And I asked Dr. Cunningham, "Is he violent? Will he be dangerous in the future?" I've been trying cases a long time. I've seen experts testify. I've seen experts testify more times than I can remember. I can tell you one thing. Experts come in all sizes and shapes, like people. But I can tell you one thing. When you ask an expert a simple directed question, is he violent, is he stupid, and it takes them five minutes to come up with an answer, and when you step back and say, what the heck did he just say, then you know you've got a problem. What did Cunningham say in response to that question, *a question you have a right to be concerned about*? What did he say? He backed out. *He avoided the question because he didn't want you to know the answer. Don't we know the answer? Don't we know based upon everything we've seen about this man for the last 10, for the last 12 years?*

Tr. 7959-60 (emphasis added). *See also* Tr. 7971 ("Sullen, angry, volatile, remorseless, dangerous, and not even a prediction from his psychologist, Dr. Cunningham, of any likelihood that things are going to change."); Tr. 7975 ("you look at his crimes, and you also ask yourself the same, the same question we asked Dr. Cunningham that he wouldn't answer, the future dangerousness, the prior crime against Joey Wavra"). The implication of this line of argument was unmistakable: even though Dr. Cunningham refused to make a prediction based on forensic psychology regarding Mr. Lee's future dangerousness, his counterpart at trial – Dr. Ryan – did not. And the answer at which Dr. Ryan arrived, and which Dr. Cunningham "didn't want the jury to know about," was that Mr. Lee was a medically diagnosable psychopath.

The prejudice to Mr. Lee is demonstrable. As the verdict form shows, the jury unanimously found the "future dangerousness" aggravator on each count. Indeed, the government's portrayal of Mr. Lee as an irredeemable psychopath appears to have been so effective that the jury failed to find mitigating factors for which there was an abundance of evidence. For example, no juror found that "Mr. Lee was only 22 years old when the murders

were committed" – a fact which is objectively and indisputably true.  Additionally, only three jurors found that "Another person, equally culpable in the crimes, will not be punished by death" – despite the fact that this very same jury had just sentenced the co-defendant, Chevie Kehoe, to life without parole.[28]  The gross disparity between the jury's findings on mitigation and the actual evidence presented at trial demonstrate that this jury did not engage in rational and dispassionate fact-finding as it decided whether to sentence Mr. Lee to death.  Rather, the verdict form findings strongly suggest that this jury was overwhelmed by the highly inflammatory "psychopathy" evidence, and deliberated on the basis of emotion and unfounded fear rather than reason.

> **b.     Both case law and empirical research demonstrate that psychopathy evidence is unfairly prejudicial.**

Numerous courts have warned of the unfairly prejudicial effect that psychopathy evidence can have on a capital jury's deliberations.  In *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), the government relied on the testimony of Dr. Scott Duncan, a psychologist who testified that based on the PCL-R, he concluded that the capital defendant (Aquilia Barnette) was a psychopath who felt no remorse or guilt, and that his score on the PCL-R was a predictor that he would be a future danger in prison.  211 F.3d at 811, 825.  The Fourth Circuit reversed the death sentence on the grounds that the district judge erred in denying the defense request for surrebuttal to question the validity of Dr. Duncan's methods with their own expert witness.  The Fourth Circuit rejected the government's claim that this was harmless error and specifically stated that "the testimony of Dr. Duncan was *as damning as it could be*," and that there was a reasonable possibility that his unrebutted expert testimony regarding the PCL-R and the

---

[28] Indeed, according to Cheyne, it was Chevie who hit Mr. Mueller with the barrel of a gun, caving in his skull, as well as, it was Chevie who put the plastic bags over Mrs. Mueller. Tr. 5328.

defendant's alleged psychopathy "contributed to the death sentence." 211 F.3d at 825 (emphasis added).

In the previously aforementioned *Stitt* case, the district court also found that the outcome of the sentencing proceeding might have been different but for Dr. Ryan's testimony regarding the PCL-R and psychopathy. As it noted in its memorandum and order:

> It is also possible the jury might have reached a different conclusion if Dr. Ryan's testimony had been different. The Court only has to find that "there is more than a faint possibility of a different jury verdict but something less than a probability." [*United States v.*] *Wallace*, 528 F.2d [863] at 866 n.3 [4th Cir. 1976)]. Given the nature of Dr. Ryan's testimony about the nature and consequences of Petitioner's psychopathy, the Court finds that it is clear that jury might have reached a different verdict.

*Stitt*, 369 F. Supp. 2d at 699-700.[29]

---

[29] The district court in *Stitt* ultimately granted relief on different grounds, and did not grant relief based on Dr. Ryan's erroneous testimony. However, the basis for the district court's denial of the psychopathy claim in *Stitt* is not applicable here because the legal claim raised in *Stitt* is different from the one raised by Mr. Lee. In *Stitt*, the § 2255 claim was not, as is the case here, that trial counsel was ineffective for failing to fully object to the psychopathy evidence. Rather, the *Stitt* motion alleged that a new sentencing proceeding should be held because Dr. Ryan had recanted his prior testimony. The district court, therefore, did not analyze the claim under *Strickland*, but rather under *United States v. Wallace*, 528 F.2d 863 (4th Cir. 1976). Under *Wallace*, when a witness recants testimony, a new proceeding should be held when (1) the court is reasonably well satisfied as to the falsity of the testimony, (2) the jury might have reached a different conclusion, and (3) the party seeking the new proceeding did not know the testimony was false until after the original proceeding or was unable to respond to the testimony because that party was taken by surprise by the testimony. 528 F.2d at 866. Notably, the district court found that the first two prongs of *Wallace* had been met. It was on the third prong that the claim failed because trial counsel in *Stitt* "made a substantial effort to address the validity and effects" of Dr. Ryan's testimony, and had put on his own expert witness "to both attack the credibility of the PCL-R and to counter the findings of the PCL-R." 369 F. Supp. 2d at 700. The question raised by the third prong of *Wallace*, however, is not a component of the two-prong *Strickland* analysis. That said, the fact that the *Stitt* claim failed on the third prong of *Wallace* only strengthens Mr. Lee's ineffective assistance of counsel claim here because it demonstrates that at the time of the *Stitt* trial, which was tried prior to Mr. Lee's case, there was substantial evidence available to Mr. Lee's trial counsel to fully object to the validity and credibility of the PCL-R on scientific grounds.

In *United States v. Sampson*, 335 F. Supp. 2d 217 (D. Mass. 2004), a federal capital case tried in the District of Massachusetts, the district judge excluded expert evidence on future dangerousness because "its probative value would have been outweighed by the danger of creating unfair prejudice." 335 F. Supp. 2d at 220. Indeed, the district judge prohibited the government's mental health expert from using the word "psychopath" because it "would have entailed a high risk that, despite any limiting instruction, the jury would have considered [the expert] testimony as tending to show that [the defendant] would be dangerous in the future . . ." 335 F. Supp. 2d at 222 n.27. The district judge also noted that jurors may give great deference to "a supposed expert for purposes of determining future dangerousness," and that therefore, "there is good reason to fear that the testimony of a psychiatrist on the issue of future dangerousness will be given more weight than it deserves." *Id*. at 220. The district judge was particularly troubled by this given all the extant research which suggests that "it is not just difficult for jurors to predict reliably whether a murderer is likely to commit violent crimes again, but that it is impossible." *Id*. at 222.

The risk that a jury will erroneously determine that a capital defendant is a future danger is made exponentially greater with the introduction of demonstrably inaccurate psychological evidence disguised as cutting edge science. Indeed, this is why in *United States v. Taylor*, 320 F. Supp. 2d 790 (N.D. Ind. 2004), a federal capital case prosecuted in the Northern District of Indiana, the district judge prohibited the government's mental health expert from even using the PCL-R on the capital defendant in its pre-trial evaluation. In the district court's judgment, "the uncertainty of the validity and reliability of the PCL-R as it is used in capital sentencing hearings" would undermine the reliability of the defendant's sentencing proceedings if testimony about the defendant's PCL-R score was injected into the trial. 320 F. Supp. 2d at 794.

Moreover, empirical research confirms the demonstrably prejudicial nature of psychopathy evidence on jury deliberations. As Dr. Edens attested in his affidavit submitted in the *Stitt* case:

> I have also written about and conducted research on the prejudicial impact that the label 'psychopath' and its associated traits may have on laypersons. In a recent article, my colleagues and I discussed the means by which testimony about psychopathy may bias jurors who are considering whether to impose a death sentence. For example, to the extent that an examiner's description of PCL-R data comports with and adds 'scientific' credibility to preconceived notions of violence potential and remorselessness, as well as bolsters the prosecution's description of the defendant as a 'cold-blooded' killer, it is difficult to imagine that such testimony would not have a significant effect on jurors.
>
> Based on these concerns, my colleagues and I have conducted several recent experiments that have examined the effects of labeling criminal defendants as exhibiting psychopathic traits. The typical format of these studies has been to present laypersons with case history information relevant to an offender's crime(s) and to then to manipulate whether he is described during testimony as psychopathic or as non-psychopathic (e.g., not mentally disordered or as suffering from some other form of mental illness such as schizophrenia). Participants in these studies are then queried about their perceptions of the defendant and what sanctions they would support in his case. The general pattern of findings from these studies is that laypersons who hear a defendant being described as psychopathic subsequently expect him to be much more violent and dangerous in the future than do laypersons who are exposed to the same case information but hear the defendant described as being non-psychopathic. Moreover, when participants in these studies are asked whether a death sentence is appropriate given the facts of the case presented to them, it is not surprising that a much higher percentage of those who hear the defendant described as psychopathic believe the appropriate sentence for his crimes is death. For example, in one of these studies (Edens, Colwell, Desforges, & Fernandez, 2003), 38% of the study participants who were informed that the defendant was not mentally disordered supported death and 30% of those who were exposed to testimony that the defendant was schizophrenic supported death. In the condition in which the defendant was described as psychopathic, however, 60% supported a death sentence, even though all other facts of the case were held constant across the three types of testimony. It is also noteworthy that these differing rates of support for the death penalty were obtained even when the prosecution expert acknowledged that the defendant was at 'low' risk for engaging in future acts of violence. Given these findings, it seems very likely that the introduction of psychopathy testimony into actual trials could increase the probability that jurors would support capital punishment.

Edens Affidavit at ¶¶ 8 &9 (footnotes omitted).

Dr. Edens' empirical research confirms the judgment of the aforementioned courts which have found that the introduction of psychopathy evidence into capital sentencing proceedings is unfairly prejudicial. Here, this Court has already acknowledged in its opinion that the evidence regarding the Wavra murder "was powerful and likely contributed to or influenced the jury's ultimate decision." Order at 88. By explicitly linking the Wavra murder to the pseudo-science of psychopathy as a predictor of future dangerousness, it is a near certainty that the jury's deliberations were improperly skewed toward a death sentence and that Mr. Lee was unfairly prejudiced on the basis of evidence that had no scientific support or probative value in answering the central question on the jurors' minds: whether Mr. Lee was a future danger.

### d.    Conclusion

Of the 53 persons currently on federal death row, Mr. Lee is the only individual whose capital sentencing proceedings featured any evidence of psychopathy or the PCL-R – every other federal capital case involving such evidence has either been reversed after judgment, or the evidence was precluded from ever being presented to the jury in the first place. In light of the fact that there is no credible evidence to support the psychopathy claim that the government advanced at Mr. Lee's trial in urging the jury to sentence him to death, and in fact such arguments have been disavowed and debunked by Dr. Ryan and respected members of the psychological community, and particularly given that the basis for challenging such psychopathy evidence was readily available at the time of Mr. Lee's trial, trial counsel were ineffective in failing to fully and adequately object to the introduction of this evidence at Mr. Lee's trial. It would be a manifest injustice to allow Mr. Lee to be executed on the basis of highly inflammatory evidence injected into the trial based on pseudo-science that the government's own

expert no longer stands by, and which the government no longer introduces in other capital cases on account of its unreliability. The undersigned respectfully submit that an evidentiary hearing is warranted here so that Mr. Lee can make the factual record to support his claim regarding trial counsel's ineffective assistance in failing to fully object to this improper and unfairly prejudicial psychopathy evidence.

### Claim II(I)– Ineffectiveness in Utilizing Dr. Cunningham as a Family and Social History Witness

Trial counsel's decision to utilize Dr. Cunningham as a family and social history witness at the penalty phase of Mr. Lee's trial constituted ineffective assistance of counsel. As previously alleged by Mr. Lee, the preferred course would have been for counsel to have presented any expert mitigation testimony in combination with lay witness testimony regarding the circumstances of Mr. Lee's background and life history. This Court denied this claim on the ground that counsel's decision "provided Lee with the benefit of having a certified forensic psychologist detail his family and social history, which allowed the expert to summarize such history with broad sweeping opinions which were difficult to counter," and therefore constituted "reasonable trial strategy." Order at 93. It is respectfully submitted that the Court's ruling on this issue is erroneous.

Trial counsel's decision to rely almost exclusively on Dr. Cunningham to present the evidence of Mr. Lee's family and social history did not comport with the standard of care and prevailing professional norms regarding the presentation of mitigating evidence to a capital jury. In support of this claim, the undersigned have attached the sworn declaration of Russell Stetler, the National Mitigation Coordinator for the Federal Death Penalty Resource Center and Habeas Assistance and Training Counsel Projects. Mr. Stetler is one of the nation's leading experts in the investigation, preparation and presentation of mitigating evidence in death penalty

46

proceedings. *See* Exhibit 7 Declaration of Russell Stetler (hereafter "Stetler Dec.") at ¶¶ 1-9 (describing Mr. Stetler's extensive background and qualifications).   As his declaration explains, there is a reasonable probability that trial counsel's decision to present virtually all of Mr. Lee's family and social history through Dr. Cunningham detracted from, rather than enhanced, the credibility of the mitigating evidence presented to the jury.

It should be noted that the Court's ruling on this claim is premised on the assumption that mitigation information provided by an expert with "credentials" is perceived as more credible by a capital jury than a "factual accounting" of a capital defendant's life history by lay witnesses. *See* Order at 93-94 ("While Settles may have been able to give a factual accounting of Lee's history, she could not have offered the opinions that Dr. Cunningham gave and her testimony would have lacked the credibility Dr. Cunningham's credentials provided.")   The Court's conclusion in this regard is mere speculation, as there is simply no evidence in the extant record to which the Court can point in support of this assertion.   Indeed, as Mr. Stetler notes, the notion that defense experts are accorded greater deference over lay witnesses by capital juries is not supported by the available research on this issue:

> Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with greater skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. (*See*, for example, Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109 (1997), finding that two-thirds of the witnesses jurors thought "backfired" were defense experts.)   Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be learned through life-history investigation.

Stetler Dec. at ¶ 24.   Indeed, as Mr. Stetler concluded after reviewing the record of Mr. Lee's penalty phase proceedings, trial counsel's utilization of Dr. Cunningham fell precisely into this trap: "Defense counsel's reliance on one expert witness, unsupported by lay witnesses or

historical experts, to describe the details of Mr. Lee's life history is a classic example of the witness who 'backfires' because jurors view him as a hired gun." Stetler Dec. at ¶ 40.  In fact, a central part of the government's cross-examination of Dr. Cunningham was focused on exploiting this exact theme: "Cross-examination of Dr. Cunningham stressed his hourly rate of $180 and his total fees in the tens of thousands of dollars in multiple federal death penalty cases (RT vol. 46, 7820-7822)."  Stetler Dec. at ¶ 40.

Moreover, contrary to the Court's assertion that Dr. Cunningham's "broad sweeping opinions . . . were difficult to counter," Order at 93, it is precisely because Dr. Cunningham's testimony consisted of broad and sweeping conclusions, rather than corroborative facts, that the mitigation presentation was doomed to fail.  Absent such a "factual accounting" by lay witness testimony from persons who were present during the formative years of Mr. Lee's life about which Dr. Cunningham broadly opined, and who had the opportunity to contemporaneously observe Mr. Lee's upbringing and development over the course of his life, the jury had no reason to believe that Dr. Cunningham's naked conclusions about Mr. Lee were reliable.  Indeed, as demonstrated by the verdict form, the jurors appeared to have rejected much of Dr. Cunningham's testimony.  It is reasonable to infer that this rejection was owing to the lack of concrete and independent facts about Mr. Lee's life in the record to corroborate Dr. Cunningham's conclusory testimony.  Absent those facts, it was quite easy for the jury to simply dismiss him as a mere hired gun whose opinion was shaped by his fee rather than verifiable facts.

In the absence of any evidence in the record to support this Court's ruling that Dr. Cunningham's testimony alone would have been more compelling to the jury than a mitigation presentation which included lay witness testimony regarding corroborative facts to support Dr. Cunningham's broad and sweeping opinions, it is submitted that this Court should vacate its

48

ruling on this claim and afford Mr. Lee the opportunity at an evidentiary hearing to develop a full record on this issue.

### *Claim II(L)– Failure to Investigate and Present Available Mitigation Evidence*

Trial counsel were ineffective in failing to investigate and present readily available mitigation evidence at Mr. Lee's trial. This Court denied this claim without any analysis or explanation, apart from characterizing the claim as vague. Order at 96. As previously discussed, however, this Court erroneously denied the entire § 2255 motion without the benefit of an evidentiary hearing, so Mr. Lee was never given the opportunity to present the evidence in support of his claim. Pursuant to Fed. R. Civ. Pro. 59(c), the undersigned refer again to the sworn declaration of Russell Stetler, which summarizes counsel's deficiencies in this regard, and respectfully requests that the Court vacate its denial of this claim and grant a hearing.

As Mr. Stetler stated, counsel's mitigation investigation was inadequate and lacked the thoroughness called for under prevailing professional norms at the time of Mr. Lee's trial. Stetler Dec. at ¶ 29. Specifically, Mr. Stetler identified investigative deficiencies in four broad areas:

> failure to obtain social history records other than those relating solely to Mr. Lee; failure to interview the numerous historical witnesses who had created the records that were obtained; failure to conduct multiple, in-person, face-to-face interviews with family members and other witnesses who knew Mr. Lee at critical developmental stages, so that the information that was elicited tended to be superficial; and the cumulative failure to provide Dr. Cunningham with the in-depth social history data that would have established a more reliable foundation for his own contact with Mr. Lee and other witnesses, and a more credible basis for his opinions. The investigative deficiencies, in turn, resulted in a sentencing phase presentation that was fatally flawed.

Stetler Dec. at ¶ 29.

49

For example, with respect to the social history records, Mr. Stetler articulated the importance of obtaining such records as part of a competent mitigation investigation and presentation:

> Reliable, objective records are critical to life-history investigation because they can reveal what the client and his family are reluctant to disclose because of shame and embarrassment, and what they simply can't disclose because they were too young or too impaired to record the events in memory.  They are more credible to fact-finders because they have no inherent bias.  Contemporaneous records are more credible than witnesses sharing previously undisclosed memories of past events, or experts offering opinions formed only after the client faces capital charges.  They also enable the defense team to interview mitigation witnesses more effectively.  The authors of reports and documents are themselves potential mitigation witnesses, otherwise unknown to the client and his family.  Siblings' records often reveal insights into family dynamics or help to explain the differences between their life trajectories and that of the capital client.  Multigenerational records show inherited predispositions and vulnerabilities, as well as patterns of behavior that are repeated from one generation to the next.  Records from multiple family members also provide a context for understanding key changes in the client's life – for example, when changes in school attendance or behavior reflect the impact of what is occurring in the lives of the parents.

Stetler Dec. at ¶ 33.  Indeed, Mr. Stetler's review of Mr. Lee's case identified a number of important available records that counsel simply failed to obtain as part of its mitigation investigation:

> The Mitigation Time Line prepared by Inquisitor, Inc., reflects the limited sources of potential social history data that were pursued.  Mr. Lee's biological father, James Lee, is identified (from Daniel Lee's birth certificate) as having been born in California in 1932, but there are no references to documents concerning James Lee or his own parents or any of his family members, including the members of his household at the time he apparently bigamously married Debra Lea Chadwick (Daniel Lee's mother, later known as Debra Lea Graham).  Her parents are identified by name in an interview, but there are no documents concerning the maternal grandparents or the mother's childhood in New Jersey and Tennessee.  Two of Debra's sisters were reported to have been sexually abused by their paternal grandfather, Willie Chadwick, but there are no records whatsoever concerning any of these individuals.  There is no indication that Debra's sisters were interviewed, even though she testified that one was treated with antidepressants (RT vol. 45, 7602).  There are no prenatal records concerning Debra's pregnancy or obstetrical records concerning Daniel Lee's birth, which required delivery by forceps.  There are no records relating to Mr. Lee's step- or

50

half-sisters, or to Dennis Graham, his step-father.  There are no records relating to Mr. Lee's cousins, other than the file of his life-sentenced co-defendant in the Wavra murder, John David Patton.  There are no records relating to a suicide in the maternal lineage (mentioned in Ms. Graham's testimony, RT vol. 45, 7601).  In short, counsel had numerous "red flags" identifying significant records to be obtained and analyzed, but there is no evidence that this triggering information led to any efforts to obtain the documents.  (As Justice Souter noted, writing for the majority of the Court, counsel "could not have reasonably ignored mitigation evidence or red flags simply because they were unexpected." *Rompilla v. Beard*, 545 U.S. 374, 391 (2005).  In *Rompilla*, postconviction experts "found plenty of 'red flags' pointing up the need" for further exploration.  *Id*. at 392.)

Stetler Dec. at ¶ 30.

Counsel's failure to recognize the numerous "red flags" before them prejudiced the mitigation investigation and presentation in at least two important ways: (1) counsel failed to avail themselves of contemporaneous records which would have corroborated Dr. Cunningham's testimony and thereby enhanced the credibility of the penalty phase presentation; and (2) such records would have offered counsel additional investigative leads regarding mitigating witnesses and information to pursue.  As Mr. Stetler explained:

the authors of reports and documents are themselves potential mitigation witnesses, otherwise unknown to the client and his family.  They have credibility with jurors because they are not perceived as paid experts ("hired guns") or biased by familial ties.  They created the records in the normal course of business, long before the capital offense, as neutral, objective professionals.  They are in the best position to explain in detail the significance of the events or conditions that they documented.  Dr. Larry Biehler, for example, is the pediatrician who prescribed phenobarbital to manage Daniel Lee's seizures in childhood.  Debra Lea Graham referred to him in her testimony (RT vol. 44, 7503), and Dr. Cunningham referred to medical records created by Dr. Biehler (RT vol. 45, 7668).  However, there is no indication that anyone ever attempted to interview Dr. Biehler (who remains at the very address mentioned by Ms. Graham in her testimony).  He could have provided a definitive description of Daniel Lee's seizures, the medications he prescribed, and the consequences of Ms. Graham's noncompliance.  (Ms. Graham's own recollections are no substitute: not only is she a lay person with a motive to defend her own parenting decisions, but by her own account she was abusing both marijuana and amphetamines in the relevant time frame.  See RT vol. 44, 7501.)

Stetler Dec. at ¶ 37.

As Mr. Stetler noted: "In Daniel Lee's case, there were voluminous records calling out for investigation, but no follow-up." Stetler Dec. at ¶ 39. This included records indicating that Mr. Lee was "huffing" neurotoxins at age eleven or twelve; documentation that Mr. Lee had attempted suicide as a teenager; and records from both grade school and a treatment center that Mr. Lee attended indicating that Mr. Lee was sexually abused as a child. Stetler Dec. at ¶¶ 39, 41. All of these were powerful areas of mitigation which trial counsel simply failed to develop and present to Mr. Lee's jury.

Of particular significance was trial counsel's failure to develop and present mitigating evidence of childhood sexual abuse. As the Supreme Court has noted, failure to investigate and present such evidence constitutes ineffective assistance of counsel. *See Wiggins*, 539 U.S. at 517, 535-36 (2003). Indeed, in *Wiggins*, the Court found that counsel's failure to investigate the capital defendant's childhood sexual abuse there was not a "reasoned strategic judgment," but rather was the "result of inattention" to investigative leads that counsel was aware of from social services records that he uncovered. *Wiggins*, 539 U.S. at 533-34. Similarly, counsel for Mr. Lee failed to follow up on several investigative leads regarding Mr. Lee's sexual abuse which were apparent from records they had uncovered, including a staff member at a treatment center that Mr. Lee had attended and to whom Mr. Lee confided that he had been sexually abused by his step-father, and a fifth grade teacher who had approached Mr. Lee's mother with concerns that Mr. Lee was being sexually abused. Stetler Dec. at ¶ 41. There is no evidence that defense counsel ever attempted to contact and interview these witnesses. As a result, such evidence was never developed and presented at trial, as Mr. Lee's mother offered no facts about this issue in her testimony, and Dr. Cunningham had no credible evidence to present to the jury given his testimony that Mr. Lee reportedly denied being sexually abused when asked by Dr. Cunningham.

52

*Id.* Indeed, trial counsel did not even list Mr. Lee's childhood sexual abuse as a mitigating factor on the verdict form they submitted to the jury.

In light of the various deficiencies in trial counsel's investigation and preparation of the mitigation case, and the consequent failure to develop and present readily available mitigation evidence, it is respectfully submitted that this Court erred in denying Mr. Lee's claims. Additionally, an evidentiary hearing is warranted on this claim, so as to afford Mr. Lee the opportunity to develop the record and present evidence regarding the available mitigation evidence which trial counsel failed to adequately investigate, develop and present at trial.

### *Claim I (E) – Defense counsel's ineffectiveness in failing to request and conduct mtDNA testing that excluded Mr. Lee as a source for evidence the government's inaccurately presented to the jury as "Danny Lee's hair."*

This Court committed a manifest error of law and fact in denying Mr. Lee's allegation of error for trial counsel's failure to challenge and submit for testing the only direct scientific evidence implicating Mr. Lee. If trial counsel had, the jury would have known that what the government argued was "Danny's hair" was not Mr. Lee's hair. Thus, the government's entire theory that it was these raid caps and this is "Danny's hair" is debunked. In short, Mr. Lee presented real science to replace the junk science offered by the government, argued to the jury and relied upon by the jury.

The exclusion of Mr. Lee as the source of the hair is significant and material evidence, given the government's theory that the raid cap with Mr. Lee's hair was used in the fake FBI raid involving the Mueller's. This government relied from opening statement through closing that "Danny's hair" established Mr. Lee's guilt. The government overwhelmingly proved their case on the basis of "Danny's hair" – so much so that the Eighth Circuit agreed and endorsed the theory of the staged raid. *See United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004) ("In

January 1996, Lee and Kehoe left the state of Washington and traveled to Arkansas where they dressed in police raid clothing and went to the home of William Mueller...").  The Eighth Circuit repeatedly referred to and relied upon the raid clothing and/or the hair found in the raid cap.  *Id.* at 643, 644, 645.

This Court committed a manifest error of fact by not acknowledging the weight that the government placed on the hair comparison in its arguments to the jury.  In rebuttal closing, the government relied in large measure on "Danny Lee's hair."  Tr. 7000.  While the government initially paid lip-service to the limited "similarity" scope of Ms. Bequette's testimony, the government then went much further.  Specifically, the government argued: "We recognize that [there might be out there somewhere another hair that could match], but here, I submit to you, the evidence establishes that was Danny Lee's hair."  Tr. 7000-01.  Thereafter, the government again referred to it as "Danny Lee's hair."  Tr. 7005.  This seized upon Bequette's previous testimony that the only reason she could not make an exact match is because there was no database to allow her to compare it to every hair in the world.  (Tr. 3653).

Thus, the government opined that it was a shortcoming of technology (an inadequate database) that limited the declaration of a conclusive match in reality existing technology could conclusively establish the inaccuracies of the government's evidence and arguments, because the hair in the raid cap did not belong to Mr. Lee.  In this circumstance, counsel were ineffective when they allowed the government to argue for a conviction and death sentence based upon inaccurate evidence, when technology existed that would have allowed the inaccuracy to be exposed to the jury.

This Court committed a manifest error of law in its failure to address Mr. Lee's claim in the context of the numerous compelling cases cited to the Court and in the context of the ABA

Guidelines.[30]  Mr. Lee presented the following authority in support of his claim of ineffective

assistance for a failure to obtain experts:

- *Dugas v. Coplan*, 428 F.3d 317, 329-30 (1st Cir. 2005) - Found counsel's performance to be deficient when he failed to consult with an expert on such investigations when arson is the "cornerstone of the state's case."

- *Draughon v. Dretke*,  427 F.3d 286 (5th Cir. 2005) - Counsel ineffective for failing to retain a ballistics expert. The "state's core theory" was that the victim had been shot from only about 10 steps away and a ballistics expert testified that the bullet recovered from the body had not ricocheted before striking the victim. Counsel's conduct was deficient because counsel was aware that the State's argument of intent to kill and for death was based on the witnesses' testimony about the distance of the shot and the ballistics evidence. Prejudice found because a defense expert could have presented a strong case that the fatal bullet struck the pavement in front of the victim and was fired at a much greater distance than the witness' testimony reflected.

- *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) – Court affirmed the district court's grant of a federal habeas petition premised upon ineffective assistance based on defense counsel's failure to "consult or call an expert on the psychology of child sexual abuse, or to educate himself sufficiently on the scientific issues."

- *Soffar v. Dretke*, 368 F.3d 441 amended, 391 F.3d 703 (5th Cir. 2004 ) -  Counsel also ineffective for failing to retain a ballistics expert "when there were such readily apparent discrepancies between the ballistics evidence and the State's theory of the case," and counsel could have established that the crime scene was consistent with the surviving victim's statements and inconsistent with the defendant's "confession."

---

[30] Of the 2003 ABA Guidelines, 10.7.1(A) provides "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." 1989 ABA Guideline 11.4.1 (A) provided "Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously."  11.4.1 (7)(D) relates to expert assistance and provides:

> Counsel should secure the assistance of experts where it is necessary or appropriate for:
> A. preparation of the defense;
> B. adequate understanding of the prosecution's case;
> C. rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial;
> D. presentation of mitigation.

Again, the Supreme Court has acknowledged that the ABA Standards constitute the longstanding prevailing standards or norms of practice. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

- *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001) - Counsel ineffective in rape and murder capital case where the two co-defendants entered a deal to avoid death penalty and testified that the defendant was involved and planned the crimes. The state corroborated the testimony with evidence from a state expert who said a pubic hair on the victim's thigh was "almost certainly" the defendant's. Expert testimony now contradicted the state's hair testimony, and in addition, counsel failed to prepare and present DNA, tire-tread, and shoe-print evidence that was exculpatory. While cross-examination may be sufficient in some cases to challenge the state's case, "[i]n these circumstances, it was irresponsible of the lawyer not to consult experts."

- *Baylor v. Estelle*, 94 F.3d 1321 (9th Cir. 1996) - Counsel ineffective in rape case for failing to follow up on criminalist's report which excluded defendant as source of semen in spite of alleged detailed confession.

- *Dees v. Caspiri*, 904 F.2d 452, 455 (8th Cir. 1990) – "Counsel had a duty to garner the expertise necessary to cross examine [the State's expert]."

- *Foster v. Lockhart*, 811 F. Supp. 1363 (E.D. Ark.), *appeal dismissed*, 995 F.2d 226 (8th Cir. 1992) - Trial counsel ineffective in rape case for failing to secure and present expert evidence that that the defendant is organically impotent.

In failing to request and secure favorable mtDNA testing, trial counsel lost the ability to challenge the "core theory" of the government's case. A theory announced in opening, presented via witnesses and reiterated in closing argument via the statements that it was "Danny Lee's hair." The mtDNA evidence not only eviscerates the government's theory but undermines the purported confessions to Gloria and Cheyne Kehoe, the only remaining "evidence" supporting the government's case. A component of the alleged confessions was the fake raid and raid caps, which became powerful evidence of guilt because it was, as the government described, "Danny Lee's hair."

Because it is not "Danny Lee's hair," the jury rested its verdict and sentence upon a false premise; a false premise that undermines the alleged confessions. In these circumstances, counsel were ineffective in not moving for and securing the mtDNA testing of the unknown sample taken from the raid cap with a known sample from Mr. Lee. Armed with this evidence, there is a reasonable probability that trial counsel could have persuaded one juror that Mr. Lee is

56

neither guilty nor should be sentenced to death, and that verdict would have been based on empirical fact, not a fiction.

***Claim I (A) – Defense counsel's ineffectiveness in failing to locate, interview and present evidence undermining Mr. Lee's guilt and sentence***

In parsing through the allegations of error, the Court committed manifest error in failing to acknowledge the ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (Rev. Ed. 2003). The importance of the ABA Guidelines is illustrated by *Wiggins* where the Supreme Court specifically cited the ABA's 1989 Standards as the benchmark for "'determining what is reasonable'" to expect of counsel in a capital case. *Wiggins*, 539 U.S. at 524, quoting *Strickland*, 466 U.S. at 688. *Wiggins* thus stands squarely for the proposition that the "prevailing professional norms" by which the performance of counsel in a capital case is measured are those set forth in the ABA Guidelines. *Wiggins*, 539 U.S. at 522, quoting *Strickland*, 466 U.S. at 688-698.

In order to make reasonable tactical decisions, the Sixth Amendment and contemporary standards place the onus and the impetus upon trial counsel to adequately prepare and put them in the position to make a reasoned decision. In the guilt phase, numerous ABA Standards describe trial counsel's responsibility to investigate and prepare for trial:

GUIDELINE 10.7 – INVESTIGATION

A.    Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

GUIDELINE 10.10.1– TRIAL PREPARATION OVERALL

A. As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.

In short, effective counsel must conduct a meaningful investigation to allow an adversarial challenge to the government's case.

To protect an accused's constitutional rights, defense counsel must conduct a reasonable pretrial investigation. Counsel has a duty to investigate all lines of defense or reasonably decide that a particular investigation is not necessary. *Strickland*, 466 U.S. at 691. Defense counsel "shall conduct a prompt investigation of the circumstances of the case and explore all avenues leading to finding relevant to the merits of the case. . . ." ABA Standards for Criminal Justice 4-4.1(a)(3 ed. 1993). At a minimum, a reasonable pretrial investigation includes interviewing the state's witnesses, as well as identifying and interviewing potential defense witnesses. *Lyons v. Luebbers*, 403 F.3d 585, 594 (8th Cir. 2005) ("Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories.") When defense counsel fails to interview witnesses or fails to conduct a reasonable pretrial investigation, defense counsel's actions constitute negligence, not trial strategy. *Wiggins*, 539 U.S. at 526, 527-28 (failure to investigate based on "inattention, not reasoned strategic judgment" is unreasonable, as is abandoning an "investigation at an unreasonable juncture, making a fully informed decision ... impossible").

In *White v. Roper*, 416 F.3d 728 (8th Cir. 2005), the court found trial counsel ineffective in failing to investigate and present exculpatory testimony of two witnesses in the guilt phase. The defendant was charged, along with two other men, who did not receive a death sentence, in a drug-related murder. While there were witnesses that connected the defendant to the other men, no physical evidence connected the defendant to the crime scene. While the defendant did present evidence that the third man was not the defendant, two available witnesses supporting the defense were never interviewed. In this instance, trial counsel's conduct was deficient because

"counsel's investigation was too superficial." *Id.* at 732. *White* is not an a-typical ruling. Courts routinely find ineffective assistance of counsel for failing to investigate and present evidence supporting a defense they intended to pursue. *See Grooms v. Solem*, 923 F.2d 88, 90-91 (8th Cir. 1991) (prejudice shown where evidence would have supported alibi defense and raised reasonable doubt about veracity and credibility of state's witness); *Chambers v. Armontrout*, 907 F.2d 825, 832 (8th Cir. 1990) (failure to present disinterested witness who would have supported defendant's claim of self-defense undermined confidence in outcome of trial); *Stewart v. Wolfenbarger*, 468 F.3d 338 (6th Cir. 2006) (counsel ineffective in murder case, in part, for failing to investigate an exculpatory and potential witness); *Riley v. Payne*, 352 F.3d 1313 (9th Cir. 2003) (counsel ineffective in an assault with a deadly weapon case for failing to investigate and present a witness supporting a defense theory of self-defense); *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003) (counsel ineffective in burglary case for failing to interview and present the testimony of an exculpatory eyewitness).

Mr. Lee asserts that his trial counsel failed to comply with those prevailing ABA norms and standards of practice under the Sixth Amendment. Mr. Lee does not reassert every basis alleged in his 2255 motion and is not waiving any claim, he would like to focus the Court on three distinct categories related specifically to defenses unsuccessfully raised at the time of Mr. Lee's trial: evidence implicating Paul Humphrey, the existence (or not) of the "APR," and challenges to the government's timeline.

When assessing these claims and Mr. Lee's argument that a manifest error has occurred, this Court is respectfully asked to keep in mind that each of the categories relates to defenses which were not successfully proffered to the jury. Thus, the Court's application of the *Strickland* "one juror" standard, as opposed to the *Lockhart* fairness/reliability test, is paramount.

*Evidence Implicating Paul Humphrey*

This Court correctly acknowledged that one aspect of Mr. Lee's trial defense was to point the finger at Paul Humphrey. This Court noted that trial counsel failed in this regard to "establish a link between Humphrey and the death of the Muellers." Order p. 27. Mr. Lee alleged that specific testimony from the following witnesses, was available and known to trial counsel, which could have fortified this "link":

- David Hill – Mr. Hill would have testified that he saw Paul Humphrey and another man throw something off the bridge at the Illinois Bayou in January 1996. The bodies were found in the Illinois Bayou.

- Glen Hinson – Mr. Hinson observed a nervous and scared Paul Humphrey obtain the title of the Mueller's vehicle, and Hinson could have reported Mrs. Mueller's fear of Humphrey.

- Eldon King – Mr. King could have testified as to Humprhey's odd behavior after the Mueller's disappeared.

Each of the above witnesses supported a defense theory that this Court found trial counsel failed to adequately prove. Given that this evidence supported the failed defense theory, the Court committed a manifest error of law at minimum for not holding a hearing in order that a determination could be made regarding trial counsel's ineffectiveness for failing to present enough evidence to carry the burden of persuasion when more evidence in support existed but was not presented. *Roper*, 416 F.3d 728; *Grooms*, 923 F.2d 88; *Chambers*, 907 F.2d 825; *Stewart*, 468 F.3d 338; *Riley*, 352 F.3d 1313; *Anderson*, 338 F.3d 382.

*The APR (whatever it may mean)*[31]

Neither the government nor this Court can provide a precise name for the "APR." *See* Order p. 5. While Kirby Kehoe pled guilty to a count regarding the enterprise, his guilty plea was not substantive evidence of the existence of the enterprise. Further, Faron Lovelace had his charges dismissed. Thus, while the government presented evidence regarding Chevie Kehoe's aspirations based on an undoubtedly categorically offensive book, no direct and tangible evidence ever existed (or exists) documenting the existence of the APR.

The failings of counsel at the guilt-phase of this case, especially as those failings allowed the government to establish the existence of an enterprise – the illusive "APR" [32] – went to the heart of the government's case.[33] Trial counsel failed to investigate and call Kelly Kramer, Faron Lovelace, Norda Lewis and Jeff Brown, each of whom would have testified that there was no existing APR enterprise. *See* Exhibit 1 (Affidavit of Investigator Dan Clark). Trial counsel could have attacked the heart of the government's case, and convinced at least one juror that no such enterprise existed. If no enterprise existed, there was no basis for the federal death penalty.

---

[31] Three different names are purported to be behind the acronym "APR:" Aryan People's Republic, Aryan People's Resistance, or Aryan People's Revolution. The fact the government could not pin down a name underscores the lack of a then existing enterprise at the time of the Muellers' disappearances.

[32] Mr. Lee was sentenced to death while the alleged main actor of the enterprise (Chevie Kehoe) received a life sentence, another alleged member of the enterprise (Kirby Kehoe) cut a deal and is currently a free man, and another alleged member of the enterprise (Faron Lovelace) simply had charges dropped. While the Court accepts that there is a vast APR network as supported by overwhelming evidence and such a network even caused the protection of witnesses prior to trial, at no point has the government ever named or brought charges to denominate the adjective "vast." That is because there is neither a vast APR enterprise, nor has there ever been any evidence supporting such.

[33] Even the government at Chevie's penalty closing noted that the murders and taking of items was not for purposes of the "APR" but Chevie "…supported his family with [it]." Tr. 7261.

*Evidence Challenging the Government's Timeline*

This Court correctly acknowledged that the government's theory of the case rested upon an extraordinarily tight timeline. *See e.g.* Order p. 29 ("…after the January 12th date so critical to the Government's timeline."). Trial counsel challenged that timeline with evidence related to when the Muellers were last seen alive and evidence regarding Mr. Lee's arrival in the State of Washington. Even though these were defenses raised, trial counsel failed to present further available evidence to support the failed theories:

- Maria and Vernon Ahrens – Both could have testified that they had contact with William Mueller the Thursday after the Mueller's were reported to have disappeared.

- Pam Wrappe – Ms. Wrappe could have corroborated the trial testimony of Susan Weaver and Betty Gray that the Muellers were seen at a Walmart after their alleged disappearance.

- Earlene Branch – Mrs. Branch indicated she heard William Mueller's distinctive cough in February 1996, when she was at the home of Sylvia and David Mason. The fact that the mother of a victim heard her son-in-law approximately three (3) weeks after he is alleged to be dead certainly is persuasive evidence..

- Jeff Brown – Mr. Brown would indicate that Mr. Lee arrived in the State of Washington either late on January 12, or early morning January 13.[34] *See* Exhibit 1 (Affidavit of Investigator Dan Clark).

---

[34] Brown's potential testimony would corroborate the trial testimony of Vada Campbell that Movant was at the Shadows Motel on January 13. Tr. 5953-5954.

The above does not fit within the government's "critical" timeline.  Indeed, due to the evidence presented by the government, such a statement is fatal to the government's case against Mr. Lee.

*Conclusion*

In summary, Mr. Lee's trial counsel failed to present numerous witnesses, or failed to seize upon the opportunities presented by those witnesses who testified, in order to raise a reasonable doubt in the mind of at least one juror.  Mr. Lee satisfies the prejudice prong because the above evidence undermines the integrity of the verdict, in that there is a reasonable probability that at least one juror would have entertained a reasonable doubt about Mr. Lee's guilt.  While this Court, in its opinion, documents a plethora of evidence implicating the bad acts of co-defendant Chevie Kehoe, little if any evidence pointed directly to Mr. Lee.

### *Claim I (G) – Defense counsel's race discrimination.*

This Court's denial of Mr. Lee's *Georgia v. McCollum*, 505 U.S. 42 (1992), claim represents a manifest error of law.  As discussed previously, the Court relied on an affidavit of co-defendant's counsel laden with hearsay[35] to reject the claim (*see* Order p. 50) without affording Mr. Lee (nor this Court for that matter) a legitimate opportunity to assess the weight to be accorded the affidavit.  This Court then committed a manifest error of law when it concluded that Mr. Lee's rights were simply not implicated.  *Id.* at p. 51.

---

[35] For instance, Attorney Hampton references a jury consultant's concurrence in the strategy and studies or research.  However, neither Attorney Hampton nor the government provided or identified the research.  Moreover, given the facts of Mr. Lee's case, it would be important to know whether this research provided a control question related to the defense of a white supremacist with visible tattoos, who would be sitting in front of and displaying those tattoos to the jury, and where counsel know the government intends to present multiple photographs of non-visible tattoos, in order to determine what weight to assign, if any, to such research.

63

To reiterate the magnitude of this error, the basic constitutional principles, of which there should be no dispute, should be repeated. In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the Equal Protection Clause governs the exercise of peremptory challenges. In *McCollum*, 505 U.S. at 55, the Supreme Court reasoned that a criminal defendant's racially discriminatory exercise of peremptory challenges harms the individual juror and undermines public confidence in this country's system of justice. Thus, the Court held that the Equal Protection Clause also bars a criminal defendant from excluding jurors on the basis of race.

The basis of *McCollum* merits illumination, because it not only controls, but also rebuts this Court's rejection of Mr. Lee's claim and demonstrates that this Court committed a manifest error of law. *McCollum*, at 46, noted that "[o]ver the last century, in an almost unbroken chain of decisions, this Court gradually has abolished race as a consideration for jury service." The Supreme Court found compelling that "[j]ust as public confidence in criminal justice is undermined by a conviction in a trial where racial discrimination has occurred in jury selection, so is public confidence undermined where a defendant, assisted by racially discriminatory peremptory strikes, obtains an acquittal." *Id.* at 50. Because defense counsel are acting as state actors, "the private body will be bound by the constitutional mandate of race neutrality." *McCollum*, at 54 (citation omitted). In a rejection of this Court's conclusion that Mr. Lee has no rights, the Supreme Court recognized such rights:

> Nonetheless, "if race stereotypes are the price for acceptance of a jury panel as fair," we reaffirm today that such a "price is too high to meet the standard of the Constitution." *Id.*, at 630. Defense counsel is limited to "legitimate, lawful conduct." *Nix v. Whiteside*, 475 U.S. 157, 166, 89 L. Ed. 2d 123, 106 S. Ct. 988 (1986) (defense counsel does not render ineffective assistance when he informs his client that he would disclose the client's perjury to the court and move to withdraw from representation). It is an affront to justice to argue that a fair trial includes the right to discriminate against a group of citizens based upon their race.

*McCollum*, at 57.

This Court's statement that Mr. Lee has no rights is misleading, respectfully, because the Court implies that Mr. Lee has no Sixth Amendment rights in this regard, which is an incorrect statement of law.  *See e.g. Kimmelman v. Morrison*, 477 U.S. 365 (1986) (Fourth Amendment claims ordinarily not cognizable in habeas proceedings are not barred from federal review when related to a Sixth Amendment ineffective assistance of counsel claim);  *Boyde v. Brown*, 404 F. 3d 1159 (9th Cir.) *amended by* 421 F. 3d 1154 (2005) (counsel ineffective, in part, under Sixth Amendment for failing to object to prior bad act evidence which was inadmissible under state law).  In *Quinn v. United States*, 2007 U.S. Dist. LEXIS 79582 at *18-*19 (E.D. Mo. 2007), the court noted that a 2255 movant possessed a **"…**right [under *McCollum*] to be tried by a jury whose members are selected by nondiscriminatory criteria" but rejected the ineffectiveness claim because the record did not establish minorities were excluded from the jury.  Finally, *this Court* recognized that a co-defendant has standing to object on the basis of *McCollum* to a co-defendant's racism in *Ruiz v. Norris*, 868 F.Supp. 1471, 1489 (E.D. Ark. 1994) (ultimately rejecting claim on basis of retroactivity doctrine).  It would render *Ruiz* and *McCollum* meaningless if counsel had the basis to object but could not be faulted for failing to object – or counsel engaged in the objectionable act.

This Court erred in also accepting the racially stereotypical basis to exclude whites – that blacks more likely discredit government testimony and blacks are less likely to impose death.[36] The Court noted in *McCollum*, at 59, that:

> But there is a distinction between exercising a peremptory challenge to discriminate invidiously against jurors on account of race and exercising a

---

[36]  It is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in an equal degree. *Loving v. Virginia*, 388 U.S. 1 (1967).

> peremptory challenge to remove an individual juror who harbors racial prejudice. This Court firmly has rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror. As this Court stated just last Term in *Powers*, "we may not accept as a defense to racial discrimination the very stereotype the law condemns." 499 U.S. at 410. "In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption -- as a *per se* rule -- that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion." *Ristaino v. Ross*, 424 U.S. 589, 596, n.8, 47 L. Ed. 2d 258, 96 S. Ct. 1017 (1976). We therefore reaffirm today that the exercise of a peremptory challenge must not be based on either the race of the juror or the racial stereotypes held by the party.

In accepting and allowing racial stereotypes, and accepting the racial nature of trial counsels' exercise of peremptories, this Court has endorsed a practice that simply is neither recognized by the United States Supreme Court as constitutionally appropriate nor as a standard of practice to utilize in trying a death penalty case.  *See* Exhibit 2 (Affidavit of Kevin McNally, Esq.) ("selecting jurors strictly on the basis of racial stereotypes is not a reasonable, effective strategy in any case. Such a strategy has been held to be discriminatory and illegal whether engaged in by the prosecution or the defense.").

The Eighth Circuit has addressed the *McCollum* decision only once substantively.  In so doing, the Eighth Circuit endorsed Mr. Lee's arguments.  In *United States v. Pospisil*, 186 F.3d 1023, 1027-28 (8th Cir. 1999), the court recognized *McCollum* and noted that *Batson* prohibits both prosecutors and defendants from using peremptory strikes in a discriminatory manner. Contrary to this Court's order, the Eighth Circuit rejected the exception this Court carved out for Mr. Lee's counsel: **"**the defendants ask us to carve out an exception to *Batson* for cases involving 'race-related issues.' We decline to do so. The Supreme Court 'firmly has rejected the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror.'" *Pospisil*, at 1028 *quoting McCollum,* 505 U.S. at 59**.**

*Pospisil* directs that Mr. Lee's counsel's attributed basis – blacks are more skeptical of government cases and are less willing to impose death – be rejected.  The policy interests in defeating racism should not be thwarted on the basis of racial stereotypes.  Finally, in Mr. Lee's circumstance, it borders on *per se* ineffectiveness to rely on such stereotypes when a client covered in racially insensitive and visible tattoos must sit in front of those jurors for weeks.  *See* Exhibit 2 (Affidavit of Kevin McNally, Esq. )

This Court erred in its application of the prejudice component.  First, the question is not whether a properly picked jury would have also convicted and imposed death; the question is if counsel had not acted illegally would a *properly* constituted jury have considered Mr. Lee's guilt and proper sentence.  The right denied is not a certain result (as this Court believes) but the right to have that determination made by a jury picked free from race discrimination.  *See Powers v. Ohio*, 499 U.S. 400 (1991)(criminal defendant's have the "right to be tried by a jury whose members are selected by nondiscriminatory criteria.")  Indeed, a *Batson/McCollum* violation is a structural defect because it corrupts the entire jury fact finding process due to the exercise of race discrimination.  *See Arizona v. Fulminante*, 499 U.S. 279 (1991);  *Becht v. United States*, 403 F.3d 541, 547 (8th Cir. 2005).[37]

---

[37]  In *Fulminante*, the Supreme Court distinguished between "trial errors" and "structural errors."  Structural errors affect the "entire conduct of the trial from beginning to end."  *Id.* at 309.  As noted by the United States Supreme Court in *J.E.B. v. Alabama*, 511 U.S. 127, 140, (1994), "[d]iscrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings. See *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628 (1991) (discrimination in the courtroom 'raises serious questions as to the fairness of the proceedings conducted there'). The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders."

Finally, this Court noted that had the government recognized this strategy, it could have made a challenge at trial. Order p. 51. However, nothing in the record supports a finding that the government, presumed to be fully informed on the law, did not recognize the strategy at the time of trial. The government has made no statement regarding their knowledge at the time of trial, and indeed, produced the evidence substantiating the improper action[38] at issue herein. The government's failure to object is not just "interesting to note," but provides evidence that the government recognized that this strategy would harm Mr. Lee as opposed to assist him at the guilt and/or penalty phase.

In conclusion, this Court wrongly rejected the claim, based on a manifest error of law, that Mr. Lee had no rights to ensure that his jury was selected by nondiscriminatory criteria. Further, this Court imposed a manifestly incorrect standard of prejudice.

### *Claim I (H) and (I) – Former Attorney Working for Governmental Agency Seeking His Death*

This Court's denial of Mr. Lee's allegation represents a manifest error of law on two bases. First, this Court described an attorney taking a job with the governmental agency seeking a defendant's death, yet simultaneously representing the defendant, has a "potential conflict of interest." Order p. 58. Under United States Supreme Court authority, this circumstance represents an actual conflict of interest. *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

Mr. Lee alternatively suggested he can meet the Supreme Court's alternative "actually prejudiced" standard. This is decidedly not a traditional *Strickland* inquiry, in that it only requires a defendant to establish some deficiency and does not require a satisfaction of *Strickland's* second prong. This Court wrongly conflated this standard with *Strickland*, and then conflated the potential conflict of interest standard, the "actually prejudiced" standard with the

---

[38] Again the actions of Attorney Hampton and Movant's Attorneys constitute illegal state action under *McCollum*.

actual conflict of interest where prejudice is presumed.  Order p. 58 (conflating different constitutional standards).

Finally, this Court committed an error of law and fact in relying solely on the government-offered, self-serving Affidavit of Karen (Coleman) Whatley.  Order pp. 56-57, 59. The Court failed to give proper deference to the Eighth Circuit opinion that specifically noted that this was a matter to be considered in the § 2255 context.  *Lee*, 374 F.3d at 654 ("[Lee] does not dispute that the district court has not developed a record on the issues….[therefore,] claims are premature and should be raised collaterally through a 2255 motion in district court.")  While there may have been a physical separation of offices, in the computer age, the lack of physical proximity is rendered nugatory.  As Mr. Lee requested, it is incumbent to learn of the nature of the "Chinese Wall" employed by the government – which includes the existence, if any, of an "Electronic Chinese Wall."

Indeed, it is the absence of any information on this point in the government's response that is alarming, not the existence of a single affidavit from the interested attorney.  Because the government remains mum on the efforts expended to erect a formal "Chinese Wall" before and after Attorney Whatley arrived, it should be presumed that no such wall actually existed, because there is no other affirmative evidence in the record that conclusively established this alleged fact.

In sum, this Court committed a manifest error of law in denying this claim.  The Court jumbled the applicable standards, and held Mr. Lee to one that was inapplicable.  Further, the Court failed to fully comply with the Eighth Circuit's suggestion.  As the Eight Circuit suggested, and as was requested by Mr. Lee, it was incumbent upon this Court to hold an evidentiary hearing at which all the relevant facts could be developed. Mr. Lee respectfully requests that such a hearing be held in due course.

***Claim II(A)– Ineffectiveness failing to challenge the inapplicable multiple murder aggravator.[39]***

The Court committed manifest error in denying Mr. Lee's claim related to the improper consideration by the jury of an inapplicable statutory aggravating factor. This Court agreed that Mr. Lee should only have been subjected to statutory aggravating factors that existed when the crime allegedly occurred. Order p. 70. The Court's manifest error of law occurred when the Court stated, without extensive analysis, that regardless of the application of the statutory aggravating factor, the jury would have considered it anyway as a non-statutory aggravating circumstance. *Id.*

This holding contradicts Supreme Court death penalty decisions describing the importance of proper eligibility determinations and *selection* decisions in imposing the death penalty. And it is within this legal framework that trial counsel were obligated, and failed, to advocate for Mr. Lee.

The Supreme Court's capital sentencing jurisprudence mandates that jurisdictions which maintain the death penalty as a sentencing option in murder cases take steps to both narrow the class of defendants who, once found guilty of murder, may be deemed legally eligible for a death sentence, and further, to guide the discretion jurors exercise in selecting between sentencing options (death or life) once a defendant has been found to be eligible for a capital sentence. *See generally, e.g., Gregg v. Georgia*, 428 U.S. 153 (1976); *Maynard v. Cartwright*, 486 U.S. 356, 380 (1988).

At the class-narrowing, or "eligibility" stage, jurors must make certain statutorily prescribed findings (commonly known as aggravating circumstances or factors) about the nature

---

[39] Mr. Lee notes that when appropriate he had also asserted the ineffectiveness of appellate counsel, and hereby incorporates in full those allegations.

of the offense and/or offender that the legislature has determined to be sufficiently aggravating as to warrant separating the offender from the general run of murder defendants, and placing him in the category of defendants for whom death is a sentencing option. *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990); *Pulley v. Harris*, 465 U.S. 37, 50 (1984); *Godfrey v. Georgia*, 446 US 420, 427 (1980).

At the sentence selection stage – which is reached only after the defendant has been deemed "eligible" – jurors' discretion to impose a sentence of life or death is guided by the requirement that they identify and weigh aggravating and mitigating circumstances, and derive their verdict from the outcome of this weighing process. *See Sochor v. Florida*, 504 U.S. 527, 532 (1992); *Stringer v. Black*, 503 U.S. 222, 232 (1992); *see also Brown v. Sanders*, 546 U.S. 212 (2006). While the factors permitted to be placed on death's side of the scale are ordinarily limited to those designated by the legislature, the range of information that may be offered in support of a sentence less than death is virtually unlimited. This is so because of the "qualitative difference between death and other penalties," which makes an "individualized [sentencing] decision . . . essential in capital cases." *Lockett v. Ohio*, 438 U.S. 586, 604-605 (1978). To facilitate the level of individualization mandated by the Eighth and Fourteenth Amendments, "the sentencer . . . [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett* , 438 U.S. at 604 (emphasis by the Court); *see also*, *e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 286-287 (2004).

Importantly, the Supreme Court has uniformly held that an invalidated sentencing factor will render a death sentence unconstitutional by reason of its adding an improper element to the

aggravation scale in the jury's weighing process.    In *Brown*, 546 U.S. at 220,[40] the Court announced the following bright-line rule: "An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances."    The court based it bright-line rule on the following principle:

> If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the rule we apply here. See *supra*, at 219, 163 L. Ed. 2d, at 732; see also n 6, *supra*. The issue we confront is the skewing that could result from the jury's considering *as aggravation* properly admitted evidence that should not have weighed in favor of the death penalty. See, *e.g.*, *Stringer*, 503 U.S., at 232, 112 S. Ct. 1130, 117 L. Ed. 2d 367 ("[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." As we have explained, such skewing will occur, and give rise to constitutional error, only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor.

*Brown*, 546 U.S. at 220-221 (footnotes omitted).

*Brown* is quite clear – a court reviewing the improper consideration of an aggravator must determine whether on the basis of the existing trial record the sentencer could have considered that evidence as aggravation under any remaining aggravating factor actually presented at trial.    It is not, as this Court determined, a cause to speculate as to how properly alerted parties may have done things differently to ensure that this evidence somehow made it to the jury.    Rather, it goes to the weighing process conducted by this jury and those factors actually considered (*see Clayton v. Roper*, 515 F.3d 784, 792-93 (8th Cir. 2008) (rejecting *Brown* claim

---

[40]    This Court reserved the *Teague* question.    Order p. 70 n. 239.    The Eighth Circuit has already answered this question. *See Rousan v. Roper*, 436 F.3d 951 (8th Cir. 2007) (applying *Brown* retroactively to habeas proceeding).

because evidence would have otherwise been considered); *Rousan v. Roper*, 436 F.3d 951 (8th Cir. 2007) (same)) – not a hypothetical weighing process conducted after a trial court is allowed to remedy via hindsight a jury's consideration of an improper aggravating factor. Indeed, if this were the case then there would never, ever be a finding of harmful error.

The government's reliance upon, and the jury's consideration of, the improper multiple murder aggravator violated the Eighth Amendment, and Mr. Lee's Sixth Amendment rights were violated by his trial attorney's failure to object to the same. Because the jury would not even have been unable under an alternate basis to consider or give effect to multiple murder as an aggravating factor, Mr. Lee's death sentence is "unconstitutional by reason of [the convictions having] add[ed] an improper element to the aggravation scale in the weighing process . . ." *Brown*, 546 U.S. at 220.

### *Claim II(B)– Ineffectiveness failing to challenge an inapplicable pecuniary gain aggravator.*

It is a constitutional requirement of capital sentencing schemes that they "perform a narrowing function with respect to the class of persons eligible for the death penalty . . . ." *Jones v. United States,* 527 U.S. 373, 381 (1999) (citation omitted). Therefore, "[w]hen the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so." *Arave v. Creech,* 507 U.S. 463, 474 (1993) (citing *Lewis v. Jeffers,* 497 U.S. 764, 776 (1990)). Overbreadth is therefore a relevant concern and the basic rule is that factors "can be overbroad if the sentencing jury 'fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty." *Jones,* 527 U.S. at 401 (quoting *Arave,* 507 U.S. at 474). Vagueness is also an applicable doctrine, though review is "quite deferential"; if "an aggravating factor has a core meaning that criminal juries should be capable of

understanding, it will pass constitutional muster." *Id.* at 400 (citing *Tuilaepa v. California,* 512 U.S. 967, 973 (1994)).

This Court should have deferred to the Eighth Circuit's interpretation of § 3592(c)(8) from *United States v. Allen*, 357 F.3d 745, 750-51 (8th Cir. 2004) (*Allen I*), *vacated on other grounds*, 406 F.3d 940 (8th Cir. 2005) (*Allen II*) (*en banc*).  In the panel opinion in *Allen I*, the Court stated:

> We are not persuaded that the indictment, even incorporating Count I into Count II, can fairly be read to state the essential facts which would constitute the pecuniary gain aggravator. Nothing in either count necessarily links the murder of Richard Heflin to the receipt of, or expectation of the receipt of, pecuniary gain. The fact that Allen and Holder robbed a bank "and in committing such offense did kill Richard Heflin," as set forth in Count I, is insufficient given that bank robbery is not among the crimes which warrant automatic death qualification under 18 U.S.C. § 3592(c)(1). We agree with our sister circuits that the "offense committed" language in § 3592(c)(8) refers to murder, not the underlying felony, so that application of the pecuniary gain aggravating factor "is limited to situations where 'pecuniary gain' is expected 'to follow as a direct result of the [murder].'" *United States v. Bernard,* 299 F.3d 467, 483 (5th Cir. 2002) (alteration in original, and citation omitted); *United States v. Chanthadara,* 230 F.3d 1237, 1263 (10th Cir. 2000)  (citing supporting cases, and concluding that Congress' exclusion of robbery from § 3592(c)(1) "suggests that the pecuniary gain aggravator applies when the murder itself was committed as consideration for, or in expectation of, anything of pecuniary value"). See also *United States v. Cuff,* 38 F. Supp. 2d 282, 288 (S.D.N.Y. 1999) ("[Section 3592(c)(8)] appears to be directed at a murder for hire or to collect insurance proceeds, or at least the sort of murder in which pecuniary gain can be expected to follow as a direct result of the crime. A murder from which pecuniary gain does not directly result would not appear to be within the reach of the statute."). To hold otherwise would convert every felony murder in which the underlying felony had a pecuniary object or benefit into a federal capital offense. See *Woratzeck v. Stewart,* 97 F.3d 329, 334-35 (9th Cir. 1996) (construing Arizona pecuniary gain aggravator, and noting that "even if it is true that under many circumstances a person who kills in the course of a robbery is motivated to do so for pecuniary reasons, that is not necessarily so . . ."). Like the other courts to

> have reviewed this issue, we find nothing in the statute or legislative history to suggest that Congress intended such a result.

*Allen I*, 357 F.3d at 850-51.  Nothing in the *Allen II en banc* opinion altered the panel's analysis, and this Court should have deferred to it as opposed to the authority from other circuits, and thus committed a manifest error of law.

### *Claim II(L)– Ineffectiveness failing to object to improper argument at the penalty phase.*

The same prosecutor that committed the egregious and overbroad presentation of the psychopathy evidence previously discussed also presented a horribly improper opening and closing argument to Mr. Lee's jury.  In considering this claim, the Court failed to discuss the frequency and pervasive nature of the improper arguments.  This is not speculation and the record demonstrates the vitriolic approach towards Mr. Lee taken by the government.  In Kehoe's penalty closings, it is readily apparent that the government did not engage in misconduct, as opposed to the arguments of Mr. Liroff at Mr. Lee's penalty phase.  *Compare* Tr. 7259-7268 (Mr. De La Cruz Closing at Kehoe's Penalty Phase) and Tr. 7293-7296 (Mr. Stripling Closing at Kehoe's Penalty Phase) *with* Tr. 7378-7284 (Mr. Liroff Opening at Mr. Lee's Penalty Phase) and Tr. 7956-7975 (Mr. Liroff Closing at Mr. Lee's Penalty Phase)**.**

Mr. Lee can establish prejudice from his attorneys' failures to object to the above improper arguments.  As a start, the incendiary impact of the arguments would have been dampened.  As a consequence, the jury's death verdict is undermined in that absent the arguments Mr. Lee's sentence would be identical, if not less, as compared to the more culpable actor who received life.  Further, it is known that there was at least one hold-out juror.  Without these arguments, there is a reasonable probability that there could have been other jurors not wanting to impose death – or this one juror would have had the where-with-all not to buckle.

75

This Court conducted a more extensive analysis of the guilt phase arguments and found the prosecutor did engage in many improper arguments, but only offered a single conclusory paragraph as to Mr. Lee's claims related to the penalty phase . This is a manifest error of law and not what is required by *Massaro*. Under *Massaro*, this Court should consider, after evidentiary development, whether trial counsel had a tactical reason for not objecting to Mr. Liroff's misconduct and, if there is a basis provided, whether that decision was reasonable.

### *Claim II(M)– Ineffectiveness in failing to request voir dire of juror.*

This Court faults Mr. Lee for not presenting any evidence in support of the claim of trial counsel's failure to request voir dire of the jury after a holdout juror suddenly switched his or her vote. *See* ECF Doc. 1163 p. 100 (Opinion). This is a manifest error of law.

Mr. Lee cannot be faulted for complying with this Court's local rules. Specifically, L.D.R. 47-1 "Conditions for Juror Contact" provides that: "No juror shall be contacted without express permission of the Court and under such conditions as the Court may prescribe." In light of the Court's denial of the claim, Mr. Lee respectfully requests the tools necessary to develop the facts of the claim, access to the jurors, in order that this Court consider this important claim of error.

### *Claim IV – Arbitrary and capriciousness of Mr. Lee's death sentence .*

This Court has accurately described the roles of the two defendants who stood trial in this case and whose lives were put into the hands of the same jury: "[T]here was no question about Kehoe's and Lee's respective roles: Chevie Kehoe was the ringleader, and Danny Lee was the follower." Order p. 17. The government conceded this point, albeit in more colorful language, when it referred to Mr. Lee as Kehoe's "faithful dog." In terms of the two actors' relative moral culpability, this Court observed that: "The undisputed evidence was that Lee was unwilling to

76

kill Sarah, the little girl, so Kehoe killed her." In addition to being the leader and moving force behind these crimes, Kehoe, but not Lee, engaged in two separate shoot-outs with law enforcement, intending, but failing, to kill the officers. As reflected in this Court's opinion, it was the view of all concerned, including prosecutors, agents, and members of the victims' family, that if Chevie Kehoe's life were spared at the penalty-phase, "a death sentence should not be pursued against Lee . . . ." Order p. 117. Summarizing its views on Lee's sentence of death, this Court wrote: "In the eyes of this Court, the DOJ's insistence on continuing to seek the death penalty as to Lee, under the circumstances, casts a pall over the case. But is it a taint of constitutional proportion for which a legal remedy exists on collateral review?" *Id.* The Court further described its views of Mr. Lee's sentence of death by stating:

> While the Court may agree with Petitioner that Deputy Attorney General Holder's decision to require the Government to continue to seek the death penalty against Lee was unreasonable, unfair, and possibly even an abuse of prosecutorial discretion, the question is whether that decision violated the Constitution.

*Id.* at 118. The Court's final word on the subject came on the final page of the opinion:

> That Petitioner's death sentence is not redressable under existing legal principles does not mean that it constitutes a fair and rational result under the peculiar and special circumstances of this particular case. Perhaps more than anything else, this case illustrates that the most carefully crafted capital punishment regime in the hands of the humans who must carry it out can never be completely free of arbitrariness in all of its implementations.

*Id.* at 119.

As an initial matter, and in the context of this Rule 59 motion, it is respectfully submitted that this Court should take this perhaps final opportunity to set aside a sentence of death that, in the eyes of the Court itself, is inappropriate, disproportionate, irrational, unreasonable, unfair and potentially the product of the abuse of prosecutorial discretion.

Moreover, although the Court viewed itself as limited to remedies of *constitutional* violations, in a 2255 proceeding, a district court is authorized to set aside a judgment where it was imposed "in violation of the Constitution *or laws of the United States* . . . ." 28 U.S.C. § 2255(a) (emphasis added).  In this regard, the Court took note of the requirement of the Sentencing Reform Act that there is a need "to avoid unwarranted sentence disparities among defendants . . . who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  In *United States v. Sampson*, 335 F.Supp.2d 166, 195-196 (D. Mass. 2004), the Court observed in this regard: "Proportionality is generally regarded as important to  sentencing. It is the foundation of the current regime of sentencing under the United States Sentencing Guidelines. The Guidelines use nationwide statistics to promote proportional sentences throughout the United States. It would be anomalous if the choice between a life sentence and a death sentence were the only  sentencing decision in the federal system in which proportionality is not a proper consideration."

The disparity in sentences between Mr. Lee and Mr. Kehoe is all the more significant in light of the fact that the government's case for guilt – which was never as strong against Mr. Lee as it was against Mr. Kehoe to begin with – has steadily eroded as more facts have come to light since the trial.  There is now no forensic or physical evidence that directly establishes Mr. Lee's involvement in the crime.  Indeed, the government's one piece of scientific evidence, on which the core of the government's "proof" of guilt rested – a hair found in a cap allegedly used by one of the killers in the course of the murders – has now been conclusively demonstrated to have come from someone other than Mr. Lee.  The government's entire case against Mr. Lee now hangs solely on the testimony of a co-defendant's family members – witnesses whose credibility and motives are suspect in light of the substantial consideration and sentence reductions they

78

received in exchange for providing testimony consistent with the government's version of "the truth." Indeed, the government's theory of the case, which relies on a rigid and inflexible time-frame, has been deconstructed by disinterested witnesses whose observations undermining that time-frame are not sullied by improper motives or the need to curry favor with authorities. Moreover, the government's theory of the case relies on the existence of an organization for which it still cannot conclusively demonstrate has ever existed, much less give a consistent answer as to what its alleged name --"APR" -- stands for. But most egregiously, even if all of the government's less than credible evidence for guilt is accepted as true, the indisputably more culpable party in the crime – Chevie Kehoe – who was the hands-on killer of the little girl that, under the government's theory, Mr. Lee refused to harm – received a life sentence, while Mr. Lee was sentenced to die. It is respectfully submitted that this case constitutes a manifest injustice which demands relief.

In this case, the Court is faced not with a situation of two defendants - Kehoe and Lee - who have been found guilty "of similar conduct," but with two defendants where the undeniably less culpable defendant received the greater punishment. This Court is urged to exercise its authority to correct unfair sentencing disparities by vacating Mr. Lee's sentence of death, as presented within this claim and throughout the entirety of Mr. Lee's Rule 59 motion. *See* 28 U.S.C. § 2255 (b) "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, *or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the* court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial *or correct the sentence as may appear appropriate*").

## Conclusion

Because the Court's Judgment is based on mistakes of law and fact, relief under Fed. R. Civ. P. Rule 59(e) is appropriate. In particular, petitioner asks the Court to provide the following relief:

• alter, amend and set aside its Judgment on all the issues addressed herein; and,

• grant Mr. Lee an evidentiary hearing; or,

• reopen the proceedings and grant whatever relief this Court deems just.

Respectfully submitted,

/s/ David A. Ruhnke
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000
(973)746-1490 (fax)
davidruhnke@ruhnkeandbarrett.com

-and-

/s/ Laurence E. Komp
Laurence E. Komp
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
(636) 207–7330
(636) 207–7351 (fax)
lekomp@swbell.net

COUNSEL FOR MOVANT

<u>CERTIFICATE OF SERVICE</u>

       Movant's counsel have filed this Motion to Alter and/or Amend on today's date via ECF, thereby serving the United States and all parties.

<u>/s/ David A. Ruhnke</u><br>
COUNSEL FOR MOVANT

<u>Electronically</u> Little Rock, Arkansas<br>
<u>filed</u>:          September 18, 2008