## DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

### *Background and Qualifications*

1. I am the National Mitigation Coordinator for the Federal Death Penalty Resource Counsel and Habeas Assistance and Training Counsel Projects. This national position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003). In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254 and 2255).

2. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with investigators, mitigation specialists, lawyers, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

3. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project,

1

a nonprofit law office in San Francisco which coordinated appellate and post-conviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with investigators, mitigation specialists, lawyers, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

4. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in postconviction. Most of these conferences were organized and attended by attorneys specializing in capital work.

5. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Wyoming. I have also lectured on numerous occasions under the auspices of the Administrative Offices of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. The Arkansas Association of Criminal Defense Lawyers has invited me to address their annual death penalty seminar this coming November in Fayetteville.

6. I have lectured on mitigation investigation at multiple national training conferences

2

sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conferences), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times in the past decade and a half, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA). I am co-chair of the planning committee for this seminar in 2009. I also teach regularly at the death penalty colleges sponsored by the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois.

7. Since 1993, I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This four-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the National Legal Aid and Defender Association. These and other articles of mine have been cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, rev. 2003 (31 HOFSTRA L. REV. 913 (Summer 2003), available at www.abanet.org/deathpenalty). At the request of HOFSTRA LAW REVIEW, I wrote an article for their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*. (31 HOFSTRA LAW

REVIEW 1157 (Summer 2003)).  At the request of HOFSTRA LAW REVIEW, I also wrote an article for their symposium issue on the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases (36 HOFSTRA L. REV. 1067 (Spring 2008)).

8.  I am the coauthor of chapters on psychiatric issues in death penalty cases in two books: *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., and Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and PUNISHMENT, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2nd ed. (Richard Rosner, M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press).

9.  As an expert witness, I have provided evidence on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Georgia, Mississippi, Missouri, New York, Oklahoma, Pennsylvania, Tennessee, Texas, and Wyoming.  I testified as an expert witness in capital mitigation investigation in a Rule 37 hearing in the Circuit Court of Jefferson County, Arkansas, in 2007, addressing standard of practice issues from the early 1990s.  Over the years, I have been directly involved in hundreds of capital cases in California and New York, including dozens of trials and postconviction hearings.  I have also been consulted in various capacities on capital cases in numerous other jurisdictions around the country.

*Standard of Care in Capital Cases*

10. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar I have participated in since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases.

11. As early as 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." (Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-324 (1983).)

12. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors which may be disclosed beyond the fact of psychiatric disorder or organicity.

13.  In three recent cases, the U.S. Supreme Court has found trial counsel ineffective for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005).  In *Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.).  In *Wiggins*, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation.  In *Rompilla*, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting mental health experts.

14.  In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves.  Moreover, even if lawyers had the skills, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence.  Thus, competent capital counsel retain a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes.  The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted that mitigation specialists "have extensive training and experience in the defense of capital cases.  They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists

or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." This report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." (FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION, Federal Judicial Conference, May 1998, *available at* http://www.uscourts/gov/dpenalty/1COVER.htm.)

15. The Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter, 2003 Revised ABA Guidelines, *available at* www.abanet.org/deathpenalty) state unequivocally that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The previous Guidelines, adopted in 1989, similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." (1989 Guideline 11.4.1.) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation" (1989 Guideline 11.4.1.(7)) Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." The 1989 ABA Guidelines were recognized by the U.S. Supreme Court in *Wiggins* as "well-defined norms." (539 U.S. at

524). "The new ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 at 487 (6th Cir. 2003).[1]

16. Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. *See* Richard G. Dudley, Jr., and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); and Douglas Liebert and David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994).

17. The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically

---

[1]The Supreme Court has consistently used the ABA's standards and guidelines in capital cases to assess the performance of trial counsel who prepared their cases before the relevant ABA publications had been issued. In *Strickland*, the Court cited standards published by the ABA in 1980 when assessing trial counsel's performance in 1976-77. In *Wiggins*, the Court cited the 1989 ABA Guidelines when assessing trial counsel's performance in 1988-89. In *Rompilla*, the Court used multiple ABA publications from 1980, 1989, and 2003, to assess deficiencies in a 1988 trial. Finally, in *Nixon v. Florida*, 543 U.S. 175 (2004), the Court used the 2003 Guidelines to assess performance in 1984-85.

8

credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Great diligence is required to ensure compliance. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

18. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

19. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. (One nationally recognized authority in mitigation investigation, Lee Norton, has stressed the cyclical nature of

the work and estimated that hundreds of hours will typically be required. *See* Lee Norton,

*Capital Cases: Mitigation Investigation*, THE CHAMPION, 43-45 (May 1992).)

20. Mitigation investigation is particularly important when the client does not share the attorney's racial, ethnic, or cultural background. Cultural differences can include not only ethnicity and language, but all of the badges of social identity that define an individual's world and belief system, including politics, religion, and sexual orientation.

21. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute, mitigation need not involve a mental disease or defect. Nevertheless, in many, many cases, defendants do suffer mental impairments that may not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities which are given great weight when juries are charged with assessing individualized culpability.

22. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same setting turn out so differently. It is an objective scientific fact. It does not reflect a choice made by the client.

23. Over the years, I have been involved in hundreds of capital cases, including dozens of trials and postconviction hearings. I have provided evidence as an expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in dozens of cases

around the country. My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases. *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness).

### Standard of Care in Capital Mental Health Evaluations

24. Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. (*See*, for example, Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997), finding that two-thirds of the witnesses jurors thought "backfired" were defense experts.) Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be learned through life-history investigation. However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of his life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities. Expert testimony is essential for placing

11

the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

25. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons). Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing. The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

26. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert. Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including neuropsychology, psychopharmacology, and the disciplines which study the effects of trauma on human development. The potential roles of experts include consultants; fact gatherers needed to elicit, or assess the credibility of, client disclosures; and testifying witnesses, to name but a few. To

make informed decisions about the kind of experts who may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

*Review of the Daniel Lewis Lee Case*

27. I was asked by counsel for Daniel Lee in his proceedings under 28 U.S.C. § 2255 to address the prevailing professional norms regarding the investigation and preparation of the penalty phase of capital cases at the time of Mr. Lee's trial and to assess trial counsel's investigation and presentation of mitigation evidence in that light.

28. At the request of Mr. Lee's § 2255 counsel, I reviewed the Memorandum Opinion in *United States of America v. Daniel Lewis Lee*, No. 4:97-CR-00243-(2) GTE filed August 28, 2008; volumes 44 through 47 of the reporter's transcript (*hereinafter*, "RT") of the sentencing phase of Mr. Lee's trial from May 11 through May 13, 1999; the Special Verdict Forms numbers 1, 2, and 3, filed on May 14, 1999; the Mitigation Time Line (last updated February 26, 1999) prepared by Inquisitor, Inc. (self-described as "specialists in investigation and preparation of capital cases"); a Memorandum described as "Witness Summaries, Mitigation Themes" prepared by the Inquisitor firm (dated April 15, 1999, but apparently dictated on April 29 and transcribed on April 30, 1999); and the Report of Mitigation for Capital Sentencing dated May 9, 1999, prepared by Mark D. Cunningham, Ph.D. (the forensic psychologist who testified in the sentencing phase of Mr. Lee's trial). I have also been briefed orally by counsel about the procedural history of the case and other details.

29. Based on the material I have reviewed and the information provided by counsel, it is my opinion that trial counsel's performance in both the investigation and presentation of

13

mitigation evidence fell below the prevailing professional norms at the time of Mr. Lee's trial in 1999. The investigative deficiencies are in four broad areas: failure to obtain social history records other than those relating solely to Mr. Lee; failure to interview the numerous historical witnesses who had created the records that were obtained; failure to conduct multiple, in-person, face-to-face interviews with family members and other witnesses who knew Mr. Lee at critical developmental stages, so that the information that was elicited tended to be superficial; and the cumulative failure to provide Dr. Cunningham with the in-depth social history data that would have established a more reliable foundation for his own contact with Mr. Lee and other witnesses, and a more credible basis for his opinions. The investigative deficiencies, in turn, resulted in a sentencing phase presentation that was fatally flawed.

30. The Mitigation Time Line prepared by Inquisitor, Inc., reflects the limited sources of potential social history data that were pursued. Mr. Lee's biological father, James Lee, is identified (from Daniel Lee's birth certificate) as having been born in California in 1932, but there are no references to documents concerning James Lee or his own parents or any of his family members, including the members of his household at the time he apparently bigamously married Debra Lea Chadwick (Daniel Lee's mother, later known as Debra Lea Graham). Her parents are identified by name in an interview, but there are no documents concerning the maternal grandparents or the mother's childhood in New Jersey and Tennessee. Two of Debra's sisters were reported to have been sexually abused by their paternal grandfather, Willie Chadwick, but there are no records whatsoever concerning any of these individuals. There is no indication that Debra's sisters were interviewed, even though she testified that one was treated with antidepressants (RT vol. 45, 7602). There are no prenatal records concerning Debra's

14

pregnancy or obstetrical records concerning Daniel Lee's birth, which required delivery by forceps. There are no records relating to Mr. Lee's step- or half-sisters, or to Dennis Graham, his step-father. There are no records relating to Mr. Lee's cousins, other than the file of his life-sentenced co-defendant in the Wavra murder, John David Patton. There are no records relating to a suicide in the maternal lineage (mentioned in Ms. Graham's testimony, RT vol. 45, 7601). In short, counsel had numerous "red flags" identifying significant records to be obtained and analyzed, but there is no evidence that this triggering information led to any efforts to obtain the documents. (As Justice Souter noted, writing for the majority of the Court, counsel "could not have reasonably ignored mitigation evidence or red flags simply because they were unexpected." *Rompilla v. Beard*, 545 U.S. 374, 391 (2005). In *Rompilla*, postconviction experts "found plenty of 'red flags' pointing up the need" for further exploration. *Id.* at 392.)

31. The Mitigation Time Line also reflects how few substantive mitigation interviews were conducted by Inquisitor, Inc.: two with Daniel Lee himself (May 12 and August 10, 1998) and two with his mother, Debra Lea Graham (May 10 and August 10, 1998, plus a telephone interview on May 15, 1998). Ten other witnesses were interviewed and provided information reflected in the Time Line, but no one else was interviewed more than once. The Inquisitor Memorandum on "Witness Summaries, Mitigation Themes" likewise reflects the absence of any investigation of the signs and symptoms of mental disorders and impairments in the interviews with potential mitigation witnesses. Only four witnesses touched on child abuse: Mr. Lee's mother, his half-sister Carrie Graham, his friend Paula Hensley, and his cousin (and life-sentenced co-defendant in the Wavra murder) John David Patton. Only the mother mentioned Attention Deficit Disorder. By contrast, three witnesses mentioned potential alibis, and seven

15

apparently thought of Mr. Lee as "nonviolent." Six thought of him as a "good guy," and five

stressed his loyalty. In fairness to the interviewer, such information is typical of what witnesses

provide the first time they are interviewed about mitigation, when they lack trust and rapport with

the interviewer and have no understanding of the kind of evidence that may inspire compassion

in a capital proceeding. This is precisely why multiple interviews with such witnesses are

necessary, in order to build the necessary trust and rapport to overcome the incomplete,

superficial, and defensive responses that are so frequently offered in the initial interview.

32. At the time of Mr. Lee's case, it was well accepted that counsel in federal death

penalty cases should engage the services of a mitigation specialist. (*See* the Report of the

Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial

Conference of the United States, discussed *supra* at ¶ 14.) The importance of the mitigation

specialist is also addressed at length in the Commentary to ABA Guideline 4.1:

> A mitigation specialist is also an indispensable member of the defense team
> throughout all capital proceedings. Mitigation specialists possess clinical and
> information-gathering skills and training that most lawyers simply do not have. They
> have the time and the ability to elicit sensitive, embarrassing and often humiliating
> evidence (e.g., family sexual abuse) that the defendant may never have disclosed. They
> have the clinical skills to recognize such things as congenital, mental or neurological
> conditions, to understand how these conditions may have affected the defendant's
> development and behavior, and to identify the most appropriate experts to examine the
> defendant or testify on his behalf. Moreover, they may be critical to assuring that the
> client obtains therapeutic services that render him cognitively and emotionally competent
> to make sound decisions concerning his case.
> Perhaps most critically, having a qualified mitigation specialist assigned to every
> capital case as an integral part of the defense team insures that the presentation to be
> made at the penalty phase is integrated into the overall preparation of the case rather than
> being hurriedly thrown together by defense counsel still in shock at the guilty verdict.
> The mitigation specialist compiles a comprehensive and well-documented psycho-social
> history of the client based on an exhaustive investigation; analyzes the significance of the
> information in terms of impact on development, including effects on personality and
> behavior; finds mitigating themes in the client's life history; identifies the need for expert

16

assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation. (Citations omitted; 31 HOFSTRA L. REV. at 959 (2003)).

In this case, there was no "exhaustive investigation," and the "Mitigation Themes" identified in the investigation provided no insight into Mr. Lee's development and no support for the themes ultimately developed by the testifying expert, Dr. Cunningham.

33. The Commentary to ABA Guideline 10.7 underscores the importance of obtaining all relevant records:

> Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information *pertaining to the client, his or her siblings and parents, and other family members,* including but not limited to:
> a.    school records
> b.    social service and welfare records
> c.    juvenile dependency or family court records
> d.    medical records
> e.    military records
> f.    employment records
> g.    criminal and correctional records
> h.    family birth, marriage, and death records
> I.    alcohol and drug abuse assessment or treatment records
> j.    INS records
> (31 HOFSTRA L. REV. at 1025, emphasis added).

Reliable, objective records are critical to life-history investigation because they can reveal what the client and his family are reluctant to disclose because of shame and embarrassment, and what they simply can't disclose because they were too young or too impaired to record the events in memory. They are more credible to fact-finders because they have no inherent bias. Contemporaneous records are more credible than witnesses sharing previously undisclosed memories of past events, or experts offering opinions formed only after the client faces capital

charges. They also enable the defense team to interview mitigation witnesses more effectively. The authors of reports and documents are themselves potential mitigation witnesses, otherwise unknown to the client and his family. Siblings' records often reveal insights into family dynamics or help to explain the differences between their life trajectories and that of the capital client. Multigenerational records show inherited predispositions and vulnerabilities, as well as patterns of behavior that are repeated from one generation to the next. Records from multiple family members also provide a context for understanding key changes in the client's life – for example, when changes in school attendance or behavior reflect the impact of what is occurring in the lives of the parents.

34. Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 677 (Spring 2008), explain in detail the duties of counsel to obtain the services of competent team members and to *supervise and direct* their work. (Supp. Guideline 4.1.A and B, 36 HOFSTRA L. REV. at 680.)

35. The Supplementary Guidelines also provide clear guidance about the qualifications of mitigation specialists. Supplementary Guideline 5.1.C elaborates on the necessary interviewing skills:

> Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance. (36 HOFSTRA L. REV. at 682)

Guideline 5.1.F discusses the necessary skills in record gathering:

> Mitigation specialists must possess the knowledge and skills to obtain all relevant records pertaining to the client and others. They must understand the various methods and mechanisms for requesting records and obtaining the necessary waivers and releases, and the commitment to pursue all means of obtaining records. (36 HOFSTRA L. REV. at 683)

Neither skill set is of much use without supervision and direction from counsel and adequate time to gather all the necessary records and to conduct multiple interviews with the individuals who knew the client most intimately over the course of his life. In Mr. Lee's case, such supervision and direction appear to have been lacking.

36. The importance of multiple one-on-one interviews is succinctly summarized at Supplementary Guideline 10.11.C:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding. (36 HOFSTRA L. REV. at 689)

37. As noted in ¶ 33 *supra*, the authors of reports and documents are themselves potential mitigation witnesses, otherwise unknown to the client and his family. They have credibility with jurors because they are not perceived as paid experts ("hired guns") or biased by familial ties. They created the records in the normal course of business, long before the capital offense, as neutral, objective professionals. They are in the best position to explain in detail the significance of the events or conditions that they documented. Dr. Larry Biehler, for example, is the pediatrician who prescribed phenobarbital to manage Daniel Lee's seizures in childhood. Debra Lea Graham referred to him in her testimony (RT vol. 44, 7503), and Dr. Cunningham referred to medical records created by Dr. Biehler (RT vol. 45, 7668). However, there is no

indication that anyone ever attempted to interview Dr. Biehler (who remains at the very address mentioned by Ms. Graham in her testimony). He could have provided a definitive description of Daniel Lee's seizures, the medications he prescribed, and the consequences of Ms. Graham's noncompliance. (Ms. Graham's own recollections are no substitute: not only is she a lay person with a motive to defend her own parenting decisions, but by her own account she was abusing both marijuana and amphetamines in the relevant time frame. *See* RT vol. 44, 7501.)

38. Similarly, there is no indication that anyone ever attempted to interview Daniel Lee's school teachers or the staff psychologists who diagnosed him with a learning disability. The abstract concept of a learning disability was referred to (for example, by Dr. Cunningham, RT vol. 45, 7675, 7769), but the educators who identified this problem and endeavored to address it could have offered concrete and vivid testimony, by contrast. They might also have offered insight into his mother and step-father, the extent to which the family cooperated with or hindered remedial efforts in the school system, and the social stigma that attached to Special Education in the particular community. Counsel had numerous school records, but there is no indication that the appropriate follow-up steps were taken to find teachers and other professionals who could have discussed the developmental impact of Daniel Lee's disabilities.

39. Records in themselves are important pieces of an individual's life story, but they are most effective in the development of mitigation evidence when they lead to the professionals who can interpret them in the context in which they were created. That context may reveal institutional failures in some cases, or in other cases how the best efforts of the intervening institutions were thwarted by parental resistance or dysfunction. In Daniel Lee's case, there were voluminous records calling out for investigation, but no follow-up. Ironically, the prosecution

20

demonstrated greater familiarity with the records than defense counsel. Mr. Lee's mother, for example, was repeatedly cross-examined using documents which could have been sources of powerful mitigation instead of impeachment. The records show that Daniel Lee was "huffing" neurotoxins at age ten or eleven (RT vol. 45, 7566), but the defense had neither tracked down the caseworkers who had documented this behavior nor prepared Ms. Graham for the discrepancy with her own memory. Records documenting a suicide attempt (for example, at RT vol. 45, 7572) are invoked by the prosecution to suggest violent impulsivity, and the defense had made no effort to interview objective mental health professionals about the significance of teenage suicidality.

40. Defense counsel's reliance on one expert witness, unsupported by lay witnesses or historical experts, to describe the details of Mr. Lee's life history is a classic example of the witness who "backfires" because jurors view him as a hired gun. (*See* ¶ 24, *supra*, citing Professor Scott Sundby's article about this precise problem – published two years prior to the Lee trial.) Cross-examination of Dr. Cunningham stressed his hourly rate of $180 and his total fees in the tens of thousands of dollars in multiple federal death penalty cases (RT vol. 46, 7820-7822). But the larger problem was the absence of corrobation from lay witnesses and historical experts because of defense counsel's failure to pursue the numerous investigative leads discussed, *supra*, in ¶ 31, ¶ 32, and ¶ 37.

41. Dr. Cunningham entered the case and conducted his interviews with Daniel Lee before significant life-history investigation had been completed by Inquisitor, Inc. His report indicates that he interviewed Mr. Lee on July 18 and 19, 1998. At that point, neither Dr. Cunningham nor the mitigation specialist from Inquisitor had had the opportunity to build a

21

relationship of rapport and trust with Mr. Lee through multiple in-person visits. Not surprisingly, Mr. Lee reportedly denied being sexually abused when asked by Dr. Cunningham (RT vol. 45, 6794: "Danny denies that he was sexually abused, which is not very surprising to me."). (*See also*, Dr. Cunningham's Report of Mitigation for Capital Sentencing, at 6: "Some evidence of interpersonal suspiciousness was exhibited.") Dr. Cunningham testified that Mr. Lee's mother "describes a fifth grade teacher who asked her if Danny was being sexually abused. And she did her minimizing thing then too and said, no, I'm sure he is not, and didn't even ask the teacher what the teacher was seeing that made her have those concerns." (RT vol. 45, 6794-7695.) More pointedly, there is no evidence that defense counsel asked anyone to find the teacher and ask her what gave her these concerns. Once again, there was a "red flag," but counsel took no steps to investigate. There was also no effort to interview the staff at the treatment center where sexual abuse by Mr. Lee's step-father was documented in the records.

42.    According to his Report of Mitigation for Capital Sentencing, Dr. Cunningham conducted brief telephone interviews with several individuals, including Mr. Lee's maternal grandmother (ten minutes), his mentor Bobby Norton (seven minutes), and an ex-girlfriend of Mr. Lee's step-father (twelve minutes). Such interviews are hardly a substitute for the multiple, in-person, face-to-face, one-on-one interviews that represent the standard of practice in mitigation investigation. (*See* ¶ 36, *supra*.) It is not cost-effective to have an expert like Dr. Cunningham conduct the investigation (at three times the hourly rate of Inquisitor's mitigation specialist), and an expert like Dr. Cunningham manages his time in such a way that interviews must be done either by appointment or by telephone. The main value of Dr. Cunningham's

contacting witnesses is to verify information that has been provided by counsel – not to unearth the whole mitigation story.

43. Dr. Cunningham was appropriately interested in potential heritable mental disorders, and he highlighted the fact that Mr. Lee's maternal cousin (and codefendant in the Wavra murder), John David Patton, had been diagnosed with paranoid schizophrenia in a recent evaluation (RT vol. 45, 7669). He noted "partial genetic penetration" in regard to such mental disorders (RT vol. 45, 7670). But Dr. Cunningham was not provided with documentation concerning a maternal aunt's treatment with antidepressants, or suicide or sexual abuse in the maternal lineage. (*See* ¶ 30, *supra.*)

44. Dr. Cunningham offered graphic descriptions of Mr. Lee's step-father's hypersexual behavior, including naked exhibitionism, autoerotic self-penetration with a baseball-size dildo, and forced sexual relations with Ms. Graham in front of Mr. Lee in adolescence (RT vol. 45, 7691-7692). However, no one on the trial team, including Dr. Cunningham and the Inquisitor staff, established sufficient rapport with Mr. Lee to overcome barriers to disclosure concerning his sexual abuse. No investigation was conducted to explore the indications of sexual abuse in the documentary record or to find the fifth grade teacher who had raised the issue with Mr. Lee's mother. Dr. Cunningham listed "perverse sexual exposure in the home; probable observed sexual assault of mother; sexual abuse" among the Findings in his Report (at 7), but he had no credible details to present to the jury in order to convey the impact of sexual trauma. In fact, when asked if he found evidence of anxiety disorders (the cluster of clinical syndromes that includes Post Traumatic Stress Disorder), Dr. Cunningham replied, "Not that's directly exhibited." (RT vol. 45, 7707.)

45. The singular impact of rape on children was noted in both the majority and dissenting opinions in *Kennedy v. Louisiana*, ___ U.S. ___, 128 S. Ct. 2641 (2008). Writing for the majority, Justice Kennedy noted, "Rape has a permanent psychological, emotional and sometimes physical impact on the child. *See* C. BAGLEY & K. KING, CHILD SEXUAL ABUSE: THE SEARCH FOR HEALING 2-24, 111-112 (1990); FINKELHOR & BROWNE, ASSESSING THE LONG-TERM IMPACT OF CHILD SEXUAL ABUSE: A REVIEW AND CONCEPTUALIZATION in HANDBOOK ON SEXUAL ABUSE OF CHILDREN 55-60 (L. Walker ed. 1988). We cannot dismiss the years of long anguish that must be endured by the victim of child rape." 128 S. Ct. at 2658. Justice Alito, in dissent, added, "Long-term studies show that sexual abuse is 'grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate.' C. BAGLEY & K. KING, CHILD SEXUAL ABUSE: THE SEARCH FOR HEALING 2 (1990). . . . Psychological problems include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide. Meister, *supra*, at 209; Broughton, *supra*, at 38; Glazer, *Child Rapists Beware! The Death Penalty and Louisiana's Amended Aggravated Rape Statute*, 25 AM. J. CRIM. L. 79, 88 (1997)." 128 S. Ct. at 2676-77. The paramount importance of fully investigating sexual abuse in the Mr. Lee's childhood is evident.

45. The jurors were left with a dehumanizing description of Daniel Lee as suffering a "wiring problem" with "abnormal brain waves" (trial counsel's opening statement at the sentencing proceeding, RT vol. 44, 7386) – countered effectively, in any event, by a government expert who claimed Mr. Lee had "absolutely" no brain damage and was "normal" on every

24

neuropsychological test (RT vol. 46, 7906). At best, the experts cancelled one another out. At worst, the jurors credited the government's expert and did not believe what the defense had offered. The problem was that defense counsel had not conducted the thorough investigation that might have identified credible lay and historical witnesses who could humanize Daniel Lee and narrate that nightmarish story of his developmental years.

46. Supplementary Guideline 10.4.A delineates the responsibility of counsel in preparing mitigation evidence as follows:

> Counsel bears ultimate responsibility for the performance of the defense team and for decisions affecting the client and the case. It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy. (36 HOFSTRA L. REV. at 688)

Defense counsel seems in this case to have delegated the mitigation preparation, rather than taking charge of it and providing needed direction. The result is dismally reflected in the Special Verdict Forms, where nine of the proffered mitigating factors – including neurological impairments, brain dysfunction, and even Mr. Lee's youthful age – did not receive a single vote. Half the jurors agreed that he had suffered abuse, abandonment, and neglect, but there was no testimony to translate those abstractions into empathy and mercy.

I declare under penalty of perjury under the laws of the State of California, and the United States of America, that the foregoing is true and correct and was executed this ___18th___ day of September 2008 in Oakland, California.

_____
RUSSELL STETLER