**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 2 6 2004

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

FRANK WILLIAMS, JR.                )
                                   )
    Petitioner,                    )
                                   )
v.                                 )       Case No. 5:02CV00296GH
                                   )
LARRY NORRIS, Director,            )
Arkansas Department of Correction, )
                                   )
    Respondent.                    )

## MOTION TO ALTER OR AMEND JUDGMENT, OR, IN THE ALTERNATIVE, FOR RELIEF FROM JUDGMENT

COMES NOW Petitioner, by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 59(e) and/or Rule 60(b), hereby moves the Court to vacate its Order of July 12, 2004 denying Petitioner's claim for habeas relief.

### BACKGROUND

Petitioner was charged with capital murder in Lafayette, County, Arkansas. He went to trial a mere four months after his arrest. His court-appointed attorney, Tommy Potter, saw him *once* during that time. He was granted "no more" than $500 for an investigator, but no investigation was done.[1] He was also granted "no more" than $500 for a psychologist, Mary Pat Carlson. Ms. Carlson found that Mr. Williams' IQ was in the 70 to 75 range, the functional equivalent of a nine-year old performing at a third-grade level. Carlson also found evidence of learning disability. T. Tr. 1332. Even the state's psychiatrist, Dr. Seidel, found that Mr. Williams

---

[1] In requesting a continuance on January 27, 1993, defense counsel stated that their investigator had been at work on another capital case, that they were "caught unaware" of Petitioner's trial date and had done no investigation. Tr. T. 136. The motion for continuance was denied.

GOVERNMENT
EXHIBIT
1
PENGAD-Bayonne, N.J.

had extremely low intelligence, finding that he preformed at a fourth-grade level and had an IQ of 74.

As the case rushed to trial, defense counsel's motion to change venue was denied. Yet, during voir dire as many as a dozen or more of the venire panel admitted to being "friends" or "close friends" with the victim or his family. Others stayed on the jury panel having acknowledged that the prosecutor, Mr. Haltom, was their personal attorney. When asked if anyone knew any of the parties involved, one venireman, Larry Scott Colvin, stated he knew "that boy," referring to Mr. Williams, who is black. T. Tr. 302. Mr. Colvin sat on the jury with no objection from the defense. This was the atmosphere that infected Mr. Williams' trial.

Mr. Williams went to trial with only one penalty-phase witness, Mary Pat Carlson. Defense counsel's opening statement absorbs but two pages of transcript; Ms. Carlson's testimony a mere twenty pages more. That was the entirety of Mr. Williams' penalty phase defense. Defense counsel did not seek out or interview any family members or, it would appear, conduct *any* mitigation investigation. Despite evidence that Mr. Williams was raised in a "severely dysfunctional family," the child of two chronic alcoholics who witnessed and was subjected to family violence throughout his life, defense counsel never undertook *any* investigation of Mr. Williams' familial, social, medical or mental history. Tr. T. 1288.

Nor did the defense present any concrete evidence of Mr. Williams' troubled life, beyond Ms. Carlson's bare conclusions. The transcript recounts no specific examples of abuse suffered by Mr. Williams; no specific description of his parents' alcoholism and its effect on their child's development; and no specific account of how, why, and in what respect the family was "dysfunctional." *Compare Wiggins v. Smith*, 123 S. Ct. 2527, 2538 (2003) ("Though she told the

2

jury it would hear that Kevin Wiggins has had a difficult life . . . counsel never followed up on that suggestion with details of Wiggins' history.").

Indeed, counsel's duty to seek discovery of "all reasonably available mitigating evidence," *Wiggins*, 123 S. Ct. at 2537, includes the duty to discover and present the particularized circumstances of the defendant's life. The Fifth Circuit's recent opinion in *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003) illustrates this aspect of *Wiggins* and *Strickland*. Trial counsel in Lewis presented general testimony that Lewis was "abused" as a child. Absent from counsel's investigation were detailed accounts of this abuse, including evidence that Lewis's father repeatedly beat the children with cords and anything else he could find around the home, that he often beat the children in the genital area, that he shot Lewis's mother in the stomach and almost killed her, that he beat the mother in front of the children, and that Lewis was hospitalized for lacerations to his penis and for an infection he suffered when a hypodermic needle was stuck into his foot. *Id.* at 369. Far from cumulative or duplicative of the "skeletal" trial testimony describing Lewis's "abuse," the details themselves were necessary "to present to the jury a true picture of the tortured childhood experienced by Lewis." Id. at 368. *Accord Collier v. Turpin*, 177 F.3d 1184, 1201-02 (11th Cir. 1999) (decrying the "hollow shell" of mitigation elicited by trial counsel from ten penalty phase witnesses, rather than specific instances of the defendant's heroism, compassion, and personal difficulties); *Ainsworth v. Woodford*, 268 F.3d 868, 874 (9th Cir. 2001) ("While it is true that the testimony touched upon general areas of mitigation, counsel's cursory examination of the witnesses failed to adduce any substantive evidence in mitigation."); *People v. Towns*, 696 N.E.2d 1128, 1142 (Ill. 1998) ("The testimony provided by the mitigation witnesses at the sentencing hearing was devoid of detail regarding defendant's

3

life.").

Clearly, the highly generalized trial testimony offered by Ms. Carlson[2] does not past muster under *Wiggins* and *Lewis*. This is supported by the fact that the jury made an affirmative and extraordinary finding that there was *no* mitigation evidence in the case.

Original habeas counsel here, Mr. Schay, also represented Petitioner in his Rule 37 appeal. Mr. Schay has provided his file to Mr. Odle. As mentioned in the Motion to Appoint Co-counsel, Mr. Schay has been laboring under a burdensome capital case load and suffering from life-threatening health issues. As a result, the posture of the case for conclusion in the district court is less than ideal. For example, the file does not appear to contain trial transcripts from the guilt phase of Mr. Williams trial. Nor is there any transcript from the Rule 37 hearing. Given the serious and clearly colorable issues that loom from the few foregoing (and undisputable) facts, to foreclose federal habeas review as this case stands would be a egregious miscarriage of justice.

## ARGUMENT

A court may alter or amend its judgment if, among other things, the Court has made a mistake of law or fact. *See e.g. Deutsch v. Burlington Northern Railway Co.*, 983 F.2d 741, 744 (7th Cir. 1992). A district court's failure to notice or consider arguments or authorities that justify relief constitutes an appropriate ground to grant a Rule 59(e) motion if these failures affected the correctness of the court's decision. *See e.g. Hicks v. Town of Hudson*, 390 F.2d 84, 87-88 (10th

---

[2] The defense was allowed only $500 for its psychological expert. At the time, Mary Pat Carlson did not have a PhD and the file reveals no written report or test data. In 1998, the Arkansas Supreme Court affirmed the revocation of Ms. Carlson's licensing, affirming the Board of Examiners in Counseling's finding that she was unqualified to conduct precisely the type of testing she preformed on Mr. Williams. Exhibit A, attached. This is all the more reason why this Court should allow counsel to reopen this habeas proceeding and obtain the kind of evaluation of Mr. Williams that justice demands.

Cir. 1967).    Alternatively, under Rule 60(b), "the court may relieve a party . . . from a final judgment, order or proceeding for the following reasons: mistake, inadvertence, surprise, excusable neglect . . . . or (6) any other reason justifying relief. . . ."

In the present case, this Court may grant relief under either provision.  Without question, Mr. Williams received woeful representation at trial, far below that contemplated by *Strickland v. Washington,* 466 U.S. 668 (1984).  From what exists of the record, it is apparent that Mr. Williams has viable claims that were either not investigated or developed by initial habeas counsel or fully presented in Mr. Williams first habeas petition, due in large part to Mr. Schay's ongoing health problems and crushing case load.  Mr. Schay, accustomed to Judge Howard's docket, had not yet filed Mr. Williams' Traverse and was caught unaware when this Court entered its Order the month following assignment of this case.

Under strikingly similar circumstances, the Eighth Circuit has remanded cases to ensure adequate review:

> We find it sufficient to say that counsel may not have recognized and presented issues of constitutional dimension during the post-conviction and habeas proceedings.  Counsel may have also failed to adequately bolster claims actually raised. In light of the death sentence in under which appellant labors and our granting of permission for his second attorney to withdraw, we believe that a remand with directions to allow the petitioner to raise additional issues for consideration by the district court is the most prudent course.

*Griffin v. Delo,* 961 F.2d 793, 794 (8th Cir. 1992); *see also Simmons v. Lockhart,* 856 F.2d 1144, 1146 (8th Cir. 1988) (same); *Murray v. Delo,* 34 F.3d 1367, 1374 (8th Cir. 1994) (similar).

In addition, this being Mr. William' *first* federal habeas petition, it is critical that careful consideration be given to all potential and obvious constitutional violations infecting his trial.  As the Supreme Court noted in *Lonchar v. Thomas,* 517 U.S. 3314, 324 (1996), "[d]ismissal of a

*first* federal habeas petition is a particularly serious matter, for that dismissal denied the petitioner the protections of the Great Writ entirely, risking injury to important interest in human liberty."

Under the circumstances, this Court has the authority and the duty to ensure that Mr. Williams receives a full and fair hearing of his federal constitutional claims. As it stands, Frank Williams faces execution without ever having had the benefit of a full investigation and development of his familial, social and psychological history. *See Wiggins v. Smith*, 539 U.S. 510 (2003). What little evidence that was adduced at trial suggests probable mental retardation and a very likely history of an abusive, dysfunctional family.

Accordingly, if the Great Writ means anything, this Court should vacate its July 12, 2004 Order and allow co-counsel a reasonable period of time to fully investigate Mr. Williams case, exhaust any unexhausted claims in state court pending abeyance and, if appropriate, file an amended habeas petition.

Respectfully Submitted:

William C. Odle, Mo Bar # 38571
Public Interest Litigation Clinic
305 E. 63rd Street
Kansas City, MO 64113
(816) 363-2795
Fax: (816) 363-2799

and

Alvin Schay
Ark. Bar. No. 75176
902 West Second Street
Little Rock, Arkansas 72201
(501)376-7000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this _____ day of July, 2004, a copy of the foregoing motion was served by mail on the Office of the Attorney General, 200 Tower Bldg., 323 Center Street, Little Rock, AR 72201-2610.

William C. Odle

7

Exhibit "A"

ARKANSAS BD. OF EXAM'RS v. CARLSON, 334 Ark. 614, 976 S.W.2d 934 (Ark. 10/29/1998)

[1]    Supreme Court of Arkansas

[2]    98-102

[3]    334 Ark. 614, 976 S.W.2d 934, 1998.AR.0043161< http://www.versuslaw.com>

[4]    October 29, 1998

[5]    **ARKANSAS BOARD OF EXAMINERS IN COUNSELING**
**V.**
**MARY PAT CARLSON**

[6]    SYLLABUS BY THE COURT

[7]    1. ADMINISTRATIVE LAW & PROCEDURE — BOARD OF EXAMINERS IN COUNSELING — JUDICIAL REVIEW. — Judicial review of decisions of the Arkansas Board of Examiners in Counseling is governed by the Arkansas Administrative Procedure Act pursuant to Ark. Code Ann § 25-15-212 (Repl. 1996).

[8]    2. ADMINISTRATIVE LAW & PROCEDURE — LIMITED REVIEW OF AGENCY DECISIONS. — The appellate court's review of administrative decisions, like that of the circuit court, is limited in scope and is directed not to the decision of the circuit court, but to the decision of the administrative agency; under the Administrative Procedure Act, it is not the role of the circuit courts or the appellate courts to conduct a de novo review of the record; rather, review is limited to ascertaining whether there is substantial evidence to support the agency's decision or whether the agency's decision runs afoul of one of the other criteria set out in Ark. Code Ann. § 25-15-212(h) (Repl. 1996); the appellate court reviews the entire record in making this determination.

[9]    3. ADMINISTRATIVE LAW & PROCEDURE — STANDARD OF REVIEW — SUBSTANTIAL EVIDENCE DEFINED. — The appellate court will not reverse an administrative board's decision if there is any substantial evidence to support it; substantial evidence is evidence that is valid, legal, and persuasive and that a reasonable mind might accept to support a conclusion and force the mind to pass beyond speculation and conjecture; the question is not whether the testimony would have supported a contrary finding, but whether it would support the finding that was made.

*Exhibit A*

[10]    4. ADMINISTRATIVE LAW & PROCEDURE — DEFERENCE TO AGENCIES — EVIDENTIARY WEIGHT — STATUTORY CONSTRUCTION. — It is the prerogative of an administrative board to believe or disbelieve any witness and to decide what weight to accord the evidence; similarly, the construction of a state statute by an administrative board or agency will not be overturned unless it is clearly wrong.

**[334 Ark Page 615]**

[11]    5. ADMINISTRATIVE LAW & PROCEDURE — DEFERENCE TO AGENCIES — UNDERLYING FACTORS. — The supreme court has recognized that administrative agencies are better equipped than courts, by specialization, insight through experience, and more flexible procedures to determine and analyze underlying legal issues affecting their agencies; this recognition accounts for the limited scope of judicial review of administrative action and the refusal of the court to substitute its judgment and discretion for that of the administrative agency.

[12]    6. ADMINISTRATIVE LAW & PROCEDURE — FAILURE TO NOTIFY MINOR'S PSYCHOLOGIST THAT APPELLEE WAS ALSO COUNSELING — BOARD'S FINDING SUPPORTED BY SUBSTANTIAL EVIDENCE. — Substantial evidence supported appellant board's finding that appellee, a licensed professional counselor, had seen a minor as a counseling client but had made no attempt, under Ethical Standard B(3), to consult with the minor's psychologist or to coordinate her activities with the psychologist despite her knowledge that the minor was seeing the psychologist.

[13]    7. ADMINISTRATIVE LAW & PROCEDURE — EXCEEDING SCOPE OF APPELLEE'S DUTIES AS LICENSED — BOARD'S FINDING SUPPORTED BY SUBSTANTIAL EVIDENCE. — Substantial evidence supported appellant board's findings that appellee was not licensed in the appraisal speciality and therefore was not authorized to perform four appraisal tests that she administered to a minor client; there was also substantial evidence that at least two of the tests were used by appellee as projective instruments, an appraisal activity prohibited by Ark. Code Ann. § 17-27-102(5)(B) (Repl. 1995).

[14]    8. ADMINISTRATIVE LAW & PROCEDURE — JUDICIAL REVIEW — ISSUES MUST HAVE BEEN RAISED BEFORE AGENCY. — The appellate court will not set aside administrative decisions on grounds that were not presented to the agency; it is essential to judicial review under the Arkansas Administrative Procedure Act that issues must be raised before the administrative agency appealed from or they will not be addressed by the appellate court.

VersusLaw Research Database    *Exhibit A*    Page 3 of 12

[15]    9. ADMINISTRATIVE LAW & PROCEDURE — JUDICIAL REVIEW — EVEN CONSTITUTIONAL ARGUMENTS MUST HAVE BEEN RAISED BEFORE AGENCY. — The appellate court will not set aside an administrative determination upon a ground not presented to the agency because to do so would deprive the agency of the opportunity to consider the matter, make its ruling, and state the reasons for its action; the same may be said for constitutional arguments not raised at the agency level.

**[334 Ark Page 616]**

[16]    10. ADMINISTRATIVE LAW & PROCEDURE — CIRCUIT COURT ERRED IN REVERSING BOARD'S DECISION TO REVOKE LICENSE — CIRCUIT COURT'S RULING REVERSED — BOARD'S DECISION REINSTATED. — Appellee's failure to raise before appellant board due-process arguments concerning the board's adoption of specialization rules and ethical standards precluded their consideration on appeal; thus, the supreme court held that it was error for the circuit court to reverse appellant board's decision to revoke appellee's license on the ground that the administrative rules had not been properly adopted; the supreme court reversed the ruling of the circuit court and reinstated appellant board's decision in its entirety.

[17]    Appeal from Miller Circuit Court; Jim Hudson, Judge; Circuit Court reversed; Board's decision reinstated.

[18]    Winston Bryant, Att'y Gen., by: Arnold M. Jochums, Ass't Att'y Gen., for appellant.

[19]    Wright & Burke, by: William Randal Wright, for appellee.

[20]    The opinion of the court was delivered by: Donald L. Corbin, Justice.

[21]    Appellant Arkansas Board of Examiners in Counseling appeals the judgment of the Miller County Circuit Court reversing the Board's decision to revoke Appellee Mary Pat Carlson's license to practice as a licensed professional counselor. Our jurisdiction of this appeal is pursuant to Ark. Sup. Ct. R. 1-2(b)(1) & (6), as it presents an issue of first impression requiring our interpretation of an act of the General Assembly. On appeal, the Board argues that (1) there is substantial evidence to support its decision, and (2) the circuit court erred in reversing its decision on a ground not raised before the Board. We reverse the ruling of the circuit court and reinstate the Board's decision.

[22]    Facts and Procedural History

*Exhibit A*

[23]     In May 1996, the Board sent Carlson notice of a hearing to determine whether she had violated the Counselors Licensing Law, Ark. Code Ann. § 17-27-101 to -308 (Repl. 1995), the Board's rules, and the ethical standards for licensees. The Board alleged that Carlson had violated section 17-27-102(5), which prohibits licensees from conducting projective tests, and had committed several ethical violations stemming from Carlson's counseling

**[334 Ark Page 617]**

[24]     of RMN, a minor female born on July 9, 1988. As to the ethical violations, the Board alleged that Carlson had failed to notify RMN's psychologist, Dr. Betty Feir, that she had been seeing the child during the same time that Dr. Feir was treating her. The Board alleged further that Carlson had exceeded the boundaries of her practice, as reflected in her Statement of Intent *fn1, by administering four tests to RMN: (1) the Bender Visual Motor Gestalt test (Bender-Gestalt), (2) the Wechsler Intelligence Scales for Children, Revised (WISC-R), (3) the Draw-A-Person test (DAP), and (4) the Draw-A-Family test (DAF). The Board asserted that these tests are projective instruments that counselors are not authorized to administer. See section 17-27-102(5). The Board also asserted that Carlson was not licensed in the appraisal speciality. The Board's notice reflected that it had adopted the Ethical Standards of the American Association for Counseling and Development (March 1988) (Ethical Standards) and the Code of Ethics and Standards of Practice of the American Counseling Association (July 1995) (Code of Ethics).

[25]     A hearing was held before the Board on June 7, 1996, during which testimony and exhibits were presented on the matter. In an order dated June 24, 1996, the Board revoked Carlson's license to practice. Particularly, the Board found that Carlson had violated Ethical Standard B(3), pertaining to her failure to notify RMN's psychologist that she was simultaneously seeing the child. The Board also found that Carlson had used appraisal techniques despite the fact that she had not been approved for a specialty license in the appraisal area, in violation of section 17-27-301(6) and Board Rules 3.3 and 4.2. The Board also found that Carlson's use of appraisal instruments constituted practice outside her Statement of Intent. Lastly, the Board found that Carlson's use of projective instruments in violation of section 17-27-102(5)(B) constituted unprofessional conduct.

[26]     Carlson appealed to the circuit court, arguing, among other things, that the Board's decision was not supported by evidence, was arbitrary and capricious, and was based on rules and

**[334 Ark Page 618]**

[27]     regulations not properly adopted by the Board. The circuit court vacated the Board's conclusions of law and ordered the Board to reconsider its ruling. This appeal followed.

[28]     Standard of Review

*Exhibit A*

[29]   [1, 2] Judicial review of decisions of the Arkansas Board of Examiners in Counseling is governed by the Arkansas Administrative Procedure Act (APA) pursuant to Ark. Code Ann § 25-15-212 (Repl. 1996). See Bohannon v. Arkansas State Bd. of Nursing, 320 Ark. 169, 895 S.W.2d 923 (1995). Our review, like that of the circuit court, is limited in scope and is directed not to the decision of the circuit court, but to the decision of the administrative agency. Arkansas Dep't of Human Servs. v. Thompson, 331 Ark. 181, 959 S.W.2d 46 (1998). Under the APA, it is not the role of the circuit courts or the appellate courts to conduct a de novo review of the record; rather, review is limited to ascertaining whether there is substantial evidence to support the agency's decision or whether the agency's decision runs afoul of one of the other criteria set out in section 25-15-212(h). Id. We review the entire record in making this determination. Arkansas Alcoholic Beverage Control Bd. v. Muncrief, 308 Ark. 373, 825 S.W.2d 816 (1992).

[30]   [3-5] We will not reverse the Board's decision if there is any substantial evidence to support it. Bohannon, 320 Ark. 169, 895 S.W.2d 923. Substantial evidence is evidence that is valid, legal, and persuasive and that a reasonable mind might accept to support a conclusion and force the mind to pass beyond speculation and conjecture. Id. The question is not whether the testimony would have supported a contrary finding, but whether it would support the finding that was made. Id. It is the prerogative of the board to believe or disbelieve any witness and to decide what weight to accord the evidence. Id. Similarly, the construction of a state statute by an administrative board or agency will not be overturned unless it is clearly wrong. Thomas v. Arkansas Dep't of Human Servs., 319 Ark. 782, 894 S.W.2d 584 (1995). This court has often stated that administrative agencies are better equipped than courts, by specialization, insight through experience, and more flexible procedures to determine and analyze

**[334 Ark Page 619]**

[31]   underlying legal issues affecting their agencies, and this recognition accounts for the limited scope of judicial review of administrative action and the refusal of the court to substitute its judgment and discretion for that of the administrative agency. See, e.g., Hamilton v. A.P.C. & E. Comm'n, 333 Ark. 370, 969 S.W.2d 653 (1998); Social Work Licensing Bd. v. Moncebaiz, 332 Ark. 67, 962 S.W.2d 797 (1998); Wright v. Arkansas State Plant Bd., 311 Ark. 125, 842 S.W.2d 42 (1992).

[32]   I. Substantial Evidence

[33]   The Board asserts that its decision to revoke Carlson's license is supported by substantial evidence. Specifically, the Board contends that there was substantial evidence to support its conclusion that (1) Carlson violated Ethical Standard B(3) by failing to notify RMN's psychologist that she was seeing the child as a patient, and (2) Carlson exceeded the scope of her practice, as originally licensed by the Board and evident in her Statement of Intent, in violation of the statutory law and Rules 2.8 and 3.3 of the Arkansas Board of Examiners in Counseling Rules and Regulations (Board Rules).

VersusLaw Research Database                *Exhibit A*    Page 1 of 7

[34]        A. Failure to Notify Child's Psychologist

[35]        The Board found that Carlson had violated Ethical Standard B(3) by failing to notify RMN's psychologist that she was counseling the child during the same period of time. Carlson maintains that RMN was never her client; instead, she asserts that RMN's mother was her patient.

[36]        Ethical Standard B(3) provides:

[37]        If an individual is already in a counseling relationship with another professional person, the member does not enter into a counseling relationship without first contacting and receiving the approval of that other professional. If the member discovers that the client is in another counseling relationship after the counseling relationship begins, the member must gain the consent of the other professional or terminate the relationship, unless the client elects to terminate the other relationship.

**[334 Ark Page 620]**

[38]        Dr. Betty Feir, a psychologist licensed in Arkansas and Texas, testified that she started seeing RMN as a patient when the child was three years old. She stated that RMN had been progressing beautifully up until the fall before the Board's hearing, when the child began having some difficulty. Specifically, she stated that the child had problems with bed-wetting and that she had become somewhat withdrawn. She stated that when she asked the child what was wrong, RMN revealed that she had been going to Carlson's offices and that Carlson had been talking to her about her situation and asking her questions. She stated that RMN indicated that she was not supposed to tell this to Dr. Feir. She also stated that RMN indicated that she did not want to go to Carlson's office. Dr. Feir perceived that RMN was having the kind of relationship with Carlson similar to the one RMN had with her, and that it was certainly RMN's perception that Carlson was her therapist. She stated that if, in fact, RMN's mother was actually Carlson's client, it was unusual and inappropriate for a child of RMN's age to be in the room while her mother was having therapy. She stated that it would not be standard therapy to see an adult in therapy with a child present. She stated that Carlson knew that she (Dr. Feir) was seeing RMN because Carlson had heard her testify about her relationship with RMN in court. She stated that Carlson also knew that RMN was continuing to see her.

[39]        Dr. Wrenda Gallien, a board-certified psychiatrist in child psychiatry, testified that she had a doctor-patient relationship with RMN that began in November of 1995. She stated that from her interviews of RMN, it appeared that the child had seen two mental health professionals at the same time. She stated that RMN said she did not like going to two therapists. She stated that on the child's second visit to her, RMN volunteered that she had been asked not to talk about her visits with Carlson. She stated that RMN indicated that Carlson had called her father stupid, and that her mother and Carlson both indicated that if RMN said that she wanted to continue living with her father, she would not be able to see

VersusLaw Research Database                                           *Exhibit A*    Page 2 of 7
                                                                                     7 of 12

her mother anymore. Dr. Gallien stated that it is normal for a parent to be present when a child is being counseled, but

**[334 Ark Page 621]**

[40]     that if the therapy is for a parent, it is not normal for the child to be present during therapy.

[41]     Carlson testified that the only substantive contact she had with RMN was when she conducted an evaluation of the child for purposes of giving testimony at trial. She denied that RMN was ever her client or patient. She stated that RMN's mother's attorney had requested that she evaluate RMN for an upcoming hearing in Texas, involving the child's continued visitation with her mother. She stated that she did so testify in court on June 30, 1994. She admitted that RMN had mentioned Dr. Feir to her, and that she knew Dr. Feir would give expert testimony at the Texas hearing in June 1994. She indicated that after she heard Dr. Feir's testimony, she became aware that Dr. Feir had been treating RMN for a number of years. She denied having counseling sessions with RMN after June 30, 1994.

[42]     On cross-examination, however, Carlson admitted to having written a letter to RMN's father on October 13, 1995, that reflected "following your request to discuss with [RMN's mother] whether she would be willing to have you sit in on counseling sessions with [RMN], I obtained her agreement and attempted to get in touch with you to notify you." (Emphasis added.) Moreover, on rebuttal, Patricia Bradley, an employee of RMN's father, testified that on November 7, 1995, she saw RMN and her mother go into Carlson's office, and that when they came out, RMN was carrying some books and papers. Bradley stated that she heard RMN crying and telling her mother that she did not like the things that they, presumably RMN's mother and Carlson, were saying about her daddy. Bradley stated that on November 14, 1995, she saw RMN go back into Carlson's office carrying paper and books, and that she was not carrying anything when she left.

[43]     [6] From the foregoing testimony, we conclude that there is substantial evidence to support the Board's finding that Carlson had seen RMN as a counseling client, but had made no attempt, under Ethical Standard B(3), to consult with Dr. Feir or to coordinate her activities with Dr. Feir despite her knowledge that RMN was seeing Dr. Feir.

**[334 Ark Page 622]**

[44]     B. Exceeding the Scope of Her Duties as Licensed

[45]     The Board argues that there is substantial evidence to support its decision that Carlson exceeded the scope of her licensed practice by administering the WISC-R, the Bender-Gestalt, the DAP, and the DAF tests to RMN, in violation of sections 17-27-102 and 17-27-301 and Board Rules 2.8 and 3.3.

*Exhibit A*    Page 3 of 7
8 of 12

[46]    Section 17-27-301 sets out the qualifications for applicants who wish to be licensed professional counselors. Subsection (6) provides:

[47]    The applicant will declare special competencies and demonstrate professional competence in specialty areas by passing a written or oral or situational examination, or any combination thereof, as the board will prescribe. Upon examination of credentials the board, by a majority of the board members present and voting, may consider such credentials adequate evidence of professional competence and recommend to the chairman of the board that a license be approved in that specialty. [Emphasis added.]

[48]    Board Rule 2.8 provides that the applicant's Statement of Intent refers to a typed statement from the license applicant "describing the intended use of the license, the public with whom the applicant will work, and the counseling approaches the applicant plans to use (including techniques and tools)." (emphasis added). Carlson's Statement of Intent, approved by the Board on September 21, 1985, reflects:

[49]    It is my intent to work in a community mental health clinic with chronic and acute mental health clients in group, individual, family and couple counseling using eclectic techniques of marriage and family counseling, individual counseling and group counseling.

[50]    My areas of expertise include: marriage and family counseling (American Association of Marriage and Family Therapy, clinical member), hypno-counseling (American Society of Clinical Hypnosis), sex counseling (American Association of Sex Educators, Counselors, Therapists — certified member), individual and group counseling (Licensed Professional Counselor, Texas).

**[334 Ark Page 623]**

[51]    Dr. Ann Thomas, Executive Director of the Licensing Board, testified that Carlson's original Statement of Intent is the current statement on file with the Board, and that it does not contain a specialty in appraisal.

[52]    Rule 3.3 of the Board's Rules and Regulations provides:

[53]    Areas of specialization, as specified in the statement of professional intent, shall be evaluated by the Board. The Board will use the national standards for the preparation of counselors, prepared by the specific professional association, as a guide in establishing the standards, for counseling, i.e., Marriage and Family Counseling, Rehabilitation Counseling, Pastoral Counseling, Career Counseling, School Counseling, Clinical Mental Health Counseling/Psychotherapy, Geriatric Counseling, Counseling Supervision, Appraisal or other specified counseling areas.

*Exhibit A*    Page 4 of 7
9 of 12

[54]    Dr. Philip Hestand, a psychologist licensed by both this Board and the Board of Examiners in Psychology, testified about the particular tests given by Carlson to RMN and about the training and specialization required to administer such tests. He stated that he had previously served on this Board and was familiar with the Board Rules and the Code of Ethics that applies to counselors. He stated that the WISC-R is a test of intelligence and ability and is considered an appraisal instrument, as some of the subtests require some judgment or interpretation by the administrator of the test as to quality of the response. He stated that an individual licensed by the Board who has a specialization in appraisal and has had course work in administering this type of test would be eligible to give the WISC-R.

[55]    Dr. Hestand stated that the Bender-Gestalt test was developed to assess both developmental age and the possibility of neurological impairment. He stated that a person who has had course work in testing of this type, including some sort of neurological assessment training, and has met the requirements for the appraisal specialization would be allowed to administer the test and make the conclusion that there is no indication of neurological problem. He stated that although the Bender-Gestalt test had been used by some as a projective test, it appeared from Carlson's report on RMN that she did not use it as a projective test.

**[334 Ark Page 624]**

[56]    Dr. Hestand testified that the DAP test is a projective test when you use it to interpret internal processes that might be going on such as personal characteristics or attitudes or you are trying to make some kind of determination about emotionality based on a drawing. He stated that as a projective instrument, the DAP test is also an assessment of emotionality or personality and thus, it is an appraisal instrument. He stated that from Carlson's report, it was apparent that the DAP test had been utilized as a projective instrument, as she had made interpretations about RMN having a sense of ambivalence, seeing men as powerful and also extremely weak or ineffectual, and that there were indications from the drawing of tension and anxiety, but overall a sense of a reasonably secure individual. He stated that the DAF test, similar to the DAP test, was also used by Carlson as a projective instrument, as she made subjective interpretations about RMN's attitudes based on the projection of the child into the drawing.

[57]    Dr. Hestand testified that a licensee's practice is based on his or her statement of intent. He explained that at the time of licensing, the applicant submits a letter of intent to the Board, wherein the applicant states what he or she intends to do in his or her practice. The Board then determines, based on what the applicant said, his or her credentials, and an oral exam, whether or not the applicant is competent to do those things. He stated that not all applicants have the same course work background or credentialing, and that the Board determines at the time of licensing what the applicant is competent to do or not competent to do. He stated further that not all persons licensed by the Board are licensed to do the same things. He stated that a counselor is required to have the appraisal specialization in order to use assessment instruments that are standardized or that require course work in training to administer. He stated that Carlson was approved for specialization in marriage and family counseling, and that she thus was not authorized to do psychological

VersusLaw Research Database                              *Exhibit A*    Page 5 of 7
                                                                        10 q 12

assessments using the foregoing tests. He noted that under the Board Rules, a person must have an assessment specialization before they can administer the WISC-R, the DAP, and the DAF as an assessment instrument, and that this requirement exists even if the test is not used as a projective instrument. He stated further that to administer the Bender-Gestalt

**[334 Ark Page 625]**

[58]    and then write a report on the results requires an appraisal specialization, as the counselor is required to demonstrate that he or she has competency in appraising individuals both developmentally and psychologically. He stated that even a person holding an appraisal specialization might not be allowed to do particular types of testing, and that under the Arkansas counseling law, licensed counselors are never approved to administer projective tests. He stated that the conclusion of Carlson's report appears to be based on projective testing rather than objective testing.

[59]    During her testimony before the Board, Carlson admitted that persons licensed by the Board must confine their practice within the ambit of their Statements of Intent. She also admitted that she does not have a speciality license. She stated that she had previously submitted an application to the Board for the appraisal specialty license, and that the Board had informed her that she would need to take three additional three-hour college courses in order to obtain such specialty license. She denied, however, that she needed such a specialty license to perform appraisals. When questioned by one of the Board members, Carlson contradicted herself, stating that she thought it would be good to have the appraisal specialty on her credentials, but that she did not think that she could do more with the appraisal specialty than she could without it. Carlson further admitted that the DAF and DAP tests can be used in a projective manner, but she denied having used them in such a way.

[60]    [7] We conclude that there was substantial evidence to support the Board's findings that Carlson was not licensed in the appraisal speciality, and that she was therefore not authorized to perform the four appraisal tests that she administered to RMN. There is likewise substantial evidence that at least two of the tests, the DAP and the DAF tests, were used by Carlson as projective instruments, which is prohibited by section 17-27-102 (5)(B).

[61]    [8] We note Carlson's arguments that (1) section 17-27-301(6) cannot be applied to her because she had been licensed by the Board prior to the time that subsection was passed by the General Assembly, and (2) that the Board applied the wrong version of Rule 3.3 to her case. Both these arguments must necessarily fail

**[334 Ark Page 626]**

*Exhibit A*    Page 6 of 7

π 9 of 12

[62]    because Carlson did not raise them before the Board, despite the fact that she raised them in the circuit court. This court will not set aside administrative decisions on grounds that were not presented to the agency. "[I]t is essential to judicial review under the Arkansas Administrative Procedure Act that issues must be raised before the administrative agency appealed from or they will not be addressed by this court[.]" Wright, 311 Ark. at 132, 842 S.W.2d at 46 (citing Alcoholic Beverage Control Div. v. Barnett, 285 Ark. 189, 685 S.W.2d 511 (1985)).

[63]    II. Adoption of the Board's Rules

[64]    The Board argues that the circuit court erred in reversing its decision on grounds not previously raised before the Board. Particularly, the Board asserts that Carlson failed to raise the issue of the Board's alleged improper adoption of its Rules governing specialization and the 1988 Ethical Standards during the administrative hearing. The Board additionally asserts that the circuit court erred in concluding that Carlson was not provided sufficient notice of the law so that she could conform her conduct to the statute because neither the licensing law nor the Board's regulations defined "projective instruments." Again, the Board asserts that this issue was raised for the first time in circuit court. We agree that the circuit court's reversal of the Board's decision on those grounds was erroneous.

[65]    The circuit court ruled that the Board's rules and the Ethical Standards were not properly adopted under Ark. Code Ann. § 25-15-204 (Repl. 1996). The circuit court concluded that the lack of notice deprived Carlson of her rights to due process of the law under both the Arkansas and United States Constitutions. The circuit court's order reflects in part:

[66]    Because the rules and regulations were not properly filed with the Secretary of State, there is no legal notice of what is expected of counselors subject to said rules and regulations. There was no evidence presented by the Board of other notice and, in fact, Ms. Carlson's attorney objected to the lack of notice. [Emphasis added.]

[67]    It is unclear what the circuit judge was referring to when he found that Appellee's attorney had objected to the lack of notice

**[334 Ark Page 627]**

[68]    of the Board's rules. We are not aware of any such objection made by Carlson to the Board. To the contrary, during opening statement before the Board, Carlson's attorney stated that "we admit that the board has adopted the standards." Moreover, Carlson admitted in her response to the Board's notice that the Board had adopted ethical standards, and that she is subject to the ethical provisions contained within the Ethical Standards and the Code of Ethics, enumerated by the Board in its notice.

*Exhibit A*   Page 7 of 7
12 of 12

[69]    [9, 10] We will not set aside an administrative determination upon a ground not presented to the agency because to do so would deprive the agency of the opportunity to consider the matter, make its ruling, and state the reasons for its action. Franklin v. Arkansas Dep't of Human Servs., 319 Ark. 468, 892 S.W.2d 262 (1995) (citing Riverways Home Care v. Arkansas Health Servs. Comm'n, 309 Ark. 452, 831 S.W.2d 611 (1992); Arkansas Cemetery Bd. v. Memorial Properties, Inc., 272 Ark. 172, 616 S.W.2d 713 (1981)). The same may be said for constitutional arguments not raised at the agency level. See Arkansas Health Servs. Agency v. Desiderata, Inc., 331 Ark. 144, 958 S.W.2d 7 (1998) (approving the rule adopted by the court of appeals in Hamilton v. Jeffrey Stone Co., 6 Ark. App. 333, 641 S.W.2d 723 (1982) that even though the Workers' Compensation Commission may not have authority to declare statutes unconstitutional, such constitutional issues should first be raised at the Administrative Law Judge or Commission level, because such issues often require an exhaustive analysis that is best accomplished by an adversary proceeding, which can only be done at the hearing level). Carlson's failure to raise the due-process arguments before the Board precludes its consideration by this court on appeal. Franklin, 319 Ark. 468, 892 S.W.2d 262. Thus, it was error for the circuit court to reverse the Board's decision on the ground that the administrative rules had not been properly adopted. We accordingly reverse the ruling of the circuit court, and we reinstate the Board's decision in its entirety.

[70]    THORNTON, J., not participating.

**[334 Ark Page 628]**

---

Opinion Footnotes

---

[71]    *fn1 For purposes of clarification, we note that during the proceedings below, the term "Letter of Intent" was used interchangeably with that of "Statement of Intent."

19981029

© 1992-2003 VersusLaw Inc.