FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 2 7 2013

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

DANIEL LEWIS LEE                                    MOVANT

vs.                    Case No: 4:06-CV-1608 GTE
                       (Criminal Case No. 4:97-cr-00243-JLH-2)

UNITED STATES OF AMERICA                           RESPONDENT

---

## MOVANT'S MOTION FOR RELIEF FROM A JUDGMENT OR ORDER PURSUANT TO FED. R. CIV. P. 60(b)

---

KARL SCHWARTZ
Jennifer Merrigan
Assistant Public Defenders
Delaware Federal Defender Office
Capital Habeas Unit
800 King Street, Suite 200
Wilmington, DE 19801
(302) 442-6545
karl_schwartz@fd.org

*Oral Argument Requested*

## TABLE OF CONTENTS

I.      BACKGROUND FACTS & PROCEDURAL HISTORY ............................................. 3

II.     FED. R. CIV.P. 60(b) IS THE APPROPRIATE PROCEDURAL MECHANISM
        FOR THE LITIGATION OF MR. LEE'S CLAIMS. ............................................. 9

III.    MR. LEE'S 60(b) MOTION ONLY ATTACKS A "DEFECT IN THE INTEGRITY
        OF THE FEDERAL HABEAS PROCEEDINGS" AND THUS THIS COURT IS
        NOT PREVENTED FROM GRANTING THE RELIEF HE SEEKS. ...................... 12

    A.  Post-Conviction Counsel's Failure To Timely Present Evidence In Support Of Mr.
        Lee's Ineffective Assistance Of Trial Counsel Claim Foreclosed This Court From
        Considering The Claim On The Merits. ................................................. 13

    B.  There is Cause To Excuse The Default. ............................................... 15

    C.  § 2255 Counsel Were Ineffective. ..................................................... 20

IV.     EXTRAORDINARY CIRCUMSTANCES JUSTIFY REOPENING THE
        JUDGMENT PURSUANT TO RULE 60(b)(6). ...................................... 22

    A.  *Trevino* Is A Supervening Change In The Law That Presents An Extraordinary
        Circumstance Sufficient For Rule 60(b)(6) Relief. .................................. 23

    B.  Mr. Lee's Rule Motion Meets All of the Relevant Criteria Warranting 60(b)
        Relief. ........................................................................... 26

        1.  The nature of the intervening law in *Trevino* and its degree of connection to Mr.
            Lee's case. ...................................................................... 26

        2.  Diligence. ....................................................................... 27

        3.  Finality. ........................................................................ 29

        4.  The underlying strength of Mr. Lee's ineffective assistance of trial counsel
            claim. ........................................................................... 29

            a.  The Psychopathy/PCL-R Evidence at the 1999 Sentencing Trial. ............... 30
            b.  The Psychopathy Evidence Unfairly Prejudiced the Jury's Sentencing
                Deliberations. ................................................................ 34
            c.  The Psychopathy/PCL-R Evidence Used At Mr. Lee's Sentencing Trial Was
                Demonstrably False. ........................................................... 39
            d.  The Underlying Ineffective Assistance Of Trial Counsel Claim Has "Some
                Merit." ....................................................................... 45

    C.  The Equities Require That 60(b)(6) Relief Be Granted. ............................ 48

V.      RELIEF PURSUANT TO RULE 60(b)(5) IS ALSO WARRANTED BECAUSE
        APPLYING THE JUDGMENT PROSPECTIVELY IS NO LONGER
        EQUITABLE. ..................................................................... 49

VI.     MR. LEE SHOULD BE GRANTED 60(b) RELIEF ............................... 52

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DANIEL LEWIS LEE                                                    MOVANT

vs.                          Case No: 4:06-cv-01608-GTE
                             (Criminal Case No. 4:97-cr-00243-JLH-2)

                             ORAL ARGUMENT REQUESTED

UNITED STATES OF AMERICA                                       RESPONDENT

MOVANT'S MOTION FOR RELIEF FROM A JUDGMENT OR ORDER
PURSUANT TO FED. R. CIV. P. 60(b)

COMES NOW Daniel Lewis Lee ("Mr. Lee"), by his undersigned counsel, and hereby

moves the Court, pursuant to Fed. R. Civ. P. 60(b), for relief from its Judgment issued September

4, 2008, denying Mr. Lee's motion for post-conviction relief pursuant to 28 U.S.C. § 2255, and

its Judgment issued December 22, 2010, denying Mr. Lee's motion to alter or amend judgment

pursuant to Fed. R. Civ. P. 59(e).

Mr. Lee is the only person on federal death row whose capital sentencing proceedings

relied on aggravating evidence of future dangerousness based on a psychological instrument –

the Hare Psychopathy Checklist-Revised ("PCL-R") – that labeled him as a "psychopath." Every

other federal capital case involving such evidence has either been reversed after judgment, or the

evidence was precluded from ever being presented to the jury in the first place. This is because

that instrument has been thoroughly disavowed by the scientific community as an unreliable and

invalid predictor of an individual's future dangerousness in prison, including by the

government's own expert in this case. In fact, in the years since Mr. Lee's trial, the government

has quietly abandoned presenting such evidence in its capital prosecutions. Yet, despite the

1

widespread acknowledgment that the PCL-R is not a valid predictor of future dangerousness in prison, no court has ever considered the issue of the unreliability and scientific invalidity of the psychopathy evidence in Mr. Lee's case. Court-appointed trial counsel unreasonably failed to utilize evidence available at the time of Mr. Lee's trial to challenge the reliability and validity of the PCL-R, and therefore did not raise the issue at trial or on direct appeal.

Mr. Lee's § 2255 proceeding was his one and only opportunity to prove his claim regarding trial counsel's ineffectiveness and to develop extra-record facts in support of that claim. However, this Court was again precluded from considering this issue in Mr. Lee's § 2255 proceedings because his court-appointed § 2255 counsel committed a default by failing to properly plead and present facts supporting a corresponding claim of ineffective assistance of trial counsel. This motion is being filed to overcome the procedural default that precluded a full merits determination of Mr. Lee's ineffective assistance claim. Absent the requested relief – a reopening of the judgment – § 2255 counsel's failure to properly plead and present this critical ineffective assistance of counsel claim will mean that Mr. Lee will be deprived of any review of that claim at all, and he will be executed based on "scientific" evidence which has been deemed unreliable and invalid by all relevant experts, including the government's.

In the following motion, the undersigned will establish the following:

1. The Rule under which this motion is brought – Rule 60(b) – is an appropriate vehicle for reopening the judgment denying § 2255 relief in Mr. Lee's case.

2. This motion is a proper exercise of Rule 60(b) because it attacks a defect in the integrity of the § 2255 proceedings – namely, the default caused by § 2255 counsel's failure to properly plead, and timely present facts in support of, an ineffective assistance of counsel claim.

2

3. Per the Supreme Court's recent decision in *Trevino v. Thaler*, 569 U.S. ___, 133 S. Ct. 1911 (2013), cause now exists to excuse the default – namely, § 2255 counsel's ineffective assistance.

4. *Trevino* represents an intervening change of the law that, combined with a variety of equitable factors and the underlying strength of the constitutional violation alleged, warrants relief under Rule 60(b)(6).

5. Relief under Rule 60(b)(5) is also warranted because enforcing the judgment against Mr. Lee is no longer equitable.

By this motion, Mr. Lee seeks to reopen the judgment so that he may be returned to the position he was in before his § 2255 counsel committed the default and have at least one meaningful opportunity to present his ineffective assistance of counsel claim, including all relevant facts in support of that claim, to a reviewing court.

In support of this motion, Mr. Lee states the following:

## I.    BACKGROUND FACTS & PROCEDURAL HISTORY

On May 4, 1999, a jury convicted Defendants Chevie Kehoe and Daniel Lee of several RICO offenses involving robbery and murder. Shortly thereafter, separate penalty phase proceedings were scheduled, and Mr. Kehoe's penalty trial occurred first. On May 10, 1999, immediately before the penalty verdict was returned in Mr. Kehoe's case, the government announced *in camera* that if the jury returned a verdict of life imprisonment, it would not pursue the death penalty against Mr. Lee. *See United States v. Lee*, 89 F. Supp. 2d 1017, 1032 (E.D. Ark. 2000). (The government maintained pre-trial, during trial and post-trial that Mr. Kehoe was the leader of the enterprise and that Mr. Lee was his subordinate, playing a lesser role in the

3

planning and commission of the offenses. *Id.* at 1032 n.9.[1]) After the jury's life verdict for Mr. Kehoe was announced, the government again indicated during a second *in camera* conference that it would contact the Department of Justice and request permission to decertify or withdraw the death penalty notice for Mr. Lee. *Id.* at 1032. When the parties reconvened in chambers later that day, the United States Attorney – Ms. Paula Casey – informed the Court that she was not able to reach the Attorney General, but instead spoke with the Deputy Attorney General, who informed Ms. Casey that the Department would not decertify the death request. Thus, Mr. Lee's case proceeded to a penalty trial despite the local U.S. Attorney's judgment that the case should not proceed capitally. At the conclusion of Mr. Lee's penalty phase proceedings – a substantial portion of which was tried for the government by prosecutors from Washington, D.C. on assignment to the Eastern District of Arkansas – the jury sentenced Mr. Lee to death.

The jury that sentenced him to death was told that a qualified mental health expert had administered a diagnostic instrument – the Hare Psychopathy Checklist-Revised ("PCL-R") – that conclusively established that Mr. Lee was a "psychopath," and that based on the results of this scientifically validated instrument, Mr. Lee had the psychological profile of a remorseless, cold-blooded killer who would likely physically harm others again. The government relied on this scientific evidence to successfully argue to the jury that Mr. Lee would be a "future danger" in prison, and that a sentence of life without possibility of release would leave Mr. Lee free to hurt prison staff and other prisoners while incarcerated.

This "psychopathy" evidence was as damning as could be – so much so that Judge Eisele "conclude[d] that it is very questionable whether the jury would have given Defendant Lee the

---

[1] *See also id.* (noting that "the proof as a whole left the definite impression that Defendant Kehoe was the orchestrator of the entire RICO operation, and that Defendant Lee served as his subordinate for only a brief portion of the lengthy multi-state conspiracy").

death penalty" without it.[2] The Court expressed this opinion in its post-verdict order granting trial counsel's Motion for a New Sentencing Phase Trial. That motion argued that the psychopathy evidence was, *as an evidentiary matter*, beyond the scope of the defense expert's direct examination and should not have been admitted. The motion did not challenge the reliability or probative value of the psychopathy evidence, and the post-verdict order thus did not address those issues. The Eighth Circuit reversed, finding that because the psychopathy/PCL-R evidence was probative of one of the government's properly alleged aggravating factors – future dangerousness – any error in admitting the evidence had to be harmless. There was, however, a problem with the Eighth Circuit's analysis that was never brought to its attention: the psychopathy/PCL-R evidence was *not*, in fact, probative in the least of future dangerousness in prison. Trial counsel failed to challenge the evidence on that substantive basis, notwithstanding available evidence supporting this critical point.

Given trial counsel's failure to question whether the evidence was, in fact, probative of future dangerousness, it is understandable that the Eighth Circuit's ruling assumed the reliability and validity of the PCL-R/psychopathy evidence. As a result, no court reviewing Mr. Lee's case has ever considered the constitutionality of a death sentence based on highly prejudicial "scientific" evidence that was demonstrably false and the use of which has since been abandoned altogether.

This was the challenge that Mr. Lee's trial counsel could have – and *should* have – raised at Mr. Lee's trial in 1999. As is explained in more detail below, the PCL-R was never designed, nor ever scientifically validated, to predict a capital defendant's future dangerousness in prison,

---

[2] *United States v. Lee*, 89 F. Supp. 2d 1017, 1031 (E.D. Ark. 3/21/00) (Memorandum Opinion and Order regarding Future Dangerousness and the Death Penalty Protocol), *rev'd on other grounds*, 274 F.3d 485, 495 (8th Cir. 2001) (finding Goverrnment's cross-examination did not exceed scope of direct)

and it is incapable of doing so. This was true at the time of Mr. Lee's trial in 1999, and as the attached declarations from several qualified mental health experts with considerable expertise in the PCL-R and the scientific research regarding its use attest, there was no scientific basis in 1999 for claiming that the PCL-R or a diagnosis of psychopathy was probative of future dangerousness in prison. Any such "expert opinion" would have been – and was – objectively unreliable and scientifically invalid.

This fact is so indisputable that the government's own expert in Mr. Lee's case – Dr. Thomas Ryan – has since disavowed the use of the PCL-R for making conclusions about a capital defendant's future dangerousness in prison. Indeed, in the years since Mr. Lee's trial, the government has abandoned introducing such evidence in its capital prosecutions altogether. (In another capital § 2255 case, the district court drily noted that after being confronted with Dr. Ryan's repudiation of his trial testimony, as well as ample evidence that the PCL-R is not a reliable predictor of future dangerousness of individuals confined in a federal prison, the government did not even attempt to refute the evidence.[3])

Mr. Lee's first and only opportunity to allege his trial counsel's ineffectiveness was in his § 2255 proceeding. Mr. Lee's initial § 2255 counsel did, in fact, raise a claim that trial counsel were ineffective in failing to properly challenge the psychopathy/PCL-R evidence. However, § 2255 counsel failed to proffer any fact in support of the claim, thereby depriving their client of any chance of prevailing on it. Subsequently, this Court denied the § 2255 Motion without an evidentiary hearing.

After this Court entered the judgment denying § 2255 relief, § 2255 counsel filed a motion for reconsideration pursuant to Civil Rule 59 and for the first time attached numerous

---

[3] *United States v. Stitt*, 369 F. Supp. 2d 679, 699 (E.D. Va. 2005) (Memorandum Opinion and Order).

6

affidavits, including a declaration from Dr. Ryan that was submitted in another capital case in which he repudiated his prior trial testimony regarding the PCL-R, and other evidence supporting the psychopathy/PCL-R claim. In his declaration, Dr. Ryan also attested that the PCL-R could not validly be used to predict an individual's future dangerousness in prison and that a challenge to its reliability was available as early as 1998, one year before Mr. Lee's trial.

This was the first time that any of this information had ever been presented to a court presiding over Mr. Lee's case. As this Court noted, however, § 2255 counsel's belated attempt to support the claim with these documents was untimely, and the Court was thus precluded from considering the newly presented information:

> Petitioner offers no explanation for why such affidavits or other supporting information were not provided to the Court before it ruled on his original motion for 2255 relief. Had they been, the Court might have determined that an evidentiary hearing was required. However, the Court is foreclosed by existing legal principle from considering the information now, absent permission and direction from the Eighth Circuit to do so.

*United States v. Lee*, 2010 WL 5347174 at *5 (E.D. Ark., Dec. 22, 2010) (Order Denying Post-Judgment Relief).

As is clear from the Court's Order on the reconsideration motion, the denial of Mr. Lee's ineffective assistance of counsel claim was not based on any finding that the information attached to the reconsideration motion was unpersuasive or otherwise lacked merit. On the contrary, the Court indicated that had the information been timely presented by § 2255 counsel, further factual development would likely have been necessary, warranting an evidentiary hearing on the claim. The Court did not consider the newly presented information in ruling on the ineffective assistance of counsel claim on the merits because § 2255 counsel created a default by inexplicably failing to present the relevant information to the Court prior to its ruling on the

original § 2255 Motion. Thereafter, the Court entered a judgment denying the motion for reconsideration.

Fortunately, this Court is no longer foreclosed from reviewing these facts and making a full merits determination of this critical claim. In *Trevino v. Thaler*, 569 U.S. ___, 133 S. Ct. 1911 (2013), the Supreme Court held that in jurisdictions where a prisoner may raise a claim of ineffective assistance of trial counsel ("IATC") on direct review, but the structure, design and operation of that system does not offer most defendants a meaningful opportunity to do so, a procedural default will not bar a court from hearing a substantial claim of ineffective assistance of trial counsel. After *Trevino*, § 2255 counsel's ineffectiveness may excuse a procedural default to allow a district court to conduct a full merits review of a substantial IATC claim.

*Trevino* justifies reopening the judgment in Mr. Lee's case. Initial § 2255 counsel's ineffectiveness in failing to timely provide supporting evidence in support of the IATC claim is the only reason that the Court never considered trial counsel's failure to substantively challenge the psychopathy evidence on the merits. The Court clearly indicated that but for § 2255 counsel's procedural default, it would have considered the relevant affidavits and supporting information, likely ordered an evidentiary hearing on the claim, and considered it on the merits.

There is no question that the psychopathy evidence that the jury heard and relied upon to sentence Mr. Lee to death was false. As previously noted, the expert utilized by the government at Mr. Lee's trial has conceded this point. Moreover, he has conceded that a challenge to the reliability of this evidence existed at the time of Mr. Lee's trial. Unfortunately, as a result of his court-appointed § 2255 counsel's ineffectiveness, Mr. Lee sits today on federal death row without a single judge ever having evaluated the substance of his § 2255 claim regarding trial counsel's ineffective assistance, a claim that indisputably establishes that he was sentenced to

8

death on the basis of unreliable and scientifically invalid psychopathy evidence. Through no fault of his own, no court has ever considered Mr. Lee's IATC claim in light of the ample evidence establishing the unreliability and invalidity of the PCL-R as a predictive instrument for an individual's future dangerousness in prison. Undersigned counsel[4] respectfully submit the instant motion to cure the procedural default committed by his court-appointed § 2255 counsel and to finally permit Mr. Lee a full merits review of his substantial IATC claim.

## II.   FED. R. CIV.P. 60(b) IS THE APPROPRIATE PROCEDURAL MECHANISM FOR THE LITIGATION OF MR. LEE'S CLAIMS.

Under Article III of the United States Constitution federal courts have inherent "power over [their] own judgments." *United States v. Ohio Power Co.*, 353 U.S. 98, 99 (1957) (*per curiam*). A vehicle for exercise of this power is Fed.R.Civ.P. 60(b), which "[i]n simple English ... vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klaprott v. United States*, 335 U.S. 601, 615 (1949).

Rule 60(b) "does not provide a new remedy at all," but rather is "simply the recitation of pre-existing judicial power." *Plaut v. Spendthrift Farm Inc.*, 514 U.S. 211, 234-235 (1995). That judicial power includes the inherent power to set aside judgments that are unfair: "Rule 60(b) ... reflects and confirms the court's own inherent and discretionary power, firmly established in English practice long before the foundation of our Republic, to set aside a judgment whose enforcement would work inequity." *Plaut*, 514 U.S. at 233-234 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944)). *See also United States v. Ohio Power Co.*,

---

[4] As is explained in more detail below, undersigned counsel did not represent Mr. Lee in his § 2255 proceedings in the district court; they joined Mr. Lee's legal team during his proceedings in the Court of Appeals. Mr. Lee's original § 2255 counsel have moved to withdraw from the case due to a conflict of interest – namely, Mr. Lee's interest in overcoming the default in his district court proceedings would require original § 2255 counsel to litigate their own ineffectiveness in causing that default by failing to properly plead the relevant IATC claim and timely present facts in support of the claim.

353 U.S. 98, 104 (1957) (Harlan, J., dissenting) (acknowledging the authority of the *per curium* majority to grant *certiorari* even though the decision had previously become final following the denial of two separate rehearing petitions, based on "the Court's inherent power over its judgments").

Rule 60(b) applies to habeas proceedings, just as it applies to all federal judicial proceedings when there is a claim that the judgment should be reconsidered in the interest of justice. *See Rodriguez v. Mitchell*, 252 F.3d 191 (2d Cir. 2001) (Rule 60(b) motions exist in habeas to remedy error in federal judgment).

As described further, *infra*, a district court may grant a 60(b) motion as long as the motion does not present a "claim" that would contravene AEDPA strictures on successive petitions. *Gonzalez v. Crosby*, 545 U.S. 524, 529, 531 (2005). [5] A claim is *not* presented by a motion which "merely asserts that a previous ruling which precluded a merits determination was in error -- for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar." For this reason such a motion – like the instant one challenging the Court's failure to consider a claim because of a procedural default – is a proper subject of a 60(b) application in a habeas proceeding. *Id*. at 532 n.4.

---

[5] The Supreme Court in *Gonzalez* explicitly excluded the application of its opinion to § 2255 cases. *See Gonzalez*, 545 U.S. at 530 n.3 ("In this case we consider only the extent to which Rule 60(b) applies to habeas proceedings under 28 U.S.C. § 2254, which governs federal habeas relief for prisoners convicted in state court. Federal prisoners generally seek post-conviction relief under § 2255, which contains its own provision governing second or successive applications. Although that portion of § 2255 is similar to, and refers to, the statutory subsection applicable to second or successive § 2254 petitions, it is not identical. Accordingly, we limit our consideration to § 2254 cases.") Although Mr. Lee is not conceding that *Gonzalez* applies to § 2255 cases, he acknowledges that the Eighth Circuit has so held. *See e.g. United States. v. Washington*, 211 Fed. Appx. 550 (8th Cir. 2007). Because his Rule 60(b) motion clearly is not constricted by *Gonzalez*, he recognizes that resolution of this open question is not necessary to grant his 60(b) motion.

Courts have repeatedly noted that a reviewing court should apply "Rule 60(b) 'most liberally to judgments in default ... [because] ... [t]runcated proceedings of this sort are not favored.... *Thus, unless it appears that no injustice was done by the judgment, the equities in such cases will militate strongly in favor of relief.*'" *Harrell v. DCS Equipment Leasing Corp.*, 951 F.2d 1453, 1459 (5th Cir. 1992) (quoting *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 403 (5th Cir. 1981)) (emphasis supplied); *see also Halicki v. La. Casino Cruises, Inc.*, 151 F.3d 465, 471 (5th Cir. 1998); *Bridoux v. Eastern Air Lines, Inc.*, 214 F.2d 207, 210 (D.C. Cir. 1954) (where denial of relief precludes examination of the full merits of the cause, even a slight abuse may justify reversal).

A Rule 60(b) motion is appropriate here because the judgment entered on Mr. Lee's § 2255 Motion makes clear that the full merits of Mr. Lee's IATC claim were not examined before judgment was issued because § 2255 counsel committed a default by failing to plead and timely present supporting facts to the Court. Such an allegation is a "true" 60(b), as envisioned by *Gonzalez v. Crosby,* 545 U.S. 524 (2005), and cannot be construed as a successive petition pursuant to § 2244(b)(2). *See also Woodberry v. Bruce*, 203 Fed. Appx. 186, 189-90 (10th Cir. 2006); *Thompson v. U.S.*, 2005 WL 3430868 at *2 (W.D. Ky., Dec. 12, 2005); *Allen v. Wydner*, 2007 WL 437799 (E.D. Pa., Feb. 6, 2007); *Gibbs v. U.S.*, 2006 WL 3759695 at *6 (S.D. Ohio, Dec. 19, 2006).

Indeed, the Court explicitly stated that it did not consider the untimely proffered declarations and supporting facts in ruling on the IATC claim because it was "foreclosed by existing legal principle from considering the information now[.]" *United States v. Lee*, 2010 WL 5347174 at *5 (E.D. Ark. Dec. 22, 2010) (Order Denying Post-Judgment Relief). Reliance on excusable procedural defaults to preclude merits consideration of significant and well supported

11

constitutional claims for habeas relief should be avoided whenever possible. *See, e.g., Michigan v. Long*, 463 U.S. 1032, 1041 (1983) (requiring "clear and express" reliance on state law ground to preclude federal merits review); *Prieto v. Quarterman*, 456 F.3d 511, (5th Cir. 2006) (a court should not lightly *sua sponte* apply a procedural default in a habeas corpus proceeding).[6]

Under the unique circumstances of this case, relief from judgment is "appropriate to accomplish justice." *Klaprott*, 335 U.S. at 615. Enforcement of the prior judgment "would work inequity" not only on Mr. Lee, but on the fair and orderly administration of justice in the context of federal capital habeas corpus proceedings. *Plaut*, 514 U.S. at 233-234. Absent relief from judgment, Mr. Lee will be "subjected to substantial injustice." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 881(1987) (Rehnquist, C.J., dissenting). Thus, Rule 60(b) is an appropriate vehicle to afford Mr. Lee the relief that he seeks.

## III.  MR. LEE'S 60(b) MOTION ONLY ATTACKS A "DEFECT IN THE INTEGRITY OF THE FEDERAL HABEAS PROCEEDINGS" AND THUS THIS COURT IS NOT PREVENTED FROM GRANTING THE RELIEF HE SEEKS.

The AEDPA's restrictions on successive petitions apply only to "applications" for habeas corpus. *See Gonzalez*, 545 U.S. at 530. An "application" is "a filing that contains one or more claims." *Id.* (internal quotation marks omitted and emphasis added). A motion brings a claim when it: (1) seeks to add a new ground for relief that was previously omitted due to "excusable neglect," "newly discovered evidence," or a "subsequent change in substantive law" or (2) attacks the federal court's previous resolution of the same claim on the merits. *See id.* at 530-32.

---

[6] Indeed, some of the cited cases themselves do not concern what the court determined to be a default judgment, but merely a judgment that "[bore] many of the characteristics of a default judgment," primarily the fact that it "seem[ed] clear that the full merits of the cause were not examined." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 403 (5th Cir. 1981). Because the full merits of Mr. Lee's meritorious constitutional claim were never reached by this Court, this case, likewise, bears characteristics of a default judgment.

A motion should not be treated as a successive habeas petition when a Rule 60(b) motion challenges not the substance of the federal court's resolution of a claim on the merits, but "some defect in the integrity of the federal habeas proceedings." *Id.* at 532. Thus, "[a] motion that ... challenges only the District Court's failure to reach the merits ... can therefore be ruled upon by the District Court without precertification by the Court of Appeals ...." *Id.* at 538.

Mr. Lee's Rule 60(b) motion meets the *Gonzalez* criteria. The subject of this Rule 60(b) motion is § 2255 counsel's default. The Rule 60(b) motion does not present a new claim but rather seeks to overcome a defect in the § 2255 proceeding, the default which led to denial of a full merits review of Mr. Lee's claim. Because of this default, no court has ever reviewed the full merits of Mr. Lee's claim. Thus, *Gonzalez* is no bar to the instant motion, as it "merely asserts that a previous ruling which precluded a merits determination was in error -- for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar." *Gonzalez*, 545 U.S. at 532 n.4. *See also U.S. v. Andrews*, 463 Fed. Appx. 169 (3d Cir 2012); *Santa v. United States*, 492 Fed. Appx. 949 (11th Cir. 2012) (holding that Rule 60(b) motion arguing that district court failed to consider all the claims raised in § 2255 motion "does not attack the district court's merits determinations, but rather 'challenges only the District Court's failure to reach the merits,'" and further holding that it "was not a successive § 2255 motion, and the district court had jurisdiction to consider it") (internal citation omitted).

A.   **Post-Conviction Counsel's Failure To Timely Present Evidence In Support Of Mr. Lee's Ineffective Assistance Of Trial Counsel Claim Foreclosed This Court From Considering The Claim On The Merits.**

As described in the introduction to this Motion, in reviewing Mr. Lee's IATC claim, this Court foreclosed review of certain evidence, and as a result failed to conduct a full merits review of the claim, solely because Mr. Lee's § 2255 counsel failed to comply with the rules governing

13

pleading of § 2255 claims. As the Court recognized, the standard for granting an evidentiary hearing under § 2255 is relatively easy to satisfy. *See United States v. Lee*, 2010 WL 5347174 at *2 (E.D. Ark. Dec. 22, 2010), ("An evidentiary hearing is required 'unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.' 28 U.S.C. § 2255."). Here, however, the Court concluded that Mr. Lee's § 2255 counsel had failed, in the first instance, to meet even that basic standard, noting that "[p]etitioner failed to adequately present facts sufficient to support his ineffective assistance of counsel claims." *Id.* at *3. The Court explained that it was "purposefully lenient in permitting the parties to expand the record as they wished" and even helpfully pointed out potential pleading deficiencies in certain claims. *Id.* at *2. In an order dated May 22, 2008, the Court gave § 2255 counsel "one final opportunity to put before the Court additional legal authority or argument in support of the grounds for relief…" *Id.* Yet § 2255 counsel still "failed to include supporting affidavits or *other independent support.*" *Id* at *3 (emphasis in original). It could not be clearer that "[p]etitioner's counsel was on notice of the law and pleading requirements for § 2255 motions" yet simply failed to comply. *Id.* at * 4.

In the subsequently filed Rule 59(e) motion for reconsideration, § 2255 counsel provided the Court with factual support and attached declarations in support of the IATC claim. However, because they were not timely presented, this Court applied a procedural default, foreclosing review of that evidence. *See id.* at *5 ("Petitioner offers no explanation for why such affidavits or other supporting information were not provided to the Court before it ruled on his original motion for § 2255 relief. . . . [T]he Court is foreclosed by existing legal principles from considering the information now[.]"). The record makes plain that the reason the Court did not review the affidavits and other supporting facts – and, consequently, did not conduct a full merits

14

review of the underlying IATC claim based on these affidavits and supporting facts – was due to a procedural default: § 2255 counsel's failure to timely provide any facts, information or proffered evidence in support of the claim to the Court.

### B.    There is Cause To Excuse The Default.

In *Trevino v. Thaler*, 569 U.S. __, 133 S. Ct. 1911 (2013), the Supreme Court clarified its decision in *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309 (2012), that ineffective assistance of post-conviction counsel may excuse procedural default of an underlying ineffective assistance of trial counsel claim if post-conviction counsel defaulted the underlying IATC claim in an "initial-review collateral proceeding." *See Martinez*, 132 S. Ct. at 1315. When the Supreme Court decided *Martinez*, this rule applied only in jurisdictions, such as Arizona, where habeas petitioners were explicitly prohibited from raising IATC claims on direct appeal or in post-verdict trial motions, and instead were *required* to raise such claims exclusively in an initial-review collateral proceeding. In such jurisdictions, the Court reasoned that because the State channeled initial review of an IATC claim to collateral proceedings, a lawyer's failure to raise an IATC claim during initial-review collateral proceedings could deprive a defendant of any review of that claim at all.

In fact, prior to *Trevino*, circuit courts held that if a jurisdiction permitted IATC claims to be raised on direct appeal, habeas counsel's failure to raise such a claim could not be excused. As the Fifth Circuit explained in a pre-*Trevino* decision, because Texas procedures did not *mandate* that IATC claims be heard in the first instance in habeas proceedings – motions for new trial and direct appeal proceedings were both theoretically available to them – they did not by law deprive Texas defendants of counsel and court-driven guidance in pursuing IATC claims; accordingly, the Circuit held that Texas petitioners were not entitled to the benefit of *Martinez*

15

for their defaulted IATC claims because Texas procedures entitled petitioners to "review through counselled (sic) motions for new trial and direct appeal." *Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012).

In *Trevino,* however, the Supreme Court held that because "[t]he structure and design of the Texas system, in actual operation . . . make it virtually impossible for an ineffective assistance claim to be presented on direct review," *Martinez* applies "in this procedural regime." 133 S. Ct. at 1915. (internal quotation marks omitted). As is explained below, *Martinez* applies in § 2255 proceedings for the same reasons the Supreme Court has now held that it applies in Texas and other jurisdictions lacking explicit direction that IATC must first be raised on collateral review.

The Court explained in *Trevino* that jurisdictions often have good reasons for initially reviewing IATC claims in collateral proceedings rather than on direct appeal. Those reasons include: the need for new attorneys to raise IATC claims; the fact that such claims depend on evidence outside the trial record; and because development of the extra-record evidence on direct appeal might "run afoul of abbreviated deadlines, depriving the new attorney of adequate time to investigate the ineffective-assistance claim." *Trevino*, 133 S. Ct. at 1918 (citing *Martinez*, 132 S. Ct. at 1318, internal quotation marks omitted).

The Court went on to describe the features of Texas's post-conviction procedure that require *Martinez* to apply there. First, Texas's procedure makes it "virtually impossible" for appellate counsel to raise IATC claims on direct review because the nature of IATC claims means that the "trial court record will often fail to contain the information necessary to substantiate the claim." *Trevino*, 133 S. Ct. at 1918 (quoting *Ex Parte Torres*, 943 S.W.2d 469, 475 (1997) (*en banc*) (internal quotation marks omitted)). Thus, IATC claims are best reserved

16

for habeas litigation rather than direct review because collateral proceedings are "essential to gathering the facts necessary to evaluate ineffective assistance of trial counsel claims." *Trevino*, 133 S. Ct. at 1918 (internal quotation marks, citations, and punctuation omitted).[7]

The Court also noted that Texas courts have "in effect . . . directed defendants to raise claims of ineffective assistance of trial counsel on collateral review rather than on direct review." *Id.* at 1919. The Court then concluded that in jurisdictions where "the procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise at claim of ineffective assistance of trial counsel on direct appeal, our holding in *Martinez* applies[.]" *Trevino*, 133 S. Ct. at 1921. The federal system is just such a jurisdiction.

Like the procedural framework at issue in Texas, federal law does not prohibit defendants from raising IATC claims on direct review. *See, e.g., United States v. Darling*, 2013 WL 195584 (2d Cir. 2013) (deciding IATC claim on direct appeal); *United States v. Jackson*, 2013 WL 2451093 (4th Cir. 2013) (same). That said, it is highly unlikely in the typical federal direct appeal that a defendant will have a meaningful opportunity to raise an IATC claim, for the very reasons identified in *Trevino*: the need for a new lawyer; the need to expand the trial court record; and the need for sufficient time to develop extra-record facts to substantiate the claim.

As the Supreme Court made plain in *Massaro v. United States*, 538 U.S. 500 (2003), § 2255 litigation is the first practicable and desirable opportunity for federal convicts challenging the constitutionality of their convictions or sentences to challenge the performance of their trial counsel. *See id.* at 504, 505 ("Under the rule we adopt today, ineffective-assistance claims

---

[7] In *Trevino*, the Supreme Court also went on to explain that motions for a new trial are inadequate for developing IATC claims because of time constraints as well as the fact that the trial transcript often is not completed before motions for a new trial must be filed. *See Trevino*, 133 S. Ct. at 1921.

17

*ordinarily* will be litigated in the first instance in district court, the forum best suited for developing the facts necessary to determining the adequacy of representation during an entire trial.") (emphasis added). In describing why § 2255 is preferable to direct appeal for litigants to raise and courts to consider IATC claims, the Court was clear that federal post-conviction litigation's structure, design, and operation make habeas, rather than direct appeal, the more appropriate proceeding in which to challenge trial counsel's effectiveness.

The Court explained that the trial record, which is the basis for direct appeals claims, will not reflect all the facts relevant to evaluating whether trial counsel's performance violated *Strickland v. Washington*, 466 U.S. 668 (1984):

> In light of the way our system has developed, in most cases, a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance. When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on the trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose.

*Massaro*, 538 U.S. at 504. *See also id.* at 505, 506 ("Even meritorious [IATC] claims would fail when brought on direct appeal if the trial record were inadequate to support them. Appellate courts would waste time and resources attempting to address some claims that were meritless and other claims that, though colorable, would be handled more efficiently if addressed in the first instance by the district court on collateral review."). The Court thereby made clear that the operation of federal post-conviction litigation made § 2255 not only the ordinary but the preferred forum in which to challenge the effectiveness of trial counsel's performance.

Before *Trevino*, if § 2255 counsel failed in any respect to raise or properly plead a claim, the post-conviction courts nearly always forever lost the opportunity to review that claim, no matter its merit or strength. In fact, unlike in § 2254 proceedings where a petitioner obtains state court review of his claim before seeking federal review, § 2255 litigants have only one forum,

18

the federal district court, in which to develop and plead all the facts supporting their post-conviction claims for relief. As such, *Trevino* should apply with even greater force in § 2255 proceedings, because the district court litigation is not only the "initial-review collateral proceeding," described in *Trevino*, it is the *only*-review collateral proceeding. In addition, concerns of federalism and comity, which might weigh against excusing ineffective assistance of *state* post-conviction counsel are not implicated in § 2255 review. Where a substantial IATC issue is raised, *Trevino* provides an opportunity for review of § 2255 counsel's performance to determine whether their ineffectiveness excuses the failure to properly plead the underlying IATC claim. As discussed *supra*, this Court foreclosed review of evidence presented in Mr. Lee's motion for reconsideration solely because his court-appointed § 2255 counsel failed to timely present it to the Court.

This is exactly the situation for which *Trevino* presents a remedy: by reason of the federal post-conviction framework's design and operation, Mr. Lee had no meaningful opportunity before his § 2255 proceedings to have any court consider his underlying IATC claim; that claim is substantial; § 2255 counsel did not give the Court an opportunity to fully consider the claim; and this Court made clear that § 2255 counsel's inadequate pleading of the claim and untimely factual support for it foreclosed the possibility of an evidentiary hearing. *See Lee*, 2010 WL 5347174 at *5. In light of the Supreme Court's clear statement in *Trevino* that post-conviction counsel's ineffectiveness may excuse default of an IATC claim in jurisdictions where initial-review collateral proceedings are the first meaningful forum in which to raise such claims, Mr. Lee respectfully submits that this Court should grant his (60)(b) motion.

19

## C.    § 2255 Counsel Were Ineffective.

In order to overcome a default, *Trevino* requires a showing that post-conviction counsel were ineffective in the initial review collateral proceedings under the standards of *Strickland v. Washington. See Trevino*, 133 S. Ct. at 1057; *Martinez*, 132 S. Ct. at 1318. To prevail under *Strickland*, a defendant must first show that his attorney's performance was deficient. *Strickland*, 466 U.S. at 687. Additionally, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

This standard is easily met here. With respect to the showing that § 2255 counsel's performance was deficient, this Court's repeated admonitions that § 2255 counsel "failed to adequately present facts sufficient to support [the] ineffective assistance of counsel claims," *Lee*, 2010 WL 5347174 at *3, establish this prong of *Strickland*. Counsel's failure to comply with the pleading requirements for § 2255 was objectively unreasonable, and there was no valid reason for § 2255 counsel to wait until after the judgment was issued to proffer relevant declarations and supporting facts for the IATC claim. As § 2255 counsel themselves attest:

> We knew at the time the Motion was filed that there was available evidence from Dr. Ryan himself (i.e., Dr. Ryan's sworn testimony and affidavits) that supported the claim that trial counsel had been ineffective for failing to raise a *Daubert* challenge to the PCL-R evidence.
> We also knew, prior to the June 26, 2006 filing, that there was additional evidence that supported the claim, emanating from a wide array of experts in the field of forensic psychology. Prior to filing the Motion we reviewed materials relating to the PCL-R from colleagues experienced in federal death penalty practice. These materials informed us that a number of nationally regarded forensic psychologists with particular expertise in the use and application of the PCL-R had concluded that there was no empirical support for using the PCL-R to assess the likelihood of an individual's future violent conduct in prison. These experts had rejected the concept that the PCL-R was a reliable evaluative tool for assessing the future dangerousness of an individual in custody.

20

The materials included a memorandum which discussed another death penalty case, *United States v. Willis Haynes,* in which Dr. Ryan had withdrawn an evaluation that had been based on the PCL-R following a challenge to its reliability. The memorandum identified several highly credentialed and nationally renowned forensic psychologists, with particular expertise in the administration and application of the PCL-R, who had challenged Dr. Ryan's use of the instrument to establish future dangerousness in prison. Some had conducted independent research on the PCL-R, and all were well versed in the research literature regarding its use. The materials also included the *Daubert* motion from the *Haynes* case. The *Daubert* motion provided detailed factual, scientific and legal analyses as to why the PCL-R could not reliably predict future dangerousness in prison. The motion also identified additional well-credentialed experts in the field who had submitted affidavits to the Court assailing the reliability of the PCL-R as a risk assessment tool for a person who would remain incarcerated for life. The common theme of these affidavits was that the results of what little research had been done on the relationship between a high PCL-R score and the likelihood of future violence in prison did not support the conclusion that one was related to the other.

Declarations of Laurence Komp, Esq., and David A. Ruhnke, Esq., September 25, 2013, at Points 10-13, attached as Exhibits 1 & 2.

Thus, both counsel knew, before filing the § 2255 motion that "leading figures in the field of forensic psychology were willing to author declarations or affidavits, and provide testimony explaining why the use of the PCL-R in the manner employed in Mr. Lee's case was scientifically unacceptable at the time of Mr. Lee's trial, and violated professional and ethical standards." *Id.* at Point 14. Yet they "did not reach out to any psychological experts, including those who had been identified to [them], for the purpose of obtaining affidavits or declarations, or to secure their testimony at a possible hearing pursuant to 28 U.S.C. § 2255." *Id.* at Point 15. In addition, "although [they] had reviewed the materials containing the *Daubert* motion filed in *Haynes* [they] pled none of its detailed factual information in support of the claim." *Id.* at Point 15.

There was no strategic or tactical reason for § 2255 counsel to refrain from presenting these facts in support of the ineffective assistance of trial counsel claim. *See Saunders v. United*

21

*States,* 236 F.3d 950, 952 (8th Cir. 2001) (in order to meet the pleading requirements of § 2255, movant cannot merely assert a legal claim; movant must also identify the factual basis for the claim, including readily available witnesses and evidence in support of the claim). Accordingly, as both counsel acknowledged:

> There was no strategic or tactical rationale for not asserting the readily available facts in support of our the claim [] that the "Hare Psychopathy Checklist (PCL-R) is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants;" nor was there a strategic or tactical rationale for not obtaining and appending supporting documentation to our Motion from any of the forensic psychologists who had demonstrated their willingness to challenge Dr. Ryan's particular use of the PCL-R, based on the fact that such use was scientifically unsupportable, and violated professional and ethical standards. We thought that by pleading the issue we had met the requirements of § 2255.

*Id.* at Point 17.

With respect to the second prong of *Strickland*, there is no question that § 2255 counsel's unprofessional errors prejudiced Mr. Lee. Section 2255 counsel's failure to comply with the relevant pleading requirements quite clearly precluded this Court from considering the crucial facts in support of Mr. Lee's IATC claim. Moreover, the Court's Order again makes clear that § 2255 counsel's failure to timely proffer this information prejudiced Mr. Lee. As the Court stated in its Order, it was § 2255 counsel's errors that resulted in the denial of a hearing, and but for those errors, the Court might have granted an evidentiary hearing on the claim. Thus, it is respectfully submitted that Mr. Lee has made the requisite threshold showing that § 2255 counsel were ineffective.

## IV.    EXTRAORDINARY CIRCUMSTANCES JUSTIFY REOPENING THE JUDGMENT PURSUANT TO RULE 60(b)(6).

Rule 60(b)(6) is "properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *Cornell v. Nix*, 119 F.3d 1329, 1332 (8th Cir. 1997)

(citing *Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir. 1989)). A consideration of extraordinary circumstances under Rule 60(b)(6) relies on a variety of factors, all of which this case meets.

### A.  *Trevino* Is A Supervening Change In The Law That Presents An Extraordinary Circumstance Sufficient For Rule 60(b)(6) Relief.

It is well-established that a supervening change in the law can present an extraordinary circumstance sufficient for Rule 60(b) relief. *See, e.g., Tarkington v. United States Lines Co.*, 222 F.2d 358 (2d Cir. 1955); *McGrath v. Potash*, 199 F.2d 166 (D.C. Cir. 1952); *Griffin v. State Board of Education*, 296 F. Supp. 1178 (E.D. Va. 1969); *Tsakonites v. Transpacific Carriers Corp.*, 322 F. Supp. 722 (S.D.N.Y. 1970). The Supreme Court's recent decision in *Trevino* is the type of supervening change in the law that satisfies the Rule 60(b)(6) standard to warrant relief. In fact this very issue was decided recently by the Hon. E. Richard Webber of the Eastern District of Missouri in the matter of *Barnett v. Roper*, No. 4:03CV00614-ERW, 2013 U.S. Dist. LEXIS 57157 (E.D. Mo. April 22, 2013) (Memorandum and Order). Given the novelty of this issue and the scarcity of cases that engage in-depth analysis of *Martinez/Trevino*, Mr. Lee begs the Court's indulgence of a relatively detailed description of *Barnett*, a district court case from the Eighth Circuit, and one that undersigned counsel hope will provide a useful guide to this Court as it considers the myriad issues presented herein.

In *Barnett*, a Missouri state prisoner filed a habeas petition in state court in which he alleged that trial counsel was ineffective for failing to investigate and present available mitigating evidence at his state capital trial. The state habeas court denied the claim on the grounds that the petitioner failed to present any facts in support of the IATC claim, and that his pleadings consisted "only of bare assertions and conclusions." *Barnett*, 2013 U.S Dist. LEXIS at *16. When the petitioner then filed a § 2254 petition in federal court, the district court denied

23

relief on the claim because it was procedurally barred from federal court review due to petitioner's default during the state post-conviction proceedings. Six years later, the petitioner filed a Rule 60(b)(6) Motion in the district court seeking to reopen the judgment in his capital § 2254 case and have his petition reviewed on the merits. Specifically, the petitioner argued that: (1) the Supreme Court's decision in *Martinez* allowed him to establish cause for his procedural default in state court – namely, his state post-conviction counsel's ineffective assistance; and (2) the change in the law which occurred as a result of *Martinez* presented extraordinary circumstances sufficient for Rule 60(b) relief. The Court agreed.

With respect to the first issue, the Court agreed that *Martinez* was dispositive because "Missouri's law requiring an ineffective assistance of counsel claim to be raised first in a collateral proceeding mirrors the Arizona state law at issue in *Martinez*." *Id.* at *32. Moreover, as in *Martinez*, the Court found that the petitioner's appointed counsel in the initial post-conviction proceeding in state court failed to properly raise the IATC claim, and that it was the state post-conviction counsel's ineffectiveness that led to the procedural default. Thus, under *Martinez*, the petitioner could overcome the default because state post-conviction counsel's ineffectiveness was grounds to excuse the default. *Id.* at *33.

As for the second issue, the Court noted that "a consideration of extraordinary circumstances under Rule 60(b)(6) relies on *several factors*, not just a determination as to whether the nature of the intervening law in *Martinez* is extraordinary." *Id.* at *49-50 (emphasis in original). The *Barnett* court set out four factors highly relevant in Mr. Lee's case: (1) the nature of the intervening law in *Martinez* and its degree of connection to the petitioner's case; (2) the petitioner's exercise of diligence in pursuing the issue during federal habeas proceedings; (3) the interest in finality; and (4) the underlying strength of the IATC claim. *Id.* at *50-*59. In

24

applying these factors, the Court found that the petitioner met the required showing of "extraordinary circumstances" under Rule 60(b)(6) based on the substantial nature of the underlying IATC claim, as well as the "equitable considerations" involved in a capital case raising a claim that was never considered on the merits. *Id.* at *59.

With respect to the first factor, the nature of the intervening law and its degree of connection to petitioner's case, the Court noted that Missouri law mirrored the Arizona law at issue in *Martinez*, in which all IATC claims are required to be brought in post-conviction collateral proceedings. Moreover, as in *Martinez*, the Court had previously held that the petitioner's IATC claim was procedurally defaulted because facts in support of the claim had not been pled. Thus, "the identity between [petitioner's] case and the intervening change of law in *Martinez* argue[d] in favor of 60(b) relief." *Id.* at *57.

As for the diligence factor, the Court noted that the petitioner was diligent about pursuing the underlying IATC claim and had expeditiously filed his 60(b) motion three months after the decision in *Martinez* was announced. *Id.* at *53-*54.  The Court also noted that "[v]alid arguments can be propounded in both directions" and ultimately decided that this was a "neutral factor" in the court's decision making. *Id.* at *54.

With respect to the finality factor, while noting that "[t]he state has a legitimate interest in the finality of the judgment," the Court ruled that "the capital nature of the case combined with a claim never considered on its merits, militate against that interest." *Id.* at *57.

In analyzing the IATC claim, the Court found dispositive that the claim involved "powerful testimony that was never presented." *Id.* at *58. Although not conducting a full merits review of the IATC claim – as that was not required for purposes of determining whether to grant 60(b) relief – the Court found that the claim was substantial under *Martinez,* and that

"although the type of supervening change in law in *Martinez* may not alone warrant the reopening of a habeas judgment, here, the equitable factors offered in conjunction with the strength of the underlying constitutional error alleged" enabled the petitioner to make the necessary showing to warrant 60(b) relief. *Id.* at *58. The Court thus found that the petitioner was entitled to an evidentiary hearing on his IATC claim, where the petitioner would be permitted "to make a presentation addressing the totality of available mitigating evidence . . . in order to reweigh that evidence against the aggravating evidence offered at sentencing." *Id.* at *59-*60.

Mr. Lee seeks the same type of 60(b) relief: a reopening of the judgment on his § 2255 Motion so that he can have an evidentiary hearing on his IATC claim. This Court has already noted that it was foreclosed from granting a hearing as a result of § 2255 counsel's failure to timely provide the Court with relevant affidavits and supporting information. Using the *Barnett* factors as a guide, Mr. Lee respectfully submits that he meets all the relevant factors warranting 60(b) relief, and that this Court should therefore excuse the procedural default on his IATC claim, reopen the judgment, and permit a full merits review of the claim.

**B.    Mr. Lee's Rule Motion Meets All of the Relevant Criteria Warranting 60(b) Relief.**

  **1.    The nature of the intervening law in *Trevino* and its degree of connection to Mr. Lee's case.**

There is a close degree of connection between Mr. Lee's case and the intervening change of law in *Trevino*. First, federal law mirrors the Texas law at issue in *Trevino*, in that claims of ineffective assistance of trial counsel may at least theoretically be raised on direct appeal and in post-verdict trial motions. Second, as in *Trevino*, the ineffectiveness of § 2255 counsel in

defaulting on the IATC claim occurred in the initial collateral review proceeding.[8] Finally, as in *Trevino*, this Court held that it was precluded from reviewing the extra-record evidence in support of Mr. Lee's IATC claim because of § 2255 counsel's failure to plead and proffer the relevant affidavits and supporting information in a timely manner.

The degree of connection between Mr. Lee's case and the intervening change of law in *Trevino* argues in favor of 60(b) relief because *Trevino* provides precisely the sort of remedy that was previously unavailable to § 2255 litigants – namely, cause to excuse a procedural default on an IATC claim occasioned by § 2255 counsel's ineffectiveness. Thus, this factor weighs in favor of granting 60(b) relief.

### 2.    Diligence.

Mr. Lee has been diligent in pursuing his theory that the ineffectiveness of his § 2255 counsel provides cause for the procedural default of his claim. The Supreme Court did not issue the *Trevino* decision until *after* the Eighth Circuit Court of Appeals affirmed the district court's denial of § 2255 relief in Mr. Lee's case.[9] In fact, *Trevino* was decided during the pendency of the time in which to file a rehearing petition in the Eighth Circuit. Upon the issuance of *Trevino*, undersigned counsel – who had been appointed on the case after the denial of the Rule 59(e) reconsideration motion – immediately began researching its potential application to Mr. Lee's case. As noted in the Introduction of this Motion, after reviewing *Trevino,* it became apparent

---

[8] As noted, *supra*, unlike state petitioners seeking § 2254 relief in federal court – who have an initial collateral review proceeding in state court before seeking habeas relief in federal court – federal prisoners such as Mr. Lee have no prior collateral proceeding in which to raise IATC claims outside of the district court proceeding on a § 2255 Motion.

[9] The Eighth Circuit issued its judgment on April 29, 2013. The Supreme Court decided *Trevino* on May 28, 2013. Prior to the issuance of *Trevino*, the federal system was one of the jurisdictions unaffected by *Martinez* precisely because it, like Texas – but unlike Arizona – did not prohibit litigants from raising IATC claims prior to entering post-conviction proceedings.

that the composition of Mr. Lee's legal team presented a problem; Mr. Lee's § 2255 counsel in the district court proceedings were still among the attorneys representing him in his appeal in the circuit court. This posed a conflict of interest because the effectiveness of § 2255 counsel's performance would be implicated in any *Trevino* litigation seeking to excuse the procedural default in the district court, and they could not be expected to litigate their own ineffectiveness.

After extensive research and consultation with expert counsel, undersigned counsel alerted the Circuit Court to the potential conflict and timely filed a motion for an extension to file the rehearing petition. Based on undersigned counsel's explanations of the reasons for the extension, the Court of Appeals granted this request for additional time to file the rehearing petition.

Following discussion and consultation regarding the conflict issue, prior § 2255 counsel agreed to withdraw from representing Mr. Lee on account of the conflict, and the undersigned have sought to stay the appellate proceedings to file the present Rule 60(b) Motion.[10] Mr. Lee is filing this Rule 60(b) Motion within four months of the Supreme Court's decision in *Trevino*. Given the procedural posture of Mr. Lee's case, as well as the practical realities of resolving the aforementioned representation issues, the instant motion is presented to this Court in a timely fashion. It is respectfully submitted that Mr. Lee has diligently pursued the underlying substantive claim of IATC and expeditiously filed his Rule 60(b) motion to excuse the procedural default on that claim. Thus, this factor also weighs in favor granting relief.

---

[10] Undersigned counsel have also filed with this Court a motion pursuant to Civil Rule 62.1 requesting an indicative ruling that the 60(b) motion raises a substantial issue so that Mr. Lee's case can be remanded back to this Court for further consideration and a merits determination of this 60(b) motion.

### 3.    Finality.

Finality of the judgment is not a factor that weighs significantly in the government's favor in the context of a Rule 60(b) Motion. Indeed, the Supreme Court explicitly discounted finality as a basis for denying Rule 60(b) relief in *Gonzalez* precisely because the very purpose of Rule 60(b) is to make exceptions to finality. *See Gonzalez*, 545 U.S. at 529 ("[The Court gives] little weight to the respondent's appeal to the virtues of finality" as "[t]hat policy consideration, standing alone, is unpersuasive in the interpretation of a provision [Rule 60(b)] whose sole purpose is to make an exception to finality.").

Here, there is no prejudice to the government beyond the lack of finality. Any such potential prejudice, however, must be weighed against the more irreversible finality of Mr. Lee's execution, as well as the serious concern that Mr. Lee's federal death sentence rests on unreliable and scientifically invalid evidence – a claim that has never been heard on the merits due to the failures of his counsel. In light of the fact that "death is different," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), and that capital cases require a greater need for reliability, consistency and fairness, this factor also counsels in favor of granting 60(b) relief.

### 4.    The underlying strength of Mr. Lee's ineffective assistance of trial counsel claim.

In order to adequately convey the underlying strength of Mr. Lee's IATC claim, it is necessary to first review the significant role that the psychopathy/PCL-R evidence played at Mr. Lee's sentencing trial. The government's central argument to the jury for why it should sentence Mr. Lee to death was that the facts and circumstances of Mr. Lee's life showed that he was a psychopath who was predisposed to commit acts of violence, and who would continue to be a future danger if sentenced to life without parole. This was an argument that the government made explicitly to the jury in both its opening statement and closing argument, and for which it

29

elicited evidence during its cross-examination of defense expert Dr. Mark Cunningham. In the course of its cross-examination of Dr. Cunningham the government elicited, in the presence of the jury, that the government's expert, Dr. Thomas Ryan, evaluated Mr. Lee prior to the trial using an instrument known as the Hare Psychopathy Checklist-Revised ("PCL-R"), and that Dr. Ryan had concluded that Mr. Lee was a psychopath based on his PCL-R score. The government also elicited evidence that the underlying theory behind the PCL-R is that an individual who attains a certain score on that instrument can be diagnosed as a "psychopath," and, consequently, evidence of such psychopathy can be used as a predictor of the individual's future dangerousness. As discussed *infra,* for a person like Mr. Lee whose "future" would be one in which he is confined in custody for the remainder of his life, this evidence was demonstrably false. The special verdict form plainly demonstrates that the jury unanimously found the aggravating factor of future dangerousness – a factor which it rejected regarding co-defendant Chevie Kehoe, who was indisputably the more culpable offender, but who received a life sentence – and sentenced Mr. Lee to death. In its Opinion in Mr. Lee's appeal, the Eighth Circuit not only referenced the jury's future dangerousness finding, but cited it as *the* reason Mr. Lee was sentenced to death. *United States v. Lee,* 715 F.3d 215, 223 (8th Cir. 2013).

### a. The Psychopathy/PCL-R Evidence at the 1999 Sentencing Trial.

The government succeeded in introducing substantial evidence regarding Mr. Lee's alleged psychopathy during its cross-examination of Dr. Cunningham. As is explained in more detail below, the government elicited from Dr. Cunningham a definition of the psychological concept of "psychopathy," as well as a detailed description of the PCL-R and how it is utilized by some mental health professionals in diagnosing individuals as psychopaths, as well as in predicting that individual's future dangerousness. The government also elicited, through Dr.

30

Cunningham, that Dr. Ryan had determined Mr. Lee to be a "psychopath" based on Mr. Lee's score on a PCL-R administered by Dr. Ryan. Additionally, the government was able to elicit sufficient information from Dr. Cunningham regarding the PCL-R to advance the theory – both through its cross-examination of Dr. Cunningham as well as in its argument for death to the jury – that Mr. Lee's "psychological profile" was consistent with a diagnosis of psychopathy, and that this meant that Mr. Lee would be a future danger if sentenced to life without possibility of release.

In one such example, the prosecutor directed Dr. Cunningham's attention to his opening statement. In opening to the jury at penalty, the prosecutor told the jury that "what the evidence that will be presented will establish is that *Mr. Lee is a psychopath. I don't mean that in a common term. I do mean that in the medical use*," Tr. 7381 (emphasis added), and that "Mr. Lee, *because of his psychological profile*, who he is and who he will be for years to come, is dangerous and will continue to be dangerous." Tr. 7383 (emphasis added). In an effort to prove to the jury that Mr. Lee was "a dangerous person, a violent person," Tr. 7745, the prosecutor specifically asked Dr. Cunningham whether he was present during the government's opening statement the day before. The prosecutor challenged Dr. Cunningham to answer the government's representations in the opening. Tr. 7745-46. The government's reference to its own opening statement carried particular significance because the opening statement did not only alert the jury to psychopathy, but also gave it the imprimatur of reliability by categorizing it as a medical term. By referring back to its opening statement, the prosecutor was delivering on his promise to provide evidence that Mr. Lee was a psychopath.

And, indeed, in the course of its cross-examination, the government utilized Dr. Cunningham as its own witness, to fully support its psychopathy theory. In addition to having

31

Dr. Cunningham tell the jury that Dr. Ryan deemed Mr. Lee a psychopath, the government was also able to elicit the following from Dr. Cunningham:

- the term "psychopath" is a psychological term that is recognized within the field of forensic psychology (Tr. 7754);

- an individual "can be diagnosed as meeting criteria for psychopathy or being psychopaths as measured by this Hare psychopathy check list revised" (Tr. 7795) and "the psychopathy check list has emerged to be the standard for the assessment of criminal psychopathy in North America" (Tr. 7811);

- a detailed description of how the PCL-R is administered and scored in order to arrive at a diagnosis of psychopathy (Tr. 7796); that the individual is given a score of zero, one or two to assess the presence of 20 different domains that may or may not be descriptive of the individual, such as whether the individual is "glib and superficial" (Id.);

- some of the particular domains that are scored as part of the PCL-R are lack of remorse, impulsivity, and poor behavior control (Tr. 7804-6); and that "on the most simple level you might say if the person scores over 30 then they would meet criteria to be called a psychopath" (Tr. 7796.).

The jury was thus given a comprehensive picture of what the PCL-R is and how it is administered and scored to arrive at a diagnosis that the individual being tested is a psychopath.

The government also repeatedly questioned Dr. Cunningham about various alleged acts and incidents in Mr. Lee's life and background that purportedly corresponded to the descriptive domains of the PCL-R, such as his impulsivity, poor behavioral control, instances of violence, threats to others, and lack of remorse. *See, e.g.,* Tr. 7750-53; 7763; 7777-83; 7788-90; 7809-10. Near the end of Dr. Cunningham's cross-examination the following exchange took place:

Q.    You know Dr. Ryan is a neuropsychologist?

A.    That's correct.

Q.    You know Dr. Ryan is sitting in this courtroom?

A.    Yes, I do.

32

Q.    In preparation for this case, you had an opportunity to see a report prepared by him?

A.    Yes, I did.

Q.    And in fact, when you testified yesterday, you made reference to that

report?

A.    Yes, I did.

. . .

Q.    *But what you didn't do is you didn't tell this jury that he made a diagnosis that Mr. Lee was a psychopath, did you?* (emphasis added)

A.    I don't recall that there was that report doesn't said (sic) diagnosis colon, but he does identify Mr. Lee as scoring in that range on the psychopathy check list and I think does make a reference to him - - I can get it specifically. Again, the only discrepancy is whether he said he had a diagnosis of. *He clearly identified him by his scoring of the PCL-R as falling into the psychopathy range based on a single standard error of measurement.*

Tr. 7825-7 (emphasis added).[11] Thus, without ever having to formally examine Dr. Ryan

regarding his risk assessment of Mr. Lee, the government managed through its cross-examination

of Dr. Cunningham to achieve the same result and inform the jury that Mr. Lee was administered

the PCL-R by a trained neuropsychologist and received a score that was sufficient to designate

him as being a psychopath.[12]

---

[11] The government also made a point of eliciting that Dr. Cunningham did not administer the PCL-R to Mr. Lee or perform a risk assessment. Tr. 7827-28. As is explained in more detail *infra,* the government repeatedly made this point in closing argument as a way of suggesting that Dr. Cunningham's understanding of Mr. Lee was deficient or incomplete because he failed to avail himself of this purportedly probative diagnostic instrument. The government's argument also implied a contrast with Dr. Ryan's approach to evaluating Mr. Lee, thereby effectively reminding the jury that Dr. Cunninghman's counterpart *had* administered the PCL-R and diagnosed Mr. Lee as being a psychopath.

[12] Indeed, as Judge Eisele stated to counsel at the conclusion of Dr. Cunningham's testimony: "I am convinced that I probably permitted the government to go much farther than is proper." Tr. 7836.

The government also managed to elicit through Dr. Cunningham that there were members of the forensic psychology community who believed that individuals who scored high enough on the PCL-R to be designated as psychopaths were substantially more likely to commit future acts of violence than the general population – i.e., that the PCL-R was an accurate predictor of future dangerousness. Tr. 7806-7811. Indeed, the government elicited testimony, in the presence of the jury, that Dr. Cunningham was aware of a scholarly study which "found that psychopaths were five times more likely to engage in violent recidivism in the community," Tr. 7809, and that individuals who achieve a score above 30 on the PCL-R "do not appear amenable to treatment." Tr. 7819. Although the jury was not told the exact score that Mr. Lee received on the PCL-R, they were informed that his score fell "into the psychopathy range." Tr. 7827. In other words, the jury was given all the evidence it needed to (erroneously) conclude that Mr. Lee would be a future danger in prison if sentenced to life without parole, and that the only way to guarantee that he would not harm anyone again would be to sentence him to death. Indeed, the verdict form reflects that the jury unanimously found that Mr. Lee would be a future danger, a factor which it unanimously rejected in co-defendant Kehoe's case, whose life the jury spared.

In its rebuttal, the government called Dr. Ryan and, once again, engaged in a line of questioning intended to highlight Mr. Lee's alleged "violent nature." *See* Tr. 7917-20; 7925. The government also questioned Dr. Ryan about the validity of how he scored Mr. Lee's PCL-R results. Tr. 7949-50. Dr. Ryan vouched for the validity of his approach. Tr. 7949.

### b.      The Psychopathy Evidence Unfairly Prejudiced the Jury's Sentencing Deliberations.

There is no question that the psychopathy issue played a central role in the government's case for death. Equally indisputable is the impact this had on the jury's verdict; as Judge Eisele previously concluded after a careful review of this evidence and line of argument by the

government, "it is very questionable whether the jury would have given Defendant Lee the death penalty based upon the Government's direct case, a properly confined cross-examination of Dr. Cunningham, and a properly limited rebuttal by the Government." *Lee*, 89 F.Supp.2d at 1031. Moreover, as the verdict form shows, the jury unanimously found the "future dangerousness" aggravator on each count.

Numerous courts have warned of the unfairly prejudicial effect that psychopathy evidence can have on a capital jury's deliberations. In *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000), the government relied on the testimony of Dr. Scott Duncan, a psychologist who testified that based on Mr. Barnette's PCL-R results he was a psychopath who felt no remorse or guilt, and that his score on the PCL-R was a predictor that he would be a future danger in prison. 211 F.3d at 811, 825. The Fourth Circuit reversed the death sentence on the grounds that the district judge erred in denying the defense request for surrebuttal to question the validity and reliability of the PCL-R. The Fourth Circuit rejected the government's claim that this was harmless error and specifically stated that "the testimony of Dr. Duncan was *as damning as it could be*," and that there was a reasonable possibility that his unrebutted expert testimony regarding the PCL-R and the defendant's alleged psychopathy "contributed to the death sentence." 211 F.3d at 825 (emphasis added).

In *Stitt v. United States*, 369 F. Supp. 2d 679 (E.D. Va. 2005), the district court also found that the outcome of the sentencing proceeding might have been different but for Dr. Ryan's testimony regarding the PCL-R and psychopathy. As it noted in its memorandum and order:

> It is also possible the jury might have reached a different conclusion if Dr. Ryan's testimony had been different. The Court only has to find that "there is more than a faint possibility of a different jury verdict but something less than a probability." [*United States v.*] *Wallace*, 528 F.2d [863] at 866 n.3 [4th Cir. 1976)]. Given the

nature of Dr. Ryan's testimony about the nature and consequences of Petitioner's psychopathy, the Court finds that it is clear that jury might have reached a different verdict.

*Stitt*, 369 F. Supp. 2d at 699-700.[13]

In *United States v. Sampson*, 335 F. Supp. 2d 217 (D. Mass. 2004), a federal capital case tried in the District of Massachusetts, the district judge prohibited the government's mental health expert from using the word "psychopath" because it "would have entailed a high risk that, despite any limiting instruction, the jury would have considered [the expert] testimony as tending to show that [the defendant] would be dangerous in the future . . ." 335 F. Supp. 2d at 222 n.27. The district judge also noted that jurors may give great deference to "a supposed expert for purposes of determining future dangerousness," and that therefore, "there is good reason to fear that the testimony of a psychiatrist on the issue of future dangerousness will be given more weight than it deserves." *Id.* at 220.

The risk that a jury will erroneously determine that a capital defendant is a future danger is made exponentially greater with the introduction of demonstrably inaccurate psychological evidence disguised as cutting edge science. Indeed, this is why in *United States v. Taylor*, 320 F. Supp. 2d 790 (N.D. Ind. 2004), a federal capital case prosecuted in the Northern District of Indiana, the district judge prohibited the government's mental health expert from even using the PCL-R on the capital defendant in its pre-trial evaluation. In the district court's judgment, "the uncertainty of the validity and reliability of the PCL-R as it is used in capital sentencing hearings" would undermine the reliability of the defendant's sentencing proceedings if testimony about the defendant's PCL-R score was injected into the trial. *Id.* at 794.

---

[13] The district court in *Stitt* ultimately granted relief on different grounds, but it demonstrates that at the time of the *Stitt* trial, which was tried prior to Mr. Lee's case, there was substantial evidence available to Mr. Lee's trial counsel to fully object to the validity and credibility of the PCL-R on scientific grounds.

There is no question that the government sought to exploit the PCL-R to secure a death sentence -- its opening and closing arguments make clear that the PCL-R and psychopathy evidence were a central part of its case for death at Mr. Lee's trial. The government's penalty phase presentation to the jury was explicitly premised on the argument that Mr. Lee had the psychological profile of a "psychopath," and that as such, violence was intrinsic to his profile, and only a death sentence could keep him from hurting other people. The government began this line of argument in its opening statement to the jury, where it stated that the jury would learn an aspect of Mr. Lee's "psychological profile that in the end will convince you that as he sits here today and will be in the future, Mr. Lee is a dangerous man. *That, ladies and gentlemen, is a lot of what this trial will be about.*" Tr. 3739 (emphasis added). The government's use of the term "psychological profile" was not merely colloquial, it was explicitly intended to be accepted as "medical": "In the end, what the evidence that will be presented will establish is that *Mr. Lee is a psychopath I don't mean that in a common term. I do mean that in the medical use.*" Tr. 7381 (emphasis added). The government returned to this theme, stating: "We will prove in this case to you that Mr. Lee, *because of his psychological profile*, who he is and who he will be for years to come, is dangerous and will continue to be dangerous." Tr. 7383 (emphasis added).[14]

Indeed, the government explicitly framed the evidence it planned to present regarding Mr. Lee's alleged prior bad acts as not merely of historical significance, but rather as evidence establishing that Mr. Lee was a psychopath and that was consistent with someone of this profile: "The evidence that will be presented in this trial is going to help you understand that Mr. Lee, this man who sits right here in this courtroom, is a violent and dangerous man. He thrives on this

---

[14] *See also* Tr. 7379 ("And during this trial then we balance his life, those he has hurt or will hurt in the future[.]"); Tr. 7381 ("[E]ven if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards. He continues to be dangerous."); Tr. 7382 ("Mr. Lee was then, as he is today, angry, suspicious, hostile, broody, a dangerous person.").

stuff. *That is part of his profile*. Even if you sent him to prison for the rest of his life, he will be a threat for a long, long time." Tr. 7381 (emphasis added). Thus, from the very outset of the penalty phase, the government rhetorically linked all the evidence it would present with the theme of psychopathy, thus insuring that the each piece of prior bad act evidence would be viewed by the jury through that lens.

Although the government did not reference the PCL-R in its closing, it still communicated to the jury – in just barely coded language – that Mr. Lee was a medically diagnosable psychopath. Indeed, the government argued to the jury that with the benefit of hindsight, it could view all of Mr. Lee's alleged "prior bad acts" as being symptomatic of, and consistent with, a diagnosis of psychopathy: "Can't we all, with the benefit of hindsight, look at this and see, My God, look at what the *diagnosis* was." Tr. 7968 (emphasis added).

Given all the foregoing, there can be no question that the jury's sentencing deliberations were unfairly prejudiced by the psychopathy/PCL-R evidence. The jury, however, never should have heard this evidence, as neither the PCL-R nor a diagnosis of psychopathy is probative of an individual's future dangerousness in prison. Indeed, not only is such evidence of psychopathy irrelevant to the issue of future dangerousness, but its injection into capital sentencing trials is unfairly prejudicial because the label "psychopath" has an extremely powerful impact on jurors' perceptions of the defendant, improperly skewing deliberations in favor of a death sentence based on a perceived likelihood that the defendant will continue to commit violence unless he is executed. Evidence of all these bases for challenging the psychopathy evidence were readily available to Mr. Lee's trial counsel.

38

### c.    The Psychopathy/PCL-R Evidence Used At Mr. Lee's Sentencing Trial Was Demonstrably False.

A diagnosis of psychopathy, as measured by the PCL-R, is not – and never has been – probative of, or a valid predictor of, an individual's future dangerousness in prison. This is a position that is fully supported by the forensic psychology community. In support of that claim, the undersigned respectfully submit the affidavit of Dr. John F. Edens, a licensed forensic clinical psychologist with extensive forensic, clinical and research experience in the area of psychopathy and the PCL-R and one of the leading experts in the country on this topic. As Dr. Edens states, at the time of Mr. Lee's trial in 1999, there was simply no scientific basis for the claim that a high PCL-R score was predictive of an individual's future dangerousness in prison:

> I have been asked in this declaration to provide an opinion as to whether at the time of Daniel Lee's trial, in May of 1999, there was a valid scientific basis to support the use of the PCL-R as an instrument to predict a capital defendant's future dangerousness, and whether the grounds for challenging the PCL-R as a reliable predictor of future violence in prison were available at the time of Mr. Lee's trial.

> As I will discuss more fully below, in 1999, at the time of Mr. Lee's trial there was no scientific basis to support the use of the PCL-R as a predictor of his future dangerousness in prison and the grounds for challenging its use for that purpose were known within the scientific and mental health communities.

> Scientific research studies were being performed as early as 1997 that examined the relationship between psychopathy scores and violent behavior in male U.S. prison inmates. None of these early studies reported a statistically significant relationship between the PCL-R and acts of physical violence in prison, meaning that the state of the science was that scores from this instrument could not be used to identify to any meaningful degree of certainty which U.S. prison inmates were likely to engage in violence. Thus, in 1999 a claim that a high PCL-R score indicated a high risk of future violence in federal prison was not only made in the absence of any empirical support, it actually contradicted the published, available scientific evidence on the subject at that time. Under these circumstances, at the time of Mr. Lee's 1999 trial, an expert could not ethically and responsibly have asserted that a high PCL-R score was predictive of whether an inmate would be violent in a U.S. prison.

> In post-conviction proceedings in another federal death penalty case, *United States v. Richard Stitt*, I was asked a question very similar to the one posed

39

here. In that case, I provided a declaration explaining the reasons why reliance on the PCL-R was inappropriate in 1998 – a year prior to Mr. Lee's trial – and explained that these reasons were known at the time. I provided a declaration summarizing the empirical literature regarding the relationship between psychopathy and U.S. prison violence and noted that the literature did not support a finding that a high PCL-R score was a reliable predictor of future violence in prison. I expressed my concern about the scientific and ethical impropriety of reliance on the PCL-R at Mr. Stitt's 1998 trial to identify him as likely to commit acts of violence in prison and stated that, had I been asked for a declaration to this effect at the time, I would have expressed the same reservations in 1998 that I stated in 2000, when I provided a declaration in another federal death penalty case, *Unites States v. Haynes*. As such, I would assert the same conclusion with respect to Mr. Lee's case. In 1999, as in 1998, the available scientific research contradicted the claim that there is a link between a high PCL-R score and violence in U.S. prisons. Thus, the basis for a challenge to the PCL-R as a predictor of future prison violence existed at the time of Mr. Lee's trial in 1999.

In conclusion, it is my opinion that it was not in 1999, nor is it today, scientifically or ethically defensible to claim that an individual offender with a high PCL-R score is more likely than the typical prison inmate to commit acts of violence in a U.S. prison, given the absence of a meaningful association between the PCL-R and U.S. prison violence.

9/13/13 Declaration of John F. Edens, Ph.D. Pursuant to 28 U.S.C. § 1746 at ¶¶ 5-9 (hereafter "Edens Declaration," attached as Exhibit 3). As Dr. Edens notes, these concerns about the scientific propriety of using the PCL-R to identify individuals as likely to commit acts of violence in prison are not new, and date at least as far back as 1998 – in other words, prior to Mr. Lee's trial. *See* Edens Declaration at ¶ 8.

The current President of the American Psychological Association, Donald N. Bersoff, Ph.D, J.D., a licensed forensic psychologist with extensive forensic, clinical and research experience, has also submitted a declaration in support of Mr. Lee's claim:

I have been retained by counsel for Daniel Lee in the instant matter, for the purpose of advising whether the basis for a legal challenge to government expert Dr. Thomas V. Ryan's use of the PCL-R to predict Mr. Lee's future dangerousness in prison existed at the time of Mr. Lee's May 1999 penalty phase hearing. Counsel for Mr. Lee have informed me that in an earlier proceeding in this matter, a question arose regarding whether the basis for such a challenge existed in 1999, since Dr. Ryan did not reject the PCL-R as an effective predictor

of future conduct until 2000, when a legal challenge was raised by counsel in a different case, *United States v. Willis Haynes*. As I played a role in the *Haynes* matter, having provided a declaration at the request of defense counsel, I address here the question of whether such a challenge could have been raised one year earlier, in 1999.

As I explain below, the basis for a challenge to the PCL-R existed at the time of Mr. Lee's trial in 1999. In fact, Dr. Ryan himself has acknowledged that the basis for such a challenge existed *before* 1999. He did so in a sworn declaration I have reviewed, which was offered in post-conviction proceedings involving an even earlier death penalty trial, *United States v. Richard Stitt*. In Mr. Stitt's post-conviction proceeding, Dr. Ryan disavowed his trial testimony that Mr. Stitt's high PCL-R score rendered him likely to commit acts of violence in prison. The *Stitt* matter was tried in 1998.

In the *Stitt* declaration, Dr. Ryan stated that "the basis for challenge to the use of the PCL-R existed at the time of the *Stitt* trial [in 1998]" Thomas V. Ryan, *Stitt* Declaration, paragraph 6.

Dr. Ryan explained further that in 1998, at the time he testified in *Stitt*,

> [i]t was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

(Ryan, *Stitt* declaration, paragraph 9).

The reason that the basis for a challenge to the PCL-R existed in 1998 and persisted through 1999, rests on the fact that the scientific research conducted through those dates did not support using the PCL-R to predict an individual's future dangerousness in prison. Had a challenge to the use of the PCL-R for the purposes of predicting future dangerousness in prison been raised in 1999, I would have provided the same opinion I provided a year later in the 2000 case of *United States v. Willis Haynes* (mentioned above), i.e., that Dr. Ryan's reliance on the PCL-R to predict future dangerousness in prison was unsupported by empirical evidence, did not present an appropriate application of generally accepted ethical principles applicable to psychologists, and violated the generally accepted standards of forensic psychological practice.

9/13/13 Declaration of Donald N. Bersoff, Ph.D., J.D., Pursuant to 28 U.S.C. § 1746 at ¶¶ 12-16

(hereafter "Bersoff Declaration," attached as Exhibit 4).

As Dr. Bersoff notes in his declaration, and as Mr. Lee alleged in his § 2255 Motion (without any evidentiary support), Dr. Ryan has since disavowed the use of the PCL-R in capital sentencing proceedings, and has specifically stated that the use of the PCL-R and the concept of psychopathy as a predictor of future dangerousness in prisons is inappropriate, as there is no scientific evidence to support such claims. Moreover he has acknowledged that, even before Mr. Lee's trial, there was a meritorious basis for a challenge to the use of the PCL-R to predict future dangerousness in prison. Dr. Ryan's reversal of his prior views on this matter came to light as part of the proceedings in another federal capital case, *United States v. Willis Haynes*, No. PJM-98-0520 (D. Md.), which was tried in the District of Maryland in May of 2000. Undersigned counsel wish to briefly recount Dr. Ryan's involvement in that case, as it is pertinent to Mr. Lee's claim here.

In *Haynes*, Dr. Ryan was retained by the government to perform a risk assessment of the capital defendant (Willis Haynes) using the PCL-R and give expert testimony regarding his potential psychopathy and future dangerousness. In May of 2000, after the written report of his evaluation was submitted to counsel, the defense filed a motion seeking to exclude Dr. Ryan's expert testimony regarding the PCL-R and the diagnosis of psychopathy. The basis for the motion was that such evidence was unscientific and not probative of future dangerousness in prison, and the motion was supported by five affidavits from prominent clinical and forensic psychologists who variously attested that there was no scientific basis for claiming that a high PCL-R score supported a future dangerousness determination for a person who would remain in prison.[15] After reviewing these affidavits, Dr. Ryan re-evaluated his position on this issue and

---

[15] Those affidavits are attached as Exhibit 5.

voluntarily withdrew his expert report in the *Haynes* case. Nor did he testify regarding the PCL-R or psychopathy at the trial. As Dr. Ryan himself later explained:[16]

> The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of *United States v. Willis Haynes*. In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy. The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score that would support a future dangerousness determination. I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists. I then determined that I would withdraw my report. As a result, no testimony about psychopathy or the PCL-R was introduced at that trial.

5/12/03 Declaration of Thomas V. Ryan, Ph.D, ABPP at ¶5 (hereafter "Ryan Declaration," attached as Exhibit 6).

Subsequent to the *Haynes* case, Dr. Ryan provided a sworn declaration as part of the § 2255 proceedings in *United States v. Stitt*, another capital case in which he was the government's expert at trial and gave testimony regarding the defendant's future dangerousness based on the PCL-R. In that declaration, Dr. Ryan repudiated his prior expert testimony made at trial and disavowed the notion that a capital defendant's potential psychopathy, as measured by the PCL-R, is predictive of his future dangerousness in prison:

> Based upon my current understanding of the literature and the obvious controversy about forensic clinicians' use of the PCL-R, I would choose not to use this instrument. Although I did not recognize it at the time, I am aware now that the PCL-R is not, and was not, appropriately relied upon to assess an individual's future dangerousness in federal prison. As an ethical and responsible

---

[16] The following is excerpted from Dr. Ryan's sworn declaration filed in the capital § 2255 proceedings in *United States v. Richard Thomas Stitt*, No. 2:98-CR-47 (E. D. Va.), which is the same declaration to which Dr. Bersoff alluded in his declaration. As is explained *infra*, Dr. Ryan provided expert testimony at the *Stitt* trial in 1998 regarding the capital defendant's psychopathy and future dangerousness, but subsequently repudiated that testimony for the same reasons that he withdrew his testimony in the *Haynes* case.

> clinician, I am informing all concerned that the statements about the defendant's future dangerousness that I made at trial were not grounded in current scientific literature and I do not stand by them now.
>
> . . .
>
> It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

Ryan Declaration (Exhibit 6). *See also id.* at ¶ 10 ("Since withdrawing my report in the [*United States v. Willis*] *Haynes* case [in the Spring of 2000], I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial. In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies. Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since *Haynes*.")

As Dr. Ryan explained in his declaration in the *Stitt* case, a comprehensive review of the scientific literature demonstrated that "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated is untenable[.]" Ryan Declaration at ¶ 9 (internal citation omitted). Of particular significance is Dr. Ryan's acknowledgment that "the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial[.]" Ryan Declaration at ¶ 6. In other words, the basis for challenging such psychopathy evidence was available at least as early as September of 1998, when the *Stitt* case was tried, and was therefore also available nearly eight months later when the government made use of such psychopathy evidence at Mr. Lee's penalty phase proceedings in May of 1999.

Additionally, it should be noted that the district court in *Stitt*, although granting relief on different grounds, made a finding that the testimony about the PCL-R was unreliable:

> [T]he Court is reasonably satisfied that Dr. Ryan's testimony was erroneous. Dr. Ryan's material testimony predicted Petitioner's future dangerousness based upon a scientific instrument [PCL-R] that Dr. Ryan now believes he inaccurately applied. . . . The Court has not found any precedent providing guidance in a situation where an expert witness has discovered that the scientific basis for a test used to support a material fact was incorrect. However, if a DNA test indicated that an individual was guilty of a crime, and the Government's DNA expert later discovered that a change in DNA science indicated that the old test was inherently flawed, the Court cannot conceive that this would not be sufficient basis for the Court to at least consider such a petitioner's collateral attack. Therefore, the Court finds that Dr. Ryan's testimony was erroneous and has been recanted.

*Stitt v. United States*, 369 F. Supp. 2d 679, 699 (E.D. Va. 2005), *affirmed by, remanded by United v. Stitt*, 441 F.3d 297 (4th Cir.), *recalled by, vacated by, appeal dismissed by United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006).[17] In short, there is absolutely no question that Dr. Ryan has rejected the use of the PCL-R as an appropriate instrument for predicting the future dangerousness of capital defendants, and that the psychopathy/PCL-R evidence used at Mr. Lee's sentencing trial based on Dr. Ryan's report was demonstrably false. There was simply no reliable, scientific basis on which to claim that Mr. Lee's score on the PCL-R was probative of whether he was likely to be a future danger in prison, and the jury should have never been exposed to that inflammatory and highly prejudicial evidence.

> d.     **The Underlying Ineffective Assistance Of Trial Counsel Claim Has "Some Merit."**

In order to overcome default, Mr. Lee must also demonstrate that the underlying ineffective assistance of trial counsel claim is a "substantial one, which is to say that the claim has some merit." *Martinez*, 132 S. Ct. at 1318. With respect to what constitutes a "substantial" claim, the Supreme Court suggested, by citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)

---

[17] After hearing argument, the Fourth Circuit initially published an opinion affirming the district court's judgment in all respects and remanding the case for resentencing. *See United v. Stitt*, 441 F.3d 297 (4th Cir. 2006). However, prior to issuance of the mandate, the Fourth Circuit discovered that, since the defendant had not yet been resentenced, it lacked jurisdiction over the appeal. *See United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006).

(describing standards for certificates of appealability to issue), that courts should apply the standard for the issuance of certificates of appealability. *Martinez*, 132 S. Ct. at 1318. Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if "a petitioner has made a substantial showing of the denial of a constitutional right." *See Miller-El*, 537 U.S. at 335-36 (describing standard); *Garrett v. United States*, 211 F.3d 1075, 1076 (8th Cir. 2000) (same). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997); *Miller-El*, 537 U.S. at 336.

Mr. Lee easily meets this standard. In fact, the evidence shows that Mr. Lee would prevail on his IATC claim under a straightforward application of *Strickland*, should the Court decide that such a showing is warranted in order to prove that his IATC claim is "substantial" within the definition of *Martinez/Trevino*.

First, trial counsel's failure to challenge the psychopathy/PCL-R evidence on the grounds that it was unreliable and scientifically invalid was objectively unreasonable. As the declarations of Drs. Edens, Bersoff and Ryan make clear, the basis for raising a challenge to the psychopathy/PCL-R evidence existed at the time of Mr. Lee's trial in 1999. Considering that there was literally no empirical data or scientific evidence in 1999 that supported using the PCL-R as a predictor for future dangerousness in prison, there was simply no strategic or tactical reason for trial counsel to have refrained from challenging the PCL-R/psychopathy evidence on those grounds. Moreover, given that trial counsel sought to keep this evidence from being presented to the jury based on an evidentiary objection, such a challenge would have been consistent with counsel's trial strategy to exclude this evidence.

46

Indeed, the litigation in the aforementioned *Haynes* case is demonstrative of the type of challenge that trial counsel could have – and should have – raised. As both Dr. Edens and Dr. Bersoff have stated in their respective declarations, had they been approached prior to Mr. Lee's trial in 1999 regarding this issue, they would have provided the exact same opinion they provided one year later in the *Haynes* case: that Dr. Ryan's reliance on the PCL-R to predict future dangerousness in prison was unsupported by empirical evidence and had no scientific basis. Indeed, Dr. Ryan himself conceded in his affidavit in *Stitt* that the basis for challenging the PCL-R existed at the time that Mr. Stitt was tried – which was in 1998, a year prior to Mr. Lee's trial – and that had the challenge been made, he would have disavowed his reliance on the PCL-R at that time.  This evidence all demonstrates that Mr. Lee's trial counsel's performance fell below an objective standard of reasonableness, and therefore he meets a showing of deficient performance, proving the first prong of *Strickland*. *See Strickland*, 484 U.S. at 690-91.

Similarly, as to prejudice, as was extensively explained *supra* at IV(B)(4)(b), there is no question that but for the presentation of the psychopathy/PCL-R evidence introduced at Mr. Lee's trial, there is a reasonable probability that the outcome of the sentencing trial would have been different. The PCL-R/psychopathy evidence was as damning as could be and formed a central argument in the government's case for death – so much so that even the District Court, which presided over the trial of Mr. Lee and his more culpable co-defendant (who received a sentence of life imprisonment), remarked that in the absence of the presentation of this evidence, it was "very questionable" that the jury would have returned a death verdict in Mr. Lee's case. This alone establishes both that Mr. Lee's claim is debatable among jurists of reason and that there is a reasonable probability of a different result, proving prejudice under *Strickland*. *See Strickland*, 484 U.S. at 696. As such, Mr. Lee has demonstrated that his underlying claim

47

challenging his counsel's performance is substantial, whether the Court applies the *Miller-El* standard the Supreme Court endorsed in *Martinez*, or whether it applies *Strickland* itself.

Moreover, the fact that this Court previously held that but for § 2255 counsel's errors the Court might have granted a hearing to consider the untimely proffered declarations and supporting facts, strongly suggests that a court could resolve the issue differently, or – at the very least – that the allegations of trial counsel's ineffectiveness deserve further proceedings. Thus, it is respectfully submitted that Mr. Lee's ineffective assistance of trial counsel claim has "some merit" under *Martinez*'s application of the *Miller-El* standard, or in the alternative, under a straightforward application of *Strickland* for assessing whether the claim meets *Martinez*'s substantiality requirement.

## C.    The Equities Require That 60(b)(6) Relief Be Granted.

It is respectfully submitted that Mr. Lee meets the required showing of extraordinary circumstances under Rule 60(b)(6). Significantly, the claim at issue here – trial counsel's ineffectiveness in failing to challenge highly prejudicial and inflammatory aggravating evidence introduced in Mr. Lee's sentencing trial – directly implicates the reliability of Mr. Lee's sentence. This Court itself has questioned whether Mr. Lee would have received a death sentence in the absence of the psychopathy/PCL-R evidence. Unfortunately, Mr. Lee's IATC claim has never been fully reviewed on the merits, through no fault of his own. Here, the supervening change in law in *Trevino*, along with the equitable factors offered and in conjunction with the strength of the constitutional error alleged, warrant reopening the § 2255 judgment and permitting Mr. Lee the evidentiary hearing that he would have received on his IATC claim, but for § 2255 counsel's ineffectiveness.

48

## V.     RELIEF PURSUANT TO RULE 60(b)(5) IS ALSO WARRANTED BECAUSE APPLYING THE JUDGMENT PROSPECTIVELY IS NO LONGER EQUITABLE.

Mr. Lee firmly believes that he is entitled to relief pursuant to Fed. R. Civ. P. 60(b)(6) for the reasons stated above.  However, Mr. Lee asserts that Fed. R. Civ. P. 60(b)(5) also provides a ground for relief from the judgment in his case because prospective application of his sentence of death is no longer equitable in light of recognition that the PCL-R evidence—a crucial factor leading the jury to sentence Mr. Lee to die—is neither reliable nor valid.  Rule 60(b)(5) provides an alternative means for this Court to reopen his case to consider the full merits of his IATC claim.

### A.     Mr. Lee's Judgment Sentencing Him to Die Applies Prospectively.

Pursuant to Fed. R. Civ. P. 60(b)(5), a district court may grant relief from a final judgment if "applying it prospectively is no longer equitable."  In order for a judgment to have prospective application, it must be "executory" or "involve the supervision of changing conduct or conditions." *In re Racing Services,* 571 F.3d 729, 733-34 (8th Cir. 2009) (citing "prospective application" standard outlined in *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988)).  Most cases explicating the application of 60(b)(5) involve modifications of a consent decrees or injunctive relief.  The rule, however, is not narrowly confined to those circumstances.  *See* 11 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2863 (2d ed.1995) ("Although the principal significance of this portion of the rule is with regard to injunctions, it is not confined to that form of relief, nor even to relief that historically would have been granted in courts of equity. Any such restriction would be inconsistent with the merger of law and equity. Instead it applies to any judgment that has

49

prospective effect."). Whether relief is available under the "prospective application" clause is essentially a case-by-case inquiry.

The plain language of 60(b)(5) demonstrates that it applies to Mr. Lee's capital § 2255 case. § 2255 proceedings are not collateral attacks on a separate judgment.[18] § 2255 cases are part and parcel of the criminal proceeding and the subject matter of the § 2255 motion is the actual judgment of the court sentencing him to die, litigated in the very same court and cause number as his original trial. Because in capital cases that judgment entails the future act of an execution—affirmatively placing obligations on the United States government to carry out the death sentence—capital § 2255 judgments must apply prospectively.[19] In fact, the statute governing the implementation of a federal death sentence makes clear that, unlike a non-capital case, the future act is a necessary condition of a federal death sentence. *See* 18 U.S.C. § 3596(a)

---

[18] This distinguishes Mr. Lee's case from § 2254 cases where a federal court reviews a state conviction. In a § 2254 proceeding, the criminal process resulting in a death sentence is a separate state process. The § 2254 petition is a collateral federal attack in which a state petitioner sues the state officer who has custody of him, alleging that he is unconstitutionally confined. If a federal court grants § 2254 relief, the court typically orders conditional release of the inmate subject to a retrial or resentencing. There is no authority for a federal judge sitting in habeas to grant a new state criminal trial. Because a § 2254 proceeding seeks *collateral* relief in a jurisdiction other than where the sentence was imposed, 60(b)(5) may not provide an avenue for a state petitioner. The federal district court's judgment in a § 2254 case (even a capital § 2254) has no prospective application. The habeas judgment solely determines whether the inmate is unconstitutionally confined. *See e.g. Gillispie v. Timmerman-Cooper*, 2012 WL 6644624 (S.D.Ohio Dec. 20, 2012) (rejecting 60(b)(5) relief because "[h]abeas corpus under § 2254 is not a suit on a judgment...but a suit attacking custody by way of collateral attack on the judgment giving rise to the custody.").
   In contrast, a grant of relief in a § 2255 case does not merely "issue a writ" granting conditional release pending further action by the government. When a judge grants relief in in a § 2255 case, he "shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." As the Committee Notes to the rule 1 of the Rules Governing § 2255 Proceedings explicitly state "[t]his is possible because a motion under § 2255 is a further step in the movant's criminal case and not a separate civil action."
[19] This is distinct from non-capital § 2255 cases where the judgment is completed at sentencing. *See e.g. Washington v. U.S.*, 2005 WL 1944773 (D. Kan. Aug. 15, 2005) (denying 60(b)(5) relief in non-capital § 2255 case because order denying relief of conviction for distribution of cocaine does not implicate future conduct).

("When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence…"). Because the judgment Mr. Lee seeks to vacate is a judgment ordering future conduct it is a judgment that applies prospectively and relief can be granted pursuant to 60(b)(5).

**B.      Applying The Judgment Prospectively Is No Longer Equitable.**

This Court is empowered to modify a judgment with prospective application where changed circumstances have caused it to be unjust. *Prudential Ins. Co. of America v. National Park Medical Center, Inc.*, 413 F.3d 897, 903 (8th Cir. 2005). In Mr. Lee's case, it would be inequitable to prospectively apply the judgment (i.e. implement his execution) in light of the indisputable fact that his death sentence was based in large part on unreliable and inaccurate pseudoscience. As previously explained in this motion, *supra* Part III, solely because his § 2255 counsel failed to comply with the rules governing pleading of § 2255 issues, this Court foreclosed review of crucial evidence and as a result refused to conduct full merits review of his ineffectiveness of trial counsel claim. As discussed *infra,* the Supreme Court's recent *Trevino* decision has now created the opportunity for full merits review of § 2255 counsel's performance to determine whether their ineffectiveness excuses the failure to properly plead the underlying IATC claim.

Mr. Lee's ineffective assistance of trial counsel claim presents compelling evidence that, but for the introduction of the unreliable PCL-R/psychopathy evidence, Mr. Lee would not have been sentenced to death. As this Court itself concluded, in the absence of the psychopathy evidence "it is very questionable whether the jury would have given Defendant Lee the death penalty." *United States v. Lee*, 89 F. Supp. 2d 1017, 1031 (E.D. Ark. 3/21/00) (Memorandum Opinion and Order regarding Future Dangerousness and the Death Penalty Protocol), *rev'd on*

51

*other grounds,* 274 F.3d 485, 495 (8th Cir. 2001) (finding Government's cross-examination did not exceed scope of direct). It would be inequitable to apply this Court's default of Mr. Lee's claim solely due to § 2255 counsel's failure, especially because Mr. Lee's death sentence was based on highly inflammatory pseudo-science that is roundly rejected and which the government no longer introduces in other capital cases on account of its unreliability.

## VI.    MR. LEE SHOULD BE GRANTED 60(b) RELIEF

Of the 57 persons currently on federal death row, Mr. Lee is the only individual whose capital sentencing proceedings relied on aggravating evidence of future dangerousness based on the PCL-R and so-called psychopathy evidence. Every other federal capital case involving such evidence has either been reversed after judgment, or the evidence was precluded from ever being presented to the jury in the first place.

There is a clear consensus in the scientific community that the PCL-R/psychopathy evidence that was presented at Mr. Lee's trial, and upon which the government relied in urging the jury to sentence Mr. Lee to death, was unreliable and scientifically invalid. Even the government's own expert, Dr. Ryan, has disavowed his reliance on the PCL-R and any claims about an individual's future dangerousness in prison based on a diagnosis of psychopathy. Trial counsel's failure to adequately challenge this evidence was objectively unreasonable, as the basis for such a challenge was readily available at the time of Mr. Lee's trial. Moreover, there is no question that trial counsel's deficient performance prejudiced Mr. Lee, as the government relied heavily upon it in seeking the death penalty; as this Court has noted, but for the introduction of that PCL-R/psychopathy evidence, it is "very questionable" that the jury would have chosen to sentence Mr. Lee to death.

The only thing standing between Mr. Lee and a full merits review of his IATC claim on this issue is the fact of his § 2255 counsel's default. This Court recognized the potential merit of Mr. Lee's claim when it referenced the possibility of a hearing had § 2255 counsel timely proffered the relevant supporting information. Under *Trevino*, Mr. Lee can now overcome that default. All Mr. Lee asks is to be put back in the position he was in before his § 2255 counsel's default, so that he can finally put before a reviewing court the extra-record facts that establish his IATC claim.

## CONCLUSION

It would be a manifest injustice to allow Mr. Lee to be executed on the basis of highly inflammatory evidence based on pseudo-science that has been roundly condemned in the field of forensic psychology, that the government's own expert no longer stands by, and that the government itself no longer uses in capital cases due to its unreliability. It is respectfully submitted that Mr. Lee has met the requirements for 60(b) relief, warranting reopening of the judgment in his case so that he will not be executed without ever having had a full merits determination of his substantial IATC claim.

Respectfully Submitted:

By:        KARL SCHWARTZ
Bar # 38994 (PA)
Chief, Capital Habeas Unit
Jennifer Merrigan
Bar # 56733 (MO)
Assistant Federal Public Defender
Delaware Federal Defender Office
800 King Street, Suite 200
Wilmington, DE 19801
(302) 442-6545
karl_schwartz@fd.org

Dated: September 27, 2013

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

### CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2013, I presented the foregoing, along

with two copies, to the Clerk of Court for filing and uploading to the CM/ECF

system, which upon information and belief, shall send notification to the following:

> Christopher R. Thyer
> United States Attorney
> Eastern District of Arkansas
> 425 West Capitol Avenue, Suite 500
> Little Rock, AR 72201

I hereby certify that on September 27, 2013, a copy of the foregoing was

delivered to the location designated for pick-up by the United States Attorney's

Office for the Eastern District of Arkansas, within the Courthouse of the United

States District Court for the Eastern District of Arkansas.

Date: September 27, 2013

By: _____
Karl Schwartz #38944 (PA)
Chief, Capital Habeas Unit
Office of the Federal Defender
District of Delaware
800 N. King Street, Suite 200
Wilmington, DE  19801

# EXHIBIT 1

## DECLARATION OF LAURENCE KOMP, Esq.

I, Laurence Komp, declare as follows, pursuant to 28 U.S.C. § 1746:

1.    I am an attorney admitted to practice in Ohio, Kentucky and Missouri.

2.    I have been a practicing attorney for 20 years. The bulk of my practice involves appellate and post-conviction matters, in both state and federal courts. In many of my cases I represent individuals who have been sentenced to death.

3.    On January 19, 2006, I was appointed, *nunc pro tunc* (with the appointment effective as of August 26, 2005) as counsel for Mr. Lee in his 2255 proceeding. On the same date, and in the same manner, this Court also appointed my co-counsel, David Ruhnke.

4.    Mr. Lee had been sentenced to death in a federal capital trial held in the Eastern District of Arkansas in 1999.

5.    During the course of Mr. Lee's 1999 penalty phase hearing, the government sought to establish that Mr. Lee presented a future danger in prison if given a life sentence. The government based its theory in part on Mr. Lee's purported high score on the Hare Psychopathy Checklist-Revised (PCL-R) and the designation of him as a "psychopath" by government expert Thomas V. Ryan, Ph.D., a psychologist. Dr. Ryan evaluated Mr. Lee, assessing him with a high PCL-R score, and concluded that he represented a future danger even if confined to a maximum security prison.

6.     On June 26, 2006, Mr. Ruhnke and I (hereafter "we") filed on Mr. Lee's behalf, a Motion Pursuant to 28 U.S.C. § 2255 to Vacate Conviction and Sentence. [Doc. 1] (hereafter Motion). Before filing the Motion we knew that numerous highly respected and highly credentialed forensic psychologists had declared that there was no scientific or psychological basis to support a link between a high PCL-R score and an individual's potential for engaging in institutional violence in the future, and that this information was known at the time of Mr. Lee's trial. We also knew that Dr. Ryan himself had come to accept these positions.

7.     The 2255 raised two claims relating to the Government's and Dr. Ryan's use of the PCL-R.

a.     The first claim, at Point H in the Motion, addressed trial counsel's failure to object to the Government's cross-examination of a defense expert on the issue of psychopathy, based on the fact that the cross-examination was beyond the scope of direct examination. Motion at 33.

b.     The second claim, at footnote 14 in the Motion, asserted that:

> Dr. [Thomas] Ryan, in sworn testimony and affidavits filed after his testimony in this case, has stated that the Hare Psychopathy Checklist (PCL-R) is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants and that he no longer stands by such testimony or analysis.

Motion at 34. In the footnote we stated that we "are prepared to offer evidence" in support of the claim. *Id.*

8.     The Motion provided no additional facts in support of the claim raised at footnote 14 (i.e., that the PCL-R was not an appropriate instrument for evaluating an individual's future dangerousness in prison).

9.     The Motion did not include affidavits from experts, or submissions of any kind, in support of the claim raised at footnote 14.

10.     We knew at the time the Motion was filed that there was available evidence from Dr. Ryan himself (i.e., Dr. Ryan's sworn testimony and affidavits) that supported the claim that trial counsel had been ineffective for failing to raise a *Daubert* challenge to the PCL-R evidence.

11.     We also knew, prior to the June 26, 2006 filing, that there was additional evidence that supported the claim, emanating from a wide array of experts in the field of forensic psychology. Prior to filing the Motion we reviewed materials relating to the PCL-R from colleagues experienced in federal death penalty practice. These materials informed us that a number of nationally regarded forensic psychologists with particular expertise in the use and application of the PCL-R had concluded that there was no empirical support for using the PCL-R to assess the likelihood of an individual's future violent conduct in prison. These

experts had rejected the concept that the PCL-R was a reliable evaluative tool for assessing the future dangerousness of an individual in custody.

12.    The materials included a memorandum which discussed another death penalty case, *United States v. Willis Haynes*, in which Dr. Ryan had withdrawn an evaluation that had been based on the PCL-R following a challenge to its reliability. The memorandum identified several highly credentialed and nationally renowned forensic psychologists, with particular expertise in the administration and application of the PCL-R, who had challenged Dr. Ryan's use of the instrument to establish future dangerousness in prison. Some had conducted independent research on the PCL-R, and all were well versed in the research literature regarding its use. The materials also included the *Daubert* motion from the *Haynes* case. The *Daubert* motion provided detailed factual, scientific and legal analyses as to why the PCL-R could not reliably predict future dangerousness in prison. The motion also identified additional well-credentialed experts in the field who had submitted affidavits to the Court assailing the reliability of the PCL-R as a risk assessment tool for a person who would remain incarcerated for life. The common theme of these affidavits was that the results of what little research had been done on the relationship between a high PCL-R score and the likelihood of future violence in prison did not support the conclusion that one was related to the other.

13.     Based on this information, we knew, before filing the Motion to Vacate, that leading figures in the field of forensic psychology were willing to author declarations or affidavits, and provide testimony explaining why the use of the PCL-R in the manner employed in Mr. Lee's case was scientifically unacceptable at the time of Mr. Lee's trial, and violated professional and ethical standards.

14.     Prior to filing Mr. Lee's Motion to Vacate we did not reach out to any psychological experts, including those who had been identified to us, for the purpose of obtaining affidavits or declarations, or to secure their testimony at a possible hearing pursuant to 28 U.S.C. § 2255.

15.     Although we had reviewed the materials containing the *Daubert* motion filed in *Haynes* we pled none of its detailed factual information in support of the claim asserted in footnote 14 of the Motion.

16.     Following the District Court's denial of the Motion, and over two years after its initial filing, we filed a 59(e) Motion. In the 59(e) Motion, for the first time, we asserted additional facts in support of the claim raised in footnote 14 and submitted expert affidavits challenging Dr. Ryan's use of the PCL-R (although those affidavits had been prepared for, and submitted in, other cases). In rejecting our submissions as successive, the District Court held that:

> Lee's original § 2255 Petition included only one sentence referencing this argument. That lone reference appeared in a footnote . . . .

> Petitioner now devotes over 25 pages to this argument. Clearly, the theory is much more developed now than the cursory reference made in requesting 2255 relief. Again, Petitioner does not explain why the information he now includes was not included in connection with his original petition. Petitioner's conclusory statement that Dr. Ryan, subsequent to his testimony in this case, stopped using the PCL-R to evaluate future dangerousness was not sufficient to place the Court on notice of the full argument that Petitioner now presents.

*United States v. Lee*, No. 406-CV-1608-GTE, 2008 (E.D. Ark.) [Doc. 6 at 11].

17. There was no strategic or tactical rationale for not asserting the readily available facts in support of our the claim asserted in footnote 14 that the "Hare Psychopathy Checklist (PCL-R) is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants;" nor was there a strategic or tactical rationale for not obtaining and appending supporting documentation to our Motion from any of the forensic psychologists who had demonstrated their willingness to challenge Dr. Ryan's particular use of the PCL-R, based on the fact that such use was scientifically unsupportable, and violated professional and ethical standards. We thought that by pleading the issue we had met the requirements of § 2255.

I declare, under penalties of perjury, that the foregoing is true and correct.

Dated: 9/25/13

Laurence Komp, Esq.

# EXHIBIT 2

## DECLARATION OF DAVID A. RUHNKE, Esq.

I, David A. Ruhnke, declare as follows, pursuant to 28 U.S.C. § 1746:

1.      I am an attorney admitted to practice in the states of New York and New Jersey, as well as in several federal district courts, several federal courts of appeal, and the United States Supreme Court.

2.      I have been a practicing attorney for 37 years. I have considerable experience in death penalty matters, at trial, on appeal and in post-conviction proceedings. I practice in both state and federal courts. I have been a member of the Federal Death Penalty Resource Counsel Project for the past seven years.

3.      On January 19, 2006, I was appointed, *nunc pro tunc* (with the appointment effective as of August 26, 2005) as counsel for Mr. Lee in his 2255 proceeding. On the same date, and in the same manner, this Court also appointed my co-counsel, Laurence Komp.

4.      Mr. Lee had been sentenced to death in a federal capital trial held in the Eastern District of Arkansas in 1999.

5.      During the course of Mr. Lee's 1999 penalty phase hearing, the government sought to establish that Mr. Lee presented a future danger in prison if given a life sentence. The government based its theory in part on Mr. Lee's purported high score on the Hare Psychopathy Checklist-Revised (PCL-R) and the designation of him as a "psychopath" by government expert Thomas V. Ryan,

Ph.D., a psychologist. Dr. Ryan evaluated Mr. Lee, assessing him with a high PCL-R score, and concluded that he represented a future danger even if confined to a maximum security prison.

6.     On June 26, 2006, Mr. Komp and I (hereafter "we") filed on Mr. Lee's behalf, a Motion Pursuant to 28 U.S.C. § 2255 to Vacate Conviction and Sentence. [Doc. 1] (hereafter Motion). Before filing the Motion we knew that numerous highly respected and highly credentialed forensic psychologists had declared that there was no scientific or psychological basis to support a link between a high PCL-R score and an individual's potential for engaging in institutional violence in the future, and that this information was known at the time of Mr. Lee's trial. We also knew that Dr. Ryan himself had come to accept these positions. I had previously litigated this issue in a federal capital case in the District of Massachusetts.

7.     The 2255 raised two claims relating to the Government's and Dr. Ryan's use of the PCL-R.

a.     The first claim, at Point H in the Motion, addressed trial counsel's failure to object to the Government's cross-examination of a defense expert on the issue of psychopathy, based on the fact that the cross-examination was beyond the scope of direct examination. Motion at 33.

b.     The second claim, at footnote 14 in the Motion, asserted that:

> Dr. [Thomas] Ryan, in sworn testimony and affidavits filed after his testimony in this case, has stated that the Hare Psychopathy Checklist (PCL-R) is not an appropriate instrument to be utilized in evaluating the future danger of capital defendants and that he no longer stands by such testimony or analysis.

Motion at 34. In the footnote we stated that we "are prepared to offer evidence" in support of the claim. *Id.*

8.     The Motion provided no additional facts in support of the claim raised at footnote 14 (i.e., that the PCL-R was not an appropriate instrument for evaluating an individual's future dangerousness in prison).

9.     The Motion did not include affidavits from experts, or submissions of any kind, in support of the claim raised at footnote 14.

10.     We knew at the time the Motion was filed that there was available evidence from Dr. Ryan himself (i.e., Dr. Ryan's sworn testimony and affidavits) that supported the claim that trial counsel had been ineffective for failing to raise a *Daubert* challenge to the PCL-R evidence.

11.     We also knew, prior to the June 26, 2006 filing, that there was additional evidence that supported the claim, emanating from a wide array of experts in the field of forensic psychology. Prior to filing the Motion we reviewed materials relating to the PCL-R from colleagues experienced in federal death penalty practice. These materials informed us that a number of nationally regarded forensic psychologists with particular expertise in the use and application of the

PCL-R had concluded that there was no empirical support for using the PCL-R to assess the likelihood of an individual's future violent conduct in prison. These experts had rejected the concept that the PCL-R was a reliable evaluative tool for assessing the future dangerousness of an individual in custody.

12.    The materials included a memorandum which discussed another death penalty case, *United States v. Willis Haynes,* in which Dr. Ryan had withdrawn an evaluation that had been based on the PCL-R following a challenge to its reliability. The memorandum identified several highly credentialed and nationally renowned forensic psychologists, with particular expertise in the administration and application of the PCL-R, who had challenged Dr. Ryan's use of the instrument to establish future dangerousness in prison. Some had conducted independent research on the PCL-R, and all were well versed in the research literature regarding its use. The materials also included the *Daubert* motion from the *Haynes* case. The *Daubert* motion provided detailed factual, scientific and legal analyses as to why the PCL-R could not reliably predict future dangerousness in prison. The motion also identified additional well-credentialed experts in the field who had submitted affidavits to the Court assailing the reliability of the PCL-R as a risk assessment tool for a person who would remain incarcerated for life. The common theme of these affidavits was that the results of what little research had been done on the relationship between a high PCL-R score and the likelihood of

future violence in prison did not support the conclusion that one was related to the other.

13.    Based on this information, we knew, before filing the Motion to Vacate, that leading figures in the field of forensic psychology were willing to author declarations or affidavits, and provide testimony explaining why the use of the PCL-R in the manner employed in Mr. Lee's case was scientifically unacceptable at the time of Mr. Lee's trial, and violated professional and ethical standards.

14.    Prior to filing Mr. Lee's Motion to Vacate we did not reach out to any psychological experts, including those who had been identified to us, for the purpose of obtaining affidavits or declarations, or to secure their testimony at a possible hearing pursuant to 28 U.S.C. § 2255.

15.    Although we had reviewed the materials containing the *Daubert* motion filed in *Haynes* we pled none of its detailed factual information in support of the claim asserted in footnote 14 of the Motion.

16.    Following the District Court's denial of the Motion, and over two years after its initial filing, we filed a 59(e) Motion. In the 59(e) Motion, for the first time, we asserted additional facts in support of the claim raised in footnote 14 and submitted expert affidavits challenging Dr. Ryan's use of the PCL-R (although

those affidavits had been prepared for, and submitted in, other cases). In rejecting

our submissions as successive, the District Court held that:

> Lee's original § 2255 Petition included only one sentence referencing this argument. That lone reference appeared in a footnote . . . .
>
> Petitioner now devotes over 25 pages to this argument. Clearly, the theory is much more developed now than the cursory reference made in requesting 2255 relief. Again, Petitioner does not explain why the information he now includes was not included in connection with his original petition. Petitioner's conclusory statement that Dr. Ryan, subsequent to his testimony in this case, stopped using the PCL-R to evaluate future dangerousness was not sufficient to place the Court on notice of the full argument that Petitioner now presents.

*United States v. Lee,* No. 406-CV-1608-GTE, 2008 (E.D. Ark.) [Doc. 6 at 11].

17.    There was no strategic or tactical rationale for not asserting the readily

available facts in support of our the claim asserted in footnote 14 that the "Hare

Psychopathy Checklist (PCL-R) is not an appropriate instrument to be utilized in

evaluating the future danger of capital defendants;" nor was there a strategic or

tactical rationale for not obtaining and appending supporting documentation to our

Motion from any of the forensic psychologists who had demonstrated their

willingness to challenge Dr. Ryan's particular use of the PCL-R, based on the fact

that such use was scientifically unsupportable, and violated professional and

ethical standards. We thought that by pleading the issue we had met the

requirements of § 2255.

I declare, under penalties of perjury, that the foregoing is true and correct.

Dated: 09.25.2013

David A. Ruhnke, Esq.

# EXHIBIT 3

<u>Declaration of John F. Edens, Ph.D. Pursuant to 28 U.S.C. § 1746</u>

I, John F. Edens, Ph.D., hereby declare:

1.       I am a licensed psychologist in the state of Texas (license number 31105) and a tenured full professor in the Department of Psychology at Texas A&M University (TAMU), where I serve as the Director of Clinical Training for the Doctoral Program in Clinical Psychology. I received my doctoral degree in clinical psychology from TAMU in 1996, after which I completed a two-year postdoctoral fellowship in forensic psychology in the Department of Mental Health Law and Policy at the Louis de la Parte Florida Mental Health Institute at the University of South Florida. After my fellowship years, I joined the faculty at Sam Houston State University in 1998 and remained there until accepting an academic appointment at Southern Methodist University in 2004. In 2007, I accepted an appointment to return to TAMU. In my role as a faculty member in three Ph.D. training programs, I have been actively involved in the education and training of graduate students in the areas of research methodology, psychological assessment and forensic psychology. I have taught multiple courses in these areas to hundreds of graduate and undergraduate students. I also have conducted advanced training workshops in these and related areas for mental health and legal professionals.

2.       I have conducted research on psychological assessment and the prediction of human behavior since the 1990s and have published over 100 peer-reviewed journal articles, book chapters, and professional manuals related to these topics. Most of my research has focused on forensic and correctional assessment issues, such as the potential for engaging in future violence and other forms of socially deviant behavior. For example, from 2002 to 2006 I was a co-investigator on a $1.3 million research grant from the National Institute of Mental Health that examined the role of psychopathic personality disorder (psychopathy) in the adjustment and

future conduct of prison inmates and substance abusers. Additionally, I am the lead author of the *Personality Assessment Inventory Interpretive Report for Correctional Settings* (PAI-CS), which is an empirically derived, actuarial interpretive system designed to aid in the identification of inmates who have mental health problems and/or are likely to have difficulties adjusting to prison. Aside from scientific research on violence risk issues, I also have published extensively on controversies concerning risk assessment methods and procedures, both in general and in relation to capital murder cases specifically.

3.      Because of my background and expertise in forensic and correctional psychology in general and violence risk specifically, I am frequently called on to evaluate the work of other social scientists, particularly related to risk assessment issues. For example, I am a former Associate Editor for the peer reviewed scientific journal, *Assessment*. In this capacity, I was responsible for judging the scientific merit of research manuscripts submitted for publication and making editorial decisions - with input from peer reviewers - regarding whether these research reports were scientifically rigorous and warranted publication. *Assessment* routinely receives submissions concerning research on forensic and correctional topics, such as the prediction of institutional misconduct. These submissions typically were assigned to me for editorial review because of my experience in this area. I also have been appointed to the editorial boards of various psychology-law journals (*Law and Human Behavior, Behavioral Sciences and the Law, International Journal of Forensic Mental Health*) and journals specifically focused on psychological assessment and abnormal behavior (*Psychological Assessment, Journal of Personality Assessment, Journal of Abnormal Psychology*), where I serve as a peer reviewer of articles submitted for publication. In this capacity, I provide the Editor or Associate Editor with a review of the methodological rigor of the research and a recommendation concerning its overall

2

contribution to the scientific literature. Over the course of my career I have been asked to serve as an editor or reviewer for hundreds of scientific research reports submitted to a multitude of social science and medical journals.

4.      I am familiar with the published research literature regarding the Hare Psychopathy Checklist-Revised (PCL-R). I also have provided consultative services and training to legal, correctional, and mental health professionals regarding violence risk and the PCL-R and have testified as an expert witness concerning the use of the PCL-R and other risk assessment methods in the assessment of violence before federal and state criminal courts. Finally, I have used the PCL-R in some of my applied clinical work, which has included conducting risk assessments on convicted sex offenders who were being evaluated for possible civil commitment in the state of Texas.

5.      I have been asked in this declaration to provide an opinion as to whether at the time of Daniel Lee's trial, in May of 1999, there was a valid scientific basis to support the use of the PCL-R as an instrument to predict a capital defendant's future dangerousness, and whether the grounds for challenging the PCL-R as a reliable predictor of future violence in prison were available at the time of Mr. Lee's trial.

6.      As I will discuss more fully below, in 1999, at the time of Mr. Lee's trial there was no scientific basis to support the use of the PCL-R as a predictor of his future dangerousness in prison and the grounds for challenging its use for that purpose were known within the scientific and mental health communities.

7.      Scientific research studies were being performed as early as 1997 that examined the relationship between psychopathy scores and violent behavior in male U.S. prison inmates. None of these early studies reported a statistically significant relationship between the PCL-R

3

and acts of physical violence in prison, meaning that the state of the science was that scores from this instrument could not be used to identify to any meaningful degree of certainty which U.S. prison inmates were likely to engage in violence. Thus, in 1999 a claim that a high PCL-R score indicated a high risk of future violence in federal prison was not only made in the absence of any empirical support, it actually contradicted the published, available scientific evidence on the subject at that time. Under these circumstances, at the time of Mr. Lee's 1999 trial, an expert could not ethically and responsibly have asserted that a high PCL-R score was predictive of whether an inmate would be violent in a U.S. prison.

8.     In post-conviction proceedings in another federal death penalty case, *United States v. Richard Stitt*, I was asked a question very similar to the one posed here. In that case, I provided a declaration explaining the reasons why reliance on the PCL-R was inappropriate in 1998—a year prior to Mr. Lee's trial—and explained that these reasons were known at the time. I provided a declaration summarizing the empirical literature regarding the relationship between psychopathy and U.S. prison violence and noted that the literature did not support a finding that a high PCL-R score was a reliable predictor of future violence in prison. I expressed my concern about the scientific and ethical impropriety of reliance on the PCL-R at Mr. Stitt's 1998 trial to identify him as likely to commit acts of violence in prison and stated that, had I been asked for a declaration to this effect at the time, I would have expressed the same reservations in 1998 that I stated in 2000, when I provided a declaration in another federal death penalty case, *United States v. Haynes*. As such, I would assert the same conclusion with respect to Mr. Lee's case. In 1999, as in 1998, the available scientific research contradicted the claim that there is a link between a high PCL-R score and violence in U.S. prisons. Thus, the basis for a challenge to the PCL-R as a predictor of future prison violence existed at the time of Mr. Lee's trial in 1999.

4

9.     In conclusion, it is my opinion that it was not in 1999, nor is it today, scientifically or ethically defensible to claim that an individual offender with a high PCL-R score is more likely than the typical prison inmate to commit acts of violence in a U.S. prison, given the absence of a meaningful association between the PCL-R and U.S. prison violence.

I declare under penalty of perjury that the foregoing is true and correct.

John F. Edens, Ph.D.
September 13, 2013

# EXHIBIT 4

<u>Declaration of Donald N. Bersoff, Ph.D., J.D.,  Pursuant to 28 U.S.C. § 1746</u>

I, Donald N. Bersoff, Ph.D, J.D., hereby declare the following:

1.  I am the 2013 President of the American Psychological Association (APA). I have been a member of the APA since 1965 and was elected a fellow in 1974. I was granted Diplomate status from the American Board of Professional Psychology in 1974. Since 1997 I have presented annual workshops on the ethics and professional standards of forensic testimony for the American Academy of Forensic Psychology. From 1980-1981 I served as president of the American Psychology-Law Society and I am a Fellow of that group.

2.  I am currently a Professor Emeritus at the Drexel University's Earle Mack School of Law and an Adjunct Professor of Psychology at Drexel University.

3.  From April 2007 to August 2012, I served as a tenured Full Professor at the Earle Mack School of Law and the Department of Psychology.  In those capacities I was the Director of the J.D./Ph.D. Program in Law & Psychology.  Since August of 2001 I have been Professor Emeritus at Villanova University School of Law.

4.  From January 1990 to August 2001 I was a tenured Full Professor at the Villanova University School of Law and the Department of Psychology of MCP Hahnemann University (the latter, now merged with Drexel University).  In those capacities, I directed their J.D./Ph.D. Program in Law & Psychology.

5.  I have been a faculty member at several other universities, including the University of Maryland School of Law, the Department of Psychology at the Johns Hopkins University, the University of Georgia, and Ohio State University.

6. I received a Ph.D. in School Psychology from New York University in 1965 and a J.D. from Yale Law School in 1976.

7. From 1979-1989 I served as general counsel to the APA during which time I attended every meeting of the APA Ethics Committee, and conducted all appeal hearings from decisions of the Ethics Committee. From 1991-1994 I served on the APA's legislative body, the Council of Representatives, which adopted the 1992 APA Ethical Principles of Psychologists and Code of Conduct (Code of Ethics). From 1994-1997 I served on the APA's eleven member elected Board of Directors. Part of my role was as a member of the Board's ethics subcommittee, reviewing all decisions of the Ethics Committee that led to expulsion or stipulated resignation of APA members. I served on the Council of Representatives again, between 1999-2001, and served as chair of the APA's Policy and Planning Board (1999-2000).

8. I am the author of Ethical Conflicts in Psychology, originally published by the APA in 1995, and now in its fourth edition (2008). I am about to prepare the fifth edition at the request of the publisher. It is a textbook used by a number of graduate departments of psychology as the basic text for courses in ethics. In that book I devote an entire chapter to the standards and ethics of testifying as a psychological expert witness in legal proceedings.

9. In all, I have published four texts, 26 chapters in texts, 47 articles in peer-reviewed journals, and presented at least 150 papers at major scientific and professional meetings. A great many of these publications and presentations concern ethical, legal, and policy issues in psychology.

2

10.    I also serve as an expert witness in cases involving the ethical conduct of psychologists. In that capacity I have been retained – at times on a *pro bono* basis – in civil and licensure board cases, and on occasion in death penalty cases.

11.    I have a particular interest in the use and misuse of social science evidence in the legal system. I have presented and written on this issue extensively.  In July 1997, at the invitation of the Federal Judicial Center, I gave an address at the National Workshop for Magistrate Judges in Denver, Colorado, on The Application of *Daubert* to Forensic and Social Science Evidence. In March and April of 1996, at the Sixth Annual National Symposium on Mental Health and the Law, and at the American Psychology-Law Society, I presented papers on the admissibility of expert psychological testimony. In March 2000, I served as chair of a symposium on the impact of *Daubert* on the admissibility of social science evidence, and I presented a paper on that topic at the biennial meeting of the American Psychology-Law Society.  In October 2000, I moderated an all-day session of a 3-day National Conference on Science and Law, co-sponsored by the National Institute of Justice, the Criminal Justice Section of the American Academy of Forensic Sciences, the National Center for State Courts, the National District Attorneys Association and the National Science Foundation, in collaboration with the National Academy of Sciences and the Federal Judicial Center. I was the counsel of record for a Group of American Law Professors, submitting an *amicus curiae* brief in the original *Daubert* case before the United States Supreme Court in 1993.  In June 2011, I presented a paper, Admissibility of Mental Health Testimony after *Daubert,* at a conference on Forensic Trends:  Psychiatric and Behavioral Issues, in Washington, DC.

12.    I have been retained by counsel for Daniel Lee in the instant matter, for the purpose of advising whether the basis for a legal challenge to government expert Dr. Thomas V.

3

Ryan's use of the PCL-R to predict Mr. Lee's future dangerousness in prison existed at the time of Mr. Lee's May 1999 penalty phase hearing. Counsel for Mr. Lee have informed me that in an earlier proceeding in this matter, a question arose regarding whether the basis for such a challenge existed in 1999, since Dr. Ryan did not reject the PCL-R as an effective predictor of future conduct until 2000, when a legal challenge was raised by counsel in a different case, *United States v. Willis Haynes*. As I played a role in the *Haynes* matter, having provided a declaration at the request of defense counsel, I address here the question of whether such a challenge could have been raised one year earlier, in 1999.

13.    As I explain below, the basis for a challenge to the PCL-R existed at the time of Mr. Lee's trial in 1999.   In fact, Dr. Ryan himself has acknowledged that the basis for such a challenge existed *before* 1999. He did so in a sworn declaration I have reviewed, which was offered in post-conviction proceedings involving an even earlier death penalty trial, *United States v. Richard Stitt.* In Mr. Stitt's post-conviction proceeding, Dr. Ryan disavowed his trial testimony that Mr. Stitt's high PCL-R score rendered him likely to commit acts of violence in prison. The *Stitt* matter was tried in 1998.

14.    In the *Stitt* declaration, Dr. Ryan stated that "the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial [in 1998]." Thomas V. Ryan, *Stitt* Declaration, paragraph 6.

15.    Dr. Ryan explained further that in 1998, at the time he testified in *Stitt*,

> [i]t was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence."

(Ryan, *Stitt* declaration, paragraph 9).

4

16.    The reason that the basis for a challenge to the PCL-R existed in 1998 and persisted through 1999[1], rests on the fact that the scientific research conducted through those dates did not support using the PCL-R to predict an individual's future dangerousness in prison. Had a challenge to the use of the PCL-R for the purpose of predicting future dangerousness in prison been raised in 1999, I would have provided the same opinion I provided a year later in the 2000 case of *United States v. Willis Haynes* (mentioned above), i.e., that Dr. Ryan's reliance on the PCL-R to predict future dangerousness in prison was unsupported by empirical evidence, did not present an appropriate application of generally accepted ethical principles applicable to psychologists, and violated the generally accepted standards of forensic psychological practice.

17.    In 2000, in the *Haynes* case, I, along with four other psychologists, provided expert opinions relating to Dr. Ryan's use of the PCL-R as a basis for predicting that the defendant would be a future danger in prison. The four other psychologists were all highly credentialed leaders in the field of forensic psychology whose expertise included violence risk assessment and who had deep knowledge of the research literature relating to the PCL-R. They offered opinions about the state of the science and whether it supported predictions of the sort offered by Dr. Ryan. Although their conclusions were based on the state of the science in the year 2000, as described above and detailed further below, their statements described equally well the state of the science in 1999, as they focused on the fact that Dr. Ryan's proposed testimony exceeded what the research done to date could support. I was asked to rely on their individual and collective expertise and determine whether Dr. Ryan's proposed testimony was consistent with prevailing

---

[1] In fact, to this day, the scientific research in this area does not support the use of the PCL-R in this manner.

5

professional standards governing forensic psychologists and whether such testimony could meet the legal requirements of *Daubert.*

18.  Each of the four risk assessment subject matter experts stated that while the PCL-R was useful for some purposes, it was not scientifically defensible to use it to predict the likelihood of an individual's future dangerousness in federal prison, due to the lack of empirical research establishing its reliability and validity for that purpose. Each explained that there was no research base to support the conclusion Dr. Ryan drew concerning the PCL-R and risk of future prison violence. Relevant portions of the *Haynes* declarations include the following.

a.  Dr. Stephen David Hart noted that "to date there are no published, peer-reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in the (sic) North America;"

b.  Dr. Kirk Heilbrun stated that "[c]urrently, insufficient research has been conducted to justify the use of the PCL-R for assessing future dangerousness or future risk for aggression amongst populations of criminal offenders during their incarceration. Because of the lack of scientific empirical research on the PCL-R for prediction of institutional violence, we do not know whether an individual's score on the instrument is related to the likelihood that this individual will commit acts of violence or aggression while in a secure prison environment;"

c.  Dr. Norman Poythress knew of "no empirical research (e.g., survey of practitioners) that has attempted to establish a consensus in the psychological community as to the reliability and validity of using the PCL-R in the context of determining future dangerousness in a maximum security prison." He found "it is inappropriate to

6

conclude that sufficient research has been conducted at this time to reliably assess future behavior of the incarcerated based on PCL-R scores;"

d. Dr. John F. Edens expressed "significant concerns about the appropriateness of using the PCL-R to identify inmates who are highly likely to commit future acts of institutional violence, given the current scientific research base that exists to support the association between psychopathy and institutional aggression while incarcerated."

19. In forming my opinion in the *Haynes* matter I relied on the opinions of Drs. Hart, Heilbrun, Poythress and Edens, as well as the APA's Code of Ethics[2] ("Ethics Code"), the Specialty Guidelines for Forensic Psychologists[3] ("Specialty Guidelines"), and my research on the application of *Daubert* to forensic psychological testimony. One of the major purposes of the Ethics Code and the Specialty Guidelines is to safeguard against the misuse of science and to ensure that only empirically-supported and generally accepted scientific conclusions are presented to a court. The forensic psychologist's status as a credentialed expert can have a profound impact on jury decision-making. For this reason, and to protect the integrity of the profession, the forensic expert's opinion must be firmly grounded in science, based on objective empirical research which has yielded observable and measurable results. I concluded then, and affirm now, that linking a high PCL-R score to a greater likelihood of institutional violence did not represent an appropriate application of generally accepted ethical principles, and violated the generally accepted standards of psychological practice. I also concluded then, and affirm now, that Dr. Ryan's conclusions were inadmissible under *Daubert*.

---

[2] APA, Ethical Principles of Psychologists and Code of Conduct, 47 Amer. Psychologist 1597 (1992). The Ethics Code was revised in 2010 and is retrievable at http://www.apa.org/ethics/code/index.aspx.

[3] Committee on Ethical Guidelines for Forensic .Psychologists, 15 L. & Hum. Behav. 655 (1991). The Specialty Guidelines were revised in 2012 and adopted as APA policy. They can be found at 68 Amer. Psychologist 7 (2013).

20.    It is my understanding that Dr. Ryan withdrew his report, and that no testimony about the PCL-R was offered at the *Haynes* trial.  To the best of my knowledge, after the litigation in *Haynes*, no prediction of future dangerousness predicated on the PCL-R has been admitted in any federal capital case.

21.    The absence of empirical support establishing a connection between a high PCL-R score and elevated risk of violent behavior in prison existed in May of 1999, at the time of Mr. Lee's penalty phase proceeding. For this reason, in May of 1999 there was a basis for a successful challenge to the use of the PCL-R as misleading and scientifically unsupportable.

I declare under the penalty of perjury that the foregoing is true and correct.


*Donald N. Bersoff*
Donald N. Bersoff, Ph.D., J.D.
September 13 , 2013

8

# EXHIBIT 5

Affidavits Submitted in Support of
Motion in Limine to Exclude Expert Testimony
Regarding the PCL-R and HCR-20 Risk Assessment Instruments
and the Diagnosis of Psychopathy,
in *U.S. v. Willis Haynes*, May 24, 2000

AFFIDAVIT OF STEPHEN D. HART

I, Dr. Stephen David Hart, do declare the following:

1.  I am an Associate Professor of Psychology at Simon Fraser University in Burnaby, British Columbia, Canada, where I teach, conduct research, and supervise graduate students in the areas of clinical and forensic psychology, with a particular focus on the assessment of psychopathy and risk for violence.

2.  I obtained a doctoral degree in clinical and forensic psychology from the University of British Columbia in Vancouver, British Columbia, Canada, a graduate training program accredited by the American and Canadian Psychological Associations, where my studies focused on the assessment of psychopathy and my clinical training included supervised practice in the assessment and treatment of violent offenders.

3.  I have written more than 150 books, chapters, and peer-reviewed articles in the area of forensic psychology and, more specifically, assessment of psychopathy and violence risk; presented more than 150 papers at academic and professional meetings on the same topics; and have co-authored psychological test and assessment procedures for assessing psychopathy and violence risk.

4.  I am professionally active in the field of forensic psychology being, *inter alia*, a member of the executive committee of the American Psychology-Law Society (Division 41 of the American Psychological Association); a member of the editorial boards of academic journals, including *Law and Human Behavior* and *Legal and Criminological Psychology*; and a reviewer of articles submitted to academic journals and applications for funding submitted to granting agencies in Canada and the United States.

5.  I have conducted more than 100 training workshops for legal, law enforcement, correctional, and forensic mental health agencies in the United States (including the U.S. Federal Bureau of Prisons, the U.S. Army, and the U.S. Navy), Canada (including the Correctional Service of Canada and the Royal Canadian Mounted Police), and the United Kingdom (including Her Majesty's Prison Service and the Scottish Prison Service), as well as in Sweden, Norway, Germany, and New Zealand.

6.  I have testified as an expert witness concerning the topic of forensic psychology and, specifically, assessment of violence risk before courts, hearings, and tribunals in the Canadian provinces of British Columbia, Alberta, Manitoba, and Ontario; in the states of Florida, Washington, and Wisconsin; and before the Canadian Parliament.

7.  I worked with Prof. Robert Hare, first as a student and later as a colleague, on the development and validation of the Hare Psychopathy Checklist-Revised (PCL-R), a psychological test for the assessment of psychopathic personality disorder; and I have conducted numerous training workshops on the use of the PCL-R, often with Prof. Hare.

8.  I worked with Prof. Christopher Webster, Dr. Derek Eaves, and Mr. Kevin Douglas on the development and validation of the HCR-20, a set of structured professional guidelines for the assessment of violence risk; and I have conducted numerous training workshops on the use of the HCR-20, often with Prof. Webster.

9.  The PCL-R, when used for clinical purposes, is scored on the basis of a comprehensive review of case history information and an interview; in cases where an interview is not possible, the test manual allows that the PCL-R can be administered on the basis of case history information if that information is sufficiently detailed.

10. Research indicates that PCL-R Total scores are correlated with violence in various contexts; but to date there are no published, peer-reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in the North America.

11. Research indicates that PCL-R Total scores are reliable when assessed in many populations; but to date only one published, peer-reviewed study has examined systematically the reliability of PCL-R scores in African-American correctional offenders in the United States. The results of that study were ambiguous, suggesting the need for further research on the reliability and applicability of the PCL-R in this context.

12. Research indicates that PCL-R Total scores are correlated violence when scored on the basis of case history information only; but the absence of an interview may negatively impact the reliability and predictive validity of PCL-R scores, particularly on items that rely heavily on behavioral observations of the offender and information concerning his future plans (i.e., Items 1, 2, 6, 7, 8, 13, and 16).

13. The HCR-20, when used for clinical purposes, is scored on the basis of a comprehensive review of case history information and an interview; in cases where an interview is not possible, the manual allows that the HCR-20 can be administered on the basis of case history information if that information is sufficiently detailed.

14. A limited body of scientific research indicates that HCR-20 ratings are correlated with violence in various contexts; but to date there are no published, peer-reviewed studies examining the predictive validity of HCR-20 ratings with respect to institutional violence in correctional offenders in the United States.

15. A limited body of scientific research indicates that HCR-20 ratings are reliable; but to date there are no published, peer-reviewed studies examining systematically the reliability of HCR-20 ratings in correctional offenders in the United States.

16. A limited body of scientific research indicates that HCR-20 ratings are reliable; but to date there are no published, peer-reviewed studies examining systematically the reliability of HCR-20 ratings in African-American individuals.

AFFIDAVIT OF STEPHEN D. HART: Page 3

17.    A limited body of scientific research indicates that HCR-20 ratings are correlated with violence when based on case history information only; but the absence of an interview may negatively impact the reliability and predictive validity of HCR-20 scores, particularly on items that rely heavily on behavioral observations of the offender and information concerning his future plans (i.e., Items C1 through C5 and R1 through R5).

18.    It is my opinion, which I hold with a reasonable degree of scientific certainty, that there is no direct scientific evidence that the PCL-R and HCR-20 are predictive of institutional violence in correctional offenders in the United States; and that the PCL-R and HCR-20 are not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in correctional offenders in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

_____
                                    Stephen D. Hart, Ph.D.
                                    19 May 2000

## MCP Hahnemann University

Operated by

**Drexel**
UNIVERSITY

**Kirk Heilbrun, Ph.D.**
Professor and Acting Chair
**School of Health Professions**
**Department of Clinical and Health Psychology**
Mail Stop 626 • 245 N. 15th Street • Philadelphia, PA 19102-1192
**TEL** 215 762.3634 • **FAX** 215.762.8625 • **E-MAIL** kheilbrun@compuserve.com
**www.mcphu.edu**

### Affidavit of Kirk Heilbrun

I, Kirk Heilbrun, state as follows:

1. I am currently Professor and Chair of the Department of Clinical and Health Psychology at MCP Hahnemann University. I am also Co-Director of the Law-Psychology Program, joint program in the Department of Clinical and Health Psychology at MCP Hahnemann and Villanova School of Law. I hold a Ph.D in Clinical Psychology from the University of Texas at Austin (1980), and completed a Postdoctoral Fellowship in Psychology and Law at Florida State University (1981-82). I am a Diplomate in Clinical Psychology and in Forensic Psychology, American Board of Professional Psychology.

2. I currently serve as a Violence Risk Assessment Consultant to the New Jersey Department of Human Services, Division of Mental Health Services and to the Pillsbury Corporation and the Giant Food Corporation as a Fitness for Duty Assessment consultant. I serve on the Advisory Board to the Forensic Psychology Program of the Federal Bureau of Investigation, and have previously served as a grant reviewer for the Office of Victims of Crimes for the United States Department of Justice. Between 1991 and 1993, I was the Clinical Director of Forensic Services for Central State Hospital in Florida, and prior to that was staff psychologist

1

and later Chief Psychologist in the Forensic Service, Florida State Hospital.

3. Since 1981, I have presented more than 80 lectures and workshops, primarily on risk assessment and risk management, to mental health and legal professionals. These have included invited lectures and presentations to the United States Department of Justice, the Federal Bureau of Prisons, the U.S. Medical Center for Federal Prisoners, the American Academy of Forensic Psychology, and the Forensic Services Unit of the Cook County Circuit Court. I have been the principal investigator or co-principal investigator on several grants to conduct research on risk assessment and criminal recidivism.

4. I have published extensively in the leading journals in my field on risk assessment and criminal behavior. These publications include more than 40 peer reviewed articles, five book chapters, and eight technical manuals. I am currently on the editorial boards of Law and Human Behavior, Journal of Threat Assessment, Criminal Justice and Behavior, Correctional Mental Health Report and the Journal of Behavioral Health Services and Research, and am an ad hoc reviewer for numerous additional journals.

5. Risk assessment and risk management have been a primary focus of my work since completion of my doctorate in 1980.

6. As a result of my extensive work in the field of risk assessment, I am familiar with the use of Psychopathy Checklist - Revised (PCL-R), having used it as a research instrument and in some applied clinical settings and forensic contexts with adults. I have administered the PCL-R and supervised its use in research. I am familiar with the published literature on the PCL-R and other risk assessment tools. Additionally, I have personal expertise in risk assessment and in the evaluation of reliability and validity as it relates to assessment instruments such as the PCL-R. I

2

believe that the PCL-R can be a useful too with which to assess the risk of future violent and nonviolent criminal behavior when used in the proper context and for the proper purposes.

7. Currently, insufficient research has been conducted to justify the use of the PCL-R for assessing future dangerousness or future risk for aggression amongst populations of criminal offenders during their incarceration. Because of the lack of scientific empirical research on the PCL-R for prediction of institutional violence, we do not know whether an individual's score on the instrument is related to the likelihood that this individual will commit acts of violence or aggression while in a secure prison environment. This is particularly true for prison settings that are the most structured and restrictive (the highest level of security). While it is certainly possible to conduct scientific studies to assess the validity of the PCL-R in predicting future violent behavior in such correctional settings, very few studies have addressed the institutional adjustment of *any* population (e.g., civil psychiatric, forensic psychiatric, jail, or prison) according to PCL-R score, let alone the specific population from the immediate case (death-sentenced or life-sentenced inmates) in the particular environment in which the defendant will be incarcerated (a maximum security prison). Until more relevant research has been completed and sufficient data are available in the published, peer reviewed literature to assess the instrument's predictive capacity in a prison setting, the PCL-R should not be used to judge an individual's risk of future violence in such a prison setting.

8. Although the predictive accuracy of the PCL-R has been studied in other settings, including psychiatric hospitals, that research does not provide an adequate basis on which to generalize the results to a different population, namely criminal offenders, in a different custodial setting. Those studies do not allow us to reach any conclusions about the predictive validity of

3

the PCL-R in the secure correctional institution setting because it is expected that a) civil and forensic psychiatric patients and convicted prisoners are dissimilar in significant ways, b) the treatment and psychiatric intervention needs of psychiatric patients are different than for prisoners, and c) the highly structured environment of prison is different in certain respects from even a structured forensic psychiatric hospital. Research based on psychiatric and community samples are substantially different from incarcerated samples, with whom little research has been focused on institutional adjustment. At this time, there is insufficient research to make generalizations from community behavior to prison behavior, and from psychiatric to life or death-sentenced correctional populations.

9. In any event, even the research conducted upon a secured psychiatric population suggests that the PCL-R may not be a strong predictor of institutional violence. I am the lead author on a study that examined how well the PCL-R predicted aggression in a mentally disordered offender population while in a forensic hospital (see, Kirk Heilbrun, Stephen Hart, Robert Hare, David Gustafson, Catherine Nunez and Adam White (1998) "Inpatient and postdischarge aggression in mentally disordered offenders" Journal of Interpersonal Violence 13(4) 514-27). We measured the PCL-R's predictive validity during the first two months and the last two months of secure forensic hospitalization. The PCL-R failed to predict aggressive behavior for the last two months of custody, as PCL-R scores were not significantly correlated with aggression during these final two months. The PCL-R had a statistically significant but modest-sized correlation with physical aggression during the first two months of custody. That correlation coefficient was .14, meaning that the PCL-R was accounting for approximately 2% of the variance in observed aggression. One conclusion of the study was that the PCL-R was not a

4

consistent predictor of institutional behavior, ranging from a modest association with aggression early in hospitalization to no association with aggression later in hospitalization. Any attempt to use the PCL-R to predict institutional aggression, therefore, would have resulted in a substantial rate of error. It should be added that none of the aggression observed in this study resulted in the death or serious injury of another individual.

10. While this study does not provide evidence about behavior in a prison setting, and should not be generalized to do so, it does provide some information concerning the overall predictive power of the PCL-R in a setting more similar to prison than in previous studies, which have followed individuals after they have been released into the community. Such research could be done, but has not, in a maximum security prison setting to determine the predictive validity of the PCL-R in relation to institutional violence by incarcerated life- or death-sentenced offenders. At this time, the PCL-R has not been tested and evaluated in this context.

11. There is also limited research at present using the PCL-R with African Americans or youth. Insufficient research has been performed to date to determine whether the meaning of PCL-R scores are comparable when the PCL is administered to African Americans.

12. Similarly, insufficient research has been done to determine whether the instrument is reliable and valid when used with a youthful or adolescent population. We do not currently know whether an adolescent who scores high on the PCL-R at the age 16 will persist in aggressive behavior beyond the late teens or early 20s. We do not yet have data to discriminate between "life course persistent" vs. "desistent" youth with respect to aggression; both may score high on the PCL when administered at the ages of 15 or 16, and the score may fail to discriminate between those who will persist and those who desist in aggression later in life. In

5

addition, not all adolescents achieve comparable levels of developmental maturity at a given chronological age. Influences such as child abuse and neglect, family dysfunction, cognitive deficits, learning problems, school problems, poverty, chronic exposure to violence, substance abuse, antisocial peers, and mental health problems can result in developmental delays, which could in turn mean that a particular adolescent was significantly less mature than comparably-aged peers. When an assessment instrument is applied with an individual at the very lower end of the technically-acceptable age range (e.g., 18 years old for the PCL-R), and such an individual has significant deficits in the areas described above, the instrument may yield results that are somewhat misleading if there is the assumption that a stable, adult "core personality structure" has been formed.

13. Absent such research, we cannot assume that the instrument possesses similar predictive validity when administered to African Americans or youths as it does with adult white males.

14. The PCL-R is a useful tool when used with a population and in a context in which it has been validated. Research conducted in non-prison settings cannot be generalized to the prison setting, and currently, there is insufficient scientific research to validly apply the PCL-R toward assessing future violence risk in a highly structured prison environment. Until sufficient research has been conducted with the PCL-R with this population and for this purpose, the scientifically sound conclusion is that it should not be used in this way.

15. The HCR-20, which is a risk assessment instrument that incorporates the PCL-R score as one of its items is a promising but new tool. Only in the past 1-2 years have studies begun to be published in the scientific literature. At this time, insufficient validation and

6

research has been completed on the HCR-20 to determine its predictive power. Use of the HCR-20 at present to predict violent behavior in a correctional setting would result in all the problems discussed in relation to the PCL-R (in the context of correctional populations and sentencing). As with the PCL-R, the HCR-20 should not presently be used to assessing future violence risk in a highly structured prison environment until that research has been conducted, peer reviewed, and published.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_Kirk Heilbrun signature_ _____

Kirk Heilbrun

5-15-07

Date

7



<u>Affidavit of Norman Poythress</u>

I, Norman Poythress, state as follows:

1. I am currently a professor in the Department of Mental Health Law and Policy at the University of South Florida, where I teach forensic assessment (psychological evaluations for legal contexts) and conduct research on a variety of law-and-psychology issues.

2. I hold a Ph.D in clinical psychology from the University of Texas at Austin (1977) and am currently licensed to practice psychology in Florida. I have previously been licensed in Michigan and Alabama. I am a fellow of the American Psychological Association (APA) and past-president of the American Psychology-Law Society (Division 41 of APA).

3. I have published more than 50 book chapters and articles in peer-reviewed journals, most on psychology-and-law issues. I am a co-author of <u>Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers</u> (1997), which is widely recognized as a leading resource on issues relating to psychological evaluations in the courts. I have served as faculty on risk assessment and risk management workshops for both clinical and legal (FBI, Secret Service) audiences and have served as a consultant to the Secret Service on issues related to risk management of persons who threaten government officials under their protection.

4. Prior to my academic career at the University of South Florida (1990-present) I worked as a forensic psychologist in maximum security forensic psychiatric hospitals (Center for

*Mental Health Law & Policy   The Louis de la Parte Florida Mental Health Institute*
University of South Florida   13301 Bruce B. Downs Boulevard   Tampa, Florida 33612-3807
(813) 974-4510   SunCom 574-4510   FAX (813) 974-9327   PDC/JJTA FAX (813) 974-4696

The University of South Florida is an Affirmative Action/Equal Access/Equal Opportunity Institution

Forensic Psychiatry, Ann Arbor, MI; Taylor Hardin Secure Medical Facility, Tuscaloosa, AL). In these settings my primary clinical duties were to conduct forensic psychological evaluations for the state courts on issues such as competence-to-proceed, insanity defense, and sentencing (including, in Alabama, capital sentencing). I have testified as an expert witness in state courts in Michigan, Florida, Alabama, and New Mexico, and before the House Armed Services Committee of the U.S. Congress regarding the U.S.S. Iowa incident.

5. Only very limited research is available that investigates the utility of the Psychopathy Checklist - Revised (PCL-R) in correctional settings for assessing the risk of violence posed by an individual while in custody. There is no such research available on individuals sentenced to life terms in maximum security prisons in the United States.

6. Error rates for the PCL-R, including false positive rates (the number of people who test high on the PCL-R and do not act aggressively), have not been established for estimates of risk for institutional violence for prison inmates generally or for maximum security detainees in particular. In order to assess these error rates, prospective studies which followed people sentenced to sufficiently long terms in custody need to be conducted. As a result of the lack of research, the predictive validity of a high score on the PCL-R in this context is unknown.

7. In a study which I co-authored, we administered the PCL-R to a group of youthful offenders in Florida and retrospectively assessed in-custody aggressive behavior [John Edens, Norman Poythress and Scott Lilienfeld (1999) *Identifying Inmates at Risk for Disciplinary Infractions: A Comparison of Two Measures of Psychopathy*, Behavioral Sciences and the Law 17:435-43]. We found a relatively low statistical association between PCL-R scores and institutional violence during the first year of incarceration, and we concluded that the PCL-R has only limited utility for purposes of individual classification. As our study is one of the few to

assess in-custody behavior, albeit using a retrospective methodology, and given our findings, it is inappropriate to conclude that sufficient research has been conducted at this time to reliably assess future behavior of the incarcerated based on PCL-R scores.

8. I know of no empirical research (e.g., survey of practitioners) that has attempted to establish a consensus in the psychological community as to the reliability and validity of using the PCL-R in the context of determining future dangerousness in a maximum security prison. In my opinion, the conclusions reached by Cunningham and Reidy in their recent review article [Mark D. Cunningham and Thomas J. Reidy (1998), *Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations*, Behavioral Sciences and the Law: 16, 333-351] fairly represent the state of the field:

"In summary, there is limited research regarding the prison behavior of psychopaths and most of the existing research is flawed by definition problems, lack of independent external criteria, small samples, and low base rates. Although some promising trends are apparent, estimations of the institutional assaultive potential of psychopaths remain tentative, particularly as a few studies cite no differences according to psychopathy ratings. Until a better research base develops caution should be exercised in utilizing the PCL-R in forecasting the likelihood of future serious person violence" (p. 343).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Norman Poythress

5/23/00
Date

1. I, John F. Edens, Ph.D., am a licensed clinical psychologist in the state of Texas (license number 3-1105) and a faculty member in the Department of Psychology at Sam Houston State University (SHSU). I received my doctoral degree in clinical psychology from Texas A&M University in 1996, after which I completed a two-year post-doctoral fellowship in forensic psychology in the Department of Mental Health Law and Policy at the Louis de la Parte Florida Mental Health Institute at the University of South Florida. I have been a faculty member at SHSU since 1998.

I have conducted research on the area of risk assessment since 1997 and have published a professional manual, two book chapters, and eleven professional journal articles related to forensic assessment generally, and five articles specifically related to psychopathy.

I also occasionally conduct risk assessments on convicted sex offenders who are being evaluated for possible civil commitment in the state of Texas. These evaluations by statute require an assessment of psychopathy. When conducting these assessments I administer the Psychopathy Checklist-Revised (PCL-R).

2. I am familiar with the PCL-R, having used it in both clinical and research settings. Being familiar with the literature on it and having published original research related to its use, I believe it is an appropriate risk assessment instrument that can be helpful in making judgments regarding future violence in certain instances in which there is sufficient scientific support to justify its use.

3. At this time, however, there are relatively few studies examining the utility of the PCL-R in estimating the likelihood or risk for aggressive acts of incarcerated people. Those studies that have been conducted among inmates suggest an inconsistent association (e.g., some studies showing a weak to moderate relationship and others showing no significant relationship) between being identified as a "psychopath" (i.e., PCL-R score $\geq$ 30) and engaging in higher rates of various forms of prison violence. I am unaware of any published studies that have examined specifically the utility of the PCL-R to predict violence among inmates with life sentences who are kept in 23-hour per day lock-down facilities.

4. In my own study of a multi-cultural (54% African American, 32% Caucasian, 12% Hispanic) sample of 50 youthful offender prison inmates incarcerated in Florida (Edens, Poythress, & Lilienfeld, 1999), which is one of the few to use the PCL-R to assess in-custody infractions, my colleagues and I found a non-significant association between PCL-R scores and violent infractions during inmates' first year of incarceration. More specifically, we found that 5 of the 10 (50%) PCL-R-identified psychopaths committed some form of violent act that was judged by staff to warrant a disciplinary report. Of the 40 inmates whose PCL-R score was below 30 (i.e., "non-psychopaths"), 18 (45%) committed a violent infraction during this same time period. Notably, our study, as well as most others that have examined institutional misbehavior among psychopaths, was a postdictive (rather than predictive) design, in that we used PCL-R scores in an attempt to predict behavior that had already occurred rather than predict future behavior. Whether it would have performed similarly in terms of predicting inmates' subsequent violent acts is unknown.

5. In conclusion, I have significant concerns about the appropriateness of using the PCL-R to identify inmates who are highly likely to commit future acts of institutional violence, given the current scientific research base that exists to support the association between psychopathy and institutional aggression while incarcerated.

I declare under penalty of perjury that the foregoing is true and correct.


John F. Edens, Ph.D.

5/22/00
Date

## AFFIDAVIT OF DONALD N. BERSOFF

I, Donald N. Bersoff, Ph.D., J.D., state that:

1.    I am a tenured full professor, Department of Clinical and Health Psychology, Medical College of Pennsylvania-Hahnemann University, and a tenured full professor, Villanova Law School. I have served in those capacities since January 1990.

2.    As a faculty member in the above universities, I direct a J.D./Ph.D. Program in Law & Psychology jointly sponsored by both institutions.

3.    I received a Ph.D. in School Psychology from New York University in 1965 and a J.D. from Yale Law School in 1976.

4.    I have been a full member of the American Psychological Association (APA) since 1965 and was elected a fellow in 1974. I was granted Diplomate status from the American Board of Professional Psychology in 1974. Since 1997 I have presented annual workshops on the ethics of forensic testimony for the American Academy of Forensic Psychology. From 1980-1981 I served as president of the American Psychology-Law Society and am a Fellow of that group.

5.    I have been a faculty member at several universities, including the University of Maryland School of Law, the Department of Psychology at the Johns Hopkins University, the University of Georgia, and the Ohio State University.

6.    From 1979-1989 I served as general counsel to the APA during which time I attended every meeting of the APA Ethics Committee and conducted all appeal hearings from decisions of the

1

Ethics Committee. From 1991-1994 I served on the APA's legislative body, the Council of Representatives, which adopted the current APA Code of Conduct (Code of Ethics) in 1992. From 1994-1997 I served on APA's 11-member elected Board of Directors. Part of my role was as a member of the Board's ethics subcommittee, reviewing all decisions of the Ethics Committee that led to expulsion or a stipulated resignation of APA members. I currently serve again on the Council of Representatives (1999-2001) and served as chair of the APA's Policy and Planning Board (1999-2000).

7. I am the author of <u>Ethical Conflicts in Psychology</u>, originally published by APA in 1995, and subsequently published in a second edition in 1999. It is a textbook used by a number of graduate departments of psychology as the basic text for courses in ethics. In that book I devote an entire chapter to the standards and ethics of testifying as a psychological expert witness in legal proceedings.

8. In all, I have published four texts, 25 chapters in texts, 47 articles in peer-reviewed journals, and presented at least 150 papers at major scientific and professional meetings. A great many of those publications and presentations concern ethical, legal, and policy issues in psychology. Most particularly, I have written and presented on the use and misuse of social science evidence in the legal system. In March 2000, I served as chair of a symposium on the impact of <u>Daubert v. Merrell Dow Pharmaceutical Co.</u> on the admissibility of social science evidence and presented a paper on that topic at the biennial meeting of the American

Psychology-Law Society.   In July 1997, at the invitation of the Federal Judicial Center, I gave an address at the National Workshop for Magistrate Judges on The Application of Daubert to Forensic and Social Science Evidence in Denver, Colorado.   In March and April 1996 I presented papers on the admissibility of expert psychological testimony at the Sixth Annual National Symposium on Mental Health and the Law and at American Psychology-Law Society, respectively.   I am currently drafting a law review article entitled, The Admissibility of Forensic and Social Science Evidence from Daubert to Kumho: A Quantitative and Qualitative Analysis. I have been selected to moderate an all-day session of a 3-day National Conference on Science and Law, co-sponsored by the National Institute of Justice, the Criminal Justice Section of the ABA, the American Academy of Forensic Sciences, the National Center for State Courts, the National District Attorneys Association and the National Science Foundation in collaboration with the National Academy of Sciences and the Federal Judicial Center.   I was the counsel of record for a Group of American Law Professors, submitting an amicus curiae brief in the original Daubert case before the U.S. Supreme Court in 1993.

9.   I have been retained, on a pro bono basis, by counsel for Defendant in the instant case for the purpose of advising this court regarding the validity of the conclusion drawn by Thomas V. Ryan, Ph.D. that the defendant "is at a relatively high risk for engaging in violence recidivism, even given the structure of incarceration in a federal maximum security penitentiary," based on

3

the Psychopathy Check List Revised (PCL-R) and the HCR-20. Ryan, Capital Sentencing Evaluation, May 12, 2000, at 7.

10.   For the purposes of this affidavit, I have reviewed Dr. Ryan's Capital Sentencing Evaluation ("Evaluation") of the instant defendant, and the affidavits of Kirk Heilbrun, Ph.D., Stephen D. Hart, Ph.D., Norman Poythress, Ph.D., and John F. Edens, Ph.D. in this case.

11.   Dr. Ryan's psychological evaluation of the defendant, a 22 year old African-American male, consisted solely of administration of the PCL-R, the HCR-20, and Dr. Ryan's assessment of a variety of historical and demographic factors deemed to be associated with violence recidivism. In arriving at his opinion, he also relied on materials supplied by county, state and federal agencies, including audio and videotapes. He never personally saw, interviewed, nor tested the defendant. Nevertheless, Dr. Ryan asserted "that the impact of not personally examining Mr. Haynes resulted in essentially no limitations regarding conclusions rendered." Evaluation at 2.

12.   Dr. Ryan makes three other statements that are relevant herein.   First, he concludes that the defendant exhibits psychopathic features and asserts, "There is a plethora of empirical studies which demonstrate that individuals with psychopathic personalities are at very high risk for violence recidivism, including those who are institutionalized." Evaluation at 6.   Second, based on the HCR-20, Dr. Ryan concludes the defendant is "at the high range regarding final risk judgement."

4

Evaluation at 6.   Finally, his ultimate conclusion is that the defendant "is at a relatively high risk for engaging in violence recidivism, even given the structure of incarceration in a federal maximum security penitentiary."  Evaluation at 7.

13.   Based on my knowledge of the American Psychological Association's Code of Ethics[1] ("Ethics Code"), the Specialty Guidelines for Forensic Psychologists[2] ("Specialty Guidelines"), the Heilbrun, Hart, Pothress, and Edens affidavits, and my research on the application of Daubert to forensic psychological testimony, it is my opinion, to a reasonable certainty, that the opinions of Dr. Ryan, quoted above, do not represent an appropriate application of generally accepted ethical principles to the issues presented and violate the generally accepted standards of forensic psychological practice.

14.   One of the major purposes of the Ethics Code and the Specialty Guidelines is to safeguard against the misuse of science and to ensure that empirically-supported and generally accepted scientific conclusions are presented to the court.   Forensic experts recognize that their credentials and testimony may have a profound impact on jury decisionmaking and, therefore, have a responsibility to confirm that their opinions are firmly grounded in science and that any inferences they draw from science are generally supported.

---

[1]   APA, Ethical Principles of Psychologists and Code of Conduct, 47 Amer. Psychologist 1597 (1992).

[2]   Committee on Ethical Guidelines for Forensic Psychologists, 15 L. & Hum. Behav. 655 (1991).

5

15.    Dr. Ryan first states that a plethora of empirical studies demonstrates that institutionalized psychopaths are at a very high risk of recidivism for violent conduct. That statement is misleading because it implies that the studies referred to involved criminal offenders in correctional institutions. In fact, there are many kinds of institutionalized populations, including those with mental disabilities who are civilly committed and those who are in forensic criminal institutions. Based on the affidavits of Drs. Hart, Heilbrun, and Edens, there are no published, peer-reviewed studies examining the predictive validity of the PCL-R or the HCR-20 with respect to institutional violence in correctional offenders in the United States. See Hart Affidavit at paras. 10, 14, 20; Heilbrun Affidavit at paras. 7, 8, 9, 14, 15; Edens Affidavit at para. 4.

16.    Second, Dr. Ryan fails to acknowledge the fact that the defendant is a young African-American adult. Both Drs. Hart and Heilbrun indicate that at most there is one study on the PCL-R and none on the HCR-20 evaluating the psychometric soundness (i.e., reliability) of these instruments with African-American correctional offenders, particularly youthful ones. See Hart Affidavit, paras. 11, 15, 16; Heilbrun Affidavit, paras. 11, 12, 13, 15. Dr. Ryan makes no mention of this fact and fails to acknowledge the resulting potential for inaccuracy in his conclusion.

17.    Third, Dr. Ryan, based solely on a subjective impression, concluded that his opinions were in no essential way limited by the

6

fact that he did not personally examine the defendant. This opinion is at variance with that of Dr. Hart, one of the authors of the PCL-R, that "the absence of an interview may negatively impact the reliability and predictive validity of PCL-R scores," particularly on 7 of the 20 items that rely heavily on behavioral observations and the assessment of future plans. Hart Affidavit at para. 11. See also para. 17 (same conclusion regarding the HCR-20). It is also at variance with at least one study indicating that administration of the PCL-R based solely on file review, as here, results in higher psychopathy scores than when combined with a personal interview.[3]  Dr. Ryan fails to acknowledge this source of inaccuracy as well.

18.    Based on the evidence of Drs. Hart, Heilbrun, Poythress, and Edens that:   (1)   There is not a generally accepted set of published, peer-reviewed studies examining violent recidivism on the population of offenders represented by defendant (young African-American males incarcerated in secure correctional facilities); (2) there are no studies using the PCL-R or the HCR-20 that establish error rates for in-custody populations concerning predictions of violent recidivism; (3 ) the use of the PCL-R and the HCR-20 to predict institutional violence in correctional offenders in the United States is not generally accepted in the relevant scientific community; and given that many federal cases have rejected psychological evidence in situations where the tests

---

[3]    R. C. Serin, Diagnosis of Psychopathy With and Without an Interview, 49 J. Clin. Psychology 367 (1993).

have not been validated for the specific purposes used in litigation, where there is insufficient published literature addressing the validity of the technique used in litigation, where there is the absence of a personal evaluation of the party by the expert, or, in the alternative, where the expert relied improperly on statements by the party calling the expert, it is my opinion that the evidence represented by Dr. Ryan's evaluation is inadmissible under Daubert.

19.   Dr. Ryan's conclusions are not only inadmissible in my opinion under Daubert, but may also be at variance with accepted professional standards.  The following provisions of the APA's Code of Ethics are relevant:

Standard 1.06:  Psychologists rely on scientifically and professionally derived knowledge when making scientific or professional judgments . . . .

Standard 1.15:  Because psychologists' scientific and professional judgments and actions may affect the lives of others, they are alert to and guard against personal, financial, social, organizational, or political factors that might lead to misuse of their influence.

Standard  2.01(b):   Psychologists'  assessments, recommendations, reports, and psychological diagnostic or evaluative statements are based on information and techniques (including personal interviews of the individual when appropriate) sufficient to provide appropriate substantiation of their findings. . . .

Standard 2.02:  (a)  Psychologists who . . . administer, score, interpret, or use psychological assessment techniques . . . do so in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of techniques.

(b)  Psychologists refrain from misuse of assessment techniques, interventions, results, and interpretations and take reasonable steps to prevent others from misusing the information these techniques provide.

Standard 2.04:  (a)  Psychologists who . . . administer,

8

score, interpret, or use assessment techniques are familiar with the reliability, validation, and related standardization or outcome studies of, and proper application and the uses of the techniques they use.

(b) Psychologists recognize limits to the certainty with which diagnoses, judgments, or predictions can be made about individuals.

(c) Psychologists attempt to identify situations in which particular . . . assessment techniques or norms may not be applicable or may require adjustment in administration or interpretation because of factors such as individuals' . . . age, race, ethnicity . . . .

Standard 2.05:  [P]sychologists . . . indicate any significant reservations they have about the accuracy of their interpretations.

Standard 3.03:  Psychologists do not make public statements that are false, deceptive [or] misleading . . . .

Standard 7.01:  Psychologists who perform forensic functions . . . base their forensic work in appropriate knowledge of and competence in the areas underlying such work, including specialized knowledge concerning special populations.

Standard 7.02: (a) Psychologists' forensic assessments, recommendations and reports are based on information and techniques (including personal interviews of the individual, when appropriate) sufficient to provide appropriate substantiation for their findings.

(b) Except as noted in (c) below, psychologists provide written or oral forensic reports or testimony of the psychological characteristics of an individual only after they have conducted an examination of the individual adequate to support their statements or conclusions.

(c) When, despite reasonable efforts, such an examination is not feasible, psychologists clarify the impact of their limited information on the reliability and validity of their reports and testimony, and they appropriately limit the nature and extent of their conclusions or recommendations.

Standard 7.04(b):  Whenever necessary to avoid misleading, psychologists acknowledge the limits of their data or conclusions.

20. Similarly, Dr. Ryan's report may be at variance with relevant provisions of the Specialty Guidelines:

9

Guideline VI(A): Because of their special status as persons qualified as experts to the court, forensic psychologists have an obligation to maintain current knowledge of scientific, professional, and legal developments within their area of claimed competence.

Guideline VI(H): Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statement, opinion, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or testimony.

Guideline VII(A): Forensic psychologists make reasonable efforts to ensure that the products of their services, as well as their own public statements and professional testimony, are communicated in ways that will . . . avoid deception.

Guideline VII(B): Forensic psychologists realize that their public role as "expert to the court" or as "expert representing the profession" confers upon them a special reponsibility for fairness and accuracy in their public statements.

Guideline VII(D): Forensic psychologists do not, by either commission or omission, participate in a misrepresentation of their evidence . . . .

21. Only the APA ethics committee can judge whether an APA member has violated the APA's code of ethics. However, it is my opinion, to a reasonable certainty, that in rendering the conclusion that the defendant is a "relatively high risk for engaging in violence recidivism," given the dearth of data generally accepted in the relevant psychological community to support his opinion, his improper generalization of the test scores to the defendant, his failure to appropriately address the lessened accuracy of his findings as a result of the absence of a personal interview, and his misleading use of extant studies, Dr. Ryan acted below the professional standards of those holding themselves out as

10

forensic psychologists.

I declare under the penalty of perjury that the foregoing is true and correct.

Donald N. Bersoff, Ph.D., J.D.
May 24, 2000

11

# EXHIBIT 6

I, Thomas V. Ryan Ph.D., ABPP, declare as follows:

1. I testified as an expert witness on the issue of future dangerousness in the case of *United States v. Richard Thomas Stitt*.

2. Based on the defendant's score on a psychological instrument called the Psychopathy Checklist-Revised (PCL-R), I testified that he met the criteria for psychopathy. I testified about the defining characteristics of psychopathy and about the utility of the PCL-R as a predictor of future violence in prison. Based upon the defendant's PCL-R score, I offered the opinion that he would be a future danger if sentenced by the jury to life without parole.

3. Based upon my current understanding of the literature and the obvious controversy about forensic clinicians' use of the PCL-R, I would choose not to use this instrument. Although I did not recognize it at the time, I am aware now that the PCL-R is not, and was not, appropriately relied upon to assess an individual's future dangerousness in federal prison. As an ethical and responsible clinician, I am informing all concerned that the statements about the defendant's future dangerousness that I made at trial were not grounded in current scientific literature and I do not stand by them now.

4. My testimony to the best of my recollection, without reviewing the transcript of my testimony about the defendant, included the following statements relating to the PCL-R and psychopathy:

   a) that based on his score on the PCL-R, the defendant presented a high risk of future violence even in the context of a maximum security federal prison;
   b) that because he was a psychopath as defined by the PCL-R, the defendant was essentially untreatable and not amenable to rehabilitation;
   c) that because he was a psychopath as assessed with the PCL-R, the defendant would not "burn out" after age forty like other violent offenders, but instead would continue to be violent;

5. The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of *United States v. Willis Haynes*. In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy. The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score that would support a future dangerousness determination. I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists. I then determined that I would withdraw my report. As a result, no testimony about psychopathy or the PCL-R was introduced at that trial.

6. Although the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial, no such challenge was brought by defense counsel. The challenge in *Haynes* rested on the fact that the existing scientific literature did not demonstrate a relationship between PCL-R scores and prison violence sufficient to conclude that a high scorer would likely be dangerous in prison. The *Haynes* motion was filed approximately 18 months after the trial in *Stitt*.

7. My experience in *Haynes* prompted me to review my future dangerousness testimony in the *Stitt* trial.

8. At the time I testified in Stitt, there was enthusiasm among psychologists about the PCL-R's potential use as a tool for assisting mental health professionals in determining whether mentally disordered individuals could safely be released into the community. Because it was a newly developed instrument, however, there were few published, peer reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in North America. It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

9. In a comprehensive review of the literature relating to institutional violence and the PCL-R that focused on the use of the PCL-R in capital sentencing proceedings, John Edens, a psychologist with extensive experience in the area of risk assessment, concluded, "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated clearly is untenable...." Edens, J., Petrila, J., & Buffington-Vollum, J.K, 2001, Psychopathy and the death penalty: can the PCL-R identify offenders who represent "a continuing threat to society?" Journal of Psychiatry and Law, 29, 433-481. Although other experts have expressed different opinions, I generally agree with Dr. Edens' conclusion, and believe it is an accurate summary of the prevailing view among forensic psychologists.

10. Since withdrawing my report in the *Haynes* case, I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial. In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies. Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since *Haynes*. The government's continued confidence in my work speaks, I believe, to the integrity of my assessments and my professional decision-making.

11. In addition to the PCL-R, I based my testimony in the *Stitt* trial on documents pertaining to the defendant and his history provided by the government, my own clinical interview of Mr. Stitt, my administration and interpretation of both the PCL-R and another psychological instrument, the Minnesota Multiphasic Personality Inventory

(MMPI), and the psychological assessment of the defense psychologist, Dr. Thomas Pasquale, which was provided to me.

12. In the course of discussions with counsel assisting Mr. Stitt in his post-conviction proceedings, I have been advised of significant historical and background facts pertaining to Mr. Stitt that I did not know of at the time of my evaluation and testimony and were not brought to my attention. Had I known of these facts at the time of my evaluation, they may have caused me to arrive at conclusions different from the ones I testified to at trial. Had I not known of them at the time of my evaluation but simply been cross-examined based on assertions that such facts were true, I probably would have testified that such facts, if true, would cause me to question the conclusions that I had previously reached about this individual.

13. I am speaking specifically of information regarding the family history and upbringing of the defendant. I believed and testified that although the defendant was born to a mother who was young and unable to appropriately care for him, he had been raised by a warm and nurturing grandmother until the age of twelve, in a home that was across the street from his maternal and paternal grandfathers, who engaged in fatherly activities with the defendant during his childhood. I believed that the pattern of behavioral problems manifested by the defendant as a child were unexplained by any major mental illness or other factor and therefore that he had manifested a conduct disorder at an early age. This, together with the defendant's continued criminal conduct as an adult, and the psychological profile indicated by his MMPI results, led me to conclude that as an adult the defendant did not suffer from a major mental illness or other mental disorder and was best described as having an antisocial personality disorder.

14. Post-conviction counsel for Mr. Stitt have advised me that their investigation has indicated that in fact his grandmother's home was a chaotic, violent and frequently terrifying environment; that Mr. Stitt lost even that home when his grandmother died when he was eight years old; and, most significantly, that acute mental illness has been diagnosed in Mr. Stitt's mother and at least one (and possibly two) of her siblings.

15. Although all of this information would have been important for my evaluation, the information about the diagnoses of the defendant's mother and her first-degree relatives would be very helpful. I have been advised that the defendant's mother experienced repeated involuntary emergency psychiatric hospitalizations for acute episodes of bipolar disorder, and that at least one aunt has been diagnosed with bipolar disorder as well.

16. Bipolar and other mood disorders have a higher than normal genetic link, and are diagnosed on the basis of an individual's behavior and family history. With an awareness of Mr. Stitt's reportedly remarkable family history of bipolar disorder, his behavior could be cast in a dramatically different light. For example, Mr. Stitt scored high on the mania scale of the MMPI, leading to a recommendation in the report of his scores to consider a diagnosis of mood disorders including manic episodes, hypomanic states, and cyclothymia. I certainly would have seriously considered this result more heavily had I been aware of the diagnoses of Mr. Stitt's mother and his aunt. Instead, I focused on the

psychopathic deviance scale, on which Mr. Stitt also scored high, and emphasized personality qualities that were similar to the features of psychopathy that he had scored high for on the PCL-R.

17. Similarly, I would most likely interpret differently statements that Mr. Stitt made to me during our clinical interview. For example, when asked to rate himself on a scale of one to ten, Mr. Stitt awarded himself a fifteen. He told me that if released he would pursue an acting career in Hollywood, and that he could anticipate no difficulty in achieving such a goal. With an awareness of his bipolar family history, this could be alternatively viewed as those indicative of mania or hypomania, suggesting the possible presence of a mood disorder.

18. Furthermore, information about a bipolar family history would have caused me to question whether the early behavior problems manifested by Mr. Stitt were indications of early onset bipolar disorder. The out-of-control behavior described in the information I was provided about Mr. Stitt's childhood could be consistent with the behavior of children suffering from early onset bipolar disorder, and therefore could have been symptomatic of a mental illness rather than a volitional decision by Mr. Stitt not to conform to societal expectations. If, on cross-examination at trial, Mr. Stitt's counsel had questioned me in this area and informed me about the family history of bipolar disorder, I certainly would have conceded that it raised substantial concerns about the possibility of mental illness in Mr. Stitt.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and recollection at this time.

Thomas V. Ryan, Ph.D., ABPP
May 12, 2003