IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,          No. 4:97CR00243-02 JLH

     v.                                 January 31, 2014
                                        Little Rock, Arkansas
DANIEL LEWIS LEE,                       9:33 a.m.

                    Defendant.


**TRANSCRIPT OF ORAL ARGUMENT ON DEFENDANT'S MOTIONS**
BEFORE THE HONORABLE J. LEON HOLMES,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

On Behalf of the Government:

    MR. JOHN M. PELLETTIERI, Assistant United States Attorney
       U.S. Department of Justice
       Criminal Division, Appellate Section
       950 Pennsylvania Avenue, N.W., Room 1264
       Washington, D.C. 20530


On Behalf of the Defendant:

    MR. KARL SCHWARTZ, Chief Assistant Federal Public Defender
    MS. JENNIFER A. MERRIGAN, Assistant Federal Public Defender
       Office of the Federal Public Defender
       Capital Habeas Unit
       800 King Street, Suite 200
       Wilmington, Delaware  19801



Defendant Not Present.


    Proceedings reported by machine stenography and displayed
in realtime; transcript prepared utilizing computer-aided

P R O C E E D I N G S

THE COURT:  Everyone, be seated.

We're here this morning for argument on pending motions in the case of Daniel Lewis Lee versus United States of America, which is Case No. 4:06CV1608 and criminal case 4:97CR243.

Are the parties ready?

MR. SCHWARTZ:  Yes, Your Honor.

MR. PELLETTIERI:  Yes, Your Honor.

THE COURT:  All right.  Mr. Schwartz, you're the moving party, so you may proceed.

MR. SCHWARTZ:  Thank you, Your Honor.  Shall I do so from here or would you prefer --

THE COURT:  If you'll come up to the podium, I think that would be easier for me and the court reporter.

MR. SCHWARTZ:  Thank you.

May I put my water here, Your Honor?

THE COURT:  Yes, wherever you want.  Just get comfortable.

MR. SCHWARTZ:  If the Court will just indulge me.

Good morning, Your Honor.

THE COURT:  Good morning.

MR. SCHWARTZ:  Karl Schwartz on behalf of Daniel Lee, along with Jennifer Merrigan.  We're of the Delaware Federal Public Defender's Office.

Your Honor, Mr. Lee is the only person on the federal death

row whose capital sentencing proceedings relied on aggravating evidence of future dangerousness based on a psychological instrument, the Hare Psychopathy Checklist, which I'll refer to as the PCL-R, that labeled him a psychopath.  Every other federal capital case involving such evidence has either been reversed after judgment or the evidence was precluded from ever being presented to the jury in the first place.  This is because that instrument has been thoroughly disavowed by the scientific community as an unreliable and invalid predictor of an individual's future dangerousness in prison.  It has been disavowed, including by the government's own expert Dr. Ryan in this case.  The government has never contested that the PCL-R evidence as a predictor of future dangerousness in prison is false.  There has never been any empirical support suggesting that the instrument can be used as a reliable predictor of future dangerousness in prison.  The government has never contested that.  After their expert Dr. Ryan disavowed the instrument as unreliable in the case of *United States v. Haynes* in the year 2000, they've never used it again.  And the government has never contested that the challenge that we argue Mr. Lee's trial counsel should have made was available to Mr. Lee's counsel at trial, and the government has never contested that after the jury returned a life sentence for the codefendant Mr. Kehoe, the more culpable actor by the government's argument and evidence at trial, and when the jury

returned life for Mr. Kehoe, the prosecutors in the room, as well as the United States Attorney, sought to withdraw the death penalty and sentence Mr. Lee to life.

In essence, Your Honor, our motion seeks to give Mr. Lee the opportunity he never has had to challenge the unscientific and utterly unreliable evidence that led to his death sentence.

I would like to, if I may, give -- I hope to be no more than an additional 25 minutes. And please feel free to cut me off or ask me any questions.

THE COURT: I will feel free to ask you questions, but I'm not going to cut you off. But I will ask questions as I feel like I need to. But go ahead.

MR. SCHWARTZ: Sure. But I'd like to give Your Honor and Mr. Pellettieri a road map of this argument.

I'm going to first talk about how both 2255 counsel and trial counsel were ineffective, because I think ultimately those questions, at least at a preliminary level, have to be discussed and addressed by the Court, even in this motion.

I'm going to second address why this motion is not a successive claim, as the government alleges, and falls well within the parameters of *Gonzalez v. Crosby*.

Third, I will talk about the recent case, which I know the Court is aware of, *Trevino v. Thaler,* in which the United States Supreme Court held that ineffective assistance at initial-review collateral proceedings can constitute cause even in

jurisdictions that permit these claims, ineffective-assistance-at-trial claims to be brought on direct appeal, and I'm going to argue why the holding of that case must apply in a 2255 proceeding.

And finally I'm going to argue why the appropriate avenue for raising this argument is 60(b), and that is, why this case fits squarely within the 60(b) framework.

So first in regard to postconviction counsel, I think even the most cursory review of their pleadings and the history of this case leads to the inescapable conclusion that they were woefully ineffective.  Your Honor, they pled a footnote.  That was their claim.  They pled no supporting facts.  They provided no supporting affidavits.  2255 capital counsel has to be obliged, is obliged to know the pleading requirements of 2255.  And when they assert a claim, a valid claim like this, to simply leave it unsupported is beyond inexcusable.  And I think if this Court simply looks at the language of the predecessor judge, Judge Eisele, in his denial of the Rule 59(e) motion, I think the deficient performance is manifest.  If you'll indulge me just a few quotations from that decision.  Judge Eisele stated that, quote:  "Petitioner failed to adequately present facts sufficient to support his ineffective-assistance-of-counsel claims.  Petitioner failed to present any facts, which, if true, would have entitled him to relief.  Petitioner's obligation was to present facts to demonstrate the need for an evidentiary

hearing.  He failed to do so.  Petitioner's contention that the court," quote, "never put Mr. Lee on notice that affidavits or other alternative measures would be considered or imposed any scheduling order requiring that affidavits be submitted rings hollow.  Petitioner's counsel was on notice of the law and pleading requirements for Section 2255 motions."  Any capital counsel would be, Your Honor.  And then finally the court says: "Petitioner offers no explanation for why such affidavits or other supporting information were not provided to the Court before it ruled on his original motion for 2255 relief.  Had they been, the Court might have determined that an evidentiary hearing was required.  However, the Court is foreclosed by existing legal principle from considering the information now."

And in their declarations that Your Honor has that we've attached to the 60(b) motion, counsel, both 2255 counsel were quite candid that they thought they were abiding by the pleading requirements of 2255.  All one need do is look at the case of *Saunders v. United States* in this circuit and they would have known that phantom witnesses and phantom evidence does not suffice in a 2255.

As to prejudice, they were foreclosed.  As the court said, Mr. Lee was foreclosed by existing legal principles from considering and -- for having the court to consider the information, and that the court might have granted a hearing, but the late submission ensured that they would not get a

hearing.

I will talk about *Trevino v. Thaler*, but assuming for the moment that *Trevino* is applicable, I think under that standard, ineffective assistance, sufficient performance, and prejudice is established.

As for the prejudice stemming from trial counsel's failure to raise this issue, I would argue it was manifest.  I would caution the Court, though, that in making the 60(b) determination, the standard is that we present some evidence of trial counsel's ineffectiveness, that there must be a substantial claim of ineffectiveness.  We're asking the Court to reopen this judgment, to set an evidentiary hearing so that we can demonstrate through evidence that trial counsel was ineffective.  And at some point this morning if the Court would like to know what we would demonstrate, I would be happy to oblige the Court.  But the determination at this point is a basic determination, is there some merit, and I would argue that there is.  And we can begin with the factual finding of Judge Eisele, the factual finding that he made in his order vacating the death sentence, and it's a factual finding that's never been disputed.  He said, and I'm quoting:  "The government highlighted to the jury that psychopathy is a clear indication of future dangerousness.  In sum, it is now apparent from the government's opening statement and the brevity of its own direct case on the issue of future dangerousness that the government

intended from the beginning to make its most compelling showing of future dangerousness through its cross-examination of Dr. Cunningham and its rebuttal testimony of Dr. Ryan."  Your Honor, Dr. Cunningham was the defense expert in the case who was cross-examined at length as to not only future dangerousness, but the PCL-R, as well, and its relation to future dangerousness in prison, which I will talk about.

Going back to the court's language, "Hence, the Court must ask:  Would this jury have given defendant Kehoe life without parole and defendant Lee the death penalty if, one, the government had not used Dr. Cunningham at all, or two, if the government had not been permitted to open up an area on cross-examination that Dr. Cunningham had not addressed during direct examination?"  Your Honor, the court concluded that it was, quote, "very questionable whether the jury would have given Mr. Lee the death penalty" had that not taken place.

And, Your Honor, Judge Eisele was making these factual findings not on a cold record.  He was the judge that sat through the penalty phase hearing and heard the testimony and the argument of the government.

THE COURT:  I know you're talking about the *Strickland* factors there, and I've got some other things that we have to get to, but let's stop there and pause a minute and talk about what Judge Eisele said about the first prong of the *Strickland* factor, which was, in denying the motion for reconsideration, he

said he didn't see how counsel could be held responsible for anticipating that Dr. Ryan would withdraw his opinion about the validity of the Hare test and predicting future dangerousness in prison.  That was his comment, I think, on the first prong of the *Strickland* test, which you don't say much about.  You address it a little bit in your brief, but you don't say much about it.  So I need you to address that for me in case we get to the point where that's important.

MR. SCHWARTZ:  Sure.

THE COURT:  The other thing about the second prong is that in the very most recent Eighth Circuit decision that refers to the argument that was made about junk science and say we've already held that it's going to be difficult to establish -- I'll just look at it and tell you exactly what it said, or what they said.  "We have previously concluded that there is no threat of unfair prejudice from elicitation in this case of psychopathy evidence by the government during sentencing."  And that would seem to go to the second prong of the *Strickland* test.  So I need you to address both of those things for me.

MR. SCHWARTZ:  Let me do that right now.  It's in my outline, but let me address it right now.

THE COURT:  If you want to come to it later, you may. Before you get through, make sure we --

MR. SCHWARTZ:  Because it's on the Court's mind, I choose, if it's all right with the Court, to address that right

now.

THE COURT:  Sure.

MR. SCHWARTZ:  So in regard to the Eighth Circuit's -- Your Honor is talking about the Eighth Circuit's opinion in the affirmance of the district court's denial of 2255 relief, the 2013 opinion.

THE COURT:  Right.  It's the 2013 opinion.

MR. SCHWARTZ:  Right, right.

THE COURT:  March 13 -- April 29, 2013.

MR. SCHWARTZ:  Right.  And I invite the Court to ask additional questions if I'm not satisfying the Court's concern, because the issue on appeal before the Eighth Circuit was whether the cross-examination and the rebuttal testimony of Dr. Ryan exceeded the scope of direct examination, and it was also whether it exceeded the scope of the charged aggravating factors.  That was the issue that the Eighth Circuit had dealt with on direct appeal.  The question of the probative value and the reliability of the Hare Psychopathy Checklist was never raised before that court.  And the court properly assumed the relevance of that diagnostic instrument.  There was no reason for the court to question the relevance.  So it made sense that in the context of a death penalty proceeding, when an expert takes the stand, that the government be permitted to cross-examine that expert as to diagnoses even if he didn't testify to diagnoses on direct examination.

So the question as to the utter unreliability, as to the fact that this is nothing more than pseudoscience was never before the Eighth Circuit.  And, as I said, the court was correct, I think, in finding that without its probative value being raised, without its probative value being questioned, assuming its probative value, that there was nothing wrong with its admission.

THE COURT:  And I understand that with respect to the original appeal, but here in the 2255 appeal, part of the argument was that the death penalty was imposed on Lee arbitrarily, and in making that argument, part of the presentation in the brief was the reliance on the junk science, which was the cross-examination of Dr. Cunningham about the very tests that we're here on.  And in the context of ruling that the death penalty was not imposed arbitrarily, the Eighth Circuit said that we've previously concluded that there is no threat of unfair prejudice from the elicitation in this case of psychopathy evidence.

So have they ruled on the second prong, on the prejudice, had they already ruled that it would not make any difference?

MR. SCHWARTZ:  No, Your Honor.  And please correct me if I'm wrong, but it was my clear understanding from that language that they were referring back to their direct appeal decision.

THE COURT:  They were.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

MR. SCHWARTZ:  And that issue was never raised on direct appeal.  Not even a hint, Your Honor, of that issue was raised.  Everybody assumed, without any basis for the assumption and totally wrongly, that that evidence had probative value; that despite its enormous prejudicial impact, that it had some probative value, and it had none.  And this was known within the scientific community.  It was known among defense practitioners.  There were articles published about this.  And when the doctor was confronted about this in the year 2000, he didn't say only today am I disavowing that.  He said ultimately, in 2003, he said, Had I been confronted with this in 1998, a year before Mr. Lee's trial, I would have disavowed it.  The information was out there.  And I assure the Court, and the Court can look through the direct appeal briefings, there is nothing about the reliability of this instrument.  And that is the crucial distinction and that's the basis of the claim that we would seek to raise if this Court reopens the judgment; that this utterly false pseudoscience for which there has never been a basis of scientific methodology, there's no empirical support that leads to the conclusion that the government sought the jury to find in this case, that Mr. Lee would represent a future danger in prison.  There's no evidence whatsoever to support that.  And that was never raised before the district court or the Eighth Circuit.

THE COURT:  All right.  And then one more thing on

that point and then we'll talk about the other prong of the test. And I don't want to turn this into a full-blown hearing on that issue because that's not where we are, and you've made that point pretty clearly and you're correct in that.

And I've lost my train of thought, so just move on. I'll come back to it.

MR. SCHWARTZ: I believe, Your Honor -- and please, again, correct me if I'm wrong because I want to address your concerns. I believe in terms of deficient performance, Your Honor was concerned about Judge Eisele's statement in his order that if Dr. Ryan only disavowed this in the year 2000, how would it have been deficient in 1999 for counsel not to have raised this challenge.

THE COURT: Right.

MR. SCHWARTZ: Is that right?

THE COURT: That is right. But it came back to me what I wanted to ask you about. And the government argues this, and it is correct. If you go back through Dr. Cunningham's cross-examination, when he was asked about Dr. Ryan's analysis, he did testify that Dr. Ryan had scored him within the psychopath range.

MR. SCHWARTZ: Correct.

THE COURT: But went on to say, as you argue now, that that is not a valid predictor of dangerousness in prison.

MR. SCHWARTZ: Right.

THE COURT:  And so the government has made the argument the evidence that you want, that you say the jury should have heard, they did hear.  And so tell me how you establish prejudice from the failure of defense counsel to bring in additional witnesses to testify to something that Dr. Cunningham testified to?

MR. SCHWARTZ:  I'm glad you asked that question, Your Honor, and let me answer it in two ways.  First of all, our request ultimately would not be, or our position would not be that counsel should have called more witnesses to testify that the test was unreliable.  Our position is that had counsel made an effective *Daubert* challenge, one of two things would have happened.  Either the evidence would never have come in because there was no empirical support out there for its reliability, or Dr. Ryan would have done -- there's no reason to disbelieve that Dr. Ryan would not have done what he did in the year 2000 or in the year 2003.  In fact, in 2003, he said that he would have walked away from this evaluation in a 1998 trial.  There's a difference between being able to fight it out in a courtroom and being permitted to put on evidence that has no reliability whatsoever and a highly prejudicial impact.  And I don't say this -- I don't say this -- I'm not trying to be informal with the Court, but I think it's a very good analogy.  I mean, it would be like saying, could a witness testify to -- an expert witness testify to astrology.  And I think we made that point in

our brief.  And if I had an expert to get up and say astrology is not sound science, would that cure the error?  And I think the answer, especially with that prejudicial PCL-R, the answer is no.  This is a question of exclusion.  There was no basis for this evidence.

And I think the second point I want to make is that, you know -- so there shouldn't be a battle over this evidence.  The second point is, if you look at the testimony -- and part of my presentation goes through a little bit of that, and whether we get to it or not, it isn't important.  But Dr. Cunningham was eviscerated through this cross-examination.  There were two discrete points that he attempted to make, but if you read the cross-examination of Dr. Cunningham, what you come away with is that he was attempting to hide Dr. Ryan's diagnosis, and that charge was put to him by the prosecution.  The prosecution did a whole long cross-examination about, You read Dr. Ryan's report, you understood it, you testified to the jury about it, but you didn't tell this jury that he diagnosed Mr. Lee as a psychopath, did you?  And that's just one piece of it.  I mean, the prosecutor cross-examined Dr. Ryan to the extent of, This Hare Psychopathy is the gold standard, and it would be for capital defendants.  This was during voir dire.  But in this case, you decided not to use it.  And there are many, many more examples of that.

So I guess I have a two-pronged answer.  The first is that

it's not a question of did the defense get a chance to respond. It's this evidence was so damning and so prejudicial that it had no business in this trial and it had a prejudicial effect.  And my second response is that Dr. Ryan -- the cross-examination of Dr. Ryan really destroyed him as a witness on this topic.  So I think as to prejudice, a fair reading of the record amply makes it out.

THE COURT:  Let's talk about the other prong.  Judge Eisele says:  "The petitioner has not explained how counsel would have been expected, almost one year before Dr. Ryan himself rejected the PCL-R as an effective predictor of future conduct, to challenge the scientific underpinnings."  So he's commented on the first prong already.

MR. SCHWARTZ:  Right.

THE COURT:  And so talk to me about that.

MR. SCHWARTZ:  Thank you.

So Judge Eisele's misunderstanding of this point is directly attributable to 2255 counsel's ineffectiveness.  Had they properly pled this information, Judge Eisele would have granted a hearing and the following would have been made very clear, as we did in our 60(b) motion, that it did not matter when Dr. Ryan disavowed this instrument.  He could have disavowed it in 2010.  The point is that the instrument for predicting future dangerousness in prison was nothing more than pseudoscience, and that was known as early as 1997.  There were

articles written about it. We cited them in our briefing. And not only that, Dr. Cunningham, who was the defense expert, had written one of those articles, so that defense counsel surely had to be on notice of the utter unreliability of this instrument as a predictor of future dangerousness. It wasn't for Dr. Cunningham to move in limine. It was for defense counsel. And Dr. Cunningham's affidavit that we attached and that Judge Eisele referred to makes it very clear that had he been confronted with this available information in 1998, a year before Mr. Lee's trial, he would have disavowed his reliance on it as a predictor of future dangerousness in prison, as he did when he was confronted in the year 2000.

THE COURT: Let me ask you this. And I know you talked about this a little bit in your brief. But the other question I have -- and let's go ahead and get it out and then we can move on to the next topic. On the first prong of the *Strickland* test, once the government had announced we're not going to put on any psychological evidence in our case in chief in the sentencing phase against Mr. Lee, and defense counsel and Dr. Cunningham decided we're not going to address the risk of future dangerousness, that's not going to be any part of our presentation, we're not going to deal with that at all. We're going to talk about his youth and his background and what led him to this position, but we're not going to get into that issue.

MR. SCHWARTZ:  Yes, sir.

THE COURT:  Why wouldn't it be reasonable then for defense counsel to think, Well, then we're not going to have to deal with the Hare test, it's not going to come in because they promised not to put it in, they can't put it in on direct?  And that's, in fact, in one of Judge Eisele's orders now, in their case in chief they can't put it in.  We're not going to address it, so it can't come in as rebuttal.  So this evidence is never going to come in.  We've dealt with it now.

MR. SCHWARTZ:  Right.

THE COURT:  Why would that be an unreasonable conclusion for defense counsel to make?

MR. SCHWARTZ:  I have two responses to that.  The first is the Eighth Circuit's reversal of Judge Eisele.  And, Your Honor, if you'll allow me, I tried capital cases for 17 years as a trial attorney, and I knew, as the Eighth Circuit stated, that when you're in a capital proceeding, the rules of evidence are relaxed.  And if you put an expert on the stand to testify to what Dr. Cunningham testified to, you had better be ready for him to be cross-examined on any diagnoses that may be relevant to your client, regardless of any representations that the government may have made about what they're going to introduce in their case in chief.  And that's what the Eighth Circuit said, and that's right.  And you don't have a right to be less than prepared in the hope that the government will hew

to the evidentiary rules that might exist at a guilt phase of a trial but that will not exist during the course of the penalty phase where the rules of evidence are relaxed.

My other response is that those discussions occurred during the course of the penalty phase so that when -- and I guess maybe this relates a little bit to prejudice as well. I mean, the day that the defense counsel got that report, they were duty-bound to file a motion in limine to preclude the use in any way whatsoever, be it on direct, be it on cross, be it in argument, of the use of the PCL-R instrument, period. And the reason I say "period" is, even if they did not make the linkage that they did during the course of cross-examination and argument between future dangerousness and -- future dangerousness of the PCL-R -- I'm sorry -- and future dangerousness in prison, I dispute with all due respect to my friend Mr. Pellettieri's argument that they didn't make that linkage, but they did. But even if they did not, in a federal death penalty case, if the defendant is not sentenced to death, then he will spend every day of the rest of his life in prison. And so that future dangerousness is only relevant in a federal capital case as it pertains to the defendant incarcerated. So that any evidence presented as to future dangerousness that cannot be connected to future dangerousness in prison is irrelevant to that determination and highly prejudicial.

THE COURT: All right. You can move on. Thank you.

MR. SCHWARTZ:  Let me see what we've covered, Your Honor.

THE COURT:  You can take a minute and look over your outline.  I got you off track.

MR. SCHWARTZ:  No, that's perfectly all right.

Let me just touch on a couple of things and then I'll talk about the applicability of *Trevino* and 60(b).  And if Your Honor doesn't need to hear that --

THE COURT:  Oh, I need to hear that.  That's a threshold issue and it's a big issue.  I don't want to turn this into a full-blown 2255 hearing on *Strickland*.  That's not what we're here for, and I recognize that.  But really we've got to deal with the threshold issue, and that's going to be whether this is a successive petition or is it a proper Rule 60(b) motion.  That's critical and essential and an important issue and you need to address that.

MR. SCHWARTZ:  And thank you for saying that, Your Honor.

So what I will do is, instead of going through, I will touch on the points I was going to make relating to how we meet the threshold -- how we meet the "some merit" requirement to deny an IAC claim.

So the Court knows that despite the fact that Mr. Kehoe was the person who committed the most aggravating act in this case, the killing of a young girl, the fact that Mr. Kehoe was seen as

the leader, the jury returned life for him and death for Mr. Lee.

I won't go through, as I was going to, the cross-examination of Dr. Cunningham.  It's in our pleadings.  I think it makes the point that I attempted to make.  I won't go through in great detail the many federal cases in which this evidence -- federal death penalty cases in which this evidence has been roundly rejected on arguments that are less -- strike that -- have been roundly rejected and I think for the same reason that I'm suggesting to you.  Your Honor knows of the case of *United States v. Sampson*, pretrial prohibited the use of the term "psychopath."  The *Stitt* case, where the court was reasonably satisfied that Dr. Ryan's testimony was erroneous, the case was reversed on other grounds, but the court likened it to a DNA situation where if we found out a DNA test was wrong, would we allow the judgment to stand, and the answer is no.  The *United States v. Taylor* case out of the Northern District of Indiana, the uncertainty of the validity and reliability of the PCL-R mandated its exclusion.  And, of course, you know about the *United States v. Haynes* case.

I won't cite the language of Dr. Ryan from his affidavit. Your Honor has seen it.  But he basically announces to the world that I cannot stand by this, I never should have said this.  And I've made this point, but I want to make it again, that even if Mr. Lee had lost a *Daubert* challenge, Dr. Ryan's affidavit in

*Stitt* makes it clear that he would have very likely withdrawn his report and his conclusion.

All right. So let me talk about 60(b). 60(b) relief is appropriate here. This Court has the power and discretion to act in an equitable manner to undo an injustice, especially where the court previously in this case, Judge Eisele, did not get to a full merits consideration. And Judge Eisele said straight-out that he was foreclosed from considering this information. So I think that there was no full merits consideration here. This is not an attack on the merits of the -- this is not an attack on the merits. It fits within *Crosby*. We are arguing that counsel's ineffectiveness, in the language of *Trevino*'s predecessor *Martinez v. Ryan*, counsel's woeful ineffectiveness obstructed and impeded the consideration of his claim. And, Your Honor, *Trevino* provides a cause for the default. *Trevino* is a case out of Texas. Texas is a system whose design and operation doesn't require ineffective-assistance-of-trial claims to be made in postconviction, but it channels them to postconviction. The Supreme Court held that in such a system, ineffective-assistance-of-postconviction counsel can constitute cause. The federalist system, structure and design, is the same as Texas. And the animating principle -- and I think this is the most important point -- of *Trevino* is equity, as it is in a 60(b) proceeding. We cannot allow -- and this is what the court said. Although I'm not quoting, I think

I'm accurately paraphrasing:  Postconviction counsel's ineffectiveness at an initial-review collateral proceeding to forever foreclose the raising of a constitutional claim of ineffective assistance of counsel.  That is the animating principle of *Trevino*.  And I would note a few things.  First of all, the dissenters in *Trevino* were concerned about extending *Martinez* because of the usurping effect on the state process, the state's ability to handle its own postconviction matters.  It's very important to note that that principle, that comity, federalism principle is not implicated here, or, frankly, more aptly, works in Mr. Lee's favor because there are no comity interests.  This is this court's judgment.  This court is not stepping on the toes of the state court process.  And I think that's an important point.  The other thing I would mention, and maybe this is a little anecdotal, but the government in these cases has taken the position in briefing before the United States Supreme Court that allowing cause for ineffective assistance of postconviction counsel will have an impact on 2255 proceedings.  We noted that in our briefing.

THE COURT:  Let me ask you, are there any cases that apply *Trevino* to 2255 cases?

MR. SCHWARTZ:  Well, you know, in the post-*Trevino* world, there are very few cases that -- and I apologize.  You know, I knew this information, it was in my head.  It's not now.

THE COURT:  It happened to me about five minutes ago,

so don't apologize.

MR. SCHWARTZ:  Most of the cases are post-*Martinez* and pre-*Trevino*, and they were cited in the government's brief.  I don't think they cited to any where a court post-*Trevino* said it didn't apply in 2255.

THE COURT:  I don't know if there are or not.  I figured that you all would know if there are any post-*Trevino* cases.

MR. SCHWARTZ:  You'd think I would, and I apologize for not having --

THE COURT:  That's okay.  Here's why it's important, and it actually comes back to what you were just saying, and that is that the context in which *Martinez* and *Trevino* come up, and under AEDPA in a 2254 case, there is a deferential standard because these are state court convictions, and it's a collateral attack in federal court on state court convictions.  And the statute requires that you defer, to some extent, and it has to be an unreasonable application of the federal law and so forth.  We know all of that.  And then so the question comes up, what happens if there was an issue that was either not raised or not raised properly, or if there's some other situation where the state courts never reached the merits, are there some occasions when federal courts still can hear, entertain those 2254 petitions?  And the answer is, yes, there are some occasions.  In order to be able to get the federal court to hear one of

those cases, even though it was never presented, or never adequately presented, or was decided on procedural grounds, then you have to have cause and prejudice.

MR. SCHWARTZ: Yes, sir.

THE COURT: And if you have cause and prejudice, then we can still hear that claim in federal court. And then the question in *Martinez* becomes, what if your first opportunity to present that is in an initial collateral review and counsel in that situation were ineffective? And then that gets extended to *Trevino*. But here we're not reviewing state court proceedings, and so we don't have any independent and adequate state grounds to consider, we don't have the federalism issues to consider. And so there's a real question as to whether *Trevino* has any effect at all on 2255 cases. And think about it this way. If it's true, then in 2255 cases, the failure of counsel to raise an issue, or raise it properly in the initial petition, can be brought up later, and is not a second or successive petition, that would seem to follow also that you'd have the same thing in 2254 cases, which is clearly not what the court was getting at in *Trevino*.

Now, I've rambled a little bit, but that's part of the argument that the government made in their brief, and I think you need to address that.

MR. SCHWARTZ: Right. So, Your Honor, I would argue, and I do argue that the impediments that the court talked about,

or talks about, the comity interests, the concern about independent and adequate state grounds, those are impediments for a federal court to act in regard to a state court judgment. And I would argue, and I do argue that the fact that those impediments don't exist in a case that from beginning to end is a federal prosecution argues very much in favor of application of *Trevino*.  In the government's briefing, I think one of their big arguments, or one of their arguments -- and you can decide what adjective applies -- is that it's simply the nature of the unitary federalist process as opposed to the binary state and federal process of a 2254 that precludes a petitioner from raising ineffective assistance of postconviction counsel.  That can't be the case.  That cannot be the justification to saying to a federal death-sentenced inmate, Because the state didn't sentence you to death, you don't get the same equitable remedy that the death-sentenced state prisoner gets.  You are just out of luck.  And that can't make sense.  There has to be an equitable way for the animating principle of *Trevino*, and *Martinez*, which is that our system cannot countenance a situation where a valid claim of ineffective assistance of trial counsel will be forever foreclosed by the unavailability of a gateway, and the gateway being ineffective assistance of postconviction counsel.

And, Your Honor, I don't think I mentioned this, and if I did, please stop me, but in the *Trevino* case, I think it's

important to note that the court cited to *Massaro v. United States*.  When the court was talking --

THE COURT:  You mentioned that in your brief.

MR. SCHWARTZ:  Okay.  Well, I mean, the reason they did was because they were talking about the applicability of *Martinez* to a system that channels.  And so one would have to ask, you know, why would the court cite to a federal death penalty case in a federal 2255 if the analysis in *Trevino* wasn't equally applicable to the death-sentenced federal prisoner?

I don't know if I've addressed Your Honor's question, but I've tried to.  Did I miss something, if I can respectfully ask?

THE COURT:  No.  I think you're making an appropriate argument.

MR. SCHWARTZ:  Okay.

THE COURT:  The other thing on that, and you may have this in your -- I doubt that I'm going to ask any questions that are not in your outline somewhere, but this is something that I need you to address, and that's the footnote in *Gonzalez* where the court says:  "We note that an attack based on the movant's own conduct, or his habeas counsel's omissions, ordinarily does not go to the integrity of the proceedings, but in effect asks for a second chance to have the merits determined favorably."

MR. SCHWARTZ:  Right.

THE COURT:  In other words, if an attack on a claim -- basically what they're saying is, I think, that a claim habeas

counsel was ineffective is a second or successive petition.

MR. SCHWARTZ:  Right, right.

THE COURT:  And that's what Judge Eisele also said in this case, that there was, in effect, a successive petition.  So tell me why what you're doing now is not a second or successive petition in light of that statement by the Supreme Court and Judge Eisele's earlier finding in this case.

MR. SCHWARTZ:  Right, right.  Well, number one, I think it's appropriate to point out that *Gonzalez* -- it was a post *Coleman v. Thompson, Maples* case where there was the absolute restriction on ineffective assistance of postconviction counsel's cause -- was still in place.  And, you know, I suspect, based on Justice Scalia's dissent in both *Martinez* and *Trevino,* that he did not anticipate what had occurred.  Of course, that's not my only argument, but I do think we're in a post-*Martinez* and *Trevino* world.

I also think, Your Honor, that the -- I don't think our briefing can be fairly read as the attempted assertion of a claim.  I mean, what we are focused on and what *Martinez* and *Trevino* tell us we are permitted to focus on is counsel's ineffectiveness.  And I think there was some question, I know there was some merits consideration in Judge Eisele's 59(e) ruling, you know, and so I don't know that he ruled the claim successive.  But even if he did, the focus of our claim relates to the defect in the proceeding, and reopening the judgment does

not offend that finding, if there was such a finding.

But there's a second point that I want to make that really distinguishes Mr. Lee's case from a case where we would bring a 60(b), you know, in a 2255 context based on counsel's ineffectiveness. And I would argue that we should be permitted after *Trevino*, but Mr. Lee's case is a much narrower case, and here's why.

If *Trevino* is applicable to 2255 proceedings, as we argue it must be, then the only place, or let me say the nearest in time, place it can be raised would be in a 59(e). That would seem to be the most appropriate place to raise it. And this evidence was put before Judge Eisele in the 59(e), or at least enough to grant a hearing. I would argue we have much more, and we had some in our 60(b) as well. When he ruled that he was foreclosed from considering the proffered evidence, and that ruling applied to all of the affidavits because he had mentioned all the affidavits before he made that statement, he was correct at that time. Today, I would argue that he would not be correct, and the reason is, Mr. Lee, today, would have had the ability to raise the ineffective assistance of his 2255 counsel for their failure to provide this supporting information. When 60(b) talks about one of the factors being a change in the law, I would argue that this is the kind of change in the law that 60(b) is directed to, a change in the law that unsettles all existing precedent and that had consequences for Mr. Lee at the

time of the 59(e), so that Mr. Lee is situated differently than he would be if he simply came in and brought a 60(b) action to reopen a judgment where the court had not foreclosed itself, correctly at the time, from reviewing the proffered evidence. Today, under *Trevino*, at a 59(e) proceeding, the court would not be precluded because counsel could come in and raise the issue of the prior lawyer's ineffectiveness at the postconviction stage. That change in the law is why in Mr. Lee's case it is the narrowest of cases. Because, Your Honor, if a 2255 petitioner cannot raise a *Trevino* argument at a 59(e), then *Trevino* is not applicable in a 2255 because where else could he raise it.

So I think -- you know, so part of the change in the law, of course, is *Trevino*, but --

THE COURT: Wouldn't *Trevino* have to change the definition of second or successive petition for it to be a change that would result in granting your motion?

MR. SCHWARTZ: No. No, Your Honor, it wouldn't, because -- well, I'm sorry. Wouldn't have to change, no, because in our motion we are not asserting a claim, we are not reasserting a claim. We are arguing prior counsel's deficiency, and so that when the judgment is reopened, then the evidence that was formerly foreclosed can be presented to the court.

THE COURT: That brings me back to the statement in *Gonzalez*, that when you're claiming that prior habeas counsel

was deficient, that that's really a second or successive claim. And when I mentioned that, you said, Well, that was pre-*Trevino,* as though *Trevino* changes the definition of what is a successive claim.  And so we're kind of going in a circle.

MR. SCHWARTZ:  Okay.  I understand, Your Honor.  Well, I think that there is -- you know, what *Martinez* and *Trevino* made clear was that this is not a successive -- that the argument ineffective assistance of postconviction counsel is not a claim.  It's cause to excuse a default.  And so that the -- and it's not just a formalistic difference.  I mean, after *Trevino*, the calling ineffective assistance of counsel a defect in the habeas proceeding is legitimate.  It's a reflection of the analysis and the animating principle in *Trevino*.  And I think at the time of *Gonzalez*, pre-*Martinez*, pre-*Trevino*, when the court is talking about asserting, you know, a claim of ineffective assistance, the meaning is different than it is today.  First of all, it's not a claim, and we've never argued that it's a claim.

THE COURT:  Okay.  All right.  I understand.

MR. SCHWARTZ:  I think Mr. Lee's case fits whatever iteration, Your Honor, of 60(b) that any court has talked about. We've briefed this.  I'll just touch on, you know, the supervening change in the law is about as dramatic as it could be.  There was no court pre-*Trevino* that allowed the allegation of ineffective assistance of postconviction counsel as a gateway

in a jurisdiction like the federal jurisdiction.  There's an extremely close relationship between Mr. Lee's case and *Trevino*. The federal system had the same structure and design as Texas. Counsel was ineffective at the collateral proceedings in both cases, and the habeas court was precluded from considering the evidence.

In regard to diligence, this counsel was in contact with prior counsel within days of the *Trevino* decision, and we've briefed our diligence.  I don't think we could have been more diligent.  We brought expert counsel in to mediate, and we moved as quickly as would be humanly possible, and I don't think the government is contending otherwise.

I talked about the underlying strength of the IAC claims as another factor.  I've already talked about the comity and federal interests.  I think they argue very much in favor of our position.

And courts also talk about finality, but in *Gonzalez*, the court made it clear that that is not a crucial factor when we're talking about reopening a judgment under 60(b), and, frankly, I think when you weigh that against the interests of an unconstitutional execution based on what essentially was pseudoscience, I think that finality gives way.

I also think, Your Honor, that 60(b)(5) is an appropriate gateway for this Court to act.  There's no question that Mr. Lee's execution is a prospective action.  It requires

performance of future acts.  It's interesting the government cited to -- and I'm just about finished, I will tell the Court. The government cited to the *Twelve John Does* case, a case in which the movant sought to undo the dismissal of the Attorney General in a prison suit.  And the court, in saying that it wasn't prospective, said the order did not compel the Attorney General to perform a future act.  Here, it's the exact opposite. Here, future acts are necessary conditions.  We cited 28 C.F.R. 26.2, which talks about what the Attorney General must do to effectuate the death sentence, submitting a proposed order to the court, et cetera.  We also cited 18 U.S.C. 4596(a), which compelled the Attorney General to take future action.  This is a case, you know, to release the prisoner to the marshal for sentencing.  This is a situation where prospective acts are necessary, and applying the judgment prospectively in lieu of reopening the judgment and allowing an evidentiary hearing would work an injustice and is no longer equitable.

Your Honor, for all of these reasons, we urge the Court to grant the 60(b) motion.  We urge the Court to give Mr. Lee the chance to show that but for his trial counsel's failure to challenge this utterly false, utterly unreliable evidence, his jury would not have sentenced him to death.

Thank you.

THE COURT:  Thank you, Mr. Schwartz.

Why don't we take ten minutes and then we'll come back and

hear from Mr. Pellettieri.

MR. SCHWARTZ:  Thank you, Your Honor.  Thank you for your indulgence.

(Recess from 10:28 a.m. until 10:40 a.m.)

THE COURT:  Mr. Pellettieri, you may address the Court.

MR. PELLETTIERI:  Good morning, Your Honor.  John Pellettieri from the Department of Justice on behalf of the United States.

I'd like to address two issues in this presentation.  First I'd like to talk about the Court's jurisdiction and whether this is a second and successive 2255 motion.  And I'd also like to address, assuming for the sake of argument the Court does have jurisdiction, whether there's any basis to grant the Rule 60(b) motion.

But turning first to jurisdiction.  A federal defendant collaterally attacking his conviction has to file and assert all claims, has to marshal all claims in a first 2255 motion.  Any second or successive motion has to pass through the bar of 2255(h).  The court of appeals has to certify that it contains new facts supporting innocence or that there's a new rule of constitutional law made retroactive.  This rule applies to any filing, regardless of the title that's given to it.  It's the substance of the filing, not the title, that controls.

Now, in *Gonzalez*, the Supreme Court explained what

qualifies as, in that case, a 2254 application, but those rules are also applicable to decide what qualifies as a 2255 motion. And the court explained that a motion that raises a new ground for setting aside a judgment or a conviction is a 2255 motion. And *Gonzalez* also establishes that a motion that asserts that a previous ruling rejecting grounds for setting aside a conviction or a sentence is also a 2255 motion.

So, for example, a motion that argues that there should be new evidence, there's new evidence or new cases that would support relief on a ground previously rejected is a 2255 motion, as is a motion asserting a new ground for relief.  Either way, both are 2255 motions.  On the other hand, a motion that attacks the integrity of the collateral proceedings is not a 2255 motion.  So, for example, a motion that alleges fraud on the court, or a motion also that alleges the district court erroneously didn't reach the merits or it didn't assess the grounds for setting aside or vacating a judgment, that that would also qualify.  So, for example, a statute of limitations ruling by the district court that prevented the district court from reaching the merits of asserted grounds for setting aside the judgment of conviction or sentence.  Mr. Lee's motion that he files now falls within that definition of a 2255 motion.  In our view, it asserts new grounds for setting aside his judgment and conviction.  It asserts a new claim of ineffective assistance of counsel.  Mr. Lee suggests that he's adding

additional evidence or additional argument to support a ground previously asserted and rejected.  Either way, it's still a second and successive 2255 motion, no matter how you come at it, whether it's a new ground, a new claim of ineffective assistance, or additional evidence or additional argument to support a ground that was previously asserted but not sufficiently fleshed out.

*Gonzalez*, as the Court has mentioned, makes clear that an omission of counsel doesn't go to the integrity of the judicial proceedings.  The quote in *Gonzalez* is that such a motion does not go to the integrity of the proceedings but in effect asks for a second chance to have the merits determined favorably.  Mr. Lee's 60(b) motion falls within that definition, falls within that framework.  As a result, this Court lacks jurisdiction without a certification from the court of appeals.

Now, *Trevino* doesn't change any of those rules.  *Trevino* creates a narrow exception to procedural default in federal habeas review of state court convictions.  To kind of understand this, it's kind of necessary to get into a little bit of the nitty-gritty of 2254 and 2255, because I think there's some facial plausibility to this notion that perhaps *Trevino* applies to 2255.  When you really look at the applicable rule and how it applies and how the system applies, it makes it clear that, in fact, *Trevino* had no application to a 2255 motion.

When a state prisoner files a 2254 motion -- excuse me --

petition attacking his state conviction, any claims that were not preserved in the state court proceedings are procedurally defaulted.  The defendant has to show both cause and actual prejudice in order to overcome that procedural default.  So, for example, if the state rules and law require that a state defendant raise a claim in collateral proceedings in a certain manner in order to preserve it and get a ruling on the merits, but the state collateral counsel doesn't preserve and raise that claim in that manner, then in order to bring in a 2254 application, the defendant has to show cause and prejudice. Now, for a long time the rule was that ineffective assistance of collateral counsel, state collateral counsel wasn't cause to overcome procedural default.  *Martinez* and *Trevino* created a very narrow exception to that rule in the context of ineffective-assistance-of-counsel claims in certain state systems.  In state systems that either require, or for all intents and purposes require a defendant to raise a claim of ineffective assistance of trial counsel in state collateral proceedings, the ineffective assistance of that collateral counsel and failure perhaps to raise an ineffective-assistance claim can now constitute cause to overcome procedural default in a 2254 application in federal court.  But once the federal -- excuse me -- the state defendant raises the ineffective-assistance claims in federal court and files a 2254 application, any additional ineffective-assistance claims that

the defendant seeks to raise in a later application -- in a later application has to go through the second and successive bar that applies to 2254 proceedings.  So, for example, if there were ten claims of ineffective assistance of counsel in state court that were either adequately preserved or for which a defendant could overcome cause and prejudice and raise them in a 2254 motion, if that defendant decides with collateral counsel in the 2254 motion to raise only eight of those, for whatever reason, perhaps strategic reasons, perhaps negligence on part of collateral counsel in a 2254 proceeding, if he wants to raise those other two, he has to go through the second and successive bar that applies to 2254 petitions.

THE COURT:  What do you say about Mr. Schwartz's argument that in *Trevino* the court cited to a federal death penalty case in the context of explaining why the Texas system was such that the court should allow error by collateral review counsel to constitute cause for the procedural default?

MR. PELLETTIERI:  Yes, I believe that there was a citation of *Massaro* -- I don't know if it was a capital case. But there was a citation to *Massaro* in which the Supreme Court held that it's generally preferable for federal ineffective-assistance claims to be raised in 2255 proceedings instead of on direct appeal.  And I believe that was in the context of explaining why state courts tend to do this and why it's generally a good thing.  And it's true there was a lot of

reasoning in *Trevino* about the ability to raise ineffective-assistance claims and not wanting to preclude the state defendants from doing it because of ineffective assistance of collateral counsel. But, again, what's important to recognize is that this was a judge-made exception to the cause and prejudice requirement. The cause and prejudice generally is a judge-made rule. And the Supreme Court carved out a very narrow exception, a judge-made exception now that it can't overcome any kind of statutory bar that applies.

THE COURT: Let me see if I can characterize the argument of Mr. Schwartz, or describe the argument as I understand it. He may get up later and correct me. I may not be getting it right. But I think it's something like this. And that is, the cause and prejudice exception to the procedural default rule in the 2254 context is based on equitable considerations. And in view of those equitable considerations, the Supreme Court has held that the absence of counsel, or the failure of counsel on initial collateral review in state court to raise a position that should have been raised or to assert it properly, that the failure of that counsel to do that is the kind of equitable consideration that should constitute cause where there is a substantial claim, because otherwise a petitioner could have a substantial claim that's never reviewed by any court. And although there are procedural differences once you get into the 2255, nevertheless, the same equitable

considerations should apply under Rule 60(b).  I think that's their argument.  That whatever equitable considerations that apply to the cause and prejudice exception to the procedural default rule also should apply under Rule 60(b) in a 2255 case, because if you don't, then someone may have a substantial claim that would never be heard on the merits.  I think that's the gist of their argument, and you need to address that.

MR. PELLETTIERI:  And I think that puts the cart before the horse.  It puts the jurisdiction -- it puts the merits of any potential 60(b) motion before whether there's any jurisdiction.  Jurisdiction, obviously, is the first question this Court has to address.  And to the extent that *Trevino* establishes an exception to a procedural default, an equitable exception, the characteristics of the 2255 system make clear that it has no application because a state defendant can procedurally default ineffective-assistance claims by failing to raise them in state court.  So when he files his 2254 motion, he would have to overcome cause and prejudice.  But when a federal defendant files a 2255 motion, he can procedurally default claims that aren't raised on direct appeal, such as constitutional claims, maybe a Confrontation Clause claim, but he cannot procedurally default an ineffective-assistance claim. There's no procedural default in ineffective-assistance claims in 2255 motions.  At that point he can raise any and all 2255 motions he wants.  So he has more of an ability at that point

when filing a 2255 motion than a state defendant has when filing a 2254 motion.  A state defendant can procedurally default an ineffective-assistance claim.  Even under *Trevino*, there might be circumstances where it's still procedurally defaulted. There's never a circumstance when a federal defendant raises an ineffective-assistance claim on a 2255.  There's no procedural default that applies to those claims.  What does apply is the second and successive bar, a statutory bar, which is totally separate than procedural default.  It's a statutory bar.  And the problem is, the procedural default and the failure to raise in a first motion have kind of been conflated in some of the filings, and I hope to make it clear that there's a very important distinction.  So when either a 2254 or a 2255 defendant raises ineffective-assistance claims, files a petition or a motion, then any time that defendant wants to raise additional ineffective-assistance claims, he has to go through the second and successive bar in order -- he has to get certification from the court of appeals to have jurisdiction. So, for example, if a state defendant has ten claims of ineffective assistance that he wants to raise, perhaps two of them are procedurally defaulted, he has eight, so he has eight he can raise in his 2254 even under *Trevino* because perhaps he can't overcome procedural default, so he has eight, and then he decides to raise six.  Well, those other two, even though he perhaps could overcome procedural default, if he just wants to

raise those six, he has to go through the second and successive window in order to raise those in a second and successive petition.

THE COURT:  Well, okay.  Go ahead.

MR. PELLETTIERI:  There's been some suggestion that the Rule 59 motion was somehow a ruling on procedural default, but that was not the case.  Judge Eisele denied the motion on either or both of two grounds, either second and successive, which we discussed is a statutory bar, has nothing do with procedural default, or he concluded that there was no relief available under Rule 59.  Rule 59 is for corrections of manifest errors in law or fact.  It's clear, and the Eighth Circuit has made clear that it is not to present new arguments, present new evidence or new theories that could have been raised at the time the judgment was entered.  So here I think it's conceded that all the arguments that were raised in the Rule 59 motion and raised again now in the Rule 60(b) motion could have been raised at the time or before Judge Eisele denied the 2255 motion.  So it's a little bit of a misnomer to characterize that Rule 59, or it's a full misnomer to characterize that Rule 59 motion as a ruling on procedural default.  It wasn't.

THE COURT:  Basically, would it be fair to say that what Judge Eisele said about the claims that are being presented here now is that they were not pled sufficiently?

MR. PELLETTIERI:  Yes.  The way I read his Rule 59

ruling is that he was not on notice of the claims, the arguments, the grounds that they were seeking reversal of the conviction.

THE COURT:  It was mentioned -- there certainly was mention in the 2255 petition this same basis that's being argued now, but it wasn't -- his ruling I think was that they didn't plead it -- they didn't meet the pleading standards under 2254. Would that be fair to say?

MR. PELLETTIERI:  They mentioned that Dr. Ryan had recanted his prior opinion about psychopathy evidence being predictive of future dangerousness in prison, but they didn't -- the way I read the 2255 motion is they didn't raise any claim that somehow that provided a basis to keep that evidence out. So really you can characterize Judge Eisele's decision in one of two ways.  One, it's raising a totally new ground, kind of a new theory of ineffective assistance, or that they're just giving additional argument or legal theories or factual support for a previously raised ground that he rejected.  Either way, it's second and successive under *Gonzalez*.  The reason you have *Gonzalez*, the language of *Gonzalez*, everything in *Gonzalez* points to the conclusion that regardless of how you characterize it, whether you characterize it as a new claim of ineffective assistance of counsel or a previously rejected claim that hadn't been fleshed out sufficiently with the facts or legal theory or argument, either way it's a second and successive motion under

*Gonzalez.*

THE COURT:  If you fail to plead something properly and, therefore, can't raise it, is that a procedural default?

MR. PELLETTIERI:  No.  Procedural default would be when there's a -- when you look at a 2255 -- when someone files a 2255 motion, whether a claim that's actually raised in that motion could not be raised because of prior proceedings.  So, for example, on direct appeal it wasn't raised.  The failure to raise something in a 2255 motion is just that, the failure to raise it in a 2255 motion.  It's not procedural default.  A defendant has to marshal all claims that he wants to raise fully in a 2255 motion on the first try.  If that were the case, any time a defendant tried to or wanted to raise a claim that he deems was inadequately presented would presumably then start arguing there was cause and prejudice.  But that's never been the case.  It's always had to go through 2255's second and successive bar.  No court, as far as I'm aware, has analyzed that under an equitable procedural default regime.

Unless the Court has additional questions about jurisdiction, I'll turn to --

THE COURT:  No.  You can move on.

MR. PELLETTIERI:  Okay.  I think in looking at the -- assuming there is jurisdiction, in looking at the merits to a 60(b) motion and granting it, it's helpful to step back a little and look at the history of the case, because the psychopathy

issue in a long string of cases was raised really from the very beginning.

As I'm sure the Court is aware, in a capital case, the jury was required to weigh the aggravating factors argued by the government or proved by the government against the mitigating factors proved by the defendant and determine whether the aggravating factors sufficiently outweigh the mitigating factors in order to impose a sentence of death.  The government alleged five aggravating factors, one of which was that Lee would be dangerous in the future to others.  Now, Mr. Kehoe, the jury sentenced him to life imprisonment and found that he would not be a danger to others in the future, and they found that a lot of the mitigating factors were present, mainly that he could be a good father to his children and that he was essentially indoctrinated by his parents into this white supremacist ideology.  Now, in light of that, the government's presentation as to Mr. Lee was emphasized on future dangerousness because it was very different circumstances with regard to Mr. Lee's future dangerousness and Mr. Kehoe's.  The government presented evidence about Mr. Lee's involvement in a murder of an individual named Joey Wavra.  They presented evidence about his use of threatening behavior toward a prison guard, his involvement in other criminal offenses regarding guns, his lack of remorse.  And that was the government's direct case.  Now, the defense decided only to address mitigating factors and not

to attempt to rebut the government's future dangerousness presentation.  They only offered evidence about mitigating factors, and to do that they largely used Dr. Cunningham.  And Dr. Cunningham's opinion was that Mr. Lee had all of these experiences that contributed to his psychological disposition that caused him to be -- to contribute, or to participate in these offenses.  Now, that opened the door to questioning about psychological diagnosis.  And so the government cross-examined Dr. Cunningham about a diagnosis of psychopathy by the government's expert.  Now, the government also did present questioning about future dangerousness with Dr. Cunningham, some of which had nothing to do with the psychopathy evidence and was just Dr. Cunningham's views based on his analysis of Mr. Lee. He had interviewed him for many hours.  And then in some of it there was questioning about whether a diagnosis of psychopathy suggests or indicates that an individual would be dangerous in the community, and I think it's undisputed that that is a correct analysis, that Dr. Cunningham agreed, yes --

THE COURT:  And Mr. Schwartz argued just a few minutes ago that that's totally irrelevant in a federal death penalty sentencing hearing because if the death penalty is not imposed, then the defendant will spend the rest of his life in prison. And so future dangerousness outside of prison is completely irrelevant.  And so then the question is about does he pose a future danger in prison.  And the argument that's been made, and

I don't think you all have disagreed, is that the conclusion that Dr. Ryan drew that the diagnosis of psychopathy would indicate future dangerousness in prison is simply not true, that there's no scientific basis for that.

MR. PELLETTIERI:  Evidence supporting future dangerousness generally can allow the inference of future dangerousness in prison.  That was the Joey Wavra evidence.  He was dangerous, and that somehow, I presume, supported the inference that he would be dangerous in prison.  That's oftentimes the nature of future dangerousness evidence.  So the idea that a diagnosis of psychopath suggests that he would be dangerous outside of prison allowed the inference from the jury that he would be dangerous in prison.  Now, their argument is, well, that psychologists, scientists have not been able to find or have not seen a statistically significant correlation between a diagnosis of psychopathy and dangerousness in prison.  Now, that goes to the weight of the evidence, not its relevance.  The jury can determine, can assess evidence regarding future dangerousness generally, and they are able to rebut that, to challenge that, and that's exactly what Dr. Cunningham did.

THE COURT:  They've cited several cases that in one way or another excluded the psychopathy evidence on the grounds that it was not a valid predictor of future dangerousness in prison.  And according to what Mr. Schwartz's argued in his brief and again here today, after Dr. Ryan withdrew his

affidavit in the 2003 case, the earlier case -- and I forget the name of it now, but I've seen the affidavit.  After he withdrew his opinion about the validity of the test to determine future dangerousness in prison, that since then the government's never used it.  Why don't you respond to that.

MR. PELLETTIERI:  That goes to an expert opinion, an expert opinion as to whether a diagnosis of psychopathy, there's a basis for making the scientific opinion that it would lead to future dangerousness in prison.  And he apparently, based on Dr. Ryan and these other psychologists, has concluded that right now the evidence isn't sufficient to show that there's no statistically -- excuse me -- statistically significant correlation.  But it's always the case -- I mean, not always, but it is typically the case that there's different views on the weight of evidence and how to interpret it, and oftentimes different views of expert testimony are relevant to that.  I would point the Court to the *Barefoot v. Estelle* case in the Supreme Court.  In that case, the American -- and that's 463 U.S. 880.  In that case, the American Psychiatric Association took the position that all expert psychiatric testimony about future dangerousness is unreliable and should be categorically barred.  And the Supreme Court rejected that.  The Supreme Court said:  "Rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who

would have the benefit of cross-examination and contrary evidence by the opposing party. Psychiatric testimony predicting dangerousness may be countered not only as erroneous in a particular case, but also as generally so unreliable that it should be ignored. If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the views of the state's psychiatrists along with opposing views of the defendant's doctors."

Now, all of this is kind of beside the point because there was no opinion testimony offered at the trial regarding the diagnosis of psychopathy with regard to future dangerousness in prison.

THE COURT: The argument he made a little bit ago was as soon as defense counsel saw Dr. Ryan's report, he had an obligation to move in limine to keep it from being used in any way and, he says, the motion would have been granted or should have been granted. So there never would have been any mention of psychopathy during the course of the sentencing hearing because that whole thing should have been kept out.

MR. PELLETTIERI: I disagree for two reasons. One is, as I've discussed, the only thing his theory would keep out is an opinion that psychopathy -- the diagnosis of psychopathy does not establish future dangerousness in prison. But everyone agrees that the opinion that the psychopathy diagnosis

establishes future dangerousness generally is a valid opinion, and that goes to the weight the jury should afford it, not its admissibility or relevance.  And number two, the psychopathy evidence would have absolutely been relevant to cross-examine Dr. Cunningham's mitigation testimony.  Dr. Cunningham's testimony was that all of these experiences, these psychological aspects of Mr. Lee, some of which were the result of life experiences and injuries, contributed to how he participated in this offense.  Another alternative explanation is that he qualifies as a psychopath and that's what resulted, or at least partially resulted in his participation in the offense at issue here, which is the three murders.  So that was perfectly appropriate rebuttal, and I think that's what the Eighth Circuit recognized in the opinion that reversed the new trial order, the new sentencing order.

THE COURT:  Is it true that Mr. Lee's the only person on federal death row who was sentenced to death based in part, apparently, on evidence about this Hare test?  And I forget the acronym now that you all know.  You remember it.  It's PCL-R, or something like that.

MR. PELLETTIERI:  Yes.

THE COURT:  That there's nobody else on death row, federal death row in which this PCL-R test, or whatever is the correct acronym, was a part of his trial?

MR. PELLETTIERI:  I have no reason to doubt that

representation, but I haven't independently looked to determine whether it's accurate.  But I have no reason to doubt it.  But if you look at the other cases, for example, the *Haynes* case, the expert Dr. Ryan recanted, so there's no basis, there was no ruling by any judge that it shouldn't come in.  In the *Stitt* case, there was no ruling it did come in, there was no ruling by a judge that it shouldn't come in.  In the *Barnette* case, it came in, and, in fact, the Fourth Circuit on appeal said it's fine to come in as long as Dr. Cunningham -- what happened in the *Barnette* case in the Fourth Circuit is that this PCL-R/psychopathy evidence came in, and the district judge disallowed surrebuttal with Dr. Cunningham, who testified here, to contest the validity of using the PCL-R.  The court of appeals said you had to allow surrebuttal because there was nothing -- but there was no problem with actually using the PCL-R.  So the only case that I'm aware of is the case I think in Indiana that made a preliminary in-limine motion that there will be no evidence about the PCL-R regarding future dangerousness, but that decision doesn't really go into any kind of analysis as to why that was proper under the applicable rules for capital cases and the evidence should be allowed to come in. And there was no basis for any kind of government appeal there because it was a preliminary evidentiary ruling.  And so we would disagree that that categorically shouldn't have come in, but that was the ruling there.

So to back up, again, the only thing that would not have come in in this case, under the theory, the *Daubert* theory -- which, again, we have to assume *Daubert* would have convinced the district judge not to let this opinion testimony in even though *Daubert* doesn't apply in capital sentencing proceedings. The Federal Rules of Evidence don't apply. That was made clear in this case when the Eighth Circuit reversed the district court, Judge Eisele's new sentencing hearing. The only rule is whether, essentially, a weighing of the -- "The government may present any information relevant to an aggravating factor for which notice has been provided. Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." That doesn't encompass any kind of *Daubert* analysis.

And the other point, as the Court, I think, has alluded to, is the fact that the Eighth Circuit has addressed this on a number of occasions, first in the new sentencing decision in recognizing that the psychopathy evidence was relevant at the very least for rebuttal and also for future dangerousness. Now, that doesn't address whether there should have been a limitation on expert opinion testimony as to future dangerousness in prison, but, again, that doesn't go to relevance generally. It

goes to the weight to be afforded that evidence.  And so that's the law of the case, and we believe it's correct.  And the Eighth Circuit again reiterated this reasoning again in the context of the claim that this is so-called junk science that doesn't go to dangerousness in prison.  That was raised in the 2255 appeal as, I guess, grounds for finding the death sentence arbitrary.  And the district court -- excuse me -- the Eighth Circuit concluded that the issue was outside the certificate of appealability, and it could have ended there, but it didn't.  It said, "We also note that we found that the evidence is not unfairly prejudicial to Lee."  So it affirmed, in the context of this notion of junk science, that this is not unfairly prejudicial.

Now, another reason that 60(b) isn't appropriate here is that 60(b) -- it's well established that 60(b) is not a vehicle to attack omissions, negligent omissions of counsel that led to the judgment.  60(b) doesn't allow reopening of judgments on the basis of negligence -- excuse me -- 60(b)(6) doesn't allow for reopening of judgments on the basis of negligence of counsel.  Now, 60(b)(1) allows for reopening based on mistake, inadvertence, surprise, or excusable neglect, grounds for reopening a judgment.  But courts have held that under 60(b)(6), only gross negligence amounting to abandonment creates exceptional circumstances warranting reopening a judgment, and that's simply not the case here.  What is alleged here is simple

negligence, ineffective assistance of counsel, not gross negligence amounting to abandonment. And it is clear, if you read the pleadings in the 2255 proceedings, there was no abandonment. This was well litigated. It was extensively litigated.

A third reason why 60(b) relief is not warranted goes back to our discussion of *Trevino* and why it just does not apply here. It doesn't provide a basis, it doesn't provide a vehicle for reviving claims that were not raised in an initial 2255 motion. Again, it doesn't override the notion that mere negligence of counsel is not enough, but that it requires actual gross negligence amounting to abandonment. *Trevino* doesn't change that rule.

THE COURT: All right.

MR. PELLETTIERI: Unless the Court has any additional questions, Your Honor?

THE COURT: I don't think so. Thank you, Mr. Pellettieri.

MR. PELLETTIERI: Thank you.

THE COURT: Mr. Schwartz.

MR. SCHWARTZ: Your Honor, may I have just a few minutes to respond?

THE COURT: Certainly.

MR. SCHWARTZ: Thank you. Thank you, Your Honor. I don't think I will be very long, Your Honor. I would like to

just do two things.  First I'd like to respond to some of the points that Mr. Pellettieri made, and I'd like to address a couple of the points that the Court asked me about.  And my sense is that I did not respond the way I would have liked to, and not because our position wasn't meritorious, but because my mind wasn't working quickly enough.  So that if I can revisit one or two of the points the Court asked me about, I would appreciate that.

THE COURT:  Sure.

MR. SCHWARTZ:  Thank you.

I guess the first thing I want to address, Your Honor, is Mr. Pellettieri's point about, you know, essentially the battle of the experts, that if there's -- and by the way, I don't believe -- and I could be wrong, but I don't believe he cited the *Barefoot* case in his responsive pleading, and if he did, I missed it, and I'd like an opportunity to take a look at it, and I think if need be --

THE COURT:  Submit a letter brief in the next week, or a week from today if you think that there's something that you need to comment on.  And if Mr. Pellettieri feels like he needs to -- I'm not going to cut off anybody from arguing in this case.  We're going to give you both an opportunity to argue as thoroughly as you need to.

MR. SCHWARTZ:  Thank you.  And I certainly didn't mean to be critical of Mr. Pellettieri, who has been very

professional throughout all of these proceedings.

But I do want to say that, you know, part of the reason an evidentiary hearing is required and the judgment should be reopened is this notion of psychopathy is a predictor of future dangerousness and the notion that this is something that reasonable experts can differ on and this is what the advocacy system is all about. It's just not. This is the kind of evidence that, if I'm remembering the name of this report, the National Science Foundation, I believe, when they talked about certain types of evidence as being worthless. And we would welcome the opportunity to prove to this Court that this is so out of bounds, that this is so unreliable. I can tell the Court the cases, very briefly. In *Taylor*, the court rejected this evidence, the federal court, and rejected the evidence based on the same information that we've presented to this Court from Dr. Edens. In *Sampson*, a death penalty case out of Massachusetts, the court rejected this evidence, wouldn't even allow a description of psychopathy. In *Stitt*, although the court reversed it on other grounds, the court made a finding, a factual finding that Dr. Ryan's testimony was erroneous, was wrong, was as wrong as if it had been a DNA report that said one thing but it was someone else's DNA. And in *Haynes*, the government walked away from the case.

Now, Mr. Pellettieri cites to *Barnette*. This Court should know that *Barnette* was reversed, so the case did not hinge on

this issue.  It was reversed.  And the appellate court, I believe it was the Fourth Circuit talked about the fact that the challenge that was made was ineffectual, that the defense expert -- it was the defense expert who actually testified and presented one or two articles.

So the notion that this type of evidence is anything other than worthless is something that we would welcome the opportunity to challenge.  And the notion that a death sentence, a man is going to be put to death based on this type of evidence is, respectfully, offensive to the Constitution.  And we would welcome the opportunity to prove that that kind of argument with this kind of evidence doesn't fit.

When Mr. Pellettieri talked about prejudice, and, again, that's a reason -- in regard to this evidence.  And that's yet another reason to have a hearing in this case.  But I would invite the Court to -- and I know the Court has read the direct appeal opinion that the circuit was referring to.  When the court talked about unfair prejudice, the court was saying -- the court was acknowledging the fact, even mentioned -- I'm sorry.  It wasn't a direct appeal opinion.  It was the reversal of Judge Eisele's vacating of the death sentence.  Right?

THE COURT:  Right.

MR. SCHWARTZ:  And the court acknowledged the psychopathy evidence and said that the prejudice was not unfair, but that is susceptible to only one interpretation, if you read

it in context, and that is, it wasn't unfair, because when you put an expert on, you have to assume that he will be cross-examined on possible diagnoses. The question of the reliability of this evidence never came up, and the court never said that absent the evidence, a death sentence would have been imposed. In fact, if you read the opinion -- I don't mean to say that. But if one reads the opinion --

THE COURT: You're not going to offend me. Don't worry about that. I have read the opinion, and, actually, I read the opinion the same way you do. I don't mind telling you that. But the problem is that in the 2013 opinion, the question of all of this being junk science was raised, and it was raised in the context of the argument that Mr. Lee received the death penalty arbitrarily, and in rejecting that argument, the Eighth Circuit said we have already held that we see no threat of unfair prejudice. And so they made that statement the second time, not in the context of reversing Judge Eisele, but in the context of holding that the death penalty was not imposed arbitrarily, even in the face of the argument that this constitutes junk science. So there they appeared to be addressing the argument you're making now.

MR. SCHWARTZ: So let me address that because that's a very important point.

THE COURT: It is.

MR. SCHWARTZ: Right. So, number one, I think because

they use the term "unfair prejudice," in that regard they're talking about -- they're referring to the direct appeal opinion. But, more importantly, when Judge Eisele stated that he was foreclosing consideration of this proffered evidence, the certificate of appealability that went before the circuit went before the circuit based on the record below.  And that's a very important distinction, because that means that no court has ever -- that means that Mr. Lee has never had this claim considered, certainly fully considered by any court.  Right?  Because the circuit's review was informed by Judge Eisele's review.

THE COURT:  And then the application to expand the certificate of appealability, there's about 25 pages devoted to the argument that you're making here.  And this whole argument about the psychopathy evidence and the unreliability of it and the unfairness of it was laid out in great detail there, just as it is here, and the Eighth Circuit declined to reissue a certificate of appealability on that issue, even though they did discuss it, in fact, in their opinion.

MR. SCHWARTZ:  Right, right.  My position, Your Honor, is that based on Judge Eisele's ruling below, the Eighth Circuit was obliged to consider -- and also consistent with a case we cited in our pleadings, *Steel Company v. Citizens for a Better Environment.*  Once the decision -- and this is a default decision -- that I, as a court, am precluded from reviewing this proffered evidence, that is the record that goes before the

circuit.  And not only is that the record that goes before the circuit, it is a record that has had no development, no evidentiary development, no live testimony.  And so that, you know, it's one thing if Judge Eisele said, I'm fully considering this evidence, you know, I'm taking all of the evidence in the light most favorable to the petitioner and I'm denying relief on the merits and makes no comment about him being precluded from review, that's not the language in the court below.  So that I think it takes a lot to say that the circuit had the benefit of full review of this claim based on the finding below.  You know, the circuit did not have that, did not have such a presentation.

You know, the court also -- Your Honor asked about -- I believe Your Honor was concerned -- and if I'm mistaken, please feel free to stop me -- about the broad reach of application of *Trevino,* and that in the 2254 context, would that allow for additional claims of ineffective assistance of habeas counsel. Was that a concern of the Court?

THE COURT:  Well, it's not a concern.  That's not the right way to put it.  I'm trying to think analytically about what does this mean legally.

MR. SCHWARTZ:  Right.

THE COURT:  And I'm not concerned about getting more cases or anything.  That's not the point. Analytically, *Trevino* deals with cause and prejudice and whether the federal court can, therefore, reach an issue that was never reached on the

merits by a state court.  And *Trevino* says yes, in the circumstance we've talked about.  And I'm not going to go through all that again.  If that applies to the 2255 context and says that raising ineffective assistance of the original 2255 counsel and failing to assert a claim or to plead it properly, if that's grounds for relief under Rule 60(b), then that would seem also, logically, to be grounds for relief under 2254.

MR. SCHWARTZ:  Right.  And my response to that is this, Your Honor.  The second tier of the process in federal court is what allows -- and I'm sorry -- for a 2254.  The second tier is what allows for the gateway, you know, the cause and prejudice gateway as to ineffective assistance of prior postconviction counsel.  So that happens in federal court as a part of the 2254 proceeding.  In the 2255 context, that second tier is the 59(e) or the 60(b).  I would argue in this case the Court can look to the 59(e) proceeding and see that the court, although it was formerly foreclosed, because of the change of law is no longer foreclosed.  My point is, that is the comparison so that in the 2254 context, the court before whom the petitioner would raise this argument, the *Trevino* argument would be the federal court in 2254.  In the 2255 context, it would be at the stage where we are now.  There is no other place to do it.

THE COURT:  And I understand that.  And what it introduces, though, is a distinction between 2254 proceedings

and 2255 proceedings based on equitable considerations that doesn't seem to have any basis in the rules or the statute. Just reading the statutes, reading what constitutes a second and successive petition, reading the way Rule 60(b) interacts with 2255 and 2254, there would not seem to be any textual basis for drawing a distinction between those two, between how 60(b) applies in a 2255 case and how 60(b) applies in a 2254 case. But you're kind of arguing that the equities are such that you wouldn't extend this to 2254.

MR. SCHWARTZ: Well, I guess what I'm arguing is that there's no way to vindicate *Martinez* and *Trevino*'s compelling interest that both Justice Breyer and Justice -- and, of course, I forget the justice who wrote the *Martinez* opinion. I think Justice Kennedy. I could be mistaken. There would be no way to vindicate that interest in a 2255, and I do think that's a consideration. And, you know, in regard to -- and I think this is a good time to address Your Honor's concern regarding the *Gonzalez* footnote, because I think that Mr. Pellettieri, you know, got it right when he said *Gonzalez*, quote, sets forth -- that footnote is applicable when a petitioner sets forth a new ground or a motion that argues there should be new evidence. And that's not this motion. This is not a distinction without a difference. This motion attacks the integrity of the habeas proceeding. And let me cite to the case of *Ward v. Norris*, which is a case in this circuit. It's in our pleadings. And

it's a pre-*Martinez*, pre-*Trevino* case.  And what the court held in *Ward v. Norris* was that ineffective -- or the court stated in *Ward v. Norris* that ineffective assistance of habeas counsel does constitute a defect in the habeas proceeding.  That's Eighth Circuit law.  The problem is that that was pre-*Martinez* and pre-*Trevino.*  So the court, although I don't think it directly cited to *Coleman v. Thompson*, it certainly cited that principle, that in the absence of the vehicle of postconviction counsel ineffectiveness, or a constitutional claim of postconviction counsel ineffectiveness, which we're not alleging, then the petitioner is out of luck.

So there's no question that what we are alleging is a defect in the proceeding, and there's no question that *Trevino* represents a sea change in the law.  Does that mean at the end of the day, if the judgment is reopened, the court will be asked to look at the merits of the claim?  The answer to that question is yes.  I'm not going to stand here and tell Your Honor that, you know, until the end of time this is just about a defect. But what *Trevino* makes clear, and what this circuit said before *Trevino*, is that when you allege a defect in the habeas proceedings -- I'm sorry.  When counsel --

THE COURT:  Did you cite *Moore* in your brief, *Moore v. Norris*?

MR. SCHWARTZ:  *Ward v. Norris*, yes.

THE COURT:  *Ward v. Norris*.  It's in your brief?

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

MR. SCHWARTZ:  I believe so.

THE COURT:  If it is, then I'll find it.

MR. PELLETTIERI:  I can also say it's in the government's brief.  We believe it supports our position.

THE COURT:  I'll be sure to go back and look at that.

MR. SCHWARTZ:  And maybe my colleagues have shuddered when I mention the case, because I think when you read it initially, you think it doesn't support our position.  What happens in *Ward v. Norris* is the petitioner tries to argue that this is a substantive claim of incompetency of the client to proceed in a habeas proceeding.  What the Eighth Circuit says: We know what's really going on, you know, prior counsel was ineffective, and you're really saying they're ineffective. That's really your claim here.  But, unfortunately, even though ineffective assistance of postconviction counsel can be a defect in the habeas proceeding, you're out of luck because of the animating principle of *Coleman* and *Maples*.  Well, as I said, *Martinez* and *Trevino*, that's no longer the case.  And so I would argue that that language is helpful to us.  And, you know, there is a tension.  I'm not going to tell the Court there isn't a tension, because at the end of the day the Court -- if the Court grants our motion, at the end of the day the Court will address a claim on the merits.  But it's important to appreciate that the gateway to reopening this judgment is a defect in the proceedings, and after *Martinez* and *Trevino* and *Ward*, there's no

way to argue it is not a defect in the proceedings.

You know, I think Mr. Pellettieri made an allusion to the possibility that this was a new claim.  I can address that if the Court needs me to.  I mean, in response to the 59(e), when the question of new versus --

THE COURT:  I guess the question -- and I think his argument was that it doesn't matter whether it's the same claim or a new claim, it's still successive.  I think that's what he said ultimately.  And whether it was not raised at all or whether it was raised but not raised properly, you get to the same point, it's still a successive petition.

MR. SCHWARTZ:  You know, our argument, Your Honor, is that when our claim is based on a defect in a habeas proceeding of prior counsel's ineffective -- prior postconviction counsel's ineffectiveness, and especially in this case where prior foreclosure, because of a sea change in the law, no longer is the case, that Mr. Lee at that time had -- and, frankly, all of the information was before the court.  The deficient performance was amply demonstrated before the court.  The court said so in its order.  The supporting documentation for the basis of a successful claim of exclusion was before the court.  The change in the law that would have allowed Mr. Lee in the 59(e) to raise the issue of his lawyer's ineffectiveness is one of the factors that merits reopening at this time and also a factor that distinguishes this 60(b) from a 60(b) where we would come along

and maybe with justification say prior counsel was ineffective.

If I can just look at my notes, Your Honor.

THE COURT:  All right.

MR. SCHWARTZ:  I would disagree with Mr. Pellettieri's -- you know, I apologize.  I probably shouldn't be -- he's my friend.  I shouldn't have been referring to him by that.  But the government's position that only full abandonment merits 60(b) relief, I would cite to the recent case of *Roper v. Barnett, the Wessinger* case, which may not be cited, in which under very similar circumstances -- *Wessinger* is a 59(e) case out of the Middle District of Louisiana, raising ineffective assistance of postconviction counsel.  I know the Court is familiar with the *Roper v. Barnett* case.  And those courts properly found in the wake of *Trevino* that ineffective assistance of counsel, even short of full abandonment, is an appropriate factor in consideration of 60(b) relief.

Your Honor, I think I'm finished.  Let me just check my notes, if I may.

Oh, finally, Your Honor, you know, again, I don't know how determinative this would be of the ultimate question, but in response to the government's claim that Mr. Lee did not commit a procedural default by the utter failure to prosecute this claim because that's not a procedural default, it is.  I think all the Court needs to do is look at the *Martinez v. Ryan* case, which the claim was pled in state court.  It just wasn't prosecuted in

any effective way. And the court found ultimately that the claim was defaulted. So I think whether -- and I think Judge Eisele's language is about as clear an indication of default as one could imagine when he states that he's precluded from reviewing the proffered evidence.

Thank you, Your Honor.

THE COURT: Thank you. Well, I want to thank the lawyers on both sides for really excellent briefs and excellent presentations here. I thank you for coming a long way to try to help me understand the case. And we will study it and get an opinion out in due course. I don't know how long it will be. But we will work on trying to get a ruling to you on the present motion.

If there's nothing -- Mr. Schwartz?

MR. SCHWARTZ: I'm sorry to interrupt, Your Honor. Your Honor, may I beg the Court's indulgence and ask the Court -- we're quite busy in Delaware. Could I ask for an additional week?

THE COURT: Sure.

MR. SCHWARTZ: And may we present a post-argument submission to the Court?

THE COURT: Mr. Pellettieri, do you have any objection to that?

MR. PELLETTIERI: I guess it just depends on what the nature of the post-argument submission -- are you talking about

addressing the additional arguments?

MR. SCHWARTZ:  I would be happy to be in contact with Mr. Pellettieri and let him know exactly --

THE COURT:  Why don't you all discuss it, and if you have a proposal for post-argument presentation, you can present it, and if you all agree, then certainly I'll accept it.  If you don't agree, then I guess we can have a further telephone hearing to determine whether I would allow it.  I will let you -- I mean, the case that was cited that was not in the brief, I'm going to give you an opportunity to respond to that.  But that's a very narrow point.  And I will say that it appears to me that the issues have been thoroughly and very ably argued on both sides, so I'm not sure that we need additional argument. But you know your case better than I do, and so if you feel like something additional is necessary, I don't want to cut anybody off in this case where it's a death case.  I mean, I really want to make sure we give every opportunity to hear what Mr. Lee has to say, as well as what the government has to say.

MR. SCHWARTZ:  Thank you, sir.

THE COURT:  All right.  Unless there's something else, we will be adjourned.

(Whereupon, the hearing adjourned at 11:43 a.m.)

C E R T I F I C A T E

I, Eugenie M. Power, Official Court Reporter, do hereby certify that the foregoing is a true and correct transcript of proceedings in the above-entitled case.

/s/ Eugenie M. Power, RMR, CRR, CCR       Date:  September 2, 2014
United States Court Reporter