# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**DANIEL LEWIS LEE,**
     **Movant**

**v.**

         **Criminal Case No. 4:97-cr-00243-JLH-2**

         **CAPITAL CASE**

**UNITED STATES OF AMERICA,**
     **Respondent.**

---

### MOTION TO VACATE CONVICTION AND SENTENCE
### PURSUANT TO 28 U.S.C. § 2255
### OR IN THE ALTERNATIVE
### MOTION FOR RELIEF FROM JUDGMENT OR ORDER
### PURSUANT TO FED. R. CIV. P. 60

---

| | |
|---|---|
| MORRIS H. MOON | GEORGE G. KOUROS |
| Assistant Federal Public Defender | Assistant Federal Public Defender |
| Federal Capital Habeas Project | Federal Capital Habeas Project |
| 6411 Ivy Lane, Suite 710 | 6411 Ivy Lane, Suite 710 |
| Greenbelt, MD 20770 | Greenbelt, MD 20770 |
| (713) 880-3556 | (301) 821-0855 |
| Morris_Moon@fd.org | George_Kouros@fd.org |

Counsel for Daniel Lewis Lee

**TABLE OF CONTENTS**

I.    Introduction…………………………………………………………………….......2

II.   Background Facts and Procedural History…………………………………………..7
      A. Pre-Trial *Brady* Litigation…………………………………………………...7
      B. Trial……………………………………………………………………….......8
         1.  Summary of the Government's evidence at the guilt phase………………….…..8
         2.  Summary of the Government's evidence at the penalty phase………………....12
      C. Post-trial Proceedings…………………………………………………………16
      D. Facts Underlying the Present Motion……………………………………….....17
         1.  James Wanker………………………………………………………………..17
         2.  The Wavra murder………………………………………………….……...…20

III.  Jurisdiction…………………………………………………………………………23
      A. Mr. Lee's motion is not "second or successive" under the gatekeeping provision of 28
         U.S.C. § 2255(h)…………………………………………………………………23
      B. Background of the § 2255(h) gatekeeping provision………………………….…24
      C. Mr. Lee was unable to include these claims in his initial § 2255 because the prosecution,
         which possessed the evidence, represented repeatedly that it had no *Brady* material to
         disclose and disclosed none……………………………………………….…...26
      D. It would be a perverse result, and contrary to the intent behind the AEDPA, to find Mr.
         Lee's current motion to be second or successive for § 2255(h) purposes…………….....28

IV.   Claims for Relief…………………………………………………………………....30
      A. First Ground for Relief: Mr. Lee's conviction was obtained in violation of *Brady v.
         Maryland*…………………………………………………………………………...30
         1.  The evidence was favorable to Mr. Lee…………………………………………..30
         2.  The evidence was suppressed by the Government……………………………..…32
         3.  The suppressed evidence was material…………………………………….....34
            a.  The testimony of Gloria and Cheyne Kehoe was inherently suspect and, absent
                corroboration, would not have persuaded the jury……………………………....36
                i.   Benefits given to the Kehoes……………………………………….....36
                ii.  Conflicts with other evidence………………………………………….38
            b.  The conviction of Mr. Lee was dependent on a problematic timeline…………..40
                i.   The Kehoes' timeline depended on a series of dubious
                     assumptions……………………………………………………….....42
                ii.  The evidence indicates that Mr. Lee was observed back in Spokane as
                     early as January 12, 1996, which would render the Government's
                     timeline—and the Kehoes' testimony—impossible to accept………...…45
                iii. The jury would have evaluated the defense witnesses differently if it had
                     known that the Kehoes' testimony was uncorroborated…………………46
            c.  Conclusion……………………………………………………………47

B.  Second Ground for Relief: Mr. Lee's conviction was obtained in violation of *Napue v. Illinois* and *Giglio v. United States*……………………………………………………...48
    1.  James Wanker's testimony was misleading………………………………………….49
    2.  The Government knew or should have known Mr. Wanker's testimony was misleading……………………………………………………………………………50
    3.  Mr. Wanker's testimony was material……………………………………………....51

C.  Third Ground for Relief: Mr. Lee's death sentence was obtained in violation of *Brady v. Maryland*…………………………………………………………………………………52
    1.  The evidence was favorable to Mr. Lee…………………………………………....52
    2.  The evidence was suppressed by the Government………………………………..53
    3.  The suppressed evidence was material…………………………………………….54

D.  Fourth Ground for Relief: Mr. Lee's death sentence was obtained in violation of *Napue v. Illinois* and *Giglio v. United States*…………………………………………………59
    1.  The Wavra evidence was false and/or misleading………………………………...59
    2.  The Government knew or should have known the Wavra evidence was false and/or misleading…………………………………………………………………………60
    3.  The Wavra evidence was material………………………………………………...61

V.  In the alternative, Mr. Lee moves this Court to construe his motion as one filed under Fed. R. Civ. P. 60(b)(3) & (d)(3) and to reopen his first § 2255 motion in light of the newly discovered evidence……………………………………………………………………….62

Conclusion…………………………………………………………………………………….64

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**DANIEL LEWIS LEE,**
     **Movant**

**vs.**

        **Criminal Case No. 4:97-cr-00243-JLH-2**

        **CAPITAL CASE**

**UNITED STATES OF AMERICA,**
     **Respondent.**

**MOTION TO VACATE CONVICTION AND SENTENCE**
**PURSUANT TO 28 U.S.C. § 2255**
**OR IN THE ALTERNATIVE**
**MOTION FOR RELIEF FROM JUDGMENT OR ORDER**
**PURSUANT TO FED. R. CIV. P. 60**

COMES NOW Daniel Lewis Lee ("Mr. Lee"), by his undersigned counsel, and hereby moves the Court, pursuant to 28 U.S.C. § 2255, to vacate, set aside, and/or correct his conviction and sentence of death, on the ground that his conviction and sentence were imposed in violation of the United States Constitution or the laws of the United States. Mr. Lee seeks a hearing on all disputed issues of fact and respectfully reserves the right to amend this petition in accordance with law. In the alternative, Mr. Lee moves the Court, pursuant to Fed. R. Civ. P. 60(b)(3) & (d)(3), for relief from its Judgment issued September 4, 2008, denying Mr. Lee's motion for post-conviction relief pursuant to 28 U.S.C. § 2255. Mr. Lee is presently confined on death row within the United States Penitentiary at Terre Haute, Indiana.

## I.  INTRODUCTION

In 1999, Daniel Lewis Lee and co-defendant Chevie Kehoe ("Mr. Kehoe")[1] were jointly tried and convicted by a jury of participating in a pattern of racketeering activity. The Government alleged that Mr. Kehoe was the leader of the racketeering enterprise and that he directed Mr. Lee to participate in various crimes in furtherance of the enterprise. Although the jury acquitted both codefendants of numerous alleged racketeering acts – including a bombing of the Spokane City Hall in 1996, the 1995 murder of Jeremy Scott in Idaho, and the 1996 murder of John Cox in Idaho – it convicted them of the 1996 robbery and murders of William Mueller, Nancy Mueller, and Sarah Powell in Tilly, Arkansas ("the Mueller murders"). In separate penalty phase hearings, the jury sentenced Mr. Kehoe to life without possibility of release and sentenced Mr. Lee to death for each of the three murders.

The greater part of the guilt phase case dealt with Chevie Kehoe's history and his purported racketeering enterprise, the "Aryan People's Republic." The guilt phase evidence against Danny Lee was built on the testimony of two cooperating witnesses: Gloria Kehoe (Chevie's mother) and Cheyne Kehoe (Chevie's brother). They each testified that Mr. Kehoe confessed his and Mr. Lee's involvement in the Mueller murders, and Gloria claimed that Mr. Lee had also separately confessed to her.[2] The Government, however, could not rely solely on this testimonial evidence to obtain a conviction against Mr. Lee. As is explained in more detail below, *see* Section IV.A.3, Gloria and Cheyne had significant credibility problems: They each

---

[1] Throughout this motion, "Mr. Kehoe" refers to Chevie Kehoe. To avoid confusion, the movant will refer to other members of the Kehoe family (primarily, Kirby, Gloria and Cheyne Kehoe) by either their full names or their first names only.

[2] As was demonstrated at trial and is discussed in more detail below, the Kehoes were an itinerant family of white supremacists who were deeply involved in arms trafficking and other criminal activity. Gloria and Cheyne were also implicated in the racketeering enterprise but were provided immunity in exchange for their testimony.

had substantial motives to curry favor with the Government given their own criminal activities, they had given multiple inconsistent statements to law enforcement, and crucial aspects of their respective stories were contradicted by other witnesses and even by physical evidence. (Indeed, the jury acquitted Mr. Lee and Mr. Kehoe of numerous other racketeering acts – including a bombing and other murders – the evidence of which rested solely on the testimony of Gloria and Cheyne.) The Government presented two pieces of evidence that independently corroborated Mr. Lee's involvement in the Mueller murders: (1) expert evidence that a hair found in a hat worn by one of the perpetrators was microscopically similar to Mr. Lee's hair, and (2) testimony from a disinterested witness, James Wanker, that Danny Lee had once told him "that when he went south somebody had … fucked with him and so he wrapped them up, taped them, and threw them in the swamp." Tr. 4082.[3]

In the years since Mr. Lee's trial, one of those two -- the only physical piece of independent evidence -- has been eliminated: DNA testing has conclusively established that the "matching hair" was not, in fact, Mr. Lee's. *See* Exh. E (Serological Research Institute Mitochondrial DNA Report).[4] Mr. Lee has now discovered that the Government suppressed evidence that would have caused the jury to discount the second piece of evidence, Mr. Wanker's trial testimony. The Government told the jury at the time that it should credit Mr. Wanker's testimony about Mr. Lee's confession because he was an unbiased witness who had no incentive to come forward other than to tell the truth. Tr. 7002.

As detailed in the attached sworn declaration from James Wanker (Exh. A), he repeatedly told the Government prior to trial that he did not believe that Danny Lee's statement implicating

---

[3] Citations to the consecutively-paginated trial transcript are designated as "Tr." Citations to documents filed in the criminal docket in this case are designated as "Doc. No."

[4] DNA testing was conducted on the hair in 2007 in connection with his initial § 2255 proceeding.

himself in the Mueller murders was true. Rather, Mr. Wanker warned authorities that Mr. Lee had a habit of falsely claiming responsibility for criminal acts in order to make himself seem like a "tough guy," and that the boast about an unspecified murder was delivered in the same "empty bragging" manner the witness had seen before. Upon recently being shown copies of the written reports of his pre-trial interviews, Mr. Wanker was surprised to see that they included none of his warnings.

Mr. Wanker further attests that prior to testifying at Mr. Lee's trial, the Government instructed him not to volunteer this information while on the witness stand, and only to answer the specific questions asked of him. He therefore did not relate to the jury that Danny Lee had a penchant for boasting about acts he had not done; that he had consistently warned authorities about that fact; and that despite appearing as a witness for the Government, he continued to discount the veracity of Mr. Lee's purported admission. Had the defense been privy to this information, they would have discredited or moved to exclude Mr. Wanker's testimony, now the sole corroborating evidence used to connect Daniel Lee to the murder of the Muellers.

The Government's misconduct was not limited to the guilt phase proceedings, however. Mr. Lee has also learned that the Government failed to disclose information that rebutted a key element of its main penalty phase argument: future dangerousness. The cornerstone of this argument (emphatically presented to the jury by AUSA Lane Liroff, a California prosecutor working on special assignment from Main Justice)[5] was that Mr. Lee was an incurable

---

[5] Mr. Liroff is no stranger to controversy. California courts vacated a first-degree murder conviction he secured in 1996 based on his failure to disclose exculpatory evidence, *see Pham v. Terhune*, 2008 WL 787123 (N.D. CA. Mar. 20, 2008), and he was named in a study on prosecutorial misconduct published by the Northern California Innocence Project in 2010. '*Misconduct' Prosecutor Liroff defends his record*, paloaltoonline.com/2010/10/20misconduct-prosecutor-liroff-defends-his record, last visited 9-6-18. In 2010, fellow prosecutors and the California Government Attorneys Association went so far as to protest a potential

"psychopath"[6] whose prior bad acts proved he was predisposed to violence and would continue to be a future danger in prison if not executed. The key prior bad act that the prosecution relied on to make this argument was Mr. Lee's role, as a juvenile, in the 1990 fatal stabbing of Joseph Wavra in Oklahoma by Mr. Lee's cousin. As viewed through the prism of "psychopathy," Mr. Lee's involvement in the Wavra incident proved that he "thrived" on violence and would always remain a threat. In fact, the Government argued to the jury that with the benefit of hindsight, it could view all of Mr. Lee's alleged "prior bad acts" as being symptomatic of, and consistent with, a diagnosis of psychopathy: "Can't we all, with the benefit of hindsight, look at this and see, My God, look at what the *diagnosis* was." Tr. 7968 (emphasis added).

The outcome of the Wavra homicide, Mr. Lee's plea to deferred adjudication on a charge of robbery, was described to the jury as a big break for him. According to Mr. Liroff,

> [H]e got a gift in that case from the prosecutors in Oklahoma. They gave him a plea bargain. And this allowed him to get off with just a robbery.

---

commendation, pointing to a long history of questionable behavior including a month-long suspension for unethical actions. *DA's retirement plaque exposes bitter rift*, mercurynews.com/2010/12/0-7/das-retirement-plaque-exposes-bitter-rift/, last visited 9-6-18.

[6] The Government introduced expert evidence that Mr. Lee was diagnosed as a "psychopath" using an instrument known as the Hare Psychopathy Checklist-Revised (PCL-R). The Government's expert has since renounced his reliance on that instrument, having acknowledged in another federal capital case that the PCL-R is not a valid or reliable predictor of future dangerousness in prison, and that even as of 1998 – a year before Mr. Lee's trial -- there was no scientific basis for claiming that the PCL-R could be used for such a purpose. *See* Exh. T (Declaration of Thomas V. Ryan, Ph.D). In the ensuing years since Mr. Lee's trial, additional flaws with the PCL-R have been documented. Although the trial judge contemporaneously noted that the psychopathy evidence played a central role in Mr. Lee's death sentence, *see United States v Lee*, 89 F.Supp.2d 1017, 1031 (E.D. Ark. 3/21/00) (Memorandum opinion and order granting motion for new trial), *reversed by*, 274 F.3d 485 (8th Cir. 2001), no court has ever considered the falsity of the evidence because both trial counsel and initial §2255 counsel failed to properly present the issue for review. *See Lee v. United States*, 811 F.3d 272 (8th. Cir. 2015) (Kelly, J., dissent from denial of rehearing). Mr. Lee remains the only individual on federal death row whose death sentence rests on such evidence.

Tr. 7383. The teenaged Danny Lee got this "gift" despite "legally and morally" having "the blood of Joey Wavra" on his hands. Tr. 7963. This was a powerful message to give to jurors—Danny Lee got away with one murder, don't let it happen again.

But previously undisclosed evidence now establishes that these representations about the Wavra incident were false. The Oklahoma prosecutors did not give Danny Lee a "gift."  On the contrary, records show that an Oklahoma judge dismissed the murder charge for a lack of evidence, following a six-hour preliminary hearing. Exh. C (Excerpts, Oklahoma County District Court No. CF-90-5292). In other words, there was a judicial determination that the evidence of Mr. Lee's alleged role in the Wavra murder was so insufficient that it did not even meet the lower "probable cause" standard of proof to bind him over for a trial. The reason Mr. Lee was not tried for the murder of Mr. Wavra was not because of prosecutorial largesse, but rather because of a lack of evidence to support a homicide charge.

The Government never disclosed this information. Instead, it carefully curated its presentation of Oklahoma state court and police records at the trial to give the jury the false impression that Mr. Lee was substantially more involved in the Wavra incident and that he had "got[ten] away" with murder once before. This was a powerful death penalty argument to make to a jury that had just sentenced the more culpable of the two defendants to life in prison. And it succeeded. As the presiding judge previously noted, "the testimony regarding [Mr. Lee's] role in the Wavra murder was powerful and likely contributed to or influenced the jury's ultimate decision." *United States v. Lee*, 2008 WL 4079315 at *45 (E.D. Ark. 8/28/08) (order denying § 2255 motion).

Daniel Lee remains under federal sentence of death. Though years after trial, it has only just come to light that the prosecution failed to disclose evidence crucial to the jury's decision-making at both phases of his trial. His conviction and death sentence cannot stand.

This pleading sets out the mechanism for addressing the legal errors here. In the sections that follow, Mr. Lee will: (1) recount the procedural history of this case; (2) describe in full the undisclosed evidence that undermines the Government's guilt- and penalty-phase cases; (3) establish this Court's jurisdiction to hear this case as a "second-in-time" § 2255 motion that does not require prior authorization by the Circuit Court; (4) plead Mr. Lee's claims for relief that his conviction and death sentence were obtained in violation of *Brady v. Maryland* and *Napue v. Illinois/Giglio v. United States*; and (5) move that, in the alternative, this pleading be construed as a request for equitable relief under Federal Civil Rule 60 to reopen the judgment in the § 2255 proceedings in light of the newly discovered evidence.

## II.    Background Facts and Procedural History

### A.  Pre-Trial *Brady* Litigation

Shortly after their appointment, counsel for Mr. Lee filed several pre-trial motions requesting that the Government reveal all information and material known to it that might be favorable to Mr. Lee on the issue of guilt or punishment pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Doc. Nos. 28, 31. The Government responded that it "recognize[d] its obligation under *Brady v. Maryland*," and would "provide all *Brady* material as required by law." Doc. No. 55 at 2. The prosecutors further stated that they would "treat this motion as continuing." *Id.*

During a pretrial conference on April 9, 1998, the prosecution represented that the "bulk" of the *Brady* material had already been disclosed to the defense. 4/9/98 Tr. at 32. The Court

thereafter entered an order dismissing Mr. Lee's *Brady* motion as moot "[f]or the reasons set forth on the record and in open court" at the hearing, while also directing the Government to provide defense counsel with any discovery to which Mr. Lee was entitled "on a continuing basis as it is received." Doc. No. 145 at 1, 3. The Government produced no additional *Brady* material pursuant to this order.

Several months later, after the Government moved to amend its notice of intent to seek a death sentence (Doc. No. 224), counsel for Mr. Lee renewed their requests for *Brady* material as to any issues relevant to sentencing. Doc. Nos. 258, 259, 260. The Government responded that it had nothing further to disclose. Doc. No. 327 at 1; *see also* Doc. No. 288 at 2.

The Court subsequently granted Mr. Lee's request for *Brady* material as to punishment:

> In his motion, Defendant Lee asks the Government to provide him with any information in its possession "arguably favorable to the Defendant on the issue of sentencing." Motion at ¶8. The Government has responded, and although it acknowledges its obligation to provide the requested information under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and its progeny, the Government states that it has already disclosed all such information in its possession. The Government further states that it will confer with counsel to verify that all such relevant documents have been disclosed. Because Defendant Lee is entitled to the requested information and the Government is under a continuing duty to disclose it to him, the Court will grant Defendant Lee's motion.

Doc. No. 344 at 4.

### B. Trial

#### 1. Summary of the Government's evidence at the guilt phase

The Government presented evidence that Chevie Kehoe, his father Kirby Kehoe, his brother Cheyne Kehoe, Faron Lovelace, and Daniel Lee participated in a variety of criminal activities to promote and fund a white supremacist organization known variously as the Aryan Peoples' Republic or the Aryan Peoples' Resistance (APR). Mr. Kehoe allegedly formed the

8

APR in 1992 to establish an independent nation of white members of the Christian Identity faith in the Pacific Northwest. *See United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004).

According to the Government, Mr. Lee did not join the enterprise until 1995, when Mr. Kehoe recruited him. In January 1996, Mr. Kehoe and Mr. Lee left the state of Washington and traveled to Oklahoma to visit Mr. Lee's mother, who was hospitalized for emergency gallbladder surgery. Tr. 2617. According to the Government, the two then left Oklahoma on January 10 or 11 and traveled to Arkansas, where they planned to rob William Mueller.

Mr. Mueller was a federally licensed gun dealer who frequently traveled the gun show circuit, selling firearms, ammunition, and various books and materials about "survivalist" practices. It was at these gun shows that the Kehoes first met him and bonded over their shared extremist beliefs. (Mr. Mueller was known to espouse antigovernment views similar to the Kehoes and he often talked about going "sovereign" and getting "off paper"—that is, renouncing his United States citizenship, exchanging his currency for gold and silver coins, and amassing a stockpile of food, weapons, and supplies to allow him and his family to live "off the grid" and unconnected to the rest of society.)  Tr. 1977-81, 2027-29, 2228-31, 2235-37, 2497, 5910.[7]

William Mueller kept a large collection of weapons, ammunition, and valuable coins at his home in Tilly, Arkansas. Mr. Kehoe and his father Kirby had previously burglarized the Mueller residence in February 1995; they broke in while the Muellers were away and stole weapons and cash. According to the Government, Mr. Kehoe believed there was additional valuable property at the Mueller home and convinced Mr. Lee to join him in a plan to steal these goods.

---

[7] Like the Kehoe family, Mr. Mueller had adopted Christian Identity teachings and "believed that the white race was superior and all others were there for the purpose of serving the white race." Tr. 2232-33.

The Government alleged that Mr. Kehoe and Mr. Lee carried out the murders on January 11, 1996.[8] According to the prosecution's theory, the Muellers were not home when Mr. Kehoe and Mr. Lee arrived. Rather than burglarize the house and leave, as Mr. Kehoe and Kirby had done in 1995, the Government contended that after breaking in, Mr. Kehoe and Mr. Lee dressed themselves in FBI raid gear and laid in wait for the Muellers to return. When the family arrived, Mr. Kehoe and Mr. Lee pretended that they were FBI agents conducting a raid. After finding $50,000 in cash, guns, and ammunition, they incapacitated the Muellers with a stun gun, placed sealed plastic bags over their heads, drove nearly 50 miles to abandon the Muellers' Jeep, then another 20 miles to dump the victims' bodies over a bridge into the Illinois Bayou, before taking off with the stolen property and driving 2,000 miles nonstop to Spokane, Washington.

The prosecution theory came solely from Cheyne and Gloria Kehoe. Both claimed that Chevie Kehoe had separately confessed to each of them that he and Mr. Lee carried out the murders. Gloria also claimed that Mr. Lee confessed his involvement to her. *Lee*, 374 F.3d at 642-43.

The Government relied heavily on two sources of evidence to corroborate the Kehoes' account of the crime. The first was the testimony of James Wanker, a resident of the Shadows Motel in Spokane where Mr. Lee and the Kehoes occasionally stayed. According to Mr. Wanker, sometime between July and September of 1996 Danny Lee told him that he committed a crime

---

[8] According to the prosecution, the last time the Muellers were ever seen or heard from was on January 11. Mr. Mueller did some electrical work at the home of a friend that morning and then went to an electronics store that same day. Tr. 1794-95; 1802-04; 1810. Another witness testified to receiving a phone call from Mrs. Mueller the morning of the 11th, Tr. 2139, and phone records showed that the last outgoing call made from the Mueller home was on January 11. Tr. 1837.

that involved facts similar to those of the Mueller murders. Tr. 4082-83.[9] The Government

emphasized in its argument to the jury that Mr. Wanker was an unbiased witness who was

receiving nothing in exchange for his testimony, and that his only incentive for coming forward

was to tell the truth:

> Nobody has paid Mr. Wanker anything. There is no reason for him to come in here and tell you that story unless it's the truth. And it's the truth because Danny Lee told him that. And there he told what happened. It's not detailed and it's not involved, but its real and that's what they did.

Tr. 7002.

The second source was a piece of physical evidence. During a search of one of Mr.

Kehoe's vehicles, the Government seized the FBI raid gear that it alleged the two wore during

the Mueller murders. A hair was recovered from one of the caps, and according to an expert from

the Arkansas State Crime Laboratory, this hair was microscopically similar to Mr. Lee's hair. Tr.

4722. In its closing argument, the Government forcefully argued that "the evidence establishes

that *that was Danny Lee's hair*." Tr. 7000-01 (emphasis added).[10]

---

[9] The Government also introduced testimony from Dalvine Wanker, James Wanker's then-wife, that sometime in August of 1996, she told Danny Lee that she was concerned about a new tenant at the Shadows Motel, and that in response Mr. Lee "went into [his] trailer and came out and he had a firearm and said that he wasn't afraid to use it and that when he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093. As even the Government conceded at trial, this "isn't a detailed statement," Tr. 7003, and provides no connection to the Muellers or even to Arkansas. The Government needed James Wanker's testimony.

[10] The prosecution also attempted to link Mr. Lee to the crime via a fingerprint recovered from a display case the Muellers used at gun shows. Tr. 7001. But as was pointed out at trial, Mr. Lee frequently helped the Kehoes transport the display case to and from a storage unit at the Shadows Motel and even, on occasion, lived in that storage unit. Tr. 2856-57; 2915; 4815; 5312; 6878; 6946-47. This evidence therefore had little, if any, probative value as to whether Danny Lee was at the crime scene.

11

### 2.   Summary of the Government's evidence at the penalty phase

The thrust of the Government's penalty phase presentation was that Mr. Lee was a "psychopath" who was predisposed to violence and would be a danger to the lives and safety of other persons if not sentenced to death. In concert with expert evidence that he had scored high enough on a diagnostic instrument to qualify as a psychopath, the prosecution relied most heavily on a key prior bad act to prove Mr. Lee's "future dangerousness" -- his alleged involvement in the 1990 murder of Joseph Wavra in Oklahoma.

According to the Government, Mr. Lee was at a house party with his cousin, John David Patton, where they, along with the other guests at the party, drank a substantial amount of alcohol and took LSD. At some point in the evening, Mr. Lee got into a fight with Mr. Wavra; Mr. Patton then came outside where the two were and assaulted Mr. Wavra as well. According to the case the prosecution presented at his penalty phase proceeding, Mr. Lee helped his cousin force Mr. Wavra down into a manhole and provided Mr. Patton with the rope and knife he used to kill Mr. Wavra. Mr. Wavra's body was found in the storm sewer with over 40 stab wounds and with his throat having been slit.

The Government called four witnesses to testify about the Wavra murder. Detective Randall Yarbrough of the Oklahoma City Police Department described his investigation. Tr. 7389-98. Forensic pathologist Chai Choi testified that the victim's throat was cut and that he had sustained multiple stab wounds. Tr. 7407. Bryan Compton, a guest at the house party, testified that he watched Mr. Lee and Mr. Wavra fighting that night, observed Mr. Wavra going into the storm sewer with Mr. Patton, and saw Mr. Lee hand Mr. Patton a bag. Tr. 7408-7418. Mr. Compton, however, never saw a knife or rope and did not see whatever happened in the storm sewer. Tr. 7414. Finally, Rochelle Ezzi, a friend of Mr. Lee's, testified that she first met him at a

12

party in 1995, long after the Oklahoma prosecution was complete; at that time, Mr. Lee told her that he wore red laces on his boots because it signified that he had murdered someone. Tr. 7456-58. But as she explained on cross-examination, she did not give Mr. Lee's story any credence because she believed he was just "trying to impress me, thinking that was going to impress me that he was this skinhead or what." Tr. 7640.

Initially only Mr. Patton was arrested and charged with Mr. Wavra's murder. Mr. Lee gave two statements to local law enforcement denying any involvement in the actual murder but corroborating the state's suspicions about Mr. Patton. At Mr. Patton's preliminary hearing on September 28, 1990, however, a 17-year old, lawyerless Mr. Lee was called by the prosecution as a witness. Tr. 7418-56. In that proceeding, Mr. Lee changed his testimony, claiming for the first time that he was involved in the Wavra murder and that he followed Mr. Patton into the storm sewer. Tr. 7428-43.[11] At the end of his testimony, Danny Lee told Patton, "I love you" and, although he had taken the stand to testify as a state's witness, the judge ordered the sheriff

---

[11] Debra Carter, a friend of both Mr. Lee's and Mr. Patton's, was present at Mr. Patton's preliminary hearing when Mr. Lee testified. As she has noted, it was clear to her that Mr. Lee, who was "younger than Patton and looked up to" and "idolized" him, exaggerated his role in the Wavra murder to help his cousin:

> I was there when Danny took the stand and incriminated himself. It was shocking to see Danny, this seventeen year old kid, who had no idea what he was doing, talking himself up like that on the stand for no reason other than to pretend to be a man and try to take some heat off of Patton. It was terrible to see Danny talk himself into trouble in the courtroom that day.

Exh. D (Declaration of Debra Carter) at ¶ 16. Indeed, Ms. Carter spoke with Mr. Lee soon after Mr. Patton's arrest, and he told her that it was Mr. Patton who "took Wavra outside the house and beat the hell out of him; Patton then got nervous and took Wavra down into the sewer and stabbed him to death because he was scared Wavra would be able to identify everyone that was at [the house party] that night." *Id.* at ¶¶12-13. According to Ms. Carter, "Patton was a big guy, at 6'2", and I doubt he needed any help taking Wavra down into the sewer." *Id.* at ¶14.

Notably, Ms. Carter's observations are entirely consistent with both Ms. Ezzi's testimony and Mr. Wanker's declaration; taken together, they demonstrate a consistent pattern of Mr. Lee falsely "taking credit" for criminal acts in order to make himself appear tough.

13

to take the teenager into custody pending murder charges.[12] The entirety of Mr. Lee's self-incriminating testimony at his cousin's preliminary hearing was read into evidence at the federal capital trial. Tr. 7418-56. Only Mr. Patton was convicted of the murder, however, and the jury was told that Mr. Lee was told that despite being guilty of murder, he was allowed by the local prosecutors to plead guilty to the less severe crime of robbery.

The Government took this murder charge and robbery conviction and presented it as evidence of Mr. Lee's guilt and the Oklahoma state attorney's beneficence. In fact it was neither and they knew (or should have known) that. Prosecutor Liroff used this as a leitmotif to convince the jury to sentence Mr. Lee to die in the federal capital trial. He told the jury:

> [Mr. Lee] got a gift in that case from the prosecutors in Oklahoma. They gave him a plea bargain. And this allowed him to get off with just a robbery.

Tr. 7383. As proof, the Government introduced a certified copy of Mr. Lee's Oklahoma state court conviction for the crime of robbery, as well as a certified copy of Mr. Patton's Oklahoma state court conviction for the crime of murder. Tr. 7470.

Throughout his closing argument to the jury, Mr. Liroff emphasized that there was no question that Mr. Lee had committed the Wavra murder. Tr. 7963 ("legally and morally the blood of Joey Wavra's hands is on Daniel Lee"); Tr. 7964 ("[Daniel Lee] has an earlier murder under his belt, who has a prior victim's blood on his hands"); Tr. 7964-64 ("Usually you commit a murder, and you get sent away for a very long time. … Daniel Lee got a do over."). The

---

[12] Oklahoma state prosecutor Brad Miller, who was lead counsel on the Patton case, also has a checkered past. Two Oklahoma capital convictions and death sentences Mr. Miller secured (only a few years after the Wavra case) were reversed because he enticed a witness to testify falsely in exchange for favorable treatment and intimidated juvenile witnesses to lie on the stand. *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009); *Powell v. Mullin,* 2006 WL 249632 (W.D. OK 2006). The Oklahoma State Bar suspended Mr. Miller's license to practice for 180 days as a sanction. *See also State ex rel. Oklahoma Var Ass'n v. Miller*, 309 P.3d 108, 115 (Okla. 2013) (Miller found to have coerced false testimony from juveniles; state bar issued 6-month license suspension).

pointed implication was that Mr. Lee inexplicably was allowed to get away with murder by the local prosecutors, but that the Government would not make the same mistake here, and neither should the jurors.

Mr. Liroff highlighted the commission of the Wavra murder as a "drastic distinction" between him and his co-defendant that justified sentencing Mr. Lee to death, even though he was the less culpable actor in the Mueller murders and the jury had just given Mr. Kehoe life imprisonment. Tr. 7962. The prosecutor repeatedly emphasized that the Wavra murder proved that, unlike his co-defendant, Mr. Lee was a "psychopath" who "even if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards. He continues to be dangerous." *See* Tr. 7381-82; 7959; 7962-64; 7970; 7974-75; 7991. Indeed, far from merely proving the "future dangerousness" aggravator, Mr. Liroff argued that this difference in the respective backgrounds of the two co-defendants also justified rejecting Mr. Lee's proposed statutory mitigating factor, that "[a]nother person, equally culpable in the crimes, will not be punished by death." Tr. 7969-70. Mr. Lee and Mr. Kehoe were not equal, argued the Government, because "[t[here's no prior Joey Wavra as to Chevie. There is as to Lee." Tr. 7970.[13] The jury ultimately agreed: all twelve jurors found that the "future dangerousness" aggravator had been proven in Mr. Lee's case, but only three jurors found that the mitigating factor had been established. *See* Exh. J (Penalty Phase Verdict Form) at 6, 8. The jury thereafter sentenced Mr. Lee to death.

---

[13] For the prosecution to suddenly argue that Daniel Lee was the more blameworthy of the two was further evidence of misrepresentation. Throughout the case, the Government had been clear that Chevie Kehoe was the ringleader and Danny Lee his "faithful dog." Tr. 6821. Chevie had also been cited for a raft of violent acts, including the attempted murder of two police officers during a shootout in Ohio (which he committed with his brother, Cheyne).

15

### C. Post-trial Proceedings

Mr. Lee's conviction and sentence were affirmed on direct appeal. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied*, 545 U.S. 1141 (2005). He filed a motion to vacate under 28 U.S.C. § 2255 on June 26, 2006, raising numerous grounds for relief. Doc. No. 1118-1. Among these were: 1) a general allegation that the Government had improperly withheld information favorable to the defense bearing on guilt or punishment in violation of its constitutional *Brady* obligations, *id.*at 7;[14] and 2) a claim that trial counsel were ineffective for failing to conduct a complete and adequate investigation of the circumstances of Mr. Lee's true role in the Wavra murder. *Id*. at 32.

In its response, the Government did not directly address the *Brady* claim but simply noted that it had previously provided a "huge amount" of discovery to trial counsel. Doc. No. 1126-1 at 45 n.16. With respect to counsel's investigation of the Wavra murder, the Government stated that it was "at a loss to understand that which Lee now argues his trial counsel should have done. Counsels' performance was neither deficient nor prejudicial." *Id*. at 76. According to the Government, the

> *basic facts* were that when Lee was 17, he assisted his cousin, John David Patton, when Mr. Patton stabbed Joey Wavra about 40 times and slit his throat. Lee beat Mr. Wavra prior to the stabbings, pushed Mr. Wavra into a large storm sewer and handed the knife Patton used to stab Wavra to Patton. *These facts were going to be presented*. The only question at the suppression hearing was the manner in which they would be presented.

Doc. No. 1126-1 at 73 (emphasis added). Given the inescapable "basic facts" about Mr. Lee's role in the Wavra murder, the Government stated that it was "difficult to imagine" how a

---

[14] Mr. Lee's initial § 2255 counsel had no facts to support the allegation that the Government had suppressed any information, but sought to preserve the issue in the event that any information came to light that would support of a specific *Brady* claim. No disclosures were made by the Government on this issue.

properly conducted investigation of the Wavra murder would have placed Mr. Lee's role in that offense "in an entirely different light." *Id*. at 75-6.

In its order denying the §2255 motion, the Court did not address the *Brady* issue, but commented with respect to the ineffectiveness claim that:

> The Court agrees with Petitioner that the testimony regarding his role in the Wavra murder was powerful and likely contributed to or influenced the jury's ultimate decision. However, there is nothing before the Court to indicate that Petitioner's "true role" in the murder was anything other than as portrayed during the sentencing trial.

Doc. No. 1163 at 88-89.

### D. Facts Underlying the Present Motion

Previously undisclosed evidence now establishes that the Government engaged in prosecutorial misconduct at Mr. Lee's trial. Due to the Government's suppression of *Brady* material and its presentation of false and misleading evidence, the jury that convicted Mr. Lee and sentenced him to death never knew two crucial facts: 1) Mr. Wanker's testimony about Mr. Lee's purported admission was not truly the corroborative evidence the Government presented it to be; and 2) dropping the prior murder charge against Danny Lee was not an act of prosecutorial generosity or even discretion but rather was compelled by a lack of evidence.

### 1. James Wanker

James Wanker testified at trial that in July or August of 1996, a group of people were having beers in the parking lot at the Shadows Motel when Mr. Lee, unprompted, told Mr. Wanker that "somebody had fucked with him and so he wrapped them up, taped them, and through (sic) them in the swamp." Tr. 4082. The testimony was offered at the capital murder trial as straight fact, with the Government asking no questions about Mr. Lee's demeanor when the statement was made or whether he appeared credible. In its closing argument, the Government

17

argued that this evidence of Mr. Lee's alleged confession was especially reliable because it came from an unbiased witness with "no reason … to come in here and tell you that story unless it's the truth." Tr. 7002.[15]

The jury was given the impression that Mr. Wanker decided to alert authorities because he believed he had important evidence about Mr. Lee's guilt. This was not true. The previously undisclosed evidence establishes that the Government's presentation of Mr. Wanker's testimony was carefully choreographed to omit the facts and circumstances that would have led jurors to question the veracity of Mr. Lee's purported admission. As detailed in the attached sworn declaration by Mr. Wanker, if a complete account of what he had told authorities had been disclosed at the time of trial, it would have revealed instead that he had a well-founded basis to discount the statement Mr. Lee made to him.

James Wanker met Mr. Lee in 1996 at the Shadows Motel in Spokane. Tr. 4078-79; Exh. A at ¶ 4. Mr. Wanker lived in the motel, and Chevie Kehoe and his family lived in a trailer in the RV section of the property. Tr. 4079. Danny Lee would often sleep on a couch outside the Kehoe trailer. Tr. 4080-81. Mr. Wanker recalled that he "really seemed like he was just looking for somewhere to belong. He wanted to look badass like the Kehoes but you could tell he didn't really fit in with them." Exh. A at ¶ 5. Over time, Mr. Wanker saw that Mr. Lee routinely made up stories to make himself seem tough and fit in better with those around him, including the Kehoes:

> Danny was a follower who tried to sound like a big guy. He was always trying to blow smoke up my ass; trying to impress me by sounding tough. He would spout off about different fights and crazy situations that were not true just to look tough and try to fit in.

---

[15] *See also id.* (arguing that people like Mr. Wanker were "salt of the earth," and that he was "not only a hard working guy; he's a mannerly guy").

Exh. A at ¶ 6.

One summer afternoon in 1996, after Mr. Lee had been drinking beers, he started bragging again about how tough he was and about all the things he had done, including that he had once killed somebody in the south. Tr. 4082. These assertions were consistent with the empty bragging that Mr. Wanker had seen him exhibit in the past:

> When Danny made these comments about this trip, I didn't believe him. I knew him to be a braggart and that he would try to claim responsibility for criminal actions in order to fit in with the Kehoes. It still cracks me up that Danny was trying to be a tough guy.

Exh. A at ¶ 7.

Almost a year later, in the spring of 1997, a local Spokane officer came to the Shadows Motel asking questions about the Kehoes. Exh. A at ¶ 8. At the time, Chevie and Cheyne Kehoe were wanted for a shoot-out with police officers in Wilmington, Ohio; they had fled the shooting and their whereabouts were unknown. While chatting with the officer, Mr. Wanker mentioned that he had heard Mr. Lee brag about committing various crimes, including an unspecified murder, but made clear that he did not believe any of it to be true. *Id.*

On June 16, 1997, Cheyne turned himself in for the Ohio shooting. In exchange for leniency, he gave a statement to authorities implicating Mr. Lee and Mr. Kehoe in the Mueller murders. It was after Cheyne's statement that authorities showed a renewed interest in Mr. Wanker. *Id.* at ¶ 9. An officer from Arkansas contacted Mr. Wanker by phone on June 26 and asked him about what he had heard Mr. Lee say. *Id.* Mr. Wanker told him what he had told the Spokane officer, noting again that Mr. Lee did not appear to be credible. *Id.* About a week later, an ATF agent from the Spokane field office interviewed Mr. Wanker. *Id.* at ¶ 10. Once again, Mr. Wanker stated what he had heard and how it was of a piece with Mr. Lee's prior phony boasts. *Id.* Notably, the ATF agent also appeared to be dismissive of the story. *Id.* However,

19

when the agents memorialized their interviews, they did not include any of the context or warnings Mr. Wanker had given them. *See* Exhs. G & H.

In subsequent interviews with the Government prior to trial, Mr. Wanker repeated his observations and caveats to the case agent and the prosecutors: Mr. Lee had a history of claiming "credit" for misdeeds that were not his. Exh. A. at ¶ 11. In preparation for his testimony, Mr. Wanker was told that what Mr. Lee had said was "very important" and that Mr. Wanker should stick to just answering the questions posed to him about it and not volunteer any other details, including why he believed Mr. Lee's "confession" was not credible. *Id.* at ¶ 12.

The Government sanitized Mr. Wanker's statements and shaped his testimony, enabling it to present the evidence in a false and misleading manner. Contrary to the specific impression the prosecution created at trial, Mr. Wanker was not a concerned witness who initiated contact with authorities because he believed he had valuable, credible information to share about the Mueller murders. Instead, Mr. Wanker had well-founded doubts about the veracity of what he had heard. The jury never learned this because the Government worked to present him as a persuasive and compelling witness who could corroborate Cheyne's and Gloria's claim that Mr. Lee was involved in the Mueller murders. The jurors never heard that in reality Mr. Wanker had repeatedly warned authorities from the start that Danny Lee's statement fit a pattern of "empty bragging" by a young man desperate to seem tough and fit in, and that Mr. Wanker found it no more credible at the time of his capital murder trial than he did when it was made. *Id*. at ¶ 13.

### 2.  The Wavra murder

By the time the Government reached Mr. Lee's penalty phase proceeding, it had a considerable problem on its hands. The jury had already sentenced Chevie Kehoe to life without possibility of release, despite the fact that the Government spent the entirety of the guilt phase

proceeding, through its evidence and its arguments, showing that Mr. Kehoe was the more

culpable party. Not only was Mr. Kehoe the leader of the racketeering enterprise and engaged in

numerous violent acts in which Mr. Lee was not implicated (including the attempted murder of

two law enforcement officers), but the Government's own evidence established that Mr. Kehoe

played a more aggravated role in the Mueller murders themselves.[16] As Judge Eisele, who

presided over the trial, contemporaneously noted:

> The Government has maintained throughout the pre-trial, trial and post-trial periods that Chevie Kehoe was the leader of the RICO enterprise and that Danny Lee and others were his subordinates. The proof at trial was consistent with those contentions. In fact, Defendant Lee was implicated in only a few of the numerous RICO acts alleged in the Indictment, and he was acquitted of at least two of the acts in which he was implicated. To be sure, he was found guilty of the RICO acts relating to the robbery and murders of the Mueller family, but even with respect to those crimes, the testimony was that Defendant Lee played a lesser role in their planning and commission.
>
> With respect to the murder of Sarah Powell [the Muellers' eight year old daughter], the principal testimony offered to establish the details of the crime was that of Chevie Kehoe's mother, Gloria Kehoe. Ms. Kehoe testified that she was told by Chevie Kehoe that Danny Lee could not participate in that murder and that he (Chevie Kehoe) had to carry it out alone. Moreover, the proof as a whole left the definite impression that Defendant Kehoe was the orchestrator of the entire RICO operation, and that Defendant Lee served as his subordinate for only a brief portion of the lengthy multi-state conspiracy.

---

[16] It was common knowledge among those involved in the case that Mr. Kehoe was the far more culpable actor, with respect both to the Mueller murders and the defendants' histories. Prior to Mr. Lee's penalty phase proceeding, the United States Attorney for the Eastern District of Arkansas announced that if the jury spared Mr. Kehoe, the Government would abandon its efforts to obtain a death sentence for Mr. Lee. The U.S. Attorney assured the trial court that the entire prosecution team and the victims' family members had approved this decision. Despite the parties' agreement that under those circumstances Mr. Lee's case should not proceed to a capital sentencing hearing, the local U.S. Attorney's decision was vetoed by their superiors in Washington, D.C. Thus, the U.S. Attorney's Office was compelled to seek a death sentence against Mr. Lee, despite its own evidence that he was far less culpable. *See United States v. Lee*, 89 F. Supp. 2d 1017, 1032-35 (E.D. Ark. Mar. 21, 2000).

*United States v. Lee*, 89 F. Supp. 2d 1017, 1032 n.9 (E.D. Ark. Mar. 21, 2000) (Memorandum

Opinion and Order regarding Future Dangerousness and the Death Penalty Protocol), *rev'd on*

*other grounds*, 274 F.3d 485 (8th Cir. 2001).

Since the Government could not credibly claim that Mr. Lee was more deserving of a

death sentence based on his role in the offense, it instead focused on Mr. Lee's "future

dangerousness." As noted above, the prosecution highlighted the Wavra murder as the critical

prior bad act that could show both that Mr. Lee was a "psychopath" who thrived on violence, and

that he was incapable of changing his ways even after being given a "gift" and a chance to

straighten out his life.

We now know that the Government's account of the Wavra case was false. An Oklahoma

state court record, attached as Exh. C, establishes that the prosecution failed to disclose critical

facts. On December 13, 1990, just a few short months after Mr. Patton's preliminary hearing,

Mr. Lee had his own preliminary hearing on the murder charge that had now been brought

against him. After taking into account all of the evidence, including Mr. Lee's prior testimony at

his cousin's preliminary hearing, the state court found that the crime of "Murder I" was "not

established by the evidence." *Id*. Based on his review of all the prosecution's evidence, the judge

recommended dismissing the murder charge altogether and that the state "consider refiling on the

charge of Robbery I." *Id*. The State agreed, and Mr. Lee accepted a deferred adjudication to a

robbery charge that involved taking Mr. Wavra's keys without his consent.

A judicial ruling that the prosecution could not even proceed on a murder charge is a far

cry from the Government's insistence that Daniel Lee was "legally and morally" guilty of Mr.

Wavra's murder and essentially got away with it due to prosecutorial charity. The Government's

insistence at the penalty phase that Danny Lee had "gotten away" with one murder and should

22

not be given such a "gift" again was, as it did know or should have known, a serious perversion

of the truth.

### III.    Jurisdiction

Due to the prosecution's failure to disclose, Daniel Lee only recently learned of the facts

on which he bases this motion. He therefore was previously unable to bring his claims before any

court. This Court now has jurisdiction to hear this evidence pursuant to 28 U.S.C. § 2255:

> A prisoner in custody under sentence of a court established by Act of Congress
> claiming the right to be released upon the ground that the sentence was imposed
> in violation of the Constitution or laws of the United States … may move the
> court which imposed the sentence to vacate, set aside or correct his sentence.

28 U.S.C. § 2255(a). Mr. Lee is in custody under sentence of this Court, and he claims the right

to vacate his conviction and sentence because they were obtained in violation of the Fifth and

Eighth Amendments to the United States Constitution.

### A. Mr. Lee's Motion is not "second or successive" under the gatekeeping provision of 28 U.S.C. § 2255(h).

Where a claimant could not have raised a claim in his first § 2255 motion because it had

not yet arisen, he may file a second § 2255 motion without first obtaining authorization from the

appellate court pursuant to § 2255(h). *Deroo v. United States*, 709 F.3d 1242 (8th Cir. 2013),

*citing Singleton v. Norris*, 319 F.3d 1018, 1023 (8th Cir. 2013) (*en banc*) ("[A]" habeas petition

raising a claim that had not arisen at the time of a previous petition is not barred by § 2244(b) or

as an abuse of the writ."). Mr. Lee's *Brady*/*Napue*/*Giglio* claims, the subject of this second-in-

time § 2255 motion, arise from *material* exculpatory evidence concealed by the Government and

are therefore, as explained below, among those this Court may review without pre-authorization

from the circuit court of appeals. *See Crawford v. Minnesota*, 698 F.3d 1086, 1090 (8th Cir.

2012) (petitioner's *Brady* claim raised in second habeas petition determined to be based on non-

23

material evidence, and thus required authorization from circuit court of appeals for further review); *Carter v. Kelley*, No. 5:16-cv-367-DPM-PSH (E.D. Ark. 4/25/17) at Doc. No. 14 ("Order," attached as Exh. I) ("If Carter's *Brady* claim is nonmaterial, then he'll have to get preauthorization to file his petition.… But if his *Brady* claim is material, then his petition may not be 'second or successive' within the meaning of AEDPA.") (citing *Crawford*, 698 F.3d at 1089-90).[17] *See also United States v. Lopez*, 577 F.3d 1053, 1066-67 (9th Cir. 2009) (*Brady* claim raised in second § 2255 motion required authorization from circuit court of appeals where movant failed to establish withheld evidence was material). *Cf. Scott v. United States*, 890 F.3d 1239, 1259 (11th Cir. 2018) (faced with binding circuit precedent requiring conclusion that, in § 2255 cases, second-in-time *Brady* claims are "second or successive" under § 2255(h), panel notes that this conclusion conflicts with *Panetti v. Quarterman* and "effects a suspension of the writ of habeas corpus as it pertains to the narrow issue of *Brady* claims" because it would deprive federal prisoners of a "full and fair opportunity to obtain relief," and *sua sponte* urges rehearing *en banc*).

## B.  Background of the § 2255(h) Gatekeeping Provision

The § 2255 motion before this Court is the second one Mr. Lee has filed challenging his conviction and death sentence. In many instances, a second-in-time application is considered successive and subject to the limitations of 28 U.S.C. § 2244(a). *See* 2255(h) (enumerating instances when a successive application may be considered). However, as the Supreme Court has explained, it is well-settled that the phrase "second or successive" "does not simply 'refer to all

---

[17] After careful analysis of the *Brady* claim, the court found it to be nonmaterial, and therefore that the petition was successive and required preauthorization from the Eighth Circuit. Rather than dismiss the petition, however, Judge Marshall ordered that it be transferred to the Court of Appeals for further consideration. *Carter v. Kelley*, 2017 WL 4214084 (E.D. Ark. 9/21/17).

[2255] applications filed second or successively in time.'" *Magwood v. Patterson*, 561 U.S. 320, 332 (2010) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007)); *see also Crawford*, 698 F.3d at 1089. As the Eighth Circuit has observed, courts considering the construction of § 2244(b)—the analogue to § 2255(h) that governs review of claims presented in habeas proceedings by prisoners in state custody—"have uniformly rejected a literal reading." *Crouch v. Norris*, 251 F.3d 720, 723-25 (8th Cir. 2001). Rather, the phrase "second or successive" is a "term of art" that takes its full meaning from the Supreme Court's case law, including decisions predating the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Crawford*, 698 F.3d at 1089; *Crouch*, 251 F.3d at 723-25.

To determine whether a second-in-time pleading should be deemed successive, a court must look to the purposes of AEDPA, which are "to further the principles of comity, finality, and federalism." *Panetti*, 551 U.S. at 945 (quotation marks omitted). The Supreme Court has cautioned courts to ensure that "petitioners [do not] run the risk under the proposed interpretation of forever losing their opportunity for federal review" and to "resist[] an interpretation of the statute that would . . . close our doors to a class of habeas petitioners seeking review without any clear indication that such was Congress' intent." *Id*. (quotation omitted); *see also Castro v. United States*, 540 U.S. 375, 380-81 (2003).

As the Supreme Court observed in *Panetti*:

We are hesitant to construe a statute, implemented to further the principles of comity, finality, and federalism, in a manner that would require unripe (and, often, factually unsupported) claims to be raised as a mere formality, to the benefit of no party.

25

551 U.S. at 947.[18] The *Panetti* Court rejected the state's argument that a prisoner contemplating a future *Ford* claim must preserve that claim by filing it in his or her first habeas petition. *Panetti*, 551 U.S. at 946. It explained that, were such an interpretation of "second or successive" correct, "the implications for habeas practice would be far reaching and seemingly perverse." *Id*. at 943 (quotation omitted). "A prisoner would be faced with two options: forego the opportunity to raise a *Ford* claim in federal court; or raise the claim in a first federal habeas application (which generally must be filed within one year of the relevant state-court ruling), even though it is premature." *Id*. at 943. *See also Stewart*, 646 F.3d at 862, 864 (declining to instruct future defendants to include all potential claims in their initial § 2255 motions and asking the district courts to "stay and abey" until claims become ripe, and collecting other examples of second-in-time § 2254 petitions or § 2255 motions challenging the same judgment which were not deemed to be "second or successive" for AEDPA gatekeeping purposes).

### C. Mr. Lee was unable to include these claims in his initial § 2255 because the prosecution, which possessed the evidence, represented repeatedly that it had no *Brady* material to disclose and disclosed none.

Mr. Lee must litigate the present claims in a second-in-time § 2255 motion because he has had no prior occasion to raise these claims. At each stage of the previous litigation, the Government failed in its duty to disclose the information underlying the current claims leaving the defense to believe that there was nothing to pursue. *See Bracy v. Gramley*, 520 U.S. 899, 909 (1997) ("Ordinarily we presume that public officials have properly discharged their official duties."). As the Supreme Court has succinctly noted "[a] rule thus declaring 'prosecutor may

---

[18] The Court held in *Panetti* that a claim made pursuant to *Ford v. Wainwright*, 477 U.S. 399 (1986), arguing that the petitioner is not legally competent to be executed, cannot be deemed successive because the claim itself will not become ripe until well after the initial habeas petition will have been adjudicated.

hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. 668, 696 (2004).

In Mr. Lee's case, every prior request by the defense was rebuffed. In an April 1998 status conference, this Court entered a standing pretrial order directing the Government to provide defense counsel with any *Brady* material to which Mr. Lee was entitled "on a continuing basis as it is received." Doc. No. 145 at 3. Mr. Lee did not receive the *Brady* material at issue in this motion.

Mr. Lee renewed his *Brady* request once the Government amended its pre-trial notice of intent to seek a death sentence. The Court granted his motion, Doc. No. 344 at 4, but once again, the Government did not disclose the *Brady* material discussed here. During the guilt phase, at the end of a full day of trial, the prosecution told defense counsel, for the first time, that it would be calling Mr. Wanker as a witness in less than 48 hours. They were provided with copies of his statements just as law enforcement memorialized them, with no hint of the relevant *Brady* material. At trial, the Government promoted a misleading interpretation of Mr. Wanker's testimony and coached him to avoid mention of the serious doubts he harbored about the veracity of Mr. Lee's purported admissions.

During the penalty phase, the Government admitted a number of Oklahoma state court records concerning the Wavra murder, but failed to disclose records documenting that the state's evidence against Mr. Lee did not even establish probable cause as to the murder charge and that the presiding state court judge consequently recommended dismissal of that charge. On the contrary, the prosecutor relied on this false presentation to argue that Mr. Lee was given the "gift" of a plea offer to robbery, and therefore allowed to get away with murder.

27

Finally, during § 2255 proceedings Mr. Lee requested the Government disclose any *Brady* material concerning guilt or punishment. In response, the Government indicated that it had complied with all its pre-trial disclosure obligations, and that the claims relating to the Wavra murder should be denied because there was no evidence indicating that Mr. Lee had played any other role different from that presented at trial. Doc. No. 1126-1 at 45 n.16, 73-76.

**D. It would be a perverse result, and contrary to the intent behind the AEDPA, to find Mr. Lee's current motion to be second or successive for § 2255(h) purposes.**

"In light of these circumstances as we now know them, to treat Mr. [Lee]'s *Brady* claim as a second or successive request for habeas relief, subject to the almost insurmountable obstacles erected by 28 U.S.C. § [2255(h)], would be to allow the government to profit from its own egregious conduct." *Douglas v. Workman*, 560 F.3d 1156, 1192-93 (10th Cir. 2009). "Certainly that could not have been Congress' intent when it enacted AEDPA." *Id*. at 1193; *see also United States v. Lopez*, 577 F.3d 1053 (9th Cir. 2009):

> [A] broad rule … under which all second-in-time *Brady* claims would be subject to § 2255(h)(1), would completely foreclose federal review of some meritorious claims and reward prosecutors for failing to meet their constitutional disclosure obligations under *Brady*. This would seem a perverse result and departure from the Supreme Court's abuse-of-the-writ jurisprudence. Barring these claims would promote finality—one of AEDPA's purposes—but it would do so only at the expense of foreclosing all federal review of meritorious claims that petitioner could not have presented to a federal court any sooner—certainly not an AEDPA goal.

577 F.3d at 1064-65.[19]

---

[19] This concern is not hypothetical. *See* Shawn Musgrave & Brooke Williams, *Federal Death Penalty Prosecutors Accuse One Another of Destroying Evidence and Other Misconduct in Discrimination Lawsuit*, The Intercept (7/18/18) (describing alleged misconduct by members of DOJ Capital Case Section, including destroying interview notes, neglecting to review and produce evidence, and a "troubling pattern of non-disclosure by prosecutors") (available at: https://theintercept.com/2018/07/18/prosecutors-misconduct-death-penalty/); Carrie Johnson, *After Stevens Case, Justice Dept. Corruption Unit in Disarray*, Washington Post (6/17/09) (describing failures by prosecutors in DOJ's Public Integrity Section to disclose evidence

Mr. Lee should not have to satisfy the "almost insurmountable obstacles" erected by § 2255(h), *Douglas*, 50 F.3d at 1192-93, where the evidence was suppressed by the Government throughout his initial § 2255 proceedings. The Supreme Court has written that *Brady* and its progeny "illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is 'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Strickler v. Greene*, 527 U.S. 263, 280-82 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)); *cf. Banks v. Dretke*, 540 U.S. 688, 695-96 (2004) ("Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation.").

This is a death penalty case in which the Government failed to disclose evidence that calls into question both the conviction and the sentence. The prosecution should not be rewarded for its improper representations and its ability to shield this evidence from review until now. This Court should "resist an interpretation of the statute that would produce troublesome results . . . and close [its] doors to a class of habeas petitioners seeking review" and find instead that Mr. Lee's second-in-time § 2255 motion is not "second or successive" under § 2255(h). *See Panetti*, 551 U.S. at 946.

---

favorable to defendants) (available at: http://www.washingtonpost.com/wp-dyn/content/article/2009/06/17/AR20090617037321.html).

### IV.    Claims for Relief

The new evidence gives rise to four independent claims for relief.

### A.  First Ground for Relief: Mr. Lee's conviction was obtained in violation of *Brady v. Maryland*

According to the Supreme Court, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). In the context of a *Brady* violation, prejudice means that the suppressed evidence was "material." *Id*. The record in Mr. Lee's case establishes that by withholding information diminishing the reliability of its key corroborative evidence, the Government violated *Brady*.

### 1.  The evidence was favorable to Mr. Lee.

There can be little doubt that the evidence suppressed by the Government as to Mr. Wanker would have been favorable to Mr. Lee's defense. The Government worked to give the jury the impression that Mr. Wanker was a concerned, disinterested witness who came forward to help the authorities because he believed he had reliable evidence of Mr. Lee's participation in the Mueller murders. This was wholly misleading. Had the jurors been informed about the relevant context of his pre-trial statements, they would have learned that he never led the authorities to believe that Mr. Lee's purported admission was given in a credible manner. In fact, Mr. Wanker repeatedly told authorities *the opposite*: Mr. Lee was prone to "taking credit" for crimes he did not commit in order to seem tough, and this latest statement was delivered in similar fashion. Had defense counsel been privy to the suppressed evidence, the jury would have learned that Mr. Wanker never changed his mind that the purported admission was not credible – even after being called to testify at a capital murder trial. Exh. A at ¶ 13.

30

The Government's suppression of this evidence deprived the jury of the ability to evaluate whether the underlying inculpatory statement was, in fact, reliable. The omitted information would have impeached the Government's cherry-picked presentation of Mr. Wanker's statement, showing the jurors that the person who heard it and knew the speaker seriously doubted its veracity and had repeatedly said so to authorities right up until the time of trial. A juror hearing this information could well have concluded that Mr. Wanker's testimony was not, in fact, probative evidence of Mr. Lee's alleged guilt, nor did it corroborate Gloria's and Cheyne's testimony. *See Gates v. District of Columbia*, 66 F.Supp.3d 1, 22-24 (D.D.C. 2014) (in case where witness claimed defendant confessed to him, evidence that detective did not find witness credible constituted impeachment evidence encompassed by *Brady*)*; Ex parte Richardson*, 70 S.W.3d 865, 871-73 (Tex. Crim. App. 2002) (capital conviction and death sentence reversed based on prosecution's suppression of diary kept by police officer who was guarding state's eyewitness to the crime; diary revealed officer's belief that witness was not a truthful person); *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (*Brady* includes any information that "would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise."); *cf. Orndorff v. Lockhart*, 707 F. Supp. 1062, 1070 (E.D. Ark. 1988), *aff'd in part*, *vacated in part*, 906 F.2d 1230 (8th Cir. 1990) (in case where prosecution failed to disclose relevant context that witness's memory was hypnotically refreshed during pretrial investigation, "[c]ritical portions of her testimony may have been disregarded by the jury had they known of the effects of hypnosis, or the trial court may have deemed some testimony inadmissible altogether.").

**2.  The evidence was suppressed by the Government.**

Mr. Wanker was a surprise witness; due to a protective order sought and received by the Government on the eve of trial, his identity was not disclosed to the defense until the middle of trial on the evening of March 29, 1999 – less than 48 hours before he was scheduled to testify. Tr. 4003. Because of the timing of the disclosure, defense counsel had no opportunity to interview Mr. Wanker before he took the stand. Tr. 4057.[20]

After notifying counsel that Mr. Wanker would be a witness, the Government disclosed three discovery items:

1.  A written report memorializing the interview of Mr. Wanker by Sgt. Aaron Duvall of the Pope County (Arkansas) Sheriff's Office, dated June 26, 1997.

2.  A written report memorializing the interview of Mr. Wanker by ATF Special Agent Michael Sprenger, dated July 2, 1997.

3.  Mr. Wanker's grand jury testimony and written statement, dated August 14, 1997.

None of these disclosures included Mr. Wanker's statements to authorities that Mr. Lee was prone to making false claims to seem tough, or that Mr. Wanker thought Danny Lee's specific remark about having committed unspecified murders entirely lacked credibility. As Mr. Wanker has attested, he "was very surprised that the reports did not include all of what I said." Exh. A at ¶ 3.

Ensuring that these omissions would not come to light, the Government instructed Mr. Wanker not to volunteer this information during his testimony. Exh. A at ¶14 ("Prior to trial, I was told to limit my testimony to only what was asked and not to give personal opinions. They made me feel like my testimony was very important and told me that I should just answer their

---

[20] As the Government noted during an in-court status conference at the conclusion of the trial day on March 30, Mr. Wanker was at that moment traveling to Little Rock from Spokane, and would be in town to testify in the morning. Tr. 4057.

questions and not go into other areas. I followed their instructions and answered just what they asked me without providing additional details.").[21] Through its selective questioning, the Government was thus able to suppress the relevant, probative facts establishing the untrustworthiness of Mr. Lee's purported confession.[22]

---

[21] The Government used a similar tactic with Mr. Wanker at the grand jury proceeding -- i.e., it instructed him to omit certain details from his written statement that undermined the trustworthiness of Mr. Lee's alleged statement against penal interest. Exh. A at ¶12. In his July 2, 1997 statement to ATF Agent Sprenger, Mr. Wanker stated that Mr. Lee said there was a third individual who had accompanied him and Mr. Kehoe to Arkansas: Sean Haines. Exh. H at 2. But as the Government knew, Mr. Haines was in Spokane throughout January 1996 when the alleged trip to Arkansas took place. The fact that Mr. Lee's story contained a demonstrably false detail lends credence to Mr. Wanker's statement to law enforcement that the story was made up and not to be believed. The fact that the Government instructed Mr. Wanker to omit that detail about Mr. Haines from his written statement to the grand jury is consistent with a pattern of behavior to suppress information that undermined the credibility of Mr. Lee's alleged statement against penal interest, and, in turn, the corroborative value of Mr. Wanker's testimony.

[22] Mr. Wanker testified on cross-examination that he did not contemporaneously report Mr. Lee's statement to police because at the time, he thought Mr. Lee was "just talking to hear himself talk." Tr. 4088. The unmistakable–yet entirely misleading–implication was that since that time, Mr. Wanker had come to understand that Mr. Lee's statement was more than just talk and therefore he felt obligated to contact authorities. Had the Government not suppressed the aforementioned *Brady* material, defense counsel could have inquired further and clarified for the jury that it was the Government who sought out and developed Mr. Wanker as a witness, and that "even at the time of trial [he] still didn't believe that Danny's story was anything more than just empty bragging." Exh. A at ¶ 13. However, without any information to indicate Mr. Wanker might answer favorably, no experienced defense attorney would risk asking him, in front of a jury, whether he *still* believed Mr. Lee's story was "just talk." *See* Exh. B (Declaration of Jack T. Lassiter) at ¶ 11 ("I did not dare ask him anything further about this, such as whether he still thought it was just talk, without knowing in advance what his answer would be. Indeed, in the absence of any information to the contrary, the very fact that the government brought him all the way from Spokane and put him on the stand to testify against Mr. Lee suggested to me that he would not have given me a favorable answer.") Thus, the mere opportunity to cross-examine Mr. Wanker cannot excuse the Government's failure to satisfy its *Brady* obligations. *See United States v. Rodriguez,* 496 F.3d 221, 227–28 (2d Cir. 2007) ("It is not surprising that, despite having pressed for disclosure of the specific lies, none of the defense lawyers ran the risk of asking Lopez what lies she had told. At least in some circumstances, a prosecutor's use of this approach to the discharge of a *Brady* disclosure obligation might well result in the defendant's never learning the nature of the exculpatory or impeaching material which gave rise to the disclosure obligation."); *Leka v. Portuondo*, 257 F.3d 89, 103 2d Cir. 2001) ("The opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some

### 3.   The suppressed evidence was material.

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A showing of materiality "does not require demonstration by a preponderance that the disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id*. (quotations omitted). In addition, "it is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id*. at 435.

In Mr. Lee's case, the suppressed evidence would have made a different result reasonably probable because absent Mr. Wanker's testimony, there would have been no independent evidence to corroborate Gloria's and Cheyne's story that Mr. Lee committed the Mueller murders. Absent corroboration, there is a reasonable probability the jury would not have convicted Mr. Lee of the Mueller murders solely on their word.

This is not mere conjecture. The jury's verdicts on the other racketeering acts demonstrate its reluctance to credit the Kehoes' testimony absent independent corroborative

---

degree of calculation and forethought. A responsible lawyer could not put [the potential witness] on the stand without essential groundwork.").

evidence. Specifically, there were three charged racketeering acts predicated entirely on the testimony of Gloria and Cheyne:

> • Racketeering Act 3, which alleged that Mr. Kehoe committed the murder of Jeremy Scott;
>
> • Racketeering Act 7, which alleged that Mr. Lee and Mr. Kehoe set off a bomb at the Spokane City Hall;
>
> • Racketeering Act 8, which alleged that Mr. Kehoe committed the murder of Jon Cox.

The jury returned not guilty verdicts as to all three.[23]

Unlike with these three acts, the jury could rely on two pieces of evidence to assuage any concerns that the Kehoes' account of the Mueller murders was not credible: the matching hair and James Wanker's testimony. But both of those pieces of evidence have now been discredited. DNA testing conducted after the trial conclusively established that the hair found in the FBI raid cap did not come from Mr. Lee.[24] And had the jury known of the previously undisclosed *Brady* material about the Wanker testimony, the jurors very well could have determined that Mr. Lee's purported confession to Mr. Wanker was neither probative nor trustworthy evidence. Now that this crucial "independent corroboration" has been eliminated, one cannot be assured that the trial resulted in a verdict worthy of confidence. Indeed, as the following cumulative review of the case demonstrates, the "trial evidence resembles a house of cards, built on the jury crediting [the Kehoes'] account." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (*per curiam*).

---

[23] The jury was well aware that the testimony of Cheyne and Gloria Kehoe was deserving of additional scrutiny. Out of over 100 witnesses who testified, they were the only two whose testimony it asked to review before rendering a verdict. *See* Tr. 7104 (jury note requesting to review "transcript of Cheyne and Gloria Kehoe testimony.")

[24] *See* Exh. E (Serological Research Institute Mitochondrial DNA Report) at 4.

### a. The testimony of Gloria and Cheyne Kehoe was inherently suspect and, absent corroboration, would not have persuaded the jury.

The Government's prosecution of Mr. Lee hinged on the testimony of Gloria and Cheyne Kehoe. Before they decided to cooperate, the Government had no evidence implicating Mr. Lee in the Mueller murders, nor was he even a suspect; its case against him was quite literally built on the word of these two witnesses. But Gloria and Cheyne each had significant credibility problems.

### i. Benefits given to the Kehoes

First, the Kehoes were not disinterested witnesses. They explicitly testified in exchange for lenience for their own crimes. When Cheyne decided to cooperate, he had a significant incentive to curry favor with the Government: He was a fugitive from the attempted murder of two Ohio police officers in a brazen daylight shoot-out that had been nationally televised. As is clear from his earliest interviews with authorities, he knew that his only hope of reducing the prison time he was facing was to cut a deal in exchange for information about an even bigger crime, the Mueller murders. Indeed, his gambit paid off. After Cheyne testified at Mr. Lee's trial, his 24-year Ohio sentence was reduced by more than half.[25] But that was not the only benefit he received. As a member of Mr. Kehoe's racketeering enterprise, Cheyne was exposed to federal

---

[25] Cheyne was originally sentenced to 24 years and 5 months in his Ohio case. Tr. 5283. His agreement with federal prosecutors included notifying the Ohio authorities about his cooperation. Tr. 5281. In December 2000, a year after Mr. Lee was sentenced to death, Cheyne's sentence was reduced to 11 years. Associated Press, *Wilmington shooter Kehoe gets 13 years off sentence*, *Cincinnati Enquirer*, Dec. 2, 2000 (available at http://enquirer.com/editions/2000/12/02/loc_wilmington_shooter.html); Tr. 5283. He was released in June 2008.

charges that carried a potential life sentence. As part of his cooperation agreement, he received a grant of immunity and escaped liability for *any* of the charged activities of the enterprise.[26]

Gloria Kehoe also received substantial benefits in exchange for her testimony. In addition to immunity from prosecution for any offenses related to the racketeering counts, as well as various tax and Social Security offenses[27]–which potentially exposed her to 30 years' imprisonment[28]--Gloria received substantial cash payments during the course of her cooperation with authorities – $2,250 per month, totaling roughly $27,000 by the time of her testimony. Tr. 3522-23. As a single mother[29] with no job and six children to feed, clothe and shelter,[30] she had every incentive to stay in the Government's good graces to stay out of prison and provide for her family.

---

[26] Cheyne also received the benefit of placement in the Federal Witness Protection Program in exchange for his testimony, but it appears he squandered that opportunity. He was arrested again in 2013, along with his father, Kirby Kehoe, on federal firearms and drug charges. He pled guilty in 2014 to one count of being a felon in possession of a firearm and was sentenced to 41 months' imprisonment. He got out in September 2016.

[27] *See* Tr. 4949, 4987-89. Gloria admitted on the stand that she assisted Mr. Kehoe in fleeing from Ohio after his shootout with police officers, that she had not filed federal income taxes in at least 10 years, and that she used a fake Social Security Number during a real estate transaction. Criminal charges had been filed against her in the Western District of Arkansas with respect to the use of the false Social Security Number, and those charges were dismissed as a result of her cooperation in this case.

[28] *See* 42 U.S.C. § 408(a)(7)(B) (maximum 5 years' imprisonment for use of false Social Security Number); 18 U.S.C. § 3 (maximum 15 years' imprisonment for being an accessory after the fact to a crime punishable by life imprisonment); 28 U.S.C. § 7203 (maximum 1 year imprisonment for each instance of willful failure to file tax return).

[29] Gloria's husband, Kirby Kehoe, was indicted and arrested in connection with this case. He was charged in Count One as a principal of the racketeering enterprise, in Count Two as a RICO co-conspirator, and in Count Six as a co-conspirator in the Hobbs Act robbery of the Muellers. He faced a potential life sentence based on these charges. He entered a plea of guilty to the first count of the indictment (RICO) on February 8, 1999, prior to the start of Mr. Lee's trial. He was sentenced to 44 ½ months' imprisonment, to run consecutive to a 51 month prison sentence he was already serving on federal weapons violations, leaving Gloria alone to take care of their children.

[30] Tr. 5205.

### ii.    Conflicts with other evidence

In addition to the huge benefits they received for cooperating, the reliability of the Kehoes' testimony was suspect due to discrepancies between their story and the physical evidence. For example, Cheyne repeatedly told authorities that he had a detail about how the murders occurred that would independently corroborate his account – namely, that Mr. Mueller's skull was fractured during the incident. Tr. 5328, 5442, 6876. According to Cheyne, Mr. Kehoe struck Mr. Mueller in the head with the butt of his rifle, and the blow was so forceful that it broke the walnut stock and Mr. Kehoe actually saw the skull cave in. *Id*. This corroborative detail was gruesome, but also a fabrication. As the medical examiner testified at trial, there was no evidence of a skull fracture, hemorrhage or other injury to Mr. Mueller's skull. Tr. 3563, 3579-80, 3587-88.

Similarly, both Gloria and Cheyne claimed that Mr. Kehoe told them that Mr. Mueller bled onto the carpet after being struck in the head. Tr. 5422; 5188-89. This was another gruesome "fact" contradicted by the physical evidence. The Arkansas State Police conducted a luminol examination of the carpet and sent multiple samples to the Serology Section of the Arkansas State Crime laboratory for further analysis. Every single sample tested negative for the presence of blood. *See* Exh. F (Arkansas State Crime Lab Report).[31]

Additionally, both Gloria's and Cheyne's accounts of the murder included the detail that Mr. Lee wore an FBI costume while committing the crime. Although that part of their story was

---

[31] It is highly implausible that Mr. Kehoe and Mr. Lee could have cleaned the Muellers' home so thoroughly as to withstand a forensic examination for trace amounts of blood. This is especially so considering the Government's timeline; every additional moment of time spent in Arkansas would have made it that much more improbable for Mr. Lee to have made it back to Spokane by January 13.

seemingly corroborated by forensic evidence at trial, we now know definitively that the hair

found in the FBI cap was not Mr. Lee's.

Finally, not only had they each given prior inconsistent statements, but their statements

conflicted with each other, as well as with the testimony of disinterested witnesses. These

inconsistencies included the following:

- In Gloria's earliest statement to authorities, she claimed that Mr. Kehoe and Mr. Lee stayed in Arkansas or Oklahoma for a few days after they committed the murders in order to see if the local media would report that the Muellers were missing. *See* Exh. N. At the time she made that statement, neither she nor the authorities knew that Mr. Lee had been seen in Spokane on January 13. Perhaps aware that her original account would have destroyed the Government's necesary timeline, Gloria conspicuously omitted that part of her story when she took the stand.

- In her initial statement to the ATF, Gloria said that Mr. Kehoe confessed to her but did not say the same of Mr. Lee. *See* Exh. L. Two weeks later, Gloria was once again interviewed by the ATF; this time she claimed that Mr. Lee had made inculpatory statements, but she could not recall *any* details of what he said. *See* Exh. O. By the time of trial a year later, Gloria claimed to now remember the details of what Mr. Lee  purportedly told her—that Mr. Mueller had fought back, and that Mrs. Mueller had put a bag over her own head because she believed it was a legitimate FBI raid. Tr. 4975. But when she was first interviewed by the ATF, she said she had learned all these details from her son Chevie. *See* Exh. L.

- Gloria and Cheyne gave conflicting accounts of when Cheyne first learned of Mr. Kehoe's involvement in the Mueller murders. Gloria testified that she begged Cheyne not to accompany his brother on a cross-country trip in December of 1996, specifically because Chevie had confessed to her that he had committed the Mueller murders. She swore she even provided details such as Chevie's admission that he was the one that killed the little girl. Tr. 5167-68. Cheyne, however, insisted that when he left with Mr. Kehoe for that trip, he knew nothing about Mr. Kehoe's involvement in the Mueller murders, and that it was only months later after they arrived in Galveston, Texas that he learned, from Mr. Kehoe himself, that he was involved in the offense. Tr. 5326-27 At least one of the two Kehoe witnesses was not telling the truth.

- Cheyne maintained that Mr. Kehoe showed him a Benelli 90 shotgun while they were on the lam in 1997 and told him that he needed to get rid of it because it had belonged to the Muellers. Tr. 5323. An uninvolved witness, Carl MacDonald, however, testified that he was the person who had given that gun to Mr. Kehoe;

39

> he had traded it to Mr. Kehoe in exchange for a Colt .45 at a gun show in Spokane in the previous year. Tr. 2698-99.
>
> • Kirby Kehoe was initially a suspect in the murders due to his involvement in the Mueller burglary in 1995. Despite admitting that she had overheard Kirby discuss plans with Mr. Kehoe in January of 1996 to rob the Muellers again, Tr. 5134, Gloria testified that Kirby was with her in Arizona in January of 1996 and never travelled to Arkansas. Tr. 5137-38. However, before she began cooperating in this case and pinned the blame on Mr. Lee, Gloria told a confidential informant of the ATF that Kirby had, in fact, been in Arkansas that January. *See* Exh. Q at 1.

In short, Gloria and Cheyne had clear motives to lie in order to curry favor with the Government, and the numerous inconsistencies in their respective accounts of the crime made their stories even more suspect.

### b. The conviction of Mr. Lee was dependent on a problematic timeline.

The Kehoes' account – and thus the prosecution's case – setting out Mr. Lee's involvement in the Mueller murders hinged on a very precise timeline. Although the Kehoes did not say that the murders were committed on January 11, that was the only date that could accommodate their narrative. As previously noted, the murders could not have happened prior to the 11th because both William and Nancy Mueller had contact with others on that day. And, as is explained in more detail below, the murders could not have happened after the 11th because that would not have allowed enough time for Mr. Lee to have returned to Spokane by the 13th. As the Government itself has acknowledged: "Had the jury not accepted the government's time line, Lee could not have been convicted."[32]

There were two major problems with that timeline. The first was that, according to the Government's theory, the crime had to have occurred in Tilly, Arkansas on January 11, yet Mr.

---

[32] *See* Doc No. 1126-1 at 33.

Lee was in Spokane, Washington at least as early as January 13.[33] As one local journalist

covering the trial aptly observed:

> The time frame that prosecutors said the Mueller murders occurred in does not
> neatly allow Chevie Kehoe and Lee enough time to get back to Spokane before
> witnesses placed them there. To do what prosecutors said they did, the pair would
> have had to drive 2,000 miles non-stop through the high altitudes of the West in
> the dead of winter.[34]

This was clearly a concern for the jury: During the second day of deliberations, it sent out

a note indicating it had questions about whether the requisite cross-country drive was

possible in that narrow time frame.[35]

The second problem with the Government's tight timeline was at its front end:

numerous disinterested witnesses from the community reported seeing the Muellers alive

*after* January 11.

The Government accounted for these obstacles by arguing that: a) Mr. Kehoe and Mr.

Lee took turns at the wheel and made the 2,000 mile trip without ever stopping to rest, eat, use a

restroom, refuel or sleep, Tr. 6986-87; and b) the multiple witnesses who had seen the Muellers

after January 11 were all either confused about the dates or mistaken about who they had in fact

seen. While the jury might have been willing to indulge these assumptions in light of persuasive

evidence corroborating the Kehoes' account—namely, scientific evidence (a matching hair) and

testimony from an unbiased witness about a purported confession (Mr. Wanker)—absent such

---

[33] According to the Government's own evidence, a non-stop drive back to Spokane would have taken between 35 to 43 hours, depending on the route. Tr. 6449-52.

[34] *See* Exh. R, "But Here's A Dissenting Opinion," The Courier News (Russellville, AR), May 6, 1999.

[35] Tr. 7100 ("We want to know if there was any road problems—snow—on trip back to Washington from Tilly, Arkansas, on January 10, 11, 12, 13[.] [S]igned Juror 100."). The Court instructed the jury that it had to decide the issues on the basis of the evidence already presented, and that it could not reopen the record to receive additional evidence. Tr. 7100.

external validators, there is a reasonable probability the jury would not have given the

Government the benefit of the doubt on this central element of its case.

### i.      The Kehoes' timeline depended on a series of dubious assumptions.

In January of 1996, Mr. Lee lived in an apartment in Spokane with Sean Haines. Mr.

Haines was in a relationship with Joy Campbell, with whom he was about to have a baby. At 8

p.m. on January 13, Joy's mother, Vada Campbell, came to the apartment to pick up Mr. Haines

and Mr. Lee answered the door. Tr. 5953-54. Vada Campbell is certain of the date because the

following day (the 14th) her daughter was admitted to the hospital, and then the day after that,

January 15, her daughter gave birth. *Id.*[36] The prosecution was not able to impeach or discredit

her testimony; indeed, it did not even cross-examine her. Tr. 5955.

In order for the Kehoes' account to be true, the Mueller murders had to have taken place

on January 11. Both Cheyne and Gloria stated in respective pre-trial statements that the crime

occurred after nightfall.[37] Assuming Mr. Lee and Mr. Kehoe left Russellville around midnight on

---

[36] The birth certificate, showing a birth date of January 15, 1996, was entered into evidence at trial. Tr. 5953.

[37] *See* Exh. M (Gloria Kehoe pre-trial statement that "it was late" when the victims' bodies were disposed in the river); Exh. P (Cheyne Kehoe pre-trial statement that the Jeep was abandoned "at night"). *See also* Tr. 2289 (UPS driver came to Mueller home on the afternoon of the 11th and saw nothing amiss).

42

the 11th – an assumption which the Government agreed was plausible[38] – that allowed just 46 hours for them to make it back to Spokane by 8 p.m. on the 13th.[39]

According to a Government trial witness, it would take between 35 to 43 hours to drive non-stop from Russellville to Spokane, depending on the route taken. Tr. 6449-52. Although that was technically possible, accepting that timeline required the jurors to indulge a series of questionable assumptions.

First, the estimated driving times assumed perfect road conditions. But it was the middle of winter and the routes from Tilly to Spokane went through high altitudes where snow and ice were common. Indeed, the testimony at trial was that there had been a big snowfall in Pope County on January 3 and that it was snowy and icy in Tilly on the 11th. Tr. 2261; 6009. Such road conditions would have made it difficult to drive at full speed and would have added more time to the trip.

Second, the Government's timeframe assumed that Mr. Lee was a capable driver. But he had lost an eye only a few months prior, and the evidence at trial established that he had poor depth perception that impaired his driving. Tr. 6263-64; 6269-70. Even under normal conditions, it would have been difficult for Mr. Lee to shoulder the burden of such a long drive. But here he

---

[38] Tr. at 6986. A juror would have been hard-pressed to find that they could have left for Spokane any earlier, even if viewing all of the prosecution's evidence in the most favorable light. Gloria and Cheyne testified that the crime occurred after nightfall, which was approximately 5:47 PM on the night of January 11, 1996. *See* Exh. S (January 2006 Sunrise/Sunset Calendar, Russellville, AR). As is explained in more detail below, their account of the murders involved substantial activity at three different crime scenes: the Mueller residence in Tilly; a site an hour away off of Highway 7; and a bridge near Lake Dardanelle. Thus, even under the Government's theory, several hours had to have elapsed to account for all of this activity before Mr. Kehoe and Mr. Lee would have been able begin the 2,000-mile journey back to Spokane.

[39] When Mr. Lee was seen at 8 p.m., he was not arriving into town at just that time in a car with Mr. Kehoe; rather, he was already at his own home, ready to answer the door when Vada Campbell knocked. Thus, Mr. Lee had actually arrived in Spokane sometime prior to 8 p.m.

43

would have also had to navigate inclement weather, fewer daylight hours, and poor road conditions that would have hampered even a driver with perfect eyesight.

Third, the estimated driving times did not account for any need to regularly stop for gas during a 2,000 mile trip.[40] Even assuming that they drove straight through the night, the available routes from Russellville to Spokane would have taken them through sparsely populated areas for long stretches at a time. Thus, the practical necessity of being able to find an open and available gas station each time it was necessary to re-fuel, and not risk running out of gas in a remote area, would have added further time to the trip.

Finally, the timeline had to account for what the prosecution maintained was activity at three different crime scenes:

> (1) The Muellers' home in Tilly, where the perpetrators abducted, interrogated, and murdered the Muellers in their home; cleaned the home so thoroughly that they left no fingerprints and removed even trace amounts of blood that had soaked into the carpet; and loaded the victims' bodies and the cache of stolen property into the Muellers' Jeep and attached trailer;

> (2) The area off Highway 7, roughly an hour drive from the Mueller home, where the Jeep was abandoned and the property and bodies of the family were transferred into the GMC truck; and

> (3) The Illinois Bayou bridge near Lake Dardanelle, another 20 miles from where the Jeep was abandoned, where the victims were fastened to large, heavy rocks and dropped into the water.

In other words, several hours had to have elapsed to account for all of the activity that occurred between when the crime began and when the drive to Spokane actually commenced.

---

[40] Mr. Kehoe's car was a 1984 GMC C/K 2500 High Sierra (diesel). Tr. 3057. At best, it had a fuel economy of about 20 miles per gallon. *See* Fuel Economy Information, U.S. Department of Energy's Office of Energy Efficiency and Renewable Energy, available online at: https://www.fueleconomy.gov/feg/bymake/GMC1984.shtml (last visited on 8/8/18). Assuming it was equipped with a standard 16 gallon or 20 gallon tank for that make and model, one would have to stop to re-fuel between five to seven times for a 2,000 mile trip.

44

Given all of these factors, the time frame within which Daniel Lee was said to have committed this offense was itself suspect.

> **ii.     The evidence indicates that Mr. Lee was observed back in Spokane as early as January 12, 1996, which would render the Government's timeline—and the Kehoes' testimony—impossible to accept.**

Prosecution witness Sean Haines was interviewed by authorities in December of 1996 and was asked when Mr. Lee returned to Spokane. Although he could not remember the exact date, Mr. Haines said that he came home one day in mid-January of that year to find the light on in the apartment. Mr. Lee's belongings were there, and he had left a handwritten note letting Mr. Haines know he had returned. Mr. Haines did not see Mr. Lee that day—"[I]t was like hit and miss, he'd come and go while I was gone" (Exh. K)—but he knew he had arrived home; he remembered he saw him a day or so later. *See* Exh. K. The Government called Mr. Haines as a witness at trial, and he gave essentially the same account:

> Q: How did you know [Mr. Lee] had returned [to Spokane] from his trip?
>
> A: I had come home one day, and his duffel bag was in my living room.
>
> Q: Did you talk to him that day?
>
> A: I believe I talked to him the next day.

Tr. 2778-79.

The "next day" to which he referred was January 13: Vada Campbell testified that she saw both Mr. Lee and Mr. Haines at the apartment at the same time on January 13 when she came to the door. Taking the testimony of these two witnesses together, Mr. Lee must have first arrived in Spokane *the day before,* on January 12, in which case the Government's timeline was physically impossible. Gloria and Chevie Kehoe could not have been telling the truth about Danny Lee's participation in this offense.

### iii. The jury would have evaluated the defense witnesses differently if it had known that the Kehoes' testimony was uncorroborated.

A number of witnesses reported seeing the Muellers alive after January 11, the date the

prosecution claimed they had been murdered. These included:

• Susan Weaver, a Walmart employee, remembered selling Mr. Mueller a very large quantity of water by the gallon. Tr. at 5832-36. Store records show this purchase was made on January 22, 1996 – eleven days after the Government claimed the murders had occurred. Tr. at 6364-65.

• Mary Reid, a longtime friend of the Muellers, spoke with William and Nancy Mueller in the parking lot outside of her bank on January 18, 1996. Tr. 5856-57, 5886.[41] Authorities confirmed that Ms. Reid was at the bank on January 18 based on her bank transaction records and surveillance footage, Tr. 5870-71, 5885-87, 5889, 5891-92, and relied upon her statement to secure a search warrant during the murder investigation. Tr. 5888-90

• Janis Rowlands, a schoolteacher, contacted authorities to report she saw the Muellers at a Walmart in Russellville on February 2 or February 3. Tr. 5798-5800, 5802. Ms. Rowland remembered it was a day when her school was closed due to inclement weather, and records corroborated that her school district was closed on February 2, 1996, due to the weather. Tr. 6080-81.

• Lucy Carr, a manager at Leonard's Hardware Store in Russellville, called authorities to let them know she had a conversation with William Mueller in her store in early February. Tr. 5807-11. Ms. Carr testified that Mr. Mueller looked like he was trying to disguise himself; he was unshaven and was wearing a large floppy hat. Tr. 5814.

• Sue Sullivan, an employee at Leonard's Hardware Store in Russellville, testified that she saw Mr. Mueller in the store around February 6 or 7, right before an article had been published in the local paper about the Muellers having gone missing. Tr. 5817.

• Ester Anderson, an acquaintance of the Muellers, testified that she had driven past the Muellers' home on January 17 with her husband and saw their Jeep and attached trailer parked outside. Tr. 5961, 5963. She was sure of the date because she was accompanying her husband to a job interview for which he subsequently filled out some paperwork dated January 22, and she knew from her own records

---

[41] The Muellers were in a car with several other men, including Paul Humphrey, an early suspect in the case because he was in possession of the title to the Muellers' Jeep. Tr. 5859, 5867-68, 5877, 5880-82.

that the 17th was the one day that week that she had not gone to work. Tr. 5962-63, 5966.

The testimony of these witnesses was obviously at odds with the Government's case, which in turn was based on the Kehoes' testimony. The prosecution worked to discredit the recollections of each of the witnesses. But it relied most heavily on the matching hair and Mr. Wanker's testimony to validate the Kehoes' version and convict Mr. Lee of the offense. Had the jury known, however, that the hair was not Mr. Lee's, and that the purported admission was viewed by its hearer as unreliable, there is a reasonable probability that it would have evaluated the trial evidence differently and reached a different result.[42]

### c.  Conclusion

The Government's case against Mr. Lee was problematic from the start. With the passage of time, it has only gotten substantially weaker. Indeed, the only remaining evidence implicating Mr. Lee in the Mueller murders is the uncorroborated testimony of Gloria and Cheyne Kehoe. As the Supreme Court has made clear, though, the *Brady* materiality determination "is not a sufficiency of the evidence test." *Kyles*, 514 U.S. at 435. The relevant question is thus not whether "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id*. Nor is it even "whether the defendant would have more likely than not have received a different verdict" but for the suppressed evidence. *Id*. at 434. Mr. Lee need only show that the suppression of the evidence "undermined confidence in the outcome of the verdict." *Id*. In light of the foregoing cumulative review of the trial evidence, and the jury's demonstrated reluctance to convict on any charges relying solely on the

---

[42] Indeed, in the absence of the false corroborative evidence, there is another reason why the jury reasonably would have credited the defense witnesses: because their alternate timeline was supported by one of the Government's own witnesses, Sean Haines. He placed Mr. Lee in Spokane as early as January 12, which meant he could not possibly have committed the Mueller murders in Tilly on the 11th.

uncorroborated testimony of Cheyne and Gloria Kehoe, it is clear that Mr. Lee's trial did not result "in a verdict worthy of confidence." *Id*.[43]

### B. Second Ground for Relief: Mr. Lee's conviction was obtained in violation of *Napue v. Illinois* and *Giglio v. United States*.

Prosecutors violate due process by presenting material testimony that is false or that creates a false impression, or by allowing such testimony to stand uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements that are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Smith v Dept. of Corrections*, 572 F.3d 1327, 1333-34 (11th Cir. 2009) ("The *Giglio* rule applies to explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury while questioning a witness."). This is so even where the particular prosecutor does not know that the testimony being presented is false or misleading. *See Giglio*, 405 U.S. at 154. Indeed, the truthfulness of the process is of the utmost importance even when a specific prosecutor acts in good faith. *Id.* at 153.

Daniel Lee was denied due process because the Government introduced misleading, inaccurate and prejudicial testimony at his capital trial. Specifically, the Government presented evidence through James Wanker that created the false impression that Mr. Lee had unquestionably made an inculpatory statement that was probative of his involvement in the Mueller murders. Under *Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny, a violation is established if: (1) the testimony in question was misleading; (2) the Government knew or should

---

[43] This is especially so given that the only question the jury asked evidenced a concern about the plausibility of the Kehoe timeline.

have known the testimony was misleading; and (3) the testimony was material. As set forth below, Mr. Lee is able to meet these three elements.

### 1. James Wanker's testimony was misleading.

The Government carefully crafted its examination of Mr. Wanker. By omitting the relevant context, and instructing the witness to narrowly focus his testimony,[44] it elicited evidence that was substantially misleading. It gave the jurors the mistaken impression that Mr. Wanker was a concerned witness who came forward because he believed he had reliable evidence to share about Mr. Lee's involvement in the Mueller murders. We now know in light of the suppressed evidence that that testimony and the implicit factual representations made to the jury were, at best, substantially misleading, and at worst, actually false.

The Government's duty to correct false testimony is not limited to situations where a witness commits perjury, but extends to testimony that is "substantially misleading." *United States v. Harris*, 498 F.2d 1164, 1169 n.14 (3d Cir. 1974). Indeed, the Supreme Court has long recognized due process violations centered on testimony that created false impressions or was misleading. *See*, *e.g.*, *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Miller v. Pate*, 386 U.S. 1 (1967) (due process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence that it knows creates a false impression of a material fact); *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) (*Napue* doctrine applies to "misleading evidence important to the prosecution's case in chief" as well as to evidence that is simply false); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957)

---

[44] As Mr. Wanker states in his declaration, the Government told him to only answer the questions posed to him and not go into other areas or otherwise offer his own opinion about the matters to which he testified. *See* Exh. A at ¶¶11-13.

(finding a due process violation where witness testimony "taken as a whole" gave a "false impression").[45]

### 2. The Government knew or should have known Mr. Wanker's testimony was misleading.

From the start, James Wanker specifically told the prosecutors and the case agent in charge of the capital trial that given his knowledge of Mr. Lee and the surrounding circumstances in which his statement was made, there was reason to doubt its credibility. Exh. A at ¶ 11. He thought that was important enough to repeat to an officer from the Spokane Sheriff's Office in the Spring of 1997, a law enforcement officer from Arkansas who interviewed him by phone in the Summer of 1997, and an ATF agent from Spokane who interviewed him in July of 1997. *Id.* at ¶¶ 8-10. All of those statements must be imputed to the prosecution. *See Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case."). The Government thus knew or should have known that Mr. Wanker's testimony as presented to the jury was highly misleading.[46]

---

[45] Similarly, courts have repeatedly recognized that *Napue* and *Giglio* encompass claims involving material testimony that is either misleading or creates a false impression. *See Drake v. Portuondo*, 553 F.3d 230, 243 (2d Cir. 2009) (*Napue* violation found where prosecution's question elicited "literal accuracy while conveying [a] false impression" about witness's qualifications); *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (finding *Napue* violation where prosecution elicited "technically accurate testimony" that was "probably true but surely misleading" and the jury was left with "mistaken impression"); *United States v. Sutton*, 542 F.2d 1239, 1243 (4th Cir. 1976) (*Napue* violation found where prosecution "allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness"); *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967) ("Evidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true."); *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) (due process violation does not require finding that witness committed perjury; "It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false.").

[46] Mr. Lee need not demonstrate that the prosecutors who tried his case were personally aware of the misleading nature of Mr. Wanker's testimony. The Supreme Court has held that the presentation of false evidence against a defendant violates due process even if the falsity was

### 3. Mr. Wanker's testimony was material.

"Claims arising under *Giglio v. United States* [] are a type of *Brady* claim that have a different and more defense friendly measure of materiality." *Hammond v. Hall*, 586 F.3d 1289, 1306-07 (11th Cir. 2009). Under this type of claim, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Augurs*, 427 U.S. 97, 103 (1976). The "could have" standard requires a new trial unless the prosecution persuades the court that the misleading testimony was harmless beyond a reasonable doubt. *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). "This standard favors granting relief. It is shaped by the realization that 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.'" *Id.* at 1333-34 (quoting *Giglio*, 405 U.S. at 153).

All of the reasons articulated above in Section IV.A.3 to show that the suppressed evidence was material to Mr. Lee's defense under *Brady* apply with even greater force to show why the *Napue*/*Giglio* violation was not harmless beyond a reasonable doubt. Mr. Wanker's testimony at trial carried the imprimatur of a citizen with no incentive to come forward other than to tell the truth and fulfill his civic duty of assisting law enforcement in solving a serious crime. The jury would have felt entitled to believe with confidence his critical testimony and treat it as probative evidence of Mr. Lee's involvement in the Mueller murders. The newly disclosed evidence would have shattered any such confidence. There is thus "any reasonable

---

unknown to the prosecutor. *See Giglio*, 405 U.S. at 154. This is because the underlying purpose of *Napue* and *Giglio* is not to punish prosecutors for the misdeeds of a witness, but rather to ensure that the jury is not misled by any falsehoods. *See, e.g., United States v. Meinster*, 619 F.2d 1041, 1044 (4th Cir. 1980).

likelihood that the false testimony could have affected the judgment of the jury," *Augurs*, 427 U.S. at 103, and the Government cannot prove that it was harmless beyond a reasonable doubt.

### C. Third Ground for Relief: Mr. Lee's death sentence was obtained in violation of *Brady v. Maryland*

Previously undisclosed evidence establishes that the jury was falsely told that Mr. Lee was legally responsible for the murder of Joseph Wavra, and that he had gotten away with the crime when the state prosecutors gave him a sweetheart plea deal to the less severe offense of robbery. Had the exculpatory information not been suppressed, there is a reasonable probability that the result of the sentencing proceeding would have been different.

#### 1. The evidence was favorable to Mr. Lee.

As noted above, the Wavra murder was central to the Government's argument in the penalty phase that Mr. Lee was a dangerous psychopath who would continue to harm others unless sentenced to death. Thus, the suppressed evidence concerning the judge's rejection of any murder charge in the Wavra matter was unquestionably favorable to Mr. Lee's defense because it would have rebutted this aggravator.

The relevant Oklahoma state court record demonstrates that there was a judicial finding that the state's evidence was insufficient to sustain a murder charge against Mr. Lee. This would have specifically rebutted a predicate fact alleged as part of the future dangerousness aggravator: that Mr. Lee was culpable for the 1990 murder of Joey Wavra. *See* Exh. J (Penalty Phase Verdict Form). Moreover, the suppressed evidence contradicted the Government's powerful penalty phase argument that Mr. Lee had "gotten away" with murder when he was allowed to plead guilty to robbery. The suppressed information demonstrates that the robbery plea was not a "gift:" it was instead the prosecution's only reasonable option after a state court judge recommended that the murder charge be dismissed and replaced with a charge of robbery.

52

### 2.     The evidence was suppressed by the Government.

Despite defense counsel's pre-trial requests for any *Brady* material as to punishment, the Government did not disclose its knowledge of favorable information concerning the actual proceedings in the Wavra case.

The Government obtained the Oklahoma state court records on the Wavra case as part of its pre-trial investigation. It introduced a portion of those records as part of its case-in-chief at the penalty phase proceedings. *See* Tr. 7418-19 (Government's Exhibit 1103, transcript of Mr. Lee's testimony at 9/28/90 preliminary hearing in the matter of State v. John David Patton); Tr. 7470 (Government's Exhibit 1108, judgment and sentence in the District Court of Oklahoma County, the State of Oklahoma, for Daniel Lee, for the crime of robbery); *id.* (Government's Exhibit 1109, conviction for John Patton in the State of Oklahoma for the crime of first degree murder). Undoubtedly, the Government was aware of the procedural history and disposition of the murder charge against Mr. Lee.[47]

The federal prosecutors also actively enlisted the help of local Oklahoma law enforcement officials in their capital case against Mr. Lee. The Government called as a witness in its case-in-chief one of the detectives who investigated the Wavra incident, Randall Yarbrough. Tr. 7389. The Government also consulted with Ron Mitchell, the Oklahoma City Police Department detective who conducted the interrogation of Mr. Lee in the Wavra case. Tr. 7349-50.[48] These detectives were undoubtedly aware that the dismissal of Mr. Lee's homicide charge was not due to a prosecutorial "gift."

---

[47] At the appropriate time, Mr. Lee intends to file a formal request for discovery, pursuant to Rule 6 of the Rules Governing § 2255 Proceedings, concerning the Oklahoma state court records that were in the Government's possession at the time of Mr. Lee's trial.

[48] The Government called Detective Mitchell as a witness at a suppression hearing regarding Mr. Lee's testimony at the Patton preliminary hearing. Tr. 7349-51.

As the Supreme Court has made clear, the *Brady* rule encompasses evidence "known only to police investigators and not to the prosecutor." *Kyles*, 514 U.S. at 438. Thus, any knowledge by the Oklahoma authorities regarding the disposition of Mr. Lee's case in the Wavra matter must be imputed to the Government. *Id.* at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."). *See also United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979) (imputing knowledge in state hands to federal prosecutors because of degree of cooperation and interaction among the various authorities during the general course of the investigation).

### 3. The suppressed evidence was material.

But for the Government's misconduct, there is a reasonable probability that the outcome of the sentencing proceeding would have been different. Indeed, as the presiding trial judge in this case previously noted, "the testimony regarding [Mr. Lee's] role in the Wavra murder was powerful and likely contributed to or influenced the jury's ultimate decision." *United States v. Lee*, 2008 WL 4079315 at *45 (E.D. Ark. 8/28/08) (order denying § 2255 motion).

The Wavra murder was the key prior bad act upon which the Government focused in its penalty phase case-in-chief: of the five witnesses that it called, four were put on the stand to testify regarding the Wavra murder. Tr. 7389-7461. Moreover, almost half of the Government's penalty phase presentation was spent reading into evidence the transcript of Mr. Lee's testimony at his cousin's September 28, 1990 preliminary hearing. Tr. 7418-56. Finally, the prosecution relied heavily on the Wavra murder to help prove that Danny Lee was a diagnosable "psychopath" who was too dangerous to be allowed to live.

Similarly, the Wavra murder was a focus of every argument that the Government made to the jury during Mr. Lee's penalty phase. During his opening statement, Mr. Liroff explicitly framed the Wavra murder as a significant piece of evidence it would offer to justify a death sentence in this proceeding, notwithstanding the jury's decision to sentence the more culpable Mr. Kehoe to life. As he explained, there were critical differences in the respective background and "life experiences" of Mr. Lee and his co-defendant that would justify punishing Mr. Lee more harshly; namely, that Mr. Lee had killed someone when he was only 17 years old. Tr. 7381. Significantly, Mr. Lee's involvement in the Wavra murder would be a key element of its proof that Mr. Lee was a "psychopath" and would continue to be a danger to others if not sentenced to death:

> The last aggravating factor that you will consider is the factor, the nonstatutory factor, called future dangerousness. What this means is that the evidence presented to you in this case as to Mr. Lee means that even if jailed for the rest of his life, he still will be a danger to others, to fellow inmates, to prison guards. He continues to be dangerous. . . .
> That is part of his profile. Even if you sent him to prison for the rest of his life, he will be a threat for a long, long time.
> In the end, what the evidence that will be presented will establish is that Mr. Lee is a psychopath. I don't mean that in a common term. I do mean that in the medical use. What you will also learn is some five- and a half years ago, before Mr. Lee helped kill the Mueller family, Mr. Lee helped kill another person, Joseph John Wavra, in Oklahoma. Mr. Lee was then just 17 years old. . . .
> Mr. Lee was then, as he is today, angry, suspicious, hostile, broody, a dangerous person.

Tr. 7381-82.

From the very start of the penalty phase, the prosecution advanced the theory that Mr. Lee escaped justice for the Wavra murder and that there was a straight line that ran from that crime to the Mueller murders:

> Now, few of us in life get an opportunity for a second chance. But Mr. Lee did. And he *got a gift* in that case from the prosecutors in Oklahoma. They gave him a plea bargain. And this allowed him to *get off with just a robbery*. He got

> minimal jail time. And he was given that opportunity to walk out that door with a second chance. Unfortunately, that doorway led him eventually to Tilly, Arkansas.

Tr. 7383 (emphasis added).

Prosecutor Liroff emphasized these same themes in his closing argument to the jurors, again pointing to Mr. Lee's dangerousness as the reason why they should not give him the same sentence as his codefendant:

> Now, I'm talking legally about the concept of future dangerousness. And that was an issue in Mr. Kehoe's trial. Mr. Lee is not Mr. Kehoe. Mr. Lee is different. And you are charged with the responsibility of judging them separately. If you believe he is a dangerous and violent man, then I suggest you have a responsibility to consider this in determining his penalty.

Tr. 7959.

> An example of that is that behavior that happened during the Joey Wavra murder. You should be very troubled by that. And that alone illustrates this drastic distinction on several levels between Danny Lee and Chevie Kehoe. . . . And you saw Danny Lee, the man he was back then. And he's the same man that sits over there. He is the same man who during this trial has that hair trigger volatility that will make him say or do something at that instant, regardless of any consequences because it's damn the consequences.

Tr. 7962. The Government repeatedly cited the Wavra murder as a critical fact that proved Mr. Lee would be a future danger. *See* Tr. 7964 ("The other aspect of the Wavra murder that's of absolute importance is because it communicates to you, and it says to you something about that aggravating factor of future dangerousness."); Tr. 7975 ("the future dangerousness, the prior crime against Joey Wavra"); Tr. 7962-63.

Mr. Liroff returned over and over to his theme that Mr. Lee "got away" with killing Joey Wavra when he was "allowed" to plead guilty to robbery. *See* Tr. 7972 ("How about that DA in Oklahoma who let him get off with a robbery?"). Indeed, one of the Government's most effective arguments in persuading the jury to impose a death sentence, despite having spared Mr.

Kehoe, was that Mr. Lee had already "fooled" the criminal justice system once before when he "got off" with that "incredible" plea deal, but despite getting a second chance, he never changed his murderous ways:

> One important aspect of this is this. When this happened, Lee got this incredible, this incredible deal, this plea bargain in the end, pled guilty to a robbery. How many of you, how many of you in your life have thought back. . . . And sometimes in the middle of the night you sit back and you think about things that you've done, places you've been, self-confession time. . . .
> *Usually you commit a murder*, and you get sent away for a very long time. And you don't get an opportunity for a do over. It's done. You made a horrible mistake, and you can't do anything about it. And you can't say, Gee, I wish I hadn't done that so I could get back on my life and have an opportunity to make amends. Danny Lee got a do over. He got the opportunity to say, my God, what have I done? Look where all this led me. He had the opportunity to say, I made a mistake, but I got an opportunity to turn myself around. And that's incredibly monumental.
> It is rare for a *murderer* like Danny Lee to stand before a jury who is about to determine his death penalty, *who has an earlier murder under his belt, who has a prior victim's blood on his hands*. You know the expression. Fool me once, shame on, you. Fool me twice, shame on me. And that's the first aspect of this Wavra *murder* that I think is terribly important and I think you should consider in distinguishing Lee from Kehoe because Lee has been here before. Lee has stood in the court of justice. Lee has had the opportunity to regret, and Lee has had that opportunity to change his ways.

Tr. 7963-64 (emphasis added).

The Government also used the alleged earlier murder to diminish the power of the mitigation the defense presented. Specifically, the defense presented mitigating evidence that Mr. Lee's mental capacity was impaired, and that he suffered from neurological impairments and brain dysfunction. According to the Government, however, this was merely a ploy by defense counsel to come up with an excuse for why Mr. Lee did not change his ways after killing Mr. Wavra. As the prosecution argued to the jurors, they ought not fall for this tactic; Mr. Lee had already received "a full quote of earthly grace" when he was given a lenient plea deal, and his failure to make a change in his life was his own fault and not due to "all this mental stuff":

57

I'm over there thinking, why is Ms. Compton putting on all this proof, and why do we have to go to the trouble to rebut this proof? It didn't make any sense to me. But it makes sense now after I've heard the arguments. It all made sense to me. Mrs. Compton knew that her situation, even though Chevie Kehoe was the leader, her situation in defending Danny Lee was way different than Professor Sullivan's situation when he tried to argue for the life of Chevie Kehoe. And it was way different because of the Wavra murder. It was way different because Danny Lee had his opportunity before. He had a chance to come in and take a look at his life, as [AUSA] Lane [Liroff] pointed out to you, and say "I will make a change." And he didn't. And I just believe that Ms. Compton realized that given that basic fact she couldn't sell grace to you. She had to go to all this mental stuff. . . .

I submit to you that Mr. Lee has had a full quota of earthly grace. Now as to heavenly grace, that's between him and his maker. I submit to you, though, that as far as earthly grace is committed, he's paid his full quota.

Tr. 7991.

Faced with Chevie Kehoe's undeniably greater role in the offense and his own history of violence, Mr. Liroff used the Wavra murder to rebut the statutory mitigating factor that an equally culpable person would not be punished by death:

And this is a mitigating factor, that another person equally culpable will not be punished by death. If you look at it, it doesn't say who that is. But there's no question what we are talking about here. We are talking about Chevie Kehoe. . . . Things are not equal. Things are not the same. People are different. Chevie is not Danny.

The most obvious, and the most glaring difference is this. It all comes under the heading of future dangerousness. . . . There's no evidence of the prior dangerousness. There's no prior Joey Wavra as to Chevie. There is as to Mr. Lee.

Tr. 7969-70. The Government's offensive use of the Wavra murder to attack Mr. Lee's mitigation case was plainly effective: despite the Government's own evidence that Chevie Kehoe was not simply *equally* culpable, but actually *more* culpable given that he alone killed Sarah Powell, only three jurors found that this mitigating factor was proven. *See* Exh. J at 8. Similarly, not a single juror found that Mr. Lee's mental capacity was impaired, or that he suffered from neurological impairments or brain dysfunction. *Id*. at 7-8.

The suppressed information about Mr. Lee's true role in that crime was material. There could hardly be a more powerful rejoinder to the Government's claim that Mr. Lee was "legally and morally" guilty of killing Mr. Wavra than an official state court adjudication finding the opposite. Indeed, that is particularly true here because the state court's determination was that the state's evidence against Mr. Lee – which included the same preliminary hearing testimony upon which the Government so heavily relied to "prove" his guilt – did not even satisfy the considerably less onerous "probable cause" standard of proof. The suppressed evidence gives lie to the inflammatory claim that Mr. Lee was given a "gift" that allowed him to "get away" with a prior murder.

In light of the central role that the Wavra murder played in the Government's penalty phase case, there is a reasonable probability that the outcome of the sentencing proceeding would have been different had the jury learned of the judicial finding that Mr. Lee could not be held responsible for Joey Wavra's death.

**D. Fourth Ground for Relief: Mr. Lee's death sentence was obtained in violation of *Napue v. Illinois* and *Giglio v. United States*.**

The use of the Wavra "murder" violated not only *Brady v. Maryland* but also the rule in *Napue v. Illinois* and *Giglio v. United States.*

**1. The Wavra evidence was false and/or misleading.**

As noted above, the Government's penalty phase presentation falsely conveyed the impression that: (1) Mr. Lee was guilty of a prior murder; and (2) that his guilty plea to robbery was an inexplicable and unfortunate "gift" by local prosecutors. The Government's penalty phase presentation was particularly misleading because it was premised on the notion that one need look no further than Mr. Lee's own sworn testimony at his cousin's preliminary hearing to establish these facts. But even though the transcript that was read to the jury was certainly

59

damning, there was clearly undisclosed information that explained how it came to be that Mr. Lee's case was resolved with a guilty plea to robbery rather than murder.

Indeed, the power of Mr. Lee's prior testimony is considerably diminished, if not destroyed, when considered in this context: a state court reviewing the totality of the evidence, including Mr. Lee's testimony at his cousin's hearing, determined that there was insufficient evidence for the state to carry its burden of proof on the murder charge. Moreover, far from having received a sweetheart plea deal from the local prosecutors, the state court record demonstrates that the resolution of Mr. Lee's case was made after a state court adjudication that the murder charge should be dismissed and that, at best, the state's evidence could satisfy only a charge of robbery.

2. **The Government knew or should have known the Wavra evidence was false and/or misleading.**

For the same reasons articulated in Section IV.C.2, the Government knew or should have known that the case it built around the Wavra killing was false and/or misleading. It had clearly sought and obtained relevant Oklahoma state court records concerning the Wavra matter. Moreover, the Oklahoma City Police Department assisted the Government in its capital prosecution of Mr. Lee and provided it with information on the Wavra matter. It is simply inconceivable that the lead detectives involved in the Wavra investigation—one of whom conducted the interrogation of Mr. Lee—were unaware of the reasons for the final disposition dismissing any murder charge. Indeed, under *Brady*, any knowledge by the police concerning the Wavra matter that was favorable to Mr. Lee is clearly attributable to the Government. *Kyles*, 514 U.S. at 437.

### 3.  The Wavra evidence was material.

All of the reasons articulated above in Section IV.C.3 to show that the suppressed evidence was material to Mr. Lee's penalty-phase defense under *Brady* apply with even greater force to show why the *Napue*/*Giglio* violation that occurred here was not harmless beyond a reasonable doubt. The representation at trial that Mr. Lee was "legally and morally" guilty of the Wavra murder, a central theme of the penalty presentation, carried the imprimatur of official state court records that seemingly established that fact. Similarly, the claim that Mr. Lee escaped a conviction for that murder because local prosecutors gave him a "gift" of a reduced charge of robbery was made by a federal prosecutor who was presumably knowledgeable about plea negotiations in criminal cases. Thus, the jury could reasonably have felt entitled to rely with confidence on these representations and believe that Mr. Lee had, in fact, gotten away with murder—and that the psychopathy diagnosis had a basis in his criminal history. The suppressed evidence would have eliminated any such confidence. Armed with the actual facts, it is reasonably likely that the jury would not have found the "future dangerousness" aggravator[49] nor failed to find and weigh the mitigating truth that the more culpable actor was receiving a life sentence. Hence, there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury," *Augurs*, 427 U.S. at 103, and the Government cannot prove that it was harmless beyond a reasonable doubt.

---

[49] That aggravating circumstance was *not* found in Mr. Kehoe's case, despite his history of criminal conduct. Indeed, the Eighth Circuit opined that the jury's rejection of that aggravator in Mr. Kehoe's case accounted for why it sentenced him to life and Mr. Lee to death. *See United States v. Lee*, 715 F.3d 215, 223 (8th Cir. 2013).

61

**V.    In the alternative, Mr. Lee moves this Court to construe his motion as one filed under Fed. R. Civ. P. 60(b)(3) & (d)(3) and to reopen his first § 2255 motion in light of the newly discovered evidence.**

In the event this Court decides that the *Brady* claims are non-material, and thus subject to the gatekeeping provisions of § 2255(h), then Mr. Lee moves the Court to construe his motion as being filed under Federal Rule of Civil Procedure 60(b)(3) and (d)(3) and to reopen his original § 2255 action.

Rule 60(b)(3) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons… (3) fraud … misrepresentation, or misconduct by an opposing party." The Supreme Court has held that Rule 60(b) motions can properly be applied to habeas proceedings when they attack "not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the [previous] federal habeas proceedings." *Gonzalez v. Crosby*, 545 U.S 524, 532 (2005). "Fraud on the federal habeas court is one example of such a defect." *Id*., n.5.

In his initial § 2255 motion, Mr. Lee raised several allegations which would have been viable had the evidence discussed above been properly disclosed. When Mr. Lee claimed that the Government had improperly withheld information favorable to the defense bearing on guilt or punishment in violation of its constitutional *Brady* obligations, the Government insisted in its reply that it had complied with all of its pre-trial discovery obligations. Doc. No. 1126-1 at 45 n.16. And when Mr. Lee attempted to argue in his earlier § 2255 motion that trial counsel was ineffective for failing to uncover evidence concerning Mr. Lee's true role in the Wavra murder, the Government responded by claiming that it was "at a loss to understand that which Lee now argues his trial counsel should have done," *id*. at 76, and that it was "difficult to imagine" how a properly conducted investigation of the Wavra murder would have placed Mr. Lee's role in that

offense "in an entirely different light." *Id*. at 75-6. Yet the prosecutors or their agents had in their possession evidence contradicting each of these assertions.

The response by the Government to Mr. Lee's *Brady* and ineffective assistance of counsel claims in his first-in-time § 2255 motion constitutes "fraud …, misrepresentation, or misconduct by an opposing party" under Rule 60(b). This misrepresentation created a defect in the integrity of the earlier § 2255 proceeding in Mr. Lee's case, thus entitling him to the reopening of his original motion. *See Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994) ("an adverse party's failure, either inadvertent or intentional, to produce such obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)"); *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983) (failure to produce requested discovery material can constitute Rule 60(b)(3) misconduct); *Square Construction Co. v. Washington Metro. Area Transit Auth.*, 657 F.2d 68, 71 (4th Cir. 1981) (same).

Similarly, Mr. Lee is entitled to relief under Fed. R. Civ. P. 60(d)(3), which recognizes this Court's "power to … set aside a judgment for fraud on the court." Fraud under Rule 60(d)(3) "is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Kerwit Medical Products, Inc. v. N & H Instruments, Inc*., 616 F.2d 833, 837 (5th Cir. 1980) (quoting 7 Moore, Federal Practice ¶ 60.33 at 511 (1971 ed.)). *See also Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (an attorney's "loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court.").

Here, the Government's representations during the § 2255 proceedings impeded this Court's impartial task of adjudging the *Brady* and ineffective assistance of counsel claims. The

63

Government's representation that it had complied with all its pre-trial discovery obligations, including those required by *Brady*, negated Mr. Lee's general *Brady* claim; this Court did not even address the issue in its Order denying the § 2255 relief. And with respect to the ineffective assistance of counsel issue, the Court formally adopted the Government's fraudulent representation that prejudice could not be established because there existed no contrary evidence which would have cast Mr. Lee's role in the Wavra murder in another light:

> However, there is nothing before the Court to indicate that Petitioner's "true role" in the murder was anything other than as portrayed during the sentencing trial. *The Government asserts, and the Court agrees,* that counsel's investigation into the matter was entirely reasonable and caused no prejudice to Petitioner.

Doc. No. 1163 at 88-89 (emphasis added). Where, as here, the withheld evidence was critical to the disposition of the claim, it is clear that "the judicial machinery [could not] perform in the usual manner its impartial task of adjudging cases that [were] presented for adjudication," and thus there has been a fraud on the court.

## CONCLUSION

Mr. Lee's trial was marred by the prosecution's failure to disclose material information central to the jury's determination of both guilt and punishment. The law, even in death penalty cases, does not require a perfect trial, but it does demand a reliable one. Here, due to the Government's misconduct, neither the conviction nor the sentence is reliable. This Court should, after hearing evidence, reverse the judgment and order a new and fair proceeding for Daniel Lee.

64

**PRAYER FOR RELIEF**

WHEREFORE, Movant Daniel Lee respectfully requests that this Court provide the

following relief:

1.   Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion;

2.   Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings in the United States District Courts, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.   Permit Movant to file a Reply to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4.   Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Motion, or by Movant's Reply to any affirmative defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

5.   Permit Movant to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

6.   Permit oral argument as appropriate and required;

7.   Vacate Movant's conviction and sentence and order that appropriate retrial and/or sentencing hearings be conducted; and

8.   Grant such further and additional relief as may be just and proper.

Respectfully submitted this 10th day of September, 2018.

/s/ Morris H. Moon

| | |
|---|---|
| MORRIS H. MOON | GEORGE G. KOUROS |
| Assistant Federal Public Defender | Assistant Federal Public Defender |
| Federal Capital Habeas Project | Federal Capital Habeas Project |
| 6411 Ivy Lane, Suite 710 | 6411 Ivy Lane, Suite 710 |
| Greenbelt, MD 20770 | Greenbelt, MD 20770 |
| (713) 880-3556 | (301) 821-0855 |
| Morris_Moon@fd.org | George_Kouros@fd.org |

Counsel for Daniel Lewis Lee

## CERTIFICATION PURSUANT TO RULE 2(b)(5)
## <u>OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS</u>

The undersigned, being authorized to sign for the movant, declares under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: September 10, 2018          /s/ Morris H. Moon

Morris H. Moon
Bar # 24032750 (TX)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (713) 880-3556
Email: Morris_Moon@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on September 10, 2018. This motion was served via this court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

LINDA B. LIPE
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203-1229
(501) 340-2600
Linda.Lipe@usdoj.gov

By: /s/*Morris Moon*
MORRIS H. MOON
Bar # 24032750 (TX)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (713) 880-3556
Email: Morris_Moon@fd.org