IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 4:97-CR-00243-JLH |
| | ) | (Capital Case) |
| | ) | |
| DANIEL LEWIS LEE. | ) | |

————————

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
VACATE CONVICTION AND SENTENCE**

————————

CODY HILAND
United States Attorney
Eastern District of Arkansas

BRIAN A. BENCZKOWSKI
Assistant Attorney General

MATTHEW S. MINER
Deputy Assistant Attorney General

JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1260
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

## TABLE OF CONTENTS

STATEMENT ........................................................................................ 1

    I.    Offense Conduct ..................................................................... 3

    II.    Trial and Sentencing ........................................................... 6

        A.    Guilt Phase ................................................................. 6

        B.    Penalty Phase ............................................................ 7

    III.    Postconviction Proceedings ............................................... 11

    IV.    The Present § 2255 Motion ................................................ 13

ARGUMENT ...................................................................................... 16

        A.    Legal Background: The Gatekeeping Requirements
            for Second or Successive § 2255 Motions ........................... 16

        B.    Lee's § 2255 Motion Must Be Dismissed Because It is
            an Uncertified Second or Successive § 2255 Motion .......... 18

            1.    A Second-in-Time § 2255 Motion is Second or
                 Successive if it Raises a Claim That Was Ripe
                 at the Time of the Defendant's First § 2255
                 Motion .................................................................... 18

            2.    Lee's Second-in-Time § 2255 Motion Asserting
                 a *Brady* Claim is Subject to AEDPA's
                 Gatekeeping Provisions for Second or
                 Successive Motions .................................................. 20

        C.    Lee's Motion is Barred Even if Evaluated Under the
            Pre-AEDPA Abuse-of-the-Writ Standard ......................... 27

            1.    James Wanker's Opinions About the Veracity
                 of Lee's Admissions ................................................. 31

                 a.    Background ..................................................... 31

i

b.      There is No Reasonable Probability That the Jury Would Have Reached a Different Verdict if it Had Been Presented with the Information in Wanker's Affidavit ........................................... 34

2.      The Oklahoma Court Document .............................. 40

a.      Background .................................................... 40

b.      The Allegedly New Information in the Oklahoma Court Document is Not Material .......................................................... 43

D.    Lee Cannot Avoid AEDPA's Gatekeeping Provisions by Characterizing His § 2255 Motion as Rule 60 Motion ................................................................................ 45

CONCLUSION ............................................................................... 49

CERTIFICATE OF SERVICE ....................................................... 50

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 4:97-CR-00243-JLH |
| | ) | (Capital Case) |
| | ) | |
| DANIEL LEWIS LEE. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
VACATE CONVICTION AND SENTENCE**

The government submits this response to defendant Daniel Lewis Lee's

motion for collateral relief under 28 U.S.C. § 2255. For the reasons stated

below, the Court should dismiss the motion for lack of jurisdiction because it

is an uncertified second or successive motion for relief under § 2255.

**STATEMENT**

This is a capital murder case with a long procedural history. In 1999, a

federal jury recommended that Lee receive the death penalty for three

murders he committed in January 1996. In 2000, this Court (Hon. G. Thomas

Eisele) granted Lee a new sentencing hearing. *United States v. Lee*, 89 F.

Supp. 2d 1017 (E.D. Ark. 2000). The Eighth Circuit reversed and reinstated

the death sentence. *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001), *cert.*

*denied*, 537 U.S. 1000 (2002). In 2004, the Eighth Circuit affirmed Lee's

1

conviction and sentence on direct appeal. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied*, 545 U.S. 1141 (2005).

In June 2006, Lee filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. Dkt. 1118.[1] This Court denied the motion and a motion for reconsideration. *United States v. Lee*, No. 97-CR-243, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008); *United States v. Lee*, No. 97-CR-243, 2010 WL 5347174 (E.D. Ark. Dec. 22, 2010). The court of appeals affirmed. *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013), *cert. denied*, 135 S. Ct. 72 (2014).

In September 2013, Lee filed a motion that he titled a motion for relief from judgment under Federal Rule of Civil Procedure 60. Dkt. 1230. This Court concluded that it lacked jurisdiction because the motion in substance amounted to an uncertified second or successive motion for relief under § 2255. *United States v. Lee*, No. 97-CR-243, 2014 WL 1093197 (E.D. Ark. Mar. 18, 2014). The court of appeals affirmed. *United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015), *cert. denied*, 137 S. Ct. 1577 (2017).

Lee has now filed another motion for collateral relief under § 2255. Dkt. 1297. He claims that his constitutional rights were violated because the government allegedly failed to disclose pre-trial statements by one of the witnesses at the guilt phase of his trial (James Wanker) and also failed to

---

[1] "Dkt." refers to docket entries in this Court. "Tr." refers to the consecutively-paginated trial transcript.

turn over court documents from criminal proceedings in Oklahoma pertaining to the murder of an individual named Joey Wavra, which Lee contends would have been relevant during the penalty phase of his trial. *Id.* at 3-6.

## I.    Offense Conduct

Lee and Chevie Kehoe were members of a white supremacist organization known as the Aryan Peoples' Republic, or the Aryan Peoples' Resistance (APR), which Kehoe founded for the purpose of establishing an independent nation of white supremacists in the Pacific Northwest. *Lee*, 374 F.3d at 641. Kehoe recruited Lee into the APR and the two men—along with, at times, others—participated in a variety of criminal activities to promote and finance the APR. *Id.*

In particular, in January 1996, expecting to find valuable property, Kehoe and Lee traveled from Washington to the Arkansas home of William Mueller, a gun dealer who owned a large collection of weapons and ammunition. *Lee*, 374 F.3d at 641. When Mueller arrived home with his wife Nancy and their eight-year-old daughter Sarah Powell, Lee and Kehoe overpowered and incapacitated the Muellers and then questioned Sarah Powell about the location of cash, guns, and ammunition. *Id.* at 641-42. After taking weapons worth about $30,000 and $50,000 in cash and coins, Lee and Kehoe shot the three victims with a stun gun, placed plastic trash bags over their heads, and sealed the bags with duct tape to asphyxiate them. *Lee*, 2008

3

WL 4079315, at *4. The men taped rocks to the bodies and threw them into the nearby Illinois Bayou. *Lee*, 374 F.3d at 641-42; *United States v. Kehoe*, 310 F.3d 579, 590 (8th Cir. 2002), *cert. denied*, 538 U.S. 1048 (2003).

Lee and Kehoe returned to Washington with the property they stole from the Muellers, *see Lee*, 374 F.3d at 642, and Lee confessed to Kehoe's mother Gloria Kehoe, telling her that "Bill [Mueller] was one tough son of a bitch because he fought so hard" and that Nancy Mueller was "dumb . . . because she . . . helped put the trash bag on her head," *Kehoe*, 310 F.3d at 590 (internal quotation marks omitted). Lee further confessed that Chevie Kehoe gave him $1000 and a rifle for participating in the robbery and murders and that he and Kehoe disposed of the bodies by weighing them down with rocks and throwing them in a river. *Id.* Lee also told James Wanker, who lived at the motel where Lee resided after the murders, that he had taken a trip "down south" and that some people "had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp." Tr. 4082-83. Lee made a similar statement to Wanker's wife Dalvine Wanker, telling her that "he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093. Chevie Kehoe also confessed to his mother Gloria, saying that he and Lee had murdered William and Nancy Mueller but that he had murdered Sarah Powell by himself because Lee was unwilling to kill the girl. *Lee*, 374 F.3d at 642; *Lee*, 2008 WL 4079315, at *4.

4

Lee and Kehoe panicked after learning, in December 1996, that a friend had been arrested in possession of one of Mueller's guns and that an ATF agent had asked if the friend had purchased the gun from Kehoe. Tr. 2794, 2799, 4980. The men fled and went their separate ways: Lee to Oklahoma, where his mother lived, *see* Tr. 4980, and Kehoe to Montana and then elsewhere, meeting up with his brother Cheyne Kehoe along the way, *see* Tr. 5318-20. Chevie Kehoe gave another detailed confession to Cheyne about how he and Lee had murdered the Muellers, Tr. 5326-31; *see Kehoe*, 310 F.3d at 584-85.

Gloria and Cheyne Kehoe eventually cooperated with law enforcement and provided information about storage units used by Chevie Kehoe in Montana and Idaho where police found, among other things, property stolen from the Muellers, including display cases that William Mueller had used at gun shows to display items he offered for sale and a key fitting the handcuffs found on Mueller's dead body. Tr. 3378-3403, 3479, 3610-28, 3650; *see Kehoe*, 310 F.3d at 585. Lee's and Kehoe's fingerprints were recovered from one of Mueller's display cases recovered from the Idaho storage unit. Tr. 3710.

## II.    Trial and Sentencing

Lee and Kehoe were charged with conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d); and three capital counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). The government provided notice of its intent to seek the death penalty against both defendants for each of the three murders. *See Lee*, 374 F.3d at 642.

### A.    Guilt Phase

Lee and Kehoe were tried together before a jury. *See Lee*, 2008 WL 4079315, at *2. After a two-month trial, the jury found them guilty on all counts. *Id.*

To prove that Lee committed the murders with Kehoe, the government introduced evidence showing, among other things, the following: Kehoe and Lee lived in Washington State in January 1996. *See, e.g.*, Tr. 2772-73. They traveled together in January 1996 and stopped at Lee's mother's house in Oklahoma, telling her they were there to sell a pickup truck, and then they left on January 10, 1996, the day before the Muellers were murdered. Tr. 2618-20, 2633. Kehoe and Lee arrived back in Washington three or four days later, flush with cash and in possession of property owned by the Muellers.

6

Tr. 2610, 2620-22, 2896, 2900-01, 2916, 3710. Kehoe and Lee both separately confessed in detail to Kehoe's mother, Gloria: Both men admitted that they killed the Muellers, and Kehoe said that he killed Sarah Powell because Lee was unwilling to kill the 8-year-old girl. Tr. 4971-75. Lee also told James and Dalvine Wanker—his neighbors in Washington—that he had gone "down south" and "taken care" of people down there, or, more specifically, had "wrapped them up, taped them, and [thrown] them in the swamp." Tr. 4082-83, 4093. Later, Lee and Kehoe both fled Washington after they learned that law enforcement authorities were asking questions that linked Kehoe with property stolen from the Muellers. Tr. 2794, 2799, 4980. Chevie Kehoe subsequently gave another detailed confession to his brother Cheyne about how he (Chevie) and Lee killed the Muellers. Tr. 5326-31; *see Kehoe*, 310 F.3d 584-85. When investigators obtained property stolen from the Muellers in a storage unit used by Chevie Kehoe, Lee's fingerprints were found on one of Mueller's stolen display cases. Tr. 3380-3403, 3610-28, 3650, 3710; *see Kehoe*, 310 F.3d at 592.

### B.    Penalty Phase

After the guilt phase, separate hearings were held to determine whether each defendant should receive the death penalty for the three capital murders. *See* Tr. 7169-7337 (Kehoe sentencing hearing); Tr. 7367-8022 (Lee sentencing hearing). The Federal Death Penalty Act, 18 U.S.C. §§ 3591-3593,

required the jury to determine, at each hearing, whether aggravating factors proved by the government sufficiently outweighed any mitigating factors proved by the defendants to justify the death penalty. *See generally United States v. Purkey*, 428 F.3d 738, 749, 761 (8th Cir. 2005). At both hearings, the government argued that five aggravating factors supported imposition of the death penalty: (1) Lee and Kehoe murdered the Muellers in expectation of receiving something of pecuniary value, (2) they murdered the Muellers after substantial planning and premeditation, (3) Sarah Powell was a vulnerable victim, (4) they killed or attempted to kill more than one person during a single criminal episode, and (5) they would be a danger in the future to the lives and safety of others. *See* Tr. 7175, 7373; *see* 18 U.S.C. § 3592(c).

At Kehoe's sentencing hearing, which went ahead first, the jury unanimously decided against a sentence of death for each of the three murders and in favor of life imprisonment without the possibility of release. Tr. 7328-37. The United States then proceeded with Lee's sentencing hearing. *See In re United States*, 197 F.3d 310, 311-12 (8th Cir. 1999).

The emphasis of the government's case at Lee's sentencing hearing was the aggravating factor of his future dangerousness. *See* Tr. 7379-84. The government introduced evidence showing that in 1990 Lee severely beat an individual named Joey Wavra, forced Wavra down a manhole into a storm sewer, and retrieved a knife for his cousin, who repeatedly stabbed Wavra

8

and slit his throat. Tr. 7394-96, 7401-07, 7412-15, 7441-46. The government introduced evidence that Lee's cousin was convicted of first-degree murder and Lee pleaded guilty to robbery, and that Lee and the cousin were not sure whether Wavra had died from the beating or the slit throat but that Lee's cousin agreed to take the blame because he was facing a life sentence regardless. Tr. 7458, 7470. The government also introduced the testimony of a prison guard who stated that Lee screamed and yelled and threatened to kill her after she told Lee he could not leave his cell to call his lawyer. Tr. 7462-67. Lee told the guard, among other things, that she was going to "die like the others" and he was "going to have [her] head blown off like the others." Tr. 7467. The government argued that this evidence, and the evidence of Lee's offense conduct introduced during the guilt phase of the trial, showed that Lee was violent and volatile and would present a danger to others in the future. Tr. 7381, 7956-75.[2]

Lee claimed 14 mitigating factors. *See* Tr. 7373-75. The emphasis of the defense presentation, however, was that Lee suffered from mental impairment due to his troubled upbringing. *See, e.g.*, Tr. 7385-88. The

---

[2] Lee contends that a central component of the government's penalty phase presentation was Lee's diagnosis as a "psychopath." *See, e.g.*, Dkt. 1297, at 15. As detailed at length in prior filings in this case, however, the evidence regarding psychopathy came out during cross-examination of one of Lee's expert witnesses and was not presented by the government either during its case-in-chief or on rebuttal. *See* Dkt. 1236, at 8-15, 45-51.

defense called lay witnesses, including Lee's mother, to testify about his past. *See, e.g.*, Tr. 7485-7553. The defense also called two expert witnesses, Mark Cunningham, Ph.D., and Kevin Bianchini, Ph.D. Tr. 7651-7895. Dr. Cunningham testified about Lee's "adverse developmental life experiences," Tr. 7661, and opined that Lee "experienced many traumatic and adverse life experiences that fundamentally shaped him . . . neurologically, psychologically, socially, emotionally and ethically, and that . . . contributed to his involvement in this offense," Tr. 7742. Dr. Bianchini testified that Lee suffered from "nonpsychotic mental disorder following organic brain damage," which he characterized as "a very generic general term to describe brain damage." Tr. 7869.

The jury rejected the government's contention that Lee committed the murders after substantial planning and premeditation but concluded that the evidence established the other four aggravating factors alleged by the government, including that Lee would be a danger to others in the future. Tr. 8017, 8020. The jury largely rejected Lee's mitigation case, with one or more of the jurors finding the existence of only five of the 14 mitigating factors claimed by Lee. Tr. 8017-19. The jurors unanimously rejected the contention that Lee had a mental impairment that should weigh against application of the death penalty. Tr. 8018-19. After weighing the aggravating and

mitigating factors, the jury unanimously decided to impose a sentence of death for each of the three murder charges. Tr. 8019-22.

## III.   Postconviction Proceedings

The court of appeals affirmed Lee's conviction and sentence on direct appeal. *Lee*, 374 F.3d at 641. Of relevance here, the court concluded that the admission of Kehoe's confession to his mother to prove Lee's guilt was "not barred under *Crawford* [*v. Washington*, 541 U.S. 36 (2004)]" and that, in any event, "any error in the admission of Kehoe's statements to Gloria was harmless beyond a reasonable doubt" because "Kehoe's statements to Gloria merely corroborated the large amount of evidence presented against Lee at trial." *Id.* at 645. The Supreme Court denied certiorari. *Lee v. United States*, 545 U.S. 1141 (2005).

Lee subsequently moved for collateral relief under 28 U.S.C. § 2255, and this Court denied the motion. *Lee*, 2008 WL 4079315, at *1. Of relevance here, the Court rejected Lee's claim that he received ineffective assistance of counsel because his lawyers failed to impeach the Wankers on cross-examination by questioning them about four $50 payments they received from the government. *Id.* at *20-*21. The Court concluded that defense counsel's cross-examination of the Wankers was not deficient and that, in any event, Lee could "not demonstrate any resulting prejudice" from the allegedly inadequate cross-examination. *Id.* at *21.

11

More broadly, in denying Lee's § 2255 motion, Judge Eisele, who presided over Kehoe and Lee's trial, discussed the strength of the evidence establishing Lee's culpability for the Mueller murders. *Lee*, 2008 WL 4079315, at \*7. Judge Eisele explained that he had "outlined some of the evidence linking Kehoe and Lee to the Mueller murders in part to demonstrate the abundance of evidence supporting the guilt phase convictions" but that "[t]hose bare facts alone can not convey the demeanor of the witnesses who testified, the scope and detail of the Government's evidence, or the general overall tenor of the case against Kehoe and Lee." *Id.* "While the bulk of the evidence at trial related to Kehoe," Judge Eisele explained, "the jury's conclusion that Lee was with Kehoe when the Muellers were murdered and that he participated in the murders was well-founded," and "there was no question about Kehoe and Lee's respective roles: Chevie Kehoe was the ringleader, and Danny Lee was the follower." *Id.*

After the court of appeals affirmed the denial of Lee's § 2255 motion, *see Lee*, 715 F.3d at 217, Lee filed a motion for relief from judgment under Federal Rule of Civil Procedure 60. Dkt. 1230. The motion asserted a claim that Lee received ineffective assistance of counsel in connection with evidence regarding "psychopathy" introduced during the penalty phase of his trial. *Id.* at 30-48. This Court determined that the motion—although denominated a motion for relief under Rule 60—in fact amounted to a second or successive

12

motion under § 2255. *Lee*, 2014 WL 1093197, at *4-*6. The Court further concluded that it lacked jurisdiction over Lee's second or successive motion because the court of appeals had not, as required by 28 U.S.C. § 2255(h), certified that the motion involved either newly-discovered evidence demonstrating Lee's innocence or a new rule of constitutional law that the Supreme Court had made retroactive on collateral review. *Id.* The court of appeals affirmed. *Lee*, 792 F.3d at 1025.

## IV.    The Present § 2255 Motion

Lee has now filed another § 2255 motion raising new claims of alleged constitutional error at his trial. Dkt. 1297. Lee contends that the government suppressed favorable evidence at the guilt and penalty phases of the trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Dkt. 1297, at 30-48, 52-59. He also contends that this allegedly suppressed evidence establishes that the government introduced false or misleading evidence at trial, in violation of *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959). Dkt. 1297, at 48-52, 59-61. The evidence Lee contends was suppressed falls into two categories.

First, Lee argues that the government never disclosed that James Wanker—Lee's Washington neighbor, who testified that Lee said he had taken a trip "down south" and that some people "had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp," Tr. 4082-

13

83—had told federal investigators that he did not believe what Lee had said to him was true. *See, e.g.*, Dkt. 1297, at 3-4. According to an affidavit from Wanker dated September 11, 2017, and submitted now in connection with Lee's newly-filed § 2255 motion, Wanker "knew [Lee] to be a braggart and that he would try to claim responsibility for criminal actions in order to fit in with the Kehoes," and if asked about his views at trial, he would have said that he "didn't believe that [Lee's] story was anything more than just empty bragging." Dkt. 1297-2, at 3-4 (Exhibit A to Lee's § 2255 motion).

Second, Lee contends that the government failed to disclose that an Oklahoma state judge had concluded that there was insufficient evidence to support a first-degree murder charge against Lee in connection with the murder of Joey Wavra. *See, e.g.*, Dkt. 1297, at 6. Lee provides a document from the Oklahoma court proceedings that appears to be an application for attorney's fees from a lawyer who represented Lee in the Oklahoma case. Dkt. 1297-4, at 2-3 (Exhibit C to Lee's § 2255 motion). That document—which appears to be a publicly-available document filed in Oklahoma state court— states that the Oklahoma court held a hearing at which it "f[ound] crime of Murder I not established by evidence," and the "Court rec[ommended] a Dismissal of Murder I charges and [the] State consider[ed] refiling on charge of Robbery I." *Id.* at 3. Lee claims (Dkt. 1297, at 5-6) that this document contradicts an argument made by the government at the penalty phase that

14

Lee was given a "gift" by Oklahoma prosecutors by allowing him to plead guilty to robbery, rather than murder, giving him a chance to reform and live a law-abiding life. *See* Tr. 7381-83, 7962-64 (relevant portions of government's opening statement and closing arguments).

Lee contends that his motion is not a "second or successive" § 2255 motion and therefore he need not obtain certification by the court of appeals pursuant to 28 U.S.C. § 2255(h). Dkt. 1297, at 23-29. Lee argues that a § 2255 motion that raises a *Brady* claim based on evidence discovered after the denial of a prior § 2255 motion is not second or successive if the motion asserts that the government suppressed "*material* exculpatory evidence." *Id.* at 23.

Lee also contends, in the alternative, that if "this Court decides that [his] *Brady* claims are non-material, and thus subject to the gatekeeping provisions of § 2255(h)," then he his nonetheless entitled to relief from judgment under Federal Rule of Civil Procedure 60. Dkt. 1297, at 62. He contends that relief is warranted as a result of "fraud," "misrepresentation, or misconduct by an opposing party," Fed. R. Civ. P. 60(b)(3), or as a result of "fraud on the court," Fed. R. Civ. P. 60(d)(3); *see* Dkt. 1297, at 62-64.

This Court directed the government to respond to Lee's newly-filed § 2255 motion. Dkt. 1298. The Court subsequently granted the government's request to file a responsive brief addressing only the Court's jurisdiction and

15

then file a separate responsive brief opposing the § 2255 motion on other grounds if and only if the Court concludes that it possesses jurisdiction. Dkt. 1302. This brief accordingly addresses only the preliminary jurisdictional question and does not address numerous additional reasons why Lee's motion would fail if this Court were to exercise jurisdiction.

## ARGUMENT

Lee's motion is a second or successive motion for relief under § 2255, but he has not obtained certification from the court of appeals, as required by 28 U.S.C. § 2255(h). This Court should therefore dismiss the motion for lack of jurisdiction, just as it did Lee's previous motion for § 2255 relief.

### A.   Legal Background: The Gatekeeping Requirements for Second or Successive § 2255 Motions

A federal prisoner may collaterally attack his conviction by filing a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. *See generally United States v. Hayman*, 342 U.S. 205, 212-19 (1952) (explaining history of § 2255). Before 1996, statutory and judge-made rules—including the abuse-of-the-writ doctrine—placed limits on the filing of repetitive § 2255 motions. *See Baranski v. United States*, 880 F.3d 951, 955 (8th Cir. 2018). In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 105, 110 Stat. 1214, 1220, which "imposed stricter limitations on the filing of second and

16

successive § 2255 motions." *Baranski*, 880 F.3d at 955; *see Crawford v. Minnesota*, 698 F.3d 1086, 1089 (8th Cir. 2012) (explaining that the AEDPA "codified 'some of the pre-existing limits on successive petitions' and imposed additional restrictions on habeas relief") (quoting *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

The AEDPA provides that a "second or successive" § 2255 motion must be certified by the court of appeals to contain:

> (1)  newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

> (2)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h). These gatekeeping requirements for second or successive § 2255 motions are jurisdictional. *See, e.g.*, *United States v. Springer*, 875 F.3d 968, 982 (10th Cir. 2017).[3]

---

[3] A state prisoner may file a habeas petition challenging his state conviction in federal court under 28 U.S.C. § 2254. The AEDPA also established restrictions on second or successive habeas petitions under § 2254. For purposes of the issues raised here, there is no basis to distinguish between the AEDPA gatekeeping provisions that apply to § 2255 motions and those that apply to § 2254 habeas petitions, and we therefore cite cases applying those provisions interchangeably. *See, e.g.*, *Storey v. Vasbinder*, 657 F.3d 372, 377 (6th Cir. 2011) (explaining that "courts do not distinguish between [§ 2254 and § 2255] for purposes of the second-or-successive

### B.    Lee's § 2255 Motion Must Be Dismissed Because It is an Uncertified Second or Successive § 2255 Motion

Lee's § 2255 motion raises claims that were ripe at the time he filed his first § 2255 motion. The present § 2255 motion is therefore "second or successive" and subject to the AEDPA gatekeeping provisions set forth at 28 U.S.C. § 2255(h). Because Lee has not sought—let alone obtained—the required certification from the court of appeals, this Court lacks jurisdiction.

### 1.    A Second-in-Time § 2255 Motion is Second or Successive if it Raises a Claim That Was Ripe at the Time of the Defendant's First § 2255 Motion

The AEDPA does not provide a definition of the phrase "second or successive." *See Crawford*, 698 F.3d at 1089. The Supreme Court has described the phrase as a "term of art," *Slack v. McDaniel*, 529 U.S. 473, 476 (2000), which derives its meaning at least in part "from [the Court's] case law, including decisions predating the enactment of the [AEDPA]." *Panetti v. Quarterman*, 551 U.S. 930, 943-44 (2007). The Court has also "stated that the term does not encompass all applications 'filed second or successively in time.'" *Crawford*, 698 F.3d at 1089 (quoting *Panetti*, 551 U.S. at 943-44).

The Supreme Court's "decision in *Panetti* sheds light on when a petition or motion that is numerically second should also be subject to the special

---

determination"); *Murray v. Greiner*, 394 F.3d 78, 81 (2d Cir. 2005) ("The federal habeas statute makes no material distinction between petitions under § 2254 and § 2255 in defining a 'second or successive' petition.").

rules for successive filings." *United States v. Obeid*, 707 F.3d 898, 901 (7th Cir. 2013). In *Panetti*, a defendant convicted of capital murder filed an unsuccessful habeas petition collaterally attacking his conviction and sentence and then later filed a second petition raising a claim under *Ford v. Wainright*, 477 U.S. 399 (1986), which holds that the Eighth Amendment prohibits carrying out a sentence of death upon a mentally-incompetent prisoner, even if the defendant was mentally competent when he committed the crime and at the time of his trial. *See Panetti*, 551 U.S. at 934-42. The Court noted that "*Ford*-based incompetency claims, as a general matter, are not ripe until after the time has run to file a first federal habeas petition." *Id.* at 943. (A *Ford* claim is "is not ripe until execution is imminent," because "competency can be lost or regained over time." *Davis v. Kelley*, 854 F.3d 967, 971 (8th Cir. 2017) (per curiam).) The Court concluded that "Congress did not intend the provisions of AEDPA addressing 'second or successive' petitions to govern a filing in the unusual posture presented here: a § 2254 application raising a *Ford*-based incompetency claim filed as soon as that claim is ripe." 551 U.S. at 945; *see id.* at 947 ("The statutory bar on 'second or successive' applications does not apply to a *Ford* claim brought in an application filed when the claim is first ripe.").

"The Court's conclusion in *Panetti* hinged on the fact that the *Ford* claim was not yet available when Panetti brought his first federal petition."

*Obeid*, 707 F.3d at 902. Courts applying *Panetti* have been "careful to distinguish genuinely unripe claims (where the factual predicate that gives rise to the claim has not yet occurred) from those in which the petitioner merely has some excuse for failing to raise the claim in his initial petition (such as when newly-discovered evidence supports a claim that the petitioner received ineffective assistance of counsel)." *Flores-Ramirez v. Foster*, 811 F.3d 861, 865 (7th Cir. 2016) (per curiam) (quoting *Obeid*, 707 F.3d at 902). It is "only the former class of petitions [that] escapes classification as 'second or successive.'" *Id.* (quoting *Obeid*, 707 F.3d at 902).

> **2.** **Lee's Second-in-Time § 2255 Motion Asserting a *Brady* Claim is Subject to AEDPA's Gatekeeping Provisions for Second or Successive Motions**

A *Brady* claim occurs "if at all, at trial or sentencing" and therefore is "ripe for inclusion in a first" § 2255 motion. *Tompkins v. Sec'y, Dep't of Corrections*, 557 F.3d 1257, 1260 (11th Cir. 2009) (per curiam).[4] A *Brady* violation "has three components" and occurs when (1) the government suppressed evidence (either willfully or inadvertently); (2) the evidence was favorable to the defendant (because it was exculpatory or impeaching); and (3) the evidence was material, which means that "there is a reasonable

---

[4] The above analysis also applies to Lee's claims that the same newly-discovered evidence establishes violations of *Giglio* and *Napue*, and therefore we collectively refer to all of these claims as Lee's *Brady* claims for ease of reference.

probability that, had it been disclosed, the result of the proceeding would have been different." *United States v. Anwar*, 880 F.3d 958, 969 (8th Cir. 2018) (citations omitted). All of these factual predicates will necessarily have occurred well before a defendant files a first § 2255, and therefore every court of appeals to address the issue has held that a second-in-time § 2255 motion or habeas petition asserting a *Brady* violation based on newly-discovered evidence is second or successive and must satisfy AEDPA's gatekeeping provisions. *Brown v. Muniz*, 889 F.3d 661, 666-75 (9th Cir. 2018); *Tompkins*, 557 F.3d at 1259-60; *Evans v. Smith*, 220 F.3d 306, 322-24 (4th Cir. 2000); *see also In re Pickard*, 681 F.3d 1201, 1204-05 (10th Cir. 2012) (treating a second-in-time § 2255 motion raising a *Brady* claim based on newly-discovered evidence as second or successive); *Case v. Hatch*, 731 F.3d 1015, 1026-43 (10th Cir. 2013) (treating a second-in-time habeas petition raising a *Brady* claim based on newly-discovered evidence as second or successive); *Quezada v. Smith*, 624 F.3d 514, 519-20 (2d Cir. 2010) (same); *In re Siggers*, 615 F.3d 477, 479 (6th Cir. 2010) (same); *Johnson v. Dretke*, 442 F.3d 901, 911 (5th Cir. 2006) (same).

The circumstances identified in *Panneti* in the context of a *Ford* claim of mental incompetence at the time of execution—which necessarily becomes ripe only at the time of execution, because "mental conditions of prisoners vary over time"—are not present in the context of a *Brady* claim. *Tomkins*,

21

557 F.3d at 1260. *Panetti* "is limited to the narrow circumstance of a claim that does not ripen until after an initial habeas petition is decided." *Muniz*, 889 F.3d at 671. The factual predicates for a *Brady* violation accrue at the time of trial, in contrast, and therefore a *Brady* claim ripens at that time. *See id.* at 672-73.

Lee's present § 2255 motion accordingly is a second or successive motion that must satisfy AEDPA's gatekeeping provisions. He contends that the government suppressed favorable and material evidence at the guilt and penalty phases of his trial (in 1999). Dkt. 1297, at 6-9. The factual predicates underlying those alleged violations were complete—and a *Brady* claim was therefore ripe—well before Lee filed his first § 2255 motion in 2006. Dkt. 1118 (Lee's § 2255 motion). Because Lee has not sought—let alone received—certification from the court of appeals in accordance with 28 U.S.C. § 2255(h), this Court lacks jurisdiction. Lee's § 2255 motion should therefore be dismissed.

Lee's reliance (Dkt. 1297, at 23-24, 31) on *United States v. Lopez*, 577 F.3d 1053 (9th Cir. 2009), and *Crawford v. Minnesota*, 698 F.3d 1086 (8th Cir. 2012), is misplaced. In *Lopez*, the Ninth Circuit expressly declined to decide the issue presented here, *i.e.*, whether a second-in-time § 2255 motion asserting a *Brady* claim is necessarily "second or successive" and subject to AEDPA's gatekeeping provisions. 577 F.3d at 1067, 1068. The court instead

22

concluded that AEDPA, at a minimum, prohibits motions that would have been barred under the pre-AEDPA abuse-of-the-writ standards, and because the defendant's motion would have been deemed abusive pre-AEDPA—because it asserted the suppression of evidence that did not qualify as material under *Brady*—it necessarily was also barred under AEDPA. *Id.* at 1063-68. The Eighth Circuit followed a similar approach in *Crawford*, noting that "some courts have concluded that all *Brady* claims in second habeas petitions are second or successive regardless of their materiality," but concluding that this "question [was] not presented here because in this case" the defendant asserted the suppression of non-material evidence and therefore his second-in-time petition was unquestionably barred both pre- and post-AEDPA. 698 F.3d at 1090.[5]

---

[5] Lee's reliance on *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009) (per curiam), and *Scott v. United States*, 890 F.3d 1239 (11th Cir. 2018), is also misplaced. In *Douglas*, the court of appeals, in what it emphasized was an "unusual case" involving "unusual circumstances," concluded that the defendant's "*Brady* claim should be treated, not as a second or successive request for habeas relief, but instead as a supplement to his initial habeas petition," which the court concluded was still open and pending. 560 F.3d at 1189-90. Lee does not—and cannot—contend that his initial § 2255 motion is open and pending. Moreover, the Tenth Circuit, in decisions following *Douglas*, has treated second-in-time habeas petitions and § 2255 motions raising *Brady* claims as second or successive. *See In re Pickard*, 681 F.3d at 1204-05; *Case*, 731 F.3d at 1026-43; *see also Muniz*, 889 F.3d at 673 n.10 (distinguishing *Douglas* and noting that the Tenth Circuit has subsequently "made clear that it [is] aligned with its sister circuits in deciding that *Brady* claims are, as a general rule, subject to AEDPA's second or successive bar").

As noted, the courts of appeals that have actually decided the question expressly left open in *Lopez* and *Crawford* have all concluded that a second-in-time § 2255 motion or habeas petition asserting that the government unlawfully suppressed evidence at trial, in violation of *Brady*, is a second or successive application that must comport with AEDPA's gatekeeping provisions. In fact, the Ninth Circuit itself, subsequent to *Lopez*, expressly reached this conclusion. *Muniz*, 889 F.3d at 666-73. The court explained that the distinction drawn in *Lopez* between "between material and immaterial *Brady* claims derives from the *pre*-AEDPA abuse-of-the-writ doctrine," but "[w]hile AEDPA's provisions are inspired by and borrow heavily from that judicially-developed rule," courts "are bound by AEDPA itself, not the judicial standard it superseded." *Id.* at 673. AEDPA "makes no distinction based on the materiality of predicate facts," the court explained, and is only concerned

---

In *Scott*, a panel of the Eleventh Circuit stated that the prior, binding panel decision in *Tompkins*—which held that a second-in-time habeas petition raising a *Brady* claims is necessarily second or successive—was incorrectly decided, and the panel urged its "colleagues to rehear th[e] case en banc and reevaluate the framework we established in *Tompkins*." 890 F.3d at 1259. But when the defendant filed a petition for rehearing en banc, none of the judges on the Eleventh Circuit requested that the court be polled on rehearing en banc, and the petition was summarily denied. Order, *Scott v. United States*, Nos. 15-11377 & 16-11950 (Aug. 16, 2018). This Court would therefore be going against every court of appeals that has addressed the issue if it were to conclude that only § 2255 motions raising non-material *Brady* claims are subject to the gatekeeping provisions for second or successive motions.

24

"with the existence of those facts at the time of the initial" application for collateral relief. *Id.* (emphasis omitted).

Lee nonetheless suggests (Dkt. 1297, at 26-29) that his § 2255 motion should not be deemed second or successive because he allegedly did not become aware of the facts giving rise to his *Brady* claim until recently, after the denial of his first § 2255 motion. But "§ 2255 addresses this precise scenario." *Muniz*, 889 F.3d at 671. The statute "contains an express statutory standard for dealing with 'second or successive' claims based on newly-discovered evidence.'" *United States v. Buenrostro*, 638 F.3d 720, 725 (9th Cir. 2011) (citation omitted). The defendant must demonstrate to the court of appeals that the newly-discovered *Brady* evidence, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255(h)(1).

This statutory standard "does not bar all newly discovered, second-in-time *Brady* claims," it merely limits the *Brady* claims permitted in a second or succession § 2255 motion to those that "prove by clear and convincing evidence a prisoner's innocence." *Buenrostro*, 638 F.3d at 725. The plain language of § 2255(h) therefore demonstrates Congress's "clear intent" to prohibit "second-in-time claims, ripe at the time of a prisoner's first § 2255 proceeding but not discovered until afterward, unless such claims either rely

25

on a new, retroactive rule of constitutional law or clearly and convincingly prove the prisoner's innocence." *Id.* at 725-26. To exempt a second-in-time motion raising a *Brady* claim from the gatekeeping requirements of § 2255(h) "would thwart the statutory scheme and render Congress' limitations on second or successive petitions a nullity in a wide range of cases." *Evans*, 220 F.3d at 324; *see Muniz*, 889 F.3d at 671 (explaining that applying the gatekeeping requirements to a motion asserting a *Brady* claim advances Congress's purposes in enacting the AEDPA).

Lee's § 2255 motion, to the extent it challenges the imposition of the death sentence, is also contrary to the plain language of § 2255 for an additional reason. Under § 2255(h), a court of appeals may authorize the filing of a second or successive § 2255 motion when the prisoner raises a claim that newly-discovered evidence shows that the factfinder would not have found him "guilty of the offense." 28 U.S.C. § 2255(h)(1). By its terms, this provision does not permit a successive § 2255 motion based on new evidence suggesting that the prisoner's sentence was improper; the statute's "of the offense" language means that the claim must relate "to the underlying conviction" and may not "assert sentencing error." *In re Vial*, 115 F.3d 1192, 1198 (4th Cir. 1997) (en banc); *accord In re Webster*, 605 F.3d 256, 258-59 (5th Cir. 2010); *Hope v. United States*, 108 F.3d 119, 119-20 (7th Cir. 1997). Allowing a challenge to Lee's sentence on the basis of newly-discovered

26

evidence would therefore contravene AEDPA's clear restrictions on second or successive § 2255 motions. *See In re Hill*, 715 F.3d 284, 300 (11th Cir. 2013) (explaining that the "exception for actual innocence of the death penalty is not among the exceptions Congress chose to enact" in the AEDPA).

### C.    Lee's Motion is Barred Even if Evaluated Under the Pre-AEDPA Abuse-of-the-Writ Standard

Despite the explicit statutory requirements of 28 U.S.C. § 2255(h), Lee nonetheless contends that his § 2255 motion is not second or successive. Dkt. 1297, at 23-29. He argues that a second-in-time § 2255 motion raising a *Brady* claim is not second or successive if it asserts that the government suppressed "*material* exculpatory evidence." *Id.* at 23. According to Lee, a second-in-time § 2255 motion raising a *Brady* claim is second or successive—and subject to the gatekeeping provisions in 28 U.S.C. § 2255(h)—only if it asserts that the government suppressed evidence that does not qualify as material under *Brady*. *See id.* at 62.

In support of this standard, Lee relies on *United States v. Lopez*, 577 F.3d 1053 (9th Cir. 2009), and *Crawford v. Minnesota*, 698 F.3d 1086 (8th Cir. 2012). *See* Dkt. 1297, at 23-24. But as explained, those cases did not decide whether "*all* second-in-time *Brady* claims must satisfy AEDPA's gatekeeping requirements." *Lopez*, 577 F.3d at 1067; *see Crawford*, 698 F.3d at 1090 (concluding that the case did "not present[]" the question whether "all

27

*Brady* claims in second habeas petitions are second or successive"). Those cases instead concluded that AEDPA's gatekeeping provisions apply, at a minimum, to § 2255 motions and habeas petitions that "would have been barred under the [pre-AEDPA] abuse-of-the-writ doctrine," *Lopez*, 577 F.3d at 1066, and therefore "there is no dispute that at least nonmaterial *Brady* claims in second habeas petitions" and § 2255 motions are subject to AEDPA's gatekeeping provisions, *Crawford*, 698 F.3d at 1090.

Under the pre-AEDPA abuse-of-the-writ doctrine, a defendant could raise a claim that he omitted from a prior § 2255 motion only if he could show either "cause and prejudice" or "actual innocence." *See, e.g.*, *Rehbein v. Clarke*, 94 F.3d 478, 481-82 (8th Cir. 1996); *Dyer v. United States*, 23 F.3d 1421, 1423 (8th Cir. 1994). This "cause and prejudice" requirement was identical to the cause and prejudice that a defendant had to show in order to overcome procedural default. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991). And in *Strickler v. Greene*, 527 U.S. 263 (1999), a case in which the defendant had defaulted a *Brady* claim by raising it for the first time in a federal habeas petition, the Supreme Court equated the prejudice required to overcome a procedural default with the prejudice (or materiality) required to make out a meritorious *Brady* claim. *See id.* at 297 n.2 (Souter, J., concurring in part and dissenting in part) (noting that the Court had "treat[ed] the prejudice enquiry as synonymous with the materiality determination under *Brady*"); *see also*

28

*Ruff v. Armontrout*, 993 F.2d 639, 641 (8th Cir. 1993) ("[T]he issue of 'prejudice' in the context of procedural bar and 'materiality' in the context of petitioner's *Brady* claim are essentially identical."). In short, a defendant raising a *Brady* claim in a second-in-time § 2255 motion and attempting to demonstrate "cause and prejudice" under the pre-AEDPA abuse-of-the-writ standard could show "actual prejudice" by establishing that the evidence allegedly suppressed by the government was material under *Brady*. *See Lopez*, 577 F.3d at 1059-60; *Crawford*, 698 F.3d at 1089-90.

No court of appeals has held that a second-in-time § 2255 motion (or habeas petition) raising a *Brady* claim is exempt from the AEDPA gatekeeping provisions merely because the motion would have been allowed to proceed under the pre-AEDPA abuse-of-the-writ doctrine. And for the reasons stated above, that conclusion would be contrary to the express language of 28 U.S.C. § 2255(h). Accordingly, the courts of appeals that have addressed this issue have correctly concluded that a second-in-time § 2255 motion (or habeas petition) that raises a *Brady* claim is second or successive and subject to the AEDPA's gatekeeping provisions whether or not the motion asserts that the government suppressed material or non-material evidence. *See supra* pp. 20-25.

In any event, even if this Court were to apply the (incorrect) standard urged by Lee—which derives from the more permissive pre-AEDPA abuse-of-

29

the-writ doctrine—Lee's motion must be dismissed. The evidence that Lee claims the government suppressed at his trial is not material under *Brady*.

In order to establish that evidence is material under *Brady*, a defendant must establish "that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." *Strickler*, 527 U.S. at 289. The relevant "question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* at 290 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). It is not enough to show that "there is a reasonable *possibility*" that disclosure of the suppressed evidence "might have produced a different result"; "petitioner's burden is to establish a reasonable *probability* of a different result." *Id.* at 291.

There is no reasonable probability that the evidence Lee claims the government unlawfully suppressed, in violation of *Brady*, would have produced a different result at Lee's trial, either at the guilt or penalty phases. Lee's motion would therefore have to be dismissed even under the pre-AEDPA abuse-of-the-writ standards. We address separately the two categories of evidence that Lee contends that the government unlawfully suppressed.

30

### 1. James Wanker's Opinions About the Veracity of Lee's Admissions

Lee has not satisfied his burden of showing that there is a reasonable probability that the pretrial statements by James Wanker would have resulted in his acquittal. Lee therefore has not demonstrated the prejudice required to allow this claim to proceed under the abuse-of-the-writ standard.

### a. Background

1. On direct examination by the government, James Wanker testified that in May 1996 (about four months after the Mueller murders) he moved into an RV park at the Shadows Motel, where Lee and Kehoe also resided. Tr. 4078-79. As relevant here, Wanker testified that in July 1996, Lee told Wanker that he had gone "down south" and "somebody had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp." Tr. 4082-83.

On cross-examination, Wanker testified that around the time Lee left the Shadows Motel, in September 1996, Wanker became the motel's manager and moved the trailer Lee had previously occupied and rented it to another family after Lee stopped making payments. Tr. 4086-88. Wanker testified that Lee returned and tried to enter the trailer by force and there was a dispute regarding whether Lee owned the trailer. Tr. 4088. When asked why he did not call the police when Lee said he had wrapped some people up and

thrown them in the swamp, Wanker testified that he "just kind of blew it off as he was talking to hear himself talk." Tr. 4088.

Wanker's wife, Dalvine Wanker, testified on direct examination about an incident in which she told Lee she was concerned about a new tenant at the Shadows Motel. Tr. 4093. According to Wanker, Lee said he would "keep an eye on the situation" and then retrieved a firearm from his trailer and "said that he wasn't afraid to use it and that when he had gone down south and that some people had fucked with him, and that he had taken care of it." *Id.* On cross-examination, Lee's counsel elicited testimony from Dalvine Wanker about the dispute over ownership of the trailer that Lee had occupied before he left the Shadows Motel. Tr. 4095-96.

During closing arguments, the government mentioned briefly the testimony by the Wankers that Lee said he "went down south" and "talked about dumping bodies in the swamp." Tr. 6822. Lee's counsel argued that the Wankers "literally stole" Lee's trailer and therefore demonstrated bias against Lee and should not be believed. Tr. 6943-44. On rebuttal, the government argued that James Wanker was "hard working" and "mannerly" ("salt of the earth") and had "no reason . . . to come in here and tell you that story unless it's the truth." Tr. 7002. The government also argued that Lee's statements to the Wankers were not "detailed" but were consistent with and

32

corroborated the other evidence of Lee's culpability for the Mueller murders. Tr. 7002-03.

2.    In connection with Lee's current § 2255 motion, on September 11, 2017, James Wanker swore in an affidavit that on multiple occasions before Lee's trial he told investigators and prosecutors that he did not believe Lee was telling the truth when he (Lee) said that he wrapped some people up and threw them in the swamp. Dkt. 1297-2, at 3. According to Wanker, Lee "would spout off about different fights and crazy situations that were not true just to look tough and try to fit in," and Lee was "a braggart and . . . would try to claim responsibility for criminal actions in order to fit in with the Kehoes." Dkt. 1297-2, at 2-3. Wanker asserts that he was instructed "to limit [his] testimony to only what was asked and not to give personal opinions." Dkt. 1297-2, at 3. Wanker acknowledges that he did in fact testify at Lee's trial that he did not contact the police because he "thought [Lee] was just talking to hear himself talk," but he claims that if he had been asked at trial whether he maintained those views, he would have testified "that [he had] never changed his opinion about that, and that even at the time of trial [he] still didn't believe that [Lee's] story was anything more than just empty bragging." Dkt. 1297-2, at 4.

> ### b. There is No Reasonable Probability That the Jury Would Have Reached a Different Verdict if it Had Been Presented with the Information in Wanker's Affidavit

The information in Wanker's affidavit is not material. Even if Lee had possessed the affidavit at the time of his trial, there is no reasonable probability that the outcome of the trial would have been any different.

1. To begin with, the newly-discovered evidence as alleged by Lee is narrow. Lee acknowledges that Wanker made clear at trial that at the time Lee made the statements about wrapping bodies and throwing them in the swamp, Wanker did not credit the statements as truthful. *See* Dkt. 1297, at 33 n.22. Wanker specifically testified that he "blew it off" and did not contact the police when Lee made the statements because he thought Lee was just "talking." Tr. 4088. As a result, the only information in Wanker's affidavit that is arguably new is Wanker's assertion that he continued to hold that opinion at the time of Lee's trial.

But Wanker's personal opinion at the time of trial about whether Lee was merely posturing or admitting to murder would have been of little if any relevance to the jury's determination of Lee's guilt. Lee does not challenge the veracity of Wanker's testimony that Lee said he had gone down South and wrapped up bodies, taped them, and thrown them in the swamp. And the jury did not need lay opinion testimony from Wanker about his current views to

evaluate on its own whether Lee's statements were just "talk" or actual admissions. The jury knew, for example, that Lee's statement that he "taped" his victims and "wrapped them up" was consistent with the unique state of the Mueller bodies when first recovered and was information that only someone who participated in the murders was likely to know. When the bodies were found, "[p]lastic bags were duct taped around the heads of all three bodies. One body was recovered with a large rock duct taped to it. The condition of the bodies indicated that rocks had been similarly placed around the other two bodies, by folding their arms over the rocks and then using duct tape to secure the rock to the body." *Lee*, 2008 WL 4079315, at *5. The same is true of Lee's statement that he threw the bodies in the "swamp," which is consistent with location where the Muellers were recovered, the Illinois Bayou.

2.    In addition, Lee's suggestion that James Wanker's testimony was a central part of the government's case is incorrect. Wanker's direct examination occupies only six pages of the trial transcript. Tr. 4078-83. The government mentioned Wanker's testimony only in passing during its closing argument. Tr. 6822 ("When Danny Lee talked to the Wankers, James and Dalvine Wanker, what did he say? 'We went down south'—I forget the exact words. But it's your recollection which controls. He talked about dumping bodies in the swamp."). The government discussed the testimony during

rebuttal only to respond to defense counsel's attempts to attack the credibility of the Wankers. *See* Tr. 7001-03. Contrary to what Lee asserts, the government did not present evidence or argument about how Wanker came to provide information about Lee's statements to investigators, let alone suggest that Wanker "was a concerned witness who initiated contact with authorities because he believed he had valuable, credible information to share about the Mueller murders." Dkt. 1297, at 20. Lee vastly overstates the government's reliance on James Wanker's testimony, while largely ignoring the similar testimony from Wanker's wife.

3.      Moreover, the other evidence of Lee's culpability for the Mueller murders—apart from Wanker's testimony—was substantial. Among other things, the government introduced evidence that Lee and Kehoe traveled from Washington to Oklahoma in January 1996 and left Oklahoma on January 10, 1996, the day before the murders. A few days later, Kehoe and Lee were back in Washington, flush with cash and in possession of property stolen from the Muellers. Lee and Kehoe both separately confessed to Gloria Kehoe, and Chevie Kehoe also separately confessed to his brother Cheyne. And Lee's fingerprints were found on a gun display case that had been stolen from William Mueller and recovered from a storage facility in Idaho used by Kehoe. In light of this wealth of evidence, Lee cannot discharge his burden of establishing a reasonable probability that the jury would have reached a

36

different verdict if it had heard Wanker's opinion testimony. *Cf. Lee*, 2008 WL 4079315, at \*20-\*21 (concluding that Lee was not prejudiced by any deficient performance by defense counsel in failing to sufficiently attack the credibility of the Wankers on cross-examination); *Lee*, 374 F.3d at 645 (concluding that any error in using Chevie Kehoe's confession to his mother to prove Lee's guilt was harmless beyond a reasonable doubt).

Lee's attempts to downplay the strength of the evidence are unavailing. He contends, for example, that there are innocent explanations for his fingerprints on William Mueller's property, but his argument rests on little more than conjecture. According to Lee, for example, he "frequently helped the Kehoes transport the display case to and from a storage unit at the Shadows Motel." Dkt. 1297, at 11 n.10. But the transcript citations provided by Lee do not support that assertion; instead, Lee apparently relies on speculation by his counsel during closing argument that "there are a hundred ways that [Lee's] fingerprints *could have* gotten on those display cases," such as he "*could have* moved them around" or he "*could have* helped the Kehoes load them up for a gun show." Tr. 6947 (emphasis added). This speculation by Lee's counsel is not evidence and cannot come close to rebutting all of the actual evidence that supports the conclusion that Lee's fingerprints were on the display case because Lee stole the case when he and Kehoe murdered the Muellers.

37

Lee similarly presents a strained interpretation of the evidence to suggest that there was insufficient time for him to travel to Washington from Arkansas after the Muellers were murdered. Dkt. 1297, at 40-47. Lee contends (Dkt. 1297, at 41, 46-47) that there was evidence the Muellers were alive after January 11, 1996, but overwhelming evidence established that the Muellers were murdered on January 11.[6] Lee similarly relies on equivocal and uncertain testimony suggesting that Lee may have been in Washington on January 12. Dkt. 1297, at 45. But the witness (Vada Campbell) with the clearest memory of seeing Lee after January 11 (because it corresponded to the birth of her grandchild) testified that she saw him around 8 p.m. on January 13, *see* Tr. 5953-54, which would have given Lee and Kehoe

---

[6] This included evidence that William Mueller, who worked as an electrician, was in the middle of installing an intercom system for a customer and ceased work as of January 11 and did not come to pick up money owed him, Tr. 1789-95; records from an electronics store and hardware store where Mueller held accounts showing that he ceased his regular purchases as of January 11, Tr, 1811-17; phone records showing that calls from the Muellers' home phone ceased on January 11, as did calls using their credit card; Tr. 1828-37; evidence that activity in Nancy Mueller's checking account ceased as of January 11, Tr. 1837-55, as did deliveries of gun parts that William Mueller had been receiving via UPS, Tr. 2287-90; evidence that Mueller ceased cashing his monthly pension checks, Tr. 2164-68; and evidence that the Muellers' contact with a number of close friends ceased as of January 11, *see, e.g.*, Tr. 1913-19, 1928-31.

approximately 48 hours to drive from Arkansas to Washington, an ample amount of time to make the trip.[7]

Lee's speculation is not enough to undermine the strong evidence establishing Lee's culpability for the Mueller murders. Judge Eisele made clear his view that a cold review of the record does not do justice to the evidence against Lee. *Lee*, 2008 WL 4079315, at *7. The record, for example, does "not convey the demeanor of the witnesses who testified" or "the general overall tenor of the case against Kehoe and Lee." *Id.* Judge Eisele, who presided over Lee's trial and observed witness demeanor and the overall tenor of the government's case, concluded that there was an "abundance of evidence supporting the guilt phase convictions" and that "the jury's conclusion that Lee was with Kehoe when the Muellers were murdered and that he participated in the murders was well-founded." *Id.*; *see also Lee*, 374 F.3d at 642 ("At trial, the government presented numerous witnesses and circumstantial physical evidence to prove Lee's participation in the murders of the Mueller family."). A mere opinion by James Wanker that he thinks Lee was posturing when he said he wrapped up and taped individuals down south and threw them in a swamp does nothing to undermine those conclusions.

---

[7] A witness from AAA testified that he drove between the two locations on three occasions using different routes—a direct route, a secondary route, and a scenic route—and that driving an average of 55 miles per hour, it took him 35, 37, and 43 hours, respectively. Tr. 6448-50.

Lee cannot demonstrate the prejudice required to avoid dismissal under the pre-AEDPA abuse-of-the-writ standard.

### 2.    The Oklahoma Court Document

Lee has similarly not satisfied his burden of showing a reasonable probability that the jury would have reached a different verdict at his sentencing hearing if it had been presented with the allegedly suppressed evidence from the Oklahoma court case pertaining to the murder of Joey Wavra. Lee therefore has not demonstrated the prejudice required to allow this claim to proceed under the abuse-of-the-writ standard.

### a.    Background

As noted, after the jury returned a verdict of life imprisonment for Chevie Kehoe, the government emphasized Lee's future dangerousness at his sentencing hearing, arguing that this aggravating factor, in particular, distinguished Lee from Kehoe. *See, e.g.*, Tr. 7381-82, 7959. To prove Lee's future dangerousness, the government presented proof of, among other things, Lee's involvement in the murder of an individual named Joey Wavra. *See* Tr. 7389-7461, 7470.

1.    The evidence introduced by the government established that Lee and his cousin, David Patton, attended a social gathering with Wavra in Oklahoma in July 1990 where the attendees consumed drugs and alcohol. Tr. 7408-12, 7421-25. Wavra angered Lee by, among other things, urinating on a

couch. Tr. 7412-13, 7426-31, 7456. Lee and Patton physically beat the intoxicated Wavra—Lee hit Wavra repeatedly with his hands and feet and a wooden stick—and then forced Wavra down into a manhole. Tr. 7412-14, 7426-40. There was "talk of a coin toss to see if [Wavra] would live or die." Tr. 7414. Patton went down the manhole with Wavra while Lee retrieved a rope and a knife and handed them down to Patton in the manhole. Tr. 7414-15, 7440-44. Lee placed Wavra's clothing in a plastic garbage bag after Patton handed them up from the manhole. Tr. 7444-45. Patton spent about another half hour down in the manhole with Wavra and used the knife to stab Wavra repeatedly in the body and slash open his throat, killing him. Tr. 7403-07, 7395-96, 7446. Patton was convicted of first-degree murder in Oklahoma state court, and Lee pleaded guilty to robbery. Tr. 7470. Lee later told a friend in 1995 that he and "his cousin years back had beat somebody up real bad and slit his throat, and they weren't sure if the guy died from beating him up or from slashing his throat." Tr. 7458 (friend's testimony).

In closing arguments, the government argued that Lee's past conduct showed that he was violent and volatile and presented a danger to others in the future. Tr. 7956-64. As relevant here, the government argued that "[a]n example of that is that behavior that happened during the Joey Wavra murder." Tr. 7962. The government argued that Lee "didn't wield that knife" but "was the one who beat" Wavra, "the one who hit him," "the one who

41

kicked him," "the one who opened the manhole," "the one who forced him to go down," "the one who brought the rope," and "the one who took the knife and gave it to his cousin to do the beating." Tr. 7962-63.[8] The government argued that Lee knew "what he was doing" by "taking the knife and giving it to" his cousin, and the government "suggest[ed]" that "both legally and morally the blood of Joey Wavra's hands is on Danny Lee." Tr. 7963. The government argued that Lee "got this . . . incredible deal," a "plea bargain," and "pled guilty to a robbery," and "had the opportunity to say, I made a mistake, but I got an opportunity to turn myself around," yet instead he murdered the Muellers, and that "says to you something about that aggravating factor of future dangerousness." Tr. 7963-64.

2.     In the present § 2255 motion, Lee contends that the government failed to turn over a document from the Oklahoma legal proceedings against Lee in which he ultimately pleaded guilty to robbery. Dkt. 1297, at 6, 22, 52-54. The specific document is an application for attorney's fees from Lee's lawyer stating that the Oklahoma court held a hearing at which the government "called [a] witness," the court "f[ound] crime of Murder I not established by evidence" and "rec[ommended] a Dismissal of Murder I

---

[8] Similarly, in its opening statement, the government explained, "I don't want to misdirect you. The person who wielded that knife was Mr. Lee's cousin. The person who got the knife and gave it to him, along with a rope, to help him was . . . Lee." Tr. 7382.

charges," and the "State consider[ed] refiling on charge of Robbery I." Dkt. 1297-4, at 2-3. According to Lee, this document is exculpatory *Brady* material because it shows he did not plead guilty to robbery as a result of a favorable plea bargain with the government but rather because a judge found there was insufficient evidence to charge him with first-degree murder. Dkt. 1297, at 6.

### b.  The Allegedly New Information in the Oklahoma Court Document is Not Material

There is no reasonable probability that the jury would have reached a different result if it had been presented with the information in the attorney's fees application now presented by Lee. The document does not undermine the facts presented to the jury regarding Lee's involvement in the murder of Joey Wavra, and the document is consistent with the government's overarching argument to the jury at Lee's sentencing hearing.

The evidence presented to the jury at Lee's sentencing hearing established that it was Lee's cousin (Patton) who stabbed Joey Wavra and slashed his throat but that Lee savagely beat Wavra, forced him down a manhole, and then retrieved rope and a knife specifically for Patton's use. This evidence amply supported the government's argument that Lee must have known that his cousin was going to murder Wavra with the knife, which would have made Lee liable, at a minimum, as an aider and abettor or co-

conspirator. The facts presented to the jury therefore fully supported the government's argument that Lee was morally and legally responsible for the Wavra murder. The attorney's fees application from Lee's lawyer does not alter the Court's conclusion that "there is nothing before the Court to indicate that [Lee's] 'true role' in the murders was anything other than as portrayed during the sentencing trial." *Lee*, 2008 WL 4079315, at *45 (denying § 2255 motion).

The attorney's fees application is also consistent with the government's argument that Lee had an opportunity to change and abide by the law but instead continued his violent and illegal conduct, demonstrating his future dangerousness. Despite Lee's culpable involvement in the Wavra murder, as described, he pleaded guilty only to robbery and avoided substantial jail time. The central thrust of the government's argument remains the same regardless of whether a judge found the evidence insufficient to maintain a first-degree murder charge or whether prosecutors agreed not to pursue first-degree murder charges as a part of a plea bargain. Either way, Lee avoided a lengthy term of imprisonment despite brutally beating Wavra and providing a knife to his cousin to kill Wavra. Based on these circumstances, the government reasonably argued that Lee had an opportunity to reform and avoid future trouble but instead continued to act violently and commit additional crimes, culminating in the murders of the Muellers. The attorney's

44

fees application does not alter this argument and there is no reasonable probability that a jury presented with the information in the document would have reached a different verdict at Lee's trial.[9]

### D.    Lee Cannot Avoid AEDPA's Gatekeeping Provisions by Characterizing His § 2255 Motion as Rule 60 Motion

Lee requests that if this Court concludes that his § 2255 motion is subject to AEDPA's gatekeeping provisions for second or successive motions, the Court instead treat the motion as a motion for relief from judgment under Federal Rule of Civil Procedure 60(b). Lee's request must fail.

1.    A defendant cannot avoid the certification requirements for second or successive § 2255 motions "by purporting to invoke some other procedure," *United States v. Lambros*, 404 F.3d 1034, 1036 (8th Cir. 2005) (per curiam), such as a motion for relief from a judgment under rule 60(b), *see Boyd v. United States*, 304 F.3d 813, 814 (8th Cir. 2002) (per curiam). A filing presented as a Rule 60(b) motion that qualifies in substance as a second or successive § 2255 motion must satisfy AEDPA's gatekeeping provisions. *Lee*,

---

[9] Although this response only addresses the Court's jurisdiction, we note that it is unlikely that the attorney's fees document could qualify as *Brady* material, because it appears to be a publicly-available document from Lee's Oklahoma case, and *Brady* only covers material that the government fails to disclose and that is "otherwise unavailable to the defendant." *United States v. Barraza Cazares*, 465 F.3d 327, 334 (8th Cir. 2006); *see United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015) (concluding that publicly-available document did not qualify as *Brady* material).

792 F.3d at 1023. And a Rule 60(b) motion is substantively a second or successive § 2255 motion if it presents a new constitutional claim attacking the defendant's conviction or sentence or newly-discovered evidence in support of a claim already litigated. *Gonzalez v. Crosby*, 545 U.S. 524, 531-32 (2005). Lee attacks his conviction and sentence on the basis of a claim that the government failed to turn over *Brady* evidence at the time of his trial. His § 2255 motion is therefore a second or successive § 2255 motion subject to AEDPA's gatekeeping requirements.

2.      Even if Lee's motion could feasibly be construed as attacking the integrity of the § 2255 proceedings, rather than raising a new merits challenge to his conviction or sentence, he does not—and cannot—show he is entitled to relief under Rule 60(b). Lee contends that relief is warranted either under Rule 60(b)(3) because of "fraud," "misrepresentation, or misconduct by an opposing party," or under Rule 60(d)(3) because of "fraud on the court." Dkt. 1297, at 62-64. Neither of these provisions, however, provides Lee a basis for relief.

A motion for relief under Rule 60(b)(3) must be made "no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1); *see* 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2866 (3d ed. 2018) ("A motion under clauses (1), (2), or (3) [of Fed. R. Civ. P. 60(b)] must be denied as untimely if made more than one year

46

after judgment regardless of whether the delay was reasonable."). This Court entered judgment denying Lee's § 2255 motion in 2008. *Lee*, 2008 WL 4079315, at *1; *see* 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2866 (3d ed. 2018) ("The one-year limit on motions under the first three clauses runs from the date the judgment was entered in the district court."). Lee's motion is therefore untimely if treated as a motion for relief under Rule 60(b)(3). *See United States v. Espinoza*, 622 Fed. Appx. 745, 748 (10th Cir. 2015) (per curiam) (unpublished) (Rule 60(b)(3) motion seeking to raise a *Brady* claim untimely); *United States v. Moon*, 527 Fed. Appx. 473, 475 (6th Cir. 2013) (unpublished) (same); *Galatolo v. United States*, 196 Fed. Appx. 854, 858 (11th Cir. 2006) (per curiam) (unpublished) (same).

As for Rule 60(d)(3), relief from judgment based on a fraud on the court "is a truly extraordinary form of relief." *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873, 878 (8th Cir. 2010). Fraud on the court "is distinct from mere fraud upon a party." *Id.* It is "fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *United States v. Smiley*, 553 F.3d 1137, 1144 (8th Cir. 2009) (citation omitted). "A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel." *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998) (citation

47

omitted); *accord Hamilton v. PAS, Inc.*, No. 4:15-CV-00071, 2015 WL 2120539, at *2 (E.D. Ark. Apr. 27, 2015). Moreover, the movant must demonstrate fraud "by clear and convincing evidence." *Greiner*, 152 F.3d at 789 (concluding that movant failed to satisfy the lesser fraud showing required by Rule 60(b)(3) and therefore failed to show fraud on the court).

Lee has not alleged that the government engaged in conduct that would qualify as fraud on the court, let alone provided clear and convincing evidence that would support such an allegation. Lee merely claims that the government failed to turn over *Brady* evidence at trial and then once again failed to turn that evidence over after he filed a § 2255 motion. He provides no clear or convincing evidence suggesting that the government recklessly— let alone deliberately—failed to turn over the information. If the government's conduct here is enough to show a fraud on the court, then every alleged failure to turn over *Brady* evidence at the time of a § 2255 proceeding would result in a fraud on the court, but that is not the law. *See Alley v. Bell*, 392 F.3d 822, 831 (6th Cir. 2004) ("We note that the claim of 'fraud on the court' that Alley has articulated in connection with his *Brady* argument in this case is essentially indistinguishable from a standard *Brady* constitutional claim that is being asserted for the first time after the completion of a first federal habeas proceeding."); *see also Galatolo v. United States*, 394 Fed. Appx. 670, 672 (11th Cir. 2010) (per curiam) (unpublished)

48

(defendant failed to establish fraud on the court based on failure to turn over alleged *Brady* evidence). Lee cannot seek relief under Rule 60(d)(3).

## CONCLUSION

For the foregoing reasons, this Court should dismiss Lee's motion for lack of jurisdiction.

Respectfully submitted,

CODY HILAND
United States Attorney
Eastern District of Arkansas

BRIAN A. BENCZKOWSKI
Assistant Attorney General

MATTHEW S. MINER
Deputy Assistant Attorney General

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1260
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

November 26, 2018

49

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on November 26, 2018. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1260
Washington, D.C. 20530
(202) 307-3766

50