# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**DANIEL LEWIS LEE,**
       **Movant**


**v.**                                          **Case No: 4:97-CR-00243-JLH**

                                                **CAPITAL CASE**


**UNITED STATES OF AMERICA,**
       **Respondent.**

_____

## REPLY TO RESPONSE TO MOTION TO VACATE CONVICTION AND SENTENCE
### PURSUANT TO 28 U.S.C. § 2255
### AND IN THE ALTERNATIVE
### MOTION FOR RELIEF FROM  JUDGMENT OR ORDER
### PURSUANT TO FED. R. CIV. P. 60

_____


MORRIS H. MOON
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lewis Lee

**TABLE OF CONTENTS**

I.   The Eighth Circuit does not require preauthorization for material *Brady* claims raised in a second-in-time § 2255 motion…………………………………………………………………...2

II.  AEDPA's gatekeeping provisions apply differently to § 2254 cases and § 2255 cases….…....5

III. Mr. Lee's *Brady* and *Napue* claims are material and satisfy the abuse-of-the-writ standard……………………………………………………………………………………..6
    A. James Wanker……………………………………………………………………………..6
        1. The newly-discovered evidence substantially changes the way the jury would have assessed Mr. Wanker's testimony…………………………………………………….....6
        2. Mr. Wanker's testimony was crucial to the Government's case……………………...9
        3. The circumstantial trial case against Mr. Lee has become even more questionable in light of subsequent developments……………………………………………………10
            a.    The Government misrepresents the remaining evidence………………...11
            b.    The Government avoids mention of the weaknesses in its case…………13
            c.    The Government misstates the standard………………………………15
    B. The Government's arguments about Mr. Lee's Oklahoma prior conviction are incorrect and misleading………………………………………………………………………...16
        1. The Government misstates Mr. Lee's *Brady* claim and ignores his *Napue* claim…...16
        2. The Government's misconduct undermines confidence in the verdict and clearly would have affected the jury's decision…................................................................18

IV.  Rule 60(b)(3) is a proper vehicle to address Mr. Lee's claims………………………………23

V.   Rule 60(d) is also a viable means of addressing Mr. Lee's claims…………………………..25

Conclusion……………………………………………………………………………………….28

i

In his § 2255 motion, Mr. Lee raised several claims arising from the recent discovery of serious allegations of government misconduct during his 1999 trial. In response, the Government asked this Court for permission to address only potential jurisdictional issues. *See* Doc. No. 1301. In its filed reply, however, the Government did not limit itself to the question of jurisdiction. Instead, the prosecution presented this Court with a carefully curated factual narrative, ignoring any evidence damaging to its argument and eliding incongruent details to bolster its case. For instance, at trial, the Government presented hair comparison testimony and told the jury in closing that the hair had been scientifically determined to be Danny Lee's. Tr. 7000-01. Subsequent DNA testing proved this to be false. This fact is never mentioned by the Government anywhere in its pleading, including in its materiality argument.

Most disturbing, however, is that the Government presents this Court with fallacious information to make its arguments. For example, the Government's timeline of the crime was a key part of its case at trial and it left little room for error. In his § 2255 motion, Mr. Lee outlined compelling facts that call the timeline into question. Doc. No. 1297 at 40 et seq. In response, the Government assures this Court that there was "an ample amount of time to make the trip" because a "witness from AAA testified that *he drove between the two locations on three occasions* using different routes—a direct route, a secondary route, and a scenic route—and that driving an average of 55 miles per hour, it took him 35, 37, and 43 hours respectively." Doc. No. 1307 at 39, n. 7 (emphasis added).  On its face, this appears damning to Mr. Lee's claim. However, it is *simply not true*. The Government's trial witness, a trip planner from Automobile Association of America (AAA), did not test the roads or driving conditions for the jury. He never left his office. He merely picked three routes from a map, assumed an average speed of 55 miles an hour and did some math. Tr. 6448-49. On cross-examination, he stated explicitly that had

1

never driven any of these roads himself and did not factor in road and weather conditions (it was dead of winter) or any rest stops. Tr. 6451.

Unfortunately, these examples are not unique. The Government's pleading is littered with misstatements of both law and fact. In the following reply, Mr. Lee highlights these errors and explains why this Court should allow further development of his claims.

I.      **The Eighth Circuit does not require preauthorization for material *Brady* claims raised in a second-in-time § 2255 motion.**

The Government argues Mr. Lee's motion should be dismissed because he is required to obtain preauthorization to file a second § 2255 motion pursuant to 28 U.S.C. § 2255(h). Doc. No. 1307 at 16. In support, it cites to opinions in other circuits requiring such authorization. *Id*. at 23 n.5. But neither the Eighth Circuit nor this district imposes that requirement. The Government is, in effect, asking this Court to reject the precedent of this circuit and district.

In *Crawford v. Minnesota*, 698 F.3d 1086, 1091 (8th Cir. 2012), the Eighth Circuit pointedly refrained from adopting the Government's expansive view that "all *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] claims in second habeas petitions are second or successive regardless of their materiality." *Crawford*, 698 F.3d at 1091. It only recognized that *non-material Brady* claims require pre-authorization. *Id*. This holding does not, as the Government's suggests, require preauthorization for *material Brady* claims. In fact, the *Crawford* court explicitly refused to join the reasoning and conclusions of the several circuits that agreed with the Government. *Id*. at 1090. This Court should decline the Government's invitation to rely on other jurisdictions to avoid the law in this circuit.

Indeed, the Eastern District of Arkansas has already issued an instructive decision that is directly on point: *Carter v. Kelley*, No. 5:16-cv-367-DPM-PSH (E.D. Ark. 4/25/17) (attached as Exh I to Doc. No. 1297).[1]

Like Mr. Lee's case, *Carter* concerned a *Brady* claim raised in a second-in-time habeas petition. The magistrate judge, at the Government's urging, recommended the *Brady* claim be dismissed for failure to obtain circuit authorization to file a successive motion. The district court, however, rejected the magistrate's recommendation. Citing *Crawford*, the court (the Honorable D.P. Marshall, Jr. presiding) concluded that the Eighth Circuit imposes no such requirement on material *Brady* claims. *See* Exh. I ("[I]f [petitioner's] *Brady* claim is material, then a second-in-time petition may not be 'second or successive' within the meaning of AEDPA.") (citing *Crawford*, 698 F.3d at 1091). Lacking an adequate factual record, the court ordered the magistrate court to allow the petitioner to develop the record on the issue of materiality. *See Carter v. Kelley*, 2017 WL 4214139 at *5 (E.D. Ark. 8/31/17) (Findings and Recommendation) (Hon. Patricia S. Harris, U.S. Magistrate Judge) ("Judge Marshall could not determine from the record whether Carter's *Brady* claim is material and, thus, whether the petition at bar requires pre-authorization. Judge Marshall asked that the record be more fully developed.")

*Carter* illustrates how a district court in the Eighth Circuit should approach a potentially meritorious *Brady* claim raised in a second-in-time § 2255 motion: it should ensure that it has a full record before it so that it might properly assess materiality. Where the prosecution remains in control of key facts, expansion of the record may be especially necessary. If materiality is proven, the § 2255 motion is exempt from the preauthorization requirement. If that threshold is

---

[1] Mr. Lee attached twenty exhibits, labeled Exhibits A through T, to his § 2255 Motion (Doc. No. 1297), to provide supporting factual detail. Mr. Lee has attached additional exhibits to the instant pleading, and has consecutively labeled them beginning with Exhibit U.

3

not met, then the § 2255 motion should be transferred to the Eighth Circuit for further consideration.[2]

The Government's insistence that the circuit law of other jurisdictions should control this Court's analysis, Doc. No. 1307 at 24 n.5 & 29, is unavailing.[3] This Court should follow precedent and first assess materiality.[4]

---

[2] After finding in *Carter* that the *Brady* claim was non-material, and thus that the petition required pre-authorization, Judge Marshall ordered that the case be transferred to the Eighth Circuit for further consideration. *Carter v. Kelley*, 2017 WL 4214084 (E.D. Ark. 9/21/17). Notably, the Eighth Circuit summarily denied the petitioner's subsequent request for pre-authorization, but otherwise gave no indication that Judge Marshall's interpretation of *Crawford* was incorrect or that his decision to conduct a preliminary materiality analysis was improper. *See Carter v. Kelley*, No. 17-3076, Entry ID: 4644737 (8th Cir. 3/29/18).

[3] The outside-circuit cases also do not provide the support the Government claims. Those decisions do not resolve the issue but rather highlight panel splits in other circuits. *Brown v. Muniz*, 889 F.3d 661 (9th Cir. 2018), for example, created a split between Ninth Circuit panels. *See United States v. Lopez*, 577 F.3d 1053, 1064 (9th Cir. 2009). Similarly, an Eleventh Circuit panel's reasoning in *Thompkins v. Sec'y, Dep't of Corrections*, 557 F.3d 1257 (11th Cir. 2009) (*per curiam*) was subsequently refuted by another panel in *Scott v. United States*, 890 F.3d 1239 (11th Cir. 2018). The remaining circuit decisions cited by the Government either do not mention, or were decided prior to, *Panetti v. Quarterman,* 551 U.S. 930 (2007). They are thus of little, if any, value here. Contrary to the Government's assertion, there is a paucity of circuit law on whether material *Brady* claims should be considered "second or successive" after *Panetti*. And even those circuits that have addressed the issue have panel splits.

[4] The Government also contends that *Brady* claims are "ripe" at the time of trial and thus must be included in an initial § 2255 motion. Doc. No. 1307 at 20-22. Where, as here, the suppressed information is discovered only after the first § 2255, such a rule would contravene the Supreme Court's reasoning in *Panetti*, which sought to prevent petitioners from flooding the courts with useless claims on the off chance that such claims might later ripen. *See id.* at 943. As with second-in-time *Ford v. Wainwright*, 477 U.S. 399 (1986) claims, "conscientious defense attorneys would be obliged to file unripe (and, in many cases, meritless) [*Brady*] claims in each and every [first § 2255] application [(and direct appeal)]," *Panetti*, 551 U.S. at 943, to preserve then-hypothetical claims on the chance that the Government might have committed a material *Brady* violation that will eventually be disclosed. Given that *Brady* applies in all criminal cases where *Ford* claims arise only in capital ones, precluding an avalanche of meritless *Brady* filings in initial petitions is arguably more necessary here.

II.     **AEDPA's gatekeeping provisions apply differently to § 2254 cases and § 2255 cases.**

One additional flaw with the Government's argument is that the circuit decisions it relies on, Doc. No. 1307 at 21, are all § 2254 cases that turned on a gatekeeping provision not applicable to § 2255s. Specifically, the courts there were concerned with the application of the statutory "due diligence" requirement to second-in-time § 2254 petitions. There is no such requirement in the statutory analogue for § 2255 motions. *Compare* 28 U.S.C. § 2244(b)(2)(B) (restricting habeas review of state convictions to, among others, cases where "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence"), *with* 28 U.S.C. § 2255(h) (limiting federal habeas review to cases of "newly discovered evidence," among others).

There are other important differences between § 2254 and § 2255 cases. Section 2254 vindicates the concerns of comity and federalism by restricting when federal courts can reopen state criminal convictions, while § 2255, which deals solely with federal criminal convictions, does not. Nor is the interest in finality exactly the same for § 2554 and § 2255 claims. "Finality has a special importance in the context of a federal attack on a state conviction." *McCleskey*, 499 U.S. 467, 491 (1991).

Finally, the federal courts have a distinctive concern for ensuring that federal prosecutors have acted appropriately in seeking justice, *Berger v. United States*, 295 U.S. 78, 88 (1935), and the Government should not be rewarded in a case like Mr. Lee's simply because it kept the exculpatory evidence hidden long enough. *See also Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process.").

5

### III.    Mr. Lee's *Brady* and *Napue* claims are material and satisfy the abuse-of-the-writ standard.

Rather than engage with the full merits of Mr. Lee's substantive claims, the Government requested (and received) permission to address only this Court's jurisdiction. *See* Doc. Nos. 1301 & 1302. Perhaps belatedly, the Government realized that the jurisdictional issue cannot be resolved absent consideration of the materiality of the underlying *Brady* and *Napue* claims, *see* Doc. No. 1307 at 31-45, and so it selectively addressed some of the merits arguments raised in Mr. Lee's § 2255 motion. But to the extent that it has done so, it has engaged in outright falsehoods about the record, mischaracterized its trial presentation to the jury, and wholly ignored the evidence and arguments raised in the § 2255 motion that are most damaging to the Government's case against Mr. Lee. The Government's specific responses to the substantive *Brady* and *Napue* claims are addressed below.

#### A.    James Wanker

The Government makes three arguments regarding the materiality of the newly-discovered evidence: (1) that it does little to change how the jury would have heard Mr. Wanker's testimony; (2) Mr. Wanker's testimony was not central to its case at trial; and (3) the remaining evidence against Mr. Lee was substantial. Doc. No. 1037 at 34-39. Mr. Lee will address each of these arguments in turn.

##### 1.    The newly-discovered evidence substantially changes the way the jury would have assessed Mr. Wanker's testimony.

The Government asserts that "the only information in Wanker's affidavit that is arguably new is Wanker's assertion that he continued to hold that opinion [that Lee's statements were not credible] at the time of Lee's trial." Doc. No. 1307 at 34. This is not accurate. Mr. Wanker's affidavit contains critical new details that were not previously disclosed to trial counsel or the jury and that dramatically alter the context and content of his trial testimony. Notably, the Government has not denied any aspect of Mr. Wanker's declaration. At trial, the jury heard from Mr. Wanker that Mr.

6

Lee had confessed to killing someone, wrapping them up, and throwing them in a swamp. Tr. 4082. The impression given at trial was that although Mr. Wanker had initially dismissed Mr. Lee's statement as "just talk," at some point he clearly changed his assessment and felt compelled to come forward as a witness against Mr. Lee. Indeed, that is the reasonable inference any juror would draw from the simple fact that Mr. Wanker had travelled all the way from Spokane to Little Rock to testify for the prosecution in a federal capital trial and made such a strong impression that it scared defense counsel from asking any further details on cross-examination. *Id*. *See also* Exh. B (Lassiter Dec.) at ¶ 11.[5]

Had the *Brady* information been disclosed, the jury would have learned of relevant information that would have put the ostensibly inculpatory statement in a much different light. On at least four different occasions prior to trial, Mr. Wanker warned authorities that Mr. Lee's "confession" was dubious. Exh. A (Wanker Dec.) at ¶¶ 8-12. He told authorities that he had observed multiple instances in which Mr. Lee attempted to take credit for crimes he had not committed in order to impress others and try to fit in, and that this "confession" appeared to him like the others. *Id*. at ¶¶ 5-7. Despite his repeated warnings to that effect to authorities, Mr. Wanker was instructed by the Government *not* to volunteer this information during his testimony and to only answer the specific questions posed to him. *Id*. at ¶ 12. If Mr. Wanker had been asked at trial about this, he would have told the jury that despite being called as a Government witness, he had never changed his

---

[5] The Government protests that it "did not present evidence or argument about how Wanker came to provide information about Lee's statements to investigators, let alone suggest that Wanker was a concerned witness who initiated contact with authorities because he believed he had valuable, credible information to share about the Mueller murders." Doc. No. 1307 at 36 (internal quotation marks and citation omitted). This is a red herring. Mr. Lee never asserted that the Government explicitly presented evidence or argument about this issue. The unmistakable impression given to the jury at trial was that Mr. Wanker no longer believed Mr. Lee's statement was "just talk," and that is why he was a Government witness in this case.

assessment that Mr. Lee's statement to him was "anything more than just empty bragging" and not reliable. *Id*. at ¶ 13.

Armed with the suppressed *Brady* material, trial counsel would have been able to effectively impeach the Government's selective presentation of Mr. Wanker's evidence. Indeed, it is hard to overstate how differently the jurors would have understood Mr. Wanker's testimony had he turned to them from the stand and informed them that: (a) from the moment he heard Mr. Lee's statement until that very day, he did not believe it was reliable or credible; (b) his assessment was based on observing multiple instances of Mr. Lee falsely taking credit for crimes in order to seem tough; and (c) despite multiple warnings to authorities about this, the Government had discouraged him from volunteering his doubts about the reliability of Mr. Lee's statement to the jurors.

> The Government now argues that none of this would have mattered because
>
> the jury did not need lay opinion testimony from Wanker about his current views to evaluate on its own whether Lee's statements were just "talk" or actual admissions. The jury knew, for example, that Lee's statement that he "taped" his victims and "wrapped them up" was consistent with the unique state of the Mueller bodies when first recovered *and was information that only someone who participated in the murders was likely to know*…. The same is true of Lee's statement that he threw the bodies in the "swamp," which is consistent with location (sic) where the Muellers were removed, the Illinois Bayou.

Doc. No. 1307 at 34-35 (emphasis added). The central premise of the Government's argument—that Mr. Lee's statement contained details only the real killer would know—is demonstrably false. Within a day and a half of the recovery of the Muellers' remains, the press had already begun reporting these supposedly "unique" details, including that the bodies were found in the Illinois Bayou with plastic bags wrapped around them and duct taped. *See*, *e.g.* Jay Meisel & Shareese Harold, "Clues on 3 Dead in Bayou," Arkansas Democrat-Gazette, June 30, 1996 (attached as Exh. V). There is no detail the Government can point to in Mr. Lee's statement that was not already public by the time Mr. Wanker spoke with him.

Finally, Mr. Lee agrees that each juror had to evaluate for him or herself whether to credit the statement as an admission of guilt. In making that determination, however, the jurors were entitled to know all the relevant facts and circumstances, including how the witness assessed the speaker's demeanor and credibility. *See, e.g., Gates v. District of Columbia*, 66 F.Supp.3d 1, 22-24 (D.D.C. 2014) (in case where witness claimed defendant confessed to him, evidence that detective did not find witness credible constituted impeachment encompassed by *Brady*).

### 2.  Mr. Wanker's testimony was crucial to the Government's case.

The Government asserts that Mr. Wanker's testimony was not central to its case because his testimony "occupies only six pages of the trial transcript." Doc. No. 1307 at 35.[6] With all due respect, this is a silly argument. Using that standard, Gloria Kehoe's inculpatory testimony was also of little importance because it occupies a single transcript page. (Tr. 4975, lines 5-18). Their testimony was damning regardless of the length. Indeed, Mr. Wanker's testimony was of particular importance to the Government because he did not have the credibility problems both Gloria and Cheyne Kehoe had. *See* Doc. No. 1297 at 34-48. That key fact was highlighted by the prosecution in closing:

> Nobody has paid Mr. Wanker anything. There is no reason for him to come in here and tell you that story unless it's the truth. And it's the truth because Danny Lee told him that. And there he told what happened. It's not detailed and it's not involved, but its real and that's what they did.

Tr. 7002. This was not a "passing mention," Doc. No. 1307 at 35, but a key point for the prosecution. The jury acquitted Mr. Lee and Mr. Kehoe of multiple predicate racketeering acts, including a bombing and several other murders, that relied solely on the testimony of Gloria and Cheyne. Doc. No. 1297 at 34-35. The Government needed James Wanker.

---

[6] The Government makes this assertion while at the same time belatedly arguing for the significance of its fingerprint evidence—which occupies eight trial transcript pages. Tr. 3705-12.

9

Finally, the Government argues that Mr. Lee "vastly overstates the government's reliance on James Wanker's testimony, while largely ignoring the similar testimony from Wanker's wife." Doc. No. 1307 at 36. But Dalvine Wanker's testimony was not "similar." She testified that Mr. Lee had mentioned using a gun to "take care of" of some people "down south." Tr. 4093. She provided no details that would link that statement to the Mueller murders: in fact, they were not committed with a gun. At trial, the Government essentially conceded her testimony was of limited probative value.[7] It relied on James Wanker to corroborate the Kehoes' evidence.

### 3. The circumstantial trial case against Mr. Lee has become even more questionable in light of subsequent developments.

Under the relevant materiality standard, the "question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Stated differently, the question is whether the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Mr. Lee has uncovered favorable evidence that does just that.

The Government's case against Mr. Lee for the Mueller murders hinged on the testimony of two highly unreliable cooperating witnesses, Gloria and Cheyne Kehoe. The verdict form in this case demonstrates just how problematic these witnesses were—the jury acquitted Mr. Lee and Mr. Kehoe of any racketeering act that relied solely on their word. Unlike these other acts, though, the Kehoes' testimony about the Mueller murders was corroborated by two independent

---

[7] "Now I recognize that it isn't a detailed statement about what he's done, but it certainly corroborates the fact that he's out talking about engaging in this kind of activity." Tr. 7003. The Government never even suggested at trial that Ms. Wanker's testimony was corroborative of the Kehoes'.

pieces of evidence: (1) a hair found on the clothing worn by one of the perpetrators that was microscopically similar to Mr. Lee's hair, and (2) James Wanker's testimony. The hair evidence was conclusively refuted in 2007 by DNA testing that excluded Mr. Lee as the source, but until now, the Wanker testimony remained as crucial independent evidence supporting the Kehoes' story. With the undisclosed evidence about Mr. Wanker's testimony now added to the picture, the case against Mr. Lee appears very different. The verdict against him, now lacking any independent evidence corroborating the Kehoes, is not worthy of confidence.

### a.   The Government misrepresents the remaining evidence.

The Government insists in its Response that the evidence against Daniel Lee was "overwhelming."  With the utility of the Wanker statement eliminated or diminished and the hair evidence debunked, the Government points to the following to prove that point:

> (1) Mr. Kehoe and Mr. Lee returned to Washington in January 1996 "flush with cash and in possession of property stolen from the Muellers."
> (2) "Lee and Kehoe both separately confessed to Gloria Kehoe, and Chevie Kehoe also separately confessed to his brother Cheyne."
> (3) "Lee's fingerprints were found on a gun display case that had been stolen from William Mueller and recovered from a storage facility in Idaho used by Kehoe."

Doc. No. 1307 at 36.

Overwhelming evidence this is not. First, the initial assertion has no basis in fact. There was no evidence that Mr. Lee was "flush with cash and in possession of property stolen from the Muellers." All of the transcript pages cited by the Government for that proposition, *see* Doc. No. 1307 at 6-7, refer solely to Mr. Kehoe. He was the one who was flush with cash and stolen property, not Mr. Lee.[8]

---

[8] The Government claims that "Lee and Kehoe both fled Washington after they learned that law enforcement authorities were asking questions that linked Kehoe with property stolen

The second piece of evidence was certainly damning but also highly suspect. Gloria and Cheyne testified in exchange for significant benefits; there were crucial discrepancies between their story and the physical evidence; and the timeline on which their story hinged was implausible. Doc. No. 1297 at 36-47. Of these points, the Government offers only a half-hearted response to the timeline.[9] It ignores the rest of his analysis—including that the acquittals in this case demonstrate that the jury was not inclined to convict based on Kehoe testimony alone.

The third piece of evidence, the fact that his fingerprints were found on a display case belonging to the Muellers, cannot place Mr. Lee at the crime scene. The Government's own witnesses testified this display case was kept in a storage unit at the Shadows Motel, and that Mr. Lee *was living out of that same storage unit* and would sleep there. Tr. 2856-57; 2915; 4815; 5312. He could have come into contact with the display case at any point. The Government's assertion that the only time Mr. Lee could have touched the item was during the commission of the Mueller murders is thus unfounded. *See* Doc. No. 1307 at 37. Even the Government's own fingerprint expert testified there was no way to determine the age of a print or when it might have been deposited on the display case. Tr. 3716. This evidence had little, if any, probative value as to whether Mr. Lee was at the crime scene.[10]

---

from the Muellers. Tr. 2794, 2799, 4980." Doc. No. 1307 at 7. None of the transcript citations corroborate this assertion. While Gloria Kehoe testified that Mr. Lee took a bus to visit his mother and sister in Oklahoma, nowhere in her testimony does she suggest this trip was a response to law enforcement action. Tr. 4980.

[9] Mr. Lee responds to that issue in more detail below.

[10] Indeed the Government could not rely much on that fingerprint at trial given the theory of the case it offered to the jury. The prosecution contended that Mr. Lee stole multiple items from the Mueller home; moved them into the Muellers' Jeep; transferred them from the Jeep into Mr. Kehoe's GMC truck; then moved them again into storage at the Shadows Motel. Yet despite extensive fingerprint analysis of the entirety of that property, there were no other prints found belonging to Mr. Lee other than on the display case, an item *he lived with* and one that was

### b.  The Government avoids mention of the weaknesses in its case.

Remarkably, there is no mention of the hair evidence in the Government's recitation of the record. At trial, the Government painstakingly laid the foundation for the science behind trace evidence collection and hair microscopy, as well as the fact that the hair recovered from a cap seized from Mr. Kehoe's property was microscopically similar to Mr. Lee's. Tr. 3644-75; 4719-25. In its closing argument to the jury, the Government even urged the jury to look past the expert's caveats about whether one could conclusively identify a hair as belonging to a particular individual based on hair microscopy, and boldly claimed "the evidence establishes that *that was Danny Lee's hair*." Tr. 7000-01 (emphasis added). Yet now it has re-written the history of its prosecution against Mr. Lee and erased all traces of its reliance on the hair evidence to secure a conviction.

The Government also does not confront the considerable problems with its timeline. Its evidence established that the murders occurred after dark on January 11.[11] *See* Exh. M. The defendants then had to drive across the country to Spokane, Washington. The prosecution went to great lengths to show that this could have been accomplished by January 13. In fact, its own evidence suggests that the long drive had to have finished by *the evening of January 12*. That fact was established by prosecution witness Sean Haines, Mr. Lee's roommate in Spokane. *See* Doc. No. 1297 at 45. He testified that he knew that Mr. Lee had returned to Spokane because he came home one day and saw his roommate's duffel bag in the living room of their apartment. But he did not actually talk to Mr. Lee until "the next day." Tr. 2778-79. The date of that "next

---

regularly moved into and out of that unit so that Mr. Kehoe could display his wares at gun shows. Tr. 2857.

[11] The Government asserts that the Illinois Bayou was "nearby" the Muellers' home. Doc. No. 1307 at 4. This is incorrect. *See* Doc. No. 1297 at 10; Exh. U.

day" was January 13. This was established by Vada Campbell, who testified that she saw both Mr. Lee and Mr. Haines at their apartment on January 13. Tr. 5953-53. The Government concedes Ms. Campbell's testimony is accurate, even noting that she is the witness "with the clearest memory" of the date on which she saw Mr. Lee because "it corresponded to the birth of her grandchild." Doc. No. 1307 at 38. Thus, if Mr. Lee and Mr. Haines were together at the apartment on the 13th, then the date on which Mr. Haines first saw Mr. Lee's travel bag in the apartment—but not Mr. Lee himself—had to have been January 12 at the latest. The prosecution's insistence on January 13th as the end-date made its proposed timeline difficult to accept at trial;[12] Mr. Haines' testimony about the 12th made it impossible.[13]

The Government's only answer here is to characterize Mr. Haines' testimony as "equivocal and uncertain." Doc. No. 1307 at 38. Nothing in the record supports that depiction. Mr. Haines unambiguously testified that he did not see Mr. Lee on the same day that he had arrived at their apartment; he saw Mr. Lee's belongings first, and then Mr. Lee himself the next day. Mr. Haines had even given a prior consistent statement on this very point over two years before he testified.

The Government fares no better when defending the January 11-13 timeframe. It offered evidence at trial that the drive would have taken from 35 to 43 hours, depending on the route. In its brief it tells this Court that its witness drove all three options all the way, experiencing the

---

[12]   During the second day of deliberations the jury sent out a note asking about the road conditions on the drive back to Washington the defendants would have made, Tr. 1700, indicating that it had concerns about the time frame.

[13] The distance between Tilly, Arkansas and Spokane, Washington was too great for one to have made that drive in less than a day's time. Thus, if the murders had been committed in Tilly on January 11, as alleged by the Government, it would have been impossible for Mr. Lee to have returned to Spokane by January 12.

14

actual roads if not the wintry weather conditions of January 1996. But there was no such evidence: the AAA employee simply looked at the roads shown on his map, divided the total miles by the speed limit, and testified to his calculations. TR. 6448-49. No one had tested the Government's theory that the cross country drive could be made, in snow and ice,[14] without stopping in that amount of time.

### c. The Government misstates the standard.

Finally, the Government quotes heavily from Judge Eisele's prior decision regarding the strength of the Government's case at trial. Doc. No. 1307 at 39.  But the earlier decision cannot answer the current materiality inquiry. First, the prior decision was made on a different record and without the benefit of the undisclosed evidence about Wanker's actual statement. Judge Eisele was therefore not in a position to analyze whether the totality of the evidence, including that which was suppressed, puts the Government's case in a different light. Additionally, while it is generally true that a cold record does "not convey the demeanor of the witnesses who testified," *id*. at 39, we have a pretty clear indication here that the jury found Gloria and Cheyne Kehoe insufficiently credible to return a guilty verdict based solely on their testimony. Indeed, Gloria testified that Mr. Lee had also confessed to her that he participated in the bombing of the Spokane City Hall building, *see* Tr. 4977, but as the jurors acquitted him of that racketeering act, they must not have believed her.[15] Similarly, while a cold record cannot convey Mr. Wanker's demeanor on the stand, it is not his demeanor that is the issue here: it is whether the suppressed

---

[14] Tr. 2261; 6009.

[15] The jury also issued not guilty verdicts to the racketeering acts concerning the murders of Jeremy Scott and Jon Cox, which similarly relied solely on the testimony of Gloria and Cheyne Kehoe. *See* Doc. No. 1297 at 34-35.

*Brady* material undermines confidence in the reliability of the underlying inculpatory statement. Judge Eisele had no occasion to consider this issue.

The Government is essentially quoting Judge Eisele in service of an argument that there is sufficient evidence to sustain the conviction against Mr. Lee, even without Mr. Wanker's testimony. But that is not the relevant standard. As the Supreme Court has explicitly held, the test for *Brady* materiality "is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 435. Indeed, Mr. Lee need not "demonstrat[e] by a preponderance that the disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id*. at 434. Instead, his burden is only to show that, in light of the favorable evidence, confidence in the result of the trial was undermined. *Id*. In light of the totality of all of the evidence, Mr. Lee has more than met that standard.

**B. The Government's arguments about Mr. Lee's Oklahoma prior conviction are incorrect and misleading.**

The Government's response to the claims Mr. Lee raised about his Oklahoma juvenile conviction misconstrues the actual claim and ignores critical facts that undermine its position.

**1. The Government misstates Mr. Lee's *Brady* claim and ignores his *Napue* claim.**

According to the Government, Mr. Lee's allegation is that the Government violated *Brady v. Maryland* by failing to disclose the trial defense attorney's fee application. Doc. No. 1307 at 42. After setting up this straw man, the Government informs this Court that such a claim cannot be a violation of *Brady* because the attorney fee document was a defense document that was publically available. *Id*. at 45, n. 9. This response fails to engage with Mr. Lee's actual claims.

16

First, Mr. Lee's claim is not that the Government failed to disclose a defense attorney's fee voucher. He has instead alleged that the Government had information in its possession, at the time of trial, proving that the disposition of the Oklahoma homicide charge was not due to a prosecutorial "gift" as it insisted to the jury. At the time it argued for Mr. Lee's execution, the Government (or its agents) knew the real reason for the disposition of the murder charge and that the facts surrounding that disposition were exculpatory. Doc. No. 1297 at 52-53.

The Government consulted with detectives from the Oklahoma City Police Department who were involved with the case, who interrogated the juvenile Danny Lee, and who testified at the preliminary hearing of the actual murderer, David Patton. Mr. Lee's § 2255 motion alleges that the Government, as part of these or other discussions, must have learned of facts exculpatory to Mr. Lee and failed to disclose them. The attorney fee voucher is not the basis of the *Brady* allegation but rather strong support for the specific factual allegations of suppression. *See, e.g., Blackledge v. Allison*, 431 U.S. 63, 75 (1977) (unless claims are "patently false or frivolous" discovery or a hearing is warranted). By reframing Mr. Lee's allegation in such an absurd manner, the Government's response fails to address the actual issue before this Court.

Second, the Government never once mentions Mr. Lee's *Giglio/Napue* claim, even in passing. This was a distinct claim raised by Mr. Lee under a separate heading in his § 2255 motion. To the extent the Government believed its response addressed this claim (although it was never mentioned), its argument is inadequate. The thrust of the Government's rebuttal to the *Brady* claim is that the defense attorney's fee voucher was publically available and that there "is no reasonable probability that a jury presented with the information in the document would have reached a different verdict at Lee's trial." Doc. No. 1307 at 45.  Neither of these arguments is relevant to a *Giglio/Napue* claim.

First, the prejudice standard for a *Napue* violation is not the same as for *Brady*: it is whether there is any likelihood the false testimony could have affected the judgment of the jury. *United States v. Augurs,* 427 U.S. 97, 103 (1976). This standard is "more defense friendly," *Hammond v. Hall*, 586 F.3d 1289, 1306-07 (11th Cir. 2009), and "favors granting relief." *Ford v. Hall*, 546 F.3d 1326, 1333-34 (11th Cir. 2008). The Government never discusses this materiality standard and makes no effort to persuade this Court the evidence was harmless.

Second, even the Government's recasting of the *Brady* issue would not undermine the *Napue* claim. Assuming, *arguendo,* the claim *was* based on the defense attorney's billing records and therefore potentially available to trial counsel, that would not have absolved the Government of its duty to correct false testimony. And certainly the prosecution was not allowed to bolster that false testimony during arguments to the jury as it did in Mr. Lee's case. *See United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) ("But the government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false."); *United States v. O'Keefe*, 128 F.3d 885, 894-95 (5th Cir. 1997) ("[E]ven when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its closing argument…or the defense is unable to utilize the information…or when the government thereafter asks misleading questions.") (internal citations omitted).

### 2. The Government's misconduct undermines confidence in the verdict and clearly would have affected the jury's decision.

Although the Government claims that its response to the Oklahoma prior "only addresses the Court's jurisdiction," Doc. No. 1307 at 45, n. 9, instead it cherry picks facts in an attempt to downplay the gravity of Mr. Lee's allegations. Randomly mixing brief quotes from the

18

Government's witnesses and the trial prosecutors' jury argument, the Government asserts that Mr. Lee hit, beat, and kicked Mr. Wavra, opened a manhole, forced him to go into it and supplied a knife for the murder after a coin toss to decide whether Mr. Wavra should be killed. *Id.* at 41-42. According to the Government, these facts led Judge Eisele to reject a previous challenge to the punishment phase evidence and conclude that "there is nothing before the court to indicate that [Lee's] 'true role' in the murders was anything other than as portrayed during the sentencing trial." *Id*. at 44 (citing *Lee*, 2008 WL 4079315 at *45).

However, Judge Eisele did not have all of the facts before him and his previous ruling has nothing to do with Mr. Lee's current claims. Neither the trial court nor the jury was aware that an Oklahoma judge had reviewed the prosecution's evidence against Mr. Lee (including his prior testimony at a preliminary hearing that was read to his capital jury) and found that it *did not establish sufficient cause to even charge him with murder. See* Doc. No. 1297 at 22.

Contrary to the Government's argument, the import of this discovery is not that a billing invoice existed attesting to it. Doc. No. 1307 at 43. The fact that the murder charge was dismissed unmistakably demonstrates that the quality and gravity of the evidence against Mr. Lee was not what the Arkansas jury was led to believe: it was instead suspect and greatly exaggerated. And the Oklahoma judge, unlike the capital jury in Arkansas, had all the conflicting evidence before it.

One prime example is the testimony of government witness Brian Compton. Mr. Compton was present at the party where Mr. Wavra was killed and was the only eyewitness the Government chose to present to Mr. Lee's capital jury.  Comparing his testimony in this case with his previous sworn testimony at a preliminary hearing in Oklahoma is startling. At Mr. Lee's penalty phase (as reflected in the Government Response), Mr. Compton alleged graphic

19

detail which was used to convince the jury to return a death sentence. In 1990, however, when Mr. Compton testified at a preliminary hearing in Oklahoma shortly after the crime, he painted a very different picture of relative culpability. Some of the major discrepancies (none of which Mr. Lee's capital jury ever learned) include:

- *Mr. Lee's fight with Joey Wavra*

In 1990, Mr. Compton recalled how everyone told Mr. Wavra to sit down in the living room and be quiet but he was insistent on going outside. Exh. W at 172. Mr. Wavra again got up "and him and Danny started fighting for a few minutes." *Id.*  Mr. Wavra apparently sat back down and thereafter urinated on the living room chair. The group members all went outside to look for some keys and, at one point, Mr. Compton looked over and saw "Joey [Wavra] on the ground and Danny was standing over him." *Id.* at 173. Mr. Compton saw Mr. Lee hit him a couple times and then got "a bag or watch or something from him and brought it to the car." *Id.* at 174. Mr. Compton testified that "Danny went back and hit him a couple more times, *and that's pretty much it with Danny.*" *Id.* (emphasis added). When asked whether he "ever [saw] Danny take a tree branch and hit him," Mr. Compton replied "no" and stated he only saw Mr. Lee hit him with his fists, as earlier mentioned.  *Id.* at 192.

By the time of the capital trial, Mr. Compton's story was much more violent and directly contradicted his previous testimony. According to Mr. Compton "Danny beat him up and beat him pretty good…There was a stick in the yard. I don't know if it was a tree branch now or if it was a shovel handle or what. But he picked up a stick of wood and hit him a couple times." Tr. 7413.

20

- *The manhole cover*

In 1990, Mr. Compton testified that he saw the manhole open with the cover off  but he could not say who removed it. *Id.* at 175. At Mr. Lee's capital trial, he told the jury that David and Danny opened the manhole to put Joey in. Tr. 7413. By closing argument, AUSA Liroff was convincing the jury that Mr. Lee "was the one who opened the manhole." Tr. 7962.

- *Entering the manhole*

Mr. Compton told the capital jury that "after Danny had beat him up, David told Joey to get down into the manhole, and Joey didn't want to go at first. After he was pushed a few more times, he proceeded to crawl down into the manhole." Tr. 7413. In closing, AUSA Liroff told the jury Mr. Lee "was the one who forced him to go down." Tr. 7962.

 In contrast, in 1990, when Mr. Compton was asked by the state prosecutor if Mr. Wavra was forced into the manhole, he responded "Well, someone told him to go into the hole." Exh. W at 176. Mr. Compton could not say who told Mr. Wavra to go into manhole. He said simply that Mr. Wavra "sat down, put his legs in and held onto the sides and he kind of lowered himself in. Whenever he got about half-way, he just dropped himself on in." *Id*. at 176-77. On cross-examination, Mr. Compton stated unequivocally that Mr. Wavra "was not physically forced in [the manhole]." *Id.* at 192.

- *Flipping a coin*

During the capital sentencing, Mr. Compton testified that there was "some talk of a coin toss to see if he would live or die. At that point I just – it was – I don't know – seemed so odd to me that it would just – it didn't click to me. I had just left the area in the back yard." Tr. 7414. Mr. Compton did not know who tossed the coin. *Id*.

21

His previous testimony was starkly different. After the first time Mr. Wavra went down into the manhole he subsequently emerged with Mr. Patton and they both went over to his bicycle. At some point, Mr. Patton and Mr. Wavra went back down into the manhole. Mr. Compton was in the backyard with Mr. Lee the second time Patton and Wavra went into the manhole and he didn't hear Mr. Lee speak to either person. Exh. W at 183. Sometime later, Mr. Patton emerged and asked everyone in the backyard, where Mr. Compton was hanging out with Mr. Lee, if he should kill him. *Id.* at 184. Mr. Compton testified that everyone responded negatively and that he heard Mr. Lee respond but he could not remember exactly what he said. *Id.* at 185. Mr. Compton was shocked by the question and went back into the house with Mr. Lee. *Id.* at 186. Twenty or thirty minutes later, Mr. Patton reappeared and lied to everyone saying that he couldn't kill Mr. Wavra and that he was still "tied up down there." *Id.* at 187.

- *Mr. Compton's mental state*

At Mr. Lee's capital trial, Mr. Compton admitted that he "probably drank a good 12 pack by [himself]," Tr. 7415, and that he took acid with Mr. Lee and Mr. Patton. Tr. 7417. He, however, omitted much of the detail he provided during his previous testimony. In the Oklahoma court, he stated that the LSD "just really – it messed me up pretty good. I mean, I knew where I was and I knew what I was doing as far as moving my arm or something; but, you know, as far as keeping time or holding a conversation or anything like, it just really wasn't within my ability." Exh. W at 189-90. Mr. Compton said the effects were so strong that they lasted "[w]ay into the next day. I know that whenever I went home to do my chores, it was just like, Wow, you know, I'm doing my thing. It was like slow motion." *Id.* at 290.

The newly discovered evidence—showing that there was no "gift" but that a judge instead made a legal determination based on the evidence he saw—undermines the

22

Government's narrative and casts grave doubt on the veracity of the story presented to the jury at trial. As Mr. Lee has explained, Prosecutor Liroff focused primarily on proving Mr. Lee would be a danger in the future and relied heavily on the Oklahoma case to convince the jury that Mr. Lee was, in fact, a psychopath. *See* Doc. No. 1297 at 54-59. The Wavra murder played a central role in the Government's penalty phase case against Mr. Lee. The suppressed evidence wholly undercuts one of the Government's most compelling arguments for death. *See e.g. East v. Johnson*, 123 F.3d 235, 238 (5th Cir. 1997) (finding prejudice where state relied heavily in closing argument on crucial future dangerousness witness without disclosing impeachment evidence). In light of the central role that the Wavra murder played at Mr. Lee's capital sentencing and the false testimony and argument that supported it, there is ample proof to establish prejudice for both Mr. Lee's *Brady* and *Napue* claims.

### IV.     Rule 60(b)(3) is a proper vehicle to address Mr. Lee's claims.

Mr. Lee moves that this Court, in the alternative, reopen the judgment on his initial § 2255 motion pursuant to Fed. R. Civ. P. 60(b)(3). *See* Doc. No. 1297 at 62-64. The Government does not respond to the merits of Mr. Lee's Rule 60(b)(3) motion. Instead, it makes two procedural arguments: (1) that the motion is an improper successor; and (2) that it is untimely. Doc. No. 1307 at 45-47. Neither is correct.

The Government's first argument is foreclosed by *Gonzalez v. Crosby*, 545 U.S. 524 (2005). There, the Supreme Court held that a Rule 60(b) motion alleging "[f]raud on the federal habeas court" is a proper 60(b) motion, not a disguised successive motion. *Gonzalez*, 545 U.S. at 532 n.5. Such a motion does not attack "the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Gonzalez*, 545 U.S. at 532. These allegations of fraud, "if proven, would simply result in the reopening of the

23

federal habeas proceeding, not in the vacating of the [trial-level] criminal judgment." *Rodriguez v. Mitchell*, 252 F.3d 191, 199 (2d Cir. 2001) (approvingly cited by *Gonzalez*, 545 U.S. at 532 n.5).

Mr. Lee alleges that the Government's representation in the initial § 2255 proceeding, that there was no further *Brady* material to which Mr. Lee's trial counsel were entitled, when in fact there was, constituted "fraud[,] misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3); *see also* Doc. No. 1297 at 63 (collecting cases holding that a party's failure to produce requested discovery material constitutes Rule 60(b)(3) misconduct). That misconduct created a defect in the integrity of the § 2255 proceedings because it corrupted the Court's judgment on the previously-pled *Brady* and ineffective assistance of counsel claims. *See* Doc. No. 1297 at 7-8, 16-17, 62-63. Such a narrowly tailored argument is a proper Rule 60(b)(3) claim. *See Scott v. United States*, 2016 WL 323902, *3 (M.D. FL 1/27/16) (granting relief pursuant to Rule 60(b)(3) to reopen § 2255 proceeding to determine whether newly disclosed *Brady* material affected prejudice analysis of any grounds raised in initial § 2255 motion). Therefore, this Court has jurisdiction to rule on the motion. *Id*.

As for the timeliness of the Rule 60(b)(3) motion, Mr. Lee acknowledges that that such a motion ordinarily must be brought within one year of the judgment under attack. Fed. R. Civ. P. 60(c)(1). However, this time limitation is not jurisdictional. *See* Fed. R. Civ. P. 82; *Hamer v. Neighborhood Housing Services of Chicago*, 138 S. Ct. 13, 17 (2018) (provision governing time to file qualifies as jurisdictional only if Congress sets the time); *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 370 (1978) ("[I]t is axiomatic that the Federal Rules of Civil Procedure do not create or withdraw federal jurisdiction.").

24

When there has been fraud, principles of fairness dictate that the time limit be equitably tolled. Otherwise, the party that has deceived the Court will benefit from hiding its misdeeds for more than a year. *See Homberg v. Armbrecht*, 327 U.S. 392, 396-98 (1946).[16] The Government should not be allowed here to benefit from its own misconduct by arguing limitations; this does not serve the cause of justice. *Holmberg*, 327 U.S. at 396-97 (equity "bars [the United States] from setting up … a fraudulent defense, as it interposes against other forms of fraud.").

## V. Rule 60(d) is also a viable means of addressing Mr. Lee's claims.

The Government contends that Mr. Lee failed to allege that it engaged in conduct that qualifies as fraud on the Court. Doc. No. 1307 at 48. This is incorrect. Mr. Lee has alleged that the Government made fraudulent representations that deceived this Court and were integral to its decision to deny the *Brady* and ineffective assistance of counsel claims. Doc. No. 1297 at 63-64. Such conduct is cognizable under Rule 60(d)(3). *See Kerwit Medical products, Inc. v. N & H Instruments, Inc.*, 616 F.2d 833, 837 (5th Cir. 1980) (fraud on the court "is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication."); *United States v. Smiley*, 553 F.3d 1137, 1145-46 (8th Cir. 2009) (fraud on the court is "fraud which is directed to the judicial machinery itself" and "involve[s] the court actually being deceived by the misrepresentation"); *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998) (fraud involves instances where "the withheld evidence was highly relevant to and probative on the theory on which the case was decided."); *Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir.1989) ("the relevant inquiry is not whether fraudulent conduct prejudiced the opposing party,

---

[16] *See also In re Benjamin's-Arnolds, Inc.*, 1997 WL 86463, *10 n.9 & *11 n.10 (Bankr. D. Minn. 2/28/97) (doctrine of equitable tolling would act to toll one-year limitations period of Rule 60(b)(3) until the time the fraud is actually discovered).

25

but whether it harmed the integrity of the judicial process.") (internal quotation marks and citation omitted).[17]

Indeed, the mere fact that misrepresentations here were made by officers of the court brings Mr. Lee's allegations within the ambit of Rule 60(d)(3). *See Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (an attorney's "loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court."); *In re Intermagnetics America, Inc.,* 926 F.2d 912, 916 (9th Cir. 1991) ("fraud upon the court includes both attempts to subvert the integrity of the court and fraud by an officer of the court.").

The Government cites two cases for the proposition that failure to disclose *Brady* evidence during federal habeas proceedings is not cognizable as fraud on the court under Rule 60(d)(3). Doc. No. 1307 at 48-49. Neither case made such a holding, and both involve factual circumstances very different from Mr. Lee's.

The first, *Alley v. Bell*, 392 F.3d 822 (6th Cir. 2004), was vacated by the Sixth Circuit *en banc* on other grounds and remanded for further proceedings. *See Alley v. Bell*, 405 F.3d 371 (6th Cir. 2005) (*en banc*). The decision cited by the Government is therefore no longer even good law. *See United States v. Stitt*, 646 Fed. Appx. 454 (6th Cir. 2016). Although the panel's Rule 60 fraud analysis was not the subject of the *en banc* reversal, five judges concurred to provide guidance to the district court on the fraud issue. They noted that when prosecutors "filed an affidavit in federal court stating that they had disclosed all exculpatory evidence, while willfully

---

[17] Although the pre-2007 cases cited here discuss fraud on the court with reference to Rule 60(b), their analysis applies to fraud-on-the-court claims brought under present-day Rule 60(d)(3). Prior to the restructuring of Rule 60 on December 1, 2007, such claims were brought under 60(b)'s savings clause. *See*, *e.g.*, *Grenier*, 152 F.3d at 789 (noting that appellants raised equitable claim of fraud on the court "in reliance on the savings clause in Rule 60(b).").

(or at least recklessly) concealing the evidence" such conduct was "sufficient to allege fraud." *Id.* (Cole, Jr., J., concurring).

In *Gatolo v. United States*, 394 Fed. Appx. 670, 673 (11th Cir. 2010), the *pro se* movant failed to allege facts which, if true, would be sufficient to establish fraud on the court.[18] By contrast, Mr. Lee (1) proffered documentary support for his claims that the Government failed to disclose *Brady* material prior to trial;[19] (2) cited pleadings filed during the § 2255 proceeding in which the Government falsely represented to this Court that it had no information relevant to two of Mr. Lee's § 2255 claims when, in fact, it did;[20] and (3) cited to rulings made by this Court during the § 2255 proceedings that demonstrate it relied upon the Government's false representations in denying Mr. Lee's § 2255 motion.[21] On its face, his motion has elaborated facts which, if true, would be sufficient to establish fraud on the Court. *See Demjanjuk v. Petrovsky*, 10 F.3d 338, 348-56 (6th Cir. 1993) (Government's failure to disclose to courts and detainee exculpatory information in its possession during denaturalization and extradition proceedings constituted fraud on the court; although attorneys acted in good faith, they recklessly disregarded their obligation to provide information specifically requested by detainee, the withholding of which misled his counsel and endangered his ability to mount defense); *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1130-34 (9th Cir.1995) (in product

---

[18] The *Gatolo* court also noted that the *pro se* movant had alleged a non-cognizable claim: "allegations of *Brady* violations that occurred during the § 2255 proceedings." 394 Fed. Appx. at 673.

[19] *See*, *e.g.*, Exh. A (Declaration of James Wanker); Exh. B (Declaration of Jack T. Lassiter); Exh. C (Excerpts, Oklahoma County District Court No. CF-90-5292).

[20] Doc. No. 1297 at 16-17.

[21] *Id.* at 64.

liability case, witness's failure to disclose knowledge of unfavorable safety tests constituted fraud on the court).

## CONCLUSION

It is notable that the Government has not denied any of the facts contained in Mr. Lee's proffered exhibits. Nor has it contested Mr. Lee's allegations that it concealed material facts and presented false information in previous proceedings. At this stage, however, this Court need not determine whether Mr. Lee can ultimately win on the merits of his claims; indeed, Mr. Lee would be entitled to further fact development and a hearing before the merits could be decided. The only issue presently before this Court is whether it has the jurisdiction to reach the merits: whether Mr. Lee has pleaded sufficient facts to allege a claim which, if true, would support post-conviction relief. As the foregoing demonstrates, Mr. Lee's motion is sufficiently pleaded, ripe for review, and ready for further consideration on the merits.

Respectfully submitted this 8th day of February, 2019.

/s/ Morris H. Moon

MORRIS H. MOON
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lewis Lee

28

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on February 8, 2019. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: /s/*Morris Moon*
MORRIS H. MOON
Bar # 24032750 (TX)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (713) 880-3556
Email: Morris_Moon@fd.org

29