**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**CAPITAL CASE**

UNITED STATES OF AMERICA                                              PLAINTIFF

v.                                          NO. 4:97CR00243-02 JLH

DANIEL LEWIS LEE                                                        DEFENDANT

**OPINION AND ORDER**

Daniel Lewis Lee is a federal death row inmate.  In a 1999 trial over which the Honorable

G. Thomas Eisele presided, Lee and co-defendant, Chevie Kehoe, were convicted of conspiring to

violate and violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-

(d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1).  During the

penalty phase, the jury first decided that Kehoe should be sentenced to life imprisonment and then,

separately, that Lee should be sentenced to death.  The Eighth Circuit affirmed Lee's conviction and

sentence.  *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), cert. denied 545 U.S. 1141 (2005).

Lee has now filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255,

or, in the alternative, for relief under Rule 60 of the Federal Rules of Civil Procedure.  In his § 2255

motion – his third such motion – Lee contends that newly discovered evidence demonstrates due-

process violations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963),

as well as *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and *Napue*

*v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).  The newly discovered evidence

is contained in the declaration of James Wanker (Document #1297-2) and an Oklahoma court record

– the fee application for a lawyer who represented Lee in a preliminary hearing before a district

judge (Document #1297-4).

At trial, Wanker testified that Lee told him that he had committed murder, describing a crime factually similar to the one at issue. In his present declaration, he says that he did not believe Lee, that he told federal law enforcement agents, as well as the federal prosecutor, that he did not believe Lee, that he was instructed to limit his testimony to what he was asked, and that he was instructed not to give personal opinions. This information was not disclosed to defense counsel.

During the sentencing phase, the United States introduced an Oklahoma court record showing that Lee had been convicted of robbery. A man named Joey Wavra was killed in connection with that robbery, and the Government argued that Lee had committed murder. The fee application, beneath the itemized time records, summarizes the proceeding and states in that summary that the court found the evidence insufficient to support a charge of first-degree murder.

The initial issue is whether Lee's motion is second or successive within the meaning of § 2255(h) and therefore is subject to that provision's requirement of authorization by the circuit. 28 U.S.C. § 2255(h); 28 U.S.C. § 2244(b)(3)(A). It is. Because Lee has not obtained authorization from the Eighth Circuit to file a second or successive § 2255 motion and because he is not entitled to relief under Rule 60, his motion is denied.

## I.      PROCEDURAL HISTORY

Lee has unsuccessfully pursued both direct and collateral review of his conviction and sentence. After the jury returned a verdict sentencing Lee to death, Judge Eisele granted Lee's motion for a new penalty-phase trial based, in part, on the admission of improper future-dangerousness evidence. *United States v. Lee*, 89 F. Supp. 2d 1017 (E.D. Ark. 2000). Judge Eisele determined that, based on the scope of direct examination and the Court's instructions, the Government improperly cross-examined the defense expert mental-health witness, Dr. Mark Cunningham, about Lee's prior bad acts and psychopathy diagnosis. Judge Eisele referred to

2

Dr. Cunningham's testimony that Dr. Thomas Ryan, the Government's mental-health expert, used the Hare Psychopathy Checklist-Revised (PCL-R) to determine Lee was a psychopath and therefore presented a propensity for future dangerousness in prison. Judge Eisele also found that the Government's questioning of Dr. Ryan about Lee's violent nature was improper rebuttal. *Id*. at 1027-32. The Circuit reversed and reinstated the death sentence, holding that the testimony did not exceed the permissible scope and that, even if the Government's examination of expert witnesses was improper, Lee was not unfairly prejudiced. *United States v. Lee,* 274 F.3d 485, 494-96 (8th Cir. 2001).

In 2006, Lee filed his first motion to vacate his conviction and sentence under 28 U.S.C. § 2255, raising several grounds for relief: he was denied effective assistance of counsel at various trial stages, including *voir dire*; his death sentence was unconstitutional; his juvenile conviction was erroneously admitted; his trial lawyers were unqualified to represent capital defendants; and there was newly discovered evidence related to a co-defendant, Kirby Kehoe. Document #1118. As part of an actual-innocence argument, Lee made a general, unsupported *Brady* allegation and asked the Government to review its files for any previously undisclosed *Brady* material. In an ineffectiveness sub-claim, Lee challenged his trial lawyers' decision not to seek funding for mtDNA testing of a hair from a cap linked to the murders; Lee proffered a mtDNA report excluding the discovered hair as originating from Lee, Document #1138-2. (The jury heard State Crime Laboratory testing showed the discovered hair was microscopically similar to Lee's. TR 4722.) In another ineffectiveness claim, Lee argued that a properly conducted investigation of his involvement in the 1990 murder of Joseph Wavra – upon which the Government relied to demonstrate Lee's future dangerousness at the penalty phase – would have revealed his actual role, placing his actions in a different light and therefore leading to a different sentence. Judge Eisele denied the post-conviction motion without

3

a hearing. *United States v. Lee*, 2008 WL 4079315 (E.D. Ark. 2008). He held that the jury's finding of guilt would not have been different if the mtDNA evidence had been introduced because the evidence of guilt was overwhelming. *Id.* at \*25. With respect to Lee's role in the Wavra murder, Judge Eisele determined "there is nothing before the Court to indicate that [Lee's] 'true role' in the murders was anything other than portrayed during the sentencing trial." *Id.* at \*45. He held that Lee's arguments did not demonstrate that the federal death penalty was unconstitutional. *Id.* at \*55-60. Judge Eisele also rejected Lee's ineffectiveness arguments that his trial lawyers should have raised additional objections to Dr. Cunningham's and Dr. Ryan's testimony, and to the introduction of the PCL-R. *Id.* at \*46, 47-48. He recognized the Circuit's holding that Lee was not unfairly prejudiced by that evidence. *Id.* at \*48. In a Rule 59(e) motion to alter and amend the § 2255 judgment, Lee revisited his ineffectiveness claim related to the psychopathy-diagnosis testimony, arguing the PCL-R has no scientific validity in predicting future dangerousness of capital defendants. Document #1165. For the first time, Lee attached supporting material, including an affidavit submitted by Dr. Ryan in support of a post-conviction motion in a separate federal capital case, stating he no longer believed the PCL-R is a reliable indicator of future dangerousness in prison. Document #1165-4. Denying the Rule 59(e) motion, Judge Eisele found the argument was successive and lacking in merit. *United States v. Lee*, 2010 WL 5347174, \*5-6 (E.D. Ark. 2010).

Judge Eisele granted a certificate of appealability on whether the death penalty was constitutionally applied. The Eighth Circuit expanded the certificate to include the question of whether Lee received ineffective assistance based on his trial lawyers' use of race-based peremptory challenges during *voir dire*. The Eighth Circuit then affirmed Judge Eisele's denial of the § 2255 petition and the denial of the Rule 59(e) motion. *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013).

Lee thereafter filed a Rule 60(b) motion to set aside the judgment denying his § 2255 motion. He argued that his habeas lawyers were ineffective for failing to challenge the validity of the PCL-R in predicting future dangerousness.  Document #1230.  This Court denied the motion without prejudice, finding the Rule 60(b) motion was a second or successive § 2255 motion for which Lee had not obtained the required authorization from the Eighth Circuit.  *United States v. Lee*, 2014 WL 1093197 (E.D. Ark. 2014).  The Eighth Circuit affirmed.  *United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015).

## II.   EVIDENCE AT TRIAL

Based on the trial record, the Eighth Circuit summarized the events that led to Lee's conviction as follows:

> The evidence presented at trial showed that Lee, Chevie Kehoe (Kehoe), his father Kirby Kehoe, his brother Cheyne Kehoe (Cheyne), and Faron Lovelace participated in a variety of criminal activities to promote and fund a white supremacist organization known as the Aryan Peoples' Republic or the Aryan Peoples' Resistence (APR).  Kehoe formed the APR to establish an independent nation of white members of the Christian Identity faith in the Pacific Northwest.  He patterned it after an antigovernment, white supremacist organization called the Order.

> Lee met Kehoe in 1995, and Kehoe recruited him into the APR.  In January 1996, Lee and Kehoe left Spokane, Washington, and traveled to Arkansas where they dressed in police raid clothing and went to the home of William Mueller, a gun dealer near Tilly, Arkansas, who owned a large collection of weapons and ammunition.  Kehoe and his father had robbed Mueller in February of 1995, and Kehoe expected to find valuable property at his house.  The Muellers were not at home when Lee and Kehoe arrived so they waited.  When the Muellers returned, Lee and Kehoe overpowered and incapacitated Mueller and his wife.  Then they questioned Nancy Mueller's eight-year-old daughter, Sarah Powell, about where they could find cash, guns, and munitions.  After finding $50,000 in cash, guns, and ammunition, they shot the three victims with a stun gun, placed plastic bags over their heads, and sealed the bags with duct tape.  They took the victims in Kehoe's vehicle to the Illinois Bayou where they taped rocks onto them and threw them into the bayou.  The bodies were discovered in Lake Dardanelle near Russellville, Arkansas, in late June of 1996.

Kehoe and Lee returned to Spokane with the stolen property around January 14, 1996. Kehoe traveled to several states to sell the Mueller property at gun shows. He and Lee were apprehended by law enforcement in 1997 after some of Mueller's guns had been traced to Kehoe.

*Lee*, 374 F.3d at 641-42.

Kehoe's mother, Gloria Kehoe, testified that Lee and Kehoe separately confessed the murders to her. She told the jury of the murder details that Kehoe described, and she testified that Lee told her that Kehoe paid him for his participation with $1000 and a rifle. TR 4971-75. Cheyne also testified that Kehoe confessed to him. He said Kehoe gave details of the murders, including Lee's role, and showed him the raid gear that he and Lee had worn. TR 5326-30. Both testified that Kehoe admitted killing the child by himself because Lee refused. TR 4974, 5328.

Lee's and Kehoe's former neighbors, James and Dalvine Wanker, also testified for the Government. On direct examination, James said that in May of 1996 he and his wife moved into an RV park at the Shadows Motel in Spokane, where Lee and Kehoe resided. TR 4078-79. He said that Lee told him in July of 1996 that "when he went down south somebody had . . . f*** with him and so he wrapped them up, taped them, and threw them in the swamp." TR 4081-83. When asked on cross-examination why he did not call the police after hearing Lee's claim, James said he "just kind of blew it off as [Lee] was talking to hear himself talk." TR 4088. Dalvine similarly testified that, in response to her concerns about a new tenant at the Shadows Motel, Lee retrieved a firearm from his trailer and told her that "he wasn't afraid to use it and that when he had gone down south and that some people had f*** with him, and that he had taken care of it." TR 4093.

The Government also presented physical evidence supporting Lee's conviction. Paint samples taken from Kehoe's GMC truck were "consistent, very similar" to metallic blue paint chips found in duct tape removed from the slain bodies. TR 3658-64, 3678-84. The jury heard that an

6

Idaho storage unit rented by Kehoe contained documents naming the Muellers, as well as paperwork naming Kehoe, or his wife.  TR 3479-80, 3610-28.  Fibers microscopically similar to the carpet in the Muellers' living room and a hair microscopically similar to William Mueller's were discovered on the Muellers' gun display case in the unit.  TR 3489-90, 3646-54.  Fingerprints inside and outside display cases matched Kehoe's and Lee's.  TR 3483-84, 3489-90, 3707-10.

During Lee's penalty phase, the Government sought to prove five aggravators supporting a death sentence: he murdered the victims with the expectation of receiving something of pecuniary value; he murdered the victims after substantial planning and premeditation; the crime involved the intentional killing of more than one person in a single criminal episode; the risk of future dangerousness; and the crime involved a particularly vulnerable victim based on her youth. Document #1297-11; TR 7373.

To justify a death sentence for Lee when Kehoe had been sentenced to life imprisonment, the Government's penalty-phase case emphasized the future-dangerousness aggravator.  The Government argued that Lee's past conduct showed that he was violent and volatile, and that he would present a danger in prison.  TR 7378-84, 7956-75.  Focusing on the Wavra murder, the Government introduced evidence showing Lee's role in that crime.  Brian Compton, who was at the party when Wavra was killed by John David Patton, testified about Lee's involvement, TR 7408-18; the transcript of Lee's testimony at John David Patton's Oklahoma preliminary hearing was read aloud, TR 7418-56; and the responding Oklahoma detective and the forensic pathologist described Wavra's wounds and cause of death, TR 7389-98, 7398-407.  The jury heard that, at a social gathering in 1990, Lee, then age seventeen, and his cousin, John David Patton, beat Wavra and forced him down a manhole into a storm sewer; that Patton went down into the manhole with Wavra, while Lee retrieved a plastic bag, rope, and knife that he handed down to Patton; that Patton

handed Wavra's clothes up to Lee, who put them in the plastic bag; and that Patton then used the knife to repeatedly stab Wavra and slit his throat. Patton was convicted of first-degree murder in an Oklahoma state court, while Lee pled to deferred adjudication on a robbery charge. TR 7470. Other future-dangerousness evidence included (1) Lee's threatening behavior toward a sheriff's deputy, while he was in jail awaiting trial, TR 7463-67, and (2) a 1995 Florida conviction for carrying a concealed weapon, TR 7469.

In both opening and closing argument, the Government told the jury that Lee "has an earlier murder under his belt." TR 7964. It argued that, even though Patton "wielded that knife," Lee helped him by giving him the knife and rope. TR 7382. The Government argued Lee knew what he was doing when he gave the knife to Patton, and that he both "legally and morally" had "the blood of Joey Wavra" on his hands. TR 7962-63. The Government contended the robbery plea offer was a "gift" from the Oklahoma prosecutor and an "incredible deal" – and a missed opportunity for Lee to turn his life around. TR 7383, 7963-64. The jury unanimously found the Government had established beyond a reasonable doubt the existence of each aggravating circumstance, except the substantial-planning-and-premeditation aggravator.

Both Judge Eisele and the Eighth Circuit recognized the Wavra evidence as an integral piece of the Government's penalty-phase case. In finding that Lee was not unfairly prejudiced by expert testimony and then reinstating the death penalty, the Eighth Circuit noted that, "none of the evidence elicited from Dr. Cunningham was likely to inflame the jury as much as testimony about Lee's involvement in the murder of Joey Wavra, which had been part of the government's case." *Lee,* 274 F.3d at 494. Similarly, in rejecting Lee's argument that his trial lawyers should have done more to investigate the Wavra murder, Judge Eisele acknowledged evidence of Lee's participation in that

crime was "powerful and likely contributed to or influenced the jury's ultimate decision" in favor of a death sentence. *Lee,* 2008 WL 4079315, at *45.

### III.    LEE'S CURRENT CLAIMS

Lee contends, first, that the Government suppressed material exculpatory evidence that his lawyers could have used to challenge James Wanker's guilt-phase testimony in violation of *Brady v. Maryland*, *Napue v. Illinois*, and *Giglio v. United States*, and, second, that the Government failed to disclose material exculpatory evidence contradicting the prosecutor's penalty-phase argument about his culpability in the Wavra murder in violation of the same three Supreme Court cases.

First, Lee argues the Government failed to disclose the entirety of Wanker's pretrial interviews and statements – specifically that Wanker told the investigating agents and the prosecuting attorney that he did not believe Lee's claims implicating himself in the Mueller murders. Lee asserts that his lawyers could have used this favorable evidence to challenge Wanker's testimony and that the Government knew or should have known that Wanker's testimony was misleading and failed to correct it. Wanker's guilt-phase testimony was that Lee told him that he had committed murders and described them as factually similar to the Mueller murders. In his present declaration, Wanker says that Lee had a habit of falsely claiming responsibility for criminal acts to make himself seem like a "tough guy." He says that he repeatedly told law enforcement and prosecutors that he did not believe Lee's claims were true. Document #1297-2. Lee proffers copies of the officers' reports that do not include Wanker's statements in which he stated that he doubted the truthfulness of Lee's confession. Document #1297-8, #1297-9. Wanker also says that, before he testified, the Government instructed him to "limit [his] testimony to only what was asked and not to give personal opinions." Document #1297-2. Wanker testified on cross-examination that he did not contemporaneously report Lee's claim to law enforcement because he thought Lee was "talking

to hear himself talk." TR 4088; Document #1297-2.  Lee's lead guilt-phase lawyer attests that if he had known about Wanker's interview statements he would have aggressively questioned him further on this point.  Document #1297-3.  Wanker says that if anyone had asked him about his beliefs at trial he would have testified that he continued to hold that opinion, and that he still did not believe that "[Lee's] story was anything more than just empty bragging."  Document #1297-2.

Second, Lee argues the Government suppressed the fact that an Oklahoma state court found at a preliminary hearing that there was insufficient evidence for a first-degree murder charge against him in the Wavra case.  He says this evidence contradicts the Government's penalty-phase argument that prosecutors gave him a "gift" by not charging him with murder.  TR 7383.  Lee contends that, because the Government consulted with Oklahoma law enforcement officials involved in the Wavra case, it must have learned about the judicial finding or the officers' knowledge should be imputed to the Government.  He attaches in support an "Application For Attorney Fees" and "Statement of Time Expended" filed by the lawyer who represented him at the preliminary hearing.  The unsigned Statement includes this paragraph:

> The matter came on for hearing before Judge Hall; District Attorney called witness; hearing held; Court finds crime of Murder I not established by evidence; Court recommends a Dismissal of Murder I charges and State consider refiling on charge of Robbery I.

Document #1297-4.

## IV.    WHETHER LEE'S MOTION IS SECOND OR SUCCESSIVE

A "second or successive" § 2255 motion to vacate, correct, or set aside a sentence must be certified by the Circuit to include:

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

(2) a new rule of constitutional law, made retroactive to cases on collateral review
by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h).  *See* 28 U.S.C. § 2244(b)(2).  Because this motion is not Lee's first-in-time

§ 2255 motion and because Lee has not obtained the certification required by § 2255(h), the

threshold question is whether it is a second or successive application for habeas relief.  If so, this

Court lacks jurisdiction to consider the motion.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) does not define the

term "second or successive."  *Crawford v. Minnesota*, 698 F.3d 1086, 1089 (8th Cir. 2012).  The

United States Supreme Court has recognized the term does not cover all motions "filed second or

successively in time."  *Panetti v. Quarterman*, 551 U.S. 930, 944, 127 S. Ct. 2842, 2853, 168 L. Ed.

2d 662 (2007).  That phrase instead is a "term of art" incorporating the pre-AEDPA abuse-of-the-

writ doctrine.  *Crawford,* 698 F.3d at 1089 (citing *Slack v. McDaniel*, 529 U.S. 473, 486, 120 S. Ct.

1595, 1605, 146 L. Ed. 2d 542 (2000)).  AEDPA codified some of the existing limits on successive

petitions and imposed new restrictions.  *Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 2340,

135 L. Ed. 2d 827 (1996).  *See Baranski v. United States*, 880 F.3d 951, 955 (8th Cir. 2018) ("In

[AEDPA], Congress imposed stricter limitations on the filing of second and successive § 2255

motions than the abuse-of-the-writ principles . . .").

In *Panetti v. Quarterman*, the Supreme Court held that a claim under *Ford v. Wainwright*,

477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986), that the defendant is incompetent to be

executed, is not subject to the gatekeeping provisions for second or successive applications for

habeas relief if the claim is promptly raised when ripe.  *Panetti*, 551 U.S. at 945, 127 S. Ct. at 2583.

Limiting its holding to *Ford* claims, the Supreme Court recognized that, because a petitioner's

mental condition at the time of the scheduled execution is at issue, *Ford* claims are generally not

11

ripe until after the time for filing an initial habeas petition has passed. *Id.* at 943, 127 S. Ct. at 2852. The Court held that its recognition of this exception did not thwart AEDPA's purposes or allow for abuse of the writ: "We are hesitant to construe a statute, implemented to further the principles of comity, finality, and federalism, in a manner that would require unripe (and, often, factually unsupported) claims to be raised as a mere formality, to the benefit of no party." *Id.* at 947, 127 S. Ct. at 2855.

Citing *Panetti*, Lee argues that his current § 2255 motion similarly cannot be considered second or successive because he was unable to raise his *Brady*[1] claims due to the Government's concealing the supporting evidence. He also argues that in the Eighth Circuit *Brady* claims based on material evidence are not "second or successive" within the meaning of § 2255(h), citing *Crawford v. Minnesota*. In *Crawford,* the Circuit held that a nonmaterial *Brady* claim raised in a second-in-time habeas petition was a second or successive application. 698 F.3d at 1090. The Eighth Circuit recognized that other circuits had held that all second-in-time *Brady* claims are subject to § 2255(h)'s preauthorization requirement but did not reach that issue. "While some courts have concluded that all *Brady* claims in second habeas petitions are second or successive regardless of their materiality, that question is not presented here because in this case there was overwhelming evidence of [guilt]." *Id*.

Lee also cites *United States v. Lopez,* 577 F.3d 1053 (9th Cir. 2009), for the same point. In that case, the Ninth Circuit, like the Eighth Circuit in *Crawford*, limited its holding to nonmaterial *Brady* claims. *Lopez,* 577 F.3d at 1066-67. More recently, the Ninth Circuit has held that all *Brady*

---

[1] Because the same analysis applies to *Brady* and *Napue/Giglio* claims, Lee's claims are collectively referred to as "*Brady* claims."

claims are subject to § 2255(b)'s preauthorization requirement. *Brown v. Muniz*, 889 F.3d 661, 668, 673 (9th Cir. 2018).

The new guilt-phase evidence upon which Lee relies as a basis for his present motion is that, when Wanker testified about Lee's claims related to the Mueller murders, he continued to hold the opinion that Lee was only posturing. Lee argues Wanker's testimony gave the false impression that, while he initially dismissed Lee's claims as "just talking," he later changed his assessment and felt compelled to come forward as a witness. The parties spar over the significance of Wanker's testimony in light of other guilt-phase evidence. Lee argues the Kehoes were not credible witnesses; he says the Government's timeline does not allow for Kehoe and Lee to murder the victims in Arkansas and then return to Washington; and he challenges fingerprint evidence, contending there were opportunities, other than during the Mueller murders, for Lee's contact with the gun display cases. These are not new arguments; the jury heard related evidence. Lee also points to the mtDNA testing conducted in 2007 in connection with his initial § 2255 motion showing that the hair linked to the crimes was not his. Document #1297-6.

There is no reasonable probability, however, that Wanker's testimony that he continued to be skeptical of Lee's claims would have resulted in a different verdict. The jury heard Wanker testify that he did not call the police when Lee claimed to have committed murder because he believed that Lee was "talking to hear himself talk." His present declaration that at trial he continued to believe that Lee's story was "empty bragging" does not materially change his testimony. Evidence of Wanker's continued opinion is not enough to overcome the overwhelming evidence of Lee's guilt. Thus, as to the Wanker testimony, Lee has not demonstrated that material evidence was withheld by the Government, so that part of his claim is second or successive under

*Crawford*.[2] 698 F.3d at 1089-90 (citing *Lopez*, 577 F.3d at 1066). Because the alleged due-process violations are not based on material evidence, the gatekeeping provision of § 2255(h) applies to Lee's claim based on the Wanker testimony.

On the other hand, assuming that the Oklahoma state court held at a preliminary hearing that the evidence was insufficient to establish probable cause that Lee was guilty of murdering Joey Wavra,[3] that evidence is material. In light of the government's reliance on the Wavra murder during sentencing, it is reasonably likely that, if it had been disclosed at trial that the Oklahoma court found the evidence insufficient to establish that Lee was guilty of murder, the outcome at sentencing would have been different. Therefore, the Court must address the issue of whether a *Brady* claim based on material evidence is subject to § 2255(b)'s preauthorization requirement.

Every circuit that has addressed this issue has held that a subsequent habeas application asserting a *Brady* violation, whether material or not, is a second or successive motion that requires

---

[2] Lee says *Carter v. Kelley*, No. 5:16CV00367-DPM-PSH (E.D. Ark. 2017), is instructive and urges this Court to order factual development on *Brady* materiality. In that case, the magistrate judge recommended dismissal of the petitioner's habeas petition as second or successive without analysis of the law surrounding second-in-time *Brady* claims. *No. 12*. The district court judge declined the recommendation and returned the case for a finding on *Brady* materiality, stating that "[i]f the [petitioner's] claim is material, then his petition *may* not be 'second or successive' within the meaning of AEDPA." *No. 14* (emphasis supplied) (citing *Crawford,* 698 F.3d at 1089-90 and *Lopez,* 577 F.3d at 1066-67). The district court judge thereafter reviewed the magistrate judge's fact findings and adopted the recommendation that the *Brady* claim was nonmaterial and therefore an unauthorized second or successive habeas application. *No. 28*. As in *Crawford,* the district court did not reach the issue of whether all second-in-time *Brady* claims are second or successive habeas applications.

[3] The only evidence presented on this point is the lawyer's cursory statement in his fee application. The Court is assuming that that statement is accurate and that Lee could prove its accuracy at an evidentiary hearing.

authorization by the Circuit.[4]  *Blackman v. Davis,* 909 F.3d 772, 778-79 (5th Cir. 2018); *In re Wogenstahl*, 902 F.3d 621, 626-28 (6th Cir. 2018);  *Brown*, 889 F.3d at 668-74; *Quezada v. Smith*, 624 F.3d 514, 522 (2d Cir. 2010); *In re Pickard,* 681 F.3d 1201, 1205 (10th Cir. 2012); *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1259-60 (11th Cir. 2009); *Evans v. Smith*, 220 F.3d 306, 322-25 (4th Cir. 2000).  Distinguishing *Panetti*, the circuits have held that, unlike competency-to-be-executed claims, a *Brady* violation occurs at trial or at sentencing and is therefore ripe when the first habeas application is filed; and they have recognized that the statutory scheme governing second or successive petitions accounts for circumstances, such as a *Brady* claim, where new evidence is discovered after the first habeas petition.  *In re Wogenstahl*, 902 F.3d at 627-28; *Brown*, 889 F.3d at 668, 672-74; *Tompkins*, 557 F.3d at 1259-60.  *See Evans*, 220 F.3d at 323 ("[T]he standards that Congress has established for the filing of second or successive petitions account for precisely the type of situation Evans alleges.").  As the Ninth Circuit recently recognized, "whether a claim is ripe under AEDPA turns on whether the factual predicate existed, not whether the petitioner *knew* it existed at the time of his initial habeas petition."  *Brown*, 889 F.3d at 674 (emphasis in original) (citing *United States v. Buenrostro*, 638 F.3d 720, 725 (9th Cir. 2011)).

Lee cites *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009), and *Scott v. United States*, 890 F.3d 1239 (11th Cir. 2018), but those cases are not on point.  In *Douglas*, the Tenth Circuit, under the "unique circumstances" presented, treated the *Brady* claim raised in a second habeas petition as a supplement to the related prosecutorial-misconduct claim in the pending habeas application.  560 F.3d at 1187-90.  Unlike the *Douglas* petitioner, Lee does not have an open or

---

[4] While 28 U.S.C. § 2255(h) governs second or successive habeas motions filed pursuant to a federal court judgment, it incorporates by reference § 2244 governing habeas petitions challenging state-court judgments.  In *Crawford*, a § 2254 case, the Eighth Circuit interpreted § 2254 as though it were identical to § 2255 when it relied on *Lopez*, which was a § 2255 case.

pending habeas application. Since *Douglas,* the Tenth Circuit has recognized a second-in-time *Brady* claim as second or successive under § 2255(h). *In re Pickard*, 681 F.3d at 1205; *see also Brown*, 889 F.3d at 673 n.10 (distinguishing *Douglas*). In *Scott,* an Eleventh Circuit panel applied *Tompkins* to hold the petitioner's second-in-time § 2255 motion was barred as second or successive, but "urged the Court to take this case *en banc* so we can reconsider *Tompkins*' reasoning." 890 F.3d at 1249-589. The Circuit, however, summarily denied the petition for rehearing *en banc*, with no Eleventh Circuit judge requesting the court be polled. *Scott v. United States*, Nos. 15-1137, 16-11950 (11th Cir. Aug. 16, 2018). *See also Jimenez v. Fla. Dep't of Corr.*, No. 18-15128, 2018 WL 6584113, *3 (11th Cir., Dec. 13, 2018) (following *Tompkins*).

Based on the unanimous authority from the circuits that have decided the issue, as well as the plain language of the statute, the *Brady* claims asserted in Lee's current § 2255 motion constitute a second or successive habeas application that requires authorization from the Eighth Circuit. A *Brady* violation occurs when the evidence is favorable to the accused, that evidence was suppressed by the State, and prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999). A *Napue/Giglio* violation requires a new trial when the Government solicits or fails to correct false testimony, or makes a misleading argument, that is material. *United States v. Bigeleisen*, 625 F.2d 203, 208-09 (8th Cir. 1980). Because all these components occurred prior to or during Lee's trial, the alleged constitutional violations were ripe when his first habeas motion was filed.

That the circuits are unanimous is not surprising because the habeas statutory scheme expressly provides for cases in which newly discovered evidence is raised in a second or successive application. 28 U.S.C. § 2255(h); 28 U.S.C. § 2244(b)(2). The statute does not except *Brady* claims. Section 2255(h) therefore applies to Lee's claims; he is entitled to file a second or

successive habeas motion only if he receives certification from the Eighth Circuit. Because Lee has not obtained the required authorization, this Court does not have jurisdiction to consider his application for relief.

## V.        WHETHER LEE IS ENTITLED TO RELIEF UNDER RULE 60

Lee alternatively asks this Court to consider his application as a motion for relief pursuant to Rule 60 of the Federal Rules of Civil Procedure and reopen his first § 2255 proceeding in light of new evidence. Lee's § 2255 motion contends that the Government violated its duties under *Brady*, *Giglio*, and *Napue* at trial; his Rule 60 motion contends that the Government violated its duties during the § 2255 proceedings. *Cf. Pickard*, 681 F.3d at 1205-06.

In evaluating a Rule 60(b) motion, the initial inquiry is whether the allegations amount to a second or successive habeas application under § 2255 or § 2244. *Boyd v. United States*, 304 F.3d 813, 814 (8th Cir. 2002). A Rule 60(b) motion is treated as a second or successive habeas application if it contains a claim, defined as an "'asserted federal basis for relief from a state court's judgment of conviction' or as an attack on the 'federal court's previous resolution of the claim *on the merits*.'" *Ward v. Norris*, 577 F.3d 925, 933 (8th Cir. 2009) (emphasis in original) (quoting *Gonzales v. Crosby,* 545 U.S. 524, 530, 532, 125 S. Ct. 2641, 2647-48, 162 L. Ed. 2d 480 (2005)). The motion is considered under Rule 60(b) when it challenges "'some defect in the integrity of the federal *habeas* proceeding.'" *Id*. Courts have applied this same analysis to Rule 60(d) motions. *See United States v. Robinson*, No. 4:10CR00032-01, 2013 WL 6195749, *1 (E.D. Ark., Nov. 26, 2013).

Lee contends the Government committed "fraud . . . , misrepresentation, or misconduct" in violation of Rule 60(b)(3), or committed "fraud on the court" in violation of Rule 60(d)(3). He says that the Government made misrepresentations in its habeas responsive brief: (1) a footnote, stating

"[a] huge amount of 'discovery' materials were provided," Document #1126 at 45 n.16[5]; and (2) in response to Lee's ineffectiveness claim related to the Wavra murder, statements that the Government was "at a loss to understand that which Lee now argues his trial counsel should have done," and that it was "difficult to imagine" how more investigation would have placed Lee's role in the Wavra murder in a different light. Docket #1126 at 75-76. Lee argues that the Government's misrepresentations impeded the district court from evaluating his habeas claims and therefore created a defect in the integrity of his initial § 2255 proceeding. He argues that his general *Brady* allegation and ineffectiveness claim related to the Wavra murder would have been viable if the Government had disclosed supporting material: Wanker's opinion statements and the finding of the district judge at the preliminary hearing in the Wavra case. The district court denied relief on the ineffectiveness claim and did not address the unsupported *Brady* allegation; a certificate of appealability was not granted on either point. *Lee*, 2008 WL 4079315, at *45; *Lee*, 715 F.3d at 217.

Assuming that Lee has properly asserted a Rule 60 motion as opposed to a second or successive habeas petition, he is not entitled to relief under either Rule 60(b)(3) or (d)(3). A Rule 60(b)(3) motion must be filed no more than a year from the order or judgment that it seeks to set aside. Fed. R. Civ. P. (60)(c)(1). The Court has no authority to extend that deadline. Fed. R. Civ. P. 6(b)(2). As Lee argues, this time limit is not jurisdictional. *Dill v. Gen. Am. Life Ins. Co.*, 525 F.3d 612, 618-19 (8th Cir. 2008). But that means only that the benefit of the time limit may be forfeited if it is not timely raised. *Id*. If the time limit is properly raised, the rules assure that the time limit will be enforced. *Id*. The Government has properly asserted the one-year time limit. This

---

[5] Lee refers to Footnote 16 as being part of the Government's response to his general, unsupported *Brady* allegation. Document #1118 at 7. Footnote 16, however, was in the response to Lee's ineffectiveness claim challenging his trial lawyers' failure to oppose the Government's motion seeking restrictions on his personal discovery access. Document #1126 at 45, n.16.

Court entered the order denying Lee's first § 2255 petition in 2008. *Lee*, 2008 WL 4079315. Lee's request for relief under Rule 60(b)(3) therefore is untimely.

Lee, moreover, has not demonstrated the "exceptional circumstances" required for relief. *Atkinson v. Prudential Property Co., Inc.*, 43 F.3d 367, 371 (8th Cir. 1994) (quotations omitted). For Rule 60(b)(3) relief, Lee must show by clear and convincing evidence that the Government "engaged in fraud or other misconduct and that this conduct prevented [him] from fully and fairly presenting his case." *Cook v. City of Bella Villa*, 582 F.3d 840, 855 (8th Cir. 2009) (quotations omitted). Lee has not met this burden. While failure to produce evidence requested in discovery may under some circumstances be grounds for vacating a judgment, the moving party must show that the failure was due to misconduct by the party that should have produced the evidence. *Atkinson*, 43 F.3d at 373. Lee has not alleged facts to show that the omission of any evidence during his § 2255 proceeding was due to the Government's misconduct or that the Government intentionally misrepresented any facts. Nor has he demonstrated that any failure to disclose Wanker's opinions or the Oklahoma judicial finding prevented him from fully and fairly litigating his initial § 2255 claim. "This is not a case in which [the Government] withheld information that they alone possessed." *Id.* Lee could have interviewed Wanker before filing his first habeas petition; and the Oklahoma court record upon which he now relies is public information.

Likewise, Lee's allegations do not meet the standard for fraud on the court under Rule 60(d)(3). Fraud on the court is narrowly defined as "fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873, 878 (8th Cir. 2010) (quoting *United States v. Smiley*, 553 F.3d 1137, 1144-45 (8th Cir. 2009) (quotations omitted)). "A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself,

such as bribery of a judge or jury or fabrication of evidence by counsel." *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998) (quotations omitted). "[I]t is necessary to show a deliberately planned scheme designed to improperly influence the court in its decision." *Heim v. Comm'r of Internal Revenue*, 872 F.2d 245, 249 (8th Cir. 1989). Lee's allegations do not clear this high bar. *See Tyler v. Purkett*, 413 F.3d 696, 700-01 n.7 (8th Cir. 2005) ("Claims that a party did not disclose to a court certain facts allegedly pertinent to the matter before it, however, do not normally constitute fraud on the court.").

### CONCLUSION

Daniel Lewis Lee's *Brady* claims in his present motion constitute a second or successive habeas petition under 28 U.S.C. § 2255 for which Eighth Circuit authorization is required. Lee is not entitled to relief under Federal Rule of Civil Procedure 60. Therefore, the motion is denied without prejudice. No certificate of appealability will be issued.

IT IS SO ORDERED this 26th day of February, 2019.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE