# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**DANIEL LEWIS LEE,**
  **Movant**

**vs.**

**UNITED STATES OF AMERICA,**
  **Respondent.**

**Criminal Case No. 4:97-cr-00243-KGB-2**

**CAPITAL CASE**

_____

## MOTION FOR RELIEF FROM JUDGMENT OR ORDER
## PURSUANT TO FED. R. CIV. P. 60

_____

MORRIS H. MOON
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lee

*Oral Argument Requested*

**TABLE OF CONTENTS**

Introduction………………………………………………………………………...............2

I.   A Case Shaped to Fit Two Witnesses: Relevant Factual Background and
     Procedural History………………………………………………………………...7

     A. The Trial Proceeding……………………………………………………………7
        1. The questionable case against Mr. Lee……………………………………………9
        2. Mr. Lee's defense theory at trial………………………………………………11

     B. Relevant Post-Trial Proceedings…………………………………………………..………12

II.  The Case Begins to Unravel: A Cumulative Review of the Case…………….…………15

     A. Gloria and Cheyne Kehoe were Inherently Unreliable Witnesses………………….....16
        1. The Kehoes' credibility problems………………………………………………… 16
        2. The trial evidence corroborating the Kehoes, and its subsequent unraveling…………21
        3. Absent corroborating evidence, the jury could not have convicted Mr. Lee………….25

     B. The Conviction of Mr. Lee was Dependent on the Validity of a Deeply Problematic
        Timeline…………………………………………………………………………..........27
        1. The Kehoes' timeline depends on a series of dubious assumptions………..………..29
        2. The evidence indicates that Mr. Lee was observed back in Spokane as early as
           January 12, 1996, which would render the Government's timeline—and the
           Kehoes' testimony—impossible to accept……………………………………....…32
        3. The jury would have evaluated the defense witnesses differently if it had known
           that the Kehoes' testimony was uncorroborated and that there was credible
           evidence implicating an alternate suspect……………………………………………33

III. The Government's Fraud, Misrepresentation, or Misconduct Precluded Mr. Lee from
     Fully and Fairly Presenting Viable Claims of Prosecutorial Misconduct in his Original
     § 2255 Proceedings…………………………………………………………………35

     A. First Ground for Relief: Mr. Lee's conviction was obtained in violation of *Brady v.
        Maryland* because the Government suppressed material impeachment information
        about Gloria Kehoe's mental instability……………………………….........................35
        1. The centrality of Gloria Kehoe's testimony to Mr. Lee's conviction………………..36
        2. The evidence was favorable to Mr. Lee………………………………………...38
        3. The evidence was suppressed………………………………………..……………39
        4. The suppressed evidence was material……………………………………………40

     B. Second Ground for Relief: Mr. Lee's conviction was obtained in violation of *Brady v.
        Maryland* because the Government suppressed material exculpatory and impeachment
        evidence concerning Paul Humphrey's involvement in the Mueller murders…………..43
        1. Paul Humphrey was the Government's initial suspect in the Mueller case…………43

2. The undisclosed evidence about suspect Paul Humphrey……………………………47
3. The evidence was favorable to Mr. Lee…………………………………………..49
4. The evidence was suppressed……………………………………………………51
5. The suppressed evidence was material……………………………………………..52

C. Third Ground for Relief: Mr. Lee's conviction was obtained in violation of *Napue v. Illinois* and *Giglio v. United States* because the Government presented false and misleading testimony about Mr. Humphrey's involvement in the Mueller murders. …...56
1. Paul Humphrey's testimony was false and misleading………………………………57
2. The Government knew or should have known Mr. Humphrey's testimony was false and misleading………...……………………………………………………..58
3. Mr. Humphrey's testimony was material…………………………………………….59

D. The materiality of the *Giglio/Napue* violation must also be considered *in toto* as well as collectively with the *Brady* violations.…………………………………………..60

IV.  The Original § 2255 Proceeding Should be Reopened Pursuant to Fed. R. Civ. P 60 Due to the Government's Fraud, Misrepresentation, or Misconduct……………………61

A. Rule 60(b)(3)…………………………………………………………………..…62

B. Rule 60(b)(6)…………………………………………………………………..67

C. Rule 60(d)(1)…………………………………………………………………..70

D. Rule 60(d)(3)…………………………………………………………………..73

Conclusion………………………………………………………………………….75

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**DANIEL LEWIS LEE,**
       **Movant**
                                   **Criminal Case No. 4:97-cr-00243-KGB-2**

                                               **CAPITAL CASE**

**vs.**

**UNITED STATES OF AMERICA,**
       **Respondent.**

**MOTION FOR RELIEF FROM JUDGMENT OR ORDER**
**PURSUANT TO FED. R. CIV. P. 60**

COMES NOW Daniel Lee ("Mr. Lee"), by his undersigned counsel, and hereby moves the Court, pursuant to Fed. R. Civ. P. 60, for relief from its Judgment issued August 28, 2008, denying Mr. Lee's motion for post-conviction relief pursuant to 28 U.S.C. § 2255. Mr. Lee alleges that the Government made material misrepresentations during the original § 2255 proceeding that prevented him from fully and fairly presenting claims that his convictions were obtained in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny because the Government suppressed favorable and material impeachment evidence in its case against Mr. Lee for the murders of William Mueller, Nancy Mueller, and Sarah Powell. Mr. Lee also alleges that these same misrepresentations prevented him from fully and fairly presenting claims that his convictions were obtained in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972), because the Government introduced misleading, inaccurate, and prejudicial evidence at his trial. Mr. Lee further alleges that the Government's conduct during the § 2255 proceedings impeded this Court's impartial task of adjudging his § 2255 motion, thereby constituting a fraud on the court.

**INTRODUCTION**

Over twenty years. That's how long it's been since the jurors who assembled at the federal courthouse in Little Rock chose to sentence Daniel Lee to death for the murders of William Mueller, Nancy Mueller, and Sarah Powell. That's how long it's been since they selected a harsher sentence for him than for the far more culpable co-defendant Chevie Kehoe, whose criminality, twisted charisma, and alleged objective of creating a revolutionary white supremacist organization were the overwhelming focus of the prosecution's evidence at trial. It has certainly been a long time since defense counsel sought to undermine the credibility of the Government's star witness (and Mr. Kehoe's mother), Gloria Kehoe, calling on jurors to find her testimony "unworthy of belief," Tr. 6937[1]; and since the Government denigrated the defense's case, taking counsel to task for spending "a bunch of time during the trial trying to convince everybody that Paul Humphrey," the initial suspect in the investigation of the Mueller murders, "did it." Tr. 6959. Over those many years, perceptions have no doubt taken root about the strength of the case the jurors considered and about the adequacy of the review process Mr. Lee received. Yet, the truth is unsettling: the Government has, for decades, effectively been reaping the benefits of its misconduct at Mr. Lee's and the justice system's expense.

Documents recently obtained through an Arkansas Freedom of Information Act request show that the Government buried an explosive piece of evidence: Mr. Humphrey flunked a polygraph exam administered by the Arkansas State Police that showed he was involved in the

---

[1] Throughout this motion, "Mr. Kehoe" refers to Chevie Kehoe. To avoid confusion, the pleading refers to other members of the Kehoe family (primarily, Kirby, Gloria and Cheyne Kehoe) by either their full names or their first names only.

Citations to the consecutively-paginated trial transcript are designated as "Tr." Citations to documents filed in the district court criminal docket in this case are designated as "Dkt." Citations to the attached exhibits are designated as "Exh."

murders.[2] Not only did the Government—which took over the investigation of the case from local authorities—hide this report from the defense, it then also allowed Mr. Humphrey to take the stand and deny any involvement in the crimes. It even told the jury that the Government's thorough investigation had turned up no evidence connecting him to the murders. The prosecution's case was, as explained in detail below, problematic as to Mr. Lee to begin with, and in light of its weaknesses, the suppressed information about Paul Humphrey's failed polygraph is enough by itself to undermine confidence in the verdict.

But that wasn't all. The Government also successfully concealed evidence that prime witness Gloria Kehoe was mentally unstable, and suffered from paranoia and hallucinations, both visual and auditory. Mrs. Kehoe's husband, Kirby Kehoe, and son, Cheyne Kehoe, both implicated in the offense and interviewed by case agents, advised them repeatedly about her affliction.[3] Information about her long-standing symptoms, including her impaired ability to perceive, remember, and narrate perceptions accurately, would have destroyed her credibility in the eyes of jurors. The prosecution's case against Mr. Lee rested squarely on that credibility: Gloria without question provided the prosecution's most damning evidence, as she alone claimed he confessed his involvement to her.

This suppressed evidence matters. Daniel Lee was implicated in the Mueller murders only after Gloria and Cheyne began cooperating with federal authorities, and the case that went to jurors was built on the inherently suspect testimony of these two witnesses. Both were facing the prospect of significant prison time. Gloria was paid thousands of dollars in exchange for her

---

[2] *See* Exh. A (1/21/97 Humphrey Interview and Polygraph Examination Report).

[3] *See* Exh. B (11/1/19 Declaration of Cheyne Kehoe); *see also* Exh. C (11/3/19 Declaration of Kirby Kehoe).

3

cooperation. Their several statements to law enforcement were riddled with inconsistencies. And their testimony blatantly conflicted with physical evidence at trial. Jurors were skeptical of their testimony, as indicated by their refusal to convict the defendants on any charges that were based solely on Gloria and Chevie's representations. It was independent, unbiased evidence corroborating their accounts that persuaded the jury that Mr. Lee was guilty of the Mueller murders; but, in the years since the trial, that necessary corroboration has, bit by bit, been whittled away from the case, unsettling what may have once seemed to be a "verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 534 (1995). The impact of this newly discovered evidence is, thus, huge.

Ordinarily, Mr. Lee would have presented these prosecutorial misconduct claims in his original § 2255 proceedings. In fact, he made a formal request at that time that the Government, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), disclose any material exculpatory evidence in its possession; and he reserved the right to amend his § 2255 motion, which alleged generally that the Government had withheld exculpatory and impeachment information, with more specific *Brady* claims based on any information that the Government produced. In light of that demand the Government should have disclosed the information about Gloria's troubling symptoms of mental illness and Mr. Humphrey's polygraph failure. Had it done so, Mr. Lee would have amended his § 2255 motion accordingly, and this Court would have been able to adjudicate the relevant *Brady* claims, and a new trial could have and would have been ordered.

But that's not what the Government did.

Instead, it misled counsel and the Court in the § 2255 proceedings into believing that it had already fully complied with its *Brady* obligations at the time of trial, and it made no additional disclosures. Consequently, its response rendered Mr. Lee's general *Brady* claim moot,

4

and this Court did not even address the claim in its order of August 28, 2008, denying § 2255 relief.

That is the premise of this motion for relief under Fed. R. Civ. P. 60: The Government's misrepresentations in the § 2255 proceedings unfairly precluded Mr. Lee from marshaling evidence and facts in support of cognizable claims pled during the post-conviction process. To be crystal clear, this Court need not determine the merits of the underlying claims at this juncture; rather, its task is to consider whether the Government made misrepresentations that resulted in a defect in the integrity of Mr. Lee's § 2255 proceedings, and if so, whether that defect warrants reopening the § 2255 judgment to allow his prosecutorial misconduct claims to be properly considered.  A number of courts have rightly held[4] that under such circumstances the prior judgment denying § 2255 relief should be reopened so that the federal prisoner can have a "fair shot" at having his or her § 2255 claims considered.[5] To do otherwise would allow the Government to profit off its own misconduct.[6] *See infra* at Section IV (discussing avenues to reopen the judgment pursuant to Rule 60(b)(3), (b)(6), (d)1), and (d)(3)).

And the Government has profited to date.  In the many years since Mr. Lee was tried, convicted, and sentenced to death, the Government has gone to great lengths to insulate its

---

[4] *See*, *e.g.*, *In re Pickard*, 681 F.3d 1201 (10th Cir. 2012); *United States v. Williams*, 753 Fed. Appx. 176 (4th Cir. 2019); *Scott v. United States*, 81 F. Supp. 3d 1326 (M.D. Fla. 2015), *aff'd*, 890 F.3d 1239 (11th Cir. 2018).

[5] *In re Pickard*, 681 F.3d at 1206.

[6] *Id.* at 1207 ("If Defendants' claim of prosecutorial deceit during the § 2255 proceedings must be treated as a second-or-successive § 2255 motion, then the government's alleged misconduct during that proceeding could compound a substantial injustice to Defendants. . . . We doubt that the governing procedural rules permit the government to gain such an advantage by its own fraudulent conduct.")

transgressions in this case from judicial scrutiny. As discussed below, Mr. Lee has uncovered other instances of prosecutorial misconduct and other favorable evidence at different points, which he has brought to the Court's attention, piece by piece, on the Government's terms and to its enormous advantage. The compelling new evidence relating to Mr. Humphrey's failed polygraph and Gloria Kehoe's mental instability is, in that sense, part of a disturbing pattern that cuts through the notion that the length of time that has passed since trial can somehow serve as an adequate substitute for a fair process. The Government trampled Daniel Lee's basic trial rights repeatedly in order to secure his conviction and death sentence in 1999. Then, in his post-conviction proceedings, it represented to this Court that the favorable evidence he sought did not exist or was turned over previously. After running out the clock in those proceedings, it has, ever since, effectively used procedural and jurisdictional roadblocks to keep that evidence concealed, thereby preventing the courts from reviewing his claims of prosecutorial misconduct. Perhaps tellingly, the Government has not once denied the allegations; rather, it has repeatedly returned to the same playbook, claiming Mr. Lee took too long to uncover the buried evidence.

The Government's attempt to short-circuit post-conviction review of Mr. Lee's claims by hiding evidence of its misconduct throughout the trial and § 2255 process cannot stand. This motion sets forth the facts, circumstances, and various sound legal bases for the requested relief, focusing on the claims he could have raised in his § 2255 proceedings but for the Government's misrepresentations. A detailed cumulative review of the totality of evidence demonstrating the infirmity of the jury's verdict in light of his newly discovered evidence is also provided—although, as noted, because determination of the merits is premature at this point, the analysis is meant to convey to the Court the grave implications of the Government's misrepresentations. Mr. Lee respectfully requests only that the prior judgment be reopened so that he can remedy this

defect in the integrity of the proceedings and fully and fairly present his claims for this Court's review.

**I.    A Case Shaped to Fit Two Witnesses: Relevant Factual Background and Procedural History**

The Government built its case against Danny Lee on the statements provided by its cooperating witnesses, Gloria and Cheyne Kehoe.  Once Cheyne provided his account of the crime, and Gloria claimed Mr. Lee confessed to her (a rather important detail missing from her original story), the rest of the trial evidence was made to conform.

**A.    The Trial Proceeding**

The substance of the 1999 proceeding, in which Daniel Lee and co-defendant Chevie Kehoe were jointly tried and convicted by an Eastern District of Arkansas jury of participating in a pattern of racketeering activity, centered on Mr. Kehoe. The Government alleged that Chevie Kehoe, his father Kirby Kehoe, his brother Cheyne Kehoe, Faron Lovelace, and Daniel Lee participated in a variety of criminal activities to promote and fund a white supremacist organization. *See United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004). According to the Government, Mr. Kehoe was the leader of the racketeering enterprise, recruited Mr. Lee to join the group some time in 1995, and directed him to participate in various crimes in furtherance of the enterprise. Although the jury acquitted both codefendants of numerous alleged racketeering acts—including a bombing of the Spokane City Hall in 1996, the 1995 murder of Jeremy Scott in Idaho, and the 1996 murder of John Cox in Idaho—it convicted them of the 1996 robbery and murders of William Mueller, Nancy Mueller, and Sarah Powell in Tilly, Arkansas ("the Mueller murders"). In separate penalty phase hearings, despite their disparate alleged roles, the jury

sentenced Mr. Kehoe to life without possibility of release and sentenced Mr. Lee to death for each of the three murders.[7]

The Kehoes first met William Mueller on the gun show circuit where they bonded over their shared extremist beliefs. Mr. Mueller was a federally licensed gun dealer who frequently traveled the circuit, selling firearms, ammunition, and various books and materials about "survivalist" practices. He was known to espouse antigovernment views similar to the Kehoes' and he often talked about going "sovereign" and getting "off paper"—that is, renouncing his United States citizenship, exchanging his currency for gold and silver coins, and amassing a stockpile of food, weapons, and supplies to allow him and his family to live "off the grid" and unconnected to the rest of society. Tr. 1977-81, 2027-29, 2228-31, 2235-37, 2497, 5910.[8] He also kept a large collection of weapons, ammunition, and valuable coins at his home in Tilly, Arkansas. Chevie Kehoe and his father Kirby had previously burglarized the Mueller residence in February 1995; they broke in and stole weapons and cash. According to the Government, Mr. Kehoe believed there was additional valuable property at the Mueller home and convinced Mr. Lee to join him in a plan to steal these goods.

---

[7] The local prosecutors were compelled by Main Justice to proceed with a penalty phase for Mr. Lee despite their attempt to drop death after Chevie Kehoe, whom all agreed was the patently more culpable of the two men, was sentenced to life imprisonment. Dkt. 824 (Tr. May 10, 1999); Dkt. 827 (Tr. June 29, 1999). Main Justice's overruling of the United States Attorney's decision itself became a point of litigation in the case. As Mr. Lee has pointed out elsewhere, the Government then relied on junk science and false claims to secure a death sentence for the less culpable actor. See *Lee v. Warden*, No. 2:19-cv-00468-JPH-DLP, Dkt. 1 (S.D. Ind. Sept. 26, 2019).

[8] Mr. Mueller had, similar to Kirby Kehoe, adopted Christian Identity teachings and "believed that the white race was superior and all others were there for the purpose of serving the white race." Tr. 2232-33.

### 1.    The questionable case against Mr. Lee

The bodies of the Muellers were recovered from Lake Dardanelle in Russellville, Arkansas in June 1996. The Government alleged that Mr. Kehoe and Mr. Lee carried out their murders on January 11, 1996,[9] a point in time it had difficulty establishing. According to the prosecution's theory, the Muellers were not home when Mr. Kehoe and Mr. Lee arrived. Rather than burglarize the house and leave, as Chevie and Kirby Kehoe had done in 1995, the Government contended that Mr. Kehoe and Mr. Lee dressed in FBI raid gear, broke into the home, and laid in wait for the Muellers to return. The prosecution's theory was that when the family arrived, Mr. Kehoe and Mr. Lee pretended that they were FBI agents conducting a raid. After finding $50,000 in cash, guns, and ammunition, they were alleged to have incapacitated the Muellers with a stun gun, placed sealed plastic bags over their heads, killed the family,[10] driven nearly 50 miles to abandon the Muellers' Jeep and trailer then another 20 miles to dump the victims' bodies over a bridge into Lake Dardanelle, before taking off with the stolen property and driving another 2,000 miles nonstop to Spokane, Washington.

---

[9] According to the prosecution, the last time the Muellers were ever seen or heard from was on January 11. Mr. Mueller did some electrical work at the home of a friend that morning and then went to an electronics store that same day. Tr. 1794-95; 1802-04; 1810. Another witness testified to receiving a phone call from Mrs. Mueller the morning of the 11th, Tr. 2139, and phone records showed that the last outgoing call made from the Mueller home was on January 11. Tr. 1837. As discussed below, however, the Government's timeline was problematic, both because witnesses saw the Muellers alive after January 11, and Mr. Lee was back in Spokane by January 13. *See* Section II.B, *infra.*

[10] The Government's case, based again on these two witnesses, has always been that Chevie Kehoe alone was responsible for killing the child, 8-year-old Sarah Powell. Although part of their own case, this is a fact the Government tends to ignore in current proceedings, especially as it maintains it chose Daniel Lee for execution over others because he killed a child. *Federal Government to Resume Capital Punishment after Nearly Two Decade Lapse*, Office of Public Affairs, Dept. of Justice (July 25, 2019).

This narrative of what happened came solely from Cheyne and Gloria Kehoe, who claimed that they learned about the Mueller murders from Chevie Kehoe. Gloria, however, also claimed that *Mr. Lee* confessed his involvement to her. *Lee*, 374 F.3d at 642. Of significance for purposes of this motion, during cross-examination by Mr. Kehoe's counsel, Gloria unexpectedly got off the witness stand and left the courtroom, causing the trial to come to a halt. *See* 4/7/99 Bench Conference Tr. 7, 10 (Judge Eisele noting that Gloria Kehoe "left the witness stand" and "I think, as I understand it, the witness has broken down and is not going to be able to finish this afternoon. I think we'll bring [the jury] back in and recess right now.") After her testimony, Mr. Kehoe's counsel filed a motion to compel Gloria to undergo a psychiatric examination, Dkt. 732, but it was denied. Dkt. 748.[11]

To shore up the Kehoes' account of the crime, the Government relied on two sources of corroborative evidence. The first was the testimony of James Wanker, a resident of the Shadows Motel in Spokane where Mr. Lee and the Kehoes occasionally stayed. According to Mr. Wanker, sometime between July and September of 1996, Danny Lee told him that he committed a crime that involved facts similar to those of the Mueller murders. Tr. 4082-83.[12] The Government

---

[11] Additionally, during Gloria's testimony, Mr. Kehoe's counsel requested a bench conference to determine whether there was any outstanding discovery material that the Government had not provided. Tr. 5063-66. Counsel noted that Gloria testified she had been interviewed on a dozen or more occasions by investigating agents or prosecutors, but the Government turned over substantially fewer materials. *Id.* at 5063-65. Lead counsel for the Government stated that although he had personally conducted some interviews with Gloria and had not disclosed his notes because they constituted attorney work product, all other materials had been disclosed. *Id.* at 5063-64. *See also id.* at 5064 ("I can't believe we've not given up everything.").

[12] The Government also introduced testimony from Dalvine Wanker, James Wanker's then-wife, that sometime in August of 1996, she told Danny Lee that she was concerned about a new tenant at the Shadows Motel, and that in response Mr. Lee "went into [his] trailer and came out and he had a firearm and said that he wasn't afraid to use it and that when he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093. As

10

emphasized in its argument to the jury that Mr. Wanker was an unbiased witness who received

nothing in exchange for his testimony, and that his only incentive for coming forward was to tell

the truth:

> Nobody has paid Mr. Wanker anything. There is no reason for him to come in
> here and tell you that story unless it's the truth. And it's the truth because Danny
> Lee told him that. And there he told what happened. It's not detailed and it's not
> involved, but it's real and that's what they did.

Tr. 7002.

The second source was a piece of physical evidence. During a search of one of Mr.

Kehoe's vehicles, the Government seized the FBI raid gear that it alleged the two wore during

the Mueller murders. A hair was recovered from one of the caps, and according to an expert from

the Arkansas State Crime Laboratory, this hair was microscopically similar to Mr. Lee's hair. Tr.

4722. In its closing argument, the Government forcefully argued that "the evidence establishes

that *that was Danny Lee's hair*." Tr. 7000-01 (emphasis added).[13]

### 2.    Mr. Lee's defense theory at trial

The defense theory was that Cheyne's and Gloria's account of the murders was false and

motivated by a desire to curry favor with the Government and avoid lengthy prison sentences.

---

even the Government conceded at trial, this "isn't a detailed statement," Tr. 7003, and provides
no connection to the Muellers or even to Arkansas. The Government needed James Wanker's
testimony.

[13] As is discussed below, we now know based on DNA evidence that that was not, in fact.
Mr. Lee's hair. *See* Exh. L. The prosecution also attempted to link Mr. Lee to the crime via a
fingerprint lifted from a display case belonging to the Muellers that was recovered in a storage
unit at the Shadows Motel. Tr. 7001. But as was pointed out at trial, Mr. Lee frequently *slept* in
that storage unit and had multiple opportunities to come into contact with the display case. Tr.
2856-57; 2915; 4815; 5312; 6878; 6946-47. Even the Government's own fingerprint expert
testified there was no way to determine the age of a print or when it might have been deposited
on the display case. Tr. 3716. This evidence therefore had no probative value as to whether
Danny Lee was at the crime scene.

Tr. 6937, 6941-42. Trial counsel argued that the Government's timeline was implausible, Tr. 6948-55, and that other individuals had a motive and opportunity to kill the Muellers, including Paul Humphrey. Tr. 6948. Mr. Kehoe's counsel, in fact, called Mr. Humphrey as a witness. After defense counsel for both defendants questioned him about evidence that implicated him in the crime -- such as his possession of forged titles to the Muellers' vehicles and his familiarity as a skin diver with Lake Dardanelle, where the victims' bodies were recovered -- the Government stepped in and elicited testimony from him that he was not "in any way involved in the death of Bill Mueller, Nancy Mueller or Sarah Powell[.]" Tr. 6204. In closing arguments, the Government took pains to assure the jury that both local and federal authorities thoroughly investigated Mr. Humphrey and turned up no evidence connecting him to the crime. Tr. 6959-60 ("[The defense] spent a bunch of time during the trial trying to convince everybody that Paul Humphrey did it. . . . There's no evidence against Mr. Humphrey.")

The jury ultimately convicted Mr. Lee of the three racketeering acts concerning the Mueller murders, as well as three capital counts of Violent Crimes in Aid of Racketeering ("VICAR") for each of the three murders.

## B.    Relevant Post-Trial Proceedings

Mr. Lee's conviction and sentence were affirmed on direct appeal. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied*, 545 U.S. 1141 (2005). He filed a motion to vacate under 28 U.S.C. § 2255 on June 26, 2006, raising numerous grounds for relief, including a general allegation that the Government had improperly withheld information favorable to the defense in violation of its constitutional *Brady* obligations. Dkt. 1118-1 at 7. As part of that motion, he specifically requested "that the Government review its files and the files of its investigating agencies for any information favorable to the defense bearing on guilt or

12

punishment, including – but not limited to – any evidence that other members of white supremacist or Christian Identity groups, or other like groups, were responsible for the murders of the Mueller family or otherwise played a role in the crimes charged in, or related to, this case." *Id*. at 7, n.3. Mr. Lee further noted that in the event the Government turned over such *Brady* material, he would "amend the petition and seek relief appropriate to the nature of the material newly-disclosed or uncovered." *Id*.

In its response, the Government did not come forward with any *Brady* material but simply noted that it had previously provided a "huge amount" of discovery to trial counsel.[14] Dkt. 1126-1 at 45 n.16. It made no further disclosures, and consequently, Mr. Lee made no amendments to his § 2255 motion. In its order denying the § 2255 motion, Dkt. 1163, the Court did not address the *Brady* issue, which had been rendered moot by the Government's response.

Notably, before Mr. Lee's § 2255 motion was filed, the Government made representations during Chevie Kehoe's § 2255 proceedings that are relevant here. Mr. Kehoe alleged that trial counsel were ineffective for failing to adequately investigate third parties, such as Paul Humphrey, and that the Government had improperly withheld exculpatory evidence implicating these third parties in the Mueller murders. Dkt. 1039 at 40 (Kehoe § 2255 motion);

---

[14] Shortly after their appointment, trial counsel for Mr. Lee filed several pre-trial motions requesting that the Government reveal all information and material known to it that might be favorable to Mr. Lee pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Dkt. 28, 31, 33, 35. The Government responded that it "recognize[d] its obligation under *Brady v. Maryland*," and would "provide all *Brady* material as required by law." Dkt. 55 at 2. The prosecutors further stated that they would "treat this motion as continuing." *Id.*

During a pretrial conference on April 9, 1998, the prosecution represented that the "bulk" of the *Brady* material had already been disclosed to the defense. 4/9/98 Tr. at 32. The Court thereafter entered an order dismissing Mr. Lee's *Brady* motion as moot "[f]or the reasons set forth on the record and in open court" at the hearing, while also directing the Government to provide defense counsel with any discovery to which Mr. Lee was entitled "on a continuing basis as it is received." Dkt. 145 at 1, 3.

Dkt. 1067 at 34-35, 39-40, 45 (amended Kehoe § 2255 motion). In its response, which was filed prior to Mr. Lee's § 2255 motion, the Government unambiguously stated: "All documents relating to Mr. Humphrey were provided to trial counsel." Dkt. 1087 at 32. It further stated: "Despite trial counsel's best efforts, no tie was ever made between Paul Humphrey and the named individuals [who were alternate suspects] which could establish that Paul Humphrey or one of the named individuals was in fact responsible for the Mueller deaths. In his argument Movant identifies no connection. Even should the Court review the issue, Movant's allegations are meritless on their face." *Id.* at 32-33. Any such evidence disclosed to Mr. Kehoe could also have benefitted Mr. Lee, but the Government asserted there was none.

Mr. Lee initiated other collateral litigation when other evidence of the Government's misconduct came to light.  On September 10, 2018, he filed a second-in-time § 2255 motion alleging, in pertinent part, prosecutorial misconduct for suppressing exculpatory and impeachment evidence concerning Mr. Wanker's testimony about Mr. Lee's purported confession, as well as for presenting substantially misleading and false testimony about the same. Dkt. 1297. Mr. Lee argued that under prevailing Eighth Circuit law, material second-in-time *Brady* claims are not subject to the pre-authorization requirement under 28 U.S.C. § 2255(h), and therefore this Court had jurisdiction to consider the claims in the first instance. *Id.* at 23-29. This Court disagreed and dismissed the motion for failing to obtain such pre-authorization and denied a Certificate of Appealability ("COA"). Dkt. 1313.[15]

---

[15] It is important to note that the Government's misconduct in this case is not limited to suppressing the Wanker evidence; in fact, Mr. Lee has uncovered a pattern of *Brady* and *Napue/Giglio* violations that infected both the guilt and penalty phases of his trial. He is currently litigating claims concerning the Government's presentation of false and misleading evidence that Mr. Lee had committed a prior murder as a juvenile. *See Lee v. Warden*, No. 2:19-cv-468-JPH-DLP (S.D. IN). (That claim was first raised in this Court in September 2018. Dkt. 1297. Although concluding that "the outcome at sentencing would have been different" but for

Mr. Lee's COA Application to the Eighth Circuit was denied on November 4, 2019, over the dissent of the Hon. Jane L. Kelly. Although the district court had made a threshold determination that the *Brady* claim concerning Mr. Wanker was not material, Judge Kelly stated that she would have granted a COA on that issue because "jurists of reason could disagree about whether Lee's newly discovered evidence is material for purposes of *Brady*." *See* Judgment, *United States v. Lee*, No. 19-2432 (8th Cir. Nov. 4, 2019) (Kelly, J., dissenting).[16]

## II.    The Case Begins to Unravel: A Cumulative Review

There is a mantra that has been attached to this case for some time: that the evidence of Daniel Lee's involvement in the Mueller murders was "overwhelming."[17] But anyone looking at that trial record now in light of the many developments that have since transpired would be hard pressed to agree.[18] This series of revelations and intervening events, which further undermine the

---

the Government's misconduct, this Court determined it lacked jurisdiction to grant relief. Dkt. 1313 at 14, 16-17.) Mr. Lee subsequently learned that the Government suppressed exculpatory evidence that undermined the fundamental basis for federal capital murder charges under 18 U.S.C. § 1959. *See Lee v. United States,* No. 19-3576 (8th Cir. Dec. 4, 2019). On January 7, 2020, the 8th Circuit denied Mr. Lee's motion for authorization to file a successive § 2255 motion based on this *Brady* claim over the dissent of Judge Kelly, who observed that the Government failed to respond to the underlying allegations of misconduct. *See* Exh. D. Indeed, the Government has never unequivocally denied any of the factual allegations concerning its suppression of evidence raised in any of Mr. Lee's *Brady* pleadings; rather, it has successfully relied on procedural or jurisdictional grounds to evade review of its misconduct. *See* Section IV.D, *infra*.

[16] Judge Kelly also stated that "jurists of reason could disagree about whether a material *Brady* claim in a second habeas motion qualifies as a "second or successive motion" subject to the gatekeeping requirements of 28 U.S.C. § 2255(h)." For the Court's convenience, Judge Kelly's dissent is attached as Exh. E.

[17] *See* Dkt. 1163 at 22, 31, 49; Dkt. 1313 at 13.

[18] Even back in 1999, observers raised concerns about the strength of the evidence used to convict Daniel Lee. *See*, *e.g.*, Exh. F, "But Here's A Dissenting Opinion," The Courier News (Russellville, AR), May 6, 1999.

Government's theory of the case, are all relevant to assessing the effect that the newly discovered evidence concerning Gloria Kehoe and Paul Humphrey would have had on the case as whole. *See Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (*per curiam*) (materiality determination under *Brady* must be made by considering all the evidence cumulatively, not in isolation).  Mr. Lee therefore describes these developments below along with the evidence in the Government's trial case. He sets out Cheyne and Gloria's glaring credibility deficits; the evidence presented at trial to shore up their account; and an inescapable problem the prosecution faced relying on their narrative.

### A.    Gloria and Cheyne Kehoe were inherently unreliable witnesses.

There can be no question but that the central evidence in the case against Mr. Lee came from Gloria and Cheyne Kehoe.  What was questionable, from the start, was their credibility. The prosecution thus needed other evidence to shore up their account, both for the jurors to credit the Kehoes' story and as a matter of law.

### 1.    The Kehoes' credibility problems.

Before Gloria and Cheyne decided to cooperate, the Government had no evidence connecting Mr. Lee to the Mueller murders; at best, he was a person of interest solely because he was a "known associate" of Chevie Kehoe. The prosecution's case against Mr. Lee was quite literally built on the word of these two witnesses. But Gloria and Cheyne each had significant credibility problems.

#### a.  Benefits given to the Kehoes

First, the Kehoes were not disinterested witnesses. They testified in direct exchange for lenience for their own crimes. When Cheyne decided to cooperate, he had a significant incentive to curry favor with the Government: He was a fugitive from the attempted murder of two Ohio

16

police officers in a brazen daylight shoot-out that had been nationally televised and that had landed him onto the FBI's "most wanted" list.[19] As is clear from his earliest interviews with authorities, he knew that his only hope of reducing the prison time he was facing was to cut a deal in exchange for information about an even bigger crime, the Mueller murders. Indeed, his gamble paid off. After Cheyne testified at Mr. Lee's trial, his 24-year Ohio sentence was reduced by more than half.[20] But that was not the only benefit he received. As a member of Mr. Kehoe's racketeering enterprise, Cheyne was exposed to federal charges that carried a potential life sentence. As part of his cooperation agreement, he received a grant of immunity and escaped liability for *any* of the charged activities of the enterprise.[21]

Gloria Kehoe also received substantial benefits in exchange for her testimony. In addition to immunity from prosecution for any offenses related to the racketeering counts, as well as for various tax and Social Security offenses,[22] which potentially exposed her to 30 years'

---

[19] *White supremacists arrests conjure memories of Kehoe shooting rampage*, Dayton Daily News, Oct. 16, 2013, https://www.daytondailynews.com/news/crime--law/white-supremacists-arrest-conjure-memories-kehoe-shooting-rampage/gGMyTxJv1Dz5s7El3ExwlK/ (last visited Jan. 28, 2020).

[20] Cheyne was originally sentenced to 24 years and 5 months. Tr. 5283. His agreement with federal prosecutors included notifying the Ohio authorities about his cooperation. Tr. 5281. In December 2000, a year after Mr. Lee was sentenced to death, Cheyne's sentence was reduced to 11 years. *White supremacists arrests conjure memories of Kehoe shooting rampage*, Dayton Daily News, Oct. 16, 2013, https://www.daytondailynews.com/news/crime--law/white-supremacists-arrest-conjure-memories-kehoe-shooting-rampage/gGMyTxJv1Dz5s7El3ExwlK/ (last visited Jan. 28, 2020); Tr. 5283. He was released in June 2008.

[21] Cheyne also received the benefit of placement in the Federal Witness Protection Program in exchange for his testimony, but it appears he squandered that opportunity. He was arrested again in 2013, along with his father, Kirby Kehoe, on federal firearms and drug charges. He pled guilty in 2014 to one count of being a felon in possession of a firearm and was sentenced to 41 months' imprisonment. He got out in September 2016.

[22] *See* Tr. 4949, 4987-89. Gloria admitted on the stand that she assisted Mr. Kehoe in fleeing from Ohio after his shootout with police officers, that she had not filed federal income

17

imprisonment,[23] Gloria received large cash payments during the course of her cooperation with authorities—$2,250 per month, totaling roughly $27,000 by the time of her testimony. Tr. 3522-23. As a single mother[24] with no job and six children to feed, clothe and shelter,[25] she had every incentive to stay in the Government's good graces to stay out of prison and provide for her family.

### b. Conflicts with other evidence

In addition to the huge benefits they received for cooperating, the reliability of the Kehoes' testimony was suspect due to discrepancies between their story and the physical evidence. For example, Cheyne repeatedly told authorities that he had a detail about how the murders occurred that would independently corroborate his account—namely, that Mr. Mueller's skull was fractured during the incident. Tr. 5328, 5442, 6876. According to Cheyne, his brother struck Mr. Mueller in the head with the butt of his rifle with a blow so forceful that it broke the

---

taxes in at least 10 years, and that she used a fake Social Security Number during a real estate transaction. Criminal charges had been filed against her in the Western District of Arkansas with respect to the use of the false Social Security Number, and those charges were dismissed as a result of her cooperation in this case.

[23] *See* 42 U.S.C. § 408(a)(7)(B) (maximum 5 years' imprisonment for use of false Social Security Number); 18 U.S.C. § 3 (maximum 15 years' imprisonment for being an accessory after the fact to a crime punishable by life imprisonment); 28 U.S.C. § 7203 (maximum 1 year imprisonment for each instance of willful failure to file tax return).

[24] Gloria's husband, Kirby Kehoe, was indicted and arrested in connection with this case. He was charged in Count One as a principal of the racketeering enterprise, in Count Two as a RICO co-conspirator, and in Count Six as a co-conspirator in the Hobbs Act robbery of the Muellers. He faced a potential life sentence on these charges. He entered a plea of guilty to the first count of the indictment (RICO) on February 8, 1999, prior to the start of Mr. Lee's trial. He was sentenced to 44 ½ months' imprisonment, to run consecutive to a 51 month prison sentence he was already serving on federal weapons violations, leaving Gloria alone to take care of their six youngest children, which at that time included an infant and a toddler.

[25] Tr. 5205.

walnut stock and Chevie saw the skull cave in. *Id*. This corroborative detail was horribly

gruesome, but also a fabrication. As the medical examiner testified at trial, there was no evidence

of a skull fracture, hemorrhage or other injury to Mr. Mueller's skull. Tr. 3563, 3579-80, 3587-

88.

Similarly, both Gloria and Cheyne claimed that Mr. Kehoe told them that Mr. Mueller

bled onto the carpet after being struck in the head. Tr. 5422; 5188-89. This was another grisly

"fact" contradicted by the physical evidence. The Arkansas State Police conducted a luminol

examination of the carpet and sent multiple samples to the Serology Section of the Arkansas

State Crime laboratory for further analysis. Every single sample tested negative for the presence

of blood. *See* Exh. G.[26]

Additionally, both Gloria's and Cheyne's accounts of the murder included the detail that

Mr. Lee wore an FBI costume while committing the crime. Although that part of their story was

seemingly corroborated by forensic evidence at trial, we now know definitively, based on DNA

testing, that the hair found in the FBI cap was not Mr. Lee's.

Finally, not only had they each given prior inconsistent statements, but their statements

conflicted with each other, as well as with the testimony of disinterested witnesses in significant

ways:

- *The required timeline.* In Gloria's earliest statement to authorities, she claimed that Mr. Kehoe and Mr. Lee stayed in Arkansas or Oklahoma for a few days after they committed the murders in order to see if the local media would report that the Muellers were missing. *See* Exh. H.  At the time she made that statement, neither she nor the authorities knew that Mr. Lee had been seen in Spokane on January 13. Perhaps aware that her original account would have destroyed the

---

[26] It is highly implausible that Mr. Kehoe and Mr. Lee could have cleaned the Muellers' home so thoroughly as to withstand a forensic examination for trace amounts of blood. This is especially so considering the Government's timeline; every additional moment of time spent in Arkansas would have made it that much more improbable for Mr. Lee to have made it back to Spokane by January 13.

19

Government's necessary timeline, Gloria conspicuously omitted that part of her story when she took the stand.

- *Gloria's sudden recollection of Lee's confession.* In her initial statement to the ATF, Gloria said that Mr. Kehoe confessed to her but did not say the same of Mr. Lee. *See* Exh. I. Two weeks later, Gloria was once again interviewed by the ATF; this time she claimed that Mr. Lee had made inculpatory statements, but she could not recall *any* details of what he said. *See* Exh. J. By the time of trial a year later, she purportedly had a clearer memory of what he had said (that Mr. Mueller had fought back, and that Mrs. Mueller had put a bag over her own head because she believed it was a legitimate FBI raid. Tr. 4975.) But when she was first interviewed by the ATF, she said she had learned all these details from her son Chevie. *See* Exh. I.

- *Cheyne Kehoe's knowledge of the crime.* Gloria and Cheyne gave conflicting accounts of when Cheyne first learned of Mr. Kehoe's involvement in the Mueller murders. Gloria testified that she begged Cheyne not to accompany his brother on a cross-country trip in December of 1996, specifically because Chevie had confessed to her that he had committed the Mueller murders. She swore she even provided details such as Chevie's admission that he was the one that killed the little girl. Tr. 5167-68. Cheyne, however, insisted that when he left with Mr. Kehoe for that trip, he knew nothing about Mr. Kehoe's involvement in the Mueller murders, and that it was only months later after they arrived in Galveston, Texas that he learned, from Mr. Kehoe himself, that he was involved in the offense. Tr. 5326-27. At least one of the two Kehoe witnesses was not telling the truth.

- *Cheyne's mistakes about the evidence.* Cheyne maintained that Mr. Kehoe showed him a Benelli 90 shotgun while they were on the lam in 1997 and told him that he needed to get rid of it because it had belonged to the Muellers. Tr. 5323. An uninvolved witness, Carl MacDonald, however, testified that he was the person who had given that gun to Mr. Kehoe; he had traded it to Mr. Kehoe in exchange for a Colt .45 at a gun show in Spokane in the previous year. Tr. 2698-99.

- *Kirby's alibi.* Kirby Kehoe was initially a suspect in the murders due to his involvement in the Mueller burglary in 1995. Despite admitting that she had overheard Kirby discuss plans with Mr. Kehoe in January of 1996 to rob the Muellers again, Tr. 5134, Gloria testified that Kirby was with her in Arizona in January of 1996 and never travelled to Arkansas. Tr. 5137-38. However, before she began cooperating in this case and pinned the blame on Mr. Lee, Gloria told a confidential informant of the ATF that Kirby had, in fact, been in Arkansas that January. *See* Exh. K at 1.

20

In short, Gloria and Cheyne had clear motives to lie in order to curry favor with the Government, and the numerous inconsistencies in their respective accounts of the crime rendered their stories even more suspect.

### 2. The trial evidence corroborating the Kehoes, and its subsequent unraveling.

The jury's mixed verdicts on the racketeering acts charged in Count One demonstrate its reluctance to credit the Kehoes' testimony absent independent corroborative evidence. Specifically, there were three charged racketeering acts predicated entirely on the testimony of Gloria and Cheyne, *and the jury returned not guilty verdicts as to all three*:

- Racketeering Act 3, which alleged that Mr. Kehoe committed the murder of Jeremy Scott;

- Racketeering Act 7, which alleged that Mr. Lee and Mr. Kehoe set off a bomb at the Spokane City Hall;

- Racketeering Act 8, which alleged that Mr. Kehoe committed the murder of Jon Cox.

Unlike for these three acts, for the Mueller murder counts the jury could rely on two pieces of evidence to assuage any concerns that the Kehoes' account was not credible: the matching hair and James Wanker's testimony. This is no longer the case.

### a. The hair.

DNA testing conducted after the trial conclusively established that the hair found in the FBI raid cap did not come from Mr. Lee. *See* Exh. L. This was the only physical evidence that directly tied him to the crime. Although the Government has attempted to downplay the importance of the hair evidence to its case ever since it was debunked, its contemporaneous arguments to the jury demonstrate that it treated it as a crucial piece of corroborative evidence that "proved" its theory of the offense. Tr. 7000-01.

### b. *The admission to the unbiased witness.*

As for Mr. Wanker, he has since provided a sworn declaration that puts his trial testimony in a very different light. What the jury heard from him at trial was that in July or August of 1996, a group of people were having beers in the parking lot at the Shadows Motel when Mr. Lee, unprompted, told Mr. Wanker that "somebody had fucked with him and so he wrapped them up, taped them, and through (sic) them in the swamp." Tr. 4082. The testimony was offered at the capital murder trial as straight fact, with the Government asking no questions about Mr. Lee's demeanor when the statement was made or whether he appeared credible. In its closing argument, the Government argued that this evidence of Mr. Lee's alleged confession was especially reliable because it came from an unbiased witness with "no reason … to come in here and tell you that story unless it's the truth," Tr. 7002, an implicit recognition that the other witnesses were not similarly situated.[27]

The jury was given the impression that James Wanker decided to alert authorities because he believed he had important evidence about Mr. Lee's guilt. This was not true. In fact, Mr. Wanker's testimony was carefully choreographed to omit the facts and circumstances that would have led jurors to question the veracity of Mr. Lee's purported admission. As detailed in the attached sworn declaration by Mr. Wanker, if a complete account of what he had told authorities had been disclosed at the time of trial, it would have revealed instead that he had a well-founded basis to discount the statement Mr. Lee made to him – and that he continued to do so even after Mr. Lee was charged and prosecuted.

---

[27] *See also* Tr. 7002 (arguing that people like Mr. Wanker were "salt of the earth," and that he was "not only a hard working guy; he's a mannerly guy").

22

James Wanker met Mr. Lee in 1996 at the Shadows Motel in Spokane. Tr. 4078-79; Exh. M at ¶ 4. Mr. Wanker lived in the motel, and Chevie Kehoe and his family lived in a trailer in the RV section of the property. Tr. 4079. Danny Lee would often sleep on a couch outside the Kehoe trailer. Tr. 4080-81. Mr. Wanker recalled that he "really seemed like he was just looking for somewhere to belong. He wanted to look badass like the Kehoes but you could tell he didn't really fit in with them." Exh. M at ¶ 5. Over time, Mr. Wanker saw that Mr. Lee routinely made up stories to make himself seem tough and fit in better with those around him, including the Kehoes:

> Danny was a follower who tried to sound like a big guy. He was always trying to blow smoke up my ass; trying to impress me by sounding tough. He would spout off about different fights and crazy situations that were not true just to look tough and try to fit in.

Exh. M at ¶ 6.

One summer afternoon in 1996, after Mr. Lee had been drinking beers, he started bragging again about how tough he was and about all the things he had done, including that he had once killed somebody "in the south." Tr. 4082. These assertions were consistent with the empty bragging that Mr. Wanker had seen him exhibit in the past:

> When Danny made these comments about this trip, I didn't believe him. I knew him to be a braggart and that he would try to claim responsibility for criminal actions in order to fit in with the Kehoes. It still cracks me up that Danny was trying to be a tough guy.

Exh. M at ¶ 7.

Almost a year later, in the spring of 1997, a local Spokane officer came to the Shadows Motel asking questions about the Kehoes. Exh. M at ¶ 8. At the time, Chevie and Cheyne Kehoe were wanted for the shoot-out with police officers in Wilmington, Ohio; they had fled the shooting and their whereabouts were unknown. While chatting with the officer, Mr. Wanker

23

mentioned that he had heard Mr. Lee brag about committing various crimes, including an unspecified murder, but made clear that he did not believe any of it to be true. *Id.*

On June 16, 1997, Cheyne turned himself in for the Ohio shooting. In exchange for leniency, he gave a statement to authorities implicating Chevie and Chevie's friend Danny Lee in the Mueller murders. It was after Cheyne's statement that authorities showed a renewed interest in Mr. Wanker. *Id.* at ¶ 9. An officer from Arkansas then contacted Mr. Wanker by phone on June 26 and asked him about what he had heard Mr. Lee say. *Id.* Mr. Wanker told him what he had told the Spokane officer, noting again that the statement Mr. Lee made did not appear credible. *Id.* About a week later, an ATF agent from the Spokane field office interviewed Mr. Wanker. *Id.* at ¶ 10. Once again, Mr. Wanker stated what he had heard and how it was of a piece with Mr. Lee's prior phony boasts. *Id.* Notably, the ATF agent similarly appeared to be dismissive of Mr. Lee's story. *Id.* However, when the agents memorialized their interviews, they did not include any of the context or warnings Mr. Wanker had given them. *See* Exhs. N & O.[28]

In subsequent interviews with the Government prior to trial, Mr. Wanker repeated his observations and caveats to the case agent and the prosecutors: Mr. Lee had a known history of claiming "credit" for misdeeds that were not his. Exh. M at ¶ 11. In preparation for his

---

[28] The Government used a similar tactic with Mr. Wanker at the grand jury proceeding. It instructed him to omit certain details from his written statement that undermined the trustworthiness of Mr. Lee's alleged statement against penal interest. Exh. M at ¶12. In his July 2, 1997 statement to ATF Agent Sprenger, Mr. Wanker stated that Mr. Lee said there was a third individual who had accompanied him and Mr. Kehoe to Arkansas: Sean Haines. Exh. O at 2. But as the Government knew, Mr. Haines was in Spokane throughout January 1996 when the alleged trip to Arkansas took place. The fact that Mr. Lee's story contained a demonstrably false detail lends credence to Mr. Wanker's warning to law enforcement that the story was made up and not to be believed. The fact that the Government instructed Mr. Wanker to omit that detail about Mr. Haines from his written statement to the grand jury is also telling. It is consistent with a pattern of behavior to suppress any information that undermined the credibility of Mr. Lee's alleged confession, and, in turn, the corroborative value of Mr. Wanker's testimony.

24

testimony, Mr. Wanker was told that he should stick to just answering the questions posed to him about it and not volunteer any other details. *Id.* at ¶ 12.

The Government thus sanitized Mr. Wanker's statements and shaped his testimony, enabling it to present the evidence in a distorted and misleading manner. Contrary to the specific impression the prosecution created at trial, Mr. Wanker was not a concerned witness who initiated contact with authorities because he believed he had valuable, credible information to share about the Mueller murders. Instead, Mr. Wanker had well-founded doubts about the veracity of what he had heard, doubts that persisted despite the fact that Danny Lee was on trial. The jury never learned this because the Government worked to present him as a persuasive and compelling witness who could corroborate Cheyne's and Gloria's claim that Mr. Lee was involved in the killing of the Mueller. The jurors never heard that in reality Mr. Wanker had warned authorities from the start that Danny Lee's statement fit a pattern of "empty bragging" by a young man desperate to seem tough and fit in, and that Mr. Wanker found it no more credible at the time of his capital murder trial than he did when it was made. *Id.* at ¶ 13.

Had the jurors known that neither the hair evidence nor the Wanker testimony truly corroborated the Government's theory of the case, there is a reasonable probability that the outcome of the proceeding would have been different.

### 3. Absent corroborating evidence, the jury could not have convicted Mr. Lee.

The fact that the hair evidence has now been eliminated and the truth behind the Wanker testimony has been revealed has additional serious implications for the case against Daniel Lee—and for the issues now before this Court.

Because Arkansas crimes were alleged as several of the predicate offenses supporting the federal RICO charges, Mr. Lee's jury was instructed under Arkansas procedural rules. Pursuant

to Arkansas law, the testimony of an accomplice (i.e., Gloria and Cheyne) must be corroborated with substantive evidence "directed toward proving the connections of the accused with the crime and not directed toward corroborating the accomplice's testimony." *Martin v. State*, 57 S.W.3d. 136, 202 (Ark. 2001). Such evidence is sufficient where, "if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission." *Id*. at 203.

> Mr. Lee's jury was specifically instructed by the court that
>
> Cheyne Kehoe and Gloria Kehoe, according to their own testimony, were, with respect to some of the Racketeering Acts charged [i.e. the murder and robbery of the Muellers], what are known as accomplices…You cannot, therefore convict a defendant of the Racketeering Acts involving Arkansas law – that's Four A, Four B, Five and Six upon the testimony of those witnesses unless that testimony is corroborated by other evidence tending to connect the defendants with the commission of the offenses.

Tr. at 7038.

Considered alongside all that has since been learned about Mr. Lee's case, it is doubtful the jury would have found sufficient corroboration to credit the accomplice testimony of Cheyne and Gloria Kehoe. Indeed, if the jurors had discounted Mr. Wanker's testimony, there is no remaining non-accomplice evidence that independently establishes the crime and connects Mr. Lee with its commission.

This point also emerges clearly when one compares the Eighth Circuit's analysis of the issue in Chevie Kehoe's case to the contrasting evidence against Danny Lee. The evidence the Court of Appeals relied upon in Mr. Kehoe's direct appeal to find sufficient corroboration as to Kehoe is wholly absent as to Mr. Lee. *See United States v. Kehoe*¸ 310 F.3d 579, 591-92 (8th Cir. 2002). For example, the Court noted that Mr. Kehoe and Mr. Lee had no money while in Oklahoma and a few days later "they were comparatively wealthy." *Id*. at 592. The evidence at

26

trial, however, was that it was *Mr. Kehoe*, not Mr. Lee, who was spending lavishly in a way that suggested newfound wealth. *See, e.g.,* Tr. 2898-99; 4814; 4971; 4976; 5303. Likewise, paint chips recovered with the victims' bodies that were similar to the paint on Mr. Kehoe's vehicle, *id.*, is evidence that tends to connect *the Kehoes* to the Mueller murders but does nothing to corroborate the accomplice testimony as to Mr. Lee. Moreover, the fact that Mr. Lee may have possessed or sold stolen firearms shortly after the murders, *id.*, also fails to connect Mr. Lee with commission of the crime. Multiple persons, including Government witnesses Travis Brake and Sean Haines, *see infra* note 41, possessed and sold firearms stolen from the Muellers. There is nothing unique or compelling in such evidence that would lead a reasonable juror to find it sufficient to corroborate the accomplice witness testimony as to Daniel Lee.

The only evidence the Court of Appeals found to have been specific to Mr. Lee also fails to provide the necessary corroboration. *Kehoe¸* 310 F.3d at 591. As noted above, *see supra* note 13, Mr. Lee's fingerprint taken from a display case stored in the area where he was living in Washington State shows only that Mr. Lee touched an item located in the room where he slept. It does not connect Mr. Lee to the crime scene.

> **B.**     **The conviction of Mr. Lee was dependent on the validity of a deeply problematic timeline.**

The Kehoes' account—and thus the prosecution's case—setting out Mr. Lee's involvement in the Mueller murders hinged on a very precise timeline that can no longer withstand scrutiny.

Although the Kehoes did not say that the murders were committed on January 11, that was the only date that could accommodate their narrative. As previously noted, the murders could not have happened prior to the 11th because both William and Nancy Mueller had contact with others on that day. And, as is explained in more detail below, the murders could not have

27

happened after the 11th because that would not have allowed enough time for Mr. Lee to have returned to Spokane by the 13th. As the Government itself has acknowledged: "Had the jury not accepted the government's timeline, Lee could not have been convicted."[29]

There were two major problems with that timeline. The first was that, according to the Government's theory, the crime had to have occurred in Tilly, Arkansas on January 11, yet Mr. Lee was in Spokane, Washington at least as early as January 13.[30] It would have been extraordinarily difficult to complete such a long and difficult drive—"2,000 miles non-stop through the high altitudes of the West in the dead of winter"[31]—on that timeline. This was clearly a concern for the jury, too: During the second day of deliberations, it sent out a note indicating it had questions about whether the requisite cross-country drive was possible in that narrow time frame.[32]

The second problem with the Government's tight timeline was at its front end: numerous disinterested witnesses from the community reported seeing the Muellers alive *after* January 11.

The Government accounted for these obstacles by arguing that: a) Mr. Kehoe and Mr. Lee took turns at the wheel and made the 2,000 mile trip without ever stopping to rest, eat, use a

---

[29] *See* Doc No. 1126-1 at 33.

[30] According to the Government's own evidence, a non-stop drive back to Spokane would have taken between 35 to 43 hours, depending on the route. Tr. 6449-52.

[31] *See* Exh. F, "But Here's A Dissenting Opinion," The Courier News (Russellville, AR), May 6, 1999.

[32] Tr. 7100 ("We want to know if there was any road problems—snow—on trip back to Washington from Tilly, Arkansas, on January 10, 11, 12, 13[.] [S]igned Juror 100."). The Court instructed the jury that it had to decide the issues on the basis of the evidence already presented, and that it could not reopen the record to receive additional evidence. Tr. 7100.

28

restroom, refuel or sleep, Tr. 6986-87; and b) the multiple witnesses who had seen the Muellers after January 11 were all either confused about the dates or mistaken about who they had in fact seen. While the jury might have been willing to indulge these assumptions in light of persuasive evidence corroborating the Kehoes' account—namely, scientific evidence (a matching hair) and testimony from an unbiased witness about a bona fide confession (Mr. Wanker)—absent such external validators, there is at least a reasonable probability the jury would not have given the Government the benefit of the doubt on this central element of its case.

### 1.    The Kehoes' timeline depends on a series of dubious assumptions.

In January of 1996, Mr. Lee lived in an apartment in Spokane with Sean Haines. Mr. Haines was in a relationship with Joy Campbell, with whom he was about to have a baby. At 8 p.m. on January 13, Joy's mother, Vada Campbell, came to the apartment to pick up Mr. Haines and Mr. Lee answered the door. Tr. 5953-54. Vada Campbell is certain of the date because the following day (the 14th) her daughter was admitted to the hospital, and then the day after that, January 15, her daughter gave birth. *Id.*[33] The prosecution was not able to impeach or discredit her testimony; indeed, it did not even cross-examine her. Tr. 5955.

In order for the Kehoes' account to be true, the Mueller murders had to have taken place on January 11. Both Cheyne and Gloria stated in respective pre-trial statements that the crime occurred after nightfall.[34] Even if Mr. Lee and Mr. Kehoe left Russellville around midnight on

---

[33] The birth certificate, showing a birth date of January 15, 1996, was entered into evidence at trial. Tr. 5953.

[34] *See* Exh. I (Gloria Kehoe pre-trial statement that "it was late" when the victims' bodies were disposed in the river); Exh. P at 94 (Cheyne Kehoe pre-trial statement that the Jeep was abandoned "at night"). *See also* Tr. 2289 (UPS driver came to Mueller home on the afternoon of the 11th and saw nothing amiss).

the 11th – an assumption which the Government agreed was plausible[35] – that allowed just 46 hours for them to make it back to Spokane by 8 p.m. on the 13th.[36]

According to a Government trial witness, it would take between 35 to 43 hours to drive non-stop from Russellville to Spokane, depending on the route taken. Tr. 6449-52. Although that was technically possible, accepting that timeline required the jurors to indulge a series of questionable assumptions.

First, the estimated driving times assumed perfect road conditions. But it was the middle of winter and the routes from Tilly to Spokane went through high altitudes where snow and ice were common. Indeed, the testimony at trial was that there had been a big snowfall in Pope County on January 3 and that it was snowy and icy in Tilly on the 11th. Tr. 2261; 6009. Such road conditions would have made it difficult to drive at full speed and would have added more time to the trip.

Second, the Government's timeframe assumed that Mr. Lee was a capable driver. But he had lost an eye only a few months prior, and the trial evidence established that he had poor depth

---

[35] Tr. at 6986. A juror would have been hard-pressed to find that the two men could have left for Spokane any earlier, even if viewing all of the prosecution's evidence in the most favorable light. Gloria and Cheyne testified that the crime occurred after nightfall, which was approximately 5:47 PM on the night of January 11, 1996. *See* Exh. Q (January 2006 Sunrise/Sunset Calendar, Russellville, AR). Their account of the murders involved substantial activity at three different crime scenes: the Mueller residence in Tilly; a site an hour away off of Highway 7; and a bridge near Lake Dardanelle. *See* Exh. R (GPS coordinates of Mueller crime scene locations) and Exh. S (FBI 302 report re: driving times between crime scene locations). Thus, even under the Government's theory, several hours had to have elapsed to account for all of this activity before Mr. Kehoe and Mr. Lee would have been able begin the 2,000-mile journey back to Spokane.

[36] When Mr. Lee was seen at 8 p.m. by Vada Campbell, he was not arriving into town at just that time in a car with Mr. Kehoe; rather, he was already at his own home, ready to answer the door when she knocked. Thus, Mr. Lee had actually arrived in Spokane sometime prior to 8 p.m.

perception that impaired his driving. Tr. 6263-64; 6269-70. Even under normal conditions, it would have been difficult for Mr. Lee to shoulder the burden of such a long drive. But here he would have also had to navigate inclement weather, fewer daylight hours, and poor road conditions that would have hampered even a driver with perfect eyesight.

Third, the estimated driving times did not account for any need to regularly stop for gas during a 2,000-mile trip.[37] Even assuming that they drove straight through the night, the available routes from Russellville to Spokane would have taken them through sparsely populated areas for long stretches at a time. Thus, the practical necessity of being able to find an open and available gas station each time it was necessary to re-fuel, and not risk running out of gas in a remote area, would have added further time to the trip.

Finally, as noted, *supra* note 35, the timeline had to account for what the prosecution maintained was activity at three different crime scenes:

> (1) The Muellers' home in Tilly, where the perpetrators abducted, interrogated, and murdered the Muellers in their home; cleaned the home so thoroughly that they left no fingerprints and removed even trace amounts of blood that had soaked into the carpet; and loaded the victims' bodies and the cache of stolen property into the Muellers' Jeep and attached trailer;
> (2) The area off Highway 7, roughly an hour drive from the Mueller home, where the Jeep was abandoned and the property and bodies of the family were transferred into the GMC truck; and
> (3) The Illinois Bayou bridge near Lake Dardanelle, another 20 miles from where the Jeep was abandoned, where the victims were fastened to large, heavy rocks and dropped into the water.

---

[37] Mr. Kehoe's car was a 1984 GMC C/K 2500 High Sierra (diesel). Tr. 3057. At best, it had a fuel economy of about 20 miles per gallon. *See* Fuel Economy Information, U.S. Department of Energy's Office of Energy Efficiency and Renewable Energy, available online at: https://www.fueleconomy.gov/feg/bymake/GMC1984.shtml (last visited on Jan. 28, 2020). Assuming it was equipped with a standard 16 gallon or 20-gallon tank for that make and model, one would have to stop to re-fuel between five to seven times for a 2,000-mile trip.

In other words, several hours had to have elapsed to account for all of the activity that occurred between when the crime began and when the drive to Spokane actually commenced.

Given all of these factors, the time frame within which Daniel Lee was said to have committed this offense was itself suspect.

> **2.    The evidence indicates that Mr. Lee was observed back in Spokane as early as January 12, 1996, which would render the Government's timeline—and the Kehoes' testimony—impossible to accept.**

The time frame advanced by the Government was problematic on its own terms. But taken together with other evidence in the case, it becomes impossible. Prosecution witness Sean Haines was interviewed by authorities in December of 1996 and was asked when Mr. Lee returned to Spokane. Although he could not remember the exact date, Mr. Haines said that he came home one day in mid-January of that year to find the light on in their apartment, Danny Lee's belongings, and a handwritten note from him letting Mr. Haines know he had returned. Mr. Haines did not see Mr. Lee that day—"[I]t was like hit and miss, he'd come and go while I was gone" (Exh. T)—but he knew Mr. Lee had arrived home; he remembered seeing him a day or so later. *See* Exh. T. The Government called Mr. Haines as a witness at trial, and he gave essentially the same account:

> Q: How did you know [Mr. Lee] had returned [to Spokane] from his trip?
>
> A: I had come home one day, and his duffel bag was in my living room.
>
> Q: Did you talk to him that day?
>
> A: I believe I talked to him the next day.

Tr. 2778-79.

The "next day" to which he referred was January 13: Vada Campbell testified that she saw both Mr. Lee and Mr. Haines at their apartment at the same time on January 13 when she

came to the door. Taking the testimony of these two witnesses together, Mr. Lee had to have first

arrived in Spokane *the day before,* on January 12, in which case the Government's timeline was

physically impossible. Gloria and Chevie Kehoe could not have been telling the truth about

Danny Lee's participation in this offense.

> **3.**      **The jury would have evaluated the defense witnesses differently if it had known that the Kehoes' testimony was uncorroborated and that there was credible evidence implicating an alternate suspect.**

A number of witnesses reported seeing the Muellers alive after January 11, the date the

prosecution claimed they had been murdered.[38] These included:

- Susan Weaver, a Walmart employee, remembered selling Mr. Mueller an unusually large quantity of water by the gallon. Tr. at 5832-36. Store records show this purchase was made on January 22, 1996—eleven days after the Government claimed the murders had occurred. Tr. at 6364-65.

- Mary Reid, a longtime friend of the Muellers, spoke with William and Nancy Mueller in the parking lot outside of her bank on January 18, 1996. Tr. 5856-57, 5886.[39] Authorities confirmed that Ms. Reid was at the bank on January 18 based on her bank transaction records and surveillance footage, Tr. 5870-71, 5885-87, 5889, 5891-92, and relied upon her statement that she had seen the Muellers with Paul Humphrey to secure a search warrant of Mr. Humphrey's residence as part of the murder investigation. Tr. 5888-90

- Janis Rowlands, a schoolteacher, contacted authorities to report she saw the Muellers at a Walmart in Russellville on February 2 or February 3. Tr. 5798-5800, 5802. Ms. Rowland remembered it was a day when her school was closed due to inclement weather, and records corroborated that her school district was closed on February 2, 1996, due to the weather. Tr. 6080-81.

- Lucy Carr, a manager at Leonard's Hardware Store in Russellville, called authorities to let them know she had a conversation with William Mueller in her store in early February. Tr. 5807-11. Ms. Carr testified that Mr. Mueller looked

---

[38] The Muellers' bodies were not found until June, several months after the Government's theory of when the crime occurred.

[39] As discussed in more detail below, the Muellers were in a car with several other men, including Paul Humphrey, an early suspect in the case because he was found in possession of the title to the Muellers' Jeep after they had gone missing. Tr. 5859, 5867-68, 5877, 5880-82.

33

like he was trying to disguise himself; he was unshaven and was wearing a large floppy hat. Tr. 5814.

• Sue Sullivan, an employee at Leonard's Hardware Store in Russellville, testified that she saw Mr. Mueller in the store around February 6 or 7, right before an article had been published in the local paper about the Muellers having gone missing. Tr. 5817.

• Ester Anderson, an acquaintance of the Muellers, testified that she had driven past the Muellers' home on January 17 with her husband and saw their Jeep and attached trailer parked outside. Tr. 5961, 5963. She was sure of the date because she was accompanying her husband to a job interview for which he subsequently filled out some paperwork dated January 22, and she knew from her own records that the 17th was the one day that week that she had not gone to work. Tr. 5962-63, 5966.

The testimony of these witnesses was obviously at odds with the Government's case, where the timeline hinged on the Kehoes' testimony. The prosecution thus worked to discredit the recollections of each of the witnesses. Had the jury known, however, about Gloria's mental instability and perception problems, and that the Kehoes' testimony lacked any independent corroboration, it would have tipped the balance in favor of crediting these witnesses. Similarly, had the jury known that there was credible evidence implicating an alternate suspect, Paul Humphrey, in the murders, and that evidence of his guilt was consistent with the timeline provided by these other witnesses (including that he lived in Russellville, obviating any need for a 2,000-mile journey in the dead of winter),[40] there is a reasonable probability that the jury would have evaluated the trial evidence differently and reached a different result.

---

[40] The defense's alternate timeline was also supported by testimony from one of the Government's own witnesses—Sean Haines—who placed Mr. Lee in Spokane as early as January 12, meaning he could not possibly have committed the Mueller murders in Tilly on the 11th.

III.    **The Government's Fraud, Misrepresentation, or Misconduct Precluded Mr. Lee from Fully and Fairly Presenting Viable Claims of Prosecutorial Misconduct in his Original § 2255 Proceedings.**

The Government's case against Mr. Lee was problematic from the start. With the passage of time, it has only gotten substantially weaker. The only unquestionably inculpatory evidence remaining implicating Mr. Lee in the Mueller murders is the uncorroborated testimony of Gloria and Cheyne Kehoe. Now, when the case is considered in its totality, with the newly discovered evidence of Government misconduct, it is clear that Mr. Lee's trial did not result "in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434.

Due to the Government's suppression of *Brady* material and its presentation of false and misleading evidence, the jury that convicted Mr. Lee never learned two crucial facts: 1) Gloria Kehoe suffered from a mental condition that impaired her ability to properly perceive events and caused her to have visual and auditory hallucinations; and 2) the initial suspect in the case, Paul Edward Humphrey, had flunked a polygraph examination about whether he was involved in the Mueller murders. But for the Government's misconduct during the original § 2255 proceeding, Mr. Lee would have been able to raise the following claims.

A.    **First Ground for Relief: Mr. Lee's conviction was obtained in violation of *Brady v. Maryland* because the Government suppressed material impeachment information about Gloria Kehoe's mental instability.**

According to the Supreme Court, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). In the context of a *Brady* violation, prejudice means that the suppressed evidence was

35

"material." *Id*. By withholding information that would have destroyed the credibility of its key witness against Mr. Lee, Gloria Kehoe, the Government violated *Brady*.

### 1.    The centrality of Gloria Kehoe's testimony to Mr. Lee's conviction

Prior to Cheyne's cooperation, there was no evidence connecting Daniel Lee to the murders of the Mueller family. Although authorities already suspected that one or more members of the Kehoe family might have been involved,[41] it was not until Cheyne came forward that the Government determined that Mr. Lee was one of the perpetrators. It was Cheyne's account that finally gave authorities a theory of the case as well as a detailed account of the crime that seemingly lined up with Mr. Kehoe's and Mr. Lee's whereabouts in Oklahoma in mid-January 1996. But as Cheyne himself admitted, he had no direct knowledge of Mr. Lee's involvement; he claimed that Chevie alone had confessed to him.

That all changed when Gloria started cooperating with authorities. Although in her first recorded statement to the authorities she said nothing about Mr. Lee speaking to her, in a subsequent statement she claimed that he had confessed his involvement in the crime. She then testified that Mr. Lee told her that Nancy Mueller had been fooled into believing the FBI raid was genuine, but that William Mueller fought back. Tr. 4975. She also testified that Mr. Lee told her about how the bodies were disposed in a "river," and that Mr. Kehoe had paid him after the murders. *Id*.

---

[41] In 1996, federal authorities provided local police with a potential lead that pointed to the Kehoes: they had recovered guns registered to the Muellers from two different individuals. The first, Travis Brake, had been arrested in Seattle in February of 1996. He told police he bought his gun from a man named Kirby Kehoe at a Seattle gun show. The second individual, Sean Haines, was arrested in South Dakota in December of 1996. He told police he got his gun from Kirby's son, Chevie Kehoe, in a private trade.

Because of her ability to testify to these inculpatory statements by Mr. Lee, Gloria was an indispensable prosecution witness.

Defense counsel attacked Gloria's credibility. As noted previously, they pointed out that at the time of her cooperation she was under indictment in a separate federal case, was implicated as well in the alleged Kehoe racketeering enterprise (and thus had an obvious incentive to curry favor with the Government), and was receiving thousands of dollars in payments every month in exchange for her cooperation. *See supra* Section II.A.1. But the Government possessed a separate kind of impeachment evidence that it did not disclose to defense counsel, and that the jury never heard, that would have been uniquely damaging to her credibility.

As detailed in the attached declaration of Cheyne Kehoe, *see* Exh. B, during the course of its dealings with Gloria, the Government came to suspect that she suffered from mental health problems. In fact, case agents approached Cheyne a number of times to ask him about his mother's "stability." Exh. B at ¶ 35. He candidly told them she was "unstable." *Id.* As he put it,

> That's always been pretty obvious to me and the people who know her. As I told the agents, my mom has always been paranoid *and she sees and hears things that aren't there*, so much so that my dad took her for psychiatric treatment when they lived in North Carolina.

*Id.* (emphasis added)

Cheyne was not the only member of the Kehoe family to advise the prosecution that Gloria had psychiatric issues. Kirby Kehoe, who also cooperated with the Government, also told case agents that Gloria was mentally ill. *See* Exh. C at ¶ 17. Like Cheyne, he advised them that Gloria suffered from hallucinations. *Id.* ("She sometimes had panic attacks and sometimes she had what she called dreams where she saw things happening to us, like seeing people (sometimes government agents) assaulting her.")

It is not clear what efforts if any the Government undertook to investigate Gloria's mental health problems after it learned of this information; there may in fact be additional impeachment evidence that it failed to disclose. What is indisputable, however, is that none of the information about her hallucinations and other problems provided to case agents by Cheyne and Kirby was ever disclosed to defense counsel. This is remarkably consistent with how the Government sanitized Mr. Wanker's statements in a way that misled jurors about the truth. But unlike the other evidence the jury heard relevant to Gloria's bias or her incentives to cooperate, this previously undisclosed evidence was in a class of its own: it fundamentally cast doubt on a star witness's ability to accurately perceive and recall events.

### 2.      The evidence was favorable to Mr. Lee.

As noted, evidence is favorable if it is exculpatory or impeaching. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Evidence that a witness suffers from mental health problems is "classic impeachment evidence." *Browning v. Trammel*, 717 F.3d 1092, 1106 (10th Cir. 2013); United States v. Love, 329 F.3d 981, 984-85 (8th Cir. 2003) (Confrontation Clause violation where witness's relevant mental health history not permitted for purposes of impeachment). *See also Gonzalez v. Wong*, 667 F.3d 965, 983-84 (9th Cir. 2011) (recognizing impeachment value of mental health evidence); *Fuentes v. T. Griffin*, 829 F.3d 233, 247 (2d Cir. 2016) (same); *United States v. Robinson*, 583 F.3d 1265, 1272 (10th Cir. 2009) (same); *Wilson v. Beard*, 589 F.3d 651, 666 (3d Cir. 2009) (same); *East v. Johnson*, 123 F.3d 235, 238 (5th Cir. 1997) (same); *United States v. Butt*, 955 F.2d 77, 82-83 (1st Cir. 1992) (same).

As stated in both Cheyne's and Kirby's declarations, Gloria was paranoid and was prone to visual and auditory hallucinations. This suppressed evidence could have been used to demonstrate Gloria's "impaired ability to perceive, remember and narrate perceptions accurately,

which is clearly relevant to [her] credibility as a witness." *Wilson*, 589 F.3d at 666 (citation and internal quotation marks omitted). It was thus unquestionably favorable to Mr. Lee's defense.

### 3.    The evidence was suppressed.

Both Cheyne and Kirby have declared that they informed the Government about Gloria's mental health problems prior to trial. *See* Exh. B at ¶ 35 ("Prior to Chevie's trial, agents asked me several times about my mother's (Gloria's) stability. I advised them my mom was unstable."); Exh. C at ¶ 17 ("I told agents all of this prior to Chevie's trial, too."). Despite a standing order requiring the Government to turn over any exculpatory or impeachment evidence to the defense, *see* Dkt. 145 at 1, 3, and despite its own acknowledgement of its continuing obligation to do so, *see* Dkt. 55 at 2, the Government never disclosed this information about Gloria's mental health.

Indeed, after Mr. Kehoe's counsel moved to compel Gloria to undergo a psychiatric examination mid-trial to determine whether she suffered from any mental disorder "bearing on the witness' credibility," Dkt. 732 at 1, the Government did not take that opportunity to comply with its *Brady* obligation and disclose to the defendants and the Court what it knew about her mental health and perception impairments. Instead, it muddied the issue and argued that the only relevant question was whether Gloria was competent to testify under Federal Rule of Evidence 601. *See* Dkt. 736 at 2-3. It reframed the question entirely as one involving a judicial gatekeeping function, rather than the jury's ability to make credibility findings about the prosecution's key witness. *Id*. at 3. Despite clearly being on notice that the defense sought impeachment evidence concerning Gloria's mental health, the Government failed to make any disclosures that were otherwise called for under the circumstances.

39

### 4.    The suppressed evidence was material.

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A showing of materiality "does not require demonstration by a preponderance that the disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (quotations omitted). In addition, "it is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 435.

The Government's case against Mr. Lee hinged on Gloria's credibility. Unlike Cheyne, she claimed that Mr. Lee directly confessed his involvement in the Mueller murders to her. Thus, the suppressed impeachment evidence was particularly material. *Bragan v. Morgan*, 791 F. Supp. 704, 714 (M.D. Tenn. 1992) (due process violation where misconduct concerned witness whose testified that defendant confessed to the murder; despite other circumstantial evidence, such a witness is "crucial to the prosecution's case"); *Kyles*, 514 U.S. at 441-45, 453-54 (concluding evidence was material when suppressed evidence could have undermined credibility of prosecution's key witnesses).

40

Moreover, the nature of the suppressed evidence made it especially prejudicial: evidence of mental instability is uniquely relevant to a witness's credibility because it "provide[s] some significant help to the jury in its efforts to evaluate the witness's ability to perceive or to recall events or to testify accurately." *United States v. Moore*, 923 F.2d 910, 913 (1st Cir. 1991). Here, Gloria's mental instability included, according to her own family members, confabulation, fabricating events that never happened (such as assaults by government agents), and a chronic history of experiencing auditory and visual hallucinations. This type of mental health evidence has been consistently found to be material because, as noted above, an impaired ability to perceive, remember and narrate perceptions accurately fundamentally undermines a witness's credibility. *See Wilson*, 589 F.3d at 666; *Gonzalez*, 667 F.3d at 983.

Additionally, the undisclosed evidence was not duplicative of the impeachment evidence actually presented, but rather "was of a different kind" and therefore "would have provided the defense with a new and different ground of impeachment." *Silva v. Brown*, 416 F.3d 980, 989 (9th Cir. 2005) (internal quotation marks and citation omitted). *See also Gonzalez*, 667 F.3d at 982, 983 (mental health evidence material because it "could have provided additional or alternative means of impeachment" that "would have raised serious questions in the factfinder's mind about [witness's] competency to perceive accurately and testify truthfully.").

The suppressed evidence also would have provided an opportunity to impeach Gloria by showing that the Government's own case agents had repeatedly expressed doubts about Gloria's credibility and mental stability. *See Silva*, 416 F.3d at 988 (noting "potentially devastating fact that the state itself doubted [the witness's] mental competency"); *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002) (information that police doubted veracity of informant because of past lies was material *Brady* evidence); *Gates v. District of Columbia*, 66 F. Supp. 3d 1, 22-24

41

(D.D.C. 2014) (in case where witness claimed defendant confessed to him, evidence that detective did not find witness credible constituted impeachment evidence encompassed by *Brady*)*; Ex parte Richardson*, 70 S.W.3d 865, 871-73 (Tex. Crim. App. 2002) (capital conviction and death sentence reversed based on prosecution's suppression of diary kept by police officer who was guarding state's eyewitness to crime; diary revealed officer's belief that witness was not a truthful person).

In addition, the damage the suppressed impeachment evidence could cause was "best understood by taking the word of the prosecutor." *Kyles*, 514 U.S. at 444, 115 S. Ct. 1555. The Government used its summations to discuss the importance of Gloria's testimony against Mr. Lee. Tr. 6799-6800, 6802, 6821, 6829. In fact, the Government told the jury that the "best proof" it had for its theory of the case was Gloria's testimony because "she, if she could have, would have a lot rather blamed this murder on her husband, Kirby, than her son Chevie. But I think she did what she had to do, which was come in here and tell you folks the truth." Tr. 6958. Additionally, the Government used its summations to counter the attempted impeachment of its witness. *See* Tr. 6808, 7006-07.

In a case that turned so much on Gloria's testimony, it cannot be said that Mr. Lee's trial resulted "in a verdict worthy of confidence," *Kyles*, 514 U.S. at 434, where the fact-finders were deprived of evidence central to her credibility. *See Horton v. Mayle*, 408 F.3d 570, 580 (9th Cir. 2005) ("The prosecutor's emphasis on the importance of [the witness's] testimony bolsters the conclusion that disclosure of the [impeachment evidence] may have significantly damaged the prosecution's case."). This is especially so given the weaknesses of the Government's evidence when viewed in its totality. Thus, there is a reasonable probability that, but for the Government's

misconduct, the jury would have evaluated the trial evidence differently and reached a different result.

> **B. Second Ground for Relief: Mr. Lee's conviction was obtained in violation of *Brady v. Maryland* because the Government suppressed material exculpatory and impeachment evidence concerning Paul Humphrey's involvement in the Mueller murders.**

In addition to evidence impugning the key witness's testimony, the defense and the jurors were deprived of damning evidence against original suspect Paul Humphrey also in the Government's possession. If disclosed, this evidence would have undermined both the prosecution's case against Daniel Lee and the soundness of its investigation.

> **1. Paul Humphrey was the Government's initial suspect in the Mueller case.**

Before Cheyne came forward in June of 1997 and fundamentally changed the course of the Mueller murder investigation, authorities were focused on Paul Edward Humphrey, who lived in Pope County, not far from the Muellers. He became a suspect after Nancy's brother, David Branch, informed Pope County authorities on February 22 that Humphrey had the title documents to the Muellers' abandoned Jeep and trailer.[42] Mr. Branch had previously seen those documents, unsigned, in the Mueller residence on February 2, after the family had already been reported as missing from their home. Although Mr. Humphrey initially agreed to cooperate with Pope County authorities when they contacted him on February 22, he spent the next several

---

[42] Details of the investigation into Mr. Humphrey are taken from the search warrant affidavit sworn to on August 27, 1996, by Aaron Duvall, an officer with the Pope County Sheriff's Office. *See* Exh. U (Humphrey search warrant affidavit). Many of the same facts are recounted in the Eighth Circuit's opinion denying Mr. Humphrey's suppression motion. *United States v. Humphrey*, 140 F.3d 762 (8th Cir. 1998). As noted in that opinion, Mr. Humphrey pled guilty to possession of firearms and marijuana that were seized pursuant to that search of his home, which was conditioned on his right to appeal the denial of his suppression motion. *Id.* at 763.

months dodging authorities and offering increasingly bizarre, and false, explanations for why he

couldn't turn over the titles:

- On March 1, Mr. Humphrey told authorities he'd been advised by his attorney in Russellville, Dale Braden, not to surrender the documents. Authorities contacted Mr. Braden a few days later and learned that Mr. Humphrey had lied to them: he had never retained Mr. Braden or otherwise consulted him about those titles.

- On March 15, Mr. Humphrey claimed he didn't have the documents because he'd given them to a friend in Little Rock. He refused to identify who this "friend" was, but agreed to get the documents and give them to authorities.

- After failing to keep his agreement, authorities contacted Mr. Humphrey again on March 26. This time, Mr. Humphrey told authorities that the documents were now with a *different* attorney he'd retained in Little Rock. When authorities contacted that lawyer to verify Mr. Humphrey's story, they found out they'd been lied to yet again: the attorney had no idea who Mr. Humphrey was, much less knew anything about the Mueller titles.

- On April 8, authorities met with Mr. Humphrey and confronted him with his most recent lie. Mr. Humphrey now claimed that he had never actually given the documents to the attorney in Little Rock, but that he only had considered doing so. Instead, he gave the documents to a friend, whom he again refused to name.

It wasn't until three months later, after the Muellers' bodies were recovered, that Pope

County authorities eventually followed up with Mr. Humphrey again and finally got the titles

from him.[43] When authorities submitted those documents for forensic examination along with

known writing samples of William and Nancy Mueller, they finally realized why Mr. Humphrey

had been evading them: the signatures on the titles were forged.[44]

---

[43] The Pope County officials' lack of urgency was especially baffling given that it knew in real-time that Mr. Humphrey was lying to them and obstructing their investigation. Presumably local authorities had given credence to rumors that William Mueller, who travelled in circles known for espousing anti-government views, had simply decided to "go sovereign" and take his family "off the grid" as many believed when they disappeared. Whatever the reason, Humphrey was left to his own devices for months after the crime was said to have occurred.

[44] *See* Exh. V (ATF Lab Report Handwriting Analysis).

After this belated discovery, local authorities spent the next several months steadily gathering evidence that implicated Mr. Humphrey in the Mueller murders, including the following:

- *Mr. Humphrey was seen with the Muellers after their disappearance.* Mary Reid, a friend of the Muellers, contacted authorities shortly after the bodies were recovered in late June of 1996. She told them that on January 18, 1996, she was exiting a bank in Russellville when she heard Nancy Mueller call her name. She turned and saw Ms. Mueller seated in the passenger side of a tan colored vehicle. She walked over to the car and engaged Ms. Mueller in conversation. She saw that Mr. Mueller was in the backseat, flanked by two other men. She also saw the driver of the vehicle, whom she later identified in a photo spread as being Mr. Humphrey. Ms. Reid's account was corroborated by bank records and surveillance camera footage that confirmed she was at the bank on that date. Bank records also corroborated Mr. Humphrey's presence in Russellville on that date. Ms. Reid also positively identified Mr. Humphrey's vehicle after driving in his neighborhood and seeing the car parked on the side of the street. Exh. U (Humphrey Search Warrant Affidavit) at ¶ 13; *United States v. Humphrey*, 140 F.3d 762, 764 (8th Cir. 1998).

- *Mr. Humphrey was in possession of Nancy Mueller's personal belongings.* Authorities conducted a search of Mr. Humphrey's home on August 30, 1996. They discovered a pamphlet belonging to Nancy Mueller with her signature and address written on it. Tr. 5893-94.[45]

- *Mr. Humphrey made inculpatory statements after the Muellers' disappearance.* In September of 1996, authorities interviewed Dr. Charles Turner and Roberta Turner, close friends of the Muellers, and learned that Mr. Humphrey had made several odd and incriminating comments to them after the Muellers disappeared. *See* Exh. W (Synopsis of ATF Interview of the Turners). He came by their home on January 25, 1996 and "tried to convince Dr. Turner that the Muellers were okay. He was trying extra hard to convince the Turners that the Muellers were fine." *Id.* at 2. He came by a second time a few weeks later in mid-February, but this time told Mrs. Turner: "Nancy and Bill was one thing but I really felt bad

---

[45] Notably, the Government pointed to similar evidence in its closing arguments—that a book belonging to Nancy Mueller was found at Mr. Kehoe's property—to claim that its theory of the case was correct. *See* Tr. 6826 ("One of the things, by the way, that came from Idaho was Nancy Mueller's book."); *id.* at 7005 ("And the whole concept that all of the proof that the government has is just from these two witnesses, Cheyne Kehoe and Gloria Kehoe, is wrong. They don't have anything to do with finding the book—Nancy Mueller's book 'August Celebration' on his property on the Priest River. They don't. They did that completely independent of these two- people. But that's great proof. He [Chevie Kehoe] stole her book.").

45

about Sarah." *Id*. When Mrs. Turner asked him to explain what he meant, Mr. Humphrey changed the subject. *Id.* On another visit to the Turners, Mr. Humphrey told them that there "wasn't any money at the Muellers' house when he [Humphrey] went there." *Id.* When Mrs. Turner asked him what money he was talking about, he changed the subject. *Id*.

- *Mr. Humphrey knew details only a perpetrator would know*. Mr. Humphrey claimed at trial that the last time he'd had any contact with the Muellers was by phone on the evening of January 10, 1996. Tr. 6148. But when he was interviewed by police after the Muellers went missing, he described the clothes they wore when he last saw them, which matched the clothes later found on their bodies. *Humphrey*, 140 F.3d at 764.

- *Mr. Humphrey was intimately familiar with the location where the bodies were recovered*. Authorities learned that Mr. Humphrey was a proficient skin diver with experience diving in Lake Dardanelle where the Muellers' bodies were recovered. He tried to deny this when examined on the stand, but quickly back-pedaled after he was confronted with his prior inconsistent statement to law enforcement. Tr. 6191-92.[46]

Federal authorities took the case over from local law enforcement shortly after Cheyne Kehoe began his cooperation. Despite the substantial evidence that had already been gathered by that point implicating Mr. Humphrey, the Government nevertheless shifted gears and concentrated its efforts on proving the theory of the case provided by Cheyne, and later Gloria: that Mr. Lee was involved in the murders. Yet the Government was never actually able to rule out Mr. Humphrey's involvement in the crime. It continued to collect evidence from him for analysis,[47] and still listed him as a suspect on various requests for forensic testing, *as late as March 2, 1999*—after jury selection had already commenced and nearly a week before opening statements. *See* Exh. Y (3/2/99 Arkansas State Crime Lab Report).

---

[46] Mr. Humphrey testified that "on a good day" the visibility in Lake Dardanelle "might be six inches." Tr. 6192. He implausibly claimed that this was not based on his own experience, but that he only knew this because he "had studied." *Id*.

[47] For example, on October 10, 1997, the Government sought to obtain a hair sample from Mr. Humphrey. *See* Exh. X.

46

### 2.    The undisclosed evidence about suspect Paul Humphrey.

One of the main defense themes at trial was that the murders had been committed by a third party, but that authorities had botched the investigation because they continued to treat this as a "missing persons" case for way too long, losing time and crucial evidence in the process; after the bodies were recovered and authorities realized their mistake, months went by with no discernible progress. When Cheyne came forward with his story, the defense contended, authorities latched onto it because it gave them a convenient way to close the case, not because it fit all the available evidence. In support of this argument, the defense presented much of the aforementioned evidence pointing to Mr. Humphrey's involvement in the murders. As noted previously, Mr. Kehoe's counsel even called Mr. Humphrey as a witness. Under questioning by Mr. Lee's trial counsel, he denied knowing that the Muellers' signatures on the titles to their vehicles were forged and denied that he had forged the signatures himself, Tr. 6201;[48] he also denied ever having skin dived in Lake Dardanelle, but then conceded he had previously admitted that fact to authorities. Tr. 6191-92. In an effort to negate the implications of defense counsel's questions, the Government point-blank asked Mr. Humphrey:

> Q.    Were you in any way involved in the death of Bill Mueller, or Nancy Mueller or Sarah Powell?
>
> A.    No.

Tr. 6204.

Unbeknownst to the defense, however, the Government was concealing devastating impeachment evidence about Mr. Humphrey's testimony. Although it had turned over a number of materials pertaining to its investigation into Mr. Humphrey prior to trial, there was at least one

---

[48] *See also* Tr. 6169, 6174-76.

47

damning document the Government withheld: a report of a polygraph examination conducted on

January 21, 1997. *See* Exh. A. The purpose of the exam was "to determine his knowledge or

involvement in the reported homicide of BILL and NANCY MUELLER." *Id.* Mr. Humphrey

was examined using the Modified General Question Technique, in which relevant questions

about the crime are asked along with irrelevant and control questions. *Id.* He was asked the

following about the Mueller murders:

Q-3:    Did you ever meet SYLVIA MASER[49] prior to the MUELLERS disappearing?

A:      No.

Q-5:    Were you present when the MUELLERS were killed?

A:      No.

Q-8:    Did you participate in disposing of the bodies of the MUELLERS?

A:      No.

Q-10:   Did you know that the title was forged when you took it to the sheriff?

A:      No.

*Id.* As the Arkansas State Police polygraph examiner concluded in his report, Mr. Humphrey had

lied in his responses to these questions and he was, in fact, involved in the murders:

---

[49] This appears to be a typographical error. Sylvia Mason was the Muellers' landlord. After initially telling police that he did not remember who had mailed him the title documents, Mr. Humphrey later claimed that it was Ms. Mason who sent them. She, however, did not corroborate Mr. Humphrey's story.

FINDINGS

The physiological responses noted on this subject's polygraph charts are in such a pattern as to indicate that the subject, Mr. PAUL EDWARD HUMPHREY, was essentially untruthful in answering the above questions.

Based on the evaluation of the subject's polygraph charts, it is the opinion of this examiner that Mr. HUMPHREY was involved in the death of the MUELLERS.

Respectfully submitted,

*Brett Pritchard /lw*

BRETT PRITCHARD, Investigator
Polygraph Examiner
Criminal Investigation Division

*Id.* Because this material was never disclosed to the defense, Mr. Lee was precluded from introducing it into evidence or impeaching Mr. Humphrey on the stand, and the jury therefore never learned of this powerful evidence.

### 3. The evidence was favorable to Mr. Lee.

Evidence that another suspect has taken and failed a polygraph test about whether he was involved in a murder that the defendant was charged with is "plainly exculpatory." *Watkins v. Miller*, 92 F. Supp. 2d 824, 842 (S.D. IN 2000). That was clearly the case here: Mr. Lee's defense was that he was not guilty, and that there were other likely suspects, such as Mr. Humphrey, that the Government failed to adequately investigate. The polygraph evidence was unmistakably relevant to his defense because it established that Mr. Humphrey was at the very least present during the Mueller murders and helped dispose of their bodies. If credited by the jury, then Mr. Lee could not have been convicted because this evidence contradicted the account of the murders provided by Gloria and Cheyne, which was the only theory offered by the Government concerning Mr. Lee's alleged involvement in the crime.

Such evidence would have been admissible at Mr. Lee's trial. There is no *per se* ban on the use of polygraph evidence in this Circuit. *United States v. Montgomery*, 635 F.3d 1074, 1094

(8th Cir. 2011); *United States v. Rouse*, 329 F. Supp. 2d 1077, 1083 (D. S.D. 2004) (polygraph

evidence no longer *per se* inadmissible in the Eighth Circuit). "To be admissible, polygraph

evidence must be relevant, and its probative value must not be substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury." *Montgomery,* 635

F.3d at 1094 (citations and internal quotation marks omitted).[50] *See also Rouse*, 329 F. Supp. 2d

at 1083 ("polygraph evidence could be admitted in the absence of a stipulation from the

government, and even over its objection, if the evidence meets *Daubert* [*v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 570 (1993)] standards.") Here, however, the Government's

failure to disclose this information precluded Mr. Lee from being allowed to make the requisite

showing of admissibility. But for the Government's misconduct, there is a reasonable probability

that Mr. Humphrey's polygraph report would have been admitted into evidence. *See United*

*States v. Galbreath*, 908 F. Supp. 877 (D. N.M. 1995) (finding that polygraph examination based

on control question technique satisfies *Daubert* standards).

The polygraph evidence was also admissible to impeach Mr. Humphrey's testimony. *See*

*United States v. Piccinona*, 885 F.2d 1529, 1536 (11th Cir. 1989) (polygraph evidence

admissible to impeach witness); *United States v. Nelson*, 970 F.2d 439, 442 (8th Cir. 1992)

(noting that polygraph report "should have been disclosed" as *Brady* evidence, but denying relief

---

[50] In *Montgomery*, the polygraph report was excluded because it was commissioned by the defense without notice to the Government and without its participation. As the Eighth Court noted, under such circumstances, a polygraph examination has minimal probative value because there is "no adverse interest at stake"—the report "won't see the light of day if the defendant flunks." 635 F.3d at 1094 (citation and internal quotation marks omitted). Moreover, the questions asked were "vague" and the physiological reactions were ambiguous. *Id.* By contrast, Mr. Humphrey's polygraph was commissioned by law enforcement authorities, and he therefore faced the possibility of "suffer[ing] negative consequences from a failed examination." *Id.* Additionally, the questions posed to him were clear and direct, and his physiological responses clearly indicated that he lied.

because information contained in the report was "fully elicited and developed" by defense counsel); *United States v. Padilla*, 908 F. Supp. 923, 929-31 (S.D. Fla. 1995). Here, Mr. Humphrey unequivocally testified that he was not involved in the Mueller murders, and that he had no knowledge that the signatures on the titles were forged. The polygraph report plainly indicated otherwise, and thus was clearly relevant impeachment, and certainly not cumulative. But for the Government's suppression, the defense could have confronted Mr. Humphrey on the stand with his polygraph report and impeached his testimony on both of these issues.

### 4.    The evidence was suppressed.

As part of its pre-trial *Brady* disclosures to the defense,[51] the Government turned over a number of reports by local law enforcement authorities documenting their interviews with Mr. Humphrey. Among those was a January 21, 1997 interview between Mr. Humphrey and the Pope County Sherriff's Office that was conducted at 3:55 p.m. at the law offices of Mr. Humphrey's attorney. *See* Exh. Z. However, earlier that same day at that same office, Mr. Humphrey also met with Investigator Brett Pritchard of the Arkansas State Police and submitted to a polygraph examination. *See* Exh. A (noting that pre-interview was conducted at 1:20 p.m.) Even though it took place on the same day, the Government withheld all information related to this earlier meeting, including the Arkansas State Police report documenting the polygraph examination and the finding that Mr. Humphrey had flunked the exam.

---

[51] *See* Dkt. 33 at 2. As noted earlier, Mr. Lee renewed his *Brady* request in his initial § 2255 proceeding and specifically requested that the Government review its files and the files of investigating agencies for any information favorable to the defense relating, *inter alia*, to others potentially responsible for the murders of the Mueller family or who otherwise played a role in the crimes charged in, or related to, the case. Dkt. 1118-1 at 7, n.3. The Government did not disclose the Humphrey polygraph report at that time, either.

Undersigned counsel obtained the Humphrey polygraph pursuant to an Arkansas Freedom of Information Act request made to the Arkansas State Police. For purposes of a *Brady* suppression analysis, the fact that the document was obtained from the state police files rather than the federal prosecutor's files is immaterial: Under *Brady*, the prosecution's obligation extends to information known to investigating agencies and officers. *See United States v. Robinson*, 809 F. 3d 991, 996 (8th Cir. 2016) ("This duty extends not only to evidence of which a prosecutor is aware, but also to material 'favorable evidence known to the others acting on the government's behalf in the case, including the police.'") (quoting *Kyles*, 514 U.S. at 419); *United States v. Long*, 870 F.3d 741, 747 (8th Cir. 2017); *United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008) ("A prosecutor has a duty to disclose evidence known by police officers, even if not known by the prosecutor, because a prosecutor has a duty to learn of such information."); *Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir. 1999) (reversing denial of habeas relief based on *Brady* violation); *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996); *Carey v. Duckworth*, 738 F.2d 875, 877–78 (7th Cir. 1984) ("a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case").

### 5.    The suppressed evidence was material.

Given the myriad problems with the trial evidence against Mr. Lee, the information the prosecution suppressed about Mr. Humphrey's failed polygraph is enough by itself to undermine confidence in the verdict and to require relief under *Brady*—evidence that someone else committed the crime is in a category by itself, and its import to trial counsel's "third party guilt" defense is unmistakable. And yet, a properly conducted materiality assessment requires that this

52

Court not examine the suppressed Humphrey evidence in isolation, but rather in light of the totality of the evidence.

The Supreme Court has explained that it is error to simply determine whether the piece of suppressed evidence, standing alone, would have resulted in a different verdict. *See e.g. Kyles*, 514 U.S. at 436 ("[for materiality purposes], suppressed evidence [must be] be considered collectively, not item by item"); *id*. at 436 n.10 ("We evaluate [the] cumulative effect [of undisclosed evidence] for purposes of materiality separately and at the end of the discussion[.]"); *id*. at 441 ("The result . . . is incompatible with a series of independent materiality evaluations, rather than the cumulative evaluation required by [precedent]."). Most recently in *Wearry v. Cain*, 136 S. Ct. 1002 (2016), the Supreme Court again rejected a prejudice determination that focused solely on the effect of evidence in isolation. *See id*. at 1007 ("[T]he state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively….")

Following *Kyles*, the Eighth Circuit has also insisted on a holistic prejudice analysis. *See*, *e.g*., *Amrine v. Bowersox*, 128 F.3d 1222, 1230 (8th Cir. 1997) ("When determining the impact of evidence unavailable at trial, a court must make its final decision based on the likely cumulative effect of the new evidence had it been presented at trial."); *Battle v. Delo*, 64 F.3d 347, n.11 (8th Cir. 1995) (same).

The analysis of prejudice in this case therefore is not whether a single piece of newly discovered evidence is enough on its own to overcome the trial evidence of guilt; *Brady* materiality determination "is not a sufficiency of the evidence test." *Kyles*, 514 U.S. at 435. Nor is the relevant question whether "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict"; or even "whether the

53

defendant would have more likely than not have received a different verdict" but for the suppressed evidence. *Id*. at 434-35. Rather, the question is *what the whole trial would have looked like to the jury* absent constitutional violations. In Mr. Lee's case, the cumulative effect of the totality of the evidence would have undoubtedly strengthened the materiality of the suppressed evidence of "third party guilt." *See Smith v. Secretary of New Mexico Dep't of Corrections*, 50 F.3d 801, 829-35 (10th Cir. 1995) (ordering habeas relief based on *Brady* violations in murder case; prosecution failed to disclose information that had cumulative effect of casting strong suspicion on another suspect); *Bowen v. Maynard*, 799 F.2d 593, 612-13 (10th Cir. 1986) (affirming habeas relief based on *Brady* violations in murder case; defendant had "creditable" alibi defense and prosecution failed to disclose information that had strong cumulative effect implicating another suspect).

Furthermore as *Kyles* clarified, a cumulative materiality analysis must account not only for the direct impact of the suppressed evidence, but also the collateral effects of the jury learning about the questionable practices in which the prosecution engaged in building its case. *See Kyles* at 445-46 (evidence of prosecutorial misconduct would have allowed jury to also question the integrity and reliability of investigation). In Mr. Lee's case, consideration of such collateral effects includes the possible impact on the jury if it had learned that Mr. Wanker had been instructed by authorities to limit his testimony on the stand; that the hair connecting him to the crime was misidentified and was not in fact his; that law enforcement reports of his previous statements had been crafted to exclude exculpatory evidence; that his grand jury testimony was manipulated to omit information that was not consistent with the Government's theory of the case; that case agents had doubts about Gloria's mental stability; that prosecutors suppressed information that Gloria had a long history of suffering from visual and auditory hallucinations

and was prone to making up events that never occurred; that the Government's theory of the crime relied on a tenuous timeframe already questioned by the jurors; and that the Government buried a damning report documenting that the earliest suspect in the murders flunked a polygraph, indicating that he had in fact committed the Mueller murders. As the Supreme Court noted in *Kyles*, jurors' exposure to these types of tactics can do profound damage to the prosecution's case because they call into question "the thoroughness and even the good faith of the investigation" upon which the case was built. *Kyles*, 514 U.S. at 445. *See also id*. at 449 (disclosure of *Brady* material "could have been used to cap an attack on the integrity of the investigation and on the reliability of [the lead detective]"). Indeed, here it functions to explain why there were so many holes in the case against Mr. Lee in the first place. In the Government's zeal to prove Mr. Lee's guilt it engaged in classic confirmation bias: it sought out any evidence that fit with Cheyne's and Gloria's story, no matter its weakness, and ignored any evidence that did not, no matter its strength.[52]

When this previously undisclosed evidence is considered alongside all the other undisclosed or problematic evidence, it cannot be said that Mr. Lee's trial resulted "in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

---

[52] *See* Fred Klein, A View from Inside the Ropes: A Prosecutor's Viewpoint on Disclosing Exculpatory Evidence, 38 Hofstra L. Rev. 867, 880 (2010) ("As one scholar (and former prosecutor) has thoughtfully proposed, psychological factors such as confirmatory bias, selective information processing, and resistance to cognitive dissonance inherently lead to *Brady* violations even by the most ethical of prosecutors."); Alafair S. Burke, Improving Prosecutorial Decision Making: Some Lessons of Cognitive Science, 47 Wm. & Mary L. Rev. 1587, 1593-1601 (2006).

**C.      Third Ground for Relief: Mr. Lee's conviction was obtained in violation of**
***Napue v. Illinois* and *Giglio v. United States* because the Government**
**presented false and misleading testimony about Mr. Humphrey's**
**involvement in the Mueller murders.**

Prosecutors violate due process by presenting material testimony that is false or that creates a false impression, or by allowing such testimony to stand uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements that are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Smith v Dept. of Corrections*, 572 F.3d 1327, 1333-34 (11th Cir. 2009) ("The *Giglio* rule applies to explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury while questioning a witness."). This is so even where the particular prosecutor does not know that the testimony being presented is false or misleading but when a member of the team either knew or should have known. *See Giglio*, 405 U.S. at 154. It is the truthfulness of the process that is of utmost importance, even when the prosecutor acts in good faith and there is no intent to deceive. *Id.* at 153. Under *Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny, a violation is established if: (1) the testimony in question was misleading; (2) the Government knew or should have known the testimony was misleading; and (3) the testimony was material. As set forth below, Mr. Lee is able to meet these three elements.

The Government stood by silently as Mr. Humphrey testified at trial that he had no idea that the Muellers' signatures on the titles were forged, and then, most critically, when he denied any involvement in the murders. It never acted to correct the testimony or otherwise notify defense counsel of material impeachment evidence. Indeed, it was the Government that elicited

56

Mr. Humphrey's testimony that he had nothing to do with the crimes. Its misconduct violated the

basic tenet of *Napue v. Illinois*, which prohibits "soliciting false evidence," and requires the

prosecutor to not "allow[ ] it to go uncorrected when it appears." 360 U.S. 264, 269 (1959).

### 1.    Paul Humphrey's testimony was false and misleading.

The polygraph examination establishes that Mr. Humphrey's testimony was false and

misleading. That deceit was compounded by the Government in closing arguments. It told the

jury that Mr. Humphrey had been thoroughly investigated and cleared by both local and federal

law enforcement agencies:

> Then they spent a bunch of time during the trial trying to convince everybody that
> Paul Humphrey did it. Again you saw Mr. Humphrey testify. Now, Mr.
> Humphrey got in some trouble with the police. He got in that trouble because of
> those car titles. He had the Bill Mueller car titles. And Aaron Duvall [of the Pope
> County Sheriff's Office] did what a good officer would do. He wanted to get to
> the bottom of why Paul Humphrey had those car titles. So what does he do? He
> gets a search warrant. He goes out. He searches Humphrey's house. And they
> submit all these items for examination. [ATF Case Agent] Glen Jordan told you
> they traced those 40 firearms they found to see if one of them was Bill Mueller's.
> It wasn't. They sent off all this stuff to be examined. They didn't find anything.
> What did they find? They found one pamphlet that had Nancy Mueller's name on
> it. When Mr. Humphrey testified, what did he say? Yeah, I had that pamphlet.
> Nancy gave it to me. She wanted me to get into the product, whatever it was, and
> start using it. *There's no evidence against Mr. Humphrey.*

Tr. 6959-60 (emphasis added).[53] The prosecution did not want to leave any door open as

to Humphrey's involvement. Not only did the Government fail to correct the false

testimony, but it reinforced it and capitalized on it in its closing argument.

---

[53] *See also supra* note 45.

## 2. The Government knew or should have known Mr. Humphrey's testimony was false and misleading.

For the same reasons articulated above, the Government knew or should have known that Paul Humphrey's testimony was false or misleading. Here, the polygraph examination was conducted by the Arkansas State Police, which cooperated and coordinated with both the Pope County Sheriff's Office and federal authorities in the investigation of the Mueller murders. Any knowledge by the Arkansas State Police regarding Mr. Humphrey's polygraph examination must be imputed to the Government. *Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."). *See also United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979) (imputing knowledge in state hands to federal prosecutors because of degree of cooperation and interaction among the various authorities during the general course of the investigation).

As the Supreme Court has made clear, the *Brady* rule encompasses evidence "known only to police investigators and not to the prosecutor." *Kyles*, 514 U.S. at 438. Under *Brady* and *Napue*, the "prosecution team" includes "both investigative and prosecutorial personnel." *Antone*, 603 F.2d at 569. Thus, any exculpatory information that investigative personnel learned must be imputed to the Government, too. *See United States v. Bin Laden*, 397 F. Supp. 2d 465, 481 (2d. Cir. 2005) ("[I]t is clear that the investigating case agents on a particular prosecution are part of the prosecution team; their possession of producible material is imputed to the prosecutor regardless of his actual knowledge."); *U.S. ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985) (recognizing duty to search files maintained by branches of government "closely aligned with the prosecution"). Nor is it a defense if law enforcement officers hid exculpatory information from the prosecutors. *See Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964)

58

("The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused.").

### 3.    Mr. Humphrey's testimony was material.

"Claims arising under *Giglio v. United States* [] are a type of *Brady* claim that have a different and more defense friendly measure of materiality." *Hammond v. Hall*, 586 F.3d 1289, 1306-07 (11th Cir. 2009). Under this type of claim, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). The "could have" standard requires a new trial unless the prosecution persuades the court that the misleading testimony was harmless beyond a reasonable doubt. *Ford v. Hall*, 546 F.3d 1326, 1332 (11th Cir. 2008) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). "This standard favors granting relief. It is shaped by the realization that 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.'" *Id*. at 1333-34 (quoting *Giglio*, 405 U.S. at 153).

All of the reasons articulated above to show that the suppressed evidence was material to Mr. Lee's defense under *Brady* apply with even greater force to show why the *Napue*/*Giglio* violation was not harmless beyond a reasonable doubt. The fact that the Government not only solicited the false evidence, but also then capitalized on it in closing arguments, is enough to warrant reversal. *See United States v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977) (where prosecutor failed to correct false testimony that witness did not receive a plea deal in exchange for his cooperation, and then argued that it was a relevant matter for jury to consider in evaluating witness's credibility, combined prejudice warranted reversal); *United States v.*

59

*Bigelesein*, 625 F.2d 203, 208-09 (8th Cir. 1980) (granting habeas relief where "combined effect" of prosecutor's failure to correct false testimony and misleading closing argument violated due process); *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988); *United States ex rel. Dowd v. Lane*, 574 F. Supp. 972, 974–75 (N.D.Ill.1983), *aff'd*, 762 F.2d 1015 (7th Cir.1985) (failure of prosecutor to correct testimony he knew was "likely to convey a false impression to the jury" and "deliberately emphasized the testimony by repeating it").

The Government's blunt elicitation of Mr. Humphrey's testimony denying his involvement in the murders, as well as its arguments in summation indicating that Mr. Humphrey had been properly investigated and ruled out as a suspect, carried the imprimatur of the Department of Justice, as well as every investigative agency that participated in the case. The jury would have felt entitled to believe with confidence that the Government had thoroughly investigated Mr. Humphrey and cleared him of any wrongdoing. The newly disclosed evidence would have shaken any trust the jury had in the Government's representation, particularly if it had learned that prosecutors had buried such explosive information. There is thus "any reasonable likelihood that the false testimony could have affected the judgment of the jury," *Agurs*, 427 U.S. at 103, and the Government cannot prove that it was harmless beyond a reasonable doubt.

> **D.    The materiality of the *Giglio/Napue* violation must also be considered *in toto* as well as collectively with the *Brady* violations.**

The Supreme Court's insistence that a *Brady* materiality analysis must examine the whole trial in light of the new evidence applies with equal force to *Giglio/Napue* claims. As with *Brady* claims, a court should not isolate the *Napue* violation when evaluating prejudice. *See e.g. United States v. McCullah,* 136 Fed. Appx. 189, 199-200 (10th Cir. 2005) (evaluating materiality of

60

*Napue* violation "in the context of the entire record"); *Campbell v. Reed,* 594 F.2d 4, 8 (4th Cir. 1979) (finding *Napue* violation after "[v]iewing the record as a whole.").

Additionally, despite the distinct tests for materiality, *Napue* and *Brady* violations must be analyzed collectively. Thus even where the *Napue* errors standing alone are not material, the collective nature of the government misconduct may be sufficient to show that trial did not result in a verdict worthy of confidence. *Reis-Campos v. Biter,* 832 F.3d 968, 977 (9th Cir. 2016); *Phillips v. Ornoski*, 673 F.3d 1168, 1189 (9th Cir. 2012).

Here, each of the errors provides a basis for relief: a key prosecution witness suffered from regular visual and auditory hallucinations; the initial suspect in the murders had never been definitively cleared, and had actually flunked a polygraph indicating his involvement in the murders; that the disinterested witness who ostensibly corroborated the Kehoes' account of Mr. Lee's involvement in the Mueller murders had actually repeatedly warned authorities that Mr. Lee's admission was neither credible or trustworthy; and the hair found on the clothing worn by one of the perpetrators was not, in fact, Mr. Lee's. When combined with the serious reservations the jury demonstrated about convicting on the basis of Cheyne's and Gloria's word alone, as well as the concerns it showed about the plausibility of the Government's timeline, there can be little if any confidence in the resulting verdict.

## IV.     The Original § 2255 Proceeding Should be Reopened Pursuant to Fed. R. Civ. P. 60 Due to the Government's Fraud, Misrepresentation, or Misconduct.

Mr. Lee's § 2255 proceeding was tainted by the Government's misconduct, but not irreparably so. The Government's failure to disclose *Brady* material in response to a direct request for such evidence prevented Mr. Lee from obtaining discovery to establish the preceding claims that the prosecution had withheld exculpatory and impeachment evidence at his trial and presented false and misleading evidence. This defect in the integrity of his § 2255 proceedings

61

can be remedied pursuant to several different provisions of Fed. R. Civ. P. 60.[54] "The decision to grant relief[55] [pursuant to Rule 60] lies with the district court and may be reviewed only for abuse of discretion." *United States v. Young*, 806 F.2d 805, 806 (8th Cir. 1986).

### A.    Rule 60(b)(3)

Rule 60(b)(3) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons… (3) fraud … misrepresentation, or misconduct by an opposing party."  Numerous courts have held that, when the Government makes misrepresentations during a § 2255 proceeding that prevent a federal prisoner from fully and fairly presenting his collateral claims, there is a defect in the integrity of the proceedings that warrants relief under Rule 60(b)(3).

For example, in *In re Pickard*, 681 F.3d 1201 (10th Cir. 2012), the movants alleged in a § 2255 motion that the Government had failed to disclose impeachment information about a key cooperating witness. The Government had released Drug Enforcement Agency (DEA) records about the witness, but the movants claimed that other agencies also had relevant records about this witness that should have been turned over. In response, the Government asserted that no agency other than the DEA was involved in the investigation against the movants, and that it was not aware of the witness' involvement with any agency besides the DEA. *Id.* at 1203. The district court denied *Brady* claim for lack of proof. *Id.* After the § 2255 proceeding had concluded, the

---

[54] The Supreme Court has held that Rule 60(b) motions can properly be applied to habeas proceedings when they attack "not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the [previous] federal habeas proceedings." *Gonzalez v. Crosby*, 545 U.S 524, 532 (2005). "Fraud on the federal habeas court is one example of such a defect." *Id.*, n.5.

[55] "Relief" refers to the re-opening of the judgment itself, not to whether the court ultimately sides with the moving party after ordering discovery or conducting whatever proceedings may be necessary for assessing the merits of the claims.

movants obtained documents via a Freedom of Information Act (FOIA) request that showed that, in fact, agencies other than the DEA were involved in the investigation and had records related to the cooperating witness. They then sought to reopen the § 2255 proceeding pursuant to Rule 60(b)(3). They alleged that "the prosecution made a false statement in the § 2255 proceedings that forestalled the discovery from which they could have established that there had been a *Brady/Giglio* violation at trial." *Id*. at 1202-03.

The Tenth Circuit agreed. It held that the movants' "claims that prosecutorial misconduct in the § 2255 proceedings affected the integrity of those proceedings are proper Rule 60(b) claims." *Id*. at 1203. *See also id.* at 1206 ("[T]he claim in the Rule 60(b) motion is that the prosecutor committed fraud in the § 2255 proceedings that prevented Defendants from obtaining discovery to establish their § 2255 claims. If we assume the truth of Defendants' allegations, as we must at this juncture, then Defendants have stated a proper Rule 60(b) motion.").[56] As the court observed, the Rule 60(b) motion was not a second or successive motion because it did not seek to raise new claims attacking the original conviction. Rather, the movants were "simply asserting" they did not "get a fair shot in the original § 2255 proceeding because its integrity was marred by a flaw that must be repaired in further proceedings." *Id*. at 1206.

---

[56] "Fraud" within the meaning of Rule 60 does not necessarily entail any intent to deceive. As is true with *Brady* violations, the effect on the proceedings is the same whether a prosecutor acted in good faith or bad, and it is the effect on the "integrity of the proceedings" which is at issue here. *See Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995); *Schultz v. Butcher*, 24 F.3 626, 630 (4th Cir. 1994); *Anderson v. Cryovac, Inc*., 862 F.2d 910, 923 (1st Cir. 1988); *Complaint of Edwards*, 809 F.2d 1403, 1405 (9th Cir. 1987); *United States v. One (1) Douglas A-26B Aircraft*, 662 F.3d 1372, 1375 n.6 (11th Cir. 1981).

As the Tenth Circuit further held, failing to allow the movants to reopen the proceeding under these circumstances would result in a "substantial injustice" and allow the Government to profit off its own misconduct:

> We cannot accept the proposition that the government has a free pass to deceive a habeas court into denying discovery just because it similarly deceived the trial court. If Defendants' claim of prosecutorial deceit during the § 2255 proceedings must be treated as a second-or-successive § 2255 motion, then the government's alleged misconduct during that proceeding could compound a substantial injustice to Defendants. In a second-or-successive proceeding Defendants must show that their FOIA evidence (which allegedly contradicts the prosecutor's statement in the § 2255 proceedings) would suffice "to establish by clear and convincing evidence that no reasonable factfinder would have found the movant[s] guilty of the offense." 28 U.S.C. § 2255(h)(1). This is a far heavier burden than the burden under Rule 60(b) of showing only that the false statement had improperly forestalled discovery in the § 2255 proceedings. … To treat [the defendants'] *Brady* claim as a second or successive request for habeas relief, subject to the almost insurmountable obstacles erected by 28 U.S.C. § 2244(b)(2) (B), would be to allow the government to profit from its own egregious conduct.

*Id.* at 1207 (internal quotation marks and citations omitted).

Similarly, in *United States v. Williams*, 753 Fed. Appx. 176 (4th Cir. 2019), the movant filed a motion pursuant to Rule 60(b)(3) alleging that the Government made several material misrepresentations during the original § 2255 proceedings that prevented him from fully and fairly presenting certain ineffective assistance of counsel claims. Specifically, the Government stated in its responses opposing the § 2255 motion that there was no evidence suggesting the DNA analysis, which tied the defendant to a crime scene, was unreliable. Mr. Williams claimed he had discovered documents proving that the DNA analyst was not credible and that the Government knew about these documents before he filed his § 2255 motion. He argued that the Government's material misrepresentations caused the district court to deny his § 2255 motion and asked that the proceeding be reopened. *Id.* at 177. The district construed the Rule 60(b)(3) motion as an unauthorized, successive § 2255 motion and dismissed for lack of jurisdiction. *Id.*

64

On appeal, the Fourth Circuit reversed. It held that claims of prosecutorial misconduct in the § 2255 proceeding are properly cognizable under Rule 60(b)(3): Williams "did not seek to raise a new claim but contended that the Government's purported misrepresentations during the § 2255 proceedings prevented him from fully and fairly presenting certain ineffective assistance of counsel claims." *Id.* at 177-78.[57] It vacated the order denying the Rule 60 motion as successive and remanded for further proceedings.

In *Scott v. United States*, 81 F. Supp. 3d 1326 (M.D. Fla. 2015), *aff'd*, 890 F.3d 1239 (11th Cir. 2018), Scott alleged in his § 2255 motion that his trial counsel was ineffective for failing to investigate and uncover additional impeachment evidence about one of the key cooperating witnesses. *Scott,* 81 F. Supp. 2d at 1328. The Government responded that no prejudice resulted from trial counsel's abridged investigation because there was no further impeachment evidence that counsel could have uncovered. *Id*. Three years after Mr. Scott's § 2255 motion was denied, an AUSA in a different office who planned to use the same cooperating witness in a different federal prosecution uncovered *Brady* evidence that the witness had lied to investigators on a number of occasions. *Id.* at 1329-30. After Mr. Scott was notified of this *Brady* evidence, he filed a Rule 60(b)(3) motion to reopen his § 2255 proceeding.

The district court found that this was a "true" Rule 60(b) motion and granted it:

> [Petitioner] does not attempt to add a new claim for relief, nor does he challenge the Court's reasoning for its decision on the initial motion to vacate. Instead, Petitioner asserts that the government's argument in the initial § 2255 proceeding that there was no further *Brady* material Petitioner's trial counsel could have uncovered, when in fact there was, corrupted the Court's judgment on the

---

[57] The Fourth Circuit also rejected the district court's ruling that the Rule 60(b)(3) motion was untimely because it was not filed within one year of the order denying § 2255 relief: "We decline to affirm the court's jurisdictional ruling on timeliness grounds because the Rule 60(b) one-year filing deadline is an affirmative defense, not a jurisdictional bar, and Williams must be given the opportunity to make a case for timely filing." *Id*. at 178 (internal quotation marks and citation omitted).

65

ineffective assistance of counsel claim. In other words, Petitioner's Rule 60 motion does not attempt to vacate the underlying conviction by adding a new *Brady* or *Giglio* claim, but instead seeks to vacate the court's previous order denying post-conviction relief based on the government withholding evidence relevant to the prejudice prong of Petitioner's *Strickland* claim. Because Petitioner has so narrowly tailored his argument, the Court is satisfied it is a proper Rule 60(b) claim rather than a disguised successive motion to vacate. Therefore, the Court has jurisdiction to rule on the motion.

*Id.* at 1336-37.[58]

The Government's misconduct in the Lee case is similarly cognizable under Rule 60(b)(3). Despite Mr. Lee's clear request for any information that would support a *Brady* claim, the Government simply noted that it had previously provided a "huge amount" of discovery to trial counsel. Dkt. 1126-1 at 45 n.16. It made no additional disclosures, and Mr. Lee had no basis to believe any *Brady* material existed given the Government's representations. (This was especially so given the specific representations that the Government had previously made in connection with Chevie Kehoe's § 2255 proceedings.)

We now know that the Government's representations were false. Its failure to produce the requested discovery during the § 2255 proceedings deprived Mr. Lee of the ability to raise *Brady* claims concerning Gloria's mental instability and Paul Humphrey's failed polygraph examination. Thus, Mr. Lee did not "get a fair shot in the original § 2255 proceeding" because the Government "committed fraud in the § 2255 proceedings that prevented [him] from obtaining discovery to establish [his] § 2255 claims." *In re Pickard*, 681 F.3d at 1206.

---

[58] The district court also declined to deny the motion as untimely, noting that the Government "made it impossible for Petitioner to timely file a Rule 60(b)(3) motion because it failed to disclose potentially impeaching evidence about [the witness] until three years after Petitioner's initial § 2255 motion was resolved. … Only unfairness would result to Petitioner were the Court, under these circumstances, to dismiss the motion on its own initiative." *Id*. at 1338.

**B.      Rule 60(b)(6)**

Rule 60(b)(6) provides that a court may reopen a judgment for "any other reason that justifies relief." Rule 60(b)(6) is "properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *Cornell v. Nix*, 119 F .3d 1329, 1332 (8th Cir. 1997) (citing *Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir. 1989)).

Mr. Lee's allegations about the Government's misconduct are cognizable under Rule 60(b)(6). *See United States v. Pelullo*, Crim. No. 94–276(DRD), Civ. No. 01–124(DRD), 2010 WL 2629080 at *15 (D. N.J. June 25, 2010) (finding grounds for jurisdiction under Rule 60(b)(6) to consider movant's claim that the Government had falsely denied the involvement of a federal agency in his prosecution, thereby resulting in his inability to obtain discovery from the agency to support his § 2255 claims concerning *Brady* violations). There is no question that the prior judgment "may work an extreme and undue hardship" on Mr. Lee absent this remedy—he may go to the death chamber despite credible allegations that the Government suppressed material *Brady* evidence, and without ever having received a full and fair opportunity to have those constitutional violations reviewed in his § 2255 proceedings. Considering that the defect in the prior judgment is directly attributable to the same Government misconduct that infected Mr. Lee's trial, "substantial justice" would be served by reopening the judgment. Conversely, allowing the Government to get away with concealing exculpatory and impeachment evidence at trial, and then again in the § 2255 proceedings, would allow the Government to effectively evade any judicial review of its misconduct and would "compound a substantial injustice" to Mr. Lee. *In re Pickard*, 681 F.3d at 1201. Rule 60(b)(6) relief is most appropriate where, as here, the full merits of the case were not previously examined. *See Seven Elves v. Eskanazi*, 635 F.2d 396,

67

402, 403 (5th Cir. 1981) (If full merits not reviewed, "the equities in such cases will militate strongly in favor of relief" and "where denial of relief precludes examination of the full merits of the cause, even a slight abuse may justify reversal.').

Mr. Lee's case presents the extraordinary circumstances supporting 60(b) relief including "'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process.'" *Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863–64 (1988)). First, the judicial process, and *Brady* jurisprudence in particular, are predicated on the Government being an honest broker. But here, not only did the Government misrepresent whether it had disclosed all the exculpatory and impeachment material in its possession at the time of Mr. Lee's trial, it maintained that falsehood for as long as it would take to try to shut the courthouse doors on Mr. Lee. In fact, the Government repeated the lie during Mr. Lee's § 2255 proceedings, thus frustrating the one and only post-conviction review process that the judicial system affords federal prisoners. But for the fact that an Arkansas state agency happened to retain a copy of a 23-year old record and decided to release it pursuant to a state FOIA request, we might not have ever learned the truth about the Government's misconduct, and neither Mr. Lee nor this Court would have been the wiser. Indeed, when Mr. Lee is able to finally get his day in this Court and have his *Brady* claims considered, it will not be because "the system worked"—it will be because of the serendipity of state record-keeping and disclosure. There could hardly be a more compelling situation that could risk undermining the public's confidence in the judicial process.

The Government's actions turn the criminal justice process on its head, forcing Mr. Lee to play the game "prosecutor may hide, defendant must seek" decried by the Supreme Court. *Banks v. Dretke*, 540 U.S. 668, 696 (2004). The fact that Mr. Lee fortuitously learned of

68

exculpatory evidence from a witness like Cheyne Kehoe so long after trial heightens the extraordinary nature of his case and the egregiousness of the Government's conduct. Mr. Lee was entitled to rely on the prosecution's assurances during trial and post-conviction and presume that public officials are acting with the integrity of their station. He is not required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Id.* 60(b) relief is appropriate under these circumstances. *See Landano v. Rafferty*, 126 F.R.D. 627, 638 (D.N.J. 1989), *rev'd on other grounds*, 897 F.2d 661 (3d Cir. 1990) ("The court cannot conceive of circumstances more 'extraordinary' than those presented here, where a prisoner presents evidence that he was convicted without the benefit of exculpatory evidence and that such evidence was not available to him until the time of his motion for relief under Rule 60(b) because of the failure of the State to meet its obligation to turn over such evidence. Landano should not be deprived of the opportunity to present evidence of the suppression of exculpatory materials simply because the State successfully suppressed such evidence until after his habeas corpus application was heard and decided by this court.").

The extraordinary nature of this case is also demonstrated by the fact that the Government's misconduct is not an isolated incident; it is part of a broader pattern of suppression of exculpatory information and the presentation of false and misleading evidence during both phases of Mr. Lee's trial. Although the Government has thus far succeeded in precluding the courts from reviewing its misdeeds, it is quite extraordinary that it has never—not once—unequivocally denied the factual allegations undergirding any of Mr. Lee's prior *Brady* claims. (As Judge Kelly recently observed, the Government did not even *respond* to allegations that it buried evidence that undermined its federal charges against Mr. Lee. *See* Exh. D.) The

69

public can hardly have confidence in a judicial process that sanctions the deprivation of any remedy even in the face of *uncontested* allegations of prosecutorial misconduct.

### C.      Rule 60(d)(1)

Rule 60(d)(1) provides that Rule 60 does not limit a court's power to entertain an independent action to set aside a judgment. 11 Wright & Miller, Federal Practice & Procedure: Civil § 2868 (3d ed. 2012). An "independent action" sounds in equity. *United States v. Beggerly*, 524 U.S. 38, 45 (1998). It is "available only to prevent a grave miscarriage of justice." *Id*. at 47.

Mr. Lee's allegations about the Government's misconduct are cognizable under Rule 60(d)(1). *See Pelullo*, 2010 WL 2629080 at *15 (finding jurisdiction under Rule 60(d)(1) to consider movant's claim that the Government had falsely denied the involvement of a federal agency in his prosecution, thereby resulting in his inability to obtain discovery from the agency to support his § 2255 claims concerning *Brady* violations). Allowing "a court to proceed in a criminal case on the basis of government misrepresentations is such a fundamental departure from principles of justice that it must be addressed in one manner or another to preserve the integrity of the Court." *Id*.

That concern is particularly present here. The Government has committed a number of other *Brady* violations that have escaped review because it managed to successfully conceal its misconduct until after the § 2255 proceedings were concluded.

Take, for example, the allegations raised in Mr. Lee's second-in-time § 2255 motion about James Wanker. Dkt. 1297 at 30-51. Mr. Lee alleged that the Government omitted exculpatory evidence about an alleged confession from all official government reports of its interviews with Mr. Wanker; instructed Mr. Wanker to avoid disclosing that information while on the stand; allowed his substantially misleading testimony to stand uncorrected; and even

eliminated facts unfavorable to its theory of the case when it prepared Mr. Wanker's written testimony to the grand jury. Remarkably, the Government did not deny any of these allegations. Rather, its position was that because Mr. Lee did not discover its misconduct until after the initial § 2255 proceeding had concluded, its constitutional violations were unreviewable as a matter of law in a second § 2255. *See Lee v. United States*, No. 19-2432, Government Response in Opposition to Application for COA at 16 (filed Oct. 7, 2019). This is so, said the Government, even if it is reasonably probable that its misconduct as to Mr. Wanker changed the outcome of the trial.[59]

Or consider Mr. Lee's prior claims about *Brady* and *Napue* violations the Government committed during the penalty phase proceedings of his trial. Dkt. 1297 at 52-62. Mr. Lee alleged that the prosecution presented false evidence that Mr. Lee was legally responsible for a previous murder when he was a juvenile, but that the local Oklahoma prosecutor in that case inexplicably allowed Mr. Lee to get off with a sweetheart plea deal to a lesser charge. In fact, Mr. Lee uncovered evidence suggesting that the plea deal was the result of a judicial determination; a state court judge found that there was insufficient evidence to even find probable cause to charge Mr. Lee with murder. Once again, the Government did not contest any of the underlying facts of Mr. Lee's *Brady* claim; rather, it argued that the violation was discovered too late to be cognizable. (Judge Holmes ruled that he was without jurisdiction to grant relief, despite the fact

---

[59] *Id.* ("[A] defendant seeking to raise a *Brady* claim in a second-in-time § 2255 motion based on newly discovered evidence may do so, but only if he can demonstrate to the court of appeals that the evidence, if accepted as true, provides compelling proof of his innocence. … It is not enough to show merely that there is a reasonable probability that the evidence would have changed the outcome of the trial, which is the less onerous standard for materiality under *Brady*."). The Eighth Circuit denied Mr. Lee's application for a COA on this issue, over a dissent by Judge Kelly. *See* Exh. D.

that he agreed that but for the Government's misconduct, "the outcome at sentencing would have been different." Dkt. 1313 at 14.).[60]

Or, more recently, consider Mr. Lee's newly discovered evidence presented to the Eighth Circuit as part of a motion requesting permission to file a second or successive § 2255 motion. *See Lee v. United States*, No. 19-3576. Mr. Lee uncovered information establishing that the Government suppressed evidence that would have undermined two key elements of the VICAR offenses for which Mr. Lee was convicted and sentenced to death: namely, that there was no "enterprise" in existence at the time of the Mueller murders, and that Mr. Lee was not paid by an enterprise in exchange for commission of the offense. Once again, the Government did not deny that it had suppressed this favorable information. Rather, it argued that the claims could not be heard now because Mr. Lee could have uncovered the misconduct sooner. *See id.*, Government Response to Application for Permission to File Second or Successive § 2255 Motion at 17 (filed Dec. 7, 2019). And once again, it has been able to "profit from its own egregious conduct." *In re Pickard*, at 1207. A panel of the Eighth Circuit denied his request for permission to file the motion, over the dissenting opinion of Judge Kelly, who highlighted the fact that the Government failed to respond to Mr. Lee's *Brady* allegations.[61] *See* Exh. D.

---

[60] Mr. Lee is now pursuing this claim in the District Court for the Southern District of Indiana pursuant to a petition for a writ of habeas corpus under 28 U.S.C. § 2241. *See supra* note 15. Notably, it appears that the Government continues to be less than candid with the courts about the extent of its misconduct. Although it claimed in its pleadings that it had no reason to know about the exculpatory facts surrounding Mr. Lee's plea in his juvenile case, Mr. Lee uncovered documents as a result of a FOIA request that indicate the Government had extensive contact with local Oklahoma authorities about the case, including sending case agents to Oklahoma to review the local prosecutor's case file. *See Lee v. Warden, et al*, No. 2:19-cv-00468-JPH-DLP (S.D. IN.), Dkt. 18.

[61] Mr. Lee notes the other litigation to make the Court aware of the number of the Government's misrepresentations and the extent of its concealment in this capital case. The proceedings in those actions, some of which are ongoing, arose in a legal and procedural posture

With respect to each *Brady* violation, the Government has followed the same playbook: hide favorable evidence prior to the trial, run out the clock until the § 2255 proceeding is complete, and then invoke procedural and jurisdictional arguments to block the courts from substantively reviewing any of its misconduct. This "playbook" is an abuse of both *Brady* jurisprudence and the AEDPA. On the front end, the Government relies on the inherent asymmetry of information between the parties to get away with falsely claiming it has complied with its *Brady* obligations; on the back end, the Government relies on the strictures of the AEDPA to evade judicial review after its misconduct has come to light. This strategy is especially offensive where the Government does not deny it committed any of the aforementioned misconduct, and its response in each instance is not "We didn't do anything wrong," but rather "What took you so long to catch us?"

Allowing the Government to, yet again, manipulate the legal system to avoid any accountability for its misconduct would be a grave miscarriage of justice. Respectfully, this Court should invoke its equitable power under Rule 60(d)(1) to reopen the § 2255 judgment and allow Mr. Lee to fully and fairly present his *Brady* claims.

### D.    Rule 60(d)(3)

Rule 60(d)(3) recognizes this Court's "power to … set aside a judgment for fraud on the court." Fraud under Rule 60(d)(3) "is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Kerwit Medical Products, Inc. v. N & H Instruments, Inc.*, 616

---

different from that at issue here. The sole question before this Court is whether the suppression of the Humphrey failed polygraph and Gloria Kehoe's history of hallucinations, when considered in the context of all the facts and violations now known, warrant this Court's reopening of the judgment for serious scrutiny.

F.2d 833, 837 (5th Cir. 1980) (quoting 7 Moore, Federal Practice ¶ 60.33 at 511 (1971 ed.)). *See also Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) (an attorney's "loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court.").

Where, as here, the withheld evidence was critical to Mr. Lee's ability to fully and fairly present his § 2255 claims, it is clear that "the judicial machinery [could not] perform in the usual manner its impartial task of adjudging cases that [were] presented for adjudication," and thus there has been a fraud on the court. Indeed, numerous courts have found that allegations of Government misconduct during § 2255 proceeding are cognizable under Rule 60(d)(3). *See*, *e.g.*, *United States v. Hall*, 737 Fed. Appx. 889 (10th Cir. 2018) (allegations that prosecutor presented false evidence during § 2255 proceeding constituted fraud on the habeas court cognizable under Rule 60(d)(3)); *In re Wax*, No. 99-3550, 1999 U.S. App. LEXIS 38883 (3d Cir. Nov. 12, 1999) (motion for permission to file second or successive § 2255 motion unnecessary where applicant's motion in the district court alleged "fraud on the court" based on prosecutor's fraudulent representation during § 2255 proceeding that prevented him from fully and fairly presenting his § 2255 claims); *Pelullo*, 2010 WL 2629080 at *15 (finding jurisdiction under Rule 60(d)(3) to consider movant's claim that the Government had falsely denied the involvement of a federal agency in his prosecution, thereby resulting in his inability to obtain discovery from the agency to support his § 2255 claims concerning *Brady* violations).

The mere fact that misrepresentations here were made by officers of the court brings Mr. Lee's allegations within the ambit of Rule 60(d)(3). *See Kupferman*, 459 F.2d at 1078 (2d Cir. 1972) (an attorney's "loyalty to the court, as an officer thereof, demands integrity and honest

74

dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court."); *In re Intermagnetics America, Inc.,* 926 F.2d 912, 916 (9th Cir. 1991) ("fraud upon the court includes both attempts to subvert the integrity of the court and fraud by an officer of the court.").

## CONCLUSION

The Government's material misrepresentations during the § 2255 proceedings prevented Mr. Lee from fully and fairly presenting his *Brady* and *Napue/Giglio* claims that he was deprived—on account of the Government's misconduct—of access to evidence material to his defense at trial and central to the jury's determination of guilt. In the interests of justice, this Court should reopen the prior judgment denying § 2255 relief to allow Mr. Lee a fair shot at litigating these claims.

Respectfully submitted this 29th day of January, 2020.

/s/ *Morris H. Moon*
MORRIS H. MOON
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

/s/ *George G. Kouros*
GEORGE G. KOUROS
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lee

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on January 29, 2020. This motion was served via this court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

MICHAEL GORDON
Chief, Criminal Division
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203-1229
(501) 340-2600
michael.gordon@usdoj.gov

/s/ *George G. Kouros*
GEORGE G. KOUROS
Bar # 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org