IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 4:97-CR-00243-JLH |
| | ) | (Capital Case) |
| | ) | |
| DANIEL LEWIS LEE. | ) | |

_____

# GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT

_____

CODY HILAND
United States Attorney
Eastern District of Arkansas

MICHAEL GORDON
Assistant United States Attorney
Eastern District of Arkansas

BRIAN A. BENCZKOWSKI
Assistant Attorney General

JOHN P. CRONAN
Deputy Assistant Attorney General

JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1258
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................... 1

STATEMENT ............................................................................................ 3

    I.    Procedural Overview ...................................................................... 3

    II.    The Murders ................................................................................... 7

    III.    Trial and Sentencing .................................................................. 10

    IV.    Collateral Review ........................................................................ 12

    V.    Subsequent Attempts at Collateral Review ..................................... 17

    VI.    The Present Motion ..................................................................... 21

ARGUMENT ............................................................................................ 24

    I.    This Court Lacks Jurisdiction Over Lee's *Brady* and *Napue* Claims Because Lee Has Not Obtained Authorization to File a Second or Successive § 2255 Motion ................................................. 25

        A.    Applicable Legal Standards .................................................... 25

        B.    Lee's Motion Is an Unauthorized Second or Successive § 2255 Motion ...................................................................... 28

    II.    Lee Does Not Establish Any Defect in the § 2255 Proceedings That Would Support Relief from Judgment Under Rule 60 ............ 30

        A.    Lee's Allegations Do Not Demonstrate Misconduct by the Government .................................................................. 31

        B.    The Court Should Adhere to the Law of the Case .................. 41

        C.    Rule 60(b)(3): Fraud, Misrepresentation, or Misconduct ....... 42

        D.    Rule 60(b)(6): Extraordinary Circumstances ......................... 48

        E.    Rule 60(d)(1): Independent Action in Equity ......................... 53

F.    Rule 60(d)(3): Fraud on the Court ........................................... 55

III.    Although Not Legally Relevant, the *Brady* and *Napue* Claims Are Without Merit ................................................................ 57

    A.    Lee Fails to Undermine the Strong Evidence of His Guilt..... 58

        1.    The Date of the Murders ................................................. 58

        2.    The Timeline of Witnesses Seeing Lee in Oklahoma and Washington Before and After the Murders ...................................................................... 59

        3.    Lee and Kehoe Return to Spokane Flush with Cash and Property Belonging to the Muellers.............. 62

        4.    Lee and Kehoe Confess to Gloria Kehoe......................... 63

        5.    Incriminating Statements to the Wankers ................... 66

        6.    Lee and Kehoe Panic When They Learn Kehoe Has Been Linked to One of Mueller's Stolen Firearms ......................................................................... 68

        7.    Kehoe Confesses to Cheyne Kehoe ............................... 69

        8.    Incriminating Evidence in Kehoe's Possession at the Time of His Arrest .................................................. 70

    B.    The Kehoe Declarations Are Not *Brady* Material ................... 71

    C.    The Polygraph Results Are Not *Brady* Material .................... 74

    D.    The Polygraph Results Do Not Establish a *Napue* Violation ........................................................................... 80

CONCLUSION................................................................................... 80

CERTIFICATE OF SERVICE......................................................... 82

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

UNITED STATES OF AMERICA,    )
    )
    )
    v.    )    Case No. 4:97-CR-00243-JLH
    )    (Capital Case)
    )
DANIEL LEWIS LEE.    )

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR
RELIEF FROM JUDGMENT**

The government submits this response to defendant Daniel Lewis Lee's

motion for relief from judgment under Federal Rule of Criminal Procedure

60. Dkt. 1363. The motion should be denied for the reasons stated below.

**INTRODUCTION**

Defendant Daniel Lewis Lee was convicted more than 20 years ago of

murdering William and Nancy Mueller and their eight-year-old daughter

Sarah Powell and was sentenced to death. He received extensive review of his

conviction on direct appeal and on collateral review under 28 U.S.C. § 2255,

and his convictions and sentence were repeatedly affirmed. This motion is

one among an array of recent legal filings in which Lee attempts to avoid or

delay his execution, which had been scheduled for December 9, 2019. In this

motion, Lee asserts that he has found new evidence that shows the

government failed to turn over favorable, material evidence, in violation of

1

*Brady v. Maryland*, 373 U.S. 83 (1963), and presented false evidence to obtain his conviction, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). To try to give credence to these claims, Lee attempts to convince this Court that the evidence proving he committed the murders is questionable, largely repeating arguments that were made to the jury and repeated multiple times throughout years of judicial review but were rightly rejected.

The evidence leaves no question that Lee is culpable for murdering the Mueller family, and Lee's newest *Brady* and *Napue* claims are without merit. But the preliminary problem for Lee is that at this juncture, with the initial collateral review of his conviction and sentence complete, he can raise new *Brady* and *Napue* claims only in a second or successive § 2255 motion. Moreover, Lee can raise *Brady* and *Napue* claims in a second or successive § 2255 motion only if he first obtains certification from the Eighth Circuit that he relies on newly discovered evidence that provides compelling evidence of his innocence. *See* 28 U.S.C. § 2255(h). Lee does not claim he can satisfy those requirements and instead seeks to evade them by purportedly trying to reopen his initial § 2255 proceedings via a motion for relief from judgment under Federal Rule of Civil Procedure 60. But that leaves Lee with an additional hurdle. He can reopen his § 2255 proceedings via Rule 60 only if he attacks a defect in the integrity of those § 2255 proceedings.

In an attempt to convince this Court that there was a defect in the integrity of his initial § 2255 proceedings, Lee claims that the government not only failed to turn over *Brady* evidence at trial, either intentionally or inadvertently, but then later, during his § 2255 proceedings, buried that evidence and lied to Lee and this Court so that the evidence would not come to light. Lee repeats these claims throughout his motion, asserting that the government engaged in fraud and misconduct.

Lee's allegations are baseless and reckless. But more to the point, when all of Lee's heated rhetoric is set aside, a hard look at his claim reveals that his assertions of government misconduct during his § 2255 proceedings come down to alleged misstatements in one footnote in the government's response to Lee's § 2255 motion. That footnote, however, contains no misrepresentations, and it certainly does not support Lee's reckless claims of government malfeasance. In fact, this Court previously rejected claims of government misconduct based on that same footnote, also in a motion in which Lee sought to use Rule 60 to raise different *Brady* and *Napue* claims. The same result is warranted here.

## STATEMENT

### I.   Procedural Overview

Lee committed three murders in 1996 and was convicted of three capital offenses and sentenced to death. The Eighth Circuit reversed an order

3

from this Court (Hon. G. Thomas Eisele) granting Lee a new sentencing hearing, *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001), *cert. denied*, 537 U.S. 1000 (2002), and then affirmed Lee's conviction and sentence on direct appeal, *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied*, 545 U.S. 1141 (2005).

Lee filed a motion collaterally attacking his conviction and sentence under 28 U.S.C. § 2255. Dkt. 1118. This Court denied the motion and a motion for reconsideration. *United States v. Lee*, No. 97-CR-243, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008); *United States v. Lee*, No. 97-CR-243, 2010 WL 5347174 (E.D. Ark. Dec. 22, 2010). The Eighth Circuit affirmed. *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013), *cert. denied*, 135 S. Ct. 72 (2014).

This Court and the Eighth Circuit subsequently rejected additional attempts by Lee to attack his conviction and sentence. In 2014, the Court denied Lee's first motion for relief from judgment under Federal Rule of Civil Procedure 60, concluding that it was an unauthorized second or successive § 2255 motion, *United States v. Lee*, No. 97-CR-243, 2014 WL 1093197 (E.D. Ark. Mar. 18, 2014), and the Eighth Circuit affirmed, *United States v. Lee*, 792 F.3d 1021 (8th Cir. 2015), *cert. denied*, 137 S. Ct. 1577 (2017). In 2019, the Court denied on similar grounds a motion—ostensibly filed as a new § 2255 motion and, alternatively, as a motion under Federal Rule of Civil Procedure 60 for relief from the judgment denying his initial § 2255 motion—

4

claiming that Lee had discovered new evidence establishing violations of

*Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264

(1959). Dkt. 1313. The Eighth Circuit denied a certificate of appealability. *Lee*

*v. United States*, No. 19-2432 (8th Cir.) (Nov. 4, 2019).

In July 2019, the government set December 9, 2019, as the date to

carry out Lee's capital sentence, and Lee subsequently filed an array of new

lawsuits and motions attacking his sentence and conviction. Lee filed a

habeas petition under 28 U.S.C. § 2241 in the Southern District of Indiana,

the district of his confinement, in which he raised *Brady* and *Napue* claims he

had unsuccessfully attempted to raise in this Court. *Lee v. Warden*, No. 2:19-

CV-468 (S.D. Ind.) (Sept. 26, 2019). He sought a preliminary injunction in a

lawsuit in the district court for the District of Columbia challenging the

government's execution protocol. *In re Federal Bureau of Prisons' Execution*

*Protocol Cases*, No. 19-MC-145 (D.D.C.) (Sept. 27, 2019). He filed a lawsuit in

the District of Columbia challenging the adequacy of his clemency

proceedings. *Lee v. Barr*, No. 1:19-CV-3611 (D.D.C.) (Dec. 2, 2019). He filed

an application in the Eighth Circuit seeking permission to file a second or

successive § 2255 motion raising new *Brady* and *Napue* claims. *Lee v. United*

*States*, No. 19-3576 (8th Cir.) (Dec. 4. 2019). Three calendar days (and one

business day) before his execution, Lee filed a third Rule 60 motion for relief

5

from judgment in this Court seeking to reopen the Court's 2010 denial of his

motion for reconsideration of his first § 2255 motion. Dkt. 1352.

Three courts, including this Court, entered orders barring Lee's

execution from going forward. The district court in the protocol-litigation case

entered a preliminary injunction. *In re Federal Bureau of Prisons' Execution*

*Protocol Cases*, No. 19-MC-145 (D.D.C.) (Nov. 20, 2019). The Indiana district

court in Lee's habeas case entered a stay pending the disposition of Lee's

habeas petition. *Lee v. Warden*, No. 2:19-CV-468 (S.D. Ind.) (Dec. 5, 2019).

And this Court entered a stay pending the disposition of the Rule 60 motion

Lee filed on the eve of his scheduled execution. Dkt. 1356.

The Seventh Circuit vacated the stay entered in the habeas case the

following day, *Lee v. Watson*, No. 19-3399, 2019 WL 6718924 (7th Cir. Dec. 6,

2019), but the preliminary injunction in the protocol litigation stayed in

effect, as did this Court's stay order, and therefore Lee's execution did not go

forward. The government has appealed the preliminary injunction and this

Court's stay order, and those appeals have been argued and remain pending.

*See United States v. Lee*, No. 19-3618 (8th Cir.) (argued Jan. 16, 2020); *In re*

*Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-5322 (D.C. Cir.)

(argued Jan. 15, 2020). While the appeal of this Court's stay order was

pending, the Eighth Circuit denied Lee's application to file a second or

successive § 2255 motion raising *Brady* and *Napue* claims. *Lee v. United States*, No. 19-3576 (8th Cir.) (Jan. 7, 2020).

On January 29, 2020, Lee filed in this Court yet another (his fourth) Rule 60 motion seeking to reopen his first § 2255 motion, asserting new *Brady* and *Napue* claims. Dkt. 1363. This Court ordered the government to respond. Dkt. 1364.

## II.    The Murders

Lee and Chevie Kehoe were members of a white supremacist organization known as the Aryan Peoples' Republic, or the Aryan Peoples' Resistance (APR), which Kehoe founded for the purpose of establishing an independent nation of white supremacists in the Pacific Northwest. *Lee*, 374 F.3d at 641. Kehoe recruited Lee into the APR and the two men, together with others, participated in a variety of criminal activities to promote and finance the APR. *Id.*

Of particular relevance here, in January 1996, expecting to find valuable property, Kehoe and Lee traveled from Washington to the Arkansas home of William Mueller, a gun dealer who owned a large collection of weapons and ammunition. *Id.* (Kehoe and his father Kirby Kehoe knew Mueller from gun shows and had burglarized the Mueller home in February 1995, stealing valuable coins. *Lee*, 2008 WL 4079315, at *3.) When Mueller arrived home with his wife Nancy and their eight-year-old daughter Sarah

Powell, Lee and Kehoe overpowered and incapacitated the Muellers and then questioned Sarah Powell about the location of cash, guns, and ammunition. *Lee*, 374 F.3d at 641-42. After taking weapons worth about $30,000 and $50,000 in cash and coins, Lee and Kehoe shot the three victims with a stun gun, placed plastic trash bags over their heads, and sealed the bags with duct tape to asphyxiate them. *Lee*, 2008 WL 4079315, at *4. The men taped rocks to the bodies and threw them into the nearby Illinois Bayou. *Lee*, 374 F.3d at 641-42; *United States v. Kehoe*, 310 F.3d 579, 590 (8th Cir. 2002), *cert. denied*, 538 U.S. 1048 (2003).[1]

Lee and Kehoe returned to Washington with the property they stole from the Muellers, *see Lee*, 374 F.3d at 642, and Lee confessed to Kehoe's mother Gloria Kehoe, telling her that "Bill [Mueller] was one tough son of a bitch because he fought so hard" and that Nancy Mueller was "dumb . . . because she . . . helped put the trash bag on her head," *Kehoe*, 310 F.3d at 590. Lee further confessed that Chevie Kehoe gave him $1000 and a rifle for participating in the robbery and murders and that he and Kehoe disposed of the bodies by weighing them down with rocks and throwing them in a river. *Id.* Lee also told James Wanker, who lived at the motel where Lee resided

---

[1] The bodies were found in the Illinois Bayou north of Russellville, Arkansas, about 64 miles from the Mueller home in Tilly, Arkansas. Tr. 3072-77; *see* Dkt. 1363-20, at 1-2.

after the murders, that he had taken a trip "down south" and that some people "had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp." Tr. 4082-83. Lee made a similar statement to Wanker's wife Dalvine Wanker, telling her that "he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093. Chevie Kehoe also confessed to his mother Gloria, saying that he and Lee had murdered William and Nancy Mueller but that he had murdered Sarah Powell by himself because Lee was unwilling to kill the girl. *Lee*, 374 F.3d at 642; *Lee*, 2008 WL 4079315, at *4.

Lee and Kehoe panicked after learning, in December 1996, that a friend had been arrested in possession of one of Mueller's guns and that an ATF agent had asked if the friend had purchased the gun from Kehoe. Tr. 2794, 2799, 4980. The men fled and went their separate ways. Tr. 4980. Lee went to Oklahoma while Kehoe went to Montana and met up with his brother Cheyne Kehoe, and then the two traveled around the country attending gun shows before landing in Utah. *See* Tr. 4836, 4980, 5318-20, 5323. During that period, Kehoe gave a detailed confession to his brother, saying that he and Lee had murdered the Muellers. Tr. 5326-31; *see Kehoe*, 310 F.3d at 584-85.

Cheyne Kehoe came to fear for his safety and decided to turn himself in and cooperate with the authorities in June 1997, taking Kehoe's GMC truck. *Lee*, 2008 WL 4079315, at *6. Cheyne's cooperation led to Chevie Kehoe's

9

arrest and a search of the trailer where he lived, which turned up property belonging to William Mueller and a key that opened the handcuffs found on Mueller's dead body. Tr. 3218-19, 3265-67, 3275-3311, 3565; *see Kehoe*, 310 F.3d at 585. Gloria Kehoe later (in March 1998) decided to cooperate with authorities as well, fearing her husband Kirby would kill her because "she knew too much." *Id.* at *7. She provided information about storage units used by Chevie Kehoe in Montana and Idaho where police found, among other things, property stolen from the Muellers, including display cases that William Mueller had used at gun shows. Tr. 2479, 3378-3403, 3479, 3610-28, 3650. Lee's and Kehoe's fingerprints were recovered from one of the display cases from the Idaho storage unit. Tr. 3489-90, 3710. And an FBI forensic chemist determined that paint from Kehoe's GMC truck was consistent with and very similar to paint chips found on duct tape removed from the bodies of the Mueller family. *Lee*, 2008 WL 4079315, at *6.

## III.    Trial and Sentencing

Lee and Kehoe were charged with conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d); and three capital counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1).

The government provided notice of its intent to seek the death penalty against both defendants for the three murders. *See Lee*, 374 F.3d at 642.

Over the course of a two-month trial, the government introduced voluminous evidence to prove the events described above. *See infra* pp. 60-73 (discussing some of the evidence). In their defense, Lee and Kehoe argued, among other things, that the timeline of when the murders took place in Arkansas and when witnesses spotted them back in Washington did not support their guilt, that Gloria and Cheyne Kehoe were biased witnesses who lacked credibility, and that evidence suggested that other individuals may have committed the murders, including Kirby and Cheyne Kehoe and individuals from Arkansas—Timothy Coombs, David and Sylvia Mason, and Paul Humphrey. *See, e.g.*, Tr. 6864-75, 6879-89, 6907, 6911-12, 6916, 6936-42, 6947-48 (closing arguments).

Defendants called Humphrey as a witness during the defense case. Tr. 6141-6201. Humphrey testified that he lived in Russellville, Arkansas, Tr. 6147, and was friends with William Mueller from gun shows, Tr. 6141-43. According to Humphrey, he and Mueller had devised a plan—based on an interpretation of the Seventh Amendment they had learned at a seminar—to take the titles to their respective vehicles "from the state out of its hands and back into our hands" by exchanging titles for "pieces of silver." Tr. 6154-62. Humphrey testified that he told the Muellers' landlord (Sylvia Mason) about

11

the plan after the Muellers went missing, and she sent him the titles to Mueller's vehicle. Tr. 5717, 6153-55, 6161-62, 6176. Humphrey said he was reluctant to turn over the titles despite repeated requests from law enforcement because his goal was to take away the taint of the government from the titles and he thought the government would become the owner if he turned over the titles. Tr. 6167-69. During cross-examination by the government, *see* Tr. 6202-04 (Humphrey cross-examination), Humphrey answered "no" when asked whether he was "in any way involved in the death of Bill Mueller or Nancy Mueller or Sarah Powell," Tr. 6204.

After the jury found Lee and Kehoe guilty on all counts, separate hearings were held to determine whether each defendant should receive the death penalty for the three capital murders. *See* Tr. 7169-7337 (Kehoe sentencing hearing); Tr. 7367-8022 (Lee sentencing hearing). The jury unanimously decided in favor of life imprisonment without the possibility of release for Kehoe. Tr. 7328-37. The same jury unanimously decided to impose a sentence of death for Lee for each of the three murder charges. Tr. 8019-22.

## IV.    Collateral Review

The Eighth Circuit affirmed Lee's conviction and sentence on direct appeal. *Lee*, 374 F.3d at 641. Thereafter, Lee filed a motion collaterally

attacking his conviction and sentence under 28 U.S.C. § 2255. Dkt. 1118.[2] As

relevant here, Lee's § 2255 motion asserted what he called a "Case for Actual

Innocence," claiming that there were "many aspects of this case" that were

"disturbing and strongly suggest[ed]" that he was "an innocent man convicted

and sentenced to death for crimes he did not commit." Dkt. 1118, at 6. Lee

specifically referred to, among other things, the timeline for the crime,

allegedly biased witnesses, the alleged "willingness of investigators to feed

witnesses details of the crime and the prosecution's theory of how and why

the murders were accomplished," and "[n]ewly-discovered evidence, or

evidence withheld in violation of the government's *Brady* obligations, that

others carried out the murders of the Mueller family." Dkt. 1118, at 6. Lee

"request[ed] that the Government review its files and the files of its

investigating agencies for any information favorable to the defense bearing

on guilt or punishment," and he stated that "[s]hould additional *Brady*

evidence be discovered," he would amend his motion. Dkt. 1118, at 7 n.3.

The government responded that Lee's claim of actual innocence

"consist[ed] of barebones claim allegations without discussion of supporting

legal principles or, for that matter, much factual context." Dkt. 1126, at 26

---

[2] Lee's § 2255 motion contained many claims for relief. *See generally Lee*, 2008 WL 4079315, at *8-*60. We only discuss those aspects of the motion that provide context for Lee's present motion.

n.13. The government further responded that even assuming a claim of actual innocence could support a free-standing basis for collateral relief, "[t]he evidence of Lee's guilt was overwhelming, and none of the supposed gaps and inconsistencies identified by Lee casts any new doubts on the convictions." Dkt. 1126, at 30.

Lee's § 2255 motion separately asserted a claim that he received ineffective assistance of counsel because his lawyers failed to object to a court order that prohibited Lee (but not his lawyers) from accessing discovery materials and the names of witnesses. Dkt. 1118, at 18-19; *see Lee*, 374 F.3d at 652 (rejecting challenge to court order on plain-error review). In response, the government explained, by way of background, that the government had turned over a "huge amount" of discovery months before trial and Lee had "sent copies of [some] material to his associates in an effort to have witnesses harmed." Dkt. 1126, at 45 & n.16. The government further explained that "[t]he vast majority of the material [was] *Jencks* material" and only a "small amount of the material was Rule 16 discovery and *Brady* material." Dkt. 1126, at 45 n.16. The government argued that Lee's lawyers did not perform deficiently by failing to object to the court order because "[a]s practically all the materials were *Jencks* materials, had Lee's trial attorney objected to any limitations on providing Lee copies, the government could have provided *Jencks* material at the time the statute directs, *i.e.*, after the witness

14

completed his direct examination," and "[t]his would have crippled the ability of defense attorneys to timely prepare for trial." Dkt. 1126, at 45.

Lee also asserted a claim that he received ineffective assistance of counsel because his lawyers failed to call witnesses who would have testified about alleged conduct by Paul Humphrey. Dkt. 1118, at 12, 15. According to Lee, one witness "could have" testified that he saw Humphrey throwing something off a bridge into the Illinois Bayou in January 1996, and two witnesses "would have" testified that Humphrey acted nervous and strange after the Muellers disappeared. Dkt. 1118, at 15.

This Court denied Lee's § 2255 motion. *Lee*, 2008 WL 4079315, at *1. In denying the motion, Judge Eisele, who presided over Lee and Kehoe's trial, did not directly address Lee's "Case for Actual Innocence," but he discussed the strength of the evidence establishing Lee's guilt. *Id.* at *7. Judge Eisele explained that he had "outlined some of the evidence linking Kehoe and Lee to the Mueller murders in part to demonstrate the abundance of evidence supporting the guilt phase convictions," and he explained that "[t]hose bare facts alone can not convey the demeanor of the witnesses who testified, the scope and detail of the Government's evidence, or the general overall tenor of the case against Kehoe and Lee." *Id.* "While the bulk of the evidence at trial related to Kehoe," Judge Eisele explained, "the jury's conclusion that Lee was with Kehoe when the Muellers were murdered and that he participated in

15

the murders was well-founded," and "there was no question about Kehoe and Lee's respective roles: Chevie Kehoe was the ringleader, and Danny Lee was the follower." *Id.; see also id.* at *25 ("The evidence in this case overwhelmingly supported the jury's finding of guilt."); *id.* at 53 ("[I]t is clear that [Lee] has failed to demonstrate actual innocence.").

As for the specific claim that Lee received ineffective assistance of counsel because his lawyers failed to object to the court order barring his access to discovery, Judge Eisele noted that "Lee and his counsel have never disputed—either prior to trial or now—that Lee in fact used the *Jencks* materials he obtained from his counsel in the threatening manner alleged by the Government," and "as the Government points out, had trial counsel objected, the Government simply would have stopped providing *Jencks* material so far in advance." *Lee*, 2008 WL 4079315, at *22. Judge Eisele accordingly rejected Lee's ineffective-assistance claim. *Id.* at *21-*22.

The Court also rejected Lee's claims of ineffective assistance based on his counsel's alleged failure to call witnesses to testify about Paul Humphrey. 2008 WL 4079315, at *11-*12. The Court concluded that Lee's counsel did not perform deficiently by deciding not to call those witnesses and that none of the proposed testimony would have altered the outcome of the trial. *Id.* The Court noted that defense counsel had talked to the witness who supposedly saw Humphrey dump something into the Illinois Bayou but had decided that

16

the witness's testimony would not have been helpful to the defense. *Id.* at *11. The Court further explained that defense counsel had called Humphrey as a witness and had questioned him "in detail about the circumstances under which he acquired the title to William Mueller's vehicle and the fact that he attempted to have the title transferred to himself." *Id.* at *12. The Court found that "trial counsel attempted, but failed, to establish a link between Humphrey and the death of the Muellers." *Id.*

## V.   Subsequent Attempts at Collateral Review

Lee made several additional attempts to collaterally attack his sentence and conviction after this Court denied his § 2255 motion. *See supra* pp. 6-8. As relevant here, in September 2018, Lee filed a motion—purportedly under 28 U.S.C. § 2255 but also, alternatively, under Federal Rule of Civil Procedure 60—asserting that he had obtained newly discovered evidence showing that the government had suppressed favorable evidence at his trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and had introduced false or misleading evidence at the trial, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). Dkt. 1297, at 30-61. Lee specifically claimed that the government failed to disclose that witness James Wanker—who testified at trial about Lee's statements that he had taken a trip "down south" and that some people "had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp," Tr. 4082-83—had told investigators before

17

trial that he (Wanker) did not actually believe Lee and, in his opinion, Lee was merely posturing. Dkt. 1297, at 3-4. Lee also claimed that the government failed to turn over a document from an Oklahoma court case in which Lee was charged with murdering an individual in 1990 but later pleaded guilty to robbery. *Id*. at 4-6. Lee claimed that the document showed he did not receive a favorable plea deal from Oklahoma prosecutors but instead there was insufficient evidence to charge him with the 1990 murder. *Id*. at 5-6. Lee argued that the Wanker evidence would have been helpful to him at the guilt phase of his trial and that the Oklahoma court document would have been helpful at the penalty phase. *Id*. at 3-6.

Lee asserted that he was entitled to raise these claims in a motion for collateral relief under § 2255 without first obtaining authorization from the Eighth Circuit—as required by § 2255(h)—to file a second or successive § 2255 motion. Dkt. 1297, at 23-29. According to Lee, a § 2255 motion that raises a *Brady* claim based on evidence discovered after the denial of a prior § 2255 motion is not second or successive if the motion asserts that the government suppressed "*material* exculpatory evidence." *Id*. at 23. Lee also argued, in the alternative, that even if his *Brady* and *Napue* claims were subject to the gatekeeping provisions of § 2255(h), he was nonetheless entitled to relief from judgment under Federal Rule of Civil Procedure 60. Dkt. 1297, at 62. He claimed that relief from judgment was warranted as a

result of "fraud," "misrepresentation, or misconduct by an opposing party,"
Fed. R. Civ. P. 60(b)(3), or as a result of "fraud on the court," Fed. R. Civ. P.
60(d)(3); *see* Dkt. 1297, at 62-64. Lee specifically argued (Dkt. 1297, at 65)
that the government committed misconduct and perpetrated a fraud in the
§ 2255 proceedings when it stated—in response to Lee's claim of ineffective
assistance of counsel based on his lawyer's failure to object to a court order
barring him from accessing discovery and witness names—that the
government had provided a "huge amount" of discovery months before trial
and that a "small amount" of that discovery was *Brady* material. Dkt. 1126,
at 45 & n.16; *see supra* pp. 16-17 (discussing Lee's claim and the
government's response).

This Court (Hon. Leon Holmes) denied Lee's motion. Dkt. 1313. The
Court concluded that Lee was required to obtain certification from the Eighth
Circuit in order to file a § 2255 motion raising *Brady* and *Napue* claims. *Id.* at
14-17. The Court also determined that "[a]ssuming that Lee has properly
asserted a Rule 60 motion as opposed to a second or successive habeas
petition, he [was] not entitled to relief under either Rule 60(b)(3) or (d)(3)."
*Id.* at 18. The Court concluded that Lee's request for relief under Rule
60(b)(3) was untimely and, in any event, lacked merit because Lee failed to
"show by clear and convincing evidence that the Government engaged in
fraud or other misconduct and that this conduct prevented [him] from fully

19

and fairly presenting his case*." Id.* at 19 (citation and quotation marks omitted). The Court determined that "Lee has not alleged facts to show that the omission of any evidence during his § 2255 proceeding was due to the Government's misconduct or that the Government intentionally misrepresented any facts." *Id.* The Court also determined that Lee's allegations did not clear the "high bar" for alleging fraud on the court under Rule 60(d)(3), which, the Court explained, "is narrowly defined as fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *Id.* at 19-20 (citation and quotation marks omitted).

Judge Holmes declined to issue a certificate of appealability. Dkt. 1313, at 20. The Eighth Circuit also denied Lee's application for a certificate of appealability. *Lee v. United States*, No. 19-2432 (8th Cir.) (Nov. 4, 2019).

Lee subsequently (on December 4, 2019) filed an application in the Eighth Circuit for permission to file a second or successive § 2255 motion, seeking to raise new and different *Brady* and *Napue* claims. *Lee v. United States*, No. 19-3576 (8th Cir.) (Dec. 4, 2019). Lee argued that newly discovered evidence established he was "innocent" because it showed that the APR was not a racketeering enterprise and therefore the murders he committed could not have been committed in aid of racketeering. According to Lee, the newly discovered evidence consisted of statements from Kirby and

20

Cheyne Kehoe—in the form of declarations—that the "APR was a pipe dream of Chevie's" and a mere "fantasy" and there "was no 'organization'" and "Chevie committed his crimes for himself" for money. *See* Dkt. 1363-3 (Cheyne Kehoe declaration); Dkt. 1363-4 (Kirby Kehoe declaration). The Eighth Circuit denied the application. *Lee v. United States*, No. 19-3576 (8th Cir.) (Jan. 7, 2020).

## VI.   The Present Motion

Lee once again seeks to present new *Brady* and *Napue* claims via the instant Rule 60 motion seeking relief from the judgment denying his initial § 2255 motion. Dkt. 1363, at 35-61. Lee asserts that newly discovered evidence supports those *Brady* and *Napue* claims, and he alleges that a defect in the integrity of the initial § 2255 proceeding permits relief from judgment under Rule 60 and allows him to avoid the restrictions on second or successive § 2255 motions. *Id.*

The first new evidence alleged by Lee (Dkt. 1363, at 37-38) consists of statements by Cheyne and Kirby Kehoe memorialized in declarations dated November 1 and 3, 2019, *see* Dkt. 1363-3, at 9, and Dkt. 1363-4, at 5, the same declarations that Lee relied on to seek permission from the Eighth Circuit to file a second or successive § 2255 motion based on the claim that the APR was not a racketeering enterprise, *see Lee v. United States*, No. 19-3576 (8th Cir.) (Dec. 4. 2019). In this iteration, Lee uses the same

21

declarations but relies on different portions of the documents. Specifically, Cheyne Kehoe's declaration states that he told federal investigators that his mother Gloria Kehoe "was unstable" and this had "always been pretty obvious to me and the people who know her." Dkt. 1363-3, at 8. The declaration also states that Gloria Kehoe "has always been paranoid and she sees and hears things that aren't there, so much so that my dad [Kirby Kehoe] took her for psychiatric treatment when they lived in North Carolina." *Id.* Kirby Kehoe's declaration states that he had told federal investigators that Gloria Kehoe "sometimes had panic attacks and sometimes had what she called dreams where she saw things happening to us, like seeing people (sometimes government agents) assaulting her." Dkt. 1363-4, at 4. According to Kirby Kehoe, "I did what I could to help and care for Gloria but it was difficult sometimes because of her mental illness." *Id.* Lee argues that these statements could have resulted in an acquittal had they been disclosed to the defense, and therefore amount to *Brady* material, because they could have been used to undermine Gloria Kehoe's trial testimony, in particular her testimony that Lee and Kehoe confessed to her about committing the Mueller murders. Dkt. 1363, at 35-43.

Lee also contends (Dkt. 1363, at 43-60) that a document he obtained from the Arkansas State Police pursuant to a request under the Arkansas Freedom of Information Act is newly discovered evidence that supports *Brady*

22

and *Napue* claims. The document from the Arkansas State Police contains the results of a polygraph test administered to Paul Humphrey by a polygraph examiner with the Arkansas State Police on January 21, 1997. Dkt. 1363-2, at 9-10. During the test, Humphrey answered "no" when asked whether he was present when the Muellers were killed and whether he participated in disposing of the bodies. *Id.* at 9. According to the report, the polygraph examiner determined that Humphrey "was essentially untruthful in answering" these questions and that it was the examiner's "opinion" that Humphrey "was involved in the death of the Muellers." *Id.* at 10.

As in his September 2018 motion seeking to raise *Brady* and *Napue* claims (but in contrast to his December 2019 application in the Eighth Circuit for permission to raise *Brady* and *Napue* claims), Lee once again claims that defects in the integrity of the § 2255 proceedings—the same purported defects he alleged in his September 2018 motion—justify relief from judgment under Federal Rule of Civil Procedure 60. *Compare* Dkt. 1297, at 62-63 (defects alleged in the September 2018 motion), *with* Dkt. 1363, at 69 (defects alleged in the present motion). Lee specifically claims (Dkt. 1363, at 69) that the government committed "misconduct" and made "false" representations when it stated—in response to the claim by Lee in his § 2255 motion that he received ineffective assistance of counsel because his lawyers failed to object to a pretrial order barring his access to discovery—that it had

23

provided a "huge" amount of discovery to Lee months before trial, most of which was *Jencks* material and only a "small amount" of which was Rule 16 or *Brady* material. Dkt. 1126, at 45 n.16.

## ARGUMENT

Lee's present motion is in much the same posture as his previous filings in which he has sought to raise *Brady* and *Napue* claims based on allegedly new evidence, and his present motion fails for largely the same reasons. A defendant seeking to raise new *Brady* and *Napue* claims based on evidence newly discovered after the denial of the defendant's first § 2255 motion must satisfy the requirements for second or successive § 2255 motions. The defendant must demonstrate to the court of appeals that the new evidence, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the [defendant] guilty of the offense." 28 U.S.C. § 2255(h). Lee's motion seeks to raise new *Brady* and *Napue* claims to overturn his convictions, yet Lee has not requested, let alone received, the requisite authorization from the court of appeals. This Court therefore should dismiss the motion for lack of jurisdiction.

Lee cannot avoid the requirements for second or successive § 2255 motions by attempting to characterize his motion as a motion for relief from judgment under Rule 60 of the Federal Rules of Civil Procedure. Lee's

24

baseless claims of government malfeasance during the § 2255 proceedings do not transform his motion into an attack on the integrity of those proceedings. Lee cannot evade the fact that, in substance, he seeks to raise standard *Brady* and *Napue* claims based on newly discovered evidence, and he therefore must satisfy the gatekeeping provisions for second or successive § 2255 motions. Regardless, even if it is assumed that Lee's motion attacks the integrity of the § 2255 proceedings and therefore avoids the requirements for second or successive § 2255 motions, he fails to demonstrate that he is entitled to relief under Rule 60.

For these reasons, denial of Lee's motion is required without regard to the merits of his *Brady* and *Napue* claims. In any event, those claims lack merit. Among other things, there is no reasonable possibility that the alleged new evidence would have affected the outcome of Lee's trial, where overwhelming evidence established Lee's guilt.

## I.  This Court Lacks Jurisdiction Over Lee's *Brady* and *Napue* Claims Because Lee Has Not Obtained Authorization to File a Second or Successive § 2255 Motion

### A.  Applicable Legal Standards

A federal prisoner may collaterally attack his conviction by filing a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. *See generally United States v. Hayman*, 342 U.S. 205, 212-19 (1952) (explaining history of § 2255). Before 1996, statutory and judge-made rules

placed limits on the filing of repetitive § 2255 motions. *See Baranski v. United States*, 880 F.3d 951, 955 (8th Cir. 2018). In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 105, 110 Stat. 1214, 1220, which "imposed stricter limitations on the filing of second and successive § 2255 motions," *Baranski*, 880 F.3d at 955; *see Crawford v. Minnesota*, 698 F.3d 1086, 1089 (8th Cir. 2012).

The AEDPA provides that a "second or successive" § 2255 motion must be certified by the court of appeals to contain:

(1)    newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or

(2)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h). These gatekeeping requirements for second or successive § 2255 motions are jurisdictional. *See, e.g.*, *United States v. Springer*, 875 F.3d 968, 982 (10th Cir. 2017).

A second-in-time § 2255 motion that raises a *Brady* or *Napue* claim based on newly discovered evidence is a second or successive § 2255 motion that must satisfy the AEDPA's gatekeeping requirements, as this Court and every court of appeals to address the issue has held. Dkt. 1313, at 14-17; *Blackman v. Davis*, 909 F.3d 772, 778-79 (5th Cir. 2018); *In re Wogenstahl*,

26

902 F.3d 621, 626-28 (6th Cir. 2018); *Brown v. Muniz*, 889 F.3d 661, 666-75 (9th Cir. 2018); *In re Pickard*, 681 F.3d 1201, 1205 (10th Cir. 2012); *Quezada v. Smith*, 624 F.3d 514, 522 (2d Cir. 2010); *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1259-60 (11th Cir. 2009); *Evans v. Smith*, 220 F.3d 306, 322-25 (4th Cir. 2000). To be sure, the requirements of § 2255(h) do "not bar all newly discovered, second-in-time *Brady* claims," but they limit the *Brady* claims permitted in a second or succession § 2255 motion to those that "prove by clear and convincing evidence a prisoner's innocence." *United States v. Buenrostro*, 638 F.3d 720, 725 (9th Cir. 2011).

The AEDPA's gatekeeping provisions also apply to a pleading that, "although labeled a Rule 60(b) motion, is in substance" a second or successive § 2255 motion. *Gonzalez v. Crosby*, 545 U.S. 524, 531 (2005); *see Lee*, 792 F.3d at 1023 ("The Supreme Court has decided that AEDPA's procedural requirements for second or successive habeas petitions apply to motions for relief from a judgment filed under Federal Rule of Civil Procedure 60(b)."). A Rule 60 motion that "present[s] [a] new claim[] for relief" from a judgment of conviction will qualify as a second or successive § 2255 motion and therefore will be subject to the AEDPA's gatekeeping provisions. *Gonzalez*, 545 U.S. at 531; *see also id.* at 532 (stating that "[a] motion that seeks to add a new ground for relief . . . will of course qualify"). In contrast, a Rule 60 motion that attacks "some defect in the integrity of the federal habeas proceedings"

27

will not qualify. *Id.* at 532. The Supreme Court has explained that "[f]raud on the federal habeas court is one example of such a defect." *Id.* at 532 n.5.

## B.    Lee's Motion Is an Unauthorized Second or Successive § 2255 Motion

Lee's current filing, although labeled a Rule 60 motion for relief from judgment, is in substance a second or successive § 2255 motion. Lee's motion "seeks to add a new ground for relief," *Gonzalez*, 545 U.S. at 532, because it seeks to assert new *Brady* and *Napue* claims attacking his conviction. In that regard, Lee's motion is virtually indistinguishable from Lee's previous motion seeking to raise new *Brady* and *Napue* claims, which this Court correctly treated as a second or successive § 2255. *See* Dkt. 1313, at 20. Lee's current motion should be treated the same and denied for the same reasons. Lee was required to obtain certification from the Eighth Circuit in accordance with § 2255(h), and because he failed to do so, his motion must be denied. *See, e.g.*, *Lee*, 792 F.3d at 1025 (affirming the denial of a Rule 60 motion filed by Lee because he failed to obtain authorization under § 2255(h)).

Lee does not contest that if he simply had a claim that the government failed to disclose *Brady* material, he could raise that claim only through the vehicle of a successive § 2255 motion. To evade that hurdle, he instead contends not just that the government failed to disclose *Brady* material, but that the government actively misled him (and the Court) during the prior

28

§ 2255 proceedings as to the existence of such *Brady* material. To that end, Lee claims that a footnote in the government's response to his § 2255 motion created a defect in the integrity of the § 2255 proceedings, *see* Dkt. 1363, at 13, 66 (citing Dkt. 1126, at 45 n.16). But those are the same allegations that he attempted to use in his September 2018 motion to raise new *Brady* and *Napue* claims and avoid the limitations on second or successive § 2255 motions. *See* Dkt. 1297, at 16, 28, 62 (citing Dkt. 1126, at 45 n.16). This Court already rejected that attempt in denying Lee's September 2018 motion, Dkt. 1313, at 10-20, and the Eighth Circuit denied a certificate of appealability, *Lee v. United States*, No. 19-2432 (8th Cir.) (Nov. 4, 2019); *see supra* pp. 19-22. Lee's attempts to manufacture a defect in the integrity of the initial § 2255 proceedings to avoid the restrictions on second or successive § 2255 motions fail for the same reasons they failed previously.

Lee's recent application to the Eighth Circuit for authorization to file a second or successive § 2255 motion confirms that Lee's current motion is also a successive § 2255 motion. In that application, Lee argued that declarations from Cheyne and Kirby Kehoe were newly discovered evidence and he should be permitted to file a second or successive § 2255 motion raising *Brady* and *Napue* claims because those declarations allegedly provided compelling evidence of his innocence and therefore he satisfied the gatekeeping requirements of § 2255(h). *Lee v. United States*, No. 19-3576 (8th Cir.) (Dec. 4,

2019). Lee now seeks to assert a different *Brady* claim based on those very same declarations. Dkt. 1363, at 35-43. Lee does not explain why his earlier *Brady* claim based on those declarations must satisfy the AEDPA gatekeeping provisions but not the *Brady* claims in his present motion based on the same declarations. Lee's motion must be denied because he has not sought, let alone received, authorization from the Eighth Circuit in accordance with § 2255(h).

## II.   Lee Does Not Establish Any Defect in the § 2255 Proceedings That Would Support Relief from Judgment Under Rule 60

As described, *see supra* pp. 19-21, Lee's September 2018 motion raising *Brady* and *Napue* claims asserted, in the alternative, that the government made a "misrepresentation" in its response to his § 2255 motion that created a defect in the integrity of those proceedings, permitting him to seek relief under Rule 60 of the Federal Rules of Civil Procedure without regard to the restrictions on second or successive § 2255 motions. Dkt. 1297, at 63. This Court correctly concluded that Lee had "not alleged facts" showing that the government committed "misconduct" or "intentionally misrepresented any facts." Dkt. 1313, at 19. The Court therefore found that Lee had not demonstrated any grounds for relief under Rule 60(b)(3) or Rule 60(d)(3). *Id.* Lee nonetheless contends once again that he is entitled to Rule 60 relief because of those same alleged misrepresentations. Lee's claims necessarily

fail for the same reasons. Although Lee now invokes additional provisions of Rule 60, none of those provisions supports a different outcome.

## A.   Lee's Allegations Do Not Demonstrate Misconduct by the Government

1.      As described above, in Lee's initial § 2255 motion, he claimed there were "many aspects of this case that are disturbing and strongly suggest" that he is "an innocent man," including, among other things, "evidence withheld in violation of the government's *Brady* obligations, that others carried out the murders of the Mueller family." Dkt. 1118, at 7. In a footnote, Lee requested that the government search its files for *Brady* material. *Id.* at 7 n.3. The government responded that Lee's "barebones" allegations failed to undermine the strong evidence of his guilt. Dkt. 1126, at 26-23 & n.13. In a different section of its response brief, the government responded to a separate claim by Lee that he received ineffective assistance of counsel because his lawyers failed to object to a court order limiting Lee's access to pretrial discovery. *Id.* at 44-46 & n.16. In footnote 16 of its response, the government explained that it had turned over a "huge amount" of discovery months before trial and that the "vast majority" was *Jencks* material and only a "small amount" was Rule 16 and *Brady* material. *Id.* at 45 n.16. The composition of the discovery material that the government had turned over was relevant because *Jencks* material, by statute, need not be

31

disclosed until trial, and therefore had defense counsel objected, the government could have waited until then to turn over the materials. *Id.* at 45 & n.16.

In his 2018 motion raising *Brady* and *Napue* claims, Lee asserted (Dkt. 1297, at 62-63) that the government had made a "misrepresentation" when it stated (in footnote 16 of its § 2255 response brief) that it had turned over a huge amount of discovery months before trial and that only a small amount of that discovery was *Brady* material. According to Lee, the government, in this footnote, had incorrectly "insisted . . . that it had complied with all of its pre-trial discovery obligations." *Id.* at 62. Lee argued that the government made a "fraudulent representation" and engaged in "misconduct." *Id.* at 67.

This Court rejected Lee's contention that the government made a "misrepresentation." Dkt. 1313, at 17-19. Judge Holmes pointed out that "Lee refers to Footnote 16 as being part of the Government's response to his general, unsupported *Brady* allegation," but "Footnote 16 . . . was in the response to Lee's ineffectiveness claim challenging his trial lawyers' failure to oppose the Government's motion seeking restrictions on his personal discovery access." *Id.* at 18 n.5. Judge Holmes concluded that Lee had "not alleged facts to show that the omission of any evidence during his § 2255 proceeding was due to the Government's misconduct or that the Government intentionally misrepresented any facts." *Id.* at 19.

32

Lee nonetheless repeats the same baseless assertions in his current motion. Dkt. 1363, at 66. Citing footnote 16, Lee claims that, "despite [his] clear request for any information that would support a *Brady* claim, the Government simply noted that it had previously provided a 'huge amount' of discovery to trial counsel," and "[i]t made no additional disclosures." *Id.* Lee claims that this shows that the government made "false" representations, *id.*, and engaged in "misconduct," *id.* at 67. Lee further asserts that the government "misrepresent[ed] whether it had disclosed all the exculpatory and impeachment material in its possession at the time of [his] trial" and then "repeated the lie during [his] § 2255 proceedings." *Id.* at 68. Lee even goes so far as to contend that the government follows a "playbook" to "hide favorable evidence prior to the trial, run out the clock until the § 2255 proceeding is complete, and then invoke procedural and jurisdictional arguments to block the courts from substantively reviewing any of its misconduct." *Id.* at 73.

Lee's incendiary claims are baseless and distort the record beyond recognition. The government made no misrepresentations (let alone intentional misrepresentations) in footnote 16 of its response to Lee's § 2255 motion, the only part of the record that Lee cites to support his claims of misconduct. As Judge Holmes concluded, footnote 16 responded to a claim of ineffective assistance of counsel and not to Lee's "general, unsupported *Brady*

33

allegations." Dkt. 1313, at 18. Footnote 16 cannot reasonably be construed as any kind of statement about the completeness of the government's *Brady* disclosures. Footnote 16 instead described the discovery the government had turned over months before the start of trial, at a time when the government's discovery production was not complete. The government sought (and obtained) a protective order at that time precisely because it intended to turn over more discovery and did not want Lee to use the additional discovery to endanger witnesses, as he had done with discovery the government had previously disclosed. The government's description of the discovery it had turned over months before trial, before discovery was completed, cannot reasonably be construed as an assertion about the state of discovery years later at the time of the § 2255 proceedings. Lee's attempts to manufacture government misconduct out of whole cloth must fail.

To be clear, although the government did not represent through that footnote that it had turned over all the *Brady* material in its possession at the time of the § 2255 proceedings, even if it had made such a representation, the government does not have a basis to conclude that the representation would have been incorrect. To start, for the reasons discussed below, the materials Lee now characterizes as *Brady* material do not, in fact, qualify as *Brady* material and therefore the government would have had no constitutional obligation to turn them over even if they were in the

34

government's possession. *See infra* pp. 59-82. The government, however, does not concede that the materials Lee now characterizes as *Brady* material were in the government's possession, either at the time of trial or later during the § 2255 proceedings, let alone that the government knew the material was in its possession and intentionally failed to turn it over. The government has reviewed its trial files and has not located the polygraph document from the Arkansas State Police. With respect to the statements Cheyne and Kirby Kehoe allegedly made to "agents," the government does not have adequate information to evaluate those allegations. None of the federal prosecutors who tried this case 20 years ago is still with the Department of Justice, and the declarations do not identify the time or date of the alleged statements, the names of the agents, or the name of the relevant law-enforcement agency.

2.      Lee's claim (Dkt. 1363, at 6, 14 n.15, 24 n.28, 69-70, 70-73) that a "pattern" of *Brady* disclosure violations demonstrates government misconduct also rings hollow. A *Brady* violation by itself does not show government misconduct, because the government may violate *Brady* by inadvertently failing to turn over favorable, material evidence. Moreover, a *Brady* violation occurs at trial and does not demonstrate misconduct at later § 2255 proceedings, which is what Lee must show in order to establish a defect in the integrity of those proceedings. There was no pattern of *Brady*

violations at Lee's trial, let alone a pattern that demonstrates misconduct at Lee's subsequent § 2255 proceedings.

a.      Lee has asserted that the government committed a *Brady* violation by failing to disclose statements about the APR that Cheyne and Kirby Kehoe allegedly made to "agents" and "prosecutors." Dkt. 1363-4, at 3 (Kirby Kehoe declaration); *see* Dkt. 1363-3, at 6-8 (Cheyne Kehoe's declaration referring to statements to "agents" and "police and prosecutors," and "interviews with the government"). As with the assertions about Gloria Kehoe's mental stability in those same affidavits, in light of the imprecision of the claims and the fact that more than 20 years have passed and the prosecutors who tried the case are no longer with the Department of Justice, the government is unable to evaluate whether Cheyne and Kirby Kehoe in fact made these statements to members of the prosecution team. Regardless, the statements are not material, and hence the government did not violate any constitutional disclosure obligations, particularly because, as Judge Eisele concluded, "there was overwhelming evidence of the existence of the RICO enterprise." *Lee*, 2008 WL 4079315, at *35; *see also Kehoe*, 310 F.3d at 586-87 (discussing ample evidence of a racketeering enterprise).

b.      Lee has similarly asserted that the government committed a *Brady* violation by failing to disclose statements by witness James Wanker to federal agents and prosecutors. Dkt. 1297, at 30-52. Wanker claimed to tell

the agents and prosecutors that he thought Lee was merely posturing when he made inculpatory admissions about going down south and wrapping and taping people and throwing them in a swamp. Dkt. 1363-14, at 2. Again, the government is not in a position to evaluate these claims 20 years after the fact and therefore the government cannot be faulted for not "unequivocally den[ying]" them, Dkt. 1363, at 15 n.15, 69, particularly when doing so is unnecessary to evaluate Lee's *Brady* claims because, as Judge Holmes concluded, "[t]here is no reasonable probability" that Wanker's statements "would have resulted in a different verdict," Dkt. 1313, at 13. Wanker did not recant the substance of his testimony, *i.e.*, the contents of Lee's inculpatory admissions, which were corroborated by independent evidence. *See infra* pp. 68-69. And any testimony that Wanker thought Lee's admissions were "empty bragging" would have been duplicative of his testimony that he thought Lee was "talking to hear himself talk." *Id.* Because Wanker's statements were not material, even assuming the government knowingly or inadvertently failed to disclose them, the government did not violate any constitutional disclosure obligations under *Brady*.

     c.     Lee has also argued that the government violated its *Brady* obligations by failing to turn over an Oklahoma court document. Dkt. 1297, at 52-59. The government has reviewed its trial files and has not located the Oklahoma court document, and therefore the government does not have a

37

basis to believe that it ever knowingly possessed the document, let alone that it knowingly failed to turn it over at trial or during § 2255 proceedings. But because doing so is unnecessary to resolve Lee's *Brady* claim, the government has not—more than 20 years later and well after the trial prosecutors left the Department of Justice—"unequivocally denied" that it possessed or knew about the document.

As the government has explained elsewhere, the Oklahoma court document does not qualify as *Brady* material—and therefore the government would not have violated any constitutional disclosure obligation even assuming the government possessed the document and failed to disclose it—because *Brady* covers only evidence that is "otherwise unavailable to the defendant," *United States v. Barraza Cazares*, 465 F.3d 327, 334 (8th Cir. 2006), and therefore does not encompass publicly available documents, such as court documents, *United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015) (concluding that publicly-available document did not qualify as *Brady* material). Moreover, the Oklahoma court document purportedly describes a hearing at which Lee himself was present and therefore does not qualify as *Brady* material for that reason as well, because "[t]he government is under no obligation to disclose to the defendant that which he already knows." *United States v. Wilson*, 787 F.2d 375, 389 (8th Cir. 1986); *see United States v. Paulino*, 445 F.3d 211, 224-25, 227 (2d Cir. 2006) (finding no *Brady* violation

38

where the government failed to disclose statements made in the midst of trial by counsel for another defendant because the statements contained only "information already known in substance to the defense"); *Allen v. Lee*, 366 F.3d 319, 325 (4th Cir. 2004) (en banc) (finding no *Brady* violation where the defendant had "personal knowledge" of the information contained in undisclosed jail records).[3]

3.      In short, Lee does not identify misrepresentations or misconduct by the government during his § 2255 proceedings that created a defect in the integrity of those proceedings. To the contrary, Lee merely claims that he has found what he characterizes as *Brady* material through additional investigation after the completion of the § 2255 proceedings. As explained below, the new evidence collected by Lee does not qualify as *Brady* evidence and therefore the government did not violate any constitutional obligations to turn over the evidence before trial. But even assuming that the new evidence amounts to *Brady* material, Lee provides no basis to conclude that government prosecutors knowingly failed to disclose the evidence to Lee

---

[3] The government also continues to believe that the Oklahoma court document was not material but recognizes that Judge Holmes concluded otherwise. Dkt. 1313, at 14. Judge Holmes, however, did not have occasion to determine whether the other *Brady* requirements were satisfied, although he correctly found that "the Oklahoma court record . . . is public information" and therefore the government did not withhold information that it alone possessed. *Id.* at 19.

before trial or, more importantly for present purposes, that the government learned about the evidence later and knowingly or intentionally failed to disclose it during the § 2255 proceedings.

To be sure, the government may violate its *Brady* obligations even if it inadvertently fails to turn over favorable evidence that is material. *See Strickler v. Greene*, 527 U.S. 263, 288 (1999) ("[U]nder *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment."). But for present purposes, Lee must show more than that the government committed an inadvertent *Brady* violation at trial. Lee must show that there was a defect in the integrity of his postconviction § 2255 proceedings, cognizable under Federal Rule of Civil Procedure 60, that would warrant reopening his initial § 2255 proceedings. In order to do that, Lee must show that the government committed fraud or some other sort of misconduct in connection with his § 2255 proceedings. An inadvertent *Brady* violation, unknown to the government until after the conclusion of § 2255 proceedings, does not establish misconduct at those § 2255 proceedings. Lee consequently accuses the government (Dkt. 1363, at 6) of "hiding" evidence during the § 2255 proceedings. But Lee provides no basis to conclude that the government knew about *Brady* material at the time of his § 2255 proceedings and lied to cover up its existence at that time (or at any time). Lee's farfetched claims of rampant government deceit and misconduct during his

40

§ 2255 proceedings are premised on baseless (and reckless) accusations without support in the record. Lee does not demonstrate a defect in the integrity of the proceedings, let alone a defect that would warrant relief under any provision of Rule 60.

## B.    The Court Should Adhere to the Law of the Case

The law-of-the-case doctrine prevents relitigation of a settled issue in a case. *United States v. Bartsh*, 69 F.3d 864, 866 (8th Cir. 1995). The doctrine "requires courts to adhere to decisions made in earlier proceedings in order to ensure uniformity of decisions, protect the expectations of the parties, and promote judicial economy." *Id.* In other words, the doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *United States v. Carter*, 490 F.3d 641, 644 (8th Cir. 2007) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). District court decisions that "either have not been appealed or have been appealed and affirmed[ ] are the law of the case and need not be revisited." *Liddell by Liddell v. Bd. of Educ. of the City of St. Louis*, 121 F.3d 1201, 1216 (8th Cir. 1997).

As discussed, *see supra* pp. 33-34, this Court previously concluded that the government did not—through footnote 16 of its response to Lee's § 2255 motion—engage in misrepresentations, misconduct, or fraud that would justify reopening his § 2255 proceedings under Rule 60 in order to consider a

41

new *Brady* or *Napue* claim. Dkt. 1313, at 17-20. This Court and the Eighth Circuit denied a certificate of appealability, and therefore the Court's prior decision is the law of the case and the Court should adhere to it. Lee should not be permitted to repeatedly seek to reopen his § 2255 proceedings on the same grounds. Finality concerns are particularly germane here, as this is Lee's fourth Rule 60 motion, filed more than a month after the date on which his execution was initially scheduled.

In any event, even if the Court concludes it is not bound by the law of the case, it should reject Lee's attempts to reopen the § 2255 proceedings under Rule 60. Lee is not entitled to relief from judgment under any provision of that Rule.

## C.    Rule 60(b)(3): Fraud, Misrepresentation, or Misconduct

Rule 60(b)(3) of the Federal Rules of Civil Procedure provides that a "court may relieve a party . . . from a final judgment" because of "fraud," "misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). A movant seeking relief from judgment under Rule 60(b)(3) must "show, with clear and convincing evidence, that the opposing party engaged in a fraud or misrepresentation that prevented the movant from fully and fairly presenting its case." *Atkinson v. Prudential Property Co., Inc.*, 43 F.3d 367, 372-73 (8th Cir. 1994). Although the "failure to produce evidence requested in discovery may under some circumstances be grounds for

42

vacating judgment," the movant must submit "evidence that the failure to do so . . . was due to misconduct on the part of" the opposing party. *Id.* at 373. A movant is not prevented from fully and fairly presenting its case if the evidence the opposing party purportedly fails to turn over is nonetheless available to the movant. *Id.* In addition, a motion for relief under Rule 60(b)(3) must be made "no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1); *see* 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2866 (3d ed. 2018) ("A motion under clauses (1), (2), or (3) [of Fed. R. Civ. P. 60(b)] must be denied as untimely if made more than one year after judgment regardless of whether the delay was reasonable."). "The one-year limit on motions under the first three clauses runs from the date the judgment was entered in the district court." Wright et al., *supra*, § 2866

Lee's motion is untimely insofar as he seeks relief under Rule 60(b)(3). This Court entered judgment denying Lee's § 2255 motion in 2008, *Lee*, 2008 WL 4079315, at *1, more than a decade before Lee filed the present motion (in 2020). This Court correctly concluded that Lee's September 2018 motion was untimely insofar as he sought relief under Rule 60(b)(3). Dkt. 1313, at 18-19. Other courts have similarly concluded that Rule 60(b)(3) motions attempting to raise *Brady* claims were untimely. *See United States v. Espinoza*, 622 Fed. Appx. 745, 748-49 (10th Cir. 2015) (per curiam)

43

(unpublished) (Rule 60(b)(3) motion seeking to raise a *Brady* claim untimely); *United States v. Hutchins*, 625 Fed. Appx. 509, 511-12 (11th Cir. 2015) (per curiam) (unpublished) (same); *United States v. Moon*, 527 Fed. Appx. 473, 475 (6th Cir. 2013) (unpublished) (same); *Galatolo v. United States*, 196 Fed. Appx. 854, 858 (11th Cir. 2006) (per curiam) (unpublished) (same). The same result is warranted here.

In unsuccessfully seeking a certificate of appealability in the Eighth Circuit for one of his prior motions relying on Rule 60, and alleging a defect in the § 2255 proceedings, Lee argued that the district court should have equitably tolled the one-year statute of limitations. A Rule 60(b)(3) motion, however, "must be denied as untimely if made more than one year after judgment *regardless of whether the delay was reasonable*." Wright et al., *supra*, § 2866 (emphasis added). And a district court "*must not* extend" this one-year limitation. Fed. R. Civ. P. 6(b)(2) (emphasis added). Thus, a court does not "have any power to enlarge the time limits of the rule." Wright et al., *supra*, § 2866. It would "make little sense to toll the limitations period of rules designed to deal with fraud because fraud was present." *In re Lothian Oil, Inc.*, 508 Fed. Appx. 352, 357 (5th Cir. 2013) (unpublished). Moreover, even if equitable tolling were available, Lee—who filed his motion 12 years after entry of judgment—provides no basis to conclude that he could satisfy the diligence requirement that would warrant tolling in the first place. *See,*

44

*e.g.*, *Burks v. Kelley*, 881 F.3d 663, 666 (8th Cir. 2018) (rejecting equitable tolling of a habeas petition where the petitioner failed to pursue his rights diligently).

Even if timely, Lee fails to demonstrate any entitlement to relief under Rule 60(b)(3). Lee does not identify any evidence showing that the government engaged in a fraud or misrepresentation, let alone clear and convincing evidence. The only "evidence" that Lee identifies as purportedly showing misconduct by the government during the proceedings on Lee's first § 2255 motion is footnote 16 in the government's response to that motion. *See* Dkt. 1363, at 66 (citing footnote 16). As discussed, however, the statements in footnote 16 were accurate. The government explained that it had produced a "huge amount" of discovery to Lee months before trial and that a "small amount" of that discovery was *Brady* material. Dkt. 1126, at 45 n.16. The footnote described the discovery the government had provided to Lee well before discovery was finished and did not purport to make any claims about the completeness of the government's production of *Brady* material at that early juncture. As this Court has concluded, the statements in footnote 16 provide no basis for relief under Rule 60(b)(3). Dkt. 1313, at 18-19 & n.5.

The cases Lee relies upon (Dkt. 1363, at 62-66) are inapposite because in each of those cases the courts found that the government made material misrepresentations that prevented an adjudication of a claim the defendant

had raised in his initial § 2255 motion. In *United States v. Williams*, 753 Fed. Appx. 176, 177 (4th Cir. 2019) (per curiam) (unpublished), for example, the defendant raised an ineffective-assistance claim in his § 2255 motion related to DNA evidence at trial that linked the defendant to the crime scene. In response to the § 2255 motion, the government stated that "there was no evidence suggesting the DNA analysis . . . was unreliable, deficient, or inaccurate," but the defendant "claimed that he had recently discovered documents proving that the DNA analyst was not credible and that the Government knew about these documents before [the defendant] filed his § 2255 motion." *Id.* Lee does not show that the government knowingly possessed documents that contradicted statements it made in footnote 16 (or anywhere else) in its response to his § 2255 motion.

Similarly, in *In re Pickard*, 681 F.3d 1201, 1203 (10th Cir. 2012), defendants convicted of conspiring to manufacture LSD raised a *Brady* claim in their § 2255 motions claiming that the government suppressed evidence that would have impeached a government informant, and in particular asserted that the government "had failed to disclose relevant files from agencies other than the federal Drug Enforcement Administration (DEA)." In response, the government asserted that "no agency other than the DEA was involved in the LSD investigation," and the district court denied a request to make the government identify federal agencies other than the DEA that had

46

participated in the case. Defendants later learned through a FOIA request, however, that federal "agencies other than the DEA were involved in the LSD investigation" and had relevant impeachment records. *Id.* at 1203-04. Again, Lee does not identify new information that contradicts the government's representations in footnote 16—or any other statements the government made in response to his § 2255 motion—let alone representations that caused this Court to deny a request to order government disclosures.[4]

As this Court has already concluded, footnote 16—which is the only basis Lee asserts for Rule 60(b)(3) relief—does not show that the government

---

[4] The district court's decision in *Scott v. United States*, 81 F. Supp. 3d 1326 (M.D. Fla. 2015), also does not assist Lee. In that case, the district court held that new evidence contradicting the government's assertions in the defendant's § 2255 proceedings could be used to reopen the § 2255 proceedings to reconsider an ineffective-assistance claim that the defendant had asserted in his initial § 2255 motion, but the court concluded that the defendant could not use the evidence to raise a new *Brady* claim that he did not assert in the § 2255 motion. *Id.* at 1336-41. The court later rejected the ineffective-assistance claim and reiterated that it was without jurisdiction to consider the defendant's "free-standing *Brady* and *Giglio* claims." *Scott v. United States*, No. 3:03-CR-343, 2016 WL 323902, at *7 (M.D. Fla. Jan. 27, 2016). The Eleventh Circuit affirmed on the basis of its prior precedent holding that second-in-time § 2255 motions raising *Brady* claims are subject to the AEDPA's gatekeeping provisions. *Scott v. United States*, 890 F.3d 1239, 1259 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 842 (2019). Lee likewise cannot raise a new *Brady* or *Napue* claim without satisfying the AEDPA's requirements.

engaged in "misconduct" or "intentionally mispresented facts." Dkt. 1313, at 19. The same conclusion necessarily follows here.[5]

## D.    Rule 60(b)(6): Extraordinary Circumstances

A defendant seeking relief under Federal Rule of Civil Procedure 60(b)(6) must show "'extraordinary circumstances' justifying the reopening of a final judgment." *Gonzalez*, 545 U.S. at 535 (quoting *Ackermann v. United States*, 340 U.S. 193, 199 (1950)); *accord Davis v. Kelley*, 855 F.3d 833, 835-36 (8th Cir. 2017) (per curiam); *In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, 496 F.3d 863, 868 (8th Cir. 2007). Such circumstances "rarely occur in the habeas context." *Gonzalez*, 545 U.S. at 535. In addition, a motion under Rule 60(b)(6) "must be made within a reasonable time." Fed. R. Civ. P. 60(c)(1); *see Williams v. Kelley*, 854 F.3d 1002, 1009 (8th Cir. 2017) (per curiam).

---

[5] Lee cites (Dkt. 1363, at 63 n.56) cases in which courts found, in cases not involving proceedings under § 2255, that an "unintentional misrepresentation" may support relief under Rule 60(b)(3). *See, e.g.*, *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995). There is reason to question the soundness of that conclusion. *See Jordan v. Paccar, Inc.*, 97 F.3d 1452 (Tbl.), 1996 WL 528950, at *6-*9 (6th Cir. 1996) (per curiam) (unpublished) (concluding, *inter alia*, that "[t]he language of the rule does not support such a construction"). Regardless, the cases Lee cites are distinguishable because they were decided outside the context of § 2255 proceedings, Lee does not provide support for the conclusion that an unintentional misrepresentation during § 2255 proceedings may represent a "defect in the integrity" of those proceedings under *Gonzalez*, which is the relevant standard here. And finally, the government made no misrepresentation—unintentional or otherwise—in footnote 16 of its response to Lee's § 2255 motion.

Lee's motion appears to be untimely to the extent he seeks relief under Rule 60(b)(6). Lee does not identify the date on which he received the polygraph documents from the Arkansas State Police pursuant to an Arkansas FOIA request, but his lawyers have been collecting information from public sources for years. In the September 2018 filing in which Lee sought to raise *Brady* and *Napue* claims based on an Oklahoma state court document, for example, Lee had obtained the court document no later than November 2014, yet he waited almost four years to seek relief in this Court based on that document. *See* Letter from Ruth E. Friedman to Attorney General Eric Holder (Nov. 4, 2014) (on file with government); *see also Lee v. Watson*, 2019 WL 6718924, at *2 (noting that Lee had sought habeas relief "more than four years after, by his own account, he obtained the evidence that he characterizes as newly discovered"). As for the declarations from Cheyne and Kirby Kehoe, Lee provides no basis to conclude that he could not have obtained the declarations at an earlier point in the last 20 years after his trial, as both men were in prison for large portions of that period and therefore were easy to locate.

Even if timely, Lee fails to demonstrate any entitlement to relief under Rule 60(b)(6). That provision cannot be used to seek relief from judgment on grounds that would be cognizable under the other subsections of Rule 60(b). As the Supreme Court has explained, a party can seek relief under Rule

49

60(b)(6) "provided that the motion . . . is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988). In other words, "if the asserted ground for relief falls within one of the enumerated grounds for relief subject to the one-year time limit of Rule 60(b), relief under the residual provision of Rule 60(b)(6) is not available." *Arrieta v. Battaglia*, 461 F.3d 861, 865 (7th Cir. 2006). Otherwise, a party could use Rule 60(b)(6) "to circumvent the 1-year limitations period that applies to" clauses (b)(1) through (b)(3). *Liljeberg*, 486 U.S. at 863 n.11; *see United States v. Fernandez*, 797 F.3d 315, 319 (5th Cir. 2015) ("[I]f a motion was of a type that must be brought within a year, and that year passed without filing, the movant cannot resort to Rule 60(b)(6); rather, it finds [it] has itself without [a] Rule 60(b) remedy altogether."); *United States v. Buck*, 281 F.3d 1336, 1341 (10th Cir. 2002) ("Because fraud is one of the reasons for relief appearing in clause (3), it is not available as 'any other reason' under clause (6). Appellants cannot so easily escape the time restrictions on Rule 60(b)(3) motions."); *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1088 (9th Cir. 2001) ("[Plaintiffs] cannot avoid the time bar by pointing out that their motion was made under Rule 60(b)(6).").

Lee asserts he is entitled to relief under Rule 60(b)(6) because the government engaged in "misconduct" and made "misrepresent[ations]." Dkt. 1363, at 67-68. As described above, Lee's assertions of misconduct lack merit.

There is no basis to support Lee's accusation that the government knowingly suppressed *Brady* evidence at trial and lied to the Court about it and then "maintained that falsehood for as long as it would take to try to shut the courthouse doors on Mr. Lee*.*" *Id.* at 71. But apart from the lack of support for Lee's rank assertions of misconduct, to the extent he seeks relief from judgment on the basis of those assertions, he must do so under Rule 60(b)(3)—which expressly contemplates relief from judgment as a result of "fraud," "misrepresentation, or misconduct by an opposing party," Fed. R. Civ. P. 60(b)(3)—and not the catch-all of Rule 60(b)(6). Lee cannot repackage his assertions and "obtain relief under 60(b)(6) where the allegations of fraud or misconduct are essentially the identical grounds for relief sought under [his] 60(b)(3) motion." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 643 (5th Cir. 2005).

Lee also suggests (Dkt. 1363, at 67-69) that "extraordinary circumstances" are present here because he may receive the death penalty without an adjudication on the merits of what he describes as "credible" *Brady* claims. As explained below, Lee's *Brady* and *Napue* claims lack merit, but in any event, an argument that Lee's *Brady* and *Napue* claims are "credible" does not assert a defect in the § 2255 proceedings but instead is an attempt to raise a new claim and therefore AEDPA's restrictions on second or successive § 2255 motions apply. *See supra* pp. 27-32. Moreover, it is hardly

51

extraordinary that the AEDPA may preclude a merits determination of *Brady* and *Napue* claims based on evidence that the defendant asserts he discovered after the denial of his § 2255 motion. The AEDPA expressly contemplates successive § 2255 motions based on new evidence and permits *Brady* and *Napue* claims based on newly discovered evidence as long the evidence, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255(h)(1). If a merely "credible" *Brady* or *Napue* claim were enough to establish a defect in the integrity of the § 2255 proceedings, the AEDPA's statutory restrictions on successive motions based on newly discovered evidence would be nullified.

Lee also contends that extraordinary circumstances justify using Rule 60(b)(6) to reopen his § 2255 proceedings to allow consideration of his *Brady* and *Napue* claims because the government allegedly has engaged in a "broad pattern of suppression of exculpatory information and the presentation of false and misleading evidence." Dkt. 1363, at 69. According to Lee, the government has asserted procedural bars and has not "unequivocally denied the factual allegations undergirding any of [his] prior *Brady* claims." *Id.* As discussed above, however, there has been no "pattern" of *Brady* violations by the government. *See supra* pp. 37-41.

52

### E.   Rule 60(d)(1): Independent Action in Equity

Rule 60(d)(1) of the Federal Rules of Civil Procedure provides that a court retains the power to "entertain an independent action to relieve a party from a judgment, order, or proceeding." The Supreme Court has stated that the requirements for a meritorious independent action, which "sound[s] in equity," are "somewhat unclear." *United States v. Beggerly*, 524 U.S. 38, 45-46 (1998). The Court has explained that a party may obtain relief through an independent action if a judgment against the party was obtained fraudulently with forged evidence but not if there was merely "a failure to furnish relevant information that would at best form the basis for a Rule 60(b)(3) motion." *Id.* at 46-47. A meritorious independent action requires, at a minimum, "a grave miscarriage of justice." *Id.* at 47. In the collateral-review context, a "miscarriage of justice" requires a showing of actual innocence, *see, e.g.*, *McQuiggin v. Perkins*, 569 U.S. 383, 392-93 (2013), and *Davis v. Kelley*, 854 F.3d 967, 971 (8th Cir. 2017) (per curiam), and courts have applied these same requirements when determining whether a party has demonstrated a grave miscarriage of justice warranting relief from judgment via an independent action, *Mitchell v. Rees*, 651 F.3d 593, 595-96 (6th Cir. 2011); *see id.* at 599 (concluding that actual innocence "is a required element for an independent action for relief from a habeas judgment"). That is consistent with the principle that relief from judgment through an independent action

53

"is a truly extraordinary form of relief." *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873, 878 (8th Cir. 2010).

Lee does not contend that he can demonstrate actual innocence and therefore does not establish a grave miscarriage of justice that would warrant the extraordinary step of reopening his § 2255 proceedings via an independent action. Lee instead repeats (Dkt. 1363, at 70) the same allegations of misconduct by the government that, for the reasons already explained, lack merit. Lee also suggests that relief is warranted under Rule 60(d)(1) because the government allegedly "has committed a number of other *Brady* violations that have escaped review because it managed to successfully conceal its misconduct until after the § 2255 proceedings were concluded." *Id.*; *see also id.* at 69 (claiming a "broader pattern of suppression of exculpatory information"). Those allegations too lack merit for the reasons already explained. *See supra* p. 37-41.

Lee's reliance on *United States v. Pelullo*, No. 01-CV-124, 2010 WL 2629080 (D.N.J. June 25, 2010), is misplaced. In that case, the district court concluded that it "arguabl[y]" had jurisdiction over the defendant's motion under Rule 60(b)(6), Rule 60(d)(1), or the court's inherent powers, *id.* at *15, and therefore it entertained (and denied) the defendant's bail motion, *id.* at *16. When the district court later addressed the merits of the motion, however, it concluded that the defendant was not entitled to relief under Rule

54

60(b) or 60(d) and that it lacked jurisdiction, and it transferred the motion to the court of appeals "to be treated as an application for leave to submit a second or successive petition." *United States v. Pelullo*, 01-CV-124, 2011 WL 3022534, at *19 (D.N.J. July 22, 2011).

### F.    Rule 60(d)(3): Fraud on the Court

Rule 60(d)(3) of the Federal Rules of Civil Procedure provides that a federal court retains the power to "set aside a judgment for fraud on the court." Fraud on the court is "fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *United States v. Smiley*, 553 F.3d 1137, 1144 (8th Cir. 2009) (citation omitted). "A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel." *Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998) (citation omitted); *accord Hamilton v. PAS, Inc.*, No. 4:15-CV-00071, 2015 WL 2120539, at *2 (E.D. Ark. Apr. 27, 2015). "[I]t is necessary to show a deliberately planned scheme designed to improperly influence the court in its decision." *Heim v. Comm'r of Internal Revenue*, 872 F.2d 245, 249 (8th Cir. 1989). Moreover, the movant must demonstrate fraud "by clear and convincing evidence." *Greiner*, 152 F.3d at 789 (concluding that movant failed

to satisfy the lesser fraud showing required by Rule 60(b)(3) and therefore failed to show fraud on the court).

Judge Holmes previously found that the same allegations of misconduct by the government (premised on footnote 16 in the government's response to Lee's § 2255 motion) did "not clear th[e] high bar" for establishing fraud on the court, Dkt. 1313, at 20, and the same conclusion necessarily follows here. Lee does not come close to meeting that standard, let alone by clear and convincing evidence. Lee does not—and cannot—contend that the government deliberately schemed to influence the Court's decision or corrupt the judicial machinery itself. Lee identifies no statements to this Court in the § 2255 proceedings that were false, let alone intentionally false. If the government's alleged conduct here is enough to show a fraud on the court, then every alleged failure to turn over *Brady* evidence at the time of a § 2255 proceeding, including inadvertent failures, would result in such fraud, but that is plainly not the law. *See Alley v. Bell*, 392 F.3d 822, 831 (6th Cir. 2004) ("We note that the claim of 'fraud on the court' that Alley has articulated in connection with his *Brady* argument in this case is essentially indistinguishable from a standard *Brady* constitutional claim that is being asserted for the first time after the completion of a first federal habeas proceeding."); *see also Galatolo v. United States*, 394 Fed. Appx. 670, 672 (11th Cir. 2010) (per curiam) (unpublished).

### III.   Although Not Legally Relevant, the *Brady* and *Napue* Claims Are Without Merit

This Court lacks jurisdiction over Lee's motion because it amounts to a second or successive § 2255 motion. Lee fails to demonstrate a defect in the integrity of the § 2255 proceedings, let alone a defect that would justify relief from judgment under Federal Rule of Civil Procedure 60. The Court should deny Lee's motion for these reasons.

The merits of Lee's *Brady* and *Napue* claims therefore are not legally relevant here. Lee himself contends that "determination of the merits is premature" at this point, and according to Lee, his motion discusses the merits of these claims only "to convey to the Court the grave implications" of the government's alleged misrepresentations. Dkt. 1363, at 6.

The government briefly addresses the merits of Lee's *Brady* and *Napue* claims to identify some of the deficiencies in those claims. The government does not purport to identify every deficiency and requests an additional opportunity to brief the merits in full if the Court deems it necessary.

A *Brady* violation "has three components" and occurs when (1) the government suppressed evidence (either willfully or inadvertently); (2) the evidence was favorable to the defendant (because it was exculpatory or impeaching); and (3) the evidence was material. *United States v. Anwar*, 880 F.3d 958, 969 (8th Cir. 2018) (citations omitted). The Supreme Court has

57

explained that "evidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). A court assessing materiality "must examine the trial record, evaluat[e] the withheld evidence in the context of the entire record, and determine in light of that examination whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (internal citations and quotation marks omitted).

### A.    Lee Fails to Undermine the Strong Evidence of His Guilt

Because the *Brady* materiality standard requires evaluating the purported *Brady* material against the trial record as a whole, we first discuss some of the evidence establishing Lee's guilt and in particular address some of Lee's assertions about weaknesses in the evidence.

### 1.    The Date of the Murders

Lee contends that there was evidence the Muellers were alive after January 11, 1996. Dkt. 1297, at 9 & n.9, 33-34. Although some witnesses testified that they thought they saw the Muellers after that date, the overwhelming evidence established that the Muellers went missing and were murdered on January 11, 1996.

The evidence established, among other things, that William Mueller, who worked as an electrician, was in the middle of installing an intercom system for a customer and abruptly ceased work as of January 11 and did not come back to pick up the money the customer owed to him. Tr. 1789-95. Records from an electronics store and hardware store where Mueller held accounts showed that he ceased his regular purchases as of January 11. Tr. 1811-17. Phone records showed that calls from the Muellers' home phone ceased on January 11, as did calls using their credit card. Tr. 1828-37. Activity in Nancy Mueller's checking account ceased as of January 11. Tr. 1837-55. Deliveries of gun parts that William Mueller had been receiving via UPS also stopped. Tr. 2287-90. Mueller ceased cashing his monthly pension checks. Tr. 2164-68. And the Muellers' contacts with a number of close friends ceased as of January 11. *See, e.g.*, Tr. 1913-19, 1928-31.

### 2. The Timeline of Witnesses Seeing Lee in Oklahoma and Washington Before and After the Murders

Lee and Kehoe lived in Washington State as of January 1996. *See, e.g.*, Tr. 2772-73. Lee's mother, Debra Graham, testified that Lee and Kehoe visited her at her home in Yukon, Oklahoma, in January 1996, and they left at about 6 p.m. on January 10, 1996. Tr. 2617-20, 2633.

A witness (Vada Campbell) testified that she saw Lee in Spokane at 8 p.m. on January 13, when she went to pick up Lee's roommate (Sean Haines).

Tr. 5953-54. She testified that she remembered that date because it was the day before her daughter was admitted to the hospital to give birth to her grandson. *Id.* Lee also made a phone call to his mother from Spokane at around 6 p.m. on January 14, 1996. Tr. 2610-11.

Even assuming Campbell's testimony is correct—and Lee and Kehoe arrived back in Spokane earlier than January 14, the date that phone records show that Lee called his mother from Spokane—Lee and Kehoe still had ample between 6 p.m. on January 10 (when Lee's mother saw them leave Oklahoma) and 8 p.m. on January 13 (when Campbell said she saw Lee back in Spokane) to drive from Oklahoma to Arkansas, commit the murders, dispose of the bodies, and then drive back to Spokane.

First, assuming the murders took place in the evening, Lee and Kehoe had ample time to leave Yukon, Oklahoma, at 6 p.m. on January 10, scout out a place to dispose of the bodies in the Illinois Bayou, and then arrive at the Mueller residence before the evening of January 11, the date that the evidence establishes the Muellers were murdered. *See supra* pp. 60-61. The drive from Yukon to Russellville, Arkansas, which is near where the bodies were found, Tr. 3072-77, is about 285 miles, Tr. 6453. And the drive from the area in the Illinois Bayou where the bodies were found to Tilly, Arkansas, where the Muellers lived, was no more than 64 miles. *See* Dkt. 1363-20, at 1-2.

Second, Lee had ample time to drive from the Mueller residence in Tilly, dispose of the bodies in the Illinois Bayou near Russellville, and then arrive back in Spokane by 8 p.m. on January 13. Assuming that Lee and Kehoe left the Mueller home in Tilly as late as midnight on January 11 (Central Daylight Time), that would have left 46 hours to dispose of the bodies and then arrive back in Spokane by 8 p.m. (Pacific Daylight Time) on January 13. A witness from AAA testified that he mapped out three routes between Russellville, Arkansas, and Spokane, Washington—a direct route, a secondary route, and a scenic route—and he estimated that at an average speed of 55 miles per hour it would take 35, 37, or 43 hours to drive those routes, respectively. Tr. 6448-50.[6] That would have left anywhere from 3 to 11 hours to drive the 64 miles from Tilly to the Illinois Bayou to dispose of the bodies. Lee speculates (Dkt. 1363, at 30-31) that driving would have been slowed down because there may have been snow or ice on some parts of the route, Lee had only one functioning eye, and Lee and Kehoe must have had to stop multiple times to refuel between Arkansas and Spokane. But even accepting that speculation, 46 hours was more than enough time for two men fleeing a murder to make that trip, even assuming Lee and Kehoe drove at a conservative 55 miles per hour.

---

[6] According to Google Maps, the drive from Russellville to Spokane is about 1,900 miles and takes only 28-29 hours.

61

Lee contends (Dkt. 1363, at 32-33) that testimony from his roommate at the time (Sean Haines) suggests that he may have seen Lee in Spokane on January 12. Haines testified that Lee was gone for two or three weeks in January 1996 and one day he saw Lee's duffle bag back at the apartment and he "believe[d] [he] talked to" Lee the next day about Lee's travels. Tr. 2778-79. Lee contends that, because Vida Campbell saw Lee and Haines at the apartment on January 13, then January 13 must have been the day that Haines "talked to" Lee, and therefore Haines must have seen Lee's duffle bag in the apartment the previous day, January 12. Haines's testimony was equivocal and uncertain, however, and in any event was not inconsistent with Lee's arrival on January 13. Campbell testified that she went to the apartment to pick up Haines, and Lee answered the door "downstairs" while Haines was "upstairs getting ready." Tr. 5954. Assuming Campbell is correct that this took place on January 13, Haines very well may not have talked to Lee about his trip until the next day even though they both saw each other in passing on January 13. Haines's testimony does not undermine the timeline or otherwise undermine the evidence of Lee's guilt.

### 3.    Lee and Kehoe Return to Spokane Flush with Cash and Property Belonging to the Muellers

Lee and Kehoe had little if any money when they left Debra Graham's home in Oklahoma on January 10, 1996. Tr. 2619-20. Lee's mother even had

62

to lend them about $40 despite her "very limited income." Tr. 2620. But when Lee and Kehoe returned to Spokane, they were flush with cash and in possession of property owned by the Muellers. *See, e.g.*, Tr. 2779-82, 2892-96, 2900-01, 2916, 3710.

Lee contends (Dkt. 1363, at 26-27) that the evidence showed that only Kehoe returned to Spokane with newfound wealth and property belonging to the Muellers and therefore the evidence inculpates Kehoe but not him. The evidence established, however, that Lee and Kehoe were travelling together in January 1996, and were in Oklahoma (relatively close to Arkansas) on January 10, the day before the Muellers went missing. Kehoe's newfound wealth and his possession of property belonging to the Muellers therefore strongly inculpates Lee as well. Moreover, the evidence established that Lee also had newfound wealth and Mueller property upon his return to Spokane. Lee's roommate (Sean Haines) testified that, when Lee and Kehoe returned from their trip, Lee had money (about $1500) that he did not have before he left and that he had received from Kehoe, and Lee also possessed a firearm that had been customized in a unique manner specifically for William Mueller. Tr. 2779-81, 2851-52; *see* Tr. 2559-62.

### 4.    Lee and Kehoe Confess to Gloria Kehoe

Gloria Kehoe testified that her son Chevie admitted to her that he and Lee had murdered the Muellers. Tr. 4971-75. Gloria had been traveling with

her husband and younger children and returned by herself with four of the children to Spokane in February 1996. Tr. 4968-70. Prompted by all the new property she saw in Chevie's possession, Gloria questioned Chevie during a drive to the supermarket, and he said he had "put Bill and Nancy on a liquid diet." Tr. 4970-71. Kehoe said that he and Lee had waited for the Muellers to return home dressed in raid gear and had identified themselves as ATF agents. Tr. 4972. Kehoe said that William Mueller "fought like a son of a bitch" and Kehoe "busted [Mueller's] head" with the butt of a shotgun. Tr. 4973. Kehoe said he and Lee shocked the Muellers with stun guns and taped trash bags over their heads so that "there would be no suffering in death," and then they tied rocks to the bodies and threw them into the river. Tr. 4973-74. Kehoe said that he and Lee both killed William and Nancy Mueller but that Kehoe alone took Sarah's life because Lee could not do it. Tr. 4974. Gloria addressed her son (Chevie) directly during her testimony and apologized and said she loved him. Tr. 4971 ("I love you, Chevie."); Tr. 4972 ("It's got to be told, Chevie. There's wrong, and there's right. God won't let—I can't live with it anymore. It's hell."); Tr. 4973 ("You know it's right, Bud. Don't look at me that way.").

Gloria Kehoe also testified that she later spoke with Lee about the murders. Tr. 4975. Lee told her that "Bill [Mueller] was one tough son of a bitch because he fought so hard" and that Nancy Mueller was "dumb . . .

because she . . . helped put the trash bag on her head." Tr. 4975. Lee said that Chevie Kehoe gave him $1000 and a rifle for his participation and that he and Kehoe disposed of the bodies "[i]n the river tied with a rock." Tr. 4975.

Lee contends (Dkt. 1363, at 16-21) that Gloria Kehoe's testimony was unreliable because she received benefits for her cooperation and there were inconsistencies with other evidence at trial. Lee (and Kehoe) had ample opportunity to cross-examine Gloria Kehoe on these matters and in fact cross-examined her extensively. Gloria Kehoe's direct testimony fills up only 34 pages of trial transcript. Tr. 4948-81. The cross-examination fills up over 200 pages. Tr. 4982-5208. The jury had ample opportunity to observe Gloria Kehoe's demeanor, evaluate her testimony in light of all of the other evidence at trial, and determine whether she was credible.

Lee also contends (Dkt. 1326, at 21-27) that "only two pieces of evidence" corroborated Gloria Kehoe's testimony at trial and that those pieces of evidence no longer provide corroboration. The government acknowledges that the first piece of evidence identified by Lee no longer inculpates him.[7]

---

[7] An expert testified at trial that a hair found in a raid cap recovered from Chevie Kehoe was similar to a hair from Lee, Tr. 4722-24, but post-conviction DNA testing established that the hair did not belong to Lee, Dkt. 1138-2, at 4. The probative value of this testimony was limited to begin with because the expert testified that the similarity she observed could not lead to a positive identification of Lee as the source of the hair. Tr. 4724; *see* Tr. 3652-54. In any event, as Judge Eisele concluded, "[t]he evidence in this case

But the second piece of evidence—testimony from James Wanker—was probative of Lee's guilty at trial and remains probative today. *See infra* pp. 68-69.

In any event, as described in this section and elsewhere throughout this brief, powerful evidence established Lee's guilt and corroborated Gloria Kehoe's testimony—far more than the two pieces of evidence identified by Lee—and therefore there was ample corroboration even without those two pieces of evidence.

### 5.    Incriminating Statements to the Wankers

James Wanker testified that he moved into an RV park at the Shadows Motel, where Lee and Kehoe also resided, in May 1996. Tr. 4078-79. Wanker further testified that in July 1996, Lee told Wanker that he had gone "down south" and "somebody had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp." Tr. 4082-83. When asked on cross-examination why he did not call the police, Wanker testified that he "just kind of blew it off as [Lee] was talking to hear himself talk." Tr. 4088.

Lee contends (Dkt. 1363, at 22-25) that a declaration from Wanker, dated September 11, 2017, undermines his testimony because Wanker

---

overwhelmingly supported the jury's finding of guilt," and the outcome of the case would not "have been different if" Lee had obtained pretrial DNA testing. Lee, 2008 WL 4079315, at *25.

asserts in the declaration that he did not believe Lee when he (Lee) said that he wrapped some people up and threw them in the swamp. Dkt. 1363-14, at 2. According to Wanker, Lee "would spout off about different fights and crazy situations that were not true just to look tough and try to fit in," and Lee was "a braggart and . . . would try to claim responsibility for criminal actions in order to fit in with the Kehoes." *Id.* at 203.

Wanker does not retract any of his testimony at trial, however, including his testimony about Lee's inculpatory statements, and those statements substantially correspond to the details of the Mueller murder. Lee said he had gone "down south," and the Muellers were murdered in Arkansas. Lee said he had "wrapped them up" and "taped them," and the Muellers were found with plastic bags duct-taped around their heads. *See Lee*, 2009 WL 4079315, at *5. Lee said he threw them "in the swamp," and the bodies had been disposed of in a bayou, which is akin to a swamp. Wanker's personal opinion about whether Lee was posturing would not have undermined this testimony, particularly because Wanker in fact testified that he "blew it off" and did not report Lee's statements to the police because he thought Lee was "talking to hear himself talk." Tr. 4088. Any additional testimony that Wanker did not believe Lee's statements would have been cumulative.

Dalvine Wanker, James Wanker's wife, also testified at trial about an incident in which she told Lee she was concerned about a new tenant at the Shadows Motel. Tr. 4093. According to Wanker, Lee said he would "keep an eye on the situation" and then retrieved a firearm from his trailer and "said that he wasn't afraid to use it and that when he had gone down south and that some people had fucked with him, and that he had taken care of it." *Id.*

### 6. Lee and Kehoe Panic When They Learn Kehoe Has Been Linked to One of Mueller's Stolen Firearms

In December 1996, Lee's former roommate (Sean Haines) was arrested in South Dakota in possession of a firearm that he had obtained from Kehoe and that had been stolen from the Muellers. Tr. 2794-99. Haines was interviewed by an ATF agent and then called Lee and told him that investigators wanted to know if he (Haines) had purchased the gun from Kehoe. Tr. 2799.

According to Gloria Kehoe, who was present, Lee was frantic when he told Kehoe that Haines had been arrested with one of the Mueller guns and had told the police that he had received it from Kehoe. Tr. 4980. Lee and Kehoe panicked and discussed how to handle the situation. Tr. 4980. Kehoe left and went to Montana, meeting up with his brother Cheyne. *See* Tr. 5318-20. Lee went to Oklahoma. *See* Tr. 4980.

### 7.    Kehoe Confesses to Cheyne Kehoe

Cheyne Kehoe testified that he and Chevie went to a storage unit in Idaho where Chevie filled up his vehicle with guns, parts, and accessories, which Cheyne later learned belonged to the Muellers, and the brothers traveled around the country selling their wares at gun shows. Tr. 5318-25. During their travels, Kehoe confessed to Cheyne that he and Lee had murdered the Muellers. Tr. 5326-31.

Cheyne testified that Kehoe said the following: Kehoe and Lee dressed in raid gear and waited for the Muellers to come home. Tr. 5327. When the Muellers arrived, Kehoe and Lee announced themselves as the police, handcuffed William Mueller, and took the girl (Sarah) aside to ask her where the valuables were hidden. Tr. 5327. Kehoe hit William Mueller in the head with a shotgun after Mueller broke free and put up a fight. Tr. 5328. Kehoe and Lee duct-taped plastic bags over Nancy Mueller's head so that she would suffocate. Tr. 5328. Lee could not bring himself to tape a plastic bag over the girl's (Sarah's) head and therefore Kehoe did it. Tr. 5328. Kehoe used carpet cleaner to spray the carpet because there had been "a little bit of blood" on the floor from when Kehoe hit Mueller. Tr. 5328-29. Kehoe and Lee drove to a nearby bridge that they had found earlier and threw the bodies into the water. Tr. 5329. Kehoe gave Lee three or four thousand dollars and a handgun for his participation. Tr. 5329-30.

The brothers later got into a shootout with police in Ohio and eventually ended up with their families in Utah. *Lee*, 2018 WL 4079315, at *6. Cheyne testified that he became fearful of Kehoe and consequently left Utah in Kehoe's GMC truck in June 1997 and turned himself in to authorities in Washington. Tr. 5374-78.

### 8.    Incriminating Evidence in Kehoe's Possession at the Time of His Arrest

A forensic examiner determined that paint samples taken from Kehoe's GMC truck were "consistent, very similar" to metallic blue paint chips found on duct tape removed from the victims' bodies. Tr. 3658-64, 3678-84. In addition, information from Cheyne Kehoe led to Chevie Kehoe's arrest in June 1997, after which investigators searched Kehoe's residence in Utah and found, among other things, property belonging to William Mueller and a key that opened the handcuffs found on Mueller's dead body. Tr. 3218-19, 3265-67, 3275-3311.

Gloria Kehoe subsequently commenced cooperating with authorities in March 2018 and provided information about storage units used by Chevie Kehoe in Montana and Idaho where police found, among other things, property stolen from the Muellers, including Mueller's display cases that William Mueller had used at gun shows. Tr. 2479, 3378-3403, 3479, 3610-28,

3650. Lee's and Kehoe's fingerprints were recovered from one of the display cases from the Idaho storage unit. Tr. 3489-90, 3710.

### B.    The Kehoe Declarations Are Not *Brady* Material

Cheyne Kehoe's declaration states that it had "always been pretty obvious to me and the people who know" Glorie Kehoe that she was "unstable." Dkt. 1363-3, at 8. The declaration also states that Gloria Kehoe "has always been paranoid and she sees and hears things that aren't there" and that Kirby Kehoe had taken her for psychiatric treatment. *Id.* Kirby Kehoe's declaration states that Gloria Kehoe "sometimes had panic attacks and sometimes had what she called dreams where she saw things happening to us, like seeing people (sometimes government agents) assaulting her." Dkt. 1363-4, at 4.

The information in the declarations from Cheyne and Kirby Kehoe about Gloria Kehoe's mental stability was not *Brady* material. Even if credited, the information was likely known to Lee or at least available to him through other channels. And the statements about Gloria Kehoe's mental stability were not material. There is no reasonable possibility that the information could have changed the outcome of the trial.

1.    "The government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels." *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001);

71

*accord United States v. Roy*, 781 F.3d 416 (8th Cir. 2015). Here, according to Cheyne Kehoe's affidavit, it was obvious to the people who knew Gloria Kehoe that she was unstable. Lee knew Gloria Kehoe, and of course so did Chevie Kehoe (her son), with whom Lee coordinated his defense. In fact, Kehoe and Lee had an eye out for information about Gloria Kehoe's mental health, filing a motion during trial to compel a psychiatric examination of Gloria Kehoe. Dkt. 732. If Cheyne Kehoe in fact had observed that his mother "sees and hears things that aren't there," then Chevie Kehoe must have also, and possibly also Lee. Lee's lawyers also interviewed Kirby Kehoe and questioned him extensively before trial. *Lee*, 2008 WL 4079315, at *10. Lee therefore would have had access to the information about Gloria Kehoe's mental health through other channels. *See Barraza Cazares*, 465 F.3d at 334 (undisclosed statements of coconspirator available to defendant because counsel could have contacted coconspirator's counsel to talk to coconspirator); *Zuazo*, 243 F.3d at 431 (undisclosed statements of coconspirator available to defendant because defendant was aware of potential testimony and had access to coconspirator).

2.    In any event, the information in the declarations, even if credited, would not have undermined Gloria Kehoe's testimony—in particular her testimony about Lee's and Kehoe's confessions. The declarations do not suggest, let alone establish, that Gloria Kehoe had memory problems or

72

problems understanding conversations. The declarations instead state that Gloria Kehoe was paranoid and had what she called dreams in which she saw and heard things happening to her and her family, such as government agents assaulting her. The declarations do not suggest that Gloria Kehoe was unable to distinguish between these "dreams" and reality. To the contrary, the fact that she called them "dreams" indicates she knew they were not real. The statements in the declarations also would have done little to undermine Gloria Kehoe's testimony because they amount to cursory lay opinions rather than considered diagnoses by trained professionals.

Furthermore, Cheyne Kehoe's testimony about Chevie Kehoe's confession corroborates Gloria Kehoe's testimony and refutes any suggestion that Gloria Kehoe's testimony was the result of mental instability and therefore not to be believed. The testimony from Gloria and Cheyne Kehoe about Chevie Kehoe's confessions largely matched up. And Cheyne Kehoe's declaration notably does not retract his trial testimony linking Lee and Kehoe to the murders. To the contrary, he implicitly confirms that testimony, stating that he "would never have gone along with the idea of killing the Muellers and [he] would have done everything [he] could to discourage Chevie from doing it if [he'd] known [Chevie] was planning it." Dkt. 1363-3, at 7.

73

In short, introducing evidence at trial about Gloria Kehoe's supposed paranoia and her "dreams" would have had little if any effect on the jury's evaluation of her testimony or the evidence as a whole. The jury had ample opportunity to evaluate her demeanor, including her demeanor over the course of lengthy cross-examinations, and then evaluate her testimony against all of the other evidence at trial. Particularly in light of the strength of the evidence linking Lee and Kehoe to the murders, there is no reasonable possibility that the outcome of the trial would have changed. In fact, on direct appeal, the Eighth Circuit concluded that any error in admitting Gloria Kehoe's testimony about Chevie Kehoe's confession was harmless beyond a reasonable doubt because of the "large amount of evidence presented against Lee at trial." *Lee*, 374 F.3d at 645. If that is the case, it is difficult to see how a relatively minor attack on Gloria Kehoe's mental stability, an attack that does not suggest she had a compromised ability to understand or recall conversations, could possibly have caused the jury to acquit Lee and Kehoe.

### C.    The Polygraph Results Are Not *Brady* Material

The government did not violate *Brady* by not turning over the polygraph examination of Paul Humphrey that Lee located in the files of the Arkansas State Police. The state officers who requested and administered the test were not on the prosecution team. Even assuming the government had known about and possessed the report, the polygraph evidence was not

74

material. The polygraph results would not have been admissible, and even had they been admissible, there is still no reasonable likelihood that those results would have changed the outcome of the trial.

1.      Prosecutors have the obligation to disclose favorable, material evidence within their own files, *United States v. Agurs*, 427 U.S. 97, 110 (1976), as well as such "evidence known to the others acting on the government's behalf in the case," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). This is sometimes referred to as the "prosecution team." *See, e.g., Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009). In a federal prosecution, state and local law enforcement officers are not necessarily a part of the prosecution team merely because they investigated the same criminal episode. *See, e.g., United States v. Kern*, 12 F.3d 122, 126 (8th Cir. 1993) (knowledge of investigative report by Omaha police not imputed to federal prosecutors). Courts evaluating the scope of the prosecution team have asked "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006).

75

Lee has not established that the Arkansas State Police, let alone the officers who requested and administered the polygraph test to Humphrey, were a part of the prosecution team in this case. After the Muellers went missing, a number of state and local law enforcement agencies investigated, following local leads. Lee and Kehoe introduced evidence about some of those early investigations, which were unfruitful, to suggest that others may have committed the Mueller murders. *See, e.g.*, Tr. 5682 (mentioning the Pope County Sheriff's Department, the Searcy County Sheriff's Department, the Russellville Police, and the Arkansas State Police). The investigation changed when federal authorities took over, which, by Lee's account (Dkt. 1363, at 46), occurred when Cheyne Kehoe turned himself in and cooperated in June 1997. Records reflect that some local officers continued to assist with the investigation. *See, e.g.*, Dkt. 1363-15.  But all of the various state and local officers who had previously investigated the Mueller murders were not necessarily on the federal prosecution team.[8]

The polygraph examination by the Arkansas State Police should not be attributed to the government for purposes of its *Brady* obligations. The

---

[8] Defendants called Thomas Brown, an investigator with the Arkansas State Police, who testified that he investigated "[t]he disappearance of the Muellers" starting in February 1996, Tr. 5780, and turned the case over to David Lafferty in May 1996, Tr. 5791; *see* Tr. 5692-5700, 5779-91. Brown was with "Company E," Tr. 5693, whereas the officers listed on the polygraph documents were with Company D, Dkt. 1363-2, at 1.

76

examination took place in January 1997, *see* Dkt. 1363-2, at 9, well before, by Lee's account, the federal government took over the investigation. The examination report indicates that Sergeant H.D. Luter requested the exam and Investigator Brett Pritchard administered it. *Id.* at 9-10. The record in this case does not indicate that those officers were acting on behalf or under the control of federal prosecutors or investigators. The record similarly does not indicate that those officers were part of a team with federal authorities or participated in a joint investigation or shared resources. The government had no constitutional duty to turn over documents that were created well before the federal government took the lead in the investigation and that were in the files of state investigators that did not participate as members of the federal prosecution team.

2.      In *Wood v. Bartholomew*, 516 U.S. 1 (1995) (per curiam), the Supreme Court held that the prosecution's failure to turn over the results of a polygraph examination of a key witness did not violate *Brady*. The Court concluded that because the polygraph results were inadmissible under state law, those results "could have had no direct effect on the outcome of trial." *Id.* at 6. The Court rejected speculation that the polygraph results, had they been disclosed, "might have led [the defendant's] counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized. *Id.* The Court concluded that "it is not 'reasonably likely' that

77

disclosure of the polygraph results—inadmissible under state law—would have resulted in a different outcome at trial." *Id.* at 8. The Court noted that even without the key witness's testimony, "the case against [the defendant] was overwhelming." *Id.*

At the time of Lee's trial, the Eighth Circuit adhered to "the rule that polygraph examination results should not be admitted absent stipulation." *Anderson v. United States*, 788 F.2d 517, 519 n.1 (8th Cir. 1986); *see United States v. Gordon*, 688 F.2d 42, 44 (8th Cir. 1982); *United States v. Alexander*, 526 F.2d 161, 166 (8th Cir. 1975). The same year as Lee's trial, the Eighth Circuit observed that polygraph results "clearly are not admissible in this circuit." *United States v. Iron Cloud*, 171 F.3d 587, 591 (8th Cir. 1999). To be sure, the court has more recently stated that "there is no per se ban on the use of polygraph evidence in this circuit," even though it remains "'disfavored.'" *United States v. Montgomery*, 635 F.3d 1074, 1094 (8th Cir. 2011); *see also United States v. Scheffer*, 523 U.S. 303, 311 (1998) (without referring to the Eighth Circuit, noting that some circuits had "abandoned the per se rule excluding polygraph evidence" but at least one circuit had "recently reaffirmed its per se ban"). At the time of Lee's trial, however, the law in the Eighth Circuit was analogous to the state law in *Wood v. Bartholomew*. Thus, even assuming the Arkansas State Police officers who requested and administered the polygraph test to Humphrey were part of the

78

prosecution team, the government did not, for the same reasons set forth in *Wood v. Bartholomew*, violate *Brady* by failing to turn over the test results.

Moreover, even if polygraph results were admissible in some circumstances at the time of Lee's trial, there is no basis to conclude that the Humphrey polygraph results would have been admitted. The results had little if any probative, there was a risk of confusing the jury, and admission of the results "would have necessitated collateral proceedings regarding the validity" of the results. *Montgomery*, 635 F.3d at 1094.

Finally, even if the polygraph results had been admitted at Lee's trial, there is no reasonable possibility that those results would have changed the outcome of the trial. In light of the overwhelming evidence establishing Lee's and Kehoe's guilt, it is not possible that a one-off polygraph exam with three questions would have caused the jury to conclude that Humphrey committed the murders. Even setting aside their admissions to Gloria and Cheyne Kehoe and the Wankers, the evidence showed that Kehoe and Lee had traveled from the Pacific Northwest to the vicinity of the Mueller residence at the time of the murders; immediately afterward they were suddenly flush with cash and in possession of property stolen from the Muellers; they were later found in possession of a gun display case belonging to Mueller with their fingerprints on it as well as a key that opened handcuffs on Mueller's dead body; and the paint on the tape wrapped around the Muellers matched

79

the paint on Kehoe's car. In fact, even Lee seems to concede (Dkt. 1363, at 26-27) that the evidence establishes that Kehoe committed the murders. And overwhelming evidence establishes that Lee was Kehoe's acolyte and was present with Kehoe before, during, and after the murders. Nothing close to that type of evidence linked Humphrey to the murders.

### D.    The Polygraph Results Do Not Establish a *Napue* Violation

Lee contends (Dkt. 1363, at 56-59) that the polygraph results establish a *Napue* violation because they demonstrate that Humphrey murdered the Muellers, that Humphrey perjured himself when he denied under oath that he was involved in the murders, and that the government knew or should have known that Humphrey murdered the Muellers and therefore testified falsely. The polygraph results provide no basis to ignore the mountain of evidence that Lee and Kehoe murdered the Muellers. Only the most committed conspiracy theorist—or someone doing his utmost to deflect responsibility from himself—could conclude from the evidence that Humphrey was the culprit. It is an understatement to say that Lee's *Napue* claim lacks merit.

### CONCLUSION

For the foregoing reasons, this Court should dismiss Lee's motion for lack of jurisdiction.

Respectfully submitted,

CODY HILAND                          BRIAN A. BENCZKOWSKI
United States Attorney               Assistant Attorney General
Eastern District of Arkansas

                                     JOHN P. CRONAN
MICHAEL GORDON                       Deputy Assistant Attorney General
Assistant United States Attorney
Eastern District of Arkansas         /s/John M. Pellettieri
                                     JOHN M. PELLETTIERI
                                     Attorney, Appellate Section
                                     Criminal Division
                                     U.S. Department of Justice
                                     950 Pennsylvania Ave., N.W., Rm. 1260
                                     Washington, D.C. 20530
                                     (202) 307-3766
                                     john.pellettieri@usdoj.gov


March 13, 2020

81

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on March 13, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/John M. Pellettieri
JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. 1260
Washington, D.C. 20530
(202) 307-3766