## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**DANIEL LEWIS LEE,**
        **Movant**                                    **Criminal Case No. 4:97-cr-00243-KGB-2**

                                                      **CAPITAL CASE**

**vs.**

**UNITED STATES OF AMERICA,**
        **Respondent.**

---

### REPLY TO GOVERNMENT'S RESPONSE TO
### MOTION FOR RELIEF FROM JUDGMENT OR ORDER
### PURSUANT TO FED. R. CIV. P. 60

---

MORRIS H. MOON                          GEORGE G. KOUROS
Assistant Federal Public Defender       Assistant Federal Public Defender
Federal Capital Habeas Project          Federal Capital Habeas Project
6411 Ivy Lane, Suite 710                6411 Ivy Lane, Suite 710
Greenbelt, MD 20770                     Greenbelt, MD 20770
Telephone: (713) 880-3556               Telephone: (301) 821-0855
Email: Morris_Moon@fd.org               Email: George_Kouros@fd.org

Counsel for Daniel Lee

*Oral Argument Requested*

## TABLE OF CONTENTS

Statement Regarding Oral Argument…………………………………...………………………i

I.    Introduction…………………………………………………………………………………..1

II.   Mr. Lee's Motion is a "Proper" Use of Rule 60 as It Seeks to Remedy a Defect in the
      Integrity of the § 2255 Proceeding………………………………………………………...6
      A.  Rule 60(b)(3)…………………………………………………………………….......9
          1.  The one-year limit under Rule 60(b)(3) is non-jurisdictional, so it can be equitably
              tolled.……………………………………………………………………………….9
          2.  Inadvertent failure to disclose requested discovery is cognizable under Rule
              60(b)(3)………………………………………………………………………………12
          3.  The Government's Response confirms that its misrepresentations corrupted the
              Court's § 2255 judgment in several respects………………………………………...15
      B.  Rule 60(b)(6)……………………………………………………………...............17
      C.  Rule 60(d)(1)…………………………………………………………………….…..20
      D.  Rule 60(d)(3)………………………………………………………………………...21

III.  The Government Withheld Material Evidence in Violation of *Brady v. Maryland*……..22
      A.  The Government Failed to Disclose Gloria Kehoe's History of Mental Problems,
          Including Delusions…………………………………………………………………...23
      B.  The Government Withheld Evidence that Suspect Paul Humphrey Failed a Law
          Enforcement Polygraph……………………………………………………………….27
          1.  The Humphrey polygraph evidence is attributable to the Government…………...27
          2.  The polygraph evidence was admissible and material……………………………29
      C.  The Government Violated *Napue v. Illinois* and *Giglio v. United States*……………......31

IV.   The Evidence of Guilt is Far from "Overwhelming" Given What We Know Now……..32

Conclusion……………………………………………………………………………………….36

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Lee's *Motion for Relief from Judgment or Order Pursuant to Fed. R. Civ. P. 60* (Dkt. 1363) raises numerous complex legal and factual issues concerning the bases for reopening this Court's previously entered judgment denying relief pursuant to 28 U.S.C. § 2255. Because of the complicated nature of the questions posed by Mr. Lee's Rule 60 Motion and the Government's Response (Dkt. 1367), it is respectfully submitted that oral argument would assist the Court in evaluating the issues presented and may conserve judicial resources by providing an opportunity for the Court to resolve any questions it has about the complex record in this case.

## I.    Introduction

Over the last two decades the Government has withheld critical evidence from Mr. Lee's defense team. As bits and pieces of that undisclosed evidence have come to light at different stages of his appeals, it has continually turned to the same tactics to prevent any court from reviewing, considering, or correcting the injustices in this case. The Government has not—and perhaps cannot—deny the allegations that it has failed to disclose evidence. Rather, it has deflected attention from all of these allegations, at times using the lengthy procedural history in this case to promote the misleading narrative that, whatever the substance of Mr. Lee's pleadings may be, courts have seen and heard enough; and it has repeatedly sought to blame Mr. Lee for not discovering its misconduct sooner. The Government has also made a practice of recasting and minimizing the importance of elements of its case against Mr. Lee that it previously claimed were paramount, in an effort to downplay the impact of the undisclosed evidence on the case as a whole; it has relied on the arcane procedural rules of post-conviction to preclude courts from examining evidence; and, it has, at times, blatantly misrepresented the facts.

The Government has resorted to the smokescreen tactic again before this Court, now in an effort to block the reopening of the judgment in this case and seal it off from scrutiny in the face of damning revelations about previously undisclosed information that was central to the credibility of a key witness, Gloria Kehoe, and that pointed to the involvement of another suspect in the Mueller murders—Paul Humphrey.

The response to Mr. Lee's Rule 60 motion, in fact, demonstrates the very problems Mr. Lee has alleged. It continues to withhold evidence all the while deferring responsibility. In its most recent pleading, the Government suggests once again that Mr. Lee has failed to timely plead his misconduct claims, flipping *Brady* on its head. Mr. Lee's initial § 2255 did not address

1

this evidence because he did not have it: only the Government did. The happenstance that Mr. Lee has now discovered suppressed evidence through the Freedom of Information Act and state open records requests does not alter the reality that the Government has always possessed significant exculpatory and impeachment material yet never disclosed it to Mr. Lee's lawyers.

In the Response to the Rule 60(b) motion,[1] the prosecution again argues that Mr. Lee must prove facts over which it alone has sole custody. It claims, for example, that he cannot establish that the *Brady* material was known or possessed by the Government because it has "reviewed its trial files" and did not find the material and furthermore "[n]one of the federal prosecutors who tried this case 20 years ago is still with the Department of Justice…" GR 35. But the Government cannot defeat Mr. Lee's misconduct claims by sticking its head in the sand. The Department of Justice Guidance for Prosecutors Regarding Criminal Discovery (CRM) itself condemns such a cavalier response.[2] According to the CRM, federal prosecutors are obligated to "seek all exculpatory and impeachment information from all members of the prosecution team." *Id*. This includes agents, law enforcement officers, and state and local law enforcement authorities who are participating in a joint investigation. "Prosecutors are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes." *Id*. The material that must be reviewed includes, inter alia, agent notes, *Giglio*

---

[1] Throughout this motion, "Mr. Kehoe" refers to Chevie Kehoe. To avoid confusion, the pleading refers to other members of the Kehoe family (primarily, Kirby and Cheyne Kehoe) by either their full names or their first names only. "Mrs. Kehoe" refers to Gloria Kehoe.
   Citations to the consecutively-paginated trial transcript are designated as "Tr." Citations to documents filed in the district court docket in this case are designated as "Dkt." Citations to the attached exhibits are designated as "Exh." Citations to the Government's *Response to Defendant's Motion for Relief from Judgment* (Dkt. 1367) are designated as "GR."
[2] *See* https://www.justice.gov/archives/jm/criminal-resource-manual-165-guidance-prosecutors-regarding-criminal-discovery (last visited April 30, 2020).

information relating to both law enforcement and non-law enforcement witnesses, and case-related communications. The Government's Response to Mr. Lee's allegations of serious prosecutorial misconduct ignores both its own internal requirements and basic constitutional commands.[3]

Respondent also, yet again, resorts to rehashing Mr. Lee's previous litigation in an attempt to bolster its portrayal of the current motion as "one among an array of recent legal filings in which Lee attempts to avoid or delay his execution…" GR 1. But Mr. Lee has filed an "array" of pleadings not by choice but because evidence that the Government failed to disclose continues to surface. Indeed, multiple pleadings raising separate *Brady* claims disadvantages Mr. Lee and this Court because it makes it increasingly more difficult to examine misconduct claims cumulatively (as required by Supreme Court precedent) when each is a subject of an individual filing. By refusing to timely and fully disclose evidence to Mr. Lee's lawyers, the Government has forced Mr. Lee to file an additional pleading every time a new piece of evidence comes to light.

---

[3] Indeed, one of those former prosecutors, Lane Liroff, who was working as part of Main Justice's Capital Crimes Unit is no stranger to prosecutorial misconduct. California courts vacated a first-degree murder conviction he secured in 1996 based on his failure to disclose exculpatory evidence, *see Pham v. Terhune*, No. C 02-1348 PJH, 2008 WL 787123 (N.D. CA. Mar. 20, 2008), and he was named in a study on prosecutorial misconduct published by the Northern California Innocence Project in 2010. *See* Sue Dremann, "'Misconduct' Prosecutor Liroff defends his record," Palo Alto Online, Oct. 20, 2010, available at: https://www.paloaltoonline.com/news/2010/10/20/misconduct-prosecutor-liroff-defends-his-record (last visited May 1, 2020). In 2010, fellow prosecutors and the California Government Attorneys Association went so far as to protest a potential commendation, pointing to a long history of questionable behavior including a month-long suspension for unethical actions. . *See* Tracey Kaplan, "DA's retirement plaque exposes bitter rift," The Mercury News, Dec. 7, 2020, available at: https://www.mercurynews.com/2010/12/07/das-retirement-plaque-exposes-bitter-rift/ (last visited May 1, 2020).

The Government's assertion that Mr. Lee has "received extensive review…and his convictions and sentence were repeatedly affirmed," GR 1, similarly belies the reality of the litigation resulting from the Government's misconduct. Because the prosecution successfully hid this evidence from Mr. Lee and his lawyers until post-conviction proceedings were completed, Mr. Lee faces myriad procedural barriers to merits review. At every turn—and in this proceeding again—Respondent has encouraged the court to dismiss the claims without review based on a procedural technicality. Due to the Government's malfeasance, Mr. Lee actually has received at best minimal review of any of his misconduct claims. Despite that, at least one of the *Brady* claims dismissed on procedural grounds was found by Judge Holmes to be material, a conclusion the Government reluctantly admits in a footnote. GR n. 3. Tellingly, the Government has never denied its knowledge about the false evidence supporting this particular claim, and, in the Response, it still does not. Rather, as it has done in other instances, the Government hides behind artfully worded deflections to circumvent the allegations entirely—for example, asserting that it has not "unequivocally denied" it possessed or knew about this evidence because doing so is "unnecessary to resolve Lee's *Brady* claim." GR 38.

Moreover, as noted previously, throughout the litigation the Government has continued to shift its position about what evidence was important at trial and what evidence supported Mr. Lee's conviction. As further disclosures undermine key pillars of the prosecution case, Respondent reverses course and downplays the compromised evidence. For example, despite arguing to the jury at trial that the Government expert's testimony about a hair recovered from a hat "establishes that was Danny Lee's hair," Tr. 7000-01, after DNA testing excluded Mr. Lee, the key piece of forensic evidence suddenly became of "limited" value to the conviction." GR 65 n.7. This tactic continues in the present pleading. Sean Haines was critical to the Government's

4

argument on direct appeal that Mr. Kehoe ran a criminal enterprise and that Mr. Lee was involved. The prosecution quoted his testimony at length to suggest that Mr. Lee was trying to recruit him and relied on Mr. Haines' testimony to attempt to link him to another predicate act. *United States v. Lee*, No. 02-2389 (8th Cir.). Appellee's Brief at 127-28. Sean Haines is mentioned no less than 20 times in the Government's brief. Now that elements of Mr. Haines' testimony exculpate Mr. Lee, the Government—without support—characterizes his testimony as "equivocal and uncertain." GR 62.

Perhaps most egregiously the Government provides this Court with false and misleading argument about the central questions before it. For example, Respondent spends much time pressing the point that the polygraph examination by the Arkansas State Police is not attributable to the Government for *Brady* purposes because the state officers were not members of the federal prosecution team and were not participating "in a joint investigation or shared resources." GR 77. The Government claims that there is nothing in the record which suggests otherwise, apparently betting the Court will take such assertions at face value and, thus, perceive Mr. Lee's claim as weak. *Id*.

But, serendipitously, records Mr. Lee received through a FOIA request prove this to be utterly false. One such record is a letter from the U.S. Department of Justice addressed to the Arkansas State Police thanking and commending the agency for its "contribution to the multi-agency investigation and prosecution." *See* Exh. 1. Another (heavily redacted) FBI memo explicitly notes that "[i]nvestigation will be coordinated with Little Rock BATF, the Arkansas State Police, and the Pope County Sherriff's Office." *See* Exh. 2 at 10. Again, the Government plays hide and seek with its evidence, hoping Mr. Lee doesn't find it, or that it will somehow be too late for him if he does.

5

Mr. Lee's motion alleges serious concerns about how the federal government handled his case. The Government's response does little to allay them. On the contrary, the prosecution magnifies these suspicions, mirroring the troubling conduct by deflecting responsibility, failing to address the alleged misdeeds, and misrepresenting facts to this Court.

Daniel Lee presents this Court with evidence that the Government suppressed information central to its key witness's credibility and indicating the involvement of a suspect whose responsibility for the Mueller murders the trial prosecutors steadfastly denied. He asks this Court, pursuant to a proper Rule 60 motion, to reopen the § 2255 proceeding tainted as a result of the Government misconduct in this federal death penalty case.

## II.     Mr. Lee's Motion is a "Proper" Use of Rule 60 as It Seeks to Remedy a Defect in the Integrity of the § 2255 Proceeding.

Resolution of Mr. Lee's present motion does not require this Court to reach any of the underlying *Brady* and *Napue* claims. The only issue to be determined at this stage is whether the § 2255 judgment should be reopened. The nature of the requested relief is limited; it is a preliminary procedural step before further proceedings can take place.[4] There are several

---

[4] *See*, *e.g.*, *Scott v. United States*, 81 F.Supp.3d 1326, 1340-41 (M.D. Fla. 2015) (granting Rule 60(b)(3) motion to reopen § 2255 proceeding, describing scope of relief as "narrow," and providing additional process); *In re Pickard*, 681 F.3d 1202, 1206 (10th Cir. 2012) (integrity of original § 2255 proceeding "marred by a flaw that must be repaired in further proceedings"). As in *Scott* and *Pickard*, granting Mr. Lee's Rule 60 motion will not disturb his conviction or sentence; it will merely put him back in the position he would have been in had the Government properly complied with his § 2255 request for *Brady* evidence.

Additionally, an order reopening the judgment under Rule 60(b) would not be final and appealable until a new amended judgment is entered disposing of the underlying *Brady* and *Napue* claims. *See St. Mary's Health Center of Jefferson City v. Bowen*, 821 F.2d 493, 498 (8th Cir. 1987) (grant of Rule 60(b) motion only immediately appealable if it disposes of the case and leaves nothing more to be done); *Stubblefield v. Windsor Capital Group*, 74 F.3d 990, 995-96 (10th Cir. 1996) (dismissing appeal; grant of Rule 60(b) motion not final because "litigation was very far from over and there was much more for the district court and the parties to do"); *Haney v. City of Cumming*, 69 F.3d 1098, 1102 n.7 (11th Cir. 1995); *Parks By and Through Parks v.*

6

avenues available for reopening Mr. Lee's § 2255 judgment under Rule 60. Before turning to the

Government's attempts to restrict them, Mr. Lee addresses a few key distortions in its responsive

brief.

First, this is not a second-in-time § 2255 motion that requires preauthorization. GR 25-30.

The AEDPA's gatekeeping restrictions do not apply to "true" Rule 60 motions, and courts have

deemed motions similar to Mr. Lee's to be proper exercises of Rule 60.[5] *See* Dkt. 1363 at 62-66.

Of the eight cases the Government cites for the proposition that preauthorization is required, GR

26-27, six do not even concern Rule 60 motions.[6] The remaining two confirm that Mr. Lee's use

of Rule 60 is proper.[7]

Second, this Court did not "treat" Mr. Lee's previous request (in the alternative) for Rule

60 relief as second or successive. GR 28. In fact, Judge Holmes assumed that Mr. Lee "properly

asserted a Rule 60 motion as opposed to a second or successive habeas petition," Dkt. 1313 at

---

*Collins*, 761 F.2d 1101, 1103-04 (5th Cir. 1985); *Oliver v. Home Indem. Co.*, 470 F.2d 329, 331 (5th Cir. 1972).

[5] The Government makes much of Mr. Lee's motion for authorization to the Eighth Circuit for a different *Brady* violation, GR 29-30, but that's a red herring. If the present motion is a "true" Rule 60 motion, then this Court has jurisdiction to consider it.

[6] *Blackman v. Davis*, 909 F.3d 772 (5th Cir. 2018) (successive § 2254 petition); *In re Wogenstahl*, 902 F.3d 621 (6th Cir. 2018) (second-in-time § 2254 petition); *Brown v. Muniz*, 889 F.3d 661 (9th Cir. 2018) (same); *Tompkins v. Sec'y. Dep't of Corr.*, 557 F.3d 1257 (11th Cir. 2009) (same); *Quezada v. Smith*, 624 F.3d 514 (2d Cir. 2010) (motion for authorization). In *Evans v. Smith*, 220 F.3d 306 (4th Cir. 2000), the petitioner's request for Rule 60 relief in the alternative was not reached. However, the Fourth Circuit previously confirmed in *United States v. Williams*, 753 Fed. Appx. 176, 177 (4th Cir. 2019), that such a Rule 60 motion would not require preauthorization.

[7] *In re Pickard*, 681 F.3d 1201, 1202-03, 1205-07 (10th Cir. 2012) (holding preauthorization requirement inapplicable to Rule 60 motion asserting that misrepresentations during § 2255 proceedings forestalled discovery which could have established *Brady/Giglio* violation at trial); *United States v. Buenrostro*, 638 F.3d 720, 723 (9th Cir. 2011) (unlike Mr. Lee, movant used Rule 60 to raise a "new claim for relief, wholly independent of the claims adjudicated in his first § 2255 proceeding").

18, and reviewed it on the merits. Although the Court deemed the Rule 60(b)(3) motion untimely, *id*. at 19, it never addressed Mr. Lee's argument regarding equitable tolling. Nor were the same factual or legal issues before the Court. Thus, there is no "law of the case" that precludes this Court's consideration of the instant motion.

Finally, the Government seeks to confine its misrepresentations in post-conviction to a single footnote in a single pleading. GR 32-34. The record says otherwise. Mr. Lee's § 2255 motion included a request that the Government "review its files and the files of investigating agencies" for *Brady* material, including impeachment evidence and any information about third party culpability for the Mueller murders. Dkt. 1363 at 12-13.[8] The Government does not dispute that it then made no further disclosures, but instead seeks to insulate its conduct with the defense that it never misrepresented "the completeness" of its compliance with *Brady*. GR 34. This is not the case. The Government did make such an affirmative misrepresentation, just months before the filing of Mr. Lee's § 2255 motion, during codefendant Chevie Kehoe's § 2255 proceeding: "All documents relating to Mr. Humphrey were provided to trial counsel." Dkt. 1363 at 14.[9] Mr. Lee was entitled to rely on the Government's assertion (which, tellingly, its response here never addresses).[10]  Then when Mr. Lee raised a general *Brady* claim, asked for any and all

---

[8] Mr. Lee further put the Government on notice that he intended to amend his motion based on any such disclosures. Dkt. 1363 at 13.

[9] The post-conviction proceedings of the codefendants were inextricably linked: they were litigated simultaneously before the same Court on the same docket and were considered in tandem, as evidenced by the Court's ruling on both § 2255 motions on the same date, often using the exact same language in its respective opinions. *Compare United States v. Lee*, No. 97-CR-243, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008), *with United States v. Kehoe*, No. 97-CR-243, 2008 WL 4079316 (E.D. Ark. Aug. 28, 2008). Mr. Lee was entitled to rely on the Government's responses to the Kehoe § 2255 motion as part of his own § 2255 proceedings, as was this Court. (Trial discovery was presented to the codefendants simultaneously. *See, e.g.,* Exh. 11.)

[10] The Government's response suggests that current counsel for the Government cannot unequivocally state that their predecessors' repeated assurances during the pre-trial and trial

8

information related to possible third-party guilt, and reserved the right to amend the claim on information provided, the Government furnished -- nothing. Respondent continues to rely on the asymmetry in the parties' access to information, obscuring material in its possession and hoping Mr. Lee does not stumble upon it. This is hardly defensive conduct. *See Banks v. Dretke*, 540 U.S. 668, 695 (2004) (law does not require defendants to "scavenge for hints of undisclosed *Brady* material").

## A. Rule 60(b)(3)

The Government makes two arguments: (1) the motion is untimely, and (2) only intentional misrepresentations are cognizable under Rule 60(b)(3). Neither has merit.

### 1. The one-year limit under Rule 60(b)(3) is non-jurisdictional, so it can be equitably tolled.

As Judge Holmes recognized, Rule 60(b)(3)'s one-year time limit is not jurisdictional. Dkt. 1313 at 18. Rather, it is a "claim-processing rule."[11] It may be equitably tolled. *See United*

---

proceedings were reliable. GR 34. But it was those assurances that led this Court to deny Mr. Lee's pre-trial *Brady* motion as moot. Dkt. 145 at 1, 3. Those same assurances—which the Government has not wavered on until now—undoubtedly also informed this Court's decision to deny Mr. Lee's § 2255 Motion without even addressing his allegations that the Government had withheld *Brady* material from trial counsel. *See* Dkt. 1363 at 13.

[11] *See Hamer v. Neighborhood Housing Servs. of Chicago*, 138 S. Ct. 13, 16-17 (2017) (describing difference between jurisdictional deadline and mandatory claim-processing rule). Even so-called "mandatory" claim processing rules may be equitably tolled. *See Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1849 n.5 (2019) (reserving whether mandatory claims-processing rules may ever be subject to equitable exceptions); *Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710, 714-15 n.7 (2019) (leaving open whether equitable tolling might apply where a litigant was "misled" about the filing deadline, or "whether an insurmountable impediment to filing timely might compel a different result"). As a general matter, motions under Rule 60(b) are consonant with the doctrine of equitable tolling because the rule itself "represents an effort to codify the equitable practice with respect to the correction of judgment after the time for appeal has expired." *Lafferty v. District of Columbia*, 277 F.2d 348, 351 n.6 (D.C. Cir. 1960); *see also In re Brown*, 68 F.R.D. 172, 174 (D.D.C. 1975) (describing Rule 60(b) as codification of various methods for gaining equitable relief from judgments). Thus, Rule 60(b) is distinguishable from other mandatory claim-processing rules because its animating principle is a concern for equity

9

*States v. Williams*, 753 Fed. Appx. 176, 178 (4th Cir. 2019) (remanding for equitable tolling

determination where misrepresentation during § 2255 proceeding prevented movant from fully

and fairly presenting IAC claims); *United States v. Jones*, ___ F.Supp.3d ___, 2020 WL

1814918, *14 (W.D. Va. Apr. 9, 2020) (considering whether to equitably toll Rule 60(b)(3)

motion alleging that IAC claim was improperly dismissed based on Government's

misrepresentation during § 2255 proceeding); *Young v. Act Fast Delivery of West Virginia, Inc.*,

No. 5:16-cv-09788, 2019 WL 4859009, *3-*4 (S.D. W.Va. Oct. 1, 2019) (tolling Rule 60(b)(3)

deadline where litigant concealed evidence through misleading responses to discovery requests);

*In re Benjamin's-Arnolds, Inc.*, 1997 WL 86463, *10 n.9 & *11 n.10 (Bankr. D. Minn. Feb. 28,

1997) (doctrine of equitable tolling would act to toll one-year limitations period of Rule 60(b)(3)

until time fraud is actually discovered); *cf. Scott v. United States*, 81 F.Supp.3d 1326, 1338

(M.D. Fla. 2015) (interests of justice not served by dismissing untimely Rule 60(b)(3) motion

*sua sponte* where the Government "made it impossible for Petitioner to timely file . . . because it

failed to disclose potentially impeaching evidence until three years after Petitioner's initial §

2255 motion was resolved").

The Government claims that even if equitable tolling applies,[12] Mr. Lee cannot

demonstrate diligence. GR 44. This is not so.[13] He made consistent and repeated requests for

---

rather than the strict enforcement of time limits. *See Gonzalez v. Crosby,* 545 U.S. 524, 529 (2005) (describing Rule 60(b) as a "provision whose whole purpose is to make an exception to finality").

[12] Its purported authority against equitable tolling, *see* GR 43-44, is not germane because the issue was not raised in the cases the Government relies on. *In re Lothian Oil, Inc.*, 508 Fed. Appx. 352, 357 (5th Cir. 2013) (unpublished), *see* GR 44, is also unavailing as it concerns a jurisdictional bankruptcy rule subject to a statutory limitations period. *See* 11 U.S.C. § 1144.

[13] The "diligence required for equitable tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.'" *Holland v. Florida*, 560 U.S. 631, 653 (2010) (internal citations omitted). Mr. Lee filed his Rule 60 motion within three months of discovering the evidence

*Brady* material during the pre-trial, trial, and § 2255 proceedings.[14] *See* Dkt. 1363 at 12-14 &

n.14. At every stage, the Government maintained it had fully complied with its obligation to

search for and disclose any such material. This includes its statements in the Kehoe § 2255

proceedings. Mr. Lee reasonably relied on those representations. *See Strickler v. Greene*, 527

U.S. 263, 284 (1999) ("[I]f it was reasonable for trial counsel to rely on … the presumption that

the prosecutor would fully perform his duty to disclose all exculpatory material … we think such

reliance by [post-conviction] counsel was equally reasonable."); *see also Banks*, 540 U.S.  at

695-97 (rejecting argument that defendant's failure to raise claim earlier [in state court

proceedings] was due to lack of diligence where he was misled by prosecution's representations).

The Government cannot now construe Mr. Lee's reliance on these representations as a lack of

diligence.

It would be a perverse result to penalize the party that relied on the misleading

representations, rather than the party that made them. The Eighth Circuit made this point again

just this week, addressing charges that the defendant was not sufficiently diligent in uncovering

information in the possession of the State:

> [D]ue diligence does not require a defendant to root out information that the State
> has kept hidden. The State cannot play "hide and seek" with information it was
> required to disclose and then accuse defense counsel of lacking due diligence.
> Due diligence does not require defense counsel to possess psychic abilities and
> discover potentially favorable evidence during trial that the State chose to
> conceal, particularly when defense counsel specifically requested disclosure of the
> evidence now at issue.

---

concerning Gloria Kehoe's mental instability, and within six months of receiving state FOIA
records containing the Humphrey polygraph report. Any questions about diligence must be
resolved by examining all relevant circumstances. *See Martin v. Fayram*, 849 F.3d 691, 698 (8th
Cir. 2017) (diligence is fact-intensive inquiry).

[14] This includes a specific representation at the time of Gloria Kehoe's testimony that all
materials concerning her had been disclosed. Dkt. 1363 at 10 n.11.

*Jimerson v. Payne,* ___ F.3d ___, 2020 WL 2050657, \*7 (8th Cir. Apr. 29, 2020) (citations omitted). *See also Strickler*, 527 U.S. at 263 (defendant cannot litigate on basis of speculation but is entitled to rely on representations of prosecution); *Holmberg v. Ambrecht*, 327 U.S. 392, 396-97 (1946) (noting that "fraudulent conduct on the part of the defendant may have prevented the plaintiff from being diligent and may make it unfair to bar appeal to equity because of mere lapse of time" and thus concluding that limitations period does not begin to run until fraud is discovered). To do so would unfairly reward a party for managing to successfully conceal its fraud beyond the one-year limitations period. *Holmberg*, 327 U.S. at 396-97 (equity "bars [the United States] from setting up … a fraudulent defense, as it interposes against other forms of fraud.").

### 2. Inadvertent failure to disclose requested discovery is cognizable under Rule 60(b)(3).

The Government claims that only intentional failures to disclose requested discovery are cognizable under Rule 60(b)(3). This is wrong as a matter of law. Misrepresentation and misconduct are separate grounds for relief under Rule 60(b)(3) apart from fraud, and neither necessitates a showing of purposeful misconduct or malice. *United States v. One (1) Douglas A–26B Aircraft*, 662 F.2d 1372, 1375 n. 6 (11th Cir.1981). As the Eleventh Circuit explained:

> Were the term "misrepresentation" as used in Rule 60(b)(3) interpreted to encompass only false statements made with the intention to deceive, the behavior described by that word would be wholly subsumed within the category of behavior that the same subsection of the rule refers to as "fraud." Such a narrow reading of the word would render it superfluous for purposes of Rule 60(b)(3) and would thus conflict with the established principle of statutory construction that all words within a statute are intended to have meaning and should not be construed as surplusage. *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972).

*Id*. The First, Fourth, Fifth, Seventh, and Ninth Circuit Courts of Appeals agree that Rule

12

60(b)(3) applies to unintentional misconduct or misrepresentations as well as intentional ones.[15]

The Government maintains that such cases should be disregarded because "they were decided outside the context of § 2255 proceedings," and that there is no authority for the proposition that "an unintentional misrepresentation during § 2255 proceedings may represent a 'defect in the integrity' of those proceedings under *Gonzalez*[.]" GR 48 n.5. This, too, is incorrect. *See, e.g., Scott v. United States*, 81 F. Supp. 3d 1326 (M.D. Fla. 2015) (holding that Rule 60(b)(3) motion proper where movant sought not to add new claim but to vacate § 2255 order based on Government's withholding of evidence relevant to claim raised in that proceeding, even where misrepresentation unintentional);[16] *Scott v. United States*, 890 F.3d 1239, 1258 (11th Cir. 2018) (not disturbing finding that the district court acted within its power in reopening § 2255 motion pursuant to Rule 60(b)).[17]

The Government's reliance on the Eighth Circuit's opinion in *Atkinson v. Prudential*

---

[15] *See Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir.1988) ("Misconduct" under Rule 60(b)(3) does not require proof of nefarious intent or purpose); *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir.1994) (inadvertent as well as intentional failure to comply with a discovery order constitutes misconduct under Rule 60(b)(3)); *Bros. Inc. v. Grace Mfg. Co.*, 351 F.2d 208, 211 (5th Cir.1965) (party can obtain relief due to misrepresentation even in the absence of "a deliberate evil purpose to misstate or conceal or thereafter engage in foot-dragging lest the truth might be uncovered."); *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir.1995) ("Rule 60(b)(3) applies to both intentional and unintentional misrepresentations."); *In re M/V Peacock on Complaint of Edwards*, 809 F.2d 1403, 1405 (9th Cir.1987) (negligent misrepresentations may support relief from judgment under Rule 60(b)(3)).

[16] Fully recognizing that the prosecuting attorney's breach was unintentional, the court was "nevertheless troubled that the government's negligence could result in depriving Petitioner of the ability to be heard on this claim earlier and now, through no fault of his own, the Petitioner must meet the higher burden of 2255(h)(1)." *Id*. at 1335 n.7.

[17] The Government makes much of the fact that the district court in *Scott* ultimately denied the Rule 60 motion on the merits after further proceedings and that this merits denial was upheld on appeal. Dkt. 1367 at 47 n.4. But that merely demonstrates that the initial decision to grant 60(b) relief is limited in nature, and separate from any determination of the underlying merits. Moreover, it shows that an appeal is not ripe until after the district court has entered an amended judgment.

*Property Co.*, 43 F.3d 367 (8th Cir. 1994) for the contrary position is misplaced. There, the relevant discovery turned out to be in movant's counsel's file all along, and opposing counsel also submitted unrebutted affidavits that they never possessed the material or knew of its existence. 43 F.3d at 373. This is a far cry from the facts here. For one thing, Mr. Lee's case is a criminal proceeding, where the prosecution's actions are to be guided not only by discovery rules but by *Brady* and where the knowledge and actions of investigators and agents in criminal cases are imputed to the prosecution team as a whole (and we now know that the state and federal investigators worked together as a team on the Mueller case). Unlike *Atkinson,* here the Government does not even allege that its agents were ignorant of the polygraph, but only that it does not have "adequate information to evaluate" that question. GR 38-40. That is hardly a resounding denial. Moreover, whether the prosecution possessed the information is a factual determination this Court can make after a hearing if necessary; it cannot turn on the extent of the Government's current willingness to review its investigative files.[18]

Mr. Lee's Rule 60 motion is indistinguishable from *Scott*. He is not raising new, free-standing *Brady* claims in an attempt to vacate his underlying conviction. Rather, he is arguing that the Government's misrepresentations in his § 2255 proceeding "corrupted the Court's judgment" in evaluating his § 2255 motion, and therefore that judgment should be reopened.

---

[18] The Government fails in its attempt to distance itself from the cases Mr. Lee cites. Mr. Lee has now established through additional FOIA records that the Arkansas State Police was integrally involved in the federal prosecution, and that the ATF and FBI received copies of its investigative file. *See infra* at 27-29. In any event, the prosecutors had a duty to learn of its existence. *See* Dkt. 1363 at 52, 58-59. Thus the Government's claim that Mr. Lee has not shown it "knowingly possessed documents," GR 46 (citing *United States v. Williams*, 753 Fed. Appx. 176 (4th Cir. 2019) (per curiam)), can provide it little comfort. Similarly, Respondent's treatment of *In re Pickard*, 681 F.3d 1201 (10th Cir. 2012), is less than helpful. The Humphrey failed polygraph record is new information attributable to the Government, and its misrepresentations about the evidence, both by omission as well as in response to the Kehoe § 2255 motion, were clearly integral to this Court's consideration of Mr. Lee's § 2255 motion.

*Scott*, 81 F. Supp. 3d at 1336.

> **3. The Government's Response confirms that its misrepresentations corrupted the Court's § 2255 judgment in several respects.**

The Government's response highlights that its withholding of evidence not only prevented Mr. Lee from fully and fairly litigating his *Brady* claims but also subverted this Court's analysis of Mr. Lee's IAC claim alleging a failure to call available witnesses in support of the third party culpability defense. GR 16-17. Mr. Kehoe raised a similar claim in his parallel § 2255 proceeding, to which the Government responded that it should be denied because "[a]ll documents relating to Mr. Humphrey were provided to trial counsel," counsel had an opportunity to examine Mr. Humphrey, and "[d]espite trial counsel's best efforts, no tie was ever made between Paul Humphrey [and the Mueller murders]." Dkt. 1087 at 32-33. The Court simultaneously denied Mr. Lee's and Mr. Kehoe's claims, adopting the Government's argument: that counsel had ample opportunity to question Mr. Humphrey and "attempted, but failed, to establish a link between Humphrey and the death of the Muellers."[19]

The Court's resolution of this issue demonstrates two points. First, denial of Mr. Lee's claim (as well as his renewed demand for *Brady* material) was based on the Government's misrepresentation in Mr. Kehoe's case that no materials concerning Mr. Humphrey had been withheld from trial counsel.[20] Second, the non-disclosure of the Humphrey polygraph report

---

[19] *Compare United States v. Lee*, No. 97-CR-243, 2008 WL 4079315 at *12 (E.D. Ark. Aug. 28, 2008), with *United States v. Kehoe*, No. 97-CR-243, 2008 WL 4079316 at *19 (E.D. Ark. Aug. 28, 2008).

[20] The Court was legally entitled to rely on what it learned during the Kehoe proceedings—*i.e.*, that the Government had not withheld any evidence at trial—to conclude that Mr. Lee's *Brady* issues did not merit further discussion. *See Machibroda v. United States*, 368 U.S. 487, 495 (1962) (district judges may rely on "personal knowledge" of related proceedings over which they presided in resolving § 2255 claims).

15

corrupted the Court's analysis of the ineffective assistance claim because its ruling accepted the Government's assurances that no other evidence existed establishing a "link" between Mr. Humphrey and the murders. But this just demonstrates the materiality of the suppressed polygraph report: it was the evidence necessary to establish that link, and without it, counsel could not make informed tactical decisions about which witnesses to call to mount an effective third party culpability defense.[21] Respectfully, this Court could not have resolved this issue in the manner it did had the suppressed evidence been properly disclosed during the § 2255 proceeding.

The same is true of Mr. Lee's § 2255 claim that trial counsel failed to properly cross-examine Gloria Kehoe. Although the Court acknowledged that counsel failed to impeach Mrs. Kehoe with a prior statement that would have dismantled the Government's timeline—*i.e.*, that after committing the murders, Mr. Lee and Mr. Kehoe stayed in Arkansas for a few days before returning to Spokane—it adopted the Government's reasoning that there was no prejudice because the Government could have "easily rehabilitated" Mrs. Kehoe by arguing she was merely "momentarily confused." *Lee*, 2008 WL 4079315 at *18. Moreover, the Court noted, defense counsel "used what they had to work with" but "were, of course, limited by the facts." *Id*. We now know this was not true. There were critical, non-cumulative impeachment facts that fundamentally implicated Mrs. Kehoe's ability to accurately perceive and recall events; the Government would have been hard-pressed to "easily rehabilitate" her especially given that the suppressed evidence establishes that even federal case agents voiced concerns about her mental

---

[21] The Court's note that trial counsel had interviewed the witnesses and determined that some were not "helpful," *Lee*, 2008 WL 4079315 at *11, is also undermined by the Government's suppression. Without benefit of the undisclosed information, trial counsels' opinions are of limited use and certainly do not establish whether counsel would have evaluated the witnesses differently in light of the corroborative Humphrey polygraph report.

instability. The Court could not have resolved this claim in the manner it did had the information about Mrs. Kehoe's mental instability been disclosed during the § 2255 proceeding. [22]

### B. Rule 60(b)(6)

The Government contends that the motion is untimely. GR 49. But Rule 60(b)(6) is not subject to a limitations period. *See* Rule 60(c)(1). Regardless, Mr. Lee brought this motion within a reasonable time of discovering the predicate facts. *See supra* at n.13.

The Government argues Rule 60(b)(6) is unavailable because his claim can be brought only under Rule 60(b)(3). GR 50-51. But it simultaneously argues (incorrectly) that Mr. Lee's motion is *not cognizable* under section 60(b)(3) because that provision does not extend to unintentional misrepresentations. GR 46-48 & n.5. The Government cannot have it both ways. If its interpretation of Rule 60(b)(3) is correct, then these two subsections are not coterminous, and Rule 60(b)(6) can fulfill its intended role as a "catch all" provision.

The Government next insists allowing litigants to pursue new *Brady* claims using Rule 60(b)(6) would nullify the AEDPA's gatekeeping restrictions. GR 52. This is another strawman argument. Of course Rule 60 cannot be used to raise entirely new claims that were never part of the original § 2255 proceeding. But here, Mr. Lee's § 2255 motion specifically alleged that the Government withheld *Brady* evidence "that others carried out the murders of the Mueller family." Dkt. 1118-1 at 7. The Government's failure to disclose the Humphrey polygraph—

---

[22] The Government argues in its response that trial counsel should have uncovered this evidence on their own, see GR 71-72, but this simply establishes an additional basis for reopening the § 2255 judgment pursuant to Rule 60(b)(3): the withheld evidence prevented Mr. Lee from fully and fairly litigating his claim that trial counsel could have, but failed, to properly impeach Gloria Kehoe. *See Scott v. United States,* 81 F. Supp. 3d 1326, 1328, 1336-37 (M.D. Fla. 2015) (granting Rule 60(b)(3) motion to reopen § 2255 judgment where Government withheld evidence during § 2255 proceeding relevant to movant's claim that trial counsel was ineffective for failing to uncover evidence that would have impeached a key witness).

whether inadvertent or not—precluded Mr. Lee from fully and fairly litigating this claim. Similarly, the Government's failure to disclose impeachment evidence about Gloria Kehoe's psychological issues precluded Mr. Lee from amending his general *Brady* claim with those potent facts. *Id*. at n.3.

Finally, the Government makes the perfunctory assertion that Mr. Lee has not demonstrated "extraordinary circumstances" warranting relief. GR 52. Yet the continued concealment in this death penalty case is extraordinary. A core focus of Rule 60(b)(6) relief is to prevent "undermining the public's confidence in the judicial process," Dkt. 1363 at 68-70,[23] which the federal Government's withholding of key facts – even to this day – threatens to do. Nor can Respondent's assertion that "there has been no 'pattern' of *Brady* violations" make it so. GR. 52. Not only have damning, contradictory facts continued to shake free from the Government's narrative here, but two different federal judges have openly pointed to the harm one such nondisclosure has likely caused Daniel Lee. *See* Dkt. 1313 at 14 (discussing the failure of the federal prosecution to disclose information that the teenaged Lee was not, contrary to its penalty phase presentation, guilty of a prior murder, this Court found that "it is reasonably likely that, if it had been disclosed at trial that the Oklahoma court found the evidence insufficient to establish that Lee was guilty of murder, the outcome at sentencing would have been different"); *Daniel Lewis Lee v. Warden*, No. 2:19-cv-00468-JPH-DLP (S.D. Ind. Dec. 5, 2019), Dkt. 27,  at

---

[23] Nor has the Government addressed that the prior judgment "may work an extreme and undue hardship" on Mr. Lee absent this remedy. This is an independent ground for Rule 60(b)(6) relief. *See* Dkt. 1363 at 67-68.

17-19 (finding "no reason to disagree" with Judge Holmes's determination and further discussing *Brady* penalty phase claim).[24]

Indeed, the fact that the misrepresentations continue in this case, whether intentional or not, only underscores the remarkable circumstances evident here. The Government's responsive brief provides yet another example. Although the information about which agencies and officers investigated the case or what was in their files or what they may have known is peculiarly within the Government's reach, the Government denies responsibility, stating it is "unable to evaluate" whether the original prosecution team was aware of any of the relevant *Brady* information. GR 35-38. It is left to Mr. Lee first to ferret out documents through FOIA showing that the state authorities administered a polygraph to the key alternate suspect that he failed, and then to prove that the agencies shared their files and worked together.

This is another instance of the Government's "prosecutor conceals/defendant must find" strategy that *Brady* and its progeny roundly reject. *See Banks*, 540 U.S. at 696 (denouncing notion that prosecution can lie and conceal and leave defendant the burden to discover). In fact, just months ago, the Government made similar misstatements about the level of cooperation between federal and state authorities on the penalty phase issue of the purported prior murder, a misrepresentation that was also only exposed because of a fortuitous FOIA response. *See* Dkt. 1363 at 72 n.60. The Government appears to hope that it can execute Danny Lee before it has to provide this or any Court with facts that corrode its case. Its refusal to provide straightforward answers in this proceeding further erodes confidence in a judicial process already marred by

---

[24] Relief was ultimately denied in both cases despite these findings: In the Arkansas proceeding, because the district court found § 2255 unavailable for pursuing the claim, and in Indiana, because the Seventh Circuit reversed the stay of execution the district court had granted. A motion to alter or amend the judgment is currently pending in the Indiana district court.

numerous unrebutted examples of the Government's failure to faithfully discharge its constitutional duty under *Brady*. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (prosecutor has a duty to learn of any favorable evidence known to others acting on government's behalf, including police).

### C. Rule 60(d)(1)

The Government's Brief seeks to add to the requirements for proceeding under Rule 60(d)(1). The elements of an independent action under Rule 60(d)(1) are:

> (1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any adequate remedy at law.

*Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873, 878 (8th Cir. 2010). Those elements are met here: whether by "fraud, accident, or mistake," the Government's failure to disclose the Humphrey polygraph and information about Mrs. Kehoe's mental health precluded him from fully and fairly litigating the *Brady* claims presented in his § 2255 motion.[25] The judgment denying § 2255 relief ought not, in equity and good conscience, be enforced because the Government obtained it by misrepresenting its compliance with its *Brady* obligations. Mr. Lee is not at fault here; he was entitled to rely on the Government's representations. *Strickler*, 527 U.S. at 288. If Rule 60(b) is deemed unavailable, then he will have no adequate remedy at law absent this independent action.

This approach to Rule 60(d)(1) was approved in *United States v. Pelullo*, No. 01-CV-124, 2010 WL 2629080 (D.N.J. June 25, 2010). *See* Dkt. 1363 at 70. The Government's description

---

[25] Mr. Lee's motion must also be assessed in light of the broader pattern of misconduct that has been uncovered but which has escaped judicial review. *See* Dkt. 1363 at 70-73.

of the case is misleading. After granting the motion to reopen the judgment, the court subsequently determined the motion was in fact an attempt to raise a new claim rather than reopen fundamentally flawed proceedings as the court had previously concluded. *United States v. Pelullo*, No. 01-CV-124, 2011 WL 3022534, at \*14 (D.N.J. July 22, 2011) (movant had not properly "asserted misrepresentations prevented him from fairly presenting any of the claims that he raised in his initial § 2255 motion," but was instead attempting to vacate his conviction "on grounds not raised in the prior § 2255 petition). The court's subsequent decision, however, reconsidered only the underlying facts; it did not disturb its earlier holding regarding what constitutes a valid use of Rule 60(d)(1).

The Government incorrectly states Rule 60(d)(1) requires a showing of "actual innocence." GR 53-54. Its sole authority is a Sixth Circuit opinion[26] that relies on a strained interpretation of *Calderon v. Thompson*, 523 U.S. 538 (1998): namely, that the meaning of the term "grave miscarriage of justice," as understood in the context of the abuse-of-the-writ doctrine, is transferable to independent actions in equity. No other court has adopted this interpretation or applied it to Rule 60(d)(1), and with good reason: *Calderon* concerned an entirely different issue—the *sua sponte* recall of the mandate in the absence of a showing of actual innocence—and expressly exempted from its holding cases alleging that a party had committed fraud upon the court. 523 U.S. at 557.

### D. Rule 60(d)(3)

The Government's analysis in connection with Rule 60(d)(3) similarly provides little guidance. It repeats the fallacy that Judge Holmes's prior ruling resolves this issue, GR 56, though his ruling was made on a different set of facts. The Court had no occasion to consider, for

---

[26] *Mitchell v. Rees*, 651 F.3d 593 (6th Cir. 2011).

21

example, the effect of the Government's false representation about the Humphrey evidence during the Kehoe § 2255 proceeding on Mr. Lee's ability to litigate his *Brady* claim regarding alternate suspects.[27] Ample authority establishes that Mr. Lee's allegations of misconduct are cognizable under Rule 60(d)(3), and the Government makes no attempt to address these cases. *See* Dkt. 1363 at 74.

Instead, the Government relies on two inapposite cases: *Alley v. Bell*, 392 F.3d 822 (6th Cir. 2004), and *Galatolo v. United States*, 394 Fed. Appx. 670 (11th Cir. 2010) (per curiam) (unpublished). Unlike Mr. Lee, those litigants sought to raise *Brady* claims for the first time in their Rule 60 motions. Moreover, *Alley* confirms that when an officer of the court "recklessly" conceals matters from a habeas court, such conduct comes within the ambit of Rule 60(d)(3). *Alley*, 392 F.3d at 831. *See also* Dkt. 1363 at 74-75.

### III.  The Government Withheld Material Evidence in Violation of *Brady v. Maryland*.

The Government acknowledges that the Court need not reach the merits of the underlying *Brady*/*Napue* claims at this stage of the proceedings. GR 57. But to the extent the Government purports to identify "deficiencies" in his claims, *id.*, Mr. Lee will respond below. Before doing so, he must address some overarching errors in the Government's analysis.

First, the Government incorrectly asserts that *Brady* requires a showing that the undisclosed evidence would have resulted in an acquittal. *See* GR 22, 72. The standard for *Brady* materiality "is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have

---

[27] Nor did Judge Holmes consider whether the broader pattern of misconduct alleged in the present motion—some of which was not uncovered until after that opinion—should inform the Court's assessment of whether the Government's misrepresentations were deliberate.

been enough left to convict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Nor must he

"demonstrat[e] by a preponderance that the disclosure of the suppressed evidence would have

resulted ultimately in the defendant's acquittal." *Id*. at 434. Mr. Lee's burden will be only to

show that, in light of the favorable evidence, confidence in the result of the trial was undermined.

*Id*.

Second, the Government engages in burden-shifting. GR 71-72. The *Brady* rule is aimed

at defining an important prosecutorial duty, not an obligation of defense counsel. The

Government's attempt to turn that duty on its head is not doctrinally supported and undermines

the very purpose of *Brady*. The Supreme Court has explicitly rejected the notion that defense

counsel's failure to discover exculpatory information relieves the prosecution of its constitutional

duty of disclosure. *See Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring

'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to

accord defendants due process.").[28]

### A. The Government Failed to Disclose Gloria Kehoe's History of Mental Problems, Including Delusions.

As a preliminary matter, the Government has yet to grapple with the implications of the

mixed verdict rendered by the jury. Dkt. 1363 at 21. Consider, for example, that the

---

[28] *See also Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 291 (3d Cir. 2016) ("[T]he concept of 'due diligence' plays no role in the *Brady* analysis."); *Amado v. Gonzalez*, 758 F.3d 1119, 1136-37 (9th Cir. 2014) (finding that the due diligence rule "is contrary to federal law as clearly established by the Supreme Court ... and unsound public policy."); *United States v. Tavera*, 719 F.3d 705, 711 (6th Cir. 2013) ("This 'due diligence' defense places the burden of discovering exculpatory information on the defendant and releases the prosecutor from the duty of disclosure. It relieves the government of its *Brady* obligations. In its latest case on the issue [*Banks v. Dretke*, 540 U.S. 668 (2004)], however, the Supreme Court rebuked the Court of Appeals [for the Fifth Circuit] for relying on such a due diligence requirement to undermine the *Brady* rule . . . . [T]he clear holding in *Banks* should have ended that practice.").

Government's case that Mr. Lee participated in the Spokane City Hall bombing was based largely on Gloria Kehoe's testimony that Mr. Lee had confessed to her. The jury acquitted Mr. Lee of that charge. There could hardly be more compelling evidence that, after having "ample opportunity" to observe and evaluate Mrs. Kehoe, GR 74, the jury determined that her testimony should not be credited absent independent corroboration.[29] In light of the many inaccuracies and inconsistencies in her story, as well as her substantial incentives to curry favor with the prosecution, Dkt. 1363 at 16-21, the jury's decision to credit Mrs. Kehoe's testimony about the Mueller murders must have been a close call.[30] The non-cumulative *Brady* information concerning her mental instability might well have tipped the scales on her credibility for the jurors. *Id*. at 41-42.

Rather than address any of this, the Government redefines the *Brady* issue into a narrower one and posits facts without any basis. GR 72. The evidence undisclosed by the prosecution includes more than its knowledge that key witness Gloria Kehoe suffered from auditory and other delusions. The suppressed evidence also includes the revelation that the Government's own case agents voiced concerns about Gloria Kehoe's mental stability. Dkt. 1363 at 37, 41-42. This would have been serious impeachment evidence to use against the prosecution's most important witness, easily affecting the credence the jurors gave to her testimony. *Id*. at 41-42. The Government never addresses this.

---

[29] The Government's other evidence came from Cheyne, who testified that his brother Chevie told him that Mr. Lee helped with the bombing. The jury clearly did not credit his testimony, either.

[30] It is questionable, for example, whether all twelve jurors would have voted to convict Mr. Lee of the Mueller murders had they known that Gloria Kehoe's testimony was not corroborated by the forensic hair evidence as they were told at trial.

Ignoring the facts before it, the Government offers the Court pure conjecture. It muses that Mr. Lee "possibly" had the opportunity to observe Mrs. Kehoe's symptoms, and speculates that Mr. Kehoe shared information about her mental health with Mr. Lee's defense team. GR 72. There is no basis for either of these assertions. Neither is there anything in the record to allow one to reasonably conclude that any knowledge about Gloria Kehoe possessed by her husband and the son who had known her all his life could be attributable to Danny Lee whom she met just months before this crime. Nor, moreover, is there anything to suggest that Mr. Lee could have known that both Cheyne and Kirby told the prosecution that Mrs. Kehoe was mentally ill, much less that the case agents themselves expressed concerns about the witness's mental instability.

The Government also asserts that Mr. Lee could have learned this information from Kirby before trial, GR 72, but this (again unsupported) supposition ignores that Kirby was a cooperating witness: He had no incentive to undermine the prosecution's case given the phenomenal bargain he was getting for that cooperation. Dkt. 913 at 40 (trial court observing how Kirby, a "substantial beneficiary of the entire prosecutorial process" received a "minimal" sentence "considering the nature of the crime charged.").

The Government goes on to argue that Cheyne's and Kirby's declarations are insufficient to establish the mental health problems of their mother and wife, respectively. GR 72-73. But their lay observations—that she saw and heard things that weren't there, that she was paranoid, that she imagined government agents assaulting her—certainly implicate Mrs. Kehoe's ability to accurately perceive and recall events, and are bolstered by the fact that Kirby took his wife for psychiatric treatment when they lived in North Carolina. Dkt. 1363 at 37. At best, the

25

Government's response demonstrates the potential need for additional fact development,[31] not that the claim is insufficiently pleaded or lacks merit.

Finally, the Government asserts that Gloria Kehoe's testimony was corroborated by Cheyne Kehoe, but this is not true. Mrs. Kehoe's key value as a prosecution witness was her claim that Mr. Lee made a direct confession to her about the Mueller murders. No other witness, and certainly not Cheyne, corroborated that such a confession ever occurred. The contention that Cheyne's and Gloria's testimony were mutually corroborative is also belied by the jury's verdict on the Spokane City Hall bombing: as with the Mueller murders, Gloria Kehoe claimed Mr. Lee confessed to her that he committed the bombing, and Cheyne claimed Mr. Kehoe's confession about the bombing implicated Mr. Lee, yet the jury believed neither of them.[32] The Government's depiction of Gloria's and Cheyne's stories "largely match[ing] up," GR 73, is a charitable description for the critical inconsistencies in their stories for which the Government has no answer.[33] Moreover, it glosses over the numerous contradictions in Cheyne's testimony, as well as his substantial incentives to curry favor with the prosecution. Dkt. 1363 at 18-20.

This was the Government's key witness: a woman who first gave authorities a statement

---

[31] The Government should be required at any hearing to turn over all documents it has related to Mrs. Kehoe's mental health. Given that it continues to leave the facts to Mr. Lee to ferret out—including that its agents worked in concert with state law enforcement investigation into the offense, a central point in this case—neither he nor this Court can be certain that all relevant information is known even now.

[32] Nor did the jury determine Cheyne was independently credible; it rejected his uncorroborated testimony about the murders of Jon Cox and Jeremy Scott.

[33] Take, for example, the issue of when Cheyne first learned about Chevie Kehoe's involvement in the Mueller murders. Dkt. 1363 at 20. Cheyne claims it was not until he had been on the run with Mr. Kehoe for several months; but Gloria Kehoe claims she told Cheyne about it before he left with Chevie, in a desperate attempt to convince him not to leave with his brother. *Id.* This is not a minor discrepancy—it is simply inconceivable that a person would have forgotten that his own mother begged him to stay away from his brother because that brother had committed a triple homicide.

that never mentioned any confession by Danny Lee, and only later added that he also spoke to her – at which point she attributed statements to him that she had earlier said were made by her son Chevie. Dkt. 1363 at 20. Years later we are told that the Government knew that she experienced auditory hallucinations and that its own case agents questioned her mental stability. The jurors had a right to this information as it decided whether to credit the damning testimony she provided.

**B.  The Government Withheld Evidence that Suspect Paul Humphrey Failed a Law Enforcement Polygraph.**

The Government argues the Humphrey polygraph evidence "should not be attributable to the federal government for purposes of its *Brady* obligations," and, in the alternative, that such evidence was neither admissible nor material. GR 75-80. Neither of these arguments has merit.

**1.  The Humphrey polygraph evidence is attributable to the Government.**

Records obtained through FOIA demonstrate that the Arkansas State Police ("ASP") was part of the "multi-agency investigation and prosecution" of Daniel Lee and Chevie Kehoe. *See* Exh. 1. A June 1997 FBI memo explicitly stated the investigation would "be coordinated with Little Rock BATF, the Arkansas State Police, and the Pope County Sheriff's Office." *See* Exh. 2. Indeed, the lead ATF case agent in the federal prosecution, Glen Jordan, had been conducting a joint investigation with the ASP into the Muellers' disappearance as early March 1996. *See* Exh. 3. Mr. Jordan specifically worked with ASP Sergeant Harold Dwane Luter. *See* Exhs. 4, 5, & 6.[34] This is the same Sergeant Luter who arranged the Humphrey polygraph examination. *See* Dkt. 1363-2.[35]

---

[34] Mr. Luter's name is spelled as "Dewayne" in these documents.

[35] These facts – not forthcoming from the Government even at this juncture – should end any question as to whether this evidence is attributable to the prosecution for *Brady* purposes.

27

State FOIA records further confirm that Mr. Jordan received a hand-delivered copy of the ASP's Mueller case file on April 14, 1997—several months after the ASP conducted and memorialized the Humphrey polygraph results. *See* Exh. 7. Federal FOIA records further confirm that FBI case agents separately obtained a copy of the ASP's investigative file by September 1997. *See* Exh. 8. These case agents were undoubtedly members of the prosecution team, and their knowledge or possession of the ASP case file is imputed to the prosecutors. *See* Dkt. 1363 at 52, 58-59.[36] Indeed, the Government clearly had access to the ASP case file because it released a number of records from that file to the defense as part of its pre-trial disclosures. Dkt. 1363-27.

An honest broker would have admitted these facts up front. Instead, the Government plays "hide the ball" with the Court and leaves it to Mr. Lee to try to document and prove to the Court what the prosecution already knew to be true. This is of a piece with how the Government has litigated this case all along—deny the facts, hope not to get caught, try for procedural roadblocks if you do. *See* Dkt. 1363 at 14 n.15, 69.

Ample authority establishes that the *Brady* obligation extends not just to the prosecutor's own files, but also to the investigative agencies'.[37] Dkt. 1363 at 52, 58-59. The Government

---

They do not represent the sum total of the evidence of cooperation. Dozens of records obtained through FOIA demonstrate extensive coordination and information sharing between federal and state authorities as part of the multi-agency investigation and prosecution of Mr. Lee. There are also indications in the records that the agencies cooperated as to Mr. Humphrey specifically, as Mr. Jordan participated in the execution of the search warrant at Paul Humphrey's home, and was the sole witness who testified at Mr. Humphrey's suppression hearing.

[36] Communication with state and local agencies did not run exclusively through the FBI and ATF. FOIA records demonstrate that at least one of the line prosecutors also "worked closely" with various "state and local criminal investigators in preparing for [Mr. Lee's] trial." *See* Exh. 9.

[37] Here, that includes not only the FBI, ATF, and ASP, but also the Pope County Sheriff's Office (PCSO), which one FBI memo described as "an instrumental member of the prosecution

cannot "get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case." *Carey v. Duckworth*, 738 F.2d 875, 877-78 (7th Cir. 1984). Particularly in the absence of more information, the Government's current assertion that the Humphrey failed polygraph was not "in its trial files" is hardly sufficient to conclude the Humphrey polygraph report was not in its possession for purposes of *Brady*.

### 2. The polygraph evidence was admissible and material.

The Government claims that at the time of Mr. Lee's trial, polygraph evidence was inadmissible under Eighth Circuit law, making it "analogous to the state law in *Wood v. Bartholomew*," GR 78, and that it was not under a duty to disclose the evidence to the defense. This is incorrect.[38] As to disclosure, in *United States v. Nelson*, 970 F.2d 439, 442 (8th Cir. 1992), the Eighth Circuit held that pursuant to *Brady*, a police report regarding a witness's polygraph examination "should have been disclosed." Although the *Nelson* court ultimately denied relief because the suppressed polygraph evidence was cumulative to the information trial counsel elicited during cross-examination, the Eighth Circuit recognized its value as impeachment evidence and made clear that the Government should not interpret the ruling as license to withhold such evidence moving forward:

> [W]e hasten to warn the government that any lack of straightforwardness in the non-disclosure of information to which the defense is clearly entitled will not be tolerated.

---

team." *See* Exh. 10. Notably, the PCSO interviewed Mr. Humphrey on the same day, at the same office, that the ASP administered the polygraph exam. Dkt. 1363 at 51.

[38] The passage the Government cites from *United States v. Iron Cloud*, 171 F.3d 587 (8th Cir. 1999), is misleading. *Iron Cloud* did not even concern polygraph evidence; it was about the admissibility of breathalyzer tests. 171 F.3d at 590. Its dicta about the inadmissibility of polygraphs cites to *United States v. Williams*, 95 F.3d 723 (8th Cir.1996), but *Williams*, in fact, says the opposite: it presumes that polygraph evidence *is* admissible provided it satisfies the *Daubert* standard. *Id*. at 729. *Williams* was prevailing circuit law at the time of Mr. Lee's trial.

*Id. Nelson* was (and still is) good law. The Government was obligated under *Brady* to disclose the Humphrey polygraph report at trial.

This may not be news to the Government. After all, it managed to turn over the polygraph report of a *different* witness, and even apologized in writing to defense counsel for inadvertently omitting it from a previous packet of disclosures. *See* Exh. 11. Its present position, that such evidence was not subject to disclosure at the time of Mr. Lee's trial, rings hollow.

As to admissibility, the Government asserts there is no basis to conclude the polygraph report would have been allowed as substantive evidence. GR 79. In fact, at the time of Mr. Lee's trial, another federal court had already found that polygraph examinations based on the control question technique are admissible under *Daubert*. *See United States v. Galbreath*, 908 F. Supp. 877 (D. N.M. 1995).[39] Moreover, the Government ignores well-established law that polygraph evidence can be admitted for the more limited purpose of impeachment. *See* Dkt. 1363 at 50-51.

Finally, the Government's response to the materiality analysis is unpersuasive. GR 79-80. The fact that the initial suspect in the case flunked a polygraph that specifically asked whether he "was present when the Muellers were killed" and "participated in disposing of the bodies" was clearly exculpatory and went to the heart of the third-party culpability defense. *See* Dkt. 1363 at 49. The Government does not address this on its own terms, nor does it engage in the type of holistic prejudice analysis required under *Brady*. *Id.* at 53-54. Instead, it adopts a legal test the Supreme Court has expressly rejected: whether the undisclosed evidence, standing alone, would

---

[39] The Government claims such evidence would have had little probative value, risked confusing the jury, and required a separate hearing to determine the validity of the results. GR 79. But had the polygraph report been disclosed, all those issues could have been resolved at a *Daubert* hearing. *See Galbreath,* 908 F. Supp. at 895 (finding that polygraph evidence was "sufficiently reliable," likely to assist the trier of fact on an issue in dispute, unlikely to confuse the jury, and therefore admissible pursuant to *Daubert* and Fed. R. Evid. 702 & 403).

have resulted in a different verdict. GR 79. The Government also ignores *Kyles*'s command to consider the *collateral effects* of the jury learning about the questionable practices in which the prosecution engaged in building its case. Dkt. 1363 at 54-55.

Mr. Humphrey was the initial suspect in this case for good reason. *See* Dkt. 1363 at 43-46. Even the Government was never able to formally rule him out as a suspect. *Id*. at 46. Had any of the jurors believed, as the defense encouraged them to, that Mr. Humphrey was involved in the killing of the Mueller family, they could not have accepted the testimony of Cheyne or Gloria Kehoe on which the prosecution's case depended. Given the numerous problems with the trial evidence, *id*. at 15-34, the Government's suppression of the polygraph evidence did not result "in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

## C.  **The Prosecution Violated *Napue v. Illinois* and *Giglio v. United States*.**

The Government all but ignores this claim. GR 80. Its response to the *Brady* claim is insufficient to answer the allegations supporting the *Napue* violation given the different elements. First, Mr. Lee need not prove that the prosecutors actually knew that Mr. Humphrey's testimony about the forged Mueller car titles[40] or his purported non-involvement in the Mueller murder was misleading, only that it *should have known*. Dkt. 1363 at 56-57. The Government makes no attempt to argue this element has not been met.

Second, the prejudice standard for a *Napue* violation differs from *Brady*'s: It is whether there is "any reasonable likelihood" the misleading testimony "could have" affected the judgment of the jury. *United States v. Agurs,* 427 U.S. 97, 103 (1976). This standard is "more

---

[40] The Government suggests that Mr. Humphrey's testimony cleared up the mystery of how he came into possession of the forged titles. GR at 11-12. How that is the case is never explained, and other trial witnesses fail to corroborate his story. Indeed, the most likely explanation is the one found in the Government's own files, a redacted June 1997 FBI memo stating that he had, in fact, forged the titles himself. *See* Exh. 2.

31

defense friendly," *Hammond v. Hall*, 586 F.3d 1289, 1306-07 (11th Cir. 2009), and "favors

granting relief." *Ford v. Hall*, 546 F.3d 1326, 1333-34 (11th Cir. 2008). The Government never

discusses this materiality standard and makes no effort to persuade this Court that the testimony

it elicited from Mr. Humphrey was harmless. *See* Dkt. 1363 at 56-60. Nor does it address that the

prejudice was compounded by the Government's closing argument. *Id*. at 59-60. The prosecution

told the jury flat out that a thorough investigation by federal and state authorities uncovered "no

evidence against Mr. Humphrey." *Id.* at 57. Given how central this was to Mr. Lee's third-party

culpability defense, there is at the very least a "reasonable likelihood" that this "could have"

affected the jury's judgment. *Id.*

## IV.    The Evidence of Guilt is Far from "Overwhelming" Given What We Know Now.

When evaluated in light of the totality of the evidence that has accrued since the trial, the

Government's case against Mr. Lee can hardly be described as "overwhelming." Indeed, this

Court cannot discount previously presented defense evidence on the grounds that "the jury

already rejected it"; rather, this Court must consider whether the cumulative record, viewed as a

whole, casts the trial evidence in a new light. *Kyles*, 514 U.S. at 434-37. The Government never

engages in such an analysis. Instead, it presents a carefully curated factual narrative, ignoring

evidence damaging to its argument and eliding incongruent details to bolster its case. It also re-

writes its trial presentation, downplaying what was once deemed crucial evidence of guilt.[41] With

---

[41] The Government claims the probative value of the hair found in the raid cap "was limited to begin with because the expert testified that the similarity she observed could not lead to a positive identification of Lee as the source of the hair." GR 65 n.7. That is a far cry from the argument it made at trial. In closing, it told the jury the opposite: that experts "have to say similar" instead of "match" because of the remote possibility that "there might be out there somewhere another hair that could match," but that "here, I submit to you, the evidence establishes that was Danny Lee's hair." Tr. 7000-01.

the caveat that Mr. Lee need not conclusively refute every piece of trial evidence,[42] he now turns

to the Government's selective presentation of the record (GR 58-71):[43]

1.  **The Date of the Murders (GR 58-59):** What the Government calls "overwhelming

evidence" for the January 11 date does not account for the numerous sightings of the Muellers

days and weeks later at various locations. Dkt. 1363 at 33-34. As the Government's case has

gotten weaker over time, it lends further credence to the notion that these witnesses were correct

and that Gloria and Cheyne Kehoe's account of the murders—which hinges on this inflexible

timeline—is not reliable.

2.  **The Timeline (GR 59-62):** The testimony of Vada Campbell – whom the Government

not long ago referred to as having "the clearest memory of seeing Lee after January 11[44] – was

uncontested. The prosecution did not cross-examine her. Looking at the testimony of Ms.

Campbell and of Sean Haines together, if Mr. Lee and Mr. Haines were both at the apartment

when Ms. Campbell arrived on January 13, then the date on which Mr. Haines first saw Mr.

Lee's belongings back in the apartment—but not Mr. Lee himself—had to have been January 12

at the latest. It would have been impossible for Mr. Lee to commit the murders in Tilly the night

of January 11 and be back in Spokane the next day.

Nothing in the record supports the Government's sudden characterization of Mr. Haines's

testimony as "equivocal and uncertain." GR 62. He unambiguously testified that he did not see

Mr. Lee on the same day he had arrived at their apartment; he saw Mr. Lee's belongings first,

---

[42] *Kyles* is instructive. Relief was granted despite the fact that much of the inculpatory trial evidence—including other eyewitnesses and "very damning" physical evidence—was unaffected by the undisclosed *Brady* material. *Kyles*, at 464-75 (Scalia, J., dissenting).

[43] Mr. Lee's response to claims about the strength of Gloria's and Cheyne's testimony (GR 63-66, 69-70) is made above, as well as in his opening pleading, and is not repeated here.

[44] The Government conceded as much about Ms. Campbell because the date Mr. Lee was in Spokane "corresponded to the birth of her grandchild." Dkt. 1307 at 38.

then Mr. Lee himself the next day. Mr. Haines even gave a prior consistent statement on this very point over two years before he testified. Dkt. 1363 at 32. Nor has there been any question prior to this as to whether Ms. Campbell's uncontested testimony could have been "correct." GR 63, 65. The Government cannot prevail here by recharacterizing witness testimony in a manner wholly unsupported by the trial record.

As to the cross-country drive, the issue is not whether it is technically possible in 46 hours, but that it relies on implausible assumptions—non-stop travel under ideal conditions (clear roads and weather, never refueling or resting, two capable drivers) that we know did not exist. *Id*. at 30-32. The Government now tries to invoke "Google Maps" in an effort to shorten the driving time, GR 61 n.6, but those estimates are based on routes as they exist today, not January 1996. The trial evidence, provided by a Government witness based on contemporaneous maps of extant routes, controls.

3.  **Cash and Property Belonging to the Muellers (GR 62-63)**: The Government overstates the evidence about Mr. Lee having a customized Mueller shotgun. The customizations were not, in fact, unique; and the Government's own witness testified that the shotgun he saw Mr. Lee with was different. Tr. 2562; 2850. The evidence that Mr. Lee had $1500 was based solely on Sean Haines's uncorroborated testimony. Notably, he was not even consistent on this point; he'd previously told authorities he'd seen about half that amount. Tr. 2851-52. Finally, none of this evidence implicated Mr. Lee in the murders. Indeed, several of the Government's witnesses, including Mr. Haines, were also in possession of the Muellers' firearms.

4.  **Statements to the Wankers (GR 66-68):** Mr. Wanker's declaration is not cumulative to his trial testimony. GR 67. Although he testified he did not timely report Mr. Lee's comments to police because he thought Mr. Lee was "talking to hear himself talk," Tr. 4088, the clear

34

implication was that he had since come to think differently. (He has not.) This was the reasonable inference to draw given that he had flown halfway across the country to testify for the prosecution in a capital murder trial. Indeed, as trial counsel Jack Lassiter has declared, he did not dare ask Mr. Wanker if he still believed at the time of the trial that it was "just talk" because the witness had not been made available to him prior to his testimony, and no seasoned trial lawyer would risk asking a question like that for the first time in front of a jury. Dkt. 1297 at 33 n.22. Moreover, the jury heard none of the evidence concerning the Government's questionable practice of omitting Mr. Wanker's warnings from its official reports, or its manipulation of his written grand jury testimony to remove facts inconsistent with its theory of the case. Dkt. 1363 at 24 n.28, 54-55.

As for Dalvine Wanker, the Government now portrays her as a crucial witness, yet at trial it conceded her testimony was not "detailed." Tr. 7003. Moreover, her testimony—that Mr. Lee brandished a firearm and implied he had previously shot someone—did not even match the facts of the Mueller murders. Dkt. 1363 at 10 n.12.

5. **Evidence that Mr. Lee panicked after Mr. Haines's arrest (GR 68):** First, this story is based solely on Gloria Kehoe's uncorroborated testimony; no other witness said it happened. Second, the notion that Mr. Lee panicked in response to news of Mr. Haines's arrest is belied by his own behavior. Unlike the Kehoe brothers—who went on the run, used aliases, and even engaged in a shootout with police to avoid being identified—Mr. Lee moved back to Oklahoma to live with his mother, and never hid from authorities or lied about his identity.[45] Furthermore, Mr. Haines himself testified that when he called Mr. Lee after his arrest, Mr. Lee's reaction was

---

[45] Mrs. Kehoe's testimony is equivocal and suggests Mr. Lee might have already made plans to travel back to Oklahoma *before* receiving Mr. Haines's call about being arrested. Tr. 4980.

to advise him to cooperate with authorities. Tr. 2846, 2850-51, 2854. Those are not the actions of a person in a panic or demonstrating consciousness of guilt.

6. **Evidence in Kehoe's possession at the time of his arrest (GR 70-71):** Mr. Lee already addressed the fingerprint evidence in his initial motion. Dkt. 1363 at n.13. None of the other evidence in Mr. Kehoe's possession implicates Mr. Lee in the murders. The Government's argument amounts to little more than guilt by association.

## CONCLUSION

The Government has consistently benefited from its ability to exploit the asymmetry between the parties and control the flow of information about its own misconduct. Its willingness to play "hide and seek" with crucial facts in his case precluded Mr. Lee from fully and fairly litigating his § 2255 claims. He respectfully requests that this Court reopen the § 2255 judgment to allow further proceedings to resolve his claims on a properly developed record, free from the Government's obfuscation and misrepresentations.

Respectfully submitted this 1st day of May, 2020.

MORRIS H. MOON
Bar Number 24032750 (TX)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (713) 880-3556
Email: Morris_Moon@fd.org

GEORGE G. KOUROS
Bar Number 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

36

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on May 1, 2020. This motion was served via this court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

MICHAEL GORDON
Chief, Criminal Division
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203-1229
(501) 340-2600
michael.gordon@usdoj.gov

GEORGE G. KOUROS
Bar # 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

37