IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 4:97-CR-00243-KGB |
| | ) | (Capital Case) |
| | ) | |
| DANIEL LEWIS LEE. | ) | |

––––––––––––

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO ORDER COMPARISON OF DNA

––––––––––––

CODY HILAND
United States Attorney
Eastern District of Arkansas

JONATHAN D. ROSS
Assistant United States Attorney
Eastern District of Arkansas

BRIAN A. BENCZKOWSKI
Assistant Attorney General

JOHN M. PELLETTIERI
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1258
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

RELEVANT BACKGROUND ........................................................................... 2

    I.     Lee's Murder Convictions ................................................................ 3

    II.    Collateral Review and mtDNA Analysis of the Hair ......................... 8

    III.   The Present Motion ......................................................................... 10

ARGUMENT ...................................................................................................... 12

    I.     Lee Is Not Entitled to DNA Testing and Comparison Under 18
         U.S.C. § 3600(e)(1)(B) ...................................................................... 13

        A.    18 U.S.C. § 3600(e)(1)(B) Is Inapplicable Here ...................... 13

        B.    Even Construing Lee's Motion as a Request for Testing
             Under 18 U.S.C. § 3600(a), Lee Fails to Satisfy the
             Statute's Requirements ........................................................... 16

            1.    Lee's Motion Is Untimely ............................................... 17

            2.    The Requested DNA Comparison, Regardless of
                 the Results, Would Not Undermine the
                 Overwhelming Evidence of Lee's Guilt.......................... 18

            3.    Any CODIS-Related Biological Sample Would Not
                 Qualify as Evidence that Was Secured in Relation
                 to the Investigation or Prosecution of Lee's
                 Offenses in this Case ..................................................... 26

    II.    Lee Demonstrates No Constitutional Entitlement to the
         Requested DNA Testing or Comparison ......................................... 27

    III.   The All Writs Act Does Not Provide a Basis to Order the DNA
         Testing or Comparison Lee Requests .............................................. 28

IV.    The Government Is Statutorily Prohibited from Using or
       Disclosing CODIS-Related Samples for the Purposes Lee
       Suggests.......................................................................................... 29

CONCLUSION........................................................................................ 33

CERTIFICATE OF SERVICE................................................................ 34

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

UNITED STATES OF AMERICA,  )
                            )
                            )
    v.                      )    Case No. 4:97-CR-00243-KGB
                            )         (Capital Case)
                            )
DANIEL LEWIS LEE.           )

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO ORDER COMPARISON OF DNA**

The government submits this response to defendant Daniel Lewis Lee's

motion requesting an order compelling DNA testing and comparison. Dkt.

1387. The motion should be denied for the reasons stated below.

**INTRODUCTION**

Defendant Daniel Lewis Lee was convicted and sentenced to death

more than 20 years ago for the murders of William and Nancy Mueller and

their eight-year-old daughter Sarah Powell. He received extensive review of

his conviction on direct appeal and on collateral review under 28 U.S.C.

§ 2255, and his convictions and sentence were repeatedly affirmed. This

motion is one among an array of recent legal filings in which Lee attempts to

avoid or delay his execution, which had been scheduled for December 9, 2019,

and is now scheduled for July 13, 2020.

1

In this motion, Lee seeks DNA comparisons with a hair that was admitted into evidence at his 1999 trial. The hair was tested in 2007 in connection with Lee's motion for collateral relief under 28 U.S.C. § 2255 and found not to belong to him. Lee now wants the mitochondrial DNA ("mtDNA") profile from that hair to be compared with the mtDNA profiles of four individuals. The government does not possess mtDNA profiles for those four individuals, and to the extent it may possess biological material from which mtDNA profiles for those individuals may possibly be extracted, Lee is not legally entitled to the DNA testing and comparison he requests. Among other things, the DNA testing and comparison Lee requests—no matter the results—would not at all undermine the overwhelming evidence of Lee's guilt. Moreover, all the information Lee relies upon for his current request was known to him as far back as 2007, yet Lee waited 13 years and only after his execution was scheduled for the second time to make the request. This Court should reject Lee's vexatious last-minute litigation and his meritless attempt to delay his execution.

## RELEVANT BACKGROUND

The government has explained at length many of the details of this case in numerous filings in this Court. *See, e.g.*, Dkt. 1367, at 3-21; Dkt. 1386, at 2-26. The government here focuses on background that is most relevant to Lee's request for DNA comparisons.

2

## I.     Lee's Murder Convictions

Lee and his codefendant Chevie Kehoe were convicted by a jury of conducting and conspiring to conduct a racketeering enterprise through a pattern of racketeering, in violation of 18 U.S.C. § 1962(c) and § 1962(d), and of committing three murders in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). The guilt phase of their trial lasted about two months and spans more than 7,000 pages of trial transcripts.

The voluminous evidence at trial established that in January 1996 Lee and Kehoe, in connection with efforts to establish an independent nation of white supremacists in the Pacific Northwest, travelled from Spokane, Washington, by way of Lee's mother's house in Yukon, Oklahoma, to the Arkansas home of William Mueller, expecting to find valuable property. *See, e.g.*, *United States v. Lee*, No. 97-CR-243, 2008 WL 4079315, at *3-*4 (E.D. Ark. Aug. 28, 2008) (denying Lee's 28 U.S.C. § 2255 motion). Mueller was a gun dealer who owned a large collection of weapons and ammunition, and Kehoe and his father (Kirby Kehoe) had burglarized Mueller's home about a year earlier. *Id.* at *3. Lee and Kehoe went to the Mueller home donning law enforcement "raid gear," pretending to be federal agents. *Id.* at *4.

When William Mueller arrived home with his wife Nancy Mueller and their eight-year-old daughter Sarah Powell, Lee and Kehoe overpowered and incapacitated the Muellers and then questioned Sarah Powell about the

location of cash, guns, and ammunition. *United States v. Lee*, 374 F.3d 637, 641-42 (8th Cir. 2004). After taking weapons worth about $30,000 and $50,000 in cash and coins, Lee and Kehoe shot the three victims with a stun gun, placed plastic trash bags over their heads, and sealed the bags with duct tape to asphyxiate them. *Lee*, 2008 WL 4079315, at *4 & n.52. Kehoe and Lee taped rocks to the bodies and threw them into the nearby Illinois Bayou. *Id.* at *4-*5. Lee and Kehoe then returned to Spokane newly flush with the cash and property they had stolen from the Muellers. *See, e.g.*, Tr. 2779-82, 2892-2901, 2916, 3710.

Arkansas law enforcement authorities initially had limited leads after the Muellers went missing and focused on local suspects, not culprits from the Pacific Northwest. For example, "[l]aw enforcement attention focused on Paul Humphrey" after Nancy Mueller's brother told local authorities on February 22, 1996, about a month after the Muellers went missing, that Humphrey possessed the title documents for a Jeep and trailer owned by William Mueller (which had been found abandoned in a nearby rural area) and that he (Nancy Mueller's brother) "had previously seen those documents, unsigned, in the Mueller residence on February 2." *United States v. Humphrey*, 140 F.3d 762, 763 (8th Cir. 1998). Humphrey, who lived in Russellville, Arkansas, admitted that he possessed the documents and promised to produce them but was evasive and repeatedly failed to turn them

4

over to law enforcement. *Id.* Humphrey and Mueller were friends and had devised a plan—based on an interpretation of the Seventh Amendment they had learned at a seminar—to take the titles to their respective vehicles "from the state out of its hands and back into our hands" by exchanging titles for "pieces of silver." Tr. 6143, 6154-62. Humphrey felt that turning over the documents to law enforcement would defeat that goal and make the government the vehicle's owner. Tr. 6167-69. According to Humphrey, Mueller's landlord had sent him the documents in the mail after the Muellers had gone missing. Tr. 6153, 6176.

After the bodies of the Muellers and Sarah Powell were found in the Illinois Bayou on June 28, 1996, Humphrey finally turned over the documents, *Humphrey*, 140 F.3d at 763, and investigators concluded that William Mueller's signature on the documents was possibly forged, Tr. 5880-81. Investigators obtained "a warrant for Humphrey's home and the surrounding buildings to search for blood, duct tape, plastic bags, carpet and clothing fibers, firearms and precious metals believed to have been taken from the abandoned Jeep and trailer, and other items related to the deaths of the Muellers and Sarah Powell." *Humphrey*, 140 F.3d at 763-64. The only evidence related to the Muellers found in the search was a product brochure about "Blue-Green Algae" that had Nancy Mueller's name and address on it. Tr. 5893.

5

In the meantime, Lee and Kehoe remained in Spokane, where they both individually confessed to Kehoe's mother (Gloria Kehoe) about murdering the Muellers. *Lee*, 2008 WL 4079315, at *4. Lee also told an acquaintance in Spokane (James Wanker) that he had taken a trip "down south" and that some people "had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp." Tr. 4082-83; *see also id.* at 4093 (similar statements to Wanker's wife). After learning that a friend was arrested in December 1996 in possession of one of Mueller's guns and was questioned by an ATF agent about whether he had purchased the gun from Kehoe, Lee and Kehoe panicked; they split up and fled Spokane. Tr. 2794, 2799, 4980.

Kehoe traveled around the country with his brother (Cheyne Kehoe) selling Mueller's firearms and later confessed to his brother that he and Lee had murdered the Muellers. *Lee*, 2008 WL 4079315, at *5-*6. Kehoe and his brother got into a shootout with police in Ohio in February 1997 and abandoned their car, which was found to contain "federal officer raid jackets, FBI caps, bullet proof vests, guns, various gun parts, ammunition, holsters, handcuffs, and duct tape." *Id.* at *6. Cheyne Kehoe later became fearful of Chevie Kehoe and turned himself in to federal authorities in June 1997, bringing with him Chevie Kehoe's GMC truck, which an FBI forensic chemist later examined, determining that paint on the truck was consistent with and

6

very similar to paint chips found on duct tape removed from the bodies of the Mueller family. *Id.* Investigators later apprehended Kehoe and found in his possession property belonging to William Mueller and a key that opened the handcuffs found on Mueller's dead body. Tr. 3218-19, 3265-67, 3275-3311, 3565; *see United States v. Kehoe*, 310 F.3d 579, 585 (8th Cir. 2002).

Gloria Kehoe also later began cooperating with federal investigators (in March 1998), revealing Kehoe's and Lee's confessions. *Lee*, 2008 WL 4079315, at \*7. She also provided information about storage units used by Chevie Kehoe in Montana and Idaho. In those units, investigators found, among other things, property stolen from the Muellers, including display cases that William Mueller had used at gun shows. Tr. 2479, 3378-3403, 3479, 3610-28, 3650. Lee's and Kehoe's fingerprints were recovered from one of the display cases from the Idaho storage unit. Tr. 3489-90, 3710.

At trial, Lee and Kehoe attempted to create reasonable doubt by, among other things, asserting that others—including, but not limited to, Humphrey, Kirby Kehoe, Cheyne Kehoe, and Faron Lovelace, another of Kehoe's white-supremacist acolytes—may have been responsible for the murders. *See, e.g.*, Tr. 6887, 6907-12 (closing arguments).[1] Lee and Kehoe

---

[1] At Kehoe's behest, Lovelace had kidnapped and robbed Malcolm and Jill Friedman in Washington State in June 1995, stealing approximately $15,000 from the couple. Kehoe kept $9,000 of the proceeds from the robbery,

highlighted the early investigation that focused on Humphrey. *See, e.g.*, Tr. 5877-97. The jury rejected these arguments and found Lee and Kehoe guilty beyond a reasonable doubt.

## II.    Collateral Review and mtDNA Analysis of the Hair

Chantelle Bequette, a criminalist at the Arkansas State Crime Laboratory, had testified at Lee's trial that she had retrieved a hair from the FBI raid cap that had been found in Kehoe's vehicle in Ohio in February 1997 and had concluded it was "microscopically similar" to a sample hair from Lee. Tr. 4720-23. She also testified that the hair was "microscopically dissimilar" to sample hairs from William Mueller, Nancy Mueller, Sarah Powell, Paul Humphrey, Chevie Kehoe, Cheyne Kehoe, and Karena Kehoe (Chevie Kehoe's wife). Tr. 4723. She testified that this analysis did not "necessarily point to a positive identification" of Lee as the source of the hair but "excluded" the other individuals. Tr. 4724.

In his motion collaterally attacking his conviction under 28 U.S.C. § 2255, Lee claimed that he received ineffective assistance of counsel because his lawyers failed to obtain DNA testing of the hair from the raid cap. Dkt. 1118, at 19-20. The government agreed to DNA testing of the hair, and

---

using the money to buy land in Idaho, and gave $2,000 to Lovelace and $4,000 to his father Kirby. *Lee*, 2008 WL 4079315, at *3.

8

mtDNA testing was completed in 2007. Dkt. 1138. The mtDNA testing excluded Lee as the source of the hair. Dkt. 1387-2, at 5.[2]

The Court (Hon. G. Thomas Eisele) rejected Lee's ineffective-assistance claim, concluding that regardless of whether Lee's trial counsel could be faulted for failing to obtain DNA testing of the hair, Lee could not show that he was prejudiced by the failure to obtain DNA testing. *Lee*, 2008 WL 4079315, at *25. "The evidence in this case overwhelmingly supported the jury's finding of guilt," Judge Eisele concluded, and "[t]he Court can not find that the outcome would have been different if [Lee's] counsel would have obtained mtDNA testing and disproved [Lee] as the source of the hair found in the raid cap." *Id.*

More broadly, Judge Eisele, in denying Lee's § 2255 motion, "outlined some of the evidence linking Kehoe and Lee to the Mueller murders in part to demonstrate the abundance of evidence supporting the guilt phase

---

[2] DNA identification is typically performed using nuclear DNA, which is inherited from both the mother and father and can be used to identify individuals with incomparable accuracy. Mitochondrial DNA (mtDNA) is inherited solely from the mother; it is helpful in significantly narrowing the field of potential contributors but is less useful for identifying a specific individual, and it is primarily used when biological materials have degraded to the point that nuclear DNA is unavailable. *See* CODIS Fact Sheet, at 2, *available at* https://ucr.fbi.gov/fingerprints_biometrics/biometric-center-of-excellence/files/btf_codis_0808_one-pager.pdf (last visited June 26, 2020). Nuclear DNA testing of the hair from the raid cap was not possible, and therefore mtDNA testing was performed. *See* Dkt. 1387-2, at 3.

9

convictions." *Lee*, 2008 WL 4079315, at \*7. Judge Eisele, who presided over Lee's trial, emphasized that "[t]hose bare facts alone can not convey the demeanor of the witnesses who testified, the scope and detail of the Government's evidence, or the general overall tenor of the case against Kehoe and Lee." *Id.* Judge Eisele acknowledged that "the bulk of the evidence at trial related to Kehoe" but explained that "the jury's conclusion that Lee was with Kehoe when the Muellers were murdered and that he participated in the murders was well-founded." *Id.*; *see also id.* at \*25 ("The evidence in this case overwhelmingly supported the jury's finding of guilt."); *id.* at \*53 ("[I]t is clear that [Lee] has failed to demonstrate actual innocence."). Judge Eisele reached those conclusions knowing that DNA analysis had excluded Lee as the source of the hair in the raid cap.

## III.   The Present Motion

At the time Lee sought and obtained DNA analysis of the hair in the raid cap in 2007, he did not request any further DNA analysis or comparison with DNA from other individuals. Indeed, Lee made no such request in the intervening 13 years, despite multiple and repeated filings challenging his convictions and sentence. *See* Dkt. 1386, at 2-6 (outlining the procedural history of this case). Lee did not even raise this request after the government, in June 2019, scheduled Lee's execution to take place on December 9, 2019. Nor did Lee raise this request in January 2020, when he filed a motion

focusing on evidence that, according to Lee, suggested that Paul Humphrey may have been responsible for murdering the Mueller family. *See* Dkt. 1363, at 43-61. Instead, Lee requested additional DNA comparison with the mtDNA profile from the hair for the first time in the present motion on June 19, 2020, four days after the government, for the second time, scheduled a date for Lee's execution, this time on July 13, 2020.

Lee's motion requests that the government compare or allow an outside lab to compare the mtDNA profile for the hair found in the raid cap with mtDNA profiles for Paul Humphrey, Cheyne Kehoe, Kirby Kehoe, and Faron Lovelace, to the extent such profiles exist or can be obtained. Dkt. 1387, at 11. Lee acknowledges that this comparison cannot be conducted through the National DNA Index System (NDIS), which is a part of the Combined DNA Index System (CODIS), because "that database currently only allows for searches of nuclear DNA profiles in criminal cases, not mtDNA profiles." *Id.* at 10 (emphasis omitted). Lee instead requests that the government determine whether it possesses mtDNA profiles for the listed individuals, and then, if it does, run a comparison with the mtDNA profile for the hair from the raid cap. *Id.* at 11. Alternatively, Lee requests that the government turn over "previously-collected biological samples" from those individuals to a private lab to extract mtDNA profiles from such biological materials for comparison against the mtDNA profile from the hair. *Id.* Lee asserts that he

11

is entitled to an order from this Court compelling the government to take either of these courses of action under 18 U.S.C. § 3600(e)(1)(B), the Fifth and Sixth Amendments to the Constitution, or the All Writs Act (28 U.S.C. § 1651). *Id.* at 1.

## ARGUMENT

The government does not possess mtDNA profiles for Paul Humphrey, Cheyne Kehoe, Kirby Kehoe, or Faron Lovelace. The government therefore cannot merely run a comparison with the mtDNA profile for the hair from the raid cap, as Lee requests. That leaves Lee's request that the government turn over "previously-collected biological samples" from those individuals to a private lab to extract mtDNA profiles. The government has determined that it possesses hair samples from Paul Humphrey and Cheyne Kehoe, which it collected during the investigation of the present case. The government may also have collected blood or saliva from Paul Humphrey, Cheyne Kehoe, Kirby Kehoe, or Faron Lovelace because it appears that those individuals have each been in federal custody, and therefore the government may have collected blood or saliva to conduct nuclear DNA analysis and placed their profiles in CODIS. *See infra* p. 30 (describing CODIS).[3] However, Lee is not

---

[3] In light of the statutory limitations on disclosure of information from CODIS, *see* 34 U.S.C. §§ 12592(b)(3), 12593(b), the FBI does not conduct searches of the database to confirm the existence of individual samples or

12

legally entitled to DNA testing of either the hair samples or any CODIS-related biological samples (*i.e.*, blood or saliva). The authorities that Lee invokes—18 U.S.C. § 3600(e)(1)(B), the Constitution, and the All Writs Act—do not entitle Lee to such testing, either testing of the hair samples or of any CODIS-related biological samples. Furthermore, specifically with respect to any CODIS-related biological samples the government may have collected, the government is statutorily prohibited from fulfilling Lee's request. The Court should deny Lee's motion.

## I.     Lee Is Not Entitled to DNA Testing and Comparison Under 18 U.S.C. § 3600(e)(1)(B)

According to Lee, his request for a court order in this case "is being made pursuant to . . . 18 U.S.C. § 3600(e)(1)(B)." Dkt. 1387, at 1. That statutory provision does not, by its terms, apply here, however, and Lee's reliance on that provision is therefore misplaced. Moreover, even if Lee's motion were instead construed as a request for testing pursuant to 18 U.S.C. § 3600(a), Lee would not be entitled to such testing.

### A.     18 U.S.C. § 3600(e)(1)(B) Is Inapplicable Here

The requirements of 18 U.S.C. § 3600(e) for reporting the results of DNA testing apply only if a defendant first has obtained DNA testing under

profiles unless such information would be disclosable pursuant to a statutory exception. As discussed below, *infra* pp. 31-33, no such exception applies in this case.

18 U.S.C. § 3600(a). And even then, the requirements of subsection (e)(1)(B) apply to some but not all testing results obtained under subsection (a). None of these preconditions for application of subsection (e)(1)(B) is present here.

Under 18 U.S.C. § 3600(a), "[u]pon a written motion by an individual sentenced to imprisonment or death pursuant to a conviction for a Federal offense," the court "that entered the judgment of conviction shall order DNA testing of specific evidence if the court finds that all of" the requirements in a long list are satisfied. Among other things, the application must "assert[], under penalty of perjury, that the applicant is actually innocent" of, as relevant here, the "Federal offense for which the applicant is sentenced to imprisonment or death." 18 U.S.C. § 3600(a)(1)(A). The court must find that "[t]he specific evidence to be tested was secured in relation to the investigation or prosecution" of that offense. 18 U.S.C. § 3600(a)(2). If the evidence was not previously subjected to DNA testing, the court must find that "the applicant did not knowingly fail to request DNA testing of that evidence in a prior motion for postconviction DNA testing." 18 U.S.C. § 3600(a)(3)(A). The applicant must identify a "theory of defense" that would establish his "actual innocence," 18 U.S.C. § 3600(a)(6)(B), and the court must find that the proposed DNA testing "may produce new material evidence that would" support that theory of defense and "raise a reasonable probability that the applicant did not commit the offense," 18 U.S.C.

14

§ 3600(a)(8). The court must also find that "[t]he motion is made in a timely fashion." 18 U.S.C. § 3600(a)(10).

If these (and other) requirements are satisfied and the defendant has successfully obtained testing under subsection (a), and if the test results exclude the defendant as the source of the tested evidence, the requirements of subsection (e)(1)(B) then apply. That provision provides, in relevant part, as follows:

> If a DNA profile is obtained through testing that excludes the applicant as the source *and the DNA complies with the Federal Bureau of Investigation's requirements for the uploading of crime scene profiles to the National DNA Index System (referred to in this subsection as "NDIS")*, the court shall order that the law enforcement entity with direct or conveyed statutory jurisdiction that has access to the NDIS submit the DNA profile obtained from probative biological material from crime scene evidence to determine whether the DNA profile matches a profile of a known individual or a profile from an unsolved crime.

18 U.S.C. § 3600(e)(1)(B)(i) (emphasis added).

Lee has not obtained testing pursuant to subsection (a) and therefore the requirements of subsection (e)(1)(B) do not apply here. But subsection (e)(1)(B) would also be inapplicable even assuming that Lee obtained testing of the hair from the raid cap pursuant to subsection (a). That is because the mtDNA profile obtained from that hair does not "compl[y] with the Federal Bureau of Investigation's requirements for the uploading of crime scene profiles to the National DNA Index System." 18 U.S.C. § 3600(e)(1)(B)(i). As

15

Lee acknowledges, the NDIS "only allows for searches of nuclear DNA profiles in criminal cases, not mtDNA profiles." Dkt. 1387, at 10 (emphasis omitted). Because 18 U.S.C. § 3600(e)(1)(B) applies only in circumstances that are not present here, Lee's reliance on that provision is unavailing.

**B.    Even Construing Lee's Motion as a Request for Testing Under 18 U.S.C. § 3600(a), Lee Fails to Satisfy the Statute's Requirements**

Lee does not purport to seek testing pursuant to 18 U.S.C. § 3600(a), and he accordingly does not even attempt to satisfy the numerous requirements of that subsection. He does not, for example, "assert[], under penalty of perjury, that" he is "actually innocent" of murdering the Mueller family. 18 U.S.C. § 3600(a)(1)(A).[4]

But even if Lee's motion were construed as a request for a court order pursuant to § 3600(a), Lee would not be entitled to a court order under that subsection. Among other things, Lee's motion was not "made in a timely fashion," 18 U.S.C. § 3600(a)(10), and the DNA testing and comparison that Lee proposes would not "raise a reasonable probability that [Lee] did not commit the offense," 18 U.S.C. § 3600(a)(8). Moreover, specifically with respect to any biological samples that the government may have collected for

---

[4] Not only does Lee fail to assert his actual innocence under penalty of perjury, as required to obtain testing under 18 U.S.C. § 3600(a), he also never expressly makes a claim of actual innocence anywhere in his motion.

purposes of placing DNA profiles in CODIS, those samples would not qualify as "evidence" that was "secured in relation to the investigation or prosecution" of Lee's offenses in this case. 18 U.S.C. § 3600(a)(2).

### 1.    Lee's Motion Is Untimely

If Lee's motion were construed as a request for a court order pursuant to § 3600(a), a "rebuttable presumption against timeliness" would apply, 18 U.S.C. § 3600(a)(10)(B), because Lee did not file the motion "within 60 months of enactment of the Justice For All Act of 2004 or within 36 months of conviction," 18 U.S.C. § 3600(a)(10)(A). Lee is not "incompetent," 18 U.S.C. § 3600(a)(10)(B)(i); he does not seek testing of "newly discovered DNA evidence," 18 U.S.C. § 3600(a)(10)(B)(ii); and, even if his challenges to his conviction could be interpreted as an assertion of innocence rather than merely an attack on the government's proof, he relies "solely upon [his] own assertion of innocence," 18 U.S.C. § 3600(a)(10)(B)(iii). As a result, the only potential method available to Lee to rebut the presumption against timeliness is for "good cause shown," 18 U.S.C. § 3600(a)(10)(B)(iv), but Lee cannot make that showing.

Lee does not—and cannot—show that he possessed a good reason for waiting to file the present motion until June 19, 2020, after his execution was scheduled for a second time. Lee could have sought the same relief he requests here as early as 2007, when he received the results of the mtDNA

17

testing of the hair in the raid cap, and Lee provides no explanation for failing

to file his motion within the ensuing thirteen years. Although Lee contends

that his request is "consistent with the recent amendments" to 18 U.S.C.

§ 3600, Dkt. 1387, at 16, he acknowledges (Dkt. 1387, at 7) that those

amendments went into effect approximately four years ago, in 2016. Lee does

not explain why he did not file his motion in the interim, nor does he explain

the specific reason that the 2016 amendments in any way altered the scope of

relief that was available to him back in 2007, when he obtained the results of

the mtDNA testing of the hair in the raid cap. Moreover, Lee also filed a

motion on January 29, 2020, seeking relief from judgment based on claims

related to evidence that allegedly suggests Humphrey—not Lee—murdered

the Mueller family. Dkt. 1363, at 43-61. That motion is also untimely, *see*

Dkt. 1367, at 49, but nonetheless, Lee fails to explain why he could not have

also filed the present motion, based on similar allegations, at the same time

five months ago, rather than after the government rescheduled his execution.

Lee's present motion, if considered under 18 U.S.C. § 3600(a), is plainly

untimely.

> **2.    The Requested DNA Comparison, Regardless of the
> Results, Would Not Undermine the Overwhelming
> Evidence of Lee's Guilt**

Not only is Lee's motion untimely under 18 U.S.C. § 3600(a), but the

DNA testing and comparison Lee proposes also would not "raise a reasonable

probability that [Lee] did not commit the offense," 18 U.S.C. § 3600(a)(8). Identifying the person whose hair was found in the raid cap would not undermine the overwhelming evidence of Lee's guilt. In other words, regardless of the person to whom the hair belonged, the evidence clearly establishes that Lee committed the Mueller murders with Kehoe. As Judge Eisele concluded, the outcome of the trial would have been no different had the jury learned that mtDNA analysis excluded Lee as the source of the hair. *Lee*, 2008 WL 4079315, at *25. Judge Eisele's conclusion remains correct.

Lee appears to concede that the evidence establishes Chevie Kehoe's culpability for the murders of William and Nancy Mueller and Sarah Powell. After all, Lee claims that the person whose hair was in the raid cap would be connected to the murders, and of course the raid cap (and other raid gear) was found in Kehoe's possession. Perhaps for these reasons, Lee does not seek a comparison of Kehoe's mtDNA with the mtDNA profile of the hair.

Lee's (implicit) concession that Kehoe murdered the Mueller family is compelled by the evidence. The evidence inculpating Kehoe included but was not limited to evidence that Kehoe left Spokane for two or three weeks in January 1996 and traveled to the South and then returned with voluminous property belonging to the Muellers. Kehoe confessed to his mother (Gloria Kehoe) and his brother (Cheyne Kehoe). He was found in possession of raid gear, consistent with his description of the murders to his mother and

19

brother. When apprehended by law enforcement authorities, he possessed a handcuff key that opened the handcuffs found on William Mueller's body. And forensic examination linked the paint on his GMC truck to paint chips found on duct tape removed from the bodies of the Mueller family.

The evidence not only establishes Kehoe's culpability, but it also overwhelmingly establishes that Lee too is culpable because he was with Kehoe and participated in the murders. Lee's roommate in Spokane testified that Kehoe and Lee went on a trip together for two or three weeks in January 1996, claiming they were going to Idaho to build a barn. Tr. 2778-79. Kehoe and Lee instead traveled south, as confirmed by testimony from Lee's own mother, Debra Graham, who testified that Kehoe and Lee visited her in Yukon, Oklahoma, Tr. 2617-20, which is about a 320-mile drive from Tilly, Arkansas, where the Muellers lived. Lee's mother also testified that Kehoe and Lee left her house at around 6 p.m. on January 10, 1996, Tr. 2618-19, 2633, the day before the Muellers went missing, *see* Dkt. 1367, at 58-59 (cataloguing some of the evidence establishing that the Muellers went missing on January 11, 1996). Lee's mother testified that when Lee and Kehoe left her house in Oklahoma on January 10, 1996, they were "short on cash," and she even had to lend them about $40 despite her "very limited income." Tr. 2619-20. But the evidence established that when Kehoe and Lee returned to Spokane two or three days after the Muellers went missing, they

20

were flush with cash and possessed property stolen from the Muellers. *See, e.g.*, Tr. 2779-82, 2892-96, 2900-01, 2916, 3710.

Lee's roommate specifically testified that when Lee returned to Spokane, he possessed about $1,500 in cash, as well as a unique firearm. Tr. 2779-80. Lee's roommate testified about specific modifications that had been made to the firearm. Tr. 2780. Another witness testified that he had modified a firearm for Mueller according to Mueller's personal specifications, and the witness had put together a reproduction of the modified firearm for use at trial. Tr. 2559-61. The modified firearm matched the description by Lee's roommate, and when shown the reproduced firearm, Lee's roommate testified that it matched the firearm that he saw in Lee's possessions upon Lee's return to Spokane in January 1996. Tr. 2780-81. Consistent with the roommate's testimony, Chevie Kehoe's mother, Gloria Kehoe, testified that Lee confessed to her that he participated in the murders with Kehoe and that Kehoe had given him $1,000 and a rifle for his participation. Tr. 4975.

A witness who lived near Lee in Spokane, James Wanker, testified that Lee said that he had taken a trip "down south" and that some people "had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp." Tr. 4082-83. Lee made a similar statement to Wanker's wife, telling her that "he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093. Lee' statements

21

corresponded to the location where the murders took place (the South) and contained information that only the perpetrators presumably would have known, for example that the bodies had been "wrapped" up and "taped" and thrown in a "swamp." *See Lee*, 2009 WL 4079315, at \*5 (describing the discovery of the bodies in the Illinois Bayou).

In addition to these inculpatory statements, as well as Lee's confession to Gloria Kehoe, Chevie Kehoe also confessed twice—to Gloria Kehoe and Cheyne Kehoe—and both times confirmed Lee's participation in the murders. *Lee*, 2008 WL 4079315, at \*4-\*5. And when investigators recovered property belonging to the Muellers after Kehoe's apprehension, they found, among other things, a gun display case belonging to Mueller that contained both Lee's and Kehoe's fingerprints. Tr. 3489-90, 3710.[5]

In light of this evidence, even if DNA analysis determined that the hair in the raid cap belonged to one of the individuals listed in Lee's motion, that determination would not raise a reasonable probability that Lee did not

---

[5] Lee contends (Dkt. 1387, at 12 n.22) that because Kehoe apparently stored the display case (and other items) in a garage at the motel where he lived in Spokane before eventually moving it to the storage unit in Idaho, *see* Tr. 2856-57, 2915, and because Cheyne Kehoe and his wife testified that they came across Lee asleep in a garage at the motel where Chevie Kehoe and others worked on their "street rod[s]" (possibly the same garage, although it is not clear), *see* Tr. 4815, 5312, then it necessarily means Lee's fingerprints got on the display case in Spokane. The simpler and more likely explanation, however, is that Lee's fingerprints got on the display case when he helped Kehoe steal it from Mueller in Arkansas.

participate with Kehoe in the murders. Even assuming the hair in the cap belonged to another person who participated in the robberies, the evidence still compels the conclusion that Lee was also present and does not diminish Lee's culpability. In addition, there are any number of reasons that hair from someone who did not participate in the murders may have gotten into the raid cap. After all, the cap was retrieved by law enforcement in February 1997, more than a year after the Muellers were murdered, and after Kehoe had traveled throughout the country with Cheyne Kehoe. Any number of individuals could have been near the hat or even put it on at some point, even though they did not participate in murdering the Muellers. The DNA comparison Lee seeks would not provide a basis to ignore the voluminous, compelling evidence establishing Lee's culpability for the murders.

Lee's assertions about the potential involvement of Paul Humphrey, Kirby Kehoe, Cheyne Kehoe, and Faron Lovelace are speculative and farfetched. Lee's story that Humphrey may have murdered the Muellers, for instance, falls apart upon the slightest scrutiny. As Judge Eisele noted, Lee's "trial counsel attempted, but failed, to establish a link between Humphrey and the death of the Muellers." *Lee*, 2008 WL 4079315, at *12. Lee fares no better more than 20 years later.

For example, Lee asserts (Dkt. 1387, at 5) that Humphrey was seen with the Muellers after their disappearance (on January 11, 1996). That

23

claim, however, relies solely on information from an individual named Mary Reid, and a review of her testimony demonstrates that the information from Reid should be afforded little weight.

Reid went to the local sheriff shortly after the Muellers' bodies were discovered in the Illinois Bayou (in June 1996) to report that months earlier she had seen William and Nancy Mueller outside her bank in Russellville in a car with at least three other men. Tr. 5854-59. The police showed Reid "a series of photographs of persons suspected in the" Mueller murders. Dkt. 1387-3, at 6-7. Reid initially could not identify any of the men but "asked God to guide [her] if there was any way that [she] could help to pick out anybody that was in the car" and then "the Lord did guide [her] in selecting some pictures." Tr. 5873. Reid identified Humphrey and two other men based on a feeling in her stomach, after praying. Tr. 5874; *see* Tr. 5882. Reid then drove by Humphrey's house. Tr. 5861; *see* Tr. 5884-85. She apparently knew Humphrey was a suspect because she "read the papers" and "knew some people that were involved" and "[it] was pretty common knowledge back then." Tr. 5861-62. She told the sheriff that the car she saw at Humphrey's house was the car she saw at the bank. Tr. 5869-70. The police then showed Reid video footage from the bank in January and February 1996 to try to identify the date on which she supposedly saw the Muellers. Tr. 5868-71. There was video of her at the bank for nearly every day during that period

24

because she visited the bank almost daily. Tr. 5870-71. Reid identified the date as January 18 because she recalled the weather was cold and rainy and she saw herself wearing a coat. Tr. 5871, 5900. According to Reid, she "more or less was able to pick out the type of day that it was and what I had on," Tr. 5870, but she wore the same coat frequently, Tr. 5875.

In short, Reid's identification of Humphrey was a product of prayer, not memory. She identified Humphrey's car after apparently knowing he was a suspect, but the tires on the car "were low" and it appeared to investigators that the car "had been sitting there for a while" and "hadn't been moved," and according to Humphrey, the car had not been driven for over a year. Tr. 5899. She visited the bank nearly every day and "more or less" identified the January 18 date on which she ostensibly saw the Muellers based on a coat she wore frequently, but bank records showed that the last banking activity by the Muellers took place on January 4, 1996. Tr. 5887, 5900. This is far from compelling evidence that the Muellers were sighted after they went missing on January 11, 1996, let alone substantial evidence inculpating Humphrey. It certainly does not come close to undermining the evidence of Lee's involvement in the murders. Lee's additional assertions aimed at

25

raising questions about potential involvement by Humphrey and other individuals suffer from similar deficiencies.[6]

### 3. Any CODIS-Related Biological Sample Would Not Qualify as Evidence that Was Secured in Relation to the Investigation or Prosecution of Lee's Offenses in this Case

As noted, in addition to the hair samples from Humphrey and Cheyne Kehoe that the government collected during the investigation of this case, the government may also possess blood or saliva samples from Paul Humphrey, Cheyne Kehoe, Kirby Kehoe, and Faron Lovelace. It appears they have all been in federal custody, and therefore it is possible the government collected blood or saliva from them to create DNA profiles to place in CODIS. Under 18 U.S.C. § 3600(a)(2), however, a court may order DNA testing only if it finds that "[t]he specific evidence to be tested was secured in relation to the investigation or prosecution of the" offense for which the applicant was sentenced to imprisonment or death. Any CODIS-related biological sample was not secured in relation to the investigation or prosecution of Lee's offenses in this case. Thus, for this additional reason, 18 U.S.C. § 3600(a)

---

[6] Lee's reliance (Dkt. 1387, at 4) on results from a polygraph administered to Humphrey by an Arkansas officer is unavailing. In light of the overwhelming evidence establishing Lee's guilt, a one-off polygraph exam with four questions does not provide a reasonable basis to question Lee's culpability or conclude that Humphrey committed the murders. Nothing close to the type and amount of evidence establishing Lee's involvement linked Humphrey to the murders.

26

does not permit Lee to obtain DNA testing of any CODIS-related biological material.

## II.    Lee Demonstrates No Constitutional Entitlement to the Requested DNA Testing or Comparison

In *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009), the Supreme Court held that the defendant did not possess "a right under the Due Process Clause to obtain postconviction access to the State's evidence for DNA testing." *Id.* at 61-62. The Court determined that the legislature has primary responsibility for determining "how to harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice." *Id.* at 62. The Court concluded that Alaska's statutory procedures for postconviction access to DNA evidence, which the Court described as "similar to" those provided by 18 U.S.C. § 3600(a), comported with due process. *Id.* at 70. And the Court declined to recognize an additional "freestanding" substantive due process right "to access DNA evidence for testing." *Id.* at 73-74.

*Osborne* establishes that Lee's due process rights are adequately protected by the procedures in 18 U.S.C. § 3600(a). To be sure, Lee is not, as described above, entitled to any relief under 18 U.S.C. § 3600(a). Nonetheless, Lee does not possess a constitutional right to access DNA evidence for testing that extends beyond the procedures established in 18 U.S.C. § 3600(a). In

27

short, Lee does not possess a constitutional right to the DNA testing and comparison he requests in his motion.

### III.    The All Writs Act Does Not Provide a Basis to Order the DNA Testing or Comparison Lee Requests

Lee also suggests that this Court may issue a writ of mandamus, which "is the traditional writ designed to compel government officers to perform nondiscretionary duties." *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1234 (10th Cir. 2005). In order for a district court to issue a writ of mandamus, "[t]he legal duty must be clear and indisputable." *Oil, Chem. & Atomic Workers Union v. Occupational Safety & Health Admin.*, 145 F.3d 120, 124 (3d Cir. 1998) (internal quotation marks omitted). Mandamus is inappropriate when "the action petitioner seeks to compel is discretionary" and "petitioner has no clear right to relief." *Carson v. U.S. Office of Special Counsel*, 534 F. Supp. 2d 103, 105 (D.D.C. 2008). "The remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances," and "[t]he party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." *Id.* (internal quotation marks omitted).[7]

---

[7] The cases Lee cites (Dkt. 1387, at 7 n.10) are inapposite because they involve court orders requiring discovery in litigation and do not support the improper issuance of a writ of mandamus compelling action by a coequal branch of government despite the absence of a clear nondiscretionary duty to act.

28

Lee has not satisfied his burden of establishing that the extraordinary remedy of mandamus is appropriate here. Lee does not establish that the government has a clear and indisputable duty to conduct the DNA testing and comparison Lee seeks. And Lee's request for a writ of mandamus is even more far afield to the extent, as discussed below, statutory provisions prohibit some of the DNA analysis Lee seeks. Mandamus is not appropriate here.

## IV.  The Government Is Statutorily Prohibited from Using or Disclosing CODIS-Related Samples for the Purposes Lee Suggests

Lee asserts (Dkt. 1387, at 9-10 & n.18) that the government may be able to generate mtDNA profiles of Cheyne Kehoe and Kirby Kehoe using biological samples that were collected from those individuals following their arrests or convictions on separate criminal charges. As the government has noted above, Cheyne Kehoe and Kirby Kehoe—as well as Paul Humphrey and Faron Lovelace—have been in federal custody in the past, and therefore the government may have collected biological samples from those individuals for the purpose of conducting nuclear DNA analysis and generating DNA identification profiles in CODIS. As the government has already explained, Lee is not entitled to testing of such samples under 18 U.S.C. § 3600(a) and (e), the Constitution, or the All Writs Act. *See supra* pp. 13-29. But even apart from the lack of legal authority to require such testing, CODIS-related

29

samples of the sort mentioned by Lee cannot be used for the purpose Lee suggests.[8]

The biological material to which Lee refers (Dkt. 1387, at 10 n.18) consists of reference samples of blood or saliva obtained pursuant to a federal law (commonly called the DNA Act) authorizing the collection of DNA from federal arrestees, convicted offenders, and prisoners for the limited purpose of generating a DNA identification profile for inclusion in CODIS. *See, e.g.,* 34 U.S.C. §§ 12592(a), 40702(a)-(b). Those reference samples are retained for the purpose of ensuring that entries in the CODIS database are accurate. *See DNA-Sample Collection and Biological Evidence Preservation in the Federal Jurisdiction,* 73 Fed. Reg. 74,932-01, 74,938 (Dec. 10, 2008).

Federal law flatly prohibits the government from using CODIS reference samples obtained from arrestees, convicted offenders, or prisoners to extract additional DNA information not included in CODIS, including mtDNA.[9] Biological samples obtained from such individuals pursuant to the

---

[8] To be clear, the argument in this section only applies to CODIS-related samples. It does not apply to the hair samples collected from Paul Humphrey and Cheyne Kehoe, which were collected during the investigation of the present case.

[9] Mitochondrial DNA may be extracted from biological samples voluntarily submitted by relatives of missing persons or from unidentified human remains to assist in the identification of missing persons. *See CODIS and NDIS Fact Sheet*, no. 23, *available at* https://www.fbi.gov/services/laboratory/biometric-analysis/codis/codis-and-ndis-fact-sheet (last visited

DNA Act are used to extract and analyze a specific set of "non-protein coding junk regions of DNA" from which a CODIS identification profile is generated. *Maryland v. King*, 569 U.S. 435, 445 (2013); *see United States v. Kincade*, 379 F.3d 813, 818-19 (9th Cir. 2004) (en banc) (describing process). Federal law forbids analyzing CODIS reference samples for any other purpose. *See* 34 U.S.C. § 40706(a) (providing that "any sample collected under, or any result of any analysis carried out under" provisions of the DNA Act "may be used only for a purpose specified" in those provisions). Indeed, if the FBI wishes to "modify or supplement" the types of genetic information it analyzes, it must notify Congress at least "180 days before any change is made and explain the reasons for such change." 34 U.S.C. § 40721.

The DNA Act also expressly prohibits the government from disclosing CODIS samples, or the results of any analysis of those samples. *See* 34 U.S.C. §§ 12592(b)(3), 12593(b); *see also Banks v. United States*, 490 F.3d 1178, 1191-92 (10th Cir. 2007) (describing the "stringent restrictions on the entire collection and profiling process"). Violations of those limits may result in cancellation of access to CODIS and criminal sanctions, including fines and imprisonment. *See* 34 U.S.C. §§ 12592(c), 12593(c), 40706(c).

---

June 26, 2020); *CODIS Fact Sheet*, *supra*, at 2.  All other CODIS identification profiles—including from arrestees, convicted offenders, and prisoners—are generated using nuclear DNA. *CODIS Fact Sheet*, *supra*, at 2.

31

The only exceptions to the DNA Act's disclosure prohibitions are disclosure (1) to criminal justice agencies for approved law-enforcement identification purposes, after a DNA match within CODIS has been confirmed; (2) for use in judicial proceedings where the existing sample or analysis would be admissible evidence; (3) to a criminal defendant, if the sample was collected or the analysis was performed "in connection with the case in which such defendant is charged"; and (4) to approved law-enforcement organizations for statistical research or quality-control purposes (after all personal identifying information has been removed). 34 U.S.C. § 12592(b)(3); *see CODIS and NDIS Fact Sheet*, *supra*, nos. 9, 13, 15. Exceptions (1), (3), and (4) do not apply here by their terms. Exception (2) does not apply because Lee does not seek to admit a CODIS sample or analysis as evidence in court proceedings.[10] He instead wants the government to conduct unauthorized tests on other individuals' CODIS reference samples in order to generate new DNA comparisons—unrelated to CODIS or any approved statutory purpose for collecting the samples in the first place—that

---

[10] As a practical matter, CODIS reference samples and profiles are almost never introduced as evidence in criminal proceedings because the government does not rely on them to establish guilt. Instead, a verified match between a CODIS profile and crime-scene evidence is used in support of probable cause to obtain a warrant for another sample of the suspect's DNA, which is then independently analyzed for evidentiary purposes. *See CODIS and NDIS Fact Sheet*, *supra*, no. 3.

32

he might then seek to use in postconviction litigation. The interlocking privacy protections in the DNA Act and its implementing regulations and policies prohibit such misuse of CODIS. *Cf. United States v. Mitchell*, 652 F.3d 387, 399-400 (3d Cir. 2011) (en banc) (explaining that disclosure exceptions work in concert with other "safeguards to prevent the improper use of DNA samples," including stringent limitations on the types of analysis that may be performed on samples, the information that may be extracted, and the uses to which it may be put). In short, the statutory scheme that creates and regulates CODIS does not permit the use of CODIS-related samples in the manner requested by Lee.

## CONCLUSION

For the foregoing reasons, this Court should deny Lee's motion to order DNA testing and comparison.

Respectfully submitted,

CODY HILAND
United States Attorney
Eastern District of Arkansas

BRIAN A. BENCZKOWSKI
Assistant Attorney General

JONATHAN D. ROSS
Assistant United States Attorney
Eastern District of Arkansas

JOHN M. PELLETTIERI
Bar Number 4145371 (NY)
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Rm. 1260
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

June 26, 2020

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on June 26, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

> JOHN M. PELLETTIERI
> Bar Number 4145371 (NY)
> Attorney, Appellate Section
> Criminal Division
> U.S. Department of Justice
> 950 Pennsylvania Ave., N.W.
> Rm. 1260
> Washington, D.C. 20530
> (202) 307-3766

34