**FEDERAL DEATH PENALTY CASE**
**\*\*\*\*EXECUTION SCHEDULED FOR JULY 13, 2020\*\*\*\***

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**DANIEL LEWIS LEE,**
    **Movant**

**vs.**

                            **Criminal Case No. 4:97-cr-00243-KGB-2**
                            **CAPITAL CASE**

**UNITED STATES OF AMERICA,**
    **Respondent.**

**REPLY TO GOVERNMENT'S RESPONSE TO**
**MOTION TO ORDER COMPARISON OF DNA**

COMES NOW Daniel Lee, by and through counsel, and hereby submits the following Reply to the Government's Response ("GR") in opposition to his Motion to Order Comparison of DNA. *See* Dkt. 1398.

**Introduction**

The Government's Response raises procedural and statutory barriers to DNA testing in this case that don't exist. It offers an analysis of 18 U.S.C. § 3600, and the liberty interest it creates, that is fundamentally flawed. And it presents arguments about the All Writs Act that are just plain wrong. But the one thing the Government should have done—but didn't do—is articulate a single downside to finding out whose hair was in the FBI raid cap.

In fact, in the time it took the Government to respond to Mr. Lee's motion, we might have had an answer already. (At no cost to the prosecution.) Instead, the Government stubbornly defends a verdict it obtained using physical evidence that DNA testing has debunked, and inexplicably refuses to look for answers where it knows it could find them.

The Government attempts to justify its resistance by leaning heavily on a decision made by Judge G. Thomas Eisele in 2008 denying the materiality of Mr. Lee's exculpatory DNA results. But that opinion can't bear the full weight of all the developments and changed circumstances that have accrued since then. When that decision was written, Judge Eisele did not know that:

- Cheyne Kehoe and Kirby Kehoe repeatedly told case agents during the course of their pre-trial cooperation that the "APR," which was the alleged racketeering enterprise giving rise to federal jurisdiction, *did not exist*; Chevie Kehoe committed crimes to line his own pockets, not to finance a fictitious white separatist group.[1] (In fact, at a different federal proceeding in 2014, the Government backpedaled significantly from its 1999 description of the APR, now characterizing it as "not a specific organized group, but it was a fledgling."[2])

- Case agents supervising Gloria Kehoe developed concerns that she was mentally unstable and approached Cheyne (Gloria's son) and Kirby (Gloria's husband) about it. They confirmed that she had long-standing mental health problems, including auditory and visual hallucinations, paranoia, panic attacks, and had even once sought psychiatric treatment.[3] None of this significant impeachment information was disclosed to the defense.

- James Wanker repeatedly warned the Government that Mr. Lee's purported "confession" was not trustworthy; he had a history of lying about criminal activity to make himself seem "tough." The Government omitted these warnings from its official reports, and the jury never learned that even at the time of trial—and to this day—Mr.

---

[1] *See* Exh. A (Declaration of Cheyne Kehoe); Exh. B (Declaration of Kirby Kehoe). As confirmed in their respective declarations, both men received substantial benefits for going along with the Government's story: Cheyne avoided charges in this case, and Kirby received the benefit of a lenient plea deal. Judge Eisele expressed his shock that the plea deal only exposed Kirby to a 44 ½ month sentence, describing him as "the substantial beneficiary of the entire prosecutorial process," and rejected the recommendation that the sentence run concurrently to an existing sentence because it was "so minimal" given "the nature of the crime charged here[.]" *See* Exh C. (Sentencing Hearing Transcript Excerpt, *United States v. Kirby Kehoe*, No. 97-CR-243 (E.D. Ark. Aug. 24, 1999)).

[2] *See* Exh. D (Sentencing Hearing Transcript, *United States v. Kirby Kehoe*, No. CR 13-8223-PCT-GMS (D. Ariz. June 23, 2014)). At a 1997 state court proceeding in Idaho, Faron Lovelace—who was initially indicted in this case, and was later unindicted pursuant to a superseding indictment—stated that he, too, told investigators that there was no such racketeering enterprise. *See* Exh. E (Transcript Excerpt, *State of Idaho v. Faron E. Lovelace*, No. CRF 96-1506 (1st Jud. Dist. Ida., Sep. 8, 1997)).

[3] *See* Exh. A (Declaration of Cheyne Kehoe); Exh. B (Declaration of Kirby Kehoe).

Wanker considered the statements to be "empty bragging," unworthy of belief.[4]

- The Government withheld a polygraph report about Paul Humphrey's involvement in the Mueller murders. And after allowing Mr. Humphrey to give false or misleading testimony on these matters, the prosecution misled the jury by telling it that Mr. Humphrey had been thoroughly investigated by state and federal authorities, and they didn't find any evidence against him.

What's even more remarkable—and also not accounted for in the 2008 opinion—is that after being confronted with all of these allegations, *the Government has refused to unequivocally deny them.*[5] In fact, the only substantive response the Government has ever offered is an artfully worded denial that the prosecution was unaware of the Humphrey polygraph report because the Arkansas State Police (ASP) was not part of the prosecution team.[6] However, independent FOIA requests yielded page after page of contemporaneous FBI memoranda documenting that case agents from both the FBI and the ATF obtained the ASP's case file, and that the ASP provided so much assistance to federal investigators that two of its officers received formal letters from the FBI thanking them for their "contribution to the multi-agency investigation and prosecution."

---

[4] *See* Exh. F (Declaration of James Wanker).

[5] *See*, *e.g.*, *Lee v. United States*, No. 193576 (8th Cir. Jan. 7, 2020) (Order denying motion for authorization to file successive § 2255 motion) (Kelly, J., dissenting) (noting that the "government does not respond to [the] allegation" that it withheld exculpatory information from the defense contained in Cheyne's and Kirby's declarations about the non-existence of a racketeering enterprise); Dkt. 1367 at 71-74 (Government response to Gloria Kehoe allegations; not denying that Mrs. Kehoe was mentally unstable, that case agents discussed their concerns about this with Cheyne and Kirby Kehoe (who provided additional information substantiating the case agents' concerns), and that the prosecution withheld this information from the defense); Dkt. 1307 at 31-37 (Government response to Wanker allegations; not denying that Mr. Wanker repeatedly warned authorities that Mr. Lee's statements were not trustworthy, that the Government omitted these warnings from its witness interview reports, and also omitted information from Mr. Wanker's written statement to the grand jury that was inconsistent with the prosecution theory); Dkt. 1367 at 80 (Government response to Paul Humphrey allegations; not responding to claim based on *Napue v. Illinois* and *Giglio v. United States* that the Government knew or should have known that Mr. Humphrey gave false or misleading testimony about his knowledge of the forged car titles and involvement in the murders).

[6] *See* Dkt. 1367 at 74-77.

Dkt. 1374 at 27-29.[7]

Simply put, this case looks very different now than it did in 2008—and certainly much different than it did in 1999. Indeed, it is remarkable that the Government has gone from once telling a capital jury that the hair found in the FBI raid cap was unassailable forensic evidence that corroborated the testimony of its cooperating witnesses and proved Mr. Lee committed the murders, to now this:

> [T]here are any number of reasons that hair from someone who did not participate in the murders may have gotten into the raid cap. … Any number of individuals could have been near the hat or even put it on at some point, even though they did not participate in murdering the Muellers.

GR 23.

The Government's case against Mr. Lee has not aged well. And knowing what we know now, it certainly cannot be objectively characterized as "overwhelming." If the hair recovered from the FBI raid cap matches the DNA of any of the alternate suspects, it would fundamentally undermine what little is left of the Government's case. Because there are no procedural barriers that preclude this Court from ordering further DNA testing, this motion should be granted so we can finally know the truth about the source of a crucial piece of trial evidence.

---

[7] The Government tried this same tactic on another issue during Mr. Lee's proceedings in the District Court for the Southern District of Indiana. *See Lee v. Warden USP Terre Haute, et al.*, No. 2:19-cv-00468-JLH-DLP, Dkt. No. 18 (S.D. Ind. Nov. 12, 2019) (Petitioner's Motion for Leave to Conduct Discovery; in response to Government's claim that federal prosecution team did not work closely with Oklahoma City prosecutors and law enforcement, and therefore could not have reasonably known that the teenaged Mr. Lee's plea to robbery was the result of a judicial finding dismissing the more serious murder charge for lack of evidence, and not a "gift" from the local prosecutors, counsel for Mr. Lee proffered FOIA records establishing that FBI agents had, in fact, traveled to Oklahoma City to "review and obtain all records relative to the 1990 murder in order to determine Lee's level of participation," including the state's attorneys case file).

### I.   The Government's understanding and application of 18 U.S.C. § 3600 is flawed.

There are only two sections of the post-conviction DNA testing statute (18 U.S.C. § 3600) that are relevant to the Court's analysis: **subsection (a)**, which concerns the testing and comparison of trial evidence against the defendant's DNA; and **subsection (e)**, which concerns the obligations imposed on the Government if the DNA testing result excludes the defendant as the source of the trial evidence.

But subsection (a) is not actually at issue here. Nor could it be. Mr. Lee already satisfied that provision in 2006 and obtained the only remedy that the statute provided at the time: to test the hair found in the raid cap and compare it with a hair previously collected from him in the course of the investigation. As everyone now knows, Mr. Lee was conclusively excluded as the source. Under the 2016 amendment to subsection (e), that exculpatory result *automatically* triggers an obligation on the Government "to determine whether the DNA profile matches a profile of a known individual or a profile from an unsolved crime." § 3600(e)(1)(B)(i). The Government's arguments for why Mr. Lee should not get the benefit of that second step are meritless.

#### A.  Mr. Lee already met the criteria under § 3600(a) in 2006.

The Government argues that it's not fair for Mr. Lee to jump straight to subsection (e) without first satisfying the list of requirements in subsection (a). GR 13-16. This argument ignores the procedural history in this case.

Mr. Lee satisfied the requirements of § 3600(a) in 2006.[8] Indeed, *it was the Government that formally moved for the testing after discussing the matter with Mr. Lee's counsel. See* Dkt.

---

[8] Apart from minor stylistic changes, the 2016 amendment to 18 U.S.C. § 3600 did not alter the requirements set forth in subsection (a) as they existed in 2006.

1120 (filed by AUSA Dan Stripling on Oct. 26, 2006) (noting that the "attorney for the Government has discussed the matter with Mr. Lee's attorney who agrees that an appropriate order should be entered" "directing Glen Jordan, Special Agent with the Bureau of Alcohol, Tobacco, Explosives and Firearms to forward the hair to [the Serology Research Institute] together with the known samples of Mr. Lee's hair gathered during the course of the investigation."). The Government cannot now complain—all these years later—that Mr. Lee should have filed a *separate* motion formally laying out how § 3600(a)'s requirements were met; the parties had already agreed that this was unnecessary because post-conviction DNA testing was clearly warranted. Any claim that Mr. Lee did not obtain testing pursuant to § 3600(a) is disingenuous.

This is also why the Government's timeliness arguments are meritless. The only provision of the statute that requires "timely" action by a defendant is a step that was already taken in 2006—the request to have Mr. Lee's hair tested and compared against the hair found in the cap. Because that motion was made "within 60 months of enactment of the Justice For All Act of 2004," there is a rebuttable presumption of timeliness. *See* § 3600(a)(10)(A). And in this case, the Government affirmatively waived any claim regarding timeliness when it consented to the request for DNA testing, so there isn't anything to rebut.

The Government claims that since the amendment to § 3600(e) was enacted in 2016, Mr. Lee has "no good reason for waiting" until now to ask that the amended provision be enforced. But the statute doesn't require him to supply one. Subsection (e), in fact, imposes no obligations on Mr. Lee. He already did his part in 2006 when he asked to have the hair in the cap tested and compared against his own. There is no other "diligence" requirement imposed by the statute. Mr. Lee's present motion cannot possibly be "untimely" because there is literally no timeliness

6

requirement he must meet.

### B.  The biological samples collected from the alternate suspects qualify for testing.

The Government concedes it may "possess blood or saliva samples from Paul Humphrey, Cheyne Kehoe, Kirby Kehoe, and Faron Lovelace." GR 26. But it claims they are off limits for testing because the samples were "not secured in relation to the investigation or prosecution of Lee's offenses in this case," per the requirements of § 3600(a)(2). *Id.* This argument is flawed, for three reasons.

First, § 3600(a)(2) does not apply here. That section is concerned with comparing the defendant's DNA to a piece of *trial evidence* "secured in relation to the investigation or prosecution," which in this case was the hair that was found in the FBI cap. That testing has already been done. Subsection (e) imposes no such similar requirement to test the DNA of alternate suspects. That provision simply directs the Government to use the DNA profile extracted from the trial evidence to search for a match with "a known individual or a profile from an unsolved crime." *See* § 3600(e)(1)(B)(i).

Second, the Government has already acknowledged it has hair samples for Paul Humphrey and Cheyne Kehoe, GR 12, which means there's no need to access their blood or saliva samples at this point; their hair will suffice. And as for Kirby Kehoe and Faron Lovelace, they were both arrested and charged in this case as Mr. Lee's co-conspirators. Any biological samples collected from them after their arrest were clearly "secured in relation to the investigation or prosecution" of the Mueller murders.

Finally, this Court has independent authority to order a DNA comparison under the All Writs Act. *See infra* at III. Even if there were any limitations on the use of CODIS-related biological samples from alternate suspects imposed by § 3600—which there are not—it would

be immaterial. Indeed, as noted in the following section, there is no federal law that prohibits testing of those samples pursuant to a court order.

### II.   The Government is not "expressly prohibited by statute" from submitting biological samples in its possession for further DNA testing.

The Government makes a significant concession at the outset: its claim about a statutory prohibition on further testing does "not apply to the hair samples collected from Paul Humphrey and Cheyne." GR 30 n.8. At a minimum, then, those hair samples should be tested. But there is no statutory bar to testing the other blood and saliva samples in the Government's possession, either.

It is telling that among the many statutes it cites, the Government cannot point to a single provision that prohibits the Court from ordering additional testing. That federal law forbids *unauthorized* access to these biological samples—to prevent violations of privacy rights and misuse by government employees and officials[9]—is irrelevant to the issue at hand.

Federal law expressly allows "disclosure of stored DNA samples" for "judicial proceedings" and "for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged." 34 U.S.C. § 12592(b)(3)(B)-(C). The Government claims these provisions "do not apply here by their terms." GR 32. But it offers no explanation why. Clearly, Mr. Lee is requesting access to the samples in connection with *this* judicial proceeding, and for criminal defense purposes in connection with the case in which he was charged. And its citation to *United States v. Mitchell*, 652 F.3d 387, 399-400 (3d Cir. 2011) (*en banc*) is unavailing. It lends no support at all to the Government's unfounded argument that Mr. Lee's request to have these

---

[9] *See* 34 U.S.C § 40706(c); 34 U.S.C. § 12593(c).

samples tested, pursuant to a court order, would violate any aspect of federal law concerning the collection and testing of DNA samples.[10] Its fictitious "statutory bar" argument should be rejected.

### III.   This Court has independent authority under The All Writs Act to order further DNA testing.

The Government claims it need not address the cases cited by Mr. Lee because they are inapposite. GR 28 n.7.[11] But it should have. Each one demonstrates that a district court has the authority to order production of samples for forensic testing pursuant to the All Writs Act. *See* Dkt. 1387 at 7 n.10 (collecting cases). The cases the Government cites, on the other hand, are not germane.

In *Oil, Chem. & Atomic Workers Union v. Occupational Safety & Health Admin.*, 145 F.3d 120, 124 (3d Cir. 1998), the petitioners invoked the All Writs Act to compel "the Occupational Safety and Health Administration ("OSHA"), its Acting Administrator and the Secretary of Labor, to cease unreasonable delay in rulemaking on hexavalent chromium." As the

---

[10] Under nearly identical circumstances, state courts have granted precisely the type of relief Mr. Lee is requesting. For example, in *State v. Batchelor et al.*, No. 89-cr-13613 (Circuit Court, Cook County, Ill.), a Y-STR DNA profile was extracted from two pieces of trial evidence (a purse and a cap), but it could not be run through the CODIS database because it was incompatible. The state, however, maintained CODIS reference samples (buccal swabs) for two alternate suspects from which Y-STR profiles could be extracted. The court determined it would not violate state or federal law, with essentially identical restrictions governing the use of CODIS reference samples, to order that the buccal swabs be made available for Y-STR testing and comparison to the trial evidence. *See* Exh. G (Court Order, *State v. Batchelor et al.*, No. 89-cr-13613 (Circuit Court, Cook County, Ill., Nov. 17, 2014)). *See also People v. Rozo*, 970 N.E.2d 544, 551–52 (Ill. App. 2012) (permitting testing of reference samples of alternate suspects).

[11] The Government says these cases are distinguishable because "they involve court orders requiring discovery in litigation." GR 28 n.7. But the All Writs Act contains no such qualifier; it provides that courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). And *Harris v. Nelson*, 394 U.S. 286, 299-300 (1969), confirms this authority extends beyond the trial level.

Third Circuit noted, this was "an unusual petition requesting extraordinary relief." *Id.* at 122. The same could be said for the petition in *Carson v. U.S. Office of Special Counsel*, 534 F. Supp. 2d 103 (D.D.C. 2008); there, a pro se litigant invoked the Act for an order "direct[ing] [the Office of Special Counsel], if adequate legal grounds exist, to include all the information required by 5 USC § 1218 in its Annual Reports to Congress it claims to make by 5 USC § 1218, which is a public document." 534 F. Supp. 2d at 104. It's no wonder these petitions were denied.[12]

By contrast, Mr. Lee's reliance on the All Writs Act is entirely mundane. In fact, the Government routinely invokes the Act when *it* seeks to obtain samples to conduct DNA testing. *See*, *e.g.*, *United States v. Barner*, No. 08-CR-00170-WMS-JJM, 2012 WL 2990033, at *1, *3 (W.D.N.Y. July 19, 2012); *United States v. Lovato*, No. 18-CR-064-WJM, 2018 WL 2008841, at *1, *2 (D. Colo. Apr. 30, 2018); *United States v. Goodridge*, 945 F. Supp. 371, 371 (D. Mass. 1996). There is nothing "extraordinary" about conducting DNA testing; the use of the Act in this context is plainly in keeping with its purpose "to supply the courts with the instruments needed to perform their duty" and to issue orders "appropriate to assist them in conducting factual inquiries." *Harris v. Nelson*, 394 U.S. 286, 299, 300 (1969). Moreover, the All Writs Act is an independent source of authority for this Court to order the testing Mr. Lee requests, regardless of whether it finds 18 U.S.C. § 3600 applies.

### IV. Mr. Lee has a liberty interest, conferred by 18 U.S.C. § 3600, in conducting further testing.

The Government concedes, as it must, that although *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009), does not create a free-standing constitutional right to DNA testing, it does recognize a liberty interest conferred by postconviction DNA

---

[12] The third case cited by the Government, *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225 (10th Cir. 2005), does not even concern a request made pursuant to the All Writs Act.

10

testing statutes.[13] (In fact, *Osborne* specifically cites to 18 U.S.C. § 3600 as an example of one such statute. 557 U.S. at 63.) Instead, the Government argues that Mr. Lee's right does not extend "beyond the procedures established in 18 U.S.C. § 3600(a)" to have trial evidence tested. GR 27. But this is no response at all.

Under the plain terms of the statute, once testing pursuant to § 3600(a) is conducted and the defendant is excluded as the source, there is an obligatory second step. Namely, the Government must compare the results against other known individuals or profiles from unsolved crimes. *See* § 3600(e)(1)(B)(i) ("*If a DNA profile is obtained through testing that excludes the applicant as the source…* the court *shall* order that the law enforcement entity [search for a match]") (emphasis added). Mr. Lee cannot be deprived of this additional process simply because he obtained his exculpatory results, pursuant to § 3600(a), in 2007, rather than after 2016. There is nothing in the language of the amendment or its legislative history indicating it only had prospective effect, or that it otherwise excluded defendants who obtained their exculpatory results prior to the amendment's passage. Indeed, as is explained in the next section, Mr. Lee retains a liberty interest in the full process provided by the statute because of the potential that further testing will vindicate his third party culpability defense presented at trial.

Moreover, it is not necessarily sufficient that the Government merely follow its own procedures in § 3600(a), because "[t]his '[government]-created right ... beget[s] yet other rights to procedures essential to the realization of the parent right.'" *Osborne*. 557 U.S. at 68 (citation omitted). For example, 28 U.S.C. §2255(h)(1) provides a remedy to Mr. Lee if he can obtain "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would

---

[13] Federal courts routinely characterize *Osborne* as recognizing a liberty interest conferred by postconviction DNA testing statutes. *See*, *e.g.*, *McKithen v. Brown*, 626 F.3d 143, 153 (2d Cir. 2010); *Alvarez v. Attorney Gen.*, 679 F.3d 1257, 1266 n.2 (11th Cir. 2012).

be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." By providing this remedy, but withholding the tools necessary to obtain that remedy—access to DNA testing that could prove Paul Humphrey (or any of the other alternate suspects) was the source of the hair in the FBI cap—the Government's application of § 3600 would create an unconstitutional deprivation of due process. *See* Dkt. 1387 at 8 n.11.

### V. A DNA match to one of the alternate suspects would fundamentally undermine the Government's case against Mr. Lee.

Mr. Lee has already described some of the ways that a match with any of the alternate suspects would undermine the case against him. *See* Dkt. 1387 at 12-16. But instead of directly responding, the Government claims that a positive match to one of these other individuals "would not raise a reasonable probability that Lee did not commit the offense" because of the "overwhelming evidence of Lee's guilt." GR 18-19. The Government vastly overstates the strength of its evidence, and its selective presentation of the trial record does not withstand scrutiny.

#### A. Paul Humphrey

Local authorities gathered a substantial amount of evidence against Mr. Humphrey. *See* Dkt. 1387 at 3-6. The Government sidesteps nearly all of it. In fact, it doesn't even dispute that after it took over the case from the locals, it was never able to formally rule out Mr. Humphrey's involvement in the crimes. Instead, the Government attempts to minimize the importance of the suppressed polygraph report, offer an innocent explanation for why Mr. Humphrey was in possession of the forged titles, and attack the credibility of the defense witness that saw him with

the Muellers after they had gone missing. None of its arguments are persuasive.[14]

1. *The polygraph.* Mr. Humphrey specifically denied: (1) being present during the murders, (2) helping dispose of the bodies, and (3) knowing the titles to the Muellers' vehicles were forged. An Arkansas State Police polygraph examiner determined he was lying. The Government doesn't claim the examiner was unqualified, that the examination technique was unsound, or that the polygraph results were unreliable. Its cursory dismissal of this evidence as "a one off polygraph exam," GR 26 n.6, is not a substantive response.

2. *The forged titles.* Mr. Humphrey led authorities on a wild goose chase before finally turning over the titles. *See* Dkt. 1387 at 3-4. The Government cites to his self-serving trial testimony to explain why: because he and Mr. Mueller devised a secret plan to exchange the titles in a way that would remove the taint of the government and prevent it from claiming ownership over the vehicles. GR 5. This is no explanation at all, much less a good one.[15] The simpler explanation, as confirmed by the ATF's handwriting analysis and the ASP's polygraph exam, is that he stole the titles, forged the Muellers' signatures, and dodged authorities because he didn't want to get caught.[16]

3. *Mary Reid.* The Government spends most of its response attacking Ms. Reid's testimony. But recall that authorities found this same information sufficiently reliable to include

---

[14] The Government's reliance on Judge Eisele's 2008 observation that "trial counsel attempted, but failed, to establish a link between Humphrey and the death of the Muellers," *see* GR 23, is particularly ironic given that the Government *hid* from trial counsel the most explosive evidence linking Mr. Humphrey to the crime, the polygraph report.

[15] The titles were seen unsigned in the Mueller home on February 2, 1996, by Nancy Mueller's brother, David Branch, and Mr. Humphrey had the signed titles on February 22. Mr. Humphrey's claim that the Muellers' landlady, Sylvia Mason, sent him the signed titles in the mail was never corroborated by her.

[16] It is also worth noting that Mr. Humphrey made incriminating remarks about his detailed knowledge of the backroads that led from the Muellers' home to the precise spot where their vehicles were found, on property that belonged to him. *See* Dkt. 1387 at 3 & n.4.

it in an application for a search warrant, which the Eighth Circuit concluded did not contain any material omissions or misstatements. *United States v. Humphrey*, 140 F.3d 762, 765 (8th Cir. 1998).[17] Although the Government characterizes Ms. Reid's evidence as the "product of prayer, not memory," GR 25, her testimony is bolstered by the fact that she was not the only person who saw the Muellers alive after January 11, 1996. These witnesses included:

- Susan Weaver, a Walmart employee, remembered selling Mr. Mueller an unusually large quantity of water by the gallon. Tr. at 5832-36. Store records show this purchase was made on January 22, 1996—eleven days after the Government claimed the murders had occurred. Tr. at 6364-65.

- Janis Rowlands, a schoolteacher, contacted authorities to report she saw the Muellers at a Walmart in Russellville on February 2 or February 3. Tr. 5798-5800, 5802. Ms. Rowland remembered it was a day when her school was closed due to inclement weather, and records corroborated that her school district was closed on February 2, 1996, due to the weather. Tr. 6080-81.

- Lucy Carr, a manager at Leonard's Hardware Store in Russellville, called authorities to let them know she had a conversation with Mr. Mueller in her store in early February. Tr. 5807-11. Ms. Carr testified that Mr. Mueller looked like he was trying to disguise himself; he was unshaven and was wearing a large floppy hat. Tr. 5814.

- Sue Sullivan, an employee at Leonard's Hardware Store in Russellville, testified that she saw Mr. Mueller in the store around February 6 or 7, right before an article had been published in the local paper about the Muellers having gone missing. Tr. 5817.

- Ester Anderson, an acquaintance of the Muellers, testified that she had driven past the Muellers' home on January 17 with her husband and saw their Jeep and attached trailer parked outside. Tr. 5961, 5963. She was sure of the date because she was accompanying her husband to a job interview for which he subsequently filled out some paperwork dated January 22, and she knew from her own records that the 17th was the one day that week that she had not gone to work. Tr. 5962-

---

[17] As noted in the affidavit, bank records corroborated that both Ms. Reid and Mr. Humphrey were at the bank in Russellville on January 18. *Humphrey*, 140 F.3d at 764. The fact that there was no banking activity by the Muellers is irrelevant; Ms. Reid never claimed the Muellers went into the bank, only that she saw them and spoke to them in Mr. Humphrey's car in the parking lot outside. Similarly, Mr. Humphrey's claim that he hadn't driven that car in over a year is hardly dispositive given that he knew he was under investigation and had an obvious incentive not to incriminate himself.

63, 5966.

### B. The Timeline.

Indeed, the prosecution's timeline has never been able to account for these numerous sightings of the Muellers days and weeks after January 11 at various locations. As the Government's case has gotten weaker over time, it lends further credence to the notion that these witnesses were correct and that Gloria and Cheyne Kehoe's account of the murders—which hinged on an inflexible timeline—is not reliable.

The theory as to how Mr. Lee could have committed the crimes in Tilly, Arkansas close to midnight on January 11, and be back in Spokane, Washington by sometime before 8 PM on January 13, has always been problematic. It relied on implausible assumptions—non-stop travel under ideal conditions (clear roads and weather, never refueling or resting, two capable drivers) that we know did not exist: in fact, the trip would have required driving at high altitudes with low visibility and icy weather conditions, in a car with poor fuel economy, and with one driver— Mr. Lee—who had just lost an eye months before, which affected his depth perception and impaired his driving. *See* Dkt. 1362 at 30-22.[18]

But the timeline is even more compromised. Vada Campbell–a defense witness whom the Government not long ago referred to as having "the clearest memory of seeing Lee after January 11[19]–gave uncontested testimony that she saw Mr. Lee at his apartment in Spokane at 8 PM on

---

[18] The jury, in fact, sent out a note on the second day of deliberations indicating it had questions about whether the requisite cross-country drive was possible in that narrow time frame. *See* Tr. 7100 ("We want to know if there was any road problems—snow—on trip back to Washington from Tilly, Arkansas, on January 10, 11, 12, 13[.] [S]igned Juror 100."). The Court instructed the jury that it had to decide the issues on the basis of the evidence already presented, and that it could not reopen the record to receive additional evidence. Tr. 7100.

[19] The Government conceded as much about Ms. Campbell because the date Mr. Lee was in Spokane "corresponded to the birth of her grandchild." Dkt. 1307 at 38.

January 13, when she came to pick up his roommate, Sean Haines. (Mr. Haines was the father of her grandchild, who was born two days later.) Tr. 5953-55. Mr. Haines, in turn, had testified (as well as given a prior consistent statement) that when Mr. Lee returned to Spokane, Mr. Haines didn't see him until the following day, but he knew Mr. Lee had come back to their apartment because his duffel bag was there. Tr. 2778-79; Dkt. 1363 at 32.

Looking at the testimony of Ms. Campbell and Mr. Haines together, if Mr. Lee and Mr. Haines were both at the apartment when Ms. Campbell arrived on January 13, then the date on which Mr. Haines first saw Mr. Lee's belongings back in the apartment—but not Mr. Lee himself—had to have been January 12 at the latest. It would have been impossible for Mr. Lee to commit the murders in Tilly the night of January 11 and be back in Spokane the next day; the Government's own trial evidence established it would have taken between 35 to 43 hours— under ideal driving conditions, without ever stopping—to make that cross-country drive. Tr. 6449-52.

### C. Cash and Property Belonging to the Muellers.

Throughout its pleading, the Government treats Mr. Kehoe and Mr. Lee as a single entity, even though the trial evidence proves otherwise.[20] They were not, in fact, both "flush with cash" and stolen Mueller property; the Government's evidence was that *Mr. Kehoe* was.

---

[20] For example, the Government claims that both Mr. Lee and Mr. Kehoe "panicked and fled" Spokane after Sean Haines was arrested while in possession of a Mueller firearm. GR 6. But Mr. Lee's behavior at the time proves otherwise. Unlike the Kehoe brothers—who went on the run, used aliases, and even engaged in a shootout with police to avoid being identified—Mr. Lee moved back to Oklahoma to live with his mother, and never hid from authorities or lied about his identity. (In fact, this whole "panic" story is based solely on Gloria Kehoe's uncorroborated testimony—no other witness said it happened—and even that was equivocal; her testimony suggests Mr. Lee might have already made plans to travel back to Oklahoma *before* receiving Mr. Haines's call about being arrested. Tr. 4980.) Furthermore, Mr. Haines himself testified that when he called Mr. Lee after his arrest, Mr. Lee's reaction was to advise him to cooperate with authorities. Tr. 2846, 2850-51, 2854. Those are not the actions of a person in a panic or demonstrating consciousness of guilt.

In fact, it's notable that of the dozens and dozens of pieces of Mueller property that were recovered from Mr. Kehoe and processed for fingerprints, somehow Mr. Lee's prints weren't on any of them but one: the display case. Contrary to the Government's assertion, the "simpler and more likely explanation" for how Mr. Lee's prints got on that item is that he frequently slept in the same storage unit in Spokane where it was kept, not that he had inadvertently left his fingerprint on the display case—but miraculously on no other piece of Mueller property that was stolen—while participating in a crime half-way across the country.[21]

The Government also overstates the evidence about Mr. Lee having a customized Mueller shotgun. The trial evidence established that these supposed "specific modifications" were not, in fact, unique. Tr. 2562. And Mr. Lee's roommate, Mr. Haines, testified that the shotgun he saw Mr. Lee with was different than the replica Mueller shotgun that was introduced at trial. Tr. 2850.

Finally, none of the Mueller property in *Mr. Kehoe's* possession implicated Mr. Lee in the murders. (In fact, several of the prosecution's witnesses, including Mr. Haines, were also in possession of the Muellers' firearms.) The Government's argument on this score amounts to little more than guilt by association.

### D.  Statements to the Wankers.

Although the Government now claims that Mr. Wanker's trial testimony was a key piece of its "overwhelming" case, just months ago it represented that it was not "a central part of the government's case," it "occupies only six pages of the trial transcript," and that the prosecution "mentioned Wanker's testimony only in passing during its closing argument." Dkt. 1307 at 35.

---

[21] *See also* Dkt. 1387 at 12 n.22 (discussing why the fingerprint evidence was not probative of guilt).

Of course at that time, the Government was responding to Mr. Wanker's declaration detailing why Mr. Lee's purportedly incriminating statement to him was not trustworthy, and attesting that, to this day, he still believes it was just empty bragging with no basis in reality.[22] Neither the jury nor Judge Eisele were privy to this information. Nor were they aware that the Government omitted Mr. Wanker's warnings from its official reports, or manipulated his written grand jury testimony to remove facts inconsistent with its theory of the case.[23] Clearly, Mr. Wanker's declaration puts his trial testimony in a much different light.

As for Dalvine Wanker, the Government now portrays her as a crucial witness, yet at trial it conceded her testimony was not "detailed." Tr. 7003. And her testimony—that Mr. Lee brandished a firearm and implied he had previously shot someone—did not even match the facts of the Mueller murders.

### E.  Confession to Gloria Kehoe.

Although the Government claims that Judge Eisele found Gloria and Cheyne Kehoe wholly credible, the jury clearly did not: it acquitted Mr. Lee and Mr. Kehoe of any count that relied solely on their uncorroborated testimony, including the bombing of Spokane City Hall, the murder of Jeremy Scott, and the murder of Jon Cox. In light of the many inaccuracies and

---

[22] As with the Government's about-face regarding the probative value of the hair evidence, this is yet another example of its confirmation bias; when evidence no longer confirms the prosecution theory of the case, the Government tosses out the evidence, rather than its theory.

[23] In his July 2, 1997 statement to ATF Agent Sprenger, Mr. Wanker stated that Mr. Lee said there was a third individual who had accompanied him and Mr. Kehoe to Arkansas: Sean Haines. But as the Government knew, Mr. Haines was in Spokane throughout January 1996 when the alleged trip to Arkansas took place. The fact that Mr. Lee's story contained a demonstrably false detail lends credence to Mr. Wanker's warning to law enforcement that the story was made up and not to be believed. The fact that the Government instructed Mr. Wanker to omit that detail about Mr. Haines from his written statement to the grand jury is also telling. It is consistent with a pattern of behavior to suppress any information that undermined the credibility of Mr. Lee's alleged confession, and, in turn, the corroborative value of Mr. Wanker's testimony. *See* Dkt. 1363 at 24 n.28.

inconsistencies in Mrs. Kehoe's story about the Mueller murders, *see* Dkt. 1363 at 16-21, as well as her substantial incentives to curry favor with the prosecution, the jury's decision to credit her testimony about Mr. Lee's alleged confession to the Arkansas crime must have been a close call. And it is highly questionable it would have made the same call knowing what we know today. DNA testing has debunked the only physical evidence corroborating Mrs. Kehoe's account that Mr. Lee carried out the crimes while dressed as an FBI agent; Mr. Wanker has undermined any evidence of a trustworthy confession to him; and newly discovered evidence establishes independent reasons why the jury would have doubted her credibility—she suffered from mental health issues that impaired her ability to accurately perceive, recall, and recount events.[24] The Government takes none of this into account.

### F.  The hair evidence.

The Government's present attempt to distance itself from the probative value of the hair found in the FBI raid cap is striking. Indeed, all the same arguments it makes now for why the hair may not belong to one of the perpetrators were just as true in 1999. Yet back then, the prosecution held this piece of evidence up as indisputable physical proof linking Mr. Lee to the crime and told the jury it provided crucial corroboration of the Kehoes' testimony about how the Mueller murders took place. The Government should not be allowed to walk away from its prior

---

[24] The Government's reliance on Mr. Kehoe's alleged confessions to Gloria and Cheyne is problematic for the same reason. The jury's verdict on the Spokane City Hall bombing demonstrates it wasn't willing to credit their testimony about Mr. Kehoe's alleged confessions absent independent corroboration: as with the Mueller murders, Mrs. Kehoe claimed Mr. Lee confessed to her that he committed the bombing, and Cheyne claimed Mr. Kehoe's confession about the bombing implicated Mr. Lee—yet the jury believed neither of them. (It also rejected Cheyne's uncorroborated testimony that Mr. Kehoe confessed to the Jeremy Scott and Jon Cox murders.) There is no reason to believe Mr. Kehoe's alleged confession implicating Mr. Lee in the Mueller murders would have fared any better with this jury after being stripped of any corroborative evidence.

representation that the hair belongs to one of the perpetrators simply because it's no longer convenient.

If further DNA testing establishes that the hair found in the FBI raid cap matches any of the alternate suspects, it would, in fact, constitute material evidence supporting Mr. Lee's third party culpability defense. *See* Dkt. 1387 at 12-16. The Government does not, and cannot, offer a principled reason to forego such testing.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that this Court should grant Mr. Lee's *Motion to Order Comparison of DNA*.

Respectfully submitted this 30th day of June, 2020.

MORRIS H. MOON
Bar Number 24032750 (TX)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (713) 880-3556
Email: Morris_Moon@fd.org

GEORGE G. KOUROS
Bar Number 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on June 30, 2020. This motion was served via this court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

MICHAEL GORDON
JONATHAN D. ROSS
SHANNON S. SMITH
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203-1229
(501) 340-2600
michael.gordon@usdoj.gov
Jonathan.D.Ross@usdoj.gov
shannon.smith@usdoj.gov

GEORGE G. KOUROS
Bar # 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

21