**FEDERAL DEATH PENALTY CASE**
**\*\*\*\*EXECUTION SCHEDULED FOR JULY 13, 2020\*\*\*\***

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**DANIEL LEWIS LEE,**
    **Movant**

**vs.**

                          **Criminal Case No. 4:97-cr-00243-KGB-2**
                          **CAPITAL CASE**

**UNITED STATES OF AMERICA,**
    **Respondent.**

**MOTION TO SET OR MODIFY EXECUTION DATE IN LIGHT OF COVID-19**
**PANDEMIC**

COMES NOW Daniel Lee, by and through counsel, and hereby moves this Court to set

an execution date for Mr. Lee for Spring 2021 and/or modify the date selected by the Federal

Bureau of Prisons (BOP), pursuant to the Court's firmly rooted authority to do so, and in

accordance with 28 C.F.R. § 26.3(a). The Court's scheduling of Mr. Lee's execution for a date

certain in Spring 2021 is appropriate, in light of the worsening public health crisis arising from

the global COVID-19 pandemic.

A proposed order is attached. Reasons in support of his motion are set forth more fully

below.

**INTRODUCTION**

This is a motion requesting that the Court set an execution date for Daniel Lee in the

Spring of 2021. This is not a motion for a stay nor a request for any form of injunctive relief. It is

rather a request based on this Court's inherent authority to set or modify federal dates of

execution, a judicial function that is firmly rooted in the historical record and long recognized by all three branches of government.[1] This Court should exercise that authority now.

There are good reasons why. Chief among them is that the Department of Justice scheduled Mr. Lee's execution to take place in the middle of a pandemic. The large-scale spread of the coronavirus has put much of the nation on an unprecedented "shutdown" over the last several months, leaving work to be conducted from home where possible and, where not, requiring sweeping closures or cutbacks in business, leisure, travel and untold other enterprises. Experts have pressed social distancing as the primary means to stem the spread of the disease.

The epidemic has not abated. On the contrary, when the country began to open up just weeks ago, attempting a return to more normal activity, the number of infections and hospitalizations in various parts of the country grew exponentially. New cases in the United States shot up by more than 80 percent in the past two weeks, with more than 52,000 new cases in the country announced on July 1, the most cases in a single day since the pandemic began.[2] Cases are now rising in more than half the states.[3] Dr. Anthony Fauci, Director of the National Institute for Allergy and Infectious Disease and Coronavirus Task Force Member, and Dr. Robert Redfield, Director of the Centers for Disease Control and Prevention, warned a Senate committee this week of increasing infections if serious steps are not taken nationwide.

---

[1] See *Motion to Declare the Bureau of Prison's Notice Scheduling Daniel Lee's Execution Null and Void* (Dkt. 1400).

[2] Derek Hawkins et al., "Daily reported coronavirus infections in the U.S. top 50,000 for the first time," Washington post, July 1, 2020 (available at: https://www.washingtonpost.com/nation/2020/07/01/coronavirus-live-updates-us/) (last visited July 2, 2020).

[3] Clare Foran and Jamie Ehrlich, "Fauci warns Congress that new US coronavirus cases could rise to 100,000 a day," CNN, June 30, 2020 (available at: https://www.cnn.com/2020/06/30/politics/fauci-redford-testimony-senate-coronavirus/index.html) (July 2, 2020).

It is in this environment that the Department of Justice has scheduled the first four federal executions in 17 years, with three of them just a day apart, and Daniel Lee's first. This follows three months of a shutdown of all institutions within the Bureau of Prisons,[4] halting all legal visits, including at USP Terre Haute where federal death row is housed and the executions are to take place. Social distancing inside the prison, where one prisoner died recently of COVID-19, will be impossible. Travel to Indiana, including from current "hot spots," will put many at risk.

DOJ's insistence on conducting his execution in the midst of this crisis has, moreover, interfered with the ability of Mr. Lee's legal team to provide him with competent counsel through end-stage litigation and clemency proceedings. It has given rise to an untenable ethical conflict–that is, whether counsel should put their client's best interests ahead of their own interests in maintaining their health and that of their families or community. That conflict has deprived Mr. Lee of his access to counsel, potentially foreclosing otherwise available avenues for relief over the last several months and now in the days leading up to his execution.

The Government's rush to execute Mr. Lee during this pandemic is even more incomprehensible in light of the extraordinary circumstances of his case. Those most familiar with this case, including in roles usually supportive of a death sentence, all oppose Lee's execution. Indeed, the victims' family members who faithfully attended every day of the trial have made their opposition to Lee's execution known publicly and to the Department of Justice directly. They have also made clear that an execution would not honor the actual victims of the

---

[4] *See* BOP Implementing Modified Operations (available at: www.bop.gov/coronavirus/covid19_status.jsp) (last visited July 1, 2020). The nation's prisons, both state and federal, are key incubators of the virus. *See* Anagha Srikanth, "Jails and prisons are some of the biggest coronavirus hotspots in the country," The Hill, Apr. 28, 2020, (available at: https://thehill.com/changing-america/respect/equality/495039-jails-and-prisons-are-some-of-the-biggest-coronavirus) (last visited July 2, 2020).

crime. *See* Ben Miller & Daniel S. Harawa, *Why the Attorney General's Concern About Crime Victims and Their Families Rings Hollow,* The Appeal (Jan. 6, 2020), https://bit.ly/2BnphAJ (quoting Earlene Peterson as saying "it would 'shame my daughter that someone has to die for her'").

The opposition of the lead prosecutor and trial judge—one who sought the death penalty and the other who presided over both the trial and post-conviction proceedings–also raises questions about the need to move with haste when the risks are so high. That they were so concerned as to take the remarkable step of speaking up says volumes about the uniqueness of this case. But the main concern here is that counsel cannot do their job and provide proper representation at this critical moment in time in the middle of the worst pandemic and health crisis in over a century. Daniel Lee therefore respectfully moves this Court to exercise its authority to set an execution date and to do so when this risk to health and life not seen in over a century is expected to have subsided.[5]

## I. THIS COURT HAS THE ABSOLUTE DISCRETION TO SET OR MODIFY MR. LEE'S EXECUTION DATE.

This Court's authority to set Mr. Lee's execution date is firmly rooted in the historical record, is recognized and respected by every branch of the federal government, and has remained unaltered for centuries.

### A. History of Judicial Authority

Federal district courts have exercised their authority to set execution dates in capital cases for centuries. The practice dates back to the earliest federal criminal statute codifying capital

---

[5] Epidemiologist Dr. Chris Beyrer, whose declaration is attached as Exh. A (hereafter "Beyrer Decl."), predicts that will not realistically occur before the Spring of 2021. Mr. Lee therefore requests that this Court choose March 19, the business day closest to the first day of Spring, as the execution date.

offenses, passed by the First Congress, a year after the establishment of the federal courts

pursuant to the Judiciary Act of 1789. *See* 1 Stat. 73; *see also* 1 Stat. 112 ("An Act for the

Punishment of Certain Crimes Against the United States"). Subsequent iterations of federal death

penalty statutes, including the current one, left the sentencing court's firmly rooted power to set

an execution date untouched. *See* 18 U.S.C. §§ 3591-3599. From the execution of Thomas Bird

on June 25, 1790 in Portland, Maine[6]—the first federal execution—to the 1963 execution of

Victor Feguer[7]—the last one to carried out before the Supreme Court invalidated all death

penalty statutes in *Furman v. Georgia*, 408 U.S. 238 (1972)[8]—sentencing courts have played a

role in determining the date for an execution and the historical record amply supports the

executive branch's recognition of the practice.[9] Indeed, ever since 1830, when President Andrew

---

[6] The Hon. David Sewall issued a "writ or warrant of execution" of Thomas Bird's death sentence, to take place "at the Time mentioned in the Judgment…" *See* "To George Washington from Thomas Bird, 5 June 1790," n.1, *Founders Online,* National Archives, https://founders.archives.gov/documents/Washington/05-05-02-0299. [Original source: *The Papers of George Washington*, Presidential Series, vol. 5, *16 January 1790–30 June 1790*, ed. Dorothy Twohig, Mark A. Mastromarino, and Jack D. Warren. Charlottesville: University Press of Virginia, 1996, pp. 478–481.], *available at* https://founders.archives.gov/documents/Washington/05-05-02-0299 (last visited July 2, 2020).

[7] *See* Exh. B, Docket Sheet, *United States v. Victor Feguer*, No. 7-6031 (N.D. Iowa) (district court ordering, on November 2, 1963, that "subject to interposition of executive clemency, said imposed death sentence by hanging scheduled for January 15, 1963 at approximately 5:30 a.m. at Iowa State Penitentiary at Fort Madison, Iowa," and subsequently resetting execution date).

[8] It was the district judge, for example, who set execution dates for Julius Rosenberg and Ethel Rosenberg "for the week of June 15th" in 1953. *Rosenberg v. United States*, 346 U.S. 273, 279 (1953).

[9] *See, e.g.,* Exh. C, 7 Op. Atty. Gen. 561 (1855) (Attorney General Caleb Cushing's opinion includes the following description of what was then made a formalized practice: "The court sentences, and fixes the day of execution; and unless the President interpose, the Marshal of the United States proceeds to execution in due time."); *see also* Exh. D, Excerpts from Department of Justice Bureau of Prisons Manual of Policies and Procedures for the Administration of the Federal Penal and Correctional Service (1942) (noting, under "Date of Execution," that "The day upon which the execution shall take place shall be that fixed in the judgment or order of the court which imposed the sentence. If only the week is designated the

Jackson announced the President would no longer issue execution warrants, the judiciary has been the sole source of authority to set federal execution dates. *See* J.N. Macpherson Berrien, 20 Op. Atty. Gen. 344 (1830).[10]

As noted in his separate Motion to Declare the Bureau of Prison's Notice Scheduling Daniel Lee's Execution Null and Void, Dkt. 1400, when DOJ issued regulations to govern implementation of the death penalty it explicitly premised its authority on the understanding that it was subordinate to that of the courts.  The justification for Section 26.2(a) of the regulations, for example, which allows the BOP to pick the time and date for an execution, was that "[t]he Department is authorized *to rely on the authority of the federal courts*, acting pursuant to the All Writs Act, 28 U.S.C. 1651(a), *to order* that their sentences be implemented." 58 Fed. Reg. 4898-01, 4899-900. (Emphasis added). To avoid encroaching upon the court's authority:

> the proposed rule directs government attorneys to seek a court order directing that execution be by lethal injection, and at a date and place determined by the Department of Justice. § 26.2. *Indeed, the very provision the comments find an "invasion" of the prerogatives of the federal judiciary begin with the qualifying language, "Except to the extent a court orders otherwise * * *" § 26.3(a)(1). Section 26.4 also begins with that qualifier.*

58 FR 4898-01, at 4900 (DOJ response during notice and comment period) (Emphasis added).

In other words, this Court's decision takes precedence. If this Court issues an order regarding implementation of an execution, that order controls (and supersedes) any action by

---

marshal shall fix the day of the week. If the court order does not fix the time of day, the execution shall take place at 'about sunrise' on the day fixed.").

[10] Mr. Lee has contemporaneously filed a motion to declare the BOP-set execution date in his case a nullity. It is based on law and history showing that date-setting authority in the modern era rests solely with the district court, and that no authority was ever transferred in his case from this Court to the executive. This instant request, however, is independent of the result of that motion: even if this Court should find the BOP's date not null and void, it is clear that the Court has the absolute discretion to set or modify an execution date and, as discussed below, the Court's discretion takes priority over the BOP's actions.

BOP. In fact, the language of the regulations shows that a court order renders the pertinent regulation inoperative. *See e.g.* 28 C.F.R. § 26.3(a) ("*Except to the extent a court orders otherwise,*" BOP may select the date, time, place and method of the execution); 28 C.F.R. § 26.4 ("*Except to the extent a court orders otherwise,*" BOP may give notice of execution to prisoner and regulate access to attorneys, family and spiritual advisors) (emphasis added).

Likewise, both the BOP Execution Protocol and the July 2019 Addendum to the BOP Execution Protocol similarly recognize that sentencing courts have the power to set dates. For example, in connection with "establishing an execution date," it is acknowledged that the Director of the BOP is authorized to move forward with setting an execution date only after "the sentencing judge signs the appropriate Judgment and Order" and, again, "*except to the extent a court orders otherwise.*" The Protocol provision relating to the Warden's notification of the death-sentenced prisoner, likewise, states that "*If the execution date is set by a judge*, the Warden will notify the condemned individual, in writing, as soon as possible." In connection with news media access to witnessing the execution, the Protocol describes a process for media representatives to be notified after "an execution date is set by the *court*/Director of the BOP"; and, as the more recent Addendum to the Protocol recognized, the "procedures utilized by the BOP to implement federal death sentences" could be modified at the discretion of the Director as necessary in order to "*comply with specific judicial orders.*" *See* Doc. 39-1, Administrative Record, *Roane et. al. v. Barr*, 1:19-mc-00145-TSC, at 0874, 0883, 0915 (D. D.C. Aug. 30, 2019) (Emphasis added).

It is also important to note that these provisions make clear that an order from this Court setting or modifying Mr. Lee's execution would not be a stay or an injunction. Because the Government's regulations are conditioned upon this Court's action, issuance of an order setting a

different execution date does not enjoin a government action; it instead renders the BOP date-setting regulations, by their own terms, non-operational. *See* 28 C.F.R. § 26.3; 28 C.F.R. § 26.4.

### B.  Recent Acknowledgement by the Government of the Court's Authority

The sentencing court's role in setting execution dates is also reflected in recent practice in federal capital cases. The Government's pleadings in these cases also recognize that the Court's decision regarding dates takes precedence and that the Government's interest must defer to the Court's authority. In the case of Juan Garza, for example, the sentencing court in the Southern District of Texas issued an Order of Inquiry as to why an execution date should not be set by the court. In response, the Government filed a pleading explaining that it was still formulating internal agency protocols and requested that the court refrain from setting an execution date. *See* Request for Extension of Time to Respond to Order of Inquiry, *United States v. Garza*, No. 1:97-cv-00273, Dkt. 16 (S.D. Tex. May 22, 2000). Notably, the Government never questioned the court's authority to set a date; it merely pleaded with the court not to do so. Four days later, the court nevertheless set Mr. Garza's execution date for August 5, 2000. *See* Order Setting Execution Date, *United States v. Garza*, No. 1:97-cv-00273, Dkt. 18 (S.D. Tex. May 26, 2000). The Government again did not challenge the court's authority to set the date and, on the contrary, defended the execution until it was halted by President Clinton. *See* United States' Opposition to Movant Garza's Motion to Reconsider Setting Execution Date, *United States v. Garza*, No. 1:97-cv-00273, Dkt. 21, at ¶¶ 3-4 (S.D. Tex. June 19, 2000) (noting "This Court's order setting an execution date fully conforms with 28 C.F.R. § 26.3").[11]

---

[11] Mr. Garza was executed on June 19, 2001 following the issuance of a 6-month reprieve by then President Clinton, pursuant to his constitutional authority. *See* Executions Under the Federal Death Penalty, DEATH PENALTY INFORMATION CENTER, https://deathpenaltyinfo.org/state-and-federal-info/federal-death-penalty/executions-under-the-federal-death-penalty (last visited June 15, 2020); *see also* U.S. CONST. art. II, § 1.

Similarly, in the case of David Paul Hammer, the sentencing court, on September 21, 2000, set an execution date of November 15, 2000.[12] *See* Exh. E, Order Setting Date for the Implementation of the Death Sentence, *United States v. Hammer*, No. 4:96-cr-00239-JHS, Dkt. 711 (M.D. Pa. September 21, 2000). The Government there also never challenged the court's authority to act. The Government, in fact, explicitly noted that authority and acceded to the court's shorter timeframe despite stating it would "ordinarily request that the execution date allow for the full 120-day period" to allow for 30 days to file for clemency and 90 days for the Pardon Attorney and President to consider it as set out in the Department's clemency rules. Exh. F, Government's Memorandum Regarding Setting of an Execution Date, *United States v. Hammer*, No. 4:96-cr-00239-JHS, Dkt. 709 at 3-4 (M.D. Pa. Sept. 20, 2000); *see also* Exh. G, Government's Memorandum Regarding Setting of a Particular Time Frame for Execution, *United States v. Hammer*, No. 4:96-cr-00239-JHS, Dkt. 719 at 3 (M.D. Pa. October 10, 2000) ("Rules promulgated by the Attorney General in 1993, which relate to those provisions, do not necessitate that the Court fix a specific time or date. 28 C.F.R. § 26.2. Rather this could be selected by the Director of the Bureau of Prisons. 28 C.F.R. § 26.3(a)(1). *However, those same rules recognize this Court's inherent authority to do so.* 28 C.F.R. § 26.3(a).") (Emphasis added).

The text of the regulations and the historical record relating to their promulgation and subsequent application demonstrate the executive branch's continued recognition of and

---

[12] Mr. Hammer was resentenced to life without parole in § 2255 proceedings after the district court granted relief based on the federal government's *Brady* violation. *See United States v. Hammer*, 564 F.3d 628, 629 (3d Cir. 2009) (dismissing appeals for lack of jurisdiction following district court's grant of sentencing relief in § 2255 proceedings).

deference to the sentencing court's primary date-setting authority. This Court has clear absolute authority to set or modify an execution date.

## II. THE COURT'S SETTING OF MR. LEE'S EXECUTION DATE FOR SPRING 2021 IS APPROPRIATE IN LIGHT OF THE GLOBAL COVID-19 PANDEMIC.

The Government seeks to carry out Mr. Lee's execution at USP Terre Haute in the midst of a rapidly deteriorating public health crisis. The COVID-19 pandemic, which began in the early Spring, is worsening by the day in many regions of the country. Houston, Texas, where Mr. Lee's lead counsel lives, is in crisis; Texas is now seeing approximately 8,000 new cases a day[13] and Houston is on the verge of running out of hospital bed capacity.[14] Cook County, Illinois, which includes Chicago — where co-counsel lives — has the highest number of cases of COVID-19 in the country at this time.[15] *See, e.g.,* Exh. A, Beyrer Decl., ¶ 66.

The pandemic has led to almost half a million deaths around the world; it continues to ravage communities across this country, from remote rural areas to densely packed urban centers. It has made interstate travel and airline travel hazardous, and it is spreading like wildfire in prisons, including many run by BOP.

DOJ's scheduling of Mr. Lee's execution date during the middle of this pandemic is also startling given the actions of other federal agencies and departments. For example, the United

---

[13] Nicole Cobler, "Texas Hits Record 8000 Coronavirus Cases," Austin American-Statesman, July 1, 2020 (available at: https://www.statesman.com/news/20200701/texas-hits-record-8000-new-coronavirus-cases-hospitalizations-near-7000) (last visited July 2, 2020).

[14] *Coronavirus in Texas*, Texas Tribune, July 1, 2020 (available at: https://apps.texastribune.org/features/2020/texas-coronavirus-cases-map/) (last visited July 1, 2020).

[15] The undersigned are Assistant Federal Public Defenders with the Federal Capital Habeas Project, a part of the Office of the Federal Public Defender program, and administered by the Office of the Federal Public Defender in Greenbelt, Maryland. As a national program, the undersigned, and other Project attorneys, are stationed throughout the country, including in Houston, TX; Chicago, IL; Philadelphia, PA; and Chapel Hill, NC.

States Fleet Forces Command of the United State Navy recently ordered all service members in the continental United States to, in part, "limit travel to/from place of residence/work with stops only for essential business (food, medical pharmacy, gas, and child care services)"; service members are forbidden from many activities including dining in restaurants, attending indoor religious services, and "to the maximum extent possible" from gathering in groups of over ten. This order applies even where local authorities have authorized reopening of the community. As the Navy order notes, the "medical intelligence analysis is clear" and "[a]symptomatic spread is a reality and one misstep opens a potential attack vector for this virus." Because COVID-19 is a continuing threat, "the easing of community restrictions is not aligned with the Navy imperative to maintain COVID infection as low as achievable." Exh. H (Fleet Forces Fragmentary Order Week of June 24).

Indeed, in March of this year, the Office of Management and Budget issued a memorandum to the heads of all executive agencies regarding travel restrictions for federal employees in response to the coronavirus. It declared that "[o]nly mission-critical travel is recommended at this time," and that due consideration should "be given to whether a Federal employee who would be traveling falls within a population(s) at higher risk for serious complications from COVID-19."[16] It also starkly cautioned that "[t]ravel by any Federal employee to or within areas where there is community spread of COVID-19 should only be undertaken when there is an urgent need, such as to protect life and property." That memorandum is still operative.

---

[16] *See* M-20-14 Updated Federal Travel Guidance in Response to Coronavirus (March 14, 2020) (available at: https://www.whitehouse.gov/wp-content/2020/03/M-20-14-travel-guidance-OMB-1.pdf) (last visited July 1, 2020)

In fact, BOP itself has heeded these warnings: under a modified operations plan it implemented in response to the COVID-19 crisis, it has suspended all official staff travel.[17] And in an effort to mitigate community spread, all staff trainings (including conferences and meetings), social visits, legal visits[18], volunteer visits, and non-essential contractor access have been also suspended under the modified operation plan.

Even DOJ in May of this year warned of the dangers of COVID-19 and addressed the need to protect its staff. In a memorandum distributed to all heads of department components and United States Attorneys,[19] it recognized that vulnerable populations and those caring for family members in vulnerable populations should be allowed to telework and that only essential travel should be permitted for all employees, followed by mandatory quarantine in certain regions. It further directed that department components "should continue to cancel or postpone large events until national conditions permit more widespread travel and close proximity attendance," and noted that it did not "anticipate restoration of postponed Department events, or scheduling of in-person new events, particularly large events, to occur in the immediate future…*In July we will assess whether we can more broadly return to in-person event scheduling and travel*."[20]

As we enter July, conditions have gotten worse, not better. In the last two weeks, rapid escalation in COVID-19 infections has made clear that this pandemic is far from over. Just yesterday alone there were more than 52,000 new cases—a new record high in the United

---

[17] *See* BOP Implementing Modified Operations (available at: https://www.bop.gov/coronavirus/covid19_status.jsp) (last visited July 1, 2020).

[18] It is counsel's understanding, though they have received no BOP program statement or other formal statement to this effect from the prison, that they may visit Mr. Lee at Terre Haute now that his execution date has been set – should they wish to assume the attendant risks.

[19] *See* Department Framework for Returning to Normal Operations Status (May 18, 2020) (available at: https://www.justice.gov/doj/page/file/1284406/download) (last visited July 1, 2020).

[20] *Id.* (emphasis added).

States—and the Government's top infectious disease expert, Dr. Anthony Fauci, testified to Congress that the current situation "puts the entire country at risk." He warned that we could soon see more than 100,000 new cases each day if strict precautionary measures were not adhered to. *See* Sheryl Gay Stolberg and Noah Weiland, "Fauci Says U.S. Could Reach 100,000 Virus Cases a Day as Warnings Grow Darker," New York Times, June 30, 2020.[21]

Two days ago the Chief Judge of this Court, with all the district court judges and magistrates concurring, extended the authorization for video or teleconferencing.[22] In so doing the Chief Judge noted that "the number of positive cases reported in Arkansas has increased dramatically in past weeks. Hospitalizations are up."[23]

Whatever hope to the contrary may have existed just last month, the incidence of COVID-19 in the United States has not abated. It is growing.

### A. Carrying out Mr. Lee's Execution During the Pandemic Interferes with his Access to Counsel and Forces Counsel and Others to Assume Grave Health Risks.

The nature and course of the pandemic, as explained below, have made counsel's ability to undertake work essential to competently representing Mr. Lee and to effectively communicating with him in the weeks and days leading up to his scheduled execution exceedingly difficult; the same is true with regard to counsel's ability to be present at the execution, a critical stage of the proceedings in and of itself. The Government's insistence on pressing forward with his execution in the midst of this public health crisis is forcing counsel and

---

[21] Available at: https://www.nytimes.com/2020/06/30/world/coronavirus-updates.html (last visited July 1, 2020).

[22] *See* Administrative Order Six, IN RE: COURT OPERATIONS DURING THE COVID-19 PANDEMIC (June 29, 2020) (available at: https://www.are.uscourts.gov/sites/are/files/AdminOrder6.pdf) (last visited July 1, 2020).

[23] The Chief Judge also noted that "it is generally believed that many folks are infected and contagious but asymptomatic." *Id.*

others to assume grave, potentially fatal, health risks in order to be present at the execution or in the days leading up to it.

### 1. The essential role of counsel in the days and weeks leading up to Mr. Lee's execution.

Mr. Lee's counsel cannot confine themselves simply to drafting legal papers in the weeks leading up to his scheduled execution. *See* Exh. I, Kendall Decl., ¶ 6. They have to undertake investigation in connection with clemency and end-stage litigation and meet with their client. They also need to be physically present with him in the days leading up to the execution and at the execution itself. Indeed, as DOJ recognizes, Mr. Lee has a right to have his counsel "be present." *See* 28 C.F.R. § 26.4.[24] There is no reasonable way to accomplish any of this remotely.

#### a. End-stage investigation

Mr. Lee's counsel are tasked with having to aggressively investigate all aspects of his case, for purposes of litigation and clemency advocacy; this, as noted, cannot be accomplished from a thousand miles away.[25] *See id.* at ¶¶ 7; 21-24; 31-38. This type of end-stage investigation

---

[24] 28 C.F.R. § 26.4(b) (prisoner shall have access to his defense attorneys from seven days before the scheduled execution); § 26.4 (c)(3)(ii) (two defense attorneys shall be present at execution).

[25] Clemency investigation is often more wide-ranging than litigation investigation at the end stage of a capital case, because clemency authorities are less concerned with shortcomings in previous legal review or whether a ground for relief was defaulted; they are also permitted to grant clemency unconstrained by recognized legal theories. Thus, the issues developed for clemency may include facts about the crime or the prisoner's life that have newly come to light or may focus on the wishes of the victim's family or jurors, or on the prisoner's prison record. *See*, *e.g.*, STATEMENT OF GOVERNOR JACK MARKELL REGARDING THE COMMUTATION OF SENTENCE OF ROBERT GATTIS, Jan. 17, 2012 (available at: https://news.delaware.gov/2012/01/17/statement-of-governor-jack-markell-regarding-the-commutation-of-sentence-of-robert-gattis/) (last visited July 1, 2020) (sentence commuted based on evidence of childhood abuse and neglect that "put[] Mr. Gattis, his case, and his potential defenses to capital murder in an entirely different light"); Reginald Fields, "Ohio Gov. John Kasich commutes inmate's death sentence to life in prison," Cleveland Plain Dealer, July 10, 2012 (available at: www.cleveland.com/open/2012/07/ohio_governor_commutes_inmates.html)

can and has produced claims that resulted in an eventual grant of relief to someone who had been

just days or even hours away from execution. *See id.* at ¶¶ 31-38 (discussing circumstances

surrounding *Banks v. Dretke*, 540 U.S. 668 (2004)).[26]

### b. *In-person meetings*

Counsel must also be able to regularly meet with Mr. Lee in person at the USP Terre

Haute in the weeks, days and hours leading up to the scheduled execution. These meetings

generally require an enormous amount of time, and focus on the client's many needs:

> During this period, the role of counsel expands to include:  assessing the client's evolving mental health; explaining to the client all matters pertaining to litigation, which at this stage often moves extraordinarily quickly; addressing with the client on-the-ground developments; helping prepare the client to make end-of-life decisions; serving as liaison with prison staff and counsel for the prison; bearing witness to his final days; and in many cases, witnessing the execution itself.

> A client's mental health in the weeks and days approaching an execution can be extraordinarily fragile, even assuming his mental health was normal at the start of the warrant period, which often is not the case with our clients.  Their moods can fluctuate tremendously from one day to the next and from hour to hour.  They are typically and understandably deeply depressed, highly anxious, and they frequently decompensate.  Many suffer from lifelong effects of childhood trauma.[27] Even those who have no pre-existing mental health problems may spin out of control.

> Whether or not a client's mental health deteriorates that far, a client has many decisions he needs to make during these last weeks and he can't make those decisions in a meaningful fashion if he is in the throes of depression or anxiety.

(last visited July 1, 2020) (sentence of John Jeffrey Eley commuted based on evidence discovered after trial of petitioner's low mental capacity and abusive childhood; also noting 2011 commutation of Joseph Murphy's sentence based on post-trial evidence of "uniquely severe and sustained verbal, physical and sexual abuse" during his childhood.); Steve Barnes, "Death-Row Inmate Spared After Juror Makes Plea," New York Times, Feb. 6, 1999 (available at: https://www.nytimes.com/1999/02/06/us/death-row-inmate-spared-after-juror-makes-plea.html) (last visited July 1, 2020) (sentence of Bobby Ray Fretwell commuted based on juror's plea and unpresented mitigation evidence).

[26] *See also* 18.U.S.C. § 3599(e) (appointed counsel expected to represent defendant in clemency proceedings).

[27] Mr. Lee, like those who Mr. Kendall describes here, suffered horrific and unrelenting trauma throughout every stage of his childhood and adolescence, and has long-standing symptoms associated with those experiences. Relevant details and context have been

Exh. I, Kendall Decl., ¶¶ 12-14.[28]

This is a period of time during which counsel is called upon to have long and often fraught conversations with their client about matters ranging from litigation decisions to discussions of disposing of his remains to how his children will deal with having a parent who has been executed. The issues that come up are both predictable and unpredictable, and move from purely legal to the more spiritual in the span of minutes. They are, simply put, not conversations that can be had in an hour over the phone.

Phone calls, moreover, are not an adequate substitute for the in-person meetings with Mr. Lee due to confidentiality concerns, which are, of course, of prime importance in any attorney-client communications. *See* ABA Criminal Justice Standards, The Defense Function, Standard 4-2.2 (4th ed. 2017).[29]  *See also* Exh. J ("Declaration of Bruce A. Green)("hereafter Green Decl."), ¶¶ 7, 11 and 13.[30]  *See also* Exh. I, Kendall Decl., ¶ 40.  In Mr. Lee's case, where in-person meetings are not possible because of COVID-19, the communications must take place using channels supplied and controlled by BOP, a sub-agency of DOJ, the adversary seeking his execution. This dampens open conversation and can potentially compromise confidentiality:

---

documented as part of the undersigned's postconviction investigation and submitted in connection with the application for executive clemency. *See*, *e.g*., Exh. K (filed under seal).

[28] ABA Guideline 10.15.1 E 1. & 2 (counsel must maintain close contact with client and continually monitor client's mental, physical and emotional condition).

[29] Standard 4-2.2(a) states that confined persons should have the right "to prompt, confidential, affordable and effective communication with a defense lawyer throughout a criminal investigation, prosecution, appeal, or other quasi-criminal proceedings such as habeas corpus." Section 4-2.2(c) states that prisons "should provide adequate facilities for private, unmonitored meetings between defense counsel and an accused."

[30] Bruce Green, a former federal prosecutor, is a professor of and expert in legal ethics. He has taught legal ethics at Fordham Law School for 33 years, has been involved in the processes by which the professional conduct rules are drafted, interpreted and enforced.  In recognition of his professional work in the field of legal ethics, he was the 2018 recipient of the ABA's Michael Franck Award. *Id.* at ¶ 3.

> [O]ther than face to face meetings with one's client in prison, all other forms of communication – telephone, video-conference if it's available, email, legal mail through the postal service – require the message to be conveyed by or mediated through prison staff.  But a department of corrections, or, in the federal system, the Bureau of Prisons, runs the prison and is the adversary in all habeas proceedings. It is represented in legal proceedings by the state attorney general's office, or in the federal system, by the Department of Justice. In other words, in the absence of in-person visits, we are forced to discuss matters of litigation and of the highest sensitivity to our client over channels supplied by our clients' adversaries.  This raises troubling issues about confidentiality.

Exh. I, Kendall Decl., ¶ 40.  *See also* Exh. J, Green Decl., ¶ 19.[31]

> c.  *Counsel's presence in the days immediately preceding the execution, and the execution itself*

Counsel's presence in the days leading up to the execution, and at the execution itself, is also essential. Even DOJ recognizes the importance of counsel's in-person access to a client during this time by expressly providing for it in the regulations for the week before the execution, s*ee* 28 C.F.R. § 26.4(a), and mandating it for the execution itself, if requested. *See* 28 C.F.R. § 26.4(c) ("In addition to the Marshal and Warden, the following persons shall be present at the execution: (ii) Two defense attorneys."). Counsel's presence is not merely a concession or for emotional support of the prisoner; it is necessary in case potential legal violations occur. In a botched 2014 execution, for example, the presence of counsel was critical to the prisoner's gaining access to the courts through an emergency petition when the execution drugs failed to bring about death, leaving him gasping for air for nearly two hours.[32]

---

[31] Professor Green notes that, although counsel may communicate with their client and others remotely, during this pandemic "counsel is effectively precluded from meeting with their client in person throughout the entire period leading up to the scheduled date of his execution, and likewise, counsel is effectively precluded from attempting to meet in person with witnesses and others who may have crucial information and opinions.  As a practical matter, the scheduling has foreclosed competent legal representation as conventionally undertaken by lawyers at this critical stage." Exh. J, Green Decl., ¶ 19.

[32] *See* Berman, *Arizona execution lasts nearly two hours; lawyer says Joseph Wood was 'gasping and struggling to breathe,'* WASH. POST (July 23, 2014),

As explained below, due to the nature of the COVID-19 disease, and the ways it has affected travel and spread through prisons, Mr. Lee's counsel are unable to safely travel to meet with Mr. Lee in-person, undertake necessary investigation, or be present in the prison in the days leading up to and including the scheduled execution.

Lawyers have a professional duty to represent clients competently.[33] These requirements are based on the ABA's Model Rules of Professional Conduct. In the context of litigation under warrant and in preparation of a clemency petition, they are further defined by the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. Counsel must meet and consult with their client in person; interview witnesses, jurors and others to investigate and prepare his litigation and his clemency petition; and attend and witness his execution.[34] But the risk Mr. Lee's counsel face from contracting COVID-19 and transmitting it to their loved ones and community prevents them from carrying out these necessary tasks and places them in an untenable position: they can fulfill their obligations to Mr. Lee and jeopardize their health, or abandon their responsibilities to him in favor of protecting themselves against a dangerous, sometimes lethal virus.[35]

---

https://www.washingtonpost.com/news/postnation/wp/2014/07/23/arizona-supreme-court-stays-planned-execution/.

[33] ABA Model Rules of Professional Conduct 1.7(b)(2). See also Exh. J, Green Decl., ¶ 9.

[34] *Id.* at ¶¶ 10-13.

[35] As Professor Green explain, this is not merely a moral dilemma. It is also a classic instance of lawyers operating under a conflict of interest. "A lawyer who declined to engage in necessary communication or investigation out of self-interest, including a personal interest in the lawyer's health, would ordinarily have a conflict of interest under ABA Model Rule 1.7(b)(2)." *Id.* at ¶15. The only reason counsel here is not required by the Model Rules to withdraw, given this conflict, is that "[i]n the context of a pandemic . . . any other lawyers would be presumably be subject to the same conflicted consideration of having to weigh their clients' interests against their interest in protecting their own health and that of their family and community." *Id.*

## 2.  The nature of the COVID-19 disease.

The SARS-CoV-2 virus, and the human infection it causes—COVID-19 disease—is a global pandemic, has been designated a global health emergency by the World Health Organization (WHO), and was declared a national emergency on March 13, 2020, by President Trump. Exh. A, Beyrer Decl., ¶¶ 7, 10. Although many recover from the disease, the fatality rate associated with it is significant. *Id.* at ¶¶ 14, 28. To date, there is no vaccine, known cure, or definitive treatment for COVID-19. *Id.* at ¶¶ 24, 116. Even when not fatal, it can wreak havoc on the body—damaging vital organs, causing permanent loss of respiratory capacity, and affecting brain and neurological function, among other complicating effects.

This disease has been difficult to contain in part because the course of the illness in any particular person is unpredictable: some people with COVID-19 may have no symptoms or "mild" symptoms,[36] while others can develop severe illness that can lead to death, or long-term, potentially permanent health complications. *Id.* at ¶¶ 28-38. There are several known risk factors for fatality or for developing the other serious complications arising from COVID-19, including, for example, age,[37] gender,[38] hypertension, heart disease, cancer, type 2 diabetes, and obesity. *Id.* at ¶¶ 40-45. The virus passes from person to person when an infected individual expels respiratory droplets into the air through, for instance, speaking or sneezing. It can be contracted from contact with hard surfaces, where it can linger for hours to days, or it can spread through

---

[36] The "mild" symptoms are not insignificant and can last for months, even in young and previously healthy individuals: they include "fever, chills, cough, shortness of breath, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and diarrhea." Exh. A, Beyrer Decl., ¶¶ 31-32.

[37] In Indiana (which is typical of most areas of outbreak), the "case-fatality" ratio as one advances in age is alarming: for 40-49 year olds, it is 1.86%; for 50-59 year olds, 5.12%; 60-69 year olds, 16.38%; 70-79 year olds, 24.55%; and for those over 80, 51.12%. *Id.* at ¶ 39.

[38] Males are more likely to die of COVID-19 than females. *Id.* at ¶ 44.

19

aerosolized fecal contact (in, for example, pubic bathrooms). *Id.* at ¶¶ 46, 59. Individuals who are pre-symptomatic are believed to be most infectious in the two to three days before their symptoms develop.  People who never develop symptoms can still infect others. As a result, individuals are carrying and spreading the virus to those around them without knowing it. This is a major contributing factor to increased spread, made more complicated by the use of ineffective screening measures and limited and inconsistent testing availability. *Id.* at ¶¶ 11, 13, 48-51.

Even when significant mitigating measures are employed—mask wearing, social distancing, frequent hand-washing, disinfecting high-touch surface areas, among them—it does not guarantee full protection from contracting the disease. *See, e.g., id.* at ¶ 55, 58.

### 3. The interstate and airline travel necessary in the weeks and days leading up to the scheduled execution, as well as that required for presence at the execution itself, are dangerous for Mr. Lee's counsel and others.

Mr. Lee's counsel, as previously noted, do not live near USP Terre Haute,[39] where all federal prisoners under death sentence are held and where BOP plans to carry out executions in the coming days. They or those in their care also suffer from known risk factors for developing complications from COVID-19. *See id.* at ¶¶ 40-45. Thus, in order to do what they need to do— including undertaking necessary investigation for clemency and litigation, meeting with Mr. Lee, and being present at the scheduled execution—they are forced to assume potentially grave health risks to themselves and others.[40] That is untenable.

Travel generally, as Dr. Beyrer explains, "involves significant risks of transmission" of COVID-19, and "has the potential to seed new outbreaks across the country." *See* Exh. A, Beyrer

---

[39] Unlike the much smaller state jurisdictions, the federal death penalty naturally covers the entire country. Nearly all of the prisoners on the federal row are housed in one facility in Terre Haute, Indiana. This necessarily requires most counsel to fly and to stay overnight in order to meet with their clients.

[40] Others who would be present would also be facing risk.

Decl., ¶¶ 22, 61. Interstate travel, and airline travel in particular, in the midst of the pandemic continue to be dangerous, and carry enhanced chances of contracting and spreading the disease, potentially without detection until it is too late.[41] *See id.* at ¶¶ 61-81. Moreover, because of the nature of the disease and how it is spreading in prison settings, interstate or airline travel to and from a prison with known COVID-19 cases presents a heightened risk for counsel and for those they come in contact with both in journeying home and in arriving there.

> Travel, as noted previously, increases risk for COVID-19 infection and spread. Therefore, the CDC recommends staying home and avoiding close contact with others. Air travel, hotel stays, and prison visits can increase risk of getting COVID-19, as these activities involve spending time in security lines, exposure to high contact surfaces, and close proximity to others.

> Risk to individuals and their household members increases if they or their household members are at greater risk of contracting COVID-19 or experiencing more severe outcomes. Living in a household with an infected person increases risk of COVID-19 transmission, as it can be difficult to socially distance between household members (stay 6 away) and there are many shared surfaces in a household.

> As asymptomatic transmission is possible, a person may return from a trip having been exposed to COVID-19 but show no signs of illness, which puts their household members at greater risk of infection.

> For people who have recently traveled, some state and local governments may require a period of quarantine where the person must stay home for 14 days. But one is typically not able to quarantine from others in their household.

> In the same fashion, if individuals became infected while inside a prison, they would pose a risk to anyone they came in contact with, including others in the prison; cab drivers, hotel staff, and fellow travelers they encounter upon their departure; and to everyone in the household to which they are returning.

*See id.* at ¶¶ 107-111; *see also id.* at ¶¶ 102-106.

---

[41] Dr. Beyrer noted the number of known COVID-19 cases and fatalities for various locations for Indiana as well as others, including where Mr. Lee's attorneys and some of Mr. Lee's family members would have to travel from and travel through to get to Terre Haute by plane. *See* Dr. Beyrer Dec. at ¶ 63.

21

**4. Traveling to and from USP Terre Haute during the pandemic continues to be extremely hazardous.**

For counsel to undertake the necessary in-person meetings with Mr. Lee, and to be present for the execution itself, going to USP Terre Haute is unavoidable. The same is true for anyone who wishes to or needs to attend the execution. But prisons like USP Terre Haute are known COVID-19 hotspots, where the disease has the potential to spread quickly and uncontrollably. *See, e.g.,* Exh. A, Beyrer Decl., ¶ 83. Dr. Beyrer explains some of the reasons for this phenomenon:

> First, as with other contaminate environments, like nursing homes, to receive basic necessities, prisoners are required to interact with numerous correctional officers daily: to receive food, receive medication, be let outside into recreational facilities. One infected correctional officer can spread infections between different areas of the prison.

> Second, meaningful isolation and social distancing within a prison, among infected or exposed persons, is nearly impossible. Crowded conditions are a known risk factor for infection, and high-density prisons can more than double the risk of major infection, for instance for tuberculosis. Prisons rarely have the facilities available to allow individuals to quarantine properly. Those in need of quarantine and monitoring for symptoms, for instance, are often put in special housing units (SHU), which in turn requires further interactions with correctional officers, often in a delayed manner.

> Third, prisons typically lack the facilities for quick and efficient dispensation of medical care and testing. This fact has been well-documented in prior studies of tuberculosis, which found 21% of prisons lacked organized healthcare systems allowing for timely testing. In addition, notably for SARS-CoV-2, individuals can quickly deteriorate, and current sick call protocols can make it difficult to receive care in the event of worsening symptoms.

*Id.* at ¶¶ 84-86 (internal citation omitted). Prisons are, by their very nature, susceptible to COVID-19 outbreaks, even where mitigation measures are instituted:

> Transmission prevention in prisons is difficult because a prison is not a closed system. Even with the suspension of in-person visitation, correctional officers and other staff have to go home at the end of the day. Therefore, there is no way to ensure that community-related infections do not enter the prison system and quickly spread.

*Id.* at ¶¶ 88-89.

These broader problems related to the spread of COVID-19 in prisons have been borne out in BOP institutions across the country, including at USP Terre Haute, and are well-documented.[42] Despite measures BOP has put in place to try to contain its spread—including suspending social and legal visits with prisoners, restricting prisoner movements within and between institutions, and barring many contractors and volunteers from entering institutions[43]—rates of COVID-19 infections and fatalities have continued to rise. As of July 1, 2020  6788 prisoners in BOP institutions have had confirmed cases of COVID-19, of which 90 have died.[44] That is significantly disproportionate to the general population in the United States, as well as compared to other nations with significant coronavirus outbreaks:

---

[42] *See, e.g.,* Keri Blakinger and Keegan Hamilton, *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps*, THE MARSHALL PROJECT (June 18, 2020) (available at: https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps )(last visited June 29, 2020); *see also* Janet Reitman, *"Something Is Going To Explode: When Coronavirus Strikes a Prison*, N.Y. TIMES (April 18, 2020), (available at: https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html) (last visited June 29, 2020); *see also* Courtney Buble, Union Files National Grievance Over Alleged Safety Violations at Federal Prisons During Coronavirus Pandemic, Government Executive (April 20, 2020), (available at https://www.govexec.com/workforce/2020/04/union-files-national-grievance-over-alleged-safety-violations-federal-prisons-during-coronavirus-pandemic/164755/ )(last visited June 29, 2020).

[43] *See* BOP, BOP Implementing Modified Operations, (available at: https://www.bop.gov/coronavirus/covid19_status.jsp) (last visited June 26, 2020).

[44] *See* BOP, BOP COVID-19 Cases (available at: https://www.bop.gov/coronavirus/covid19_status.jsp) (last visited July 2, 2020). This includes the number of BOP inmates who have tested positive for COVID-19, the number of BOP inmates who have recovered, and the number of BOP inmates who have died from COVID-19.

**COVID-19 RATE OF INFECTION FOR VARIOUS POPULATIONS
(AS OF JULY 1, 2020)**

| Location | Cases[45] | Population[46] | Infections/ 1,000 People | Infection Rate as Percent of Population |
|---|---|---|---|---|
| BOP Imprisoned Population | 6,788[47] | 144,817[48] | 46.87 | 4.6873% |
| United States | 2,68270 | 329,882,238 | 8.10 | 0.8131% |
| China | 84,813 | 1,394,015,977 | 0.06 | 0.0061% |
| Italy | 240,760 | 62,402,659 | 3.74 | 0.3738% |
| Brazil | 1,448,753 | 211,715,973 | 6.84 | 0.6843% |

| | BOP has an infection rate X times higher |
|---|---|
| Compared to the United States | 5.79 |
| Compared to China | 781.17 |
| Compared to Italy | 12.53 |
| Compared to Brazil | 6.85 |

[45] All data regarding positive COVID cases in the United States, China, Italy, and Brazil were obtained on 7/01/2020 at 7:43pm from https://coronavirus.jhu.edu/map.html

[46] All data regarding the population of United States, China, Italy, and Brazil were obtained on 7/01/2020 at 7:43pm from https://www.census.gov/popclock/

[47] This includes the number of BOP inmates who have tested positive for COVID-19, the number of BOP inmates who have recovered, and the number of BOP inmates who have died from COVID-19. These numbers were obtained from www.bop.gov/coronavirus on 7/01/2020 at 7:40pm. There is good reason to believe that the numbers reported by the BOP understate the actual number of cases. *See* Walter Pavlo, "Federal Judges Are Relying On Bureau Of Prisons COVID-19 Numbers To Make Rulings," Forbes, May 20, 2020 (noting that BOP "figures do not accurately reflect the illness and the potential problems associated with deadly virus spread in prison" because they rely on "a carefully crafted definition of COVID-19 results" that only counts "active" cases of prisoners who have tested positive "and does not include those with symptoms, who have not been tested but are presumed sick enough to be quarantined," and that BOP "has no protocol for testing every inmate on a regular basis" because of cost concerns).

[48] This includes the number of federal inmates in BOP-managed institutions, the number of federal inmates in community-based facilities, and the number of federal inmates who have died from COVID-19. These numbers were obtained from www.bop.gov/coronavirus on 07/01/2020 at 7:40pm.

Enormous outbreaks have already occurred in BOP institutions: at the Lompoc prison complex, where nearly all of those incarcerated tested positive for COVID 19,[49] USP Yazoo City,[50] FCI Butner,[51] FCI Elkton,[52] and FCI Forrest City,[53] to name a few. As noted previously, USP Terre Haute has not been spared,[54] and given the current trends and course of the disease in prison settings, there is little reason to believe it is immune from the alarming path COVID-19 has taken in other BOP facilities or that holding an execution there at this time will not be the catalyst for a new outbreak. (Indeed, in the single execution that has been held in this country since the coronavirus outbreak, the prison reported a spike in cases in the weeks immediately following it.[55]) There are no measures that DOJ or BOP can now take that will keep safe Mr.

---

[49] Tyler Hayden, *ACLU Sues Lompoc Prison for Botching COVID-19 Response*, Santa Barbara Independent, May 18, 2020, (available at: https://www.independent.com/2020/05/18/aclu-sues-lompoc-prison-for-botching-response-to-covid-19-outbreak/) (last visited July 2, 2020). *See also* Dr. Beyrer Dec. at ¶¶ 90-91.

[50] *81 COVID-19 cases reported at Yazoo City federal prison*, WJTV News, April 21, 2020. (available at: https://www.wjtv.com/news/81-covid-19-cases-reported-at-yazoo-city-federal-prison/) (last visited July 2, 2020).

[51] Dan Kane, *Butner federal prison begins mass COVID testing after six inmates die in eight days*, The News & Observer, June 3, 2020. (available at: https://www.newsobserver.com/news/coronavirus/article243210251.html) (last visited July 2, 2020).

[52] "A total of 523 inmates at the prison have tested positive for COVID-19" and 9 have died. Julia Tullos, *No new COVID-19 cases at Ohio federal prison*, FOX19NOW.com, June 10, 2020 (available at: https://www.fox19.com/2020/06/10/no-new-covid-cases-ohio-federal-prison/) (last visited July 2, 2020).

[53] Ninette Sosa, *A CLOSER LOOK: Forrest City and COVID-19*, KNWA FOX24, June 4, 2020. (available at: https://www.nwahomepage.com/news/a-closer-look/a-closer-look-forrest-city-and-covid-19/) (last visited July 2, 2020) (reporting more than 600 positive cases at one point).

[54] Eleven inmates at the federal prison at Terre Haute had tested positive for COVID-19 as of July 1, 2020, with 39 test results still pending. https://www.bop.gov/coronavirus/ (last visited July 2, 2020). One inmate is reported as having died. Sue Loughlin, *Federal prison in Terre Haute records first COVID-19 death*, Tribune-Star, May 26, 2020. (available at: https://www.tribstar.com/news/federal-prison-in-terre-haute-records-first-covid-19-death/article_852d74da-9f86-11ea-ae3c-f7f139af47cc.html)(last visited July 2, 2020).

[55] Bobby Radford, *COVID-19 outbreak confirmed at prison in Bonne Terre,* Daily Journal Online, June 19, 2020. (available at: https://dailyjournalonline.com/news/local/govt-and-

Lee's counsel or others who would attend the July 13th execution.[56] *See* Exh. A, Beyrer Decl.,

*e.g.,* ¶¶ 61-81; 102-111.

### 5. The movement of people in and out of USP Terre Haute for the execution heightens the COVID-19-related health risks for Mr. Lee's counsel, and others who may be present, and the general public.

The execution of Mr. Lee is not planned to be a local event, held in complete isolation,

limited to a specific date and time, and sealed off from COVID-19. Any claims to the contrary

are refuted by the nature of the disease and how it spreads.

The execution itself takes place in a small building at USP Terre Haute, with smaller

viewing rooms in which social distancing is exceedingly difficult. Upon information and belief,[57]

witnesses will be required to report at a designated off-site location prior to the scheduled

execution. They will be loaded into a standard-size passenger van and driven by BOP personnel

to the prison. That drive is approximately 10 to 15 minutes, during which time witnesses will be

required to sit next to each other and be unable to socially distance.

Upon arrival, witnesses will be escorted to their respective viewing rooms inside the

---

politics/covid-19-outbreak-confirmed-at-prison-in-bonne-terre/article_c7222072-e242-513d-871a-c63a9c30cfbc.html (last visited July 2, 2020).

[56] Undersigned counsel Kouros has previously informed the Court concerning his responsibilities in caring for his elderly parents, whose pre-existing health conditions put them at elevated risk for contracting COVID-19. See Dkt. 1372 at 3. He is not alone. Each of the other lawyers involved in Mr. Lee's case, including those on his witness list for his execution, are also caring for family members with pre-existing conditions, and/or have their own pre-existing conditions that put them at elevated risk. These conditions include their age, cancer, hypertension, diabetes, heart disease, Parkinson's disease, kidney disease, and asthma. *See*, *e.g.*, Exh. A, Beyrer Decl., ¶¶ 39-45; *see also* Center for Disease Control and Prevention, Coronavirus Disease 2019, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July, 2, 2020).

[57] The following information is based on the undersigned's conversation with counsel who witnessed one of the three executions to have been carried out at USP-Terre Haute. More specific information concerning room dimensions and timing is uniquely within the control of the BOP.

building where the execution will take place, by group. (There are four viewing rooms that look into the execution chamber, and each is designated to a particular group: (1) victims' family members; (2) Government personnel; (3) media; (4) witnesses for the condemned prisoner.) Each room has a glass window from which the witnesses can view the prisoner on the gurney. The room for the prisoner's witnesses is small. The only way to have visual contact with the prisoner is to be up against the glass window; although there are chairs in the room, it is not possible to have visual contact with the prisoner from a seated position. The window is not wide; it can accommodate four adults, standing shoulder-to-shoulder. (And even without being up against the glass, witnesses will not be able to effectively socially distance from each other because of the small size of the room.)

The prisoner's witnesses will be in their viewing room for at least 20 to 30 minutes. After the execution, those witnesses will be escorted to a holding room, waiting until it is their turn to address the media outside of the building. The holding room is small, and witnesses will have to remain there until the other groups (the victims' family members and Government personnel) have finished speaking. The witnesses may have to wait in the small holding room for 45 minutes to an hour. If they need to use the facilities, the witnesses will have to share a common bathroom.

After speaking with the media, the prisoner's witnesses will then be shepherded into a standard-size passenger van and driven off-site. This drive is also approximately 10-15 minutes. All in all, the prisoner's witnesses will be in each other's close proximity, and unable to socially distance, for between 90 minute to two hours, at a minimum. (The small size of the building poses additional challenges for the prisoner's counsel. Upon information and belief, in the days leading up to the execution, the prisoner will be transferred to a cell in that building, and it will

be the only location where counsel can meet with their client. The visiting area is separated by

glass that has perforations in it to allow for communication. The side on which counsel is

required to be is a very small room. Two people cannot be in that room and maintain a distance

of six feet; counsel will thus be unable to socially distance while meeting with their client.

Additionally, counsel will be required to share a common bathroom.)

In other words, for nearly the entirety of the process, witnesses will be in the kind of tight

space that poses the greatest risk of contracting the virus:

> The length of time a person spends in an environment that harbors the virus increases his or her chance of contracting it. While a very short period of time may be enough for someone to contract it if the viral load is heavy, a longer period of time in the presence of even a small amount of virus increases the chance of infection.
>
> The most dangerous transmission scenarios are indoor environments with poor ventilation in which people are close together. Research suggests that speech droplets which carry the virus that causes COVID-19 can linger in the air in closed environments for 8 to 14 minutes…
>
> Poorly ventilated spaces increase the likelihood of COVID-19 transmission. Some airflow studies have found that respiratory droplets can travel between people even from 10 feet away, suggesting that even the social distancing recommendation of 6 feet may be insufficient depending on ventilation. Airflow direction may also influence transmission. One case report from China found that a cluster of infections mapped onto the direction of air conditioning flow through a restaurant.

*Id.* at ¶¶ 52, 54, 57.

But focusing on the execution itself does not capture the enormity of the health risks

facing Mr. Lee's counsel and others surrounding the execution. It will inevitably involve the

movement of many people across state lines, including from areas of heavy COVID-19 outbreak,

utilizing various modes of transportation, to and from a prison; it will require the sharing of

public spaces, including, hotels, restrooms, and other prison facilities over the course of several

days, and it will require many situations in which the recommended COVID-19 mitigation

measures are ineffective or impossible. Counsel will have little control over their exposure. Exh.

28

A, Beyrer Decl., ¶ 80.

For the Government's part, a mass mobilization of hundreds of BOP employees from different prison facilities, from the immediate area and from afar, as well as outside contractors and personnel from other federal, state, and local law enforcement agencies, will be required. As Rick Winter, Regional Counsel for BOP's North Central Region (which includes FCC Terre Haute), stated under oath, in connection to Mr. Lee's and others' 2019 execution dates:

> [A]rrangements include the activation of the execution team, which consists of over 40 BOP staff members. These staff members will, by necessity, be removed from their normal duties, which include a wide range of correctional and administrative positions within the BOP. Pursuant to the current operational plan, these staff members are scheduled to cease their normal duties several days in advance of a scheduled execution, in order to give the team time to practice and prepare for their role in an execution. In addition to the team members, a number of BOP administrators will be present as well, also ceasing their normal duties in advance of an execution.

> Additionally, the BOP plans to use contractors who have made themselves available and presumably have made any necessary arrangements for personal and work related matters based on the executions scheduled in December.

> Executions are scheduled to take place at the Federal Correctional Complex at Terre Haute, Indiana (FCC Terre Haute). Accordingly, FCC Terre Haute is also mobilizing personnel in preparation of the currently scheduled executions. In preparation, FCC Terre Haute has also been coordinating with federal, state, and local law enforcement agencies, some of whom have indicated their plans to send personnel to FCC Terre Haute to help maintain security for the currently scheduled executions.

> Approximately 200 FCC Terre Haute staff will serve as institution security and support during an execution…

> Additionally, FCC Terre Haute has made arrangements for specific needs related solely to an execution, for example contracting for buses which will be used to transport public demonstrators who wish to assemble.

> Schedules for FCC Terre Haute staff members are currently being created, allocating staff based on current execution dates. For additional security and support, specialized BOP teams such as Special Operations Response Teams (SORT) and Disturbance Control Teams (DCT) will travel to FCC Terre Haute from other BOP institutions. These teams consists [sic] of approximately 50 individuals.

29

Additionally, BOP has made travel and lodging arrangements for the victims' family members to attend the December executions.

*See* Declaration of Rick Winter, *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145, Doc. 54, ¶¶ 5-11 (Nov. 21, 2019). [58] The logistics Mr. Winter describes were presumably necessary for safety and security for the previously scheduled execution dates, and are presumably comparable to what will be necessary for the currently scheduled one.

DOJ and its sub-agency the BOP are aiming to control a situation that is not in their power to control. That is the nature of COVID-19. No assurances they may give—about what the BOP claims to be able to accomplish safely in the execution chamber or otherwise—can adequately protect counsel, others who may be present for the execution, or the general public. Rather than press forth in the midst of this unprecedented public health emergency, Dr. Beyrer's sound and sensible conclusions should inform the Court's decision:

> It is my opinion, to a reasonable degree of medical certainty, that overnight, out-of-state travel, poses a significant and enhanced risk to the traveler and the members of his or her household, of contracting, and causing community spread of, COVID-19, a disease which can cause serious illness, long-term and permanent health effects, and death.
>
> It is my opinion, to a reasonable degree of medical certainty, that visiting a prison, poses a significant and enhanced risk to the traveler and members of his or her household, of contracting, and causing community spread of, COVID-19, a disease which can cause serious illness, long-term and permanent health effects, and death.
>
> It is my opinion, to a reasonable degree of medical certainty, that traveling from out of state and visiting a prison, poses a significant and enhanced risk of the traveler bringing SARS-CoV-2 into the prison and transmitting it to staff, prisoners, and others one encounters in the prison, including other visitors.
>
> It is my opinion, to a reasonable degree of medical certainty, that travel and visits to penal institutions currently risks public health and community spread and will remain a risk until at least the Spring of 2021.

---

[58] If these arrangements have changed in any way, no one has advised counsel for Mr. Lee.

*See* Exh. A, Beyrer Decl., ¶¶ 119-122.

When the logistics of moving forward with the currently scheduled execution date for Mr. Lee are considered along with what is known about the attendant risks of COVID-19 and the manner in which it spreads insidiously and boundlessly, the need for setting a later date is clear.

## CONCLUSION

This Court has the unchallengeable discretion to set or modify Mr. Lee's execution date, a fact supported by the law and the history of the federal death penalty and acknowledged as well by the DOJ. That his execution has been set in the midst of an unprecedented and worsening health crisis presents a strong case for the use of that discretion. Counsel have been left with the unthinkable choice of abandoning their professional obligations to Mr. Lee to protect their own well-being or fulfilling those obligations and, in the process, potentially imperiling themselves, their families, and members of the public. This is easily solved, not by cancelling Mr. Lee's execution, but merely by postponing it until the crisis abates. Mr. Lee asks this Court to do so.

Respectfully submitted this 2nd day of July, 2020.

MORRIS H. MOON
Bar Number 24032750 (TX)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (713) 880-3556
Email: Morris_Moon@fd.org

GEORGE G. KOUROS
Bar Number 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on July 2, 2020. This motion was served via this court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

MICHAEL GORDON
JONATHAN D. ROSS
SHANNON S. SMITH
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203-1229
(501) 340-2600
michael.gordon@usdoj.gov
Jonathan.D.Ross@usdoj.gov
shannon.smith@usdoj.gov

GEORGE G. KOUROS
Bar # 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org