# EXHIBIT I

**Declaration of**

**George H. Kendall**

My name is George H. Kendall.  I am above the age of 18 and freely and voluntarily provide this declaration.  My current position is Senior Counsel and Director of the Public Service Initiative at Squire Patton Boggs (US) LLP, 1211 Avenue of the Americas, New York, NY 10036.

1.    I became an attorney in 1979 and was admitted to the District of Columbia Bar.  In 1980, along with two other DC-based attorneys, I became involved in my first case representing a client under sentence of death.  (I attach my Vita which summarizes my professional career).  I have represented capital clients ever since and currently serve as lead counsel in three capital cases.

2.    I have represented clients in capital proceedings at trial, on direct appeal, in state post-conviction proceedings, in federal habeas corpus proceedings, and in clemency.  I have represented capital clients under active execution warrants, in their first habeas proceeding, in second or successive habeas corpus proceedings, and in efforts to win clemency in the weeks, days and hours leading up to an execution. I have appeared on behalf of capital clients in state and federal courts around the country.

3.    During the past three months, I have focused primarily upon problems presented by COVID-19 in the prison setting.  In late March, I recruited major law firms to represent detainees and prisoners to assure adequate precautions were taken to lessen the risk of COVID-19 infection.  In April, along with co-counsel, I filed a suit against the Arkansas Department of Corrections alleging insufficient protections were in place to protect both staff and inmates from the virus.  As my work brings me in regular contact with other practitioners around the country (currently through technology), I have been made aware of the experiences of other criminal and capital defense lawyers as they have navigated the changes wrought by the novel coronavirus over the last several months.

4.    I wish to address the demands that are placed on counsel representing a capital client, under an active death warrant, and facing execution.  As every judge and lawyer knows, lawyers representing a death-sentenced client are obligated to represent their client zealously, and vigorously seek any and all avenues of relief.

1

As will become clear, the breadth of representation necessary here is impossible to provide in the current COVID-19 dominated world.

5.      First, it goes without saying that it is critical for a client's case when under warrant that his lawyer remain healthy. The drafting of legal papers is exhausting and made significantly more difficult by the many legal doctrines that forbid merits review of a claim unless and until doctrines of exhaustion, default, waiver, and abuse of the writ are first dealt with satisfactorily.  Given the compressed time, papers must be prepared for at least three courts: the district court, court of appeals, (sometimes, a petition seeking en banc review in the court of appeals) and then a petition for writ of certiorari and application for stay of execution for the Supreme Court of the United States. Compared to other responsibilities, this is the easy part. But doing it while ill with COVID-19 would be a virtual impossibility and by this point in a client's case, it's rarely possible for a new lawyer to step in who knows the record and history of the case.

6.      In addition to drafting legal papers, there is a wide array of duties that arise in the weeks prior to an execution date.

7.       The ABA's 2003 Death Penalty Representation Guidelines provide broad guidance and a starting point.  Two sections apply most directly to counsel when a client is under warrant: "Duties of Post-Conviction Counsel" and the "Duties of Clemency Counsel."  The duties of post-conviction counsel include:  "(1) maintain close contact with the client regarding litigation developments;  (2) continually monitor the client's mental, physical, and emotional conditions for effects on the client's legal position;  and (4) continue aggressive investigations of all aspects of the case."  Guidelines 10.15.1(B) and (E).  The duties of clemency counsel instruct, among other things, that counsel should conduct a thorough and independent investigation of the issues of both guilt and penalty.  Guidelines 10.7 and 10.15.2(B) and (C).

8.      Sometimes, a claim raised in the final days before an execution will focus on an important question other than the lawfulness of the capital conviction or sentence, like the client's declining mental health as an execution date approaches, or the ability to have one's spiritual adviser present in the execution chamber. Such claims nearly always require factual development in order to assert the issue in good faith or respond to opposition suggesting the claim was manufactured.  And given the number of horribly botched executions in past years, claims challenging new protocols are common, necessary, and sometimes found meritorious.

2

9.    Claims raised at this stage nearly always require factual development and may require consultation with expert witnesses.  In many, it is necessary that the expert(s) interview the client at the prison, at least once, and often more than once.  Depending on the claim, the expert might need to review evidence in the record and/or meet and speak with other witnesses, family of the client, or others. Such interviews are always conducted face to face, in a confidential setting, and never over a telephone or other means of impersonal communication. Medical examinations can necessitate testing, that can require that the client be transported to a medical facility away from the prison.   Often, this end-stage litigation is complicated, and must be flawlessly put together over a very short period of time.

10.    But the heart and soul of capital representation under an active execution warrant is the unique interaction between the attorney and his or her client, with family, and with the many issues and questions that the execution process raises.

11.    Representing someone under warrant requires, first and foremost, an enormous amount of time spent visiting the client.  This is necessary for a variety of reasons.

12.     During this period, the role of counsel expands to include:  assessing the client's evolving mental health; explaining to the client all matters pertaining to litigation, which at this stage often moves extraordinarily quickly; addressing with the client on-the-ground developments; helping prepare the client to make end-of-life decisions; serving as liaison with prison staff and counsel for the prison; bearing witness to his final days; and in many cases, witnessing the execution itself.

13.     A client's mental health in the weeks and days approaching an execution can be extraordinarily fragile, even assuming his mental health was normal at the start of the warrant period, which often is not the case with our clients.  Their moods can fluctuate tremendously from one day to the next and from hour to hour.  They are typically and understandably deeply depressed, highly anxious, and they frequently decompensate.  Many suffer from lifelong effects of childhood trauma. Even those who have no pre-existing mental health problems may spin out of control.

14.     Whether or not a client's mental health deteriorates that far, a client has many decisions he needs to make during these last weeks and he can't make those decisions in a meaningful fashion if he is in the throes of depression or anxiety.

3

15.    Likewise, no one in the prison setting is well-served by having a prisoner with escalating mental health issues.  A prisoner can become a danger to himself and to others.  I have seen instances where a prisoner's sense of panic and despair spread quickly to others throughout the institution.

16.    The legal team's assessment of their client's mental and physical health requires observing the client in person in order to notice, for example, a change in his general countenance; his clothes fitting differently; his hygiene deteriorating; having bad breath or body odor;  changes in his skin tone and color, such as an increase in his pallor; whether his eyes seem glassy, glazed, unfocused, darting, or bloodshot; his ability to maintain focus in conversation and comprehend what's being said to him; his attention span; his orientation; changes from his normal speech patterns; his degree of rationality;  whether he's exhibiting emotional outbursts or, perhaps, exhibiting no emotion at all; abnormal body movements like hand shaking, leg trembling, foot tapping, facial tics and verbal tics; rapidly cycling through anger, despair, confusion, magical thinking, or fantastical hopes during a single visit. Conducting these assessments, and helping to keep one's client in his right mind, is important for every client under warrant.

17.    In addition, we often are the primary emotional support for our clients during this period. Our clients, who live in isolation, are confined to their cell 23 hours a day under normal circumstances.  Despite this confinement, they are able to communicate with a limited number of people within ear shot and when they go outside for their daily rec time.  In this way, the prisoners often form close friendships over the years with their "range-mates."

18.    Because those with execution dates are typically moved from their normal range in the prison to a more isolated location when their execution dates are set, clients under warrant are separated from those few people to whom they would ordinarily express fears and frustrations, and who know them well enough to lighten their mood or give them encouragement.

19.    This frequently makes in-person visits from his legal team the condemned's only source of contact with people he knows well enough to confide in or seek counsel from, without having to put on the face of calm they often try to present to family (assuming they have family to visit them.)

4

20.    Clemency advocacy differs significantly from litigation.    Most clemency authorities are not interested in reviewing perceived shortcomings in the court system's review of legal issues, regardless of how compelling the circumstances. They focus on whether there is some fundamental and compelling reason or reasons for the executive to intervene and upset a now final court judgment and sentence. Petitions for clemency in capital cases often focus on whether the sentence remains proportional, or whether an inmate's extraordinary positive deeds in prison warrant a lesser sentence, or on facts about the crime or case that were not considered by the courts that have newly come to light.    At the same time, many tell the story of the client's life and often include elements that were never described to the sentencing jury.    Overwhelmingly, these petitions are long and comprehensive, and are supported by numerous witness declarations and official records.

21.    Thus, the Guidelines' instruction that a full investigation should be undertaken by clemency counsel has sound foundations.    Time and circumstances change what people have to say.    We have seen co-defendants become  willing to acknowledge things they hadn't been willing to talk about earlier, especially if all their appeals have concluded or they have finished serving their sentences a prisoner's execution is imminent.    They, and other witnesses, may now be able to talk about things they told prosecutors prior to trial or admit to crime facts about which they had never been forthcoming.

22.    I am aware of instances in which a witness or family member provided new information at the last hour that had an impact on legal claims or clemency.    This may be because the witness suddenly realized the significance of certain facts or that the failure to disclose them would result in an unjust execution.    Sometimes the witness was only now willing to reveal abuse some family member visited upon the person facing execution because the abuser died, freeing the rest of the family from the grip of secrecy.    These are revelations that can only happen in person, in face to face meetings between the witnesses and the legal team.

23.    The reality of a pending execution may also have an effect on the victim's family prompting them to decide that executing someone will not give them the closure they're seeking.    Interviewing them may lead counsel to discover they are willing to support a bid for clemency.    It's something competent counsel has to explore, even if they believe chances for success are small.

24.    In those last weeks, counsel typically tries to meet with jurors, as well, or to seek court permission to interview them.    This can be important in the context of a clemency petition, particularly if new exculpatory evidence has arisen since trial,

5

new mitigation has come to light, or if the jury's determination focused on the client's future dangerousness and the client has a demonstrated record of compliance over decades in prison.  In such an instance, learning that new information may be important to jurors who would not have voted for death with this information in hand. These are matters that can be raised in clemency and have at times had profound effects on decision-makers.

25.     Clients frequently don't understand the nature or value of filing a clemency petition, however.  They often don't grasp the fact that issues that, for example, couldn't succeed in court as a result of procedural hurdles may nevertheless positively influence the clemency determination.  They may still be pursuing guilt-phase issues and may fear they will jeopardize those if they seek clemency. Thus, even the decision whether to file a clemency petition often requires a number of conversations with one's client.  Once filed, many clients still have misgivings and wonder whether there is any point in pursuing this avenue of relief.

26.     And the decision to file is only the start of the process.  Clemency petitions typically include extraordinarily personal information about the client and his family – information that has never been revealed publicly before.

27.     This requires having long, difficult, and often highly emotional conversations with one's client – discussions about loved but abusive, neglectful, or mentally ill parents; about family members no one has ever previously accused of engaging in sexual abuse, despite several family members having been victims of it; about problems within the family of alcoholism or drug abuse.  And because it is important for these accounts to be veridical, verifiable, and credible, our conversations with our client require us to probe for names, dates, possible other witnesses, and details.

28.     Such conversations have to be conducted in private, in person, and with the highest degree of confidentiality possible.

29.     My representation of a Texas condemned inmate, Delma Banks, is typical of the unique issues that must be attended to during the warrant period.

30.     Mr. Banks' death sentence, vacated by a district court, was reinstated by the United States Court of Appeals for the Fifth Circuit in late August, 2002, and shortly thereafter, state officials set a March 10, 2003 execution date.   Even with this six months, there was an enormous amount of work to complete. Much of the fall was

6

consumed by writing the petition for writ of certiorari that was filed at the end of the year, and a detailed clemency petition. During January through early March, there were many persons we needed to meet with to encourage support of both the certiorari petition and clemency. Eventually, a powerful amicus brief was filed in support of the petition, and stay of execution, by former federal judges, a former director of the FBI, and a former United States Attorney. This was significant because the petition presented cert-worthy claims of prosecutorial misconduct, ineffective assistance of counsel, and purposeful racial discrimination in jury selection the court of appeals had failed to address appropriately. That brief caught the attention of media and others.

31.    Throughout January and February, although I live in New Jersey, I spent much time in Texas, meeting with prominent citizens there who were concerned about the unfairness of the trial and volunteered to help with clemency.

32.    At my client's request, I met often (also in Texas) with various members of his family who were having an enormously difficult time understanding why their loved one was going to be executed even though nearly all of the evidence against him came from two witnesses who, at trial, repeatedly committed perjury. They had many questions about what the Supreme Court might do, how the clemency effort could be more effective, and scores of questions about the execution process. These were not simple discussions. They required hours and hours of time, and were absolutely necessary to my representation of Mr. Banks.

33.    I also visited with Mr. Banks often. His questions and requests that I take certain action were many. As the date drew near, he became increasingly concerned about his family, and felt enormous guilt that, even though he did not commit the crime, and was wrongfully convicted on the basis of two perjurers, he felt he was the cause of his family coming to pieces. And each of his four teenage children was bewildered and distraught.

34.    On the eve of his execution, there was still no decision on our stay application. His family had traveled to Huntsville, the site of executions in Texas, and we all had dinner together. Among other things, we planned Mr. Banks' funeral. The family wondered how soon they could claim the body. Did the prison know that their religion forbade an autopsy? When would they last be able to see or speak to their loved one prior to his execution? That was a difficult evening for everyone. (Just as often, these are discussions one has with one's client, who is typically given forms to fill out indicating where to send his property and who intends to claim his body. Can his family afford to have his body shipped to them? What might the prison do

7

with his body if he leaves it to them to dispose of?  To wonder about these things alone would be terrible.)

35.    On March 12, the date of the execution, I visited Mr. Banks at 8:00 am, and he naturally was very concerned the Court had not yet acted. When, he pleaded, would we hear something.  He also needed to speak about a raft of things, and wanted to make sure that certain members of his family would not try to serve as witnesses at the execution.  After leaving him, I spent the day visiting with family, assuring them repeatedly we had a chance for a stay, and answering many other inquiries.  At 4:00 pm, I was permitted a short meeting with Mr. Banks, this time at the holding cell next to the execution chamber.  He was desperate for news.  Had the Court ruled, he asked, and was incredulous to learn no ruling had been announced. While he wanted me to remain with him, I was removed after ten minutes and could not again speak with him before the 6:00 pm execution.

36.    Mr. Banks was not executed that night.  Ten minutes prior to the execution, as we waited to be taken as witnesses to the execution chamber, a correctional officer entered the room.  He told us a stay had been entered and we were free to leave. I spent much of the remainder of that evening answering scores of questions from family who all day had braced themselves for the worst and could not allow themselves to believe there would be no execution.  Prison officials denied my repeated requests to see or speak by phone with Mr. Banks that evening. I was denied a visit the next day because I had not requested it 24-hours in advance, and was only able to arrange a brief call the next day.

37.    These efforts were not taken in vain.  Thereafter, the Supreme Court heard Mr. Banks' case,  *Banks v. Dretke*, 540 U.S. 668 (2004), and  determined the State of Texas had withheld evidence that would have allowed Mr. Banks to discredit two essential prosecution witnesses.  The Court found the State had failed to disclose that one of those witnesses was a paid police informant and that the other witness' trial testimony had been intensively coached by prosecutors and law enforcement officers. This evidence had been withheld for decades.

38.    In 2012, Mr. Banks accepted an offer from prosecutors to settle the case with a life sentence under which he is eligible for parole in 2024.

39.    Given my experience in this case, in three other cases where clients I had represented were executed, and having advised lawyers in scores of other late-stage representation since, I am certain there is no way to even begin to properly discharge

8

one's responsibility as counsel in the absence of having full contact with your client, with any witness, with family, and with any other person who could aid or assist the case.

40.    Two final notes that strike me as central. First, other than face to face meetings with one's client in prison, all other forms of communication – telephone, video-conference if it's available, email, legal mail through the postal service – require the message to be conveyed by or mediated through prison staff.  But a department of corrections, or, in the federal system, the Bureau of Prisons, runs the prison and is the adversary in all habeas proceedings.  It is represented in legal proceedings by the state attorney general's office, or in the federal system, by the Department of Justice. In other words, in the absence of in-person visits, we are forced to discuss matters of litigation and of the highest sensitivity to our client over channels supplied by our clients' adversaries.  This raises troubling issues about confidentiality.

41.    Second, since the shutdowns caused by the coronavirus, departments of corrections and the Bureau of Prisons have placed many prisons on lockdown and have cancelled all legal visits due to concerns over viral spread. Lawyers representing federal clients have been unable to meet with them in person since mid-March, 2020, when all federal prisons terminated visits.

42.     Now, when these same agencies make the decision to execute someone within their walls, they "allow" the condemned's lawyers and family members assume the risk of exposure to the virus by entering into an environment over which the lawyers and family members have no control and about which the lawyers and family members have virtually no access to neutral information.  Again, it is the adversary who is controlling that environment and creating the need for in-person visits that risk the health of the prison community, the visitors and the families and communities to which these visitors return.  This, too, raises troubling issues and points to the need for someone other than a party to the litigation to take control of this process.

43.     COVID-19 has altered profoundly our world, the ebb and flow of our nation's commerce, and up-ended, for now, much of what gives our legal system the capacity to administer justice fairly and even-handedly.  The last thing we should attempt, in the name of justice, is to resume executions until normal operations are restored.

I affirm under penalty of perjury the substance of this declaration, this 25th day of June, 2020.

George H. Kendall

10