# EXHIBIT J

## DECLARATION OF BRUCE A. GREEN

I, Bruce A. Green, being of full age, do hereby declare the following:

1. I have been retained by the Federal Public Defender's office to render objective expert opinions in *United States v. Lee* regarding questions of lawyers' professional conduct (or legal ethics). In particular, I have been asked to address the implications of Mr. Lee's counsel's inability to meet in person with Mr. Lee and others prior to the scheduled date of his execution.

### **Qualifications**

2. My qualifications to provide expert opinions on the subject of lawyers' professional conduct in general, and in the context of post-conviction proceedings in capital cases in particular, are reflected in my CV, which is attached to this report.

3. With regard to lawyers' professional conduct in general: I have taught legal ethics for 33 years as a professor at Fordham Law School, where I hold the Stein Chair and direct the Stein Center for Law and Ethics. I am co-author of a casebook on professional responsibility that is now in its fourth edition, and author or co-author of many law review articles and other writings on this subject. I have chaired the ethics committees of the New York State Bar Association ("NYSBA") and the New York City Bar, and I currently chair the Multistate Professional Responsibility Examination (MPRE) drafting committee. I have served on the American Bar Association's ("ABA") Standing Committee on Professional Ethics, I am serving on the NYSBA's Committee on Standards of Attorney Conduct, and I have engaged in a wide variety of other professional service relating to legal ethics, including serving for six years on my jurisdiction's attorney disciplinary committee and chairing the ethics committee of the ABA Litigation Section. I frequently speak at academic and professional (CLE) programs on legal ethics topics. I have also provided advice to lawyers and served as an expert witness on questions of lawyers' professional conduct. In these and other capacities, I have been involved in the processes by which the professional conduct rules are drafted, interpreted and enforced in New York and nationally. In recognition of my professional work in the field of legal ethics, I was the 2018 recipient of the ABA's Michael Franck Award.

4. With regard to lawyers' professional conduct in the criminal context, including in capital cases in particular: Prior to joining the Fordham law faculty, I served as a law clerk to Judge James L. Oakes and Justice Thurgood Marshall and

served for four years as a federal prosecutor in the U.S. Attorney's Office for the Southern District of New York, where I eventually became Deputy Chief Appellate Attorney and Chief Appellate Attorney in the Criminal Division. For close to three decades at Fordham, I have taught a seminar on Ethics in Criminal Advocacy that focuses on the professional responsibilities of prosecutors and criminal defense lawyers. I have also taught criminal law and criminal procedure courses. I have served in the leadership of the ABA Criminal Justice Section for more than a decade, including as Chair of that Section, as co-chair of that Section's ethics committee, and currently as Chair of the Criminal Justice Standards Committee, which has overseen the revision of the Prosecution Function and Defense Function Standards and accompanying commentary. I have written and spoken extensively on the work of criminal defense lawyers and even more extensively on the work of prosecutors. In my writings and teachings, I have addressed lawyers' work in death penalty cases in particular, and I have also engaged in professional service relating to capital cases, including as a member of the ABA Death Penalty Representation Project.

### **Opinions**

5. Scheduling a federal prisoner's execution to take place during the Covid-19 pandemic effectively denies the prisoner's counsel the ability meet in person with the client and others, thereby depriving the prisoner of what, in ordinary circumstances, would be necessary as a matter of competent representation during the critical period leading up to the scheduled execution. In my judgment, this scheduling induces the prisoner's counsel to violate professional standards and it is prejudicial to the administration of justice.

> 1. *Scheduling a prisoner's execution during the current pandemic precludes the prisoner's lawyers from providing competent representation.*

6. The "warrant stage" of death penalty proceedings, after an execution date has been scheduled, is a period when counsel has a critical role – indeed, unless the prisoner's lawyer succeeds in obtaining clemency or other relief, it is the only remaining stage of post-conviction proceedings. During this time, as attorney George Kendall's declaration describes, counsel meets with the client to assist him in deciding whether to authorize procedural steps to try to avert his execution, and to assist him in making decisions regarding both his execution and the aftermath. If the client consents, the prisoner's counsel customarily undertakes substantial work that requires further in-person access to the client as well as to others, in an effort to avail the client of any remaining remedies. This includes seeking information from the client, both by way of communications and by way of observation, that may be

relevant to judicial applications and/or to a clemency application.  Likewise, it includes attempting to interview the client's family members, members of a victim's family, jurors and others who may possess information or present views helpful to the lawyers' submissions on the client's behalf.  Further, as important legal events occur prior to the scheduled execution, counsel communicates with the client in person both to provide timely information about changes in the status of the proceedings and to obtain direction from the client regarding the decisions that the client is entitled to make or as to which the client is entitled to provide input.

7.  Effective communications with the client who is under an active death warrant require in-person meetings.  This is true, in part, because of confidentiality considerations.  Clients in this context are unlikely to be as forthcoming in telephonic or other remote communications because of their fear – which may be well-founded – that their communications can and will be overheard.  The professional conduct rules and other law, including the attorney-client privilege, presuppose that confidentiality is essential to promote client candor.  Further, wholly apart from clients' fear that their telecommunications with counsel will be overheard and potentially used to their detriment, particularly in this context telecommunications are not conducive to effective information-gathering, explanation and decision-making.  Even in-person communications with death-sentenced prisoners are notoriously challenging, given both the clients' potential intellectual and psychological impairments and given the life-and-death nature of the information the clients must assimilate and the decisions they must make.  This is especially likely to be so when an execution date has been set. Telecommunications with death-sentenced prisoners are likely to be not only challenging but ineffective, especially given that counsel ordinarily relies on nonverbal cues and other physical manifestations that will not be discernable through remote communications. Likewise, information-gathering from witnesses, jurors and family members of the client and, in some cases, the victim, is likely to be less effective, or ineffective, if it is not face-to-face, because people with sensitive information relevant to the death-sentenced prisoner's legal filings or clemency application are generally more disposed to be forthcoming with someone with whom they are speaking in person.

8. Setting a federal prisoner's execution date during the Covid-19 pandemic, when, concerned about their own health, the prisoner's lawyers cannot reasonably be expected to meet in person with the client and others, effectively precludes the prisoner's lawyers from engaging in the necessary communications, consultations and investigative measures that would otherwise be undertaken as a matter of competent representation during this phase of a capital post-conviction representation.  As discussed below, the prisoner will be deprived of competent

representation whether counsel's professional obligations are measured by (1) the standard of care of lawyers who ordinarily conduct this work, or (2) the ABA standards and guidelines applicable to criminal defense lawyers generally and to lawyers in capital cases specifically.

9.  In general, lawyers have a professional duty to represent clients competently. The duty is established by agency law and tort law and has been codified in professional conduct rules adopted by the judiciary of every U.S. jurisdiction.  In the U.S., the applicable professional conduct rules are generally based on the ABA Model Rules of Professional Conduct.  ABA Model Rule 1.1 requires that: "A lawyer shall provide competent representation to a client."  The rule focuses on the quality of the lawyer's work, not on whether the client is ultimately harmed in a legal sense.  For example, incompetent legal representation runs afoul of the ethical obligation even if the lawyer is not subject to civil liability because the substandard work did not cause financial harm, or even if, in a criminal case, the client's conviction cannot be overturned because the lawyer's work, although substandard, was not likely to be outcome-determinative and therefore did not cause "prejudice" under the Sixth Amendment standard of *Strickland v. Washington*, 466 U.S. 668 (1984).

10. Ethically competent representation requires counsel to communicate effectively with the client.  ABA Model Rule 1.4 specifically addresses this obligation.  Among other things, it requires a lawyer to "promptly inform the client of any decision or circumstance" calling for the client's informed consent, to "reasonably consult with the client about the means by which the client's objectives are to be accomplished," to "keep the client reasonably informed about the status of the matter," to "promptly comply with reasonable requests for information," and to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."  Further, competent representation presupposes that the lawyer will undertake a reasonable investigation or inquiry to learn the facts needed to advise the client or to advocate or negotiate on the client's behalf at every stage.  *See* ABA Model Rule 1.1, cmt. [5] ("Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem").

11. The competence rule does not describe with specificity what is required in any given situation, nor could it.  In general, it requires the "use of methods and procedures meeting the standards of competent practitioners."  ABA Model Rule 1.1, cmt. [5].  With regard to the methods and procedures used by competent lawyers representing death-sentenced prisoners after an execution date has been set, one

might reasonably look to either of two sources for specific guidance: expert opinion such as that offered by qualified, experienced practitioners, of which Mr. Kendall is one, or standards published by the American Bar Association based on the collective work of lawyers with a range of relevant experience.  Both sources establish that, in this context, competent counseling and fact-gathering necessitate in-person meetings with the client and others.

12. One conventional measure of lawyers' competence is the standard of care for purposes of lawyers' professional negligence or legal malpractice: lawyers must use "the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances." *Hassebrock v. Bernhoft*, 815 F.3d 334, 341 (7th Cir. 2016).  In legal malpractice cases, expert testimony is ordinarily employed to establish the relevant standard of care.  *Id.* at 342.  Here, Mr. Kendall's expert declaration describes the standard of care of lawyers who represent capital clients who are "under an active death warrant, and facing execution." Kendall Decl. at ¶ 4.  His declaration describes at length why he is "certain there is no way to even begin to properly discharge one's responsibility as counsel in the absence of having full contact with your client." *Id.* at ¶ 39.  Meetings with the client will address the client's decision whether to file a clemency petition, *id.* at ¶ 26, and if so, will necessitate "long, difficult, and often highly emotional conversations" which "have to be conducted in private, in person, and with the highest degree of confidentiality possible." *Id.* at ¶¶ 27-28.  Mr. Kendall further explains why, in conducting an investigation, counsel or their investigators must attempt to speak face-to-face with witnesses, co-defendants, jurors, the client's family, and the victim's family.  *Id.* at ¶¶ 20-24.

13. The same conclusion is compelled by the standards published by the American Bar Association to guide criminal defense lawyers' work in general, and in capital cases in particular.  The Supreme Court has identified these standards "as 'guides to determining what is reasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 524-525 (2003) (finding that capital defense counsel failed to conduct a reasonable investigation into mitigation evidence, in light of the failure to take steps required by the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases and by the ABA Criminal Justice Standards on the Defense Function).  The Standards that generally address criminal defense work presuppose that counsel will have the opportunity to meet in person with the client, including at the post-conviction stage.  *See* ABA Criminal Justice Standards, The Defense Function,

Standard 4-2.2 (4th ed. 2017).[1]  Further, as Mr. Kendall explains, the ABA's 2003 Death Penalty Representation Guidelines, which specifically address lawyers' work in capital cases, call for post-conviction counsel to "maintain close contact with the client regarding litigation developments" and "continually monitor the client's mental, physical and emotional conditions," and for clemency counsel to conduct a though investigation.  Kendall Decl. at ¶ 7 (citing relevant Guidelines).  *See also, for example,* Guideline 10.11(C), *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases,* 36 Hofstra L. Rev. 677, 689 (2008); and Mark E. Olive & Russell Stetler*, Using the  Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases to Change the Picture in Post-Conviction*, 36 Hofstra L. Rev. 1067, 1092-93 (2008).

14. This is not to say that, in the context of a pandemic, lawyers are subject to professional discipline if, to protect their *own* and others' health, they are unwilling to travel to a federal prison and meet with their client there, and are equally unwilling to conduct investigations through face-to-face interactions.  In ordinary circumstances, however, these deficiencies in legal representation would constitute incompetent representation under Rule 1.1.

15. Further, a lawyer who declined to engage in necessary communications or investigation out of self-interest, including a personal interest in the lawyer's health, would ordinarily have a conflict of interest under ABA Model Rule 1.7(b)(2) and would be required to withdraw in favor of a lawyer who was not so *constricted.  See* ABA Model Rule 1.16(a)(1) & (2).  In the context of a pandemic, however, any other lawyers would presumably be subject to the same conflicted consideration of having to weigh their clients' interests against their interest in protecting their own health and that of their family and community.  It is only in this unprecedented circumstance, where every lawyer labors under the same disqualifying self-interest, that individual lawyers would not be considered to have a disciplinable conflict as described by the Model Rules.  By way of analogy: If prison officials surrounded the prison with a moat filled with crocodiles and required the prisoner's lawyer to swim across in order to meet with the client, the lawyer would not be subject to discipline for refusing to meet with the client out of concern for his or her own

---

[1] Standard 4-2.2(a) states that confined persons should have the right "to prompt, confidential, affordable and effective communication with a defense lawyer throughout a criminal investigation, prosecution, appeal, or other quasi-criminal proceedings such as habeas corpus." Section 4-2.2(c) states that prisons "should provide adequate facilities for private, unmonitored meetings between defense counsel and an accused."

personal safety. The lawyer would be acting reasonably, as any other lawyer presumably would. The rule set by the prison, not the lawyer, would be blameworthy. But the lawyer still would be denying the client what, by ordinary measure, would be competent representation.

> 2. *Scheduling an execution at a time when the prisoner's counsel cannot provide competent representation is prejudicial to the administration of justice.*

16. As discussed above, Mr. Lee's execution has been scheduled to take place during a pandemic. when it is not feasible for post-conviction and clemency counsel to provide the quality of representation that is ordinarily required as a matter of lawyer competence. To the extent that government lawyers are responsible for choosing this timing, this is, in the very least, ethically problematic. *See, e.g.*, ABA Model Rule 8.4(a) (a lawyer may not knowingly induce another lawyer to violate the professional conduct rules); ABA Model Rule 8.4(d) (a lawyer may not "engage in conduct that is prejudicial to the administration of justice"); *see also* ABA Model Rule 3.8, cmt. [1] ("A prosecutor has the responsibility of a minister of justice . . . to see that the defendant is accorded procedural justice").

17. Conduct by lawyers, including government lawyers, that interferes with individuals' ability to obtain competent, unconflicted representation implicates the professional conduct rules. Notably, in *United States v. Ky. Bar Ass'n*, 439 S.W.3d 136 (2014), the Kentucky Supreme Court held that it is ethically impermissible for prosecutors to offer plea deals under which defendants waive the right to bring post-conviction claims of ineffective assistance of trial counsel. The court reasoned that these plea offers put trial counsel in a conflict between their clients' best interest and the lawyers' self-interest in avoiding a future challenge to the quality of their work, thereby jeopardizing the quality of the lawyers' legal advice. By making these plea offers, the court concluded, prosecutors violated Rule 8.4(a) by inducing defense counsel to act unethically. *Id.* at 156-57. Other authorities have condemned the same prosecutorial conduct based on Rule 8.4(d), which forbids lawyers from engaging in conduct prejudicial to the administration of justice. *See, e.g.*, NYS Bar Ass'n, Comm. on Prof'l Ethics, Op. 1098 (2016); Advisory Opinion of the Board of Commissioners on Grievances and Discipline, Ohio Adv. Op. 2001-6 (Ohio Bd. Com. Griev. Disp. 2001).

18. The impediment to competent representation in this case is at least as significant as the impediment imposed by government lawyers that the Kentucky Supreme Court found to be unethical. Judicial decisions recognize that in criminal,

civil and administrative matters alike, it is imperative for lawyers to be able to counsel their clients. Judicial or government action that interferes with lawyers' ability to counsel clients has been found to violate the right to counsel in criminal cases and to due process in civil cases. *See, e.g., Geders v. United States*, 425 U.S. 80, 91(1976) ("an order preventing petitioner from consulting his counsel 'about anything' during a 17-hour overnight recess between his direct- and cross-examination impinged upon his right to the assistance of counsel"); *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1118 (5th Cir. 1980) (a judge's "rule prohibiting a [civil] litigant from consulting with his attorney during breaks and recesses in the litigant's testimony impinges upon" the due process right to retain counsel); *see also Danny B. v. Raimondo*, 784 F.3d 825, 833 (1st Cir. 2015); ("the court below abused its discretion when it completely denied the plaintiffs access to their lawyers prior to trial"); *Mosley v. St. Louis S. Railway*, 634 F.2d 942, 946 (5th Cir., Unit A 1981) (an EEOC investigator's "decision not to honor plaintiffs' request for an opportunity to discuss the proposed settlement with their attorney, combined with her efforts to persuade the uncounseled plaintiffs to accept the settlement terms constitutes a denial of access to counsel").

19. Granted, scheduling Mr. Lee's execution during the pandemic does not entirely foreclose counsel from communicating with their client. Counsel may communicate with the client and others remotely. But counsel is effectively precluded from meeting with their client in person throughout the entire period leading up to the scheduled date of his execution, and likewise, counsel is effectively precluded from attempting to meet in person with witnesses and others who may have crucial information and opinions. As a practical matter, the scheduling has foreclosed competent legal representation as conventionally undertaken by lawyers at this critical stage. Under these circumstances, it seems inescapable that scheduling an execution to occur during the current pandemic knowingly induces Mr. Lee's counsel to engage in incompetent representation – both incompetent advice-giving and incompetent fact-gathering – and, ultimately, prejudices the administration of justice.

I hereby affirm under penalty of perjury the substance of this declaration, this 25th day of June, 2020.

Bruce A. Green