**FEDERAL DEATH PENALTY CASE**
**\*\*\*\*EXECUTION SCHEDULED FOR JULY 13, 2020\*\*\*\***

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**DANIEL LEWIS LEE,**
    **Movant**

**vs.**

                           **Criminal Case No. 4:97-cr-00243-LPR**
                           **CAPITAL CASE**

**UNITED STATES OF AMERICA,**
    **Respondent.**

**REPLY TO GOVERNMENT'S RESPONSE TO MOTION**
**TO SET OR MODIFY EXECUTION DATE IN LIGHT OF COVID-19 PANDEMIC**

COMES NOW Daniel Lee ("Mr. Lee"), by his undersigned counsel, and hereby files this Reply to the Government's Response (Dkt. 1413) to his *Motion to Set or Modify Execution Date in Light of COVID-19 Pandemic* (Dkt. 1401).

**I.**       **The Government's position presents grave Separation of Powers concerns.**

The Government takes the breathtaking position that this Court has *no* authority over its own judgment. In its view, the Executive has full control over how the judgment will be implemented, leaving this Court without any judicial power to act. This argument commits a number of errors.

First, the Government is conflating two different types of judgments: (1) one *imposing* the sentence; and (2) one *implementing* the sentence. These are not the same. The judgment entered by this Court on May 13, 2002 (Dkt. 996) is the former. It identifies the sentences imposed on each of the five Counts of which Mr. Lee was convicted. It does not, however, contain any further orders about the date or the manner in which the death sentence (imposed on

Counts 3, 4, and 5) is to be carried out. Document 996 is just the standard criminal judgment form for district courts (Form AO245B) that is routinely entered in every criminal case at the conclusion of the sentencing proceedings, whether capital or non-capital. This Court has never entered a separate judgment ordering the BOP to *implement* the death sentence on Counts 3, 4, and 5.

The Government's position is that after this Court entered Dkt. 996, it relinquished all control over the implementation of that judgment to the Executive. It can point to no authority for this proposition. By contrast, both *Garza* and *Hammer* plainly demonstrate a district court's control over the initial judgment and its authority to enter a subsequent judgment implementing the death sentence. Indeed, as the Government acknowledged during the notice and comment period for the proposed regulations that were eventually codified at 28 C.F.R. § 26.2, a court has inherent control over its own judgments pursuant to the All Writs Act to implement a death sentence. *See* 58 Fed. Reg. 4898-01, 4899-900 ("The Department is authorized to rely on the authority of the federal courts, acting pursuant to the All Writs Act, 28 U.S.C. 1651(a), to order that their sentences *be implemented*.") (emphasis added).

Adopting the Government's position would be to accept the wholly paradoxical view that by entering a judgment on Form AO245B, a district court divests itself of the authority granted to it under the All Writs Act. Apart from the fact that this would produce absurd results, it would also represent a gross violation of the Separation of Powers between the Judicial and Executive branches. Simply put, the Bureau of Prisons cannot unilaterally usurp this Court's authority to control its own judgments, or render the All Writs Act a legal nullity, just by issuing a letter setting an execution date on its own.

The Government's argument that any of this Court's exercise of its authority to modify the execution date would be an injunction in disguise is also specious. Such an order would not enjoin the execution at all; it would set it for a different date, but a date certain, nonetheless. Mr. Lee has previously set forth the ample authority establishing this Court's power to do so by virtue over its inherent control over its own judgment. *See* Dkts. 1400 & 1401. Its attempt to conflate *that* power with an order staying the execution is unfounded.

The Government argues that § 26.3(a)'s introductory clause of "Except to the extent a court orders otherwise" is merely a "proviso" that "contemplates that a court may, for example, issue a stay of execution." GR 23. This reading is belied by the regulation itself. If that's what the agency meant, it clearly knew to use such language, because it, in fact, references stay of execution in a different part of that same regulation. *See* § 26.3(a)(1) ("If the date designated for execution passes *by reason of a stay of execution*, then a new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted."). Clearly, the introductory clause means something more than that.

The Government's professed concern that a federally death-sentenced prisoner could engage in an infinite regress of asking a court to reschedule an execution date, rather than seek a stay, is also baseless. GR 23. Mr. Lee's request would create no such precedent: as was detailed in his original motion, and more fully below, there are clear and extraordinary reasons for not moving forward with an execution during a once-in-a-lifetime pandemic that poses genuine health concerns to all those involved. No reasonable person could conclude that rescheduling an execution, at a time when so many other operations of Government, as well as the private sector, have been disrupted, would constitute an abuse of discretion. It is, instead, an eminently prudential course of action in light of the specific circumstances present here.

II.    **It would be appropriate for this Court to exercise its discretion in light of an unprecedented global pandemic that poses genuine health risks to all those involved.**

The Government's fallback position is that even if this Court has not relinquished control over the implementation of its judgment, it would be an abuse of discretion to change the execution date here. Its argument is simply non-responsive to the realities of the COVID-19 crisis, which has worsened even since Mr. Lee filed his motion last week. For example, just yesterday, Texas reported a record-setting 10,000 new cases in a single day. *See* J. Edward Moreno, "New Texas COVID-19 cases jump by more than 10K for first time," The Hill, July 7, 2020.[1] Even more concerning, there is growing evidence that in Houston, where Mr. Moon resides, the strain of coronavirus that is spreading has mutated and is more contagious than the original strain of the virus in China. *See* Todd Ackerman, "Evidence growing that Houston's main coronavirus strain is more contagious than original," Houston Chronicle, July 4, 2020.[2]

Indeed, the Government ignores the genuine risk of exposure to COVID-19 that counsel for Mr. Lee face by the very act of travelling to Terre Haute, IN. These risks are documented and supported by the expert declaration of Dr. Chris Beyrer. But its pleading is silent as to these issues. Its response that "the Bureau of Prisons is taking steps to reduce the risk to those who wish to be present at the execution," GR 25, is plainly insufficient to address these health concerns. (Indeed, the Government acknowledges that "the risks cannot be eliminated." *Id*.)

---

[1] Available at: https://thehill.com/homenews/state-watch/506262-new-texas-covid-19-cases-jump-to-more-than-10k-for-first-time) (last visited July 8, 2020).

[2] Available at: https://www.houstonchronicle.com/news/houston-texas/houston/article/coronavirus-evidence-growing-houston-strain-mutant-15386157.php) (last visited July 8, 2020).

Regardless of any measures instituted at USP-Terre Haute, the BOP has no control over the very real and very grave risk of exposure to COVID-19 inherent in simply traveling to Terre Haute.

Moreover, the steps that BOP is taking to "reduce the risk" at the prison are plainly inadequate. It has indicated that it will take the temperatures of all persons who will be present and ask the following screening questions outlined in its "Visitor COVID-19 Screening Tool" form:[3]

## VISITOR/VOLUNTEER/CONTRACTOR COVID-19 SCREENING TOOL

| 1. Have you....... | |
|---|---|
| ☐ Yes ☐ No | a. Traveled from or through, any of the following locations identified by the CDC as increasing epidemiologic risk for COVID-19 within the last 14 days?<br>China, Iran, South Korea, Italy, Japan |
| ☐ Yes ☐ No | b. Had close contact with anyone diagnosed with the COVID-19 illness within the last 14 days? |
| | |
| 2.  Do you currently have a ............ | |
| ☐ Yes ☐ No | a. Fever or Chills |
| ☐ Yes ☐ No | b. Cough |
| ☐ Yes ☐ No | c. Shortness of Breath |
| 3.  Perform a temperature check _____°F Method: oral / forehead (temporal) / tympanic | |
| *Staff see instruction sheet for screening form. | |

Neither a temperature check nor these screening questions, are adequate to identify asymptomatic individuals. Indeed, if any of the witnesses contract the coronavirus *on their way to Terre Haute*, they could be *pre-symptomatic* and not know it because there will not have been sufficient time for them to have developed any of the symptoms BOP screens for.

---

[3] Available online at: https://www.bop.gov/coronavirus/docs/Visitor_Volunteer_Contractor_COVID-19%20Screening_v1_March_2020.pdf (last visited July 8, 2020).

Indeed, counsel for Mr. Lee have learned additional information about the measures BOP

plans to take for visitors since the motion was originally filed, and they are not encouraging.

Yesterday, undersigned counsel Mr. Kouros spoke with Steve Markle, the Team Leader for

Crisis Support Team at FCC Terre Haute in charge of supervising the logistics for witnesses to

Mr. Lee's execution. The undersigned expressed his genuine concerns about the risk of exposure

to COVID-19. Mr. Markle provided Mr. Kouros the following information:

> • Mr. Markle stated that all witnesses will be provided "face coverings" by the prison. Mr. Kouros asked for more details about what kind of face covering, and specifically asked if he would be given an N95 mask. Mr. Markle said witnesses would be provided with a "surgical mask." Mr. Kouros asked if witnesses could supply their own face coverings, and Mr. Markle said that would not be allowed. Mr. Markle further stated that witnesses were required to wear the surgical mask supplied BOP, otherwise they would not be permitted to enter the prison and witness the execution.

> • Mr. Markle confirmed that the witnesses would have to meet off-site, at the Vigo County Sheriff's Office, prior to the scheduled execution, and would be transported in a 12-passenger van to the prison. Travel from that location to the prison takes approximately 10-15 minutes, depending on the route taken and traffic conditions.[4] There is literally no way for the witnesses to be socially distanced from each other, or the BOP staff in the van, during travel to and from the prison.

> • Mr. Markle stated that witnesses were required to report to the Vigo County Sheriff's Office at 1:45 PM, and that upon arrival and processing through security, they would be taken to a separate "staging area" where they would remain for approximately two hours, before being transported to the building where the execution would take place. After the execution is complete, which Mr. Markle estimated would be between 4:15 PM and 4:30 PM, the witnesses would then be taken to another location to speak with media. Mr. Markle stated that because there was no way for him to estimate how long the various entities present for the execution would speak with the media, he could not give a definite time when the witness would be driven back to the Vigo County Sheriff's Office. That means witnesses will be in each other's presence for a minimum of two and a half hours,

---

[4] *See* Google Maps:
https://www.google.com/maps/dir/vigo+county+sheriff's+office/Federal+Correctional+Institution,+4200+Bureau+Rd+N,+Terre+Haute,+IN+47802/@39.4398802,-87.4674745,13z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x886d652f3f061281:0x8767f009674528e7!2m2!1d-87.414726!2d39.4667376!1m5!1m1!1s0x886d7b83242a91a1:0xd2123701c473953e!2m2!1d-87.4512972!2d39.416124 (last visited July 8, 2020).

under circumstances where social distancing cannot be guaranteed, with only surgical masks on.

The risks to counsel are not theoretical. For example, as was already disclosed to this Court several months ago, undersigned counsel Mr. Kouros is responsible for the care of his elderly parents, which includes, among other things, obtaining their prescription medications for them. Mr. Kouros's father has Parkinson's disease, heart disease, diabetes, and kidney damage.[5] He is reliant on the undersigned to prepare the many medications he has to take for his various health conditions and sort them for his daily morning, afternoon, and evening medication routine. Two of the pills are quite small and need to be split in half for the correct dosage. Mr. Kouros's father cannot accomplish this on his own because of the tremors in his hands from Parkinson's disease. Because Mr. Kouros has to both deliver these medications and prepare them, he has to occasionally enter his father's home to do so. Any travel to Indiana, however, would require Mr. Kouros to self-quarantine upon his return.[6] And even if he did not display any symptoms, that would not mean that he was virus-free; there remains a genuine possibility that he could transmit this deadly virus to his father.

The Government's response appears to be that Mr. Kouros could simply choose not to go to Terre Haute. *This is no choice at all*. Mr. Kouros, like all counsel, has a professional obligation to his client; the Government's decision to schedule the execution in the midst of a global pandemic has created an impossible ethical conflict for them. (Again, counsel has proffered an expert declaration on this matter Professor Bruce A. Green, which the Government

---

[5] Mr. Kouros obtained verbal authorization from his father to disclose this information in a public filing.

[6] This, in itself is impractical; Mr. Kouros lives in a one-bedroom condominium with his domestic partner, and has no way to effectively self-quarantine from her.

has simply ignored.) Indeed, as defense counsel, the undersigned also have a right to be present as a witnesses to the execution. *See* 28 C.F.R. § 26.4(c)(3)(ii).

Moreover, Mr. Lee has an Eighth Amendment right not to be subjected to cruel and unusual punishment, and substantial caselaw supports the contention that this right attaches until his successful execution. *See Wilkerson v. Utah*, 99 U.S. 130 (1878) (while holding execution by shooting not cruel and unusual punishment, stating that cruel and unusual punishment includes "torture" and "unnecessary cruelty"); *State v. Perry*, 610 So.2d 746 (La. 1992) (holding involuntary medication of incompetent death row prisoner violates state constitutional prohibition against cruel and unusual punishment and right to privacy where medication administered for neither protection nor medical interest of death row prisoner). Mr. Lee's right to meaningful access to the courts to assert that right requires that counsel have some access to him during the last hour before the execution and be permitted to witness his execution and have access to a telephone until execution has been completed. *Coe v. Bell*, 89 F.Supp.2d 962, 967 (M.D. Tenn. 2000); *Coe v. Bell*, 95 F.Supp.2d 795 (M.D. Tenn. 2000). It would be a gross abdication of counsel's duties to simply assume that the execution will occur without any complications, when the historical record contains examples of botched lethal injections. *See*, *e.g.*, Dkt. 1401 at 17. (Indeed, Mr. Lee is the first person in almost twenty years who will be executed by the BOP, under a protocol that was newly created and has never been used before.)

Counsel has also proffered an expert declaration from George Kendall, Esq., detailing capital counsel's obligations to their clients in the days and hours leading up to the execution, why those duties require face-to-face interaction, and why communication by telephone will not suffice. Indeed, even with respect to phone calls, the prison is in control over the amount of time

8

counsel can speak with their client.[7] (There is a single phone line that the four men scheduled to be executed must share for legal calls; unlike in-person visits, where counsel can spend the full day with the client, Mr. Lee has to compete with the other prisoners for access to the phone. Indeed, as Warden Watson's declaration confirms, the prison is experiencing higher demand than normal for the scheduling of legal calls during this period of time.) Regardless, phone communication is plainly inadequate under circumstances such as these, which are the most extraordinary that could possibly exist between a lawyer and a client.[8]

The Government claims that its interest in carrying out the execution on July 13, 2020 is "overwhelming." But it cannot explain the significance of that date, or how it would be prejudiced if the execution was scheduled in March 2021. Moreover, whatever interest it has is severely diminished here, where the surviving victims' family members, the lead federal prosecutor who tried the case, and the presiding federal judge have all stated their opposition to the execution.

## CONCLUSION

For the foregoing reasons, Mr. Lee respectfully requests that this Court grant his motion.

---

[7] The Government claims there is no basis for concerns about a federal prison recording attorney-client phone calls. But that is precisely what occurred at a federal facility in Leavenworth, Kansas. *See* Dan Margolies, " Leavenworth Inmates Reach $1.45 Million Settlement Over Taped Attorney-Client Phone Calls," KCUR National Public Radio, Aug, 26, 2019 (available at: https://www.kcur.org/news/2019-08-26/leavenworth-inmates-reach-1-45-million-settlement-over-taped-attorney-client-phone-calls) (last visited July 8, 2020).

[8] The Government complains that undersigned counsel have not disclosed confidential and privileged information about the types of investigation they wish to conduct on behalf of Mr. Lee. Clearly, counsel cannot divulge that information. But as the Government is clearly aware, Mr. Lee's counsel *had* been conducting such investigations prior to the pandemic and traveling to interview various witnesses, as is evident by the various witness declarations that have been submitted in connection with various filings, including his clemency petition, that have been filed since July 2019.

Respectfully submitted this 8th day of July, 2020.

MORRIS H. MOON
Bar Number 24032750 (TX)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (713) 880-3556
Email: Morris_Moon@fd.org

GEORGE G. KOUROS
Bar Number 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on July 8, 2020. This motion was served via this court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

MICHAEL GORDON
JONATHAN D. ROSS
SHANNON S. SMITH
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203-1229
(501) 340-2600
michael.gordon@usdoj.gov
Jonathan.D.Ross@usdoj.gov
shannon.smith@usdoj.gov

GEORGE G. KOUROS
Bar # 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org